## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLOMBIA

| | | |
|---|---|---|
| **UNITED STATES** | * | |
| | * | |
| | * | |
| **v.** | * | **Criminal No. 06-248 (JDB)** |
| | * | |
| | * | |
| **ALVARO AGUSTIN-MEJIA** | * | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL, FOR NEW TRIAL AND TO ADOPT MOTIONS FILED BY CO-DEFENDANT

Comes now the United States through Kenneth A. Blanco, Chief, Narcotic and Dangerous Drug Section, United States Department of Justice, and Paul W. Laymon, Kia M. Habisreitinger, and Brian Tomney, Trial Attorneys, Narcotic and Dangerous Drug Section, and responds to the defendant's motion for judgment of acquittal and motion for a new trial.

## BACKGROUND

I. PROCEDURAL BACKGROUND:

On August 17, 2006, the Grand Jury returned an indictment charging Alvaro Agustin Mejia, a Guatemalan citizen, with two counts of federal drug violations. At the time of the indictment, Agustin-Mejia was charged as Juan Doe, a.k.a. Edwin Renee Sapon Ruiz. On September 20, 2007, the Grand Jury returned a one count superseding indictment charging the defendant under his true name with conspiracy to import five kilograms or more of cocaine into the Unites States and conspiracy to manufacture and distribute five kilograms or more of cocaine knowing and intending that the cocaine would be imported into the United States. On March 5, 2008, a petit jury returned a guilty as charged verdict against the defendant. On April 14, 2008, Agustin-

Mejia filed a Motion for Judgment of Acquittal, for New Trial and to Adopt the Motions Filed

by Co-defendants.  For the reasons set forth herein, the Government requests that defendant's

motion be summarily denied.

II.  <u>EVIDENCE INTRODUCED AT TRIAL</u>:

  Agustin Mejia was arrested in El Salvador in September 2006, following a lengthy

investigation by the U.S. Drug Enforcement Administration (DEA).  The investigation began

with several DEA informants infiltrating a large scale drug trafficking organization operating in

Guatemala.  The DEA initially became aware of a man named Jorge Bardales Bourdet who

operated as a type of broker between Colombian drug sources of supply and those capable of

providing protection and security for containers of cocaine while in transit.  Bardales-Bourdet

had told one of the informants that he had contact with high ranking Guatemalan officials and

could facilitate the transportation of cocaine shipments to the United States through the country

of Guatemala.  As a result, a meeting was held on June 20, 2006, in Panama City, Panama.

Present at this meeting was Bardales-Bourdet, Antonio Chui-Serrano, and three DEA informants,

including "Augustine Cortez" who represented himself as a Colombian cocaine trafficker.

  At this meeting, Bardales-Bourdet and Chui-Serrano discussed with the informants the

fee for transporting shipments of cocaine – with each load containing at least 1000 kilograms of

cocaine – the importation of the cocaine into Guatemala, and protection and storage of the

cocaine while in transit through Guatemala.  The participants also discussed the transportation of

the cocaine to the border of Mexico, and that a second group would be responsible for the

transportation of the cocaine into the United States.  During this meeting, "Augustine Cortez"

learned that Bardales-Bourdet's boss in Guatemala was a man named Erik Donaire Constanza-

Bran.  Within hours after this initial meeting, "Augustine Cortez" received a call from Constanza-Bran who advised that he was Chiu-Serrano's boss, that he knew everything about the meeting, and that he was at the informant's service.  After at least two additional telephone calls between Constanza-Bran and "Augustine Cortez",  a second meeting in El Salvador was arranged.

On July 19, 2006, "Augustine Cortez", continuing to pose as a Colombian cocaine trafficker, met in San Salvador, El Salvador, with Bardales-Bourdet, Constanza-Bran, an unidentified co-conspirator referred to as "Filipino", and two individuals posing as high ranking Guatemalan officials – Guatemala General Ovidio Fajardo-Adana and Guatemala Commisario General Edwin Renee Sapon-Ruiz, both subsequently identified as Juan Daniel Del Cid Morales and Alvaro Augustin-Mejia.[1]  During this meeting "Augustine Cortez" specifically stated that he was seeking assistance in moving a container of 1300 kilograms of cocaine from Colombia to Panama and then into Guatemala, where the load would be stashed until it could be taken to the border of Mexico and then on to the United States.  Bardales-Bourdet and Constanza-Bran agreed to provide the "infrastructure" for the movement of the cocaine.  This "infrastructure" would include a safe place to store the cocaine while in Guatemala and, with the help of Del Cid Morales and Agustin-Mejia, "safe passage" of the cocaine to the Mexican border.

During this meeting, Agustin-Mejia discussed DIPA (Division of Protection/Security of Ports, Airports, and Borders), the newly created Guatemalan customs agency tasked with anti-narcotics enforcement at the border.  As Del Cid Morales explained the necessity of waiting

---

[1]  During this meeting, Agustin-Mejia provided the informant with credentials bearing the name of Edwin Renee Sapon-Ruiz.

three months to avoid entanglements with the DEA, Agustin-Mejia interrupted to talk about the creation of DIPA, explaining that DIPA would take the place of the Narcotics unit. Agustin-Mejia further explained that they have the control of the "commands" of DIPA. Also, during this meeting, Del Cid Morales accepted and pocketed the $10,000, which the informant had given to the organization.

On August 23, 2006, "Augustine Cortez" met again in San Salvador, El Salvador, with Constanza-Bran, Del Cid Morales, and Agustin-Mejia.[2] During this meeting Constanza-Bran assured the informant that he would assume the responsibility from Bardales-Bourdet and that the project would proceed as planned. Constanza-Bran pledged that he, Del Cid Morales, and Agustin-Mejia still were willing and able to assist the informant with the transport of the container of cocaine. To demonstrate this ability, Constanza-Bran drew a diagram depicting how the cocaine would be hidden within a forty foot shipping container, provided the informant with paperwork for a purported legitimate transportation company, and discussed the price for setting up their own front company that would be used to transport, store, and hide the illicit product before shipment to the Mexican border. Constanza-Bran assured the informant that crossing the border with the illicit shipment would not pose a problem and that his product would "pass like Vaseline."

Between August 23, 2006 and September 27, 2006, "Augustine Cortez" consensually recorded numerous telephone calls with Constanza-Bran, wherein Constanza-Bran assured the informant that his shipment would not be checked, that he had assumed responsibility from

---

[2] Bardales-Bourdet was not present at this meeting. During a telephone call on August 9, 2006, Constanza-Bran had advised "Augustine Cortez" that Bardales-Bourdet had been involved in an accident. During this call Constanza Bran advised the informant that he would be continuing with the project.

Bardales-Bourdet, and that "Edwin" and "Ovidio" were making changes at the border.  At DEA's instruction, "Augustine Cortez" arranged a fourth meeting in San Salvador, El Salvador, with Constanza-Bran, Del Cid Morales and Agustin-Mejia.  Unbeknownst to the conspirators, the true purpose behind the setting of this meeting was to "take down" the organization.  On September 27, 2006, officers in El Salvador detained all three defendants and turned them over to the custody of DEA.  On that day, officers found Constanza-Bran to be in possession of a compact disc containing a document setting forth a fabricated business plan to import Christmas goods.  Agustin-Mejia was in possession of a handwritten list of DEA agents currently assigned to the Guatemala field office.  The list included the name of S.A. Mike Johnson, who testified as an expert witness in the trials of all three defendants and who, at the time of the conspiracy, was stationed in Guatemala.

All three defendants were advised of their rights pursuant to *Miranda*.  All three defendants waived those rights and gave statements, consistent with the evidence and each others' statements, regarding their involvement in the conspiracy.  Specifically, Agustin-Mejia stated that he was a former Guatemalan police officer, that "Augustine" was moving a shipment of cocaine and had requested assistance for safe passage through Guatemala to the Mexican Border, and that he was aware the cocaine was destined for the United States.

<u>ARGUMENT</u>

III.  <u>DEFENDANT'S REQUEST FOR JUDGMENT OF ACQUITTAL IS WITHOUT MERIT.</u>

In its motion, defendant moves this Court for a Judgment of Acquittal or in the alternative, a new trial.  Additionally, defendant seeks to adopt and incorporate the motion filed

on behalf of co-defendant Del Cid Morales, in which he also sought a judgment of acquittal and a new trial.[3]

A motion for judgment of acquittal based on insufficient evidence may be made at the close of the Government's case or at the close of all the evidence. Fed. R. Crim. P. Rule 29. A defendant may renew a judgment of acquittal within seven days after a guilty verdict or after the court discharges the jury, whichever is later. Fed. R. Crim. P. Rule 29(c)(1).

After the close of the Government's case, defendant moved for a judgment of acquittal. [Tr. 3/4/08 Afternoon Session, p. 108]. The Court deferred its ruling until the next morning. The following morning after presenting one defense witness, counsel for defendant renewed her motion for judgment of acquittal. In denying the motion, the Court stated that "a reasonable jury could convict on the basis of the evidence presented, and that the evidence is sufficient to sustain a conviction with respect to the three elements of the conspiracy offense that is charged including the aspect of the agreement that requires knowledge or intent to import into the United States." [Tr. 3/5/08 Morning Session, p. 42].

On April 14, 2008, defendant filed the motion that is now before the Court, in which he seeks to renew his motion for judgment of acquittal. Defendant's claims are without merit. In considering a motion for a judgment of acquittal, the Court, in viewing the evidence in the light

---

[3] Defendant seeks to adopt and incorporate the motion for judgment of acquittal and new trial filed by co-defendant, Del Cid Morales. In doing so, Agustin-Mejia does not set forth any additional arguments or cite any additional caselaw in support of the arguments previously made by co-defendant Del Cid Morales. Therefore, the Government refers the Court to the Government's opposition to defendant Del Cid Morales' motion for judgment of acquittal and new trial filed on March 12, 2008, and adopts the arguments propounded therein. Additionally, the Government also adopts, to the extent applicable, the trial transcripts from Del Cid Morales' trial, including but not limited to any arguments made by the Government in opposition to Del Cid Morales' oral motion for judgment of acquittal. Del Cid Morales filed his motion seeking a judgment of acquittal and a new trial on February 1, 2008. On April 3, 2008, the Court denied defendant's motion.

most favorable to the government, must determine whether the evidence presented at trial is sufficient to sustain a conviction as a matter of law.

The motion for judgment of acquittal should be denied when, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Poston, 902 F.2d 90, 94 (D.C.Cir. 1990). In making this determination, "the prosecution's evidence is to be viewed in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." United States v. Dykes, 406 F.3d 717, 721 (D.C. Cir. 2005)(*internal quotations and citation omitted*); United States v. Valdes, 437 F.3d 1276, 1278 (D.C. Cir. 2006)(court views all evidence in the light most favorable to the government, giving it the benefit of all reasonable inferences); *see also* United States v. Campbell, 702 F.2d 262, 264 (D.C. Cir. 1983).

Courts accord great deference to a jury's determination. "When a reasonable mind might fairly have a reasonable doubt of guilt or might fairly have none, the decision is for the jury to make." United States v. Heron, 567 F.2d 510, 514 (D.C. Cir. 1977). Thus, the jury's determination will stand unless no reasonable juror could have found a defendant guilty beyond a reasonable doubt. United States v. Singleton, 702 F.2d 1159, 1163 (D.C. Cir. 1983)

In his motion for judgment of acquittal, defendant argues that the evidence was insufficient as a matter of law to convict Agustin-Mejia. Specifically, defendant argues that 1) the evidence failed to show a conspiracy to import cocaine but was rather a scam by the

defendants who fraudulently represented themselves as high level Guatemalan officials, and 2) no meeting of the minds sufficient to support a conviction for conspiracy existed.

A. Defendant's claim that the evidence failed to show a conspiracy to import cocaine is without merit.

The Government charged Agustin-Mejia and his co-defendants with participating in a single conspiracy to import cocaine into the United States and to manufacture and distribute cocaine, knowing such cocaine would be imported into the United States. The Government established the existence of the conspiracy by the introduction of videotaped meetings, audio-taped telephone conversations, the testimony of a cooperating informant and other law enforcement witnesses, and the post-arrest statement of the defendant. The Government established that the common goal of the conspiracy, from the beginning of the conspiracy in June 2006, and throughout the conspiracy, was the movement of more than 1000 kilograms of cocaine from Colombia into the country of Guatemala, and on to the Mexican border, where it would be transported to the United States.

As set forth more fully in the aforementioned facts, the Government proved the existence and particulars of the conspiracy though the words and actions of the defendant and his co-conspirators as caught on video and audio-taped recordings. Although Agustin-Mejia did not participate at the first meeting on June 20, 2006, this meeting identified the parties and established the nature and objective of the conspiracy; that is, that the informant would provide more than 1000 kilogram amounts of cocaine and Bardales-Bourdet, through his contacts in Guatemala, would arrange for the safe passage of the illicit product through Guatemala to the border of Mexico, where a second group would transport the drugs to the United States.

At the second meeting on July 19, 2006, the goals of the conspiracy were further defined when "Augustine Cortez" informed Bardales-Bourdet, Constanza-Bran, Del Cid Morales and Agustin-Mejia that he was in possession of "1300" – referring to 1300 kilograms of cocaine–that he wished to send to the United States.  By showing up at the meeting, falsely representing himself as Guatemala's Comisario General Edwin Renee Sapon-Ruiz, and participating and speaking at the meeting, Agustin-Mejia demonstrated that he had the specific intent to further the common unlawful objective of the conspiracy.

Agustin-Mejia also participated at the third meeting on August 23, 2006, in which Constanza-Bran assured the informant that he, Del Cid Morales and Agustin-Mejia were willing and able to assist in the transport of the 1300 kilograms of cocaine.  To further establish the goals of the unlawful conspiracy, the Government presented evidence from this meeting of Constanza-Bran's drawing of a diagram depicting the means of hiding the cocaine while in transit, the paperwork for a purported legitimate transportation company, and the groups' discussion of the cost of setting up their own front company that would be used to transport, store, and hide the illicit product before shipment to the Mexican border.  In addition to the video taped meetings, the Government introduced numerous consensually recorded telephone calls between the informant and Constanza-Bran discussing, among other things, the objectives of the conspiracy, how those objectives would be attained, and Agustin-Mejia's role in the conspiracy.

The evidence does not support defendant's assertion that the evidence failed to establish the existence of a conspiracy but merely showed a scam perpetuated by defendant and his conspirators.  In viewing the evidence in the light most favorable to the Government, there exists sufficient evidence to sustain a conviction as a matter of law.  Moreover, a reasonable jury could

conclude that the Government met its burden of proving each element of the offense beyond a reasonable doubt. Defendant's argument is further undermined when taking into account defendant's post arrest statements, which in essence amounted to a complete confession to the elements of the offense. The defendant's post arrest statement is devoid of any reference to a purported scam being perpetuated by the conspirators. Moreover, Guatemalan Police Officer Fernando Antonio Carrillo-Garcia testified about the unlikelihood of someone in Guatemala "ripping off" a Colombian drug trafficker. Specifically, Señor Carrillo-Garcia testified that the penalty for "ripping off" or swindling a Colombian drug trafficker is death. [Tr. 2/29/08 Afternoon Session, p. 72].

Defendant's claim that the Government's evidence merely established a scam is contrary to the evidence presented at trial and has no merit.

B. Defendant's claim that the Government failed to show the existence of a "meeting of the minds" sufficient to support a conviction for conspiracy is without merit.

In order to establish the conspiracy, the Government presented evidence that showed a common understanding among those involved in the conspiracy. As in any organization, legitimate or otherwise, members carry out specific roles. As detailed more fully above, the Government established that a common understanding existed among the conspirators as to the goals of the conspiracy and the roles that each member would undertake. Specifically, Constanza-Bran would provide the informant with the assistance he needed to effectively move 1300 kilograms of cocaine through Guatemala and that Del Cid Morales and Agustin-Mejia would provide the necessary protection and secure safe passage of the product. The evidence presented, particularly the video taped meetings, clearly demonstrates the common

-10-

understanding among the members of the conspiracy.  Accordingly, defendant's argument is without merit.

IV.    DEFENDANT'S MOTION FOR A NEW TRIAL IS WITHOUT MERIT.

Rule 33 of the Federal Rules of Criminal Procedure provides that a court may grant a new trial only if "the interests of justice so require."  The remedy of granting a new trial, however, is to be used sparingly and only when there would be a miscarriage of justice because the evidence preponderates heavily against the verdict.  United States v. Walker, 899 F.Supp. 14, 15 (D.D.C. 1995), aff'd, 99 F.3d 439 (D.C. Cir. 1996).  *See also* United States v. Rogers, 918 F.2d 207, 213 (D.C. Cir. 1990).  "This power should be exercised with caution, and is invoked only in those exceptional cases in which the evidence weighs heavily against the verdict."  United States v. Edmonds, 765 F.Supp. 1112, 1118 (D.D.C. 1991); United States v. Reese, 561 F.2d 894, 902 (D.C. Cir. 1977).   Furthermore, the defendant bears the burden of showing that a new trial would be in the "interest of justice."  *Id*.

Even if the defendant demonstrates that an error occurred, a new trial is not warranted unless the defendant shows that it so influenced the jury that a substantial right of the defendant was affected.  "Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."  Fed.R.Crim.P. 52(a).

Agustin-Mejia claims that the judgment should be set aside and a new trial granted for essentially three reasons.  First, defendant claims prosecutorial error in the Government's rebuttal argument.  Second, defendant claims that a Government witness committed perjury.  And lastly, defendant argues that the Government's expert witnesses were not sufficiently qualified to render expert testimony.

A. <u>Arguments by Government counsel during rebuttal do not warrant the granting of a new trial.</u>

Defendant alleges the following three errors during the Government's rebuttal argument: 1) the prosecutor improperly argued that defendant lived in Guatemala City, 2) the prosecutor's reference to the DEA, the Guatemalan police and the bloody civil war was not supported by evidence, and 3) the Government improperly argued that defendant was the only police officer involved in the conspiracy.[4]

Generally, courts are reluctant to reverse a conviction based upon a prosecutor's improper reference in closing argument.  <u>United States v. Nichols</u>, 22 F.3d 1185 (D.C. Cir. 1994) citing <u>United States v. Edelin</u>, 996 F.2d 1238 (D.C. Cir. 1993), *cert denied*, 114 S.Ct. 895 (1994).  *See also* <u>United States v. Monaghan</u>, 741 F.2d 1434 (D.C. Cir. 1984) and <u>United States v. Modica</u>, 663 F.2d 1173 (2d Cir. 1981).   "Without other compelling factors, a single misstatement confined to a closing argument rarely amounts to severe misconduct."  <u>United States v. North</u>, 910 F.2d 843, *amended in part on other grounds*, 920 F.2d 940 (D.C. Cir. 1990), *cert. denied*, 111 S.Ct. 2235 (1991).  In <u>North</u> the Court stated that it "reverses a conviction on the grounds of a prosecutor's summation in only the rarest and most prejudicial cases." <u>North</u> at 898.[5]    In <u>Monaghan</u>, *supra* the Court discussed the factors to consider in determining whether

---

[4]  Defendant cites two cases to support its argument. Both cases are distinguishable from the case at bar.  In <u>United States v. Watson</u>, 171 F.3d 695 (D.C. Cir. 1999), the Court allowed a new trial after finding substantial prejudice as a result of a misstatement by the prosecutor. The Court granted the new trial based on, among other things, the closeness of the case, the fact that credibility was key, and the misstated testimony concerned a central issue in the case.  Defendant also cites <u>United States v. Blueford</u>, 312 F.3d 962 (9th Cir. 2002), wherein the Ninth Circuit found error where the Government's mid-trial release of recordings of defendant's telephone calls did not afford defendant a fair opportunity to review the evidence and object to the Government's use of them to infer, in closing argument, the concoction of an alibi.

[5]  In denying North's appeal for reversal, the Court stated that it had not "reversed a conviction in over twenty years on grounds of a prosecutor's reference during closing argument to facts outside the record."  <u>Id.</u> at 898.

-12-

improper prosecutorial remarks resulted in substantial prejudice to the defendant.  These factors include the severity of the misconduct, the measure adopted to cure the misconduct, and the certainty of conviction absent the improper remarks.  Monaghan, 741 F.2d at 1443 (citing United States v. Modica, 663 F.2d at 1181).

First, defendant asserts that a new trial is warranted based on the prosecutor incorrectly stating that the defendant lived in Guatemala City and that he traveled several hours from his home in Guatemala City to the various meetings.  The evidence adduced at trial revealed that at some point the defendant did in fact live in Guatemala City.  On cross-examination the defense's sole witness, Señor Francisco Pivaral de Leon, testified that he had been to defendant's home which was located in Zone 8 in Guatemala City.  The prosecutor asked the witness whether defendant lived in Guatemala City, to which the witness replied "[t]hat's right."  In response to the prosecutor's next question as to whether defendant always lived in Guatemala City, the witness replied that "[h]e no longer lives there now."  [Tr. 5/5/08 Morning Session, p 36].

The testimony elicited from the defense witness established at a minimum that defendant at some time either owned and/or resided in a home located within the city limits of Guatemala City.  The witness' response is a bit ambiguous in that it does not clarify whether defendant had later lived at another location other than Guatemala City or whether the witness' response simply meant that defendant had not been living in Guatemala City since the time of his arrest on the charges for which he was being tried.  Although it was not error for the prosecutor to infer the witness lived in Guatemala City at the time of the conspiracy, even if the prosecutor had misstated such a minor and irrelevant fact, the defendant has not articulated how this misstatement caused him substantial prejudice.

-13-

Additionally, defendant asserts error in the prosecutor's detailing of the travel time between defendant's home and San Salvador, El Salvador, the location of the meetings in which defendant participated.  Leo Garcia, former United States Customs officer, testified as to the travel time and conditions in traveling from Guatemala City to San Salvador.  Specifically, Mr. Garcia testified that the travel time would take four-and-a-half to five hours and that travelers would be checked for documentation and vehicle registration at the border.  [Tr. 2/29/08 Afternoon Session, p. 15].  Based on this testimony, the prosecutor reasonably argued that the defendant traveled several hours from his hometown of Guatemala City to San Salvador.  The defendant's claim is without merit.   Moreover, defendant fails to show how this argument substantially prejudiced him.

Second, defendant argues that the prosecutor's reference to the DEA, the Guatemalan police and the bloody civil war were not supported by evidence.  Specifically, defendant cites the prosecutor's statement that defendant was in possession of a list of DEA agents because the "Guatemala police are essentially powerless to deal with the overwhelming number of Colombian drug-traffickers that are sending cocaine into Guatemala, and because they're just recovering from – not just, but several years ago, they're coming out of a bloody civil war."  [Tr. 3/5/08 Afternoon Session, p. 13].  Defendant's claim that the prosecutor argued facts not in evidence is without merit.

Señor Carillo-Garcia, in testifying regarding the difficulty the Guatemala police officers have in fighting drug traffickers at its border with Mexico, stated that "[t]he people who live in this region through here [referring to the areas near the border between Mexico and Guatemala] are mostly indigenous, and due to civil war that we had in my country, they don't tend to share

-14-

information with the police or national forces." [Tr. 2/29/08 Afternoon Session, p. 63]. The prosecutor's argument to the jury that the defendant was more concerned about the DEA because of the limited effectiveness of the Guatemalan police agencies was supported by the testimony adduced at trial. Thus, defendant's argument is without merit.

Finally, the defendant contends that the Government improperly argued that defendant was the only police officer involved in the conspiracy.[6] Defendant misstates the crux of the prosecutor's argument. Although the prosecutor stated that defendant brings something to the table that "they apparently don't have, that is law enforcement experience," his next sentence explains what he meant. The prosecutor clarified what he meant by stating the following: "15 years, not only as a cop on the beat apparently, but as a supervisor, as someone with a sufficiently sophisticated position that he was planning major operations, and that's why they needed Mr. Mejia. That's why they recruited him into this conspiracy." [Tr. 5/5/08 Afternoon Session, p. 15].

The prosecutor's statement was consistent with the evidence adduced at trial. During its case-in-chief the Government introduced a law enforcement identification card, which had been located in defendant's wallet, bearing defendant's name and his title as "Subcomisario" of the Policia Nacional Civil (PNC), Guatemala's national police force. Señor Carillo-Garcia testified that there are three levels of rankings within the Guatemalan police force – from the lowest level which includes, for example an agent, to the highest level to include the superior officers. The witness explained that a "comissario" is a first rank of the superior officers. [Tr. 2/29/08

---

[6] At trial, counsel for the defendant did not contemporaneously object to the prosecutor's argument on this issue. Instead, counsel asked to approach the bench at the conclusion of the Government's rebuttal and raised this issue at that time.

Afternoon Session, p. 71]. The Government questioned the witness as to whether he was aware

of former police officers utilizing their contacts within the PNC. The witness explained that

there are "former police officers who use their contacts . . . people within the police forces . . . do

this and they coordinate them." [Tr. 2/29/08 Afternoon session, p. 69].[7]  The witness further

explained as follows:

> [w]ithin the active police officials, *there are those who still follow
> the lead of the former police officers*, *and these former police
> officers coordinate*, they have an agreement basically, and they
> will carry out certain activities that are not professional. And what
> I mean by that is that their functions are not governed – they're
> [sic] – carry on activities that do not fall within their functions as is
> described by the law regarding the . . . Civil National Police in
> Guatemala, and so *what they do is order these members to carry
> out activities in – and this could be within SAIA or DIPA or
> whatever other police jurisdiction there is.*

[Tr. 2/29/08 Afternoon Session, pp. 69-70 (emphasis added)].

Additionally, Señor Pivaral de Leon, the defense witness, testified on direct examination

that Agustin-Mejia had been the chief of the operational section. [Tr. 3/5/08 Morning Session, p.

15]. On cross-examination, the witness, when asked about defendant's duties as chief of the

operational section, offered that defendant "was in charge of carrying out operational plans

against common crime, organized crime, all types of crime." [Tr. 3/5/08, Morning Session, p.

32].

The defendant in his motion before the Court, although not explicitly argued, cites a

portion of the post-rebuttal argument wherein defense counsel argued that the prosecutor's

singling out Agustin-Mejia as the only former police officer who could provide service to the

---

[7] The transcript incorrectly reflects "formal" as opposed to "former." "Former" is consistent with the
Government's recollection of the testimony, is in context with the question asked, which can be found on page 65,
line one and page 67, line 21, and is consistent with defense counsel's argument and the court's analysis and ruling.

organization was in error.  Defendant contended that co-defendant Del Cid Morales also could

have provided the same assistance.  The court correctly noted that no specific information about

Del Cid Morales' role, ranking, etc. within the Guatemalan police force was elicited at trial.  As

noted by the prosecutor during this bench conference, "I don't know exactly what Del Cid

Morales did in the police.  Today, as a result of . . . evidence the Defendant put in, we have a

much clearer understanding of what Mr. Mejia's role was.  We don't have that kind of

understanding with Del Cid Morales."  [Tr. 3/5/08 Afternoon Session, pp. 21-22].

      The Government committed no error in arguing to the jury that Agustin-Mejia provided a

unique service to the organization.  From the testimony adduced at trial, it was reasonable to

infer that a former police officer of such a high rank as defendant, who had been in charge of

other police officers, would maintain those contacts and ability to coordinate operations, albeit

illicit ones.  Moreover, based on the evidence gleaned at trial the prosecutor did not err in

arguing that defendant had the capability of providing that particular assistance to the

organization.  Based on the foregoing, the defendant failed to demonstrate how the

Government's rebuttal argument caused him substantial prejudice and is therefore, without

merit.

      Pursuant to the factors discussed in Monaghan, the Court should determine whether any

prosecutorial remarks resulted in substantial prejudice to the defendant.  Simply put, they do not.

Defendant has failed to show how the statements in which he complains substantially prejudiced

him.  Additionally, the Court instructed the jury in its preliminary instructions and again in its

final instructions before deliberations that statements and arguments by lawyers are not

evidence.  Even absent the prosecutor's statements, in light of the abundant evidence against the

defendant, particularly his own voice on the videotapes and his post-arrest inculpatory statements, the defendant would have been convicted.

  B.  Defendant's claim that a Government witness committed perjury is without merit.

Defendant also contends that one of the Government's witnesses committed perjury and faults the Government for failing to correct the purported perjury.[8]  The point of contention stems from a finding by a Judge, sitting in the United States District Court for the Middle District of Florida, who opined in a sentencing memorandum that she did not find the informant to be entirely truthful.  As was discussed prior to the informant being cross-examined on this issue, the informant was not present at the sentencing hearing and had no personal knowledge that a judge had made an adverse finding as to his credibility.  The informant was first questioned about the post-trial judicial finding in the trial of co-defendant Constanza-Bran.[9]  In discussions prior to the informant's cross-examination on this issue, Government counsel informed the Court that he had questioned the informant as to whether the informant was aware of the judge's finding; Government counsel reported that the informant stated that he was not aware of the finding.  [Tr. 2/28/08 Afternoon Session, p. 123].

---

  [8]  Counsel for defendant did not lodge an objection at the time of the alleged perjury nor did she object at the conclusion of the Government's re-direct.  Rather, defense counsel first raised this issue after the conclusion of the Government's rebuttal.

  [9]  During the Constanza-Bran trial, counsel for Constanza-Bran questioned the informant as follows:
    Q: And you are aware, however, that the judge in that case made a finding of your credibility, correct?
    A: I'm sorry?
    Q: The Judge in that case made a finding as to your credibility after you testified?
    A: I don't know.
  [Constanza-Bran Transcript 9/25/07 Afternoon session, p. 20].

-18-

Counsel for defendant contends that the informant, when questioned on the judicial finding, did not provide truthful answers in response to her cross-examination questions. The inquiry on this issue consisted of four questions. In her first question, counsel for defendant asks whether the informant had "ever read the opinion of the judge in that case about the sentencing?" The informant responded that "I have never read any statements from any judge ever, in any of my cases." [Tr. 2/29/08, Morning Session, p. 63]. Based on the information before the court, the informant's response was a truthful response. The informant was neither shown the sentencing memorandum during the Constanza-Bran trial nor did the Government show the document to the informant.

Defendant's second cross-examination question is as follows: "So you're testifying here today that you're not aware of a federal judge ever making a finding that you were not entirely truthful." The witness provided the following response: "I have never read or heard any judge, federal judge for that matter, ever saying that I haven't been truthful in any of the cases I have testified on behalf of the U.S. Government." [Tr. 2/29/08, Morning Session, p. 63]. Although arguably not entirely responsive, this witness' response was not in any way untruthful.

The third cross-examination question is as follows: "You haven't heard or – you said you haven't heard or what?" The witness responded: "Or read about any judge doubting my truthfulness. I have never seen that before." [Tr. 2/29/08, Morning Session, p. 63]. This question should be read in light of the previous question and response. In the response to the second question, the informant stated that he had never *heard any judge* say he had been untruthful. When defense counsel asked this third question, inquiring as to whether the witness had ever heard about the judicial finding, it was not unreasonable that the defendant answered in

-19-

conformity with the second question, that is, that he had not heard any judge or "read about any judge doubting my truthfulness." Although the defense counsel may have been seeking to illicit whether the defendant had heard *from anyone* about the judicial finding, the question asked was ambiguous as stated and the informant was not unreasonable to answer as he did nor was he untruthful in his response.

        In the final cross-examination question on this issue, counsel for defendant asked the witness whether he was aware that "this federal judge . . . in that case in Tampa, found that you were not entirely truthful when you testified." Defense counsel couched her question in the present tense but the defendant, responding in the past tense, stated: "I *didn't* know any of that." [Tr. 2/29/08, Morning Session, p. 63 (emphasis added)]. Although the defense counsel consistently sought an answer regarding what the informant currently knew, the informant consistently responded in the past tense by explaining that he had not *read or heard, or knew* about the judicial finding. This final question also is a bit ambiguous in that defense counsel ends her question with "*when you testified.*" Defense counsel did not specify whether she was referring to *when you testified* in Florida or *when you testified* in the previous Constanza-Bran trial. A witness whose first language is not English and who already had consistently testified in the past tense, very easily could have construed that counsel for defendant was referring to what he knew when he had testified in the previous trial related to this case.

        Throughout his testimony, the witness was candid and testified consistently with the evidence in the case. The defendant's allegation that the witness perjured himself has no merit and amounted to nothing more than the witness providing arguably unresponsive answers to the defense counsel's questions and perhaps, misunderstanding the questions asked. Furthermore,

counsel for defendant failed to correct the alleged  misrepresentation at the time that it

occurred.[10]  After the Government's rebuttal, in response to defendant's inquiry as to the proper

remedy to correct the purported misrepresentation, the Court stated: "I decided no remedy is

necessary." [Tr. 3/5/08, Afternoon Session p. 27].  The defendant has failed to demonstrate a

serious miscarriage of justice, which would warrant the granting of a new trial.

     C.   Defendant's claim that the Government's expert witnesses were not
           sufficiently qualified is without merit.

     Defendant also contends that the Government's witnesses were not sufficiently qualified

to render expert testimony.  A witness may be qualified to render expert testimony if the witness

possesses "knowledge, skill, experience, training, or education" and that such specialized

knowledge will assist the trier of fact.  Fed. R. Evid. 702.  Moreover, it is common practice for

law enforcement officers to testify, on the basis of their law enforcement experience, regarding

the modus operandi of drug trafficking organizations.  *See for example* U.S. v. Mejia, 448 F.3d

436 (DC Cir. 2006); U.S. v. Martinez, 476 F.3d 961 (D.C. Cir. 2007); and Fed. R. Evid. 702,

Advisory Committee's Notes (Expert testimony of a law enforcement officer regarding the use

of code words used by drug traffickers to conceal the nature of their activities should be admitted

as long as the principles and methods are reliable and are applied reliably to the facts of the

case).

In its case-in-chief, the Government qualified two witnesses as experts - DEA S.A. Mike

Johnson and SAIA law enforcement officer Fernando Carrillo-Garcia.  Prior to being qualified as

---

[10]  Counsel for defendant did not lodge an objection to the witness' testimony, nor did she ask the Court to
instruct the witness to answer the question or to afford the defense an opportunity to ask a follow-up question.

experts, both witnesses testified regarding their extensive law enforcement background and their specific experience in combating drug trafficking in Guatemala.

The Court's acceptance of the Government's witnesses as experts was in accord with the mandates of Rule 702, was consistent with the caselaw in this Circuit, and was not an abuse of discretion.  Defendant's claims of error in the qualifications of the Government's expert witnesses are without merit.

## CONCLUSION

Agustin-Mejia failed to demonstrate sufficient grounds to warrant a judgment of acquittal or a new trial.  The Government introduced overwhelming evidence that Agustin-Mejia actively participated in a conspiracy to import 1300 kilograms of cocaine into the United States.  The Government presented extensive evidence at trial, including Agustin-Mejia's own actions and words captured on videotape and his post-arrest inculpatory statements.  Based on the foregoing, the United States respectfully moves this Honorable Court to deny defendant's motion for judgment of acquittal and new trial.

Respectfully submitted,


   /s/ *Kia M. Habisreitinger*
KIA M. HABISREITINGER
PAUL LAYMON
BRIAN TOMNEY
Trial Attorneys
Narcotic and Dangerous Drug Section
Department of Justice
1400 New York Ave NW
Washington, D.C. 20005
202-725-7741 (Paul Laymon / Office)
paul.laymon@usdoj.gov

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLOMBIA**


| **UNITED STATES** | * |   |
|---|---|---|
|  | * |   |
|  | * |   |
| **v.** | * | **Criminal No. 06-248 (JDB)** |
|  | * |   |
|  | * |   |
| **ALVARO AGUSTIN-MEJIA** | * |   |


**O R D E R**


It is hereby ordered that Defendant's Motion for Judgment of Acquittal and Motion for

New Trial is denied.


Signed this _____ day of May 2008.


_____
JUDGE JOHN D. BATES

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of April 2008, I electronically filed this motion and sent a copy via facsimile to attorney for the defendant, Carmen Hernandez.


      /s/ *Kia M. Habisreitinger*

KIA M. HABISREITINGER