```
 1                  UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLUMBIA
      -------------------------X
 3   UNITED STATES OF AMERICA,

 4           Plaintiff,

 5           v.                    CR 06-0248-05 (JDB)


 6
     ALVARO AUGUSTIN MEJIA,         Washington, D.C.
 7                                  Thursday, February 28, 2008
                 Defendant.         1:45 p.m.
 8

 9                                  AFTERNOON SESSION
      -------------------------X
10
                              DAY 4
11                    TRANSCRIPT OF JURY TRIAL
               BEFORE THE HONORABLE JOHN D. BATES
12                  UNITED STATES DISTRICT JUDGE
     APPEARANCES:
13   For the Government:    BRIAN TOMNEY, ESQ.
                            KIA M. HABISREITINGER, ESQ.
14                          PAUL W. LAYMON, ESQ.
                            U.S. Department of Justice
15                          1400 New York Avenue, N.W.
                            Washington, D.C.  20530
16                          202.307.1383

17   For the Defendant:     CARMEN D. HERNANDEZ, ESQ.
                            P.O. Box 70
18                          7166 Mink Hollow Road
                            Highland, MD  20777
19                          240.472.3391

20   Court Reporter:        CATALINA KERR, RPR
                            Official Court Reporter
21                          U.S. Courthouse, Room 6716
                            333 Constitution Avenue, NW
22                          Washington, D.C.  20001
                            202.354.3258
23
     Proceedings recorded by mechanical stenography, transcript
24   produced by computer.

25
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2            THE DEPUTY CLERK:  All rise.

 3            THE COURT:  And we are now ready to bring the jury

 4  in, Mr. Laymon?

 5            MR. LAYMON:  Yes, Your Honor.

 6            THE COURT:  All right.  Mr. Bradley, the jury.

 7            (JURY PRESENT.)

 8            THE COURT:  Good afternoon, ladies and gentlemen.

 9  We are ready to proceed as soon as we get our witness.

10            (PAUSE.)

11            THE COURT:  Mr. Cortez, good afternoon.  I remind

12  you, you are still under oath.

13            THE WITNESS:  Yes, sir.

14            THE COURT:  Mr. Laymon.

15            MR. LAYMON:  Thank you, Judge.

16                     AUGUSTINE CORTEZ,

17  having been duly sworn, testified as follows:

18               DIRECT EXAMINATION (CONT'D.)

19  BY MR. LAYMON:

20   Q   Mr. Cortez, as we left off, I had asked you about the

21  arrest in El Salvador, and if you can, at this time, explain

22  to us where everyone was in terms of there on the patio and

23  then what happened during that arrest scenario.

24   A   They came.  They show up for the meeting, and we sat, as

25  I said earlier, outside at the patio on the table, on the
```

1  front table.  I was, in a sense, sitting facing the plaza, and

2  they came and sat across the table from me.

3  Q    Okay.  And what happened at some point?

4  A    As we start talking for a few minutes, very few minutes,

5  I already knew, of course, that the take-down was going to

6  take place.  I was already expecting that, and they -- I can

7  see the local authorities from Sal Salvador police coming all

8  dressed in black like a SWAT team, and they surrounded the

9  table and took everybody down to the floor, including myself,

10 and everybody got arrested.

11     I was put with my hands behind my back and taken away to

12 the vehicle, and that was it.

13 Q    Okay.  And then where did you go after that?

14 A    They put me inside a vehicle, and we -- I was taken to a

15 second location where I met with Agent Fraga and a couple of

16 more agents from the local DEA and find out if I was okay, and

17 I was debriefed and that was it.

18 Q    Okay.  Were you -- at the time of the arrest, were you

19 with the other three, Mr. Constanza Bran, Mr. Mejia and

20 Mr. Del Cid Morales, did you join them at some point or did

21 they keep you segregated from them?

22 A    After the arrest?

23 Q    Right, after the arrest.

24 A    After the arrest, we were kept separate.  I never saw

25 them anymore.

```
 1   Q    Okay.  Let me go -- go back just a moment to the meeting

 2   in Panama.

 3              MR. LAYMON:  May I approach, Your Honor?

 4              THE COURT:  You may.

 5   Q    (BY MR. LAYMON)  Let me show you, Mr. Cortez, what has

 6   previously been marked as Government Exhibits 16, 17 and 18.  Do

 7   you recognize Government Exhibits 16, 17 and 18?

 8   A    Yes, I do.

 9   Q    And how are you able to recognize them?

10   A    By seeing the pictures of the people, including myself

11   who were at that meeting.

12   Q    Okay.  And what do the pictures -- well --

13              MR. LAYMON:  Your Honor, I would offer those into

14   evidence as 16, 17 and 18.

15              MS. HERNANDEZ:  No objection.

16              THE COURT:  Without objection, Government 16, 17 and

17   18 are admitted, and they may be published.

18              (GOVERNMENT EXHIBITS 16, 17 AND 18 ADMITTED.)

19              MR. LAYMON:  May I approach again, Judge?

20              THE COURT:  You may.

21   Q    (BY MR. LAYMON)  You had indicated throughout your

22   testimony, Mr. Cortez, that the agents or the police would be

23   nearby watching the meeting; is that right?

24   A    That's right.

25   Q    Okay.  Let me show you Government Exhibit 16.  For
```

1    example, who is depicted in Government Exhibit 16?

2    A    Mr. Bardales, Antonio Chiu Serrano and myself.

3    Q    Okay.  And I take it that's the back -- the person whose

4    back we see, that's you?

5    A    Yes.

6    Q    All right.  And then likewise, 17, just more of the same?

7    A    That's correct.

8    Q    Okay.  18 as well?

9    A    The same.

10    Q    All right.  This is surveillance photos of that meeting;

11    is that correct?

12    A    Yes, sir.

13    Q    All right.  Now, Mr. Cortez, as we wind this down, I

14    would like you to turn -- I want to go back to Tab C of your

15    notebook, top of page 28.

16            THE COURT:  Since I don't have it correlated exactly

17    for the record, identify which exhibit it is, please.

18            MR. LAYMON:  Yes, Judge.  That would be Exhibit 6B.

19            THE COURT:  Thank you.

20            MR. LAYMON:  Tab C of the notebook, and if we could

21    have the Ladies and Gentlemen of the Jury go there.  Judge,

22    this one -- this was previously admitted in evidence.

23            THE COURT:  It is in evidence.  That's why I asked

24    you which exhibit it was, and you may turn to Tab C.

25    A    What page, sir?

```
1    Q    (BY MR. LAYMON)  Top of page 28, and I would call your

2    attention to the top of page 28 where a Confidential Source 1,

3    and that's you, that's correct?

4    A    That's correct.

5    Q    You say, "Honestly, I'm thankful to you.  I'm very

6    thankful to you guys."  And then you say, "Edwin Rene

7    Sapon-Ruiz."  Do you see that?  It's just down the page a

8    little bit, page 28.

9    A    Yes.

10    Q    First one-third of the page you say, "I'm very thankful

11    to you guys, Edwin Rene Sapon-Ruiz."  Do you see that?

12    A    I do.

13              MR. LAYMON:  Mr. Rhodes, are we broadcasting?

14              (VIDEO ON.)

15    Q    (BY MR. LAYMON)  Okay.  Can you see the video at your

16    seat, Mr. Cortez?

17    A    Yes, I do.

18              MS. HERNANDEZ:  Just a second, please.

19              MR. LAYMON:  I'm sorry.

20              THE DEPUTY CLERK:  Somebody just turned it off.

21    That's all.

22              THE COURT:  All right.

23              MR. LAYMON:  You on now, Ms. Hernandez?

24              MS. HERNANDEZ:  Yes.

25              MR. LAYMON:  Okay.
```

1  Q    (BY MR. LAYMON)  Mr. Cortez, my question to you at this

2  point is, what is occurring on the video?

3  A    We were -- I was shaking hands with Mr. Mejia, but

4  previous to that, they were showing me their credentials, I

5  believe.

6  Q    Okay.  And I guess that -- you've answered my next

7  question.  Who is the person that you're shaking hands with?

8  A    Mr. Mejia.

9  Q    Okay.  And is that person present in court here today?

10  A    Yes, he is.

11  Q    And is that the person you previously identified?

12  A    Yes, it is.

13  Q    All right.

14       MR. LAYMON:  I have no further questions at this

15  time for this witness, Your Honor.

16       THE COURT:  All right.  Ms. Hernandez.

17       MR. LAYMON:  Judge, I would -- there is that one

18  unresolved matter that we discussed.

19       THE COURT:  We're not going to reach that for a

20  little while, right?

21       MS. HERNANDEZ:  No.

22       THE COURT:  Until we at least take a break.

23       MS. HERNANDEZ:  Yes.

24       MR. LAYMON:  Okay.

25       THE COURT:  And is Mr. Rhodes going to be assisting

```
 1   you?
 2            MS. HERNANDEZ:  If he's -- if we're able to
 3   communicate.  I think we speak different languages.
 4            MR. RHODES:  I know numbers.
 5            MS. HERNANDEZ:  He knows computers and I don't.
 6            THE COURT:  He knows numbers and letters.  Set that
 7   up better, Mr. Bradley.  You can put your laptop where you
 8   want and then Mr. Bradley will adjust to it.
 9            MS. HERNANDEZ:  Thank you.
10                            CROSS-EXAMINATION
11   BY MS. HERNANDEZ:
12    Q   Buenas tardes.
13    A   Buenas tardes.
14    Q   I'm going to try to go over a number of the things you
15   said, so I'm going to try to separate them out into pieces so
16   we can both understand each other, okay?
17    A   Yes, ma'am.
18    Q   Okay.  Now, the first thing I want to go over is why you
19   were brought into this case.  And you were brought into the
20   case in June or May of 2006; is that correct?
21    A   That is correct.
22    Q   Was it May or was it June?
23    A   I'm not sure.
24    Q   Okay.  And you were brought into the case to act the part
25   of a drug dealer, of a Colombian drug dealer?
```

```
 1    A    That was the issue, yes.

 2    Q    Okay.  And before you actually had your first meeting

 3  with anyone charged in this case, you had a meeting with Agent

 4  Fraga, right?

 5    A    That's correct.

 6    Q    Was it the night before, or did you meet with him earlier

 7  than that?

 8    A    I don't recall the exact date or time.

 9    Q    Okay.  And you also had various telephone conversations

10  with Mr. Bardales?

11    A    No.

12    Q    You never spoke on the phone with Bardales?

13    A    Not that I can recall.

14    Q    Okay.  But you met with Agent Fraga and then you had a

15  meeting with Bardales on June 20th, 2006; remember that?

16    A    In Panama?

17    Q    Yes.

18    A    Okay.  Of course, I don't remember the exact date but

19  that is a meeting that occurred, yes, ma'am.

20    Q    And when you were at that meeting, Bardales was there?

21    A    That's correct.

22    Q    And Bardales is the person who died in the car accident

23  after that sometime?

24    A    That's what I was told.

25    Q    And there was another guy called Chiu Serrano?
```

1    A    Yes, ma'am.

2    Q    And there was -- there were other confidential informants

3  at that meeting; is that correct?

4    A    That is correct.

5    Q    Do you remember how many other confidential informants

6  there were?

7    A    I'm sorry?

8    Q    How many?  How many confidential informants?

9    A    Oh, I'm sorry.  Two, two more.

10   Q    Okay.  So two plus you made three confidential

11  informants?

12   A    Yes.

13   Q    Bardales?

14   A    Correct.

15   Q    These aren't tricky questions, really.  Bardales and Chiu

16  Serrano?

17   A    Yes.

18   Q    And that was in Panama?

19   A    That's correct.

20   Q    At a restaurant?

21   A    Yes.

22   Q    And the agreement that you -- and you went there and

23  you -- and your plan was to say, "I'm a drug dealer from

24  Colombia," correct?

25   A    That wasn't the plan.  I was -- the plan was, as

1  instructed by DEA, to meet with them, okay, and listen to what

2  they have to say, and then for trade, that I needed to

3  transport some drugs between three different countries.

4  Q    Okay.  So your plan was that you were a drug dealer?

5  A    A drug dealer -- the transport -- yeah, transporter.

6  Yes.

7  Q    You make a distinction between a drug dealer and a

8  transporter?

9  A    Well, I was looking for transportation so I just use the

10  title "drug transporter."

11  Q    Okay.  Let me start again.  You went to a meeting in

12  Panama.

13  A    That's correct.

14  Q    And you said you were from Colombia, or you were

15  Colombian?

16  A    I think they assumed that when I got there.

17  Q    They assumed you were Colombian?

18  A    That's correct.

19  Q    And the plan was that you were looking for safe passage

20  through Guatemala, correct?

21  A    Through Guatemala, yes.

22  Q    But the plan was that you were looking for safe passage

23  through Guatemala, right?

24  A    That's correct.

25  Q    And when you met -- and you were looking for someone in

1    the government of Guatemala to give you that safe passage,

2    right, some official -- some official in Guatemala to give you

3    safe passage?

4    A    I wasn't looking for any officials on the Panamanian --

5    on the Guatemalan government to give me safe passage.  I went

6    to meet Mr. Bardales, who after meeting me, brought into the

7    table, the conversation, that he had some people that could

8    help me.  At the time, it wasn't determined yet that I needed

9    to use government officials or not.  He's the one that

10   expressed that at the table.

11   Q    Okay.  All right.  Let's do it this way.  You went to

12   that meeting and you said, "This is my plan."  Let me -- let

13   me -- let me let you look at -- At some point during that

14   meeting in Guatemala with Mr. Bardales, you --

15   A    In Panama.

16   Q    I'm sorry, in Panama.  You said you wanted to explain

17   what your plan was; do you remember that?

18   A    I think I do.

19   Q    Okay.  And what you said was that you were looking for

20   safe conduct or pass, or whatever it's called, to go through

21   without a problem.  Do you remember words to that effect?

22   A    Yes.

23   Q    Okay.  And so then Mr. Bardales is the one who told you

24   that -- and what did you mean by that?

25   A    About Mr. Bardales?

1    Q    No, what did you mean by you wanted safe passage?

2    A    That I needed to send my so-called drugs to -- safely

3    through various countries until they reach the United States.

4    Q    Okay.  But safe passage, you can obtain safe passage by

5    getting the biggest army in the world to protect your cocaine,

6    is that correct, that's one way to get safe passage?

7    A    Would you come back again.

8    Q    One way to get safe passage is to get the biggest army in

9    the world to protect your goods, that's one way to get

10   passage?

11   A    That's one way but not necessarily the way to do a drug

12   deal.

13   Q    Right.  But that's not what you were looking for?

14   A    I was looking for a safe passage.

15   Q    You were looking for safe passage but not necessarily

16   with an army protecting your drugs, right?

17   A    It was never mention of an army, so I don't know where we

18   coming from with an army.

19   Q    Okay.  What -- how did you -- what did you want

20   Mr. Bardales to do for you?

21   A    What I was instructed by the agents to do.

22   Q    And what was that?

23   A    Find out whether he could do what he has previously said

24   to someone else, wasn't me, and that's why I will assume the

25   investigation got started.  And they just send me to feel the

1  guy out and let him express what he really had on hand.

2         At that point it was all assumptions from the part

3  of the Government here and from what he was saying.  We just

4  thinking -- saying or listening, or they just take it what

5  he's saying and they just wanted to verify whether he could do

6  or not.

7  Q   Okay.  And what the Government was looking for was

8  corrupt Guatemalan officials, right?

9  A   You need to ask that to the agent.

10  Q   No, I'm asking what you were told.

11  A   Okay.  That's a different question.  I was told to sit

12  down with Mr. Bardales and find out if indeed he has the

13  connections to bring that dope in.

14  Q   Okay.  And the connections meant officials in Guatemala,

15  correct?

16  A   Now it is officials in Guatemala.  At the time, it was an

17  assumption.

18  Q   I'm not asking you what was real, what wasn't real.  I'm

19  asking what you were told and what your job was when you went

20  there pretending to be someone trying to get cocaine from

21  Colombia through to Mexico, okay?

22  A   Let me answer the best way I can.

23  Q   Okay.  Wait, that wasn't a question.  I'm not trying to

24  get to what the truth is.  From you, I just want to know when

25  you arrived to have a meeting in Panama, right, you arrived --

1    Let me start there.

2        You arrived, you went and you had a meeting in Panama,

3    correct?

4    A    I went to have a meeting in Panama, yes.

5    Q    And there was Bardales whom you were told was a drug

6    dealer or someone who wanted to engage in a drug deal?

7    A    Yes.

8    Q    Okay.  And there was also another person named Chiu

9    Serrano?

10   A    Correct.

11   Q    Who also somehow wanted to get involved in some sort of

12   drug dealing, correct, that's what you were told?

13   A    Correct.

14   Q    And there were also two other informants along with you?

15   A    Correct.

16   Q    And who were those two other informants?  Just their -- I

17   don't want their first name and their last name.  Just one --

18   was one of them Iberia?

19   A    It was Iberia -- would be Iberia.

20   Q    Iberia or Iberia.  Is that the same guy who's called

21   Madrid and also called Espana?

22   A    Yes, ma'am.

23   Q    And who was the third one?

24   A    I know him by a first name or by a name, named Carlos.

25   Q    Okay.  So it was the three of you, Chiu Serrano and

1   Bardales?

2   A    Yes.

3   Q    And what you understood was supposed to happen, okay,

4   what you understood, was that you were going to show up and

5   say you had some cocaine that you wanted to transport through

6   Central America, to Mexico -- to the border with Mexico?

7   A    Yes.

8   Q    Okay.  And the way you phrased that was you wanted safe

9   passage?

10  A    Correct.

11  Q    And your understanding of what safe passage was is that

12  it was some official who was going to be able to grease the

13  skids, use Vaseline to get it through?

14  A    That was the purpose.

15  Q    Right?  It wasn't the purpose to shoot it up and get the

16  cocaine from Colombia to Mexico, right?

17  A    That's correct.

18  Q    It wasn't the purpose to find the biggest army in the

19  world and move the cocaine from Colombia to Mexico, right?

20  A    I have instructions.  I just went to there and instructed

21  to find out what Mr. Bardales indeed will have.

22  Q    And the reason you were sent there is because there was

23  some belief that Bardales could deliver some government

24  officials?

25  A    Some contact within the government to do this.

1    Q    Okay.  Now we're -- So that was the nuts of the agreement

2    that you were seeking, or that you -- at least you left on

3    June 20th believing you were going to participate in, right?

4    A    Yes.

5    Q    And the agreement whereby you got safe passage through

6    Guatemala by virtue of having some officials in Guatemala

7    giving you that safe passage?

8    A    That was the case.

9    Q    Okay.  So that was the agreement?

10   A    With them.

11   Q    With them.  And that -- that was, in essence, the

12   beginning of what -- what the government claims was a

13   conspiracy?

14   A    That's right.

15   Q    Okay.  So if -- if -- Never mind.

16        And then the next day or that same day you received a

17   phone call from Constanza Bran, correct?

18   A    Yes.

19   Q    And Constanza Bran claimed to be the boss of Chiu Serrano

20   who had been there with you?

21   A    That's what he told me over the phone.

22   Q    Okay.  And there were a number of more telephone calls

23   that you had from that day until the day they were arrested

24   with Constanza Bran, right?

25   A    Will you repeat that?

1    Q    I'll make them shorter.  From that day on you had many

2    other telephone calls with Constanza Bran.

3    A    Yes.

4    Q    At no time during that whole period did you ever have a

5    telephone call with Mr. Mejia, did you?

6    A    No.

7    Q    None?

8    A    Not that I can recall.

9    Q    Okay.  And at no time did you ever have any conversation

10   with Mr. Mejia other than what we've seen on the videotape

11   that you saw -- that we showed to the jury, correct?

12   A    The various videos, yes, that was the only contact.

13   Q    That's the only time.  You never had a separate

14   conversation with Mr. Mejia?

15   A    No.

16   Q    Okay.  And you've testified for the past day-and-a-half

17   about -- Let me back up.

18         And at no time during any meetings with Mr. Mejia did you

19   ever use the word "cocaine," correct?

20   A    No.

21   Q    Never?

22   A    Never, that I can recall.

23   Q    We can only deal with what you can recall, okay.

24   A    I can only say the truth of what I remember.

25   Q    Excuse me?

```
 1    A    I can only testify to what I remember.

 2    Q    Exactly.  And for the last day-and-a-half you've been

 3   testifying about your understanding about what things -- about

 4   what was said, correct?

 5    A    Will you explain that a little bit more, the question,

 6   please.

 7    Q    For the past -- you've been on the stand for a

 8   day-and-a-half, give or take a few.  You were on the stand

 9   yesterday?

10    A    Correct.

11    Q    You were on the stand this morning?

12    A    Correct.

13    Q    And you've been answering questions from the Government?

14    A    Correct.

15    Q    And quite often you've been told to look at the video,

16   right?

17    A    Right.

18    Q    And you've been told to read some lines, right?

19    A    Yes.

20    Q    And then you've been asked, "what did that mean to you"?

21    A    Correct.

22    Q    Or words to that effect?

23    A    Yes.

24    Q    And each time you explained what you believed it to mean,

25   right?
```

```
 1    A    The common sense of the phrases I explain.

 2    Q    You explained what you believed it to mean.  Your sense,

 3    right, what you believed it to mean?

 4    A    Yes.

 5    Q    What you think is common sense may be different from what

 6    I think is common sense, right?

 7    A    Common sense is common sense.

 8    Q    To you.  Okay.  We're not going to get into -- I'm sorry.

 9         Okay.  You explained, you were asked not what was common

10    sense.  You were asked what you understood that to mean in the

11    context of that meeting, correct?

12    A    I explained the content of the discussions the way I

13    understood; to explain it better to the people sitting in this

14    room only because there is some terms that I use differently

15    than any normal person will use and I have to go about to

16    explain why we use X words that don't mean anything to the

17    normal public but to a drug traffic -- drug traffickers will.

18    Q    And sometimes you explain "it," the word "it" as meaning

19    cocaine, correct?

20    A    Only because "it" sounds in English as an "it," but in

21    the ways in the Spanish, it's completely different meaning.

22    Q    You're telling me that the word "it" has a meaning in

23    Spanish?

24    A    No, no, it doesn't have a meaning in Spanish, but "it,"

25    and if we look in the transcript and we decide which word "it"
```

1   was -- came from what word in the Spanish, then I can explain

2   to you why "it" means cocaine if we look at a transcript.

3   Q    What you were explaining is your understanding, correct?

4   You can only speak about what you know; isn't that correct?

5   A    What I know.

6   Q    Just answer that question.  You can't -- you can't say

7   what I know, can you?

8   A    No, I cannot.

9   Q    You can't say what he knows, can you?

10  A    I cannot.

11  Q    You can't say what the interpreters know, can you?

12  A    The interpreters will probably --

13  Q    You don't know what they know.

14  A    Okay, yes, I don't know what they know.

15  Q    You're on the stand to explain what you know.

16  A    What I know about the cocaine trade.

17  Q    Okay.  What you know about the cocaine trade, fine.

18       And your knowledge of the cocaine trade is extensive?

19  A    It is.

20  Q    Your knowledge of the cocaine trade, you told us, is

21  based on that you were engaged in cocaine trafficking in the

22  1980s?

23  A    That's correct.

24  Q    And you were also engaged in the cocaine traffic in the

25  1990s?

1  A    That's correct.

2  Q    How many years in the 1980s were you engaged in cocaine

3  trafficking?

4  A    About perhaps six, five years -- six years.

5  Q    Okay.  And then you were arrested in 1992 or '93?

6  A    1993.

7  Q    Okay.  So six years in the '80s -- six or seven years in

8  the '80s, another three years in the '90s, right?

9  A    Five or six, and then another three in the '90s.

10  Q    Okay.  So almost 10 years in that period?

11  A    Give or take.

12  Q    And then you came out of jail in 1996?

13  A    Yes.

14  Q    And since 1996 until today that you're sitting here,

15  you've been a confidential informant with one law enforcement

16  agency or another?

17  A    About 12 years as a confidential informant.

18  Q    So your knowledge -- and during that period of time you

19  usually played, acted as if you were a cocaine trafficker or

20  transporter or something to that effect, right?

21  A    During those years as an informant, I have just done what

22  I've been asked to do, follow the instructions from the

23  Government and do as I'm told.

24  Q    You know, let me explain.  These are not trick questions.

25  I'm really asking you to answer my question.

```
 1        During those 12 years -- I understand that as an
 2   informant you were being directed either by agents or by some
 3   prosecutor.  We agree.
 4        During those 12 years, you acted in the role of a cocaine
 5   trafficker.
 6   A    Yes.
 7   Q    Okay.  And during those 12 years, you also learned
 8   additional information about cocaine trafficking, right?
 9   A    Yes.
10   Q    And you were also -- and some of that information you
11   learned on the job, as it were?
12   A    I learn on the job?
13   Q    Yeah.  I mean, some of the information you learned as you
14   were engaged in these meetings?
15   A    Yes, absolutely.
16   Q    Every day you go out, you learn something new, probably?
17   A    I do.
18   Q    Okay.  And some of the information you learned it because
19   the agents told you, possibly?
20   A    I'm sorry?
21   Q    Some of the information you learned from the agents?
22   A    Yes.
23   Q    Sometimes you taught them some things?
24   A    I tell them what I learn from the streets.
25   Q    Right.  Sometimes you taught them?
```

1    A    That's right.

2    Q    Okay.  So when you were testifying about what you

3    understood words to mean, you based it, in part, on all those

4    years and all that experience that you have, right?

5    A    Yes.

6    Q    So that's the 10 years of actual experience and the 12

7    years of acting as a drug trafficker?

8    A    Yes.

9    Q    In addition, you also had a meeting on June 20th,

10   correct?

11   A    If that was the correct date, yes, I did.

12   Q    In June.  How about if we say June?

13   A    Yes, ma'am, June.

14   Q    Just because you don't trust that I'm giving you the

15   right date?

16   A    No, no, by no means, believe me, I respect all your words

17   and I follow them.

18   Q    Okay.  So, in June you had a meeting.  So, in part, when

19   you explain what you believe these words to mean, you based it

20   on that meeting in June?

21   A    Sorry?

22   Q    You based your understanding of what all these words

23   mean, was partially, partially based on what you -- on this

24   meeting you had in June with Mr. Bardales and Mr. Serrano?

25   A    I have a meeting with them and I learned of what -- after

1    what he says what was going on.

2    Q    And some of your understanding was based on other

3    telephone calls, correct?

4    A    With -- on the case.

5    Q    Right, in the case.  With Constanza Bran?

6    A    That's correct.

7    Q    And so -- and you had -- that same day of the meeting in

8    Panama, you had one call with Constanza Bran, right?

9    A    Yes, ma'am.

10    Q    And you also had more conversations with Constanza Bran,

11    right?

12    A    In person, over the phone, both?

13    Q    Over the phone.

14    A    Yes, ma'am.

15    Q    Over the phone, you had at least six or seven more

16    telephone calls with Constanza Bran?

17    A    Yes.

18    Q    Sometimes you called him?

19    A    Yes, ma'am.

20    Q    And sometimes he called you?

21    A    That's correct.

22    Q    But neither at that meeting on June 20th -- Let me back

23    up.

24        On June 20th, Mr. Mejia was not there, right?

25    A    No, he was not.

1  Q   And in none of the telephone conversations that you had

2  with Mr. Constanza Bran, Mr. Mejia -- you didn't hear

3  Mr. Mejia's voice?

4  A   No.

5  Q   And you -- to your knowledge, Mr. Mejia was not on those

6  phone calls?

7  A   No.

8  Q   Okay.  So you have phone calls with Mejia, you have --

9  I'm sorry, phone calls with Constanza Bran, you have a

10  June 20th meeting without Constanza -- without Mejia, you

11  have 10 years of drug-trafficking experience without

12  Mr. Mejia, correct?  Mr. Mejia was not with you during those

13  10 years when you were actually drug-trafficking?

14  A   Never heard about him before.

15  Q   Okay.  And Mr. Mejia was not with you during the 12 years

16  that you were doing -- acting like a drug trafficker?

17  A   Not until the day I met him.

18  Q   Okay.  So any time you explained what you understood

19  something to mean, that was your understanding based on all

20  your knowledge, right?

21  A   Right.

22  Q   See if you can agree with me on this statement, that your

23  understanding and his understanding may be different?

24  A   Maybe.

25  Q   Okay.  And, in fact, you know the last couple of phone

1    calls when you were talking about the wedding dress meaning

2    cocaine?

3    A    Yes, ma'am.

4    Q    You have no idea whether he understood a wedding dress to

5    mean cocaine, right?

6    A    I don't know if he was listening or if he was explained

7    by his body.

8    Q    Right.  So you don't know?

9    A    I can't tell.

10   Q    And you don't know what Constanza Bran told Mr. Mejia,

11   right?

12   A    Don't know.

13   Q    He could have -- because what Mr. Mejia said to you --

14   I'm sorry, what Mr. Constanza Bran said to you, even if he

15   told you he said something or other to Mr. Mejia -- let me

16   back up.

17        There were a series of phone calls -- or one of the phone

18   calls you talked about was a phone call where Mr. Constanza

19   Bran calls you and tells you that his friends were concerned

20   that you appeared nervous.

21   A    Yes.

22   Q    Remember that phone call?

23   A    I do.

24   Q    You, sitting there, don't know whether, in fact, his

25   friends told him that, right?

```
1    A    Of course not.

2    Q    He could be making that up?

3    A    He could have been.

4    Q    It could have been that he was concerned?

5    A    Perhaps.

6    Q    And didn't want to say "he"?

7    A    That could be.

8    Q    Okay.  And part of the -- let me back up.  Let me see if

9    you agree with me on this.

10        When you're engaged in drug-trafficking, at least on the

11   phone, you often don't use the word "cocaine"?

12   A    That's correct.

13   Q    You probably will never use the word "cocaine" on the

14   phone with another drug trafficker?

15   A    In the position I'm -- I am right now, for all the

16   purpose of law enforcement, I try to use the word "cocaine."

17   Q    You do because you're not a trafficker.  You're acting

18   like a trafficker?

19   A    That's correct.

20   Q    And your -- and your role as a confidential informant is

21   to try to find evidence to incriminate?  Part of your role,

22   how's that?

23   A    I'm sorry?

24   Q    Part of your role?

25   A    Part of my role is to do what I'm told, so I can just get
```

1    evidence.

2    Q    So you can get evidence.  But someone who's a drug

3    trafficker is not trying to generate evidence, unlike you?

4    A    A drug trafficker will try to get the job done.

5    Q    Right.

6    A    But not to look for evidence because he's on the other

7    side.

8    Q    Okay.  What people -- do you agree with me that drug

9    traffickers will try not to use the word "cocaine" when

10   they're having a telephone conversation?

11   A    In all honesty, most of them will.  Some of them are

12   careless.  Like any other business, some people act -- people

13   act different ways, as you say earlier about all the people

14   around this room.  Sometimes they use it.

15   Q    But I thought that the reason you had to explain what all

16   these words mean is because the drug traffickers didn't want

17   to use the word "cocaine," they wanted to use "wedding dress"

18   or "it" or "Christmas goods"?

19   A    Most are -- everybody's different; drug traffickers,

20   attorneys, bus drivers, pilots, everybody acts different and

21   thinks different in their profession.  And these people

22   sometimes, yes, they think it's better to conceal the word

23   "cocaine" to protect themselves from law enforcement.

24   Q    Okay.  Let's go back to this case.  In any of the

25   telephone conversations that we had here, that you were asked

1    to interpret, no one used the term "cocaine," right?

2    A    That's correct.

3    Q    And you didn't use it?

4    A    No, I did not.

5    Q    And the reason you didn't use it is because if you had

6    started talking about cocaine, maybe the people on the other

7    line would have said, "What are you talking about?"

8    A    I can assume what they were thinking.  I just didn't use

9    it because perhaps at the time I didn't think it was

10   appropriate to use it because now we into the case and

11   they're -- I'm told that they're police officers, so you don't

12   want to use that kind of word.

13   Q    Okay.  Let me ask you this:  Part of your job, you told

14   me, was to try to get evidence, right?

15   A    Yes.

16   Q    And you will agree with me that if you had said, "I want

17   500 kilograms of cocaine from Colombia to Mexico" during that

18   meeting on -- in July and everybody said, "Yes, we're with

19   you," that would be evidence?

20   A    Absolutely.

21   Q    Right.  So at the meeting that Mr. -- that -- the video

22   that you showed where Mr. Mejia was present, if you had used

23   the term "yes, I want you to provide me safe passage of

24   cocaine," and he would have said "yes," that would be

25   evidence?

1    A    That would have been evidence.

2    Q    Yes.  You didn't use that word?

3    A    It wasn't necessary because we were using codes.

4    Q    Just answer my question, please.  You didn't use that

5    word?

6    A    I didn't use the word "cocaine."

7    Q    All right.  And in none of the telephone conversations

8    that you use -- that you had, that have been produced here,

9    you didn't use the word "cocaine"?

10   A    Did not.

11   Q    Okay.  I'm going to give you the chance.  Why didn't you

12   use the word "cocaine"?

13   A    Thank you for the chance.

14   Q    You're welcome.

15   A    It wasn't necessary.  It was all said in codes.

16   Q    Excuse me?

17   A    It wasn't necessary.  Everything was -- we were talking

18   about cocaine, but we all were using a code or different codes

19   for the word "cocaine."

20   Q    You were talking about cocaine.

21   A    We all were meaning cocaine.

22   Q    Excuse me.  You were talking about cocaine.  That was the

23   first time you had met my client.  How do you -- how can you

24   stand there under oath and say you know what he was talking

25   about?

1    A    Under oath I can tell you that I didn't talk to him about

2    cocaine direct, but from the go, from the very first date that

3    I met part of their organization, I was told by Mr. Constanza

4    Bran over the phone, okay, that he knew exactly what was going

5    on.  I understand that his people says "we'll go" and he had

6    his approval, and that includes everybody.

7    Q    So your knowledge is based on what Mr. Constanza Bran

8    told you?  Just answer that question.  Your knowledge that you

9    just described here is based on what Mr. Constanza Bran told

10   you?

11   A    Yes.

12   Q    So if he was lying or overstating something, your

13   knowledge may be incorrect?

14   A    Can I add something else to that?  I need to ask if -- in

15   all due respect, if I can't answer just a little bit of your

16   question and don't explain it, it's not -- not fair.

17   Q    This is the last time I am going let you do this.

18            MR. LAYMON:  I would object to this.  She's done

19   this several times.  He can give a responsive answer to the

20   question, and he's trying to do that and she keeps cutting him

21   off, so we would object.

22            THE COURT:  She hasn't been cutting him off.  She's

23   been trying to frame it so she only gets a certain kind of

24   answer, but she's -- I'm not going to rule on things in

25   advance.  She's allowing him to give the explanation now.

1    We'll hear that.  You make your objections for future points

2    that you think warrant it.

3    A    Will you state the question again, please.

4    Q    (BY MS. HERNANDEZ)  Yes.  Let me, before I let you answer

5    this question, let me explain, and it doesn't have to come from

6    me.  The judge can.  The way a courtroom works is I ask the

7    questions and you answer them.  If I ask a question and you have

8    to -- and you need more time to answer, you can ask me, but I

9    get to ask the questions and you get to answer them, okay?

10   A    I hear you.

11            THE COURT:  That's fair.  She's the questioner,

12   you're the answerer.  No mystery to that.  Let's go ahead.

13            MS. HERNANDEZ:  All right.

14   Q    (BY MS. HERNANDEZ)  Did you have something you wanted to

15   say?  I'm going to let you say it, but I don't know where --

16   we've gone around this question so many times that I can just

17   start at some different point, but I'm going to let you say

18   whatever you want right now.

19   A    Well, that I want to hear the question again so I could

20   address that properly, but if you want to pass on, we go to

21   the next item.

22            THE COURT:  Let's go to the next question.

23   Q    (BY MS. HERNANDEZ)  Okay.  Let's go to the next question.

24   So after the -- at the June meeting with Mr. Bardales, he told

25   you that he could provide some officials in Guatemala that would

1  be able to give you the safe passage, correct, in those -- maybe

2  not those exact words but that was the sense of what you came

3  away with?

4  A   Yes, ma'am.

5  Q   All right.  And thereafter you had a conversation with

6  Constanza Bran?

7  A   Yes, ma'am.

8  Q   And he also said or gave you the same impression, that

9  that's what was going to be happening?

10  A   That's correct.

11  Q   And then you have a meeting in July?

12  A   Yes.

13  Q   Or a part -- well, you got together, let's put it that

14  way.  You were all together at some outdoor restaurant?

15  A   That's correct.

16  Q   And we saw some clips of that.  Do you recall how long

17  that -- that meeting -- let's call it a meeting -- was?

18  A   Perhaps about two hours or less.

19  Q   Two or four hours?

20  A   I mean, I just give you an estimated time.  I don't know

21  exactly but it was quite long.  It was long.

22  Q   Okay.  And there is a lot of eating?

23  A   I'm sorry?

24  Q   A lot of eating?

25  A   It was a lot of eating and a lot of drinking.

1   Q    And a lot of drinking?

2   A    Yes, sir.

3   Q    And when we're talking about drinking, we're not talking

4   about water?

5   A    No.  We order Johnny Walker Black and beers.

6   Q    Okay.  So probably during most of the meeting you were --

7   and did you also drink?

8   A    Yes, I did.

9   Q    Okay.  And the reason you're drinking is because you want

10  to fit in?

11  A    Absolutely.

12  Q    And because maybe you like to drink, too?

13  A    I like to drink, too, so...

14  Q    And during that meeting you were first introduced to

15  Mr. Mejia.  That was the first time you saw Mr. Mejia,

16  correct?

17  A    That's correct.

18  Q    But when you were introduced to him, you were -- you --

19  his name was -- you were not told that his name was Mr. Mejia?

20  A    No, ma'am.

21  Q    You were told that his name was someone else?

22  A    That's correct.

23  Q    And that someone else, you were told, was some high

24  official in the Guatemalan government?

25  A    That was not someone else.  Mr. Mejia for -- give me a

1  name of -- to himself and he put him -- himself in a position

2  to say that he was a high-ranking official under an assumed

3  name.

4  Q    Okay.  So Mr. Mejia identified himself as this other

5  person and that name he gave you is actually the name of

6  someone who is a high official in the Guatemalan government?

7  A    I didn't know that, but it is.

8  Q    You don't know that?

9  A    No.

10  Q    You don't have to say "yes" if I tell you something and

11  you don't know it.  You can say "I don't know it," okay.

12             THE COURT:  You're also free to say "no."  You

13  answer the truth.

14             THE WITNESS:  Thank you.

15             MS. HERNANDEZ:  It would be good if he had to answer

16  just "yes" to everything I said, but you don't have to.

17             THE COURT:  There's a certain design to that.

18             MS. HERNANDEZ:  Yes.

19             (LAUGHTER.)

20  Q    (BY MS. HERNANDEZ)  But when he identified himself as this

21  other person, he also -- he and others around the table led you

22  to believe that he was a high government official in Guatemala,

23  correct?

24  A    He did.  Can I add something else?

25  Q    Yes.

1    A    He also show me an I.D.

2    Q    He showed you an I.D.?

3    A    So, you know, at the point this is --

4    Q    You thought he was a government official and he thought

5    you were a drug trafficker?

6    A    And to be honest with you, at that moment I really

7    thought he was -- they were government officials.  I'll be

8    honest with that.  That's what I thought at the beginning.

9    Turned out to be different, but they were so well done with

10   the conventions and pictures and all that, and this other guy,

11   Constanza Bran being so knowledgeable of everything he talk,

12   fully about the government and use names and positions that I

13   didn't have any reason to doubt what they were telling me at

14   the time.

15   Q    All right.  And someones also -- one of the other people

16   there was also identified by some other name that wasn't his

17   true name?

18   A    Yes.

19   Q    And they said that one of them was the director or was

20   like the director of the --

21   A    Customs or something like that.

22   Q    Aduana.

23   A    Yeah, customs.

24   Q    The customs?

25   A    Yes, ma'am.

1    Q    I mean, they weren't just -- they weren't saying the guys

2    who took the tickets at the customs department.  They said

3    they were the head of customs for Guatemala?

4    A    Yes.

5    Q    And so what they were offering at the table was safe

6    passage by high government officials?

7    A    That's correct.

8    Q    And that was the deal that you were entering into?

9    A    That's right.

10   Q    Okay.  That was the -- the gist or the nut of the

11   conspiracy; that was the agreement?

12   A    That was the sense of that.

13   Q    That was the essential of the agreement.

14        Now, during that conver- -- during that -- the -- that

15   outdoor meeting where you first met Mr. Mejia, Mr. Constanza

16   talked about Switzerland.  There was a long conversation about

17   Switzerland and whether his grandfather was from Switzerland,

18   correct?

19   A    Yes, ma'am.

20   Q    And you talked about having been in Switzerland?

21   A    Yes.

22   Q    And Mr. Mejia never piped in when he talked about it?

23   A    No.

24   Q    And, in fact, the only thing Mr. Mejia said during that

25   whole two-, three- or four-hour meeting was his identification

1    and he said two or three sentences about DIPA, which is

2    supposed to be some agency in Guatemala, is that correct,

3    DIPA, D-I-P-A?

4    A    That's correct.  Can I say something else?  May I?

5             THE COURT:  That's your choice.

6             MS. HERNANDEZ:  I understand it's my choice.

7             THE COURT:  You can go ahead and ask your question.

8    Q    (BY MS. HERNANDEZ)  Sure, you can say something else.

9    A    Apart from Mr. Mejia saying the few words that you just

10   established previously, he also nod up and down on his head to

11   agree on the conversation that we were talking.

12   Q    Okay.  So he nodded up and down his head during most --

13   but words out of his mouth, those were the only words that he

14   used?

15   A    The ones that I documented.

16   Q    Right.  And he ate a lot.  He ate a lot.  It seemed like

17   he was eating.  I mean, of course, all we saw was he was

18   always eating the whole time.

19   A    Yes.

20   Q    And I think what you had were oysters?

21   A    I don't recall.  I don't think so, but I don't recall.

22   Q    Okay.  So at least at that meeting Mr. Bran --

23   Mr. Constanza Bran lied to you?

24   A    Sorry?

25   Q    At least at that meeting, you know -- now you know that

```
1    Mr. Constanza Bran lied to you?

2     A    Lied to me?

3     Q    Lied.  Was not truthful.  Let me -- you hesitate.

4          Mr. Constanza Bran -- you now know that Mr. Mejia is not

5    the person whose name appeared on the I.D. he gave you,

6    correct?

7     A    Now I know.

8     Q    Now you know that?

9     A    Yes, I do.  Now I know.

10    Q    And now you know he wasn't the high official represented

11   by that card?  In other words, he was not the person whose

12   name appeared on that card?

13    A    I'm going to answer that in two parts.

14    Q    Just answer my question first and then you can go to the

15   second -- and this is the last time you get to do this, okay.

16   I ask the questions.  When they get up here, they can ask you

17   any other questions they want.

18            THE COURT:  Answer the question.  If your answer

19   requires two parts, you answer the question.  Just answer the

20   question.  Don't ask for her permission anymore.  You give an

21   answer.  If she thinks you're deviating from answering the

22   question, she'll point that out, and I'll take care of it,

23   okay.  No more permission.  Just answer the question.

24    A    Now I know that he told me different.  He didn't say the

25   truth about who this other people were.
```

1    Q    Okay.

2    A    But I believe it's my understanding that the two

3    individuals --

4    Q    You know what, we -- your understanding is not --

5         THE COURT:  All right.  Let's not have an argument.

6    Go ahead to the next question.

7    Q    (BY MS. HERNANDEZ)  I don't want you the give us your

8    understanding because you're here to testify under oath about

9    what you do know, okay.

10   A    But I also -- I was about to say what I know that they

11   were at one given time police officials.

12   Q    But at the time that you were meeting -- here's what the

13   question is.  At the time that you were meeting, Mr. Mejia was

14   not the person whose picture appeared -- was not the person

15   that he represented to you that he was?

16   A    That is correct.

17        THE COURT:  Well, wait a minute.  You need to be

18   clear because are you asking him what he knew at the time of

19   the meeting?

20        MS. HERNANDEZ:  No, no, no.

21        THE COURT:  Because that's different.

22        MS. HERNANDEZ:  No, no, what he knows now.

23        THE COURT:  All right.  Then what he knows now

24   includes what he also --

25        MS. HERNANDEZ:  That's not the question I'm asking

 1   him.

 2              THE COURT:  All right.  Let's be precise.

 3   Q    (BY MS. HERNANDEZ)  Okay.  What you know.  Let me back up.

 4        The person whom he identified himself to be was not

 5   Alvaro Mejia, correct?

 6   A    Correct.

 7   Q    And Mr. Constanza Bran, who was sitting at the table next

 8   to you, led you to believe that the identification he gave you

 9   was correct?

10   A    That's correct.  That's true.

11   Q    So if he knew that his name was not Edwin Sapon, whatever

12   it was, Edwin, he was allowing -- or participating in lying to

13   you?

14   A    They all were.

15   Q    Okay.  So when Mr. Constanza Bran, after one of the

16   meetings, calls you and tells you that my friends are telling

17   you -- are concerned that you seem nervous, that could have

18   been another lie, right?

19   A    Again, I cannot assume what they're thinking.

20   Q    But you don't know.  That's right.  You don't know

21   whether he was telling the truth that time or whether he was

22   again lying?

23   A    No way of telling.

24   Q    You don't know.  Good.

25        Now, you were talking earlier about a container, right?

1    A    Right.

2    Q    Discussions about a container.  If you know, you can

3    answer.  Any time you don't know an answer, you can say "I

4    don't know."

5         Containers are used for transporting more than just

6    drugs, correct?  You can use a container to transport

7    furniture?

8    A    Yes.

9    Q    Fruit?

10   A    Correct.

11   Q    Computers?

12   A    That's correct.

13   Q    All sorts of legal goods?

14   A    Yes.

15   Q    So the fact that you talked about a container doesn't

16   necessarily mean that you'll be talking about cocaine?

17   A    That's correct.

18   Q    Okay.  And Mr. Constanza Bran came to the next meeting, I

19   think, in August, with some documents relating to a company,

20   correct?

21   A    Yes.

22   Q    And as far as you know, that was a legitimate company?

23   A    It was a legitimate company?

24   Q    Legitimate?

25   A    Yes.

1    Q    Not illegal, legitimate.

2    A    Yes.

3    Q    So anybody sitting around the table hearing this

4    discussion could have believed that you were talking about a

5    legitimate company?

6    A    Talking about?

7    Q    A legitimate -- legitimate.

8    A    Yes.

9    Q    Okay.  And, in fact, Mr. Constanza Bran was talking about

10   the amount of money it would cost to hire lawyers?

11   A    Who?

12   Q    To hire -- the amount of money it would cost --

13   Mr. Constanza Bran and you were talking about some money that

14   it would cost to do this, correct?

15   A    Correct.

16   Q    And part of the discussion was how much the lawyers would

17   charge to incorporate or to do legal paperwork.

18   A    The lawyers?

19   Q    Did Mr. Constanza -- do you remember Constanza Bran

20   saying or you saying that part of the cost was what had to be

21   paid to lawyers?

22   A    We didn't mention lawyers.

23   Q    Okay.  Well, it's -- I'll get to that in a moment.

24        Part of the cost was to open an office of some kind?

25   A    Open a warehouse.

1  Q   He was going to open a warehouse and he was going to have

2  some office area?

3  A   Yes.

4  Q   Okay.  I'm going to leave that for later.

5      Let me ask you some questions about the money.  At the

6  first meeting in June when you had a meeting with

7  Mr. Bardales, you -- and Mr. Serrano, you gave them $2,500,

8  correct?

9  A   Correct.

10  Q   And you said that that was for their expenses?

11  A   For their expenses.

12  Q   For their expenses.

13  A   That's correct.

14  Q   Right.  You said that you would pay their expenses?

15  A   That's correct.

16  Q   And you gave them $2500?

17  A   Correct.

18  Q   Now, in July you gave, not Mr. Mejia, you gave the other

19  guy $10,000.  You say you gave him $10,000.

20  A   I didn't say.  It was on the video.  I gave them $10,000.

21  Q   Well, you gave them something.  They were going to -- you

22  gave them some -- you gave them money.

23  A   Okay.

24  Q   Correct?

25  A   Yes.

1    Q    You said it was $10,000?

2    A    Yes.

3    Q    One of them started to count it?

4    A    Yes.

5    Q    The counting was ended, correct; someone said, "don't

6    count it"?

7    A    Yes.

8    Q    I think it was so that it would -- people wouldn't see

9    that it was being counted?

10    A    Perhaps, impression.

11    Q    But on the video, we don't actually see anybody count to

12    10,000?

13    A    Just see the movement but you don't see perhaps the

14    money.

15    Q    And nobody confirms that in fact it's $10,000?

16    A    They did.  I think at one given point they say, "It's

17    here."  They know they receive the money.

18    Q    They received the money.  And that money was for

19    expenses, too, for their travel expenses?

20    A    No.  That money was for them to use it as part of the

21    operation.

22    Q    Well, did you say that on the record that it was for part

23    of their operations?  That's just a "yes" or "no" answer, if

24    you recall.

25    A    I don't recall.

1    Q    Okay.  They did travel there, right?

2    A    They did.

3    Q    And they traveled one more time?

4    A    They did.

5    Q    And they had expenses in coming over, correct?

6    A    They did.

7    Q    And, in fact, I think Mr. Bardales stayed overnight?

8    A    Don't know.

9    Q    Okay.  But according -- I'm sorry.  Mr. -- according

10   to -- Let me leave it at that.

11   A    May I?

12   Q    Yes.  No, no.

13   A    You say "yes."

14   Q    I know but I changed my name because this is not -- this

15   is --

16            THE COURT:  And no more permission, so go ahead.

17            (LAUGHTER.)

18   Q    (BY MS. HERNANDEZ)  No more permission.  You can answer my

19   questions, period.

20        Okay.  Let's talk a little bit about -- let's talk a

21   little bit about your -- what it's like to be a confidential

22   informant, how about that.

23        When you're a confidential informant, you are acting

24   like someone else, correct?

25   A    I'm not acting like someone else.  I acting under

```
 1   instructions of play a role of a trafficker.  It's not someone
 2   else.  It's me doing it.
 3   Q    You're playing a role, how's that?
 4   A    That's better, yes.
 5   Q    You're playing a role.  And as part of that role, you are
 6   deceiving the people around you?
 7   A    Deceiving.
 8   Q    Yeah.
 9   A    I'm negotiating with them.
10   Q    They think you are someone you're not?
11   A    I don't know what they're thinking.
12   Q    And this is -- you can't tell me what they're thinking?
13   A    Only because you told me not to assume what peoples
14   think.
15   Q    Okay.  All right.  Good.  I'm glad you're following --
16   you've now come -- Strike that.  I'm sorry.
17        You are representing yourself to be someone interested in
18   trafficking in cocaine?
19   A    In this one particular case, I am playing the role of
20   being a Colombian drug trafficker to transport cocaine.
21   Q    Okay.  But, in fact, you were not trying to transport
22   cocaine?
23   A    Of course not.
24   Q    And, in fact, there was no cocaine to be transported in
25   this case?
```

1   A   That's correct.

2   Q   And, in fact, there were not millions of dollars to be

3   gained in this case?

4   A   That's also correct.

5   Q   So all of those things were -- I want to get to a word

6   that you will agree with me.  You were acting -- you were

7   deceiving -- let me see.

8       Can you agree that you were deceiving them?

9   A   I was gathering information to get evidence against the

10  people who were in this conspiracy.

11  Q   Okay.  And you were deceiving them?

12  A   I was following instructions.

13  Q   And all of that is true.  And you were deceiving them?

14  A   I don't like the term, and I have to say I don't

15  understand it real good, but I was not doing nothing else but

16  following instructions to get to the bottom of the case.

17  Q   I understand all those things, but you were not -- you

18  were not a drug trafficker.  You were not a Colombian drug

19  trafficker; do you agree with me on that?

20  A   I understand that.

21  Q   At that moment you were not?

22  A   I was not.

23  Q   But you were representing to them that you were?

24  A   I was doing that.

25  Q   You wanted them to believe that that's who you were?

1  A    That's what I was doing.

2  Q    You certainly didn't want them to believe that you were a

3  confidential informant working for the DEA?

4  A    That would be dangerous for my life.

5  Q    Right.  That's the last thing you wanted them to believe.

6  So you were -- you weren't acting and speaking and drinking

7  and joking and doing everything else that it took to have them

8  believe that you were not a confidential informant?

9  A    There was no reason for them to believe I was a

10  confidential informant.

11  Q    So you were doing all those things and you did them very

12  well, how's that?  They believed -- let met put it this way:

13  Mr. Bardales believed that you were a drug trafficker.

14  A    Is that your opinion.  It is what it is.

15  Q    Okay.  I don't know and it's not what my opinion is.

16  It's what you're -- you're the -- you're the witness, so --

17        THE COURT:  But you don't want his opinion either,

18  do you?

19        MS. HERNANDEZ:  No, no, of course I do, Your Honor.

20        THE COURT:  Okay.

21  Q    (BY MS. HERNANDEZ)  Let me ask you a question.  Are you

22  better today at being a confidential informant than you were the

23  first time you did it in 1996?

24  A    Absolutely.

25  Q    You're more at ease?

```
 1    A    No, I'm more confident in what I do because now I know
 2  what is right and what is wrong when I do a case.
 3    Q    Okay.  In terms of --
 4           MS. HERNANDEZ:  With the Court's indulgence.
 5           THE COURT:  Certainly.
 6           (PAUSE.)
 7    Q    (BY MS. HERNANDEZ)  Okay.  Let's talk about the 1980s and
 8  1990s, how's that?
 9         You were born in Colombia?
10    A    Yes, ma'am.
11    Q    And you were granted a Visa to enter the United States?
12    A    I got a Visa to come to the United States.
13    Q    And you were in the United States and you got a job with
14  an airline company; is that what you said?
15    A    Yes, ma'am.
16    Q    And you were working in the catering aspect of that?
17    A    That's correct.
18    Q    In the old days when they actually fed you food when you
19  ran -- when you took a flight, right?
20    A    That's correct.
21    Q    Some young people may not know that.  In the old days,
22  you actually rode an airplane and they gave you -- it wasn't
23  great food but it was an actual meal, right?
24    A    My food was good because I was the supervisor.
25           THE COURT:  I knew you were going to get that
```

1   response.

2            MS. HERNANDEZ:  His food was good; is that what he

3   said?

4            (LAUGHTER.)

5   Q    (BY MS. HERNANDEZ)  And your drug-trafficking in those

6   years took the form of what?  Can you explain a little bit?

7   What did you?  Do did you use your contacts in the airline to

8   transport cocaine to the U.S.?

9   A    Not in the -- no, not in the beginning.  I'm a casualty

10  of the system here of the All American Dream to try to get

11  ahead on life in this country and that's the honest truth, and

12  I'm here under oath, and I say that without hesitations.

13       When you come this country as a foreigner, especially as

14  a Latin American individual who didn't have much at home and

15  you see the generosities and everything you see in this

16  country, you can probably refer to that.  I don't know if you

17  come from the same crib that I came from, which is -- was a

18  poor crib of my days.

19       But when you come here and you see what it's all about,

20  you create a habit, a habit of living well, and that living

21  well demands money.  And as a person without any funds, you

22  want to get ahead in life and you want to continue to live up

23  to the standards or better to what you have now and accustomed

24  to be.  And you get to a point at which people -- and I -- as

25  you know, I was working very decently, a job, and I make money

1    on the job to a point that I was able to open my own

2    restaurant, apart from being on the airline catering business.

3        One individual works -- and I'm giving you a little part

4    of my story here because I think it's important, to me anyway,

5    to express this in this courtroom.

6        This individual walks into the restaurant and he sees me

7    well-dressed, well-mannered and he thinks I'm a drug

8    trafficker; only because I was -- he's Colombian -- he was

9    Colombian as well.  That person has since deceased.  They

10   killed him over half a kilo of cocaine, I learned.  He thought

11   I was part of this group that play and invited me to join

12   them, or so-and-so were into the business of trafficking drugs

13   from Colombia.  They were very successful.

14       And that came to my ear, and I say that's an opportunity

15   for me to make money, and that's exactly what I did.  I

16   went -- I can't regret what I did because I did it.  I know it

17   was illegal, but I paid my debt to society.

18       I came back and I was able to get a second chance on my

19   life here in this country and it happens to be through DEA,

20   and today I can tell you I'm proud to have been -- met DEA or

21   crash into DEA, but I took it for what it's worth and here I

22   am today on the side of the Government.

23           THE COURT:  Let's have another question.

24   Q   (BY MS. HERNANDEZ)  So, in other words, your view of the

25   American dream is that you commit crimes to make money?

1    A    I'm sorry?

2    Q    Your view of the American dream is that you commit crimes

3    to make money?

4    A    No, you come here to live better.

5    Q    Okay.  And if that means committing crime -- at least

6    that's what you were thinking in the '80s and '90s.  If that

7    means -- if to live better required you to commit a crime,

8    that was okay with you?

9    A    It wasn't okay with me.

10   Q    That's what you did.

11   A    I went to the wrong side of the fence, unfortunately.

12   Q    Okay.  And how much money do you think you made during

13   the '80s and '90s drug trafficking?  How much money did you

14   make in a year drug-trafficking?

15   A    Not enough.

16   Q    How much?

17   A    I have no idea of the exact figure at this very moment

18   because those days were different than today.  Today you move

19   a ton or two or what have you.  In my days it was a hundred or

20   200 kilos, so I don't -- in all honesty, I can't tell you a

21   figure because that would be speculation on my part.

22   Q    And so it was a hundred, 200 kilos a year?

23   A    No, a hundred to a hundred kilos a load.

24   Q    A load.  And how many loads do you think?

25   A    Don't know exact number, but I probably -- if I want to

```
 1    add how many kilos I participated on, it was probably a couple

 2    thousand kilos -- 2000 kilos or less.  It was very small, but

 3    yet, as a head of the organization, you have to pay a lot of

 4    people, and the profits are not always there.

 5    Q    So you were the head of an organization?

 6    A    Well, because I was the people -- the person who would be

 7    the broker between the owners and the people that actually did

 8    the job and I have to distribute very much and figure out a

 9    way to pay people.

10    Q    And how many -- where did you distribute the cocaine?  To

11    whom?  Where in the U.S.?

12    A    No, I didn't distribute.  What I'm saying is I was a

13    transporter.  My basic deal was to transport cocaine from

14    Point A to Point B, and when I say I distribute, the money was

15    to the people who I physically would -- that did the work,

16    that transported, the boat guy or the pilot or --

17    Q    Was it commercial pilots or was it pilots for commercial

18    airlines or were they pilots for small separate airlines?

19    A    I have private pilots that did fly for loads for me, and

20    at one given moment I did have a commercial pilot.  Never flew

21    with me but was associated with mine.

22    Q    With one of the airlines?

23    A    Yes.

24    Q    And in -- and how many people in total did you have

25    working for you?
```

```
 1    A    No one worked for me.  They all was associates, let's put

 2   it that way.  Everybody is their own entrepreneur.  I don't

 3   know.  I can't have the figure but --

 4    Q    Ten?

 5    A    In those years, I'm pretty sure more than 10.  You meet

 6   people, they do one job today, they disappear, so I don't

 7   know.

 8    Q    Hundreds?

 9    A    No.

10    Q    And so how much money are we talking about?  A million?

11   2 million?  3 million?

12    A    Never that much money, no.

13    Q    Total.  Millions of dollars pass through your hands?

14    A    I'm sorry?

15    Q    Millions of dollars pass through your hand?

16    A    No.

17    Q    So you could pay off the pilot and the -- this one and

18   the other one?

19    A    Millions of dollars, but not as millions.  Maybe a couple

20   millions but not necessarily the hundred millions.

21    Q    Okay.  And do you know where the cocaine ended up?

22    A    No.

23    Q    You don't know if it --

24    A    No, because I never sold cocaine on the streets.  I just

25   pass it on to all people that either would -- that -- the boat
```

1  people would probably take money.  Instead of money, in lieu

2  of money, they would take cocaine.

3  Q   Did you say the boat people?

4  A   Yeah, yes.

5  Q   Because some of the cocaine came in through boats?

6  A   Well, you -- I used to -- now we going about the past

7  here, but people who bring a load into the Bahamas in the

8  '80s, which is what it used to be the tread -- the trend, you

9  need a boat to bring it from the Bahamas into the U.S.

10  Q   And did it come into Miami or did it come into different

11  places in the -- different states in the U.S.?

12  A   Mostly Miami.

13  Q   And from there, where did it -- where did you have it

14  shipped?

15  A   That's it.  That's the end of the road for me.  Whoever

16  took the dope, that was it, I'm done, I'm finished.

17  Q   So you made sure it came to Miami, and then how did it go

18  from your hands or from your control to someone else?

19           MR. LAYMON:  Judge, may we approach just a moment?

20           THE COURT:  You may.

21           (AT THE BENCH; ON THE RECORD.)

22           MR. LAYMON:  I wanted to object, but since it was

23  maybe quite lengthy, I thought I would do it up here.

24       My objection to this is that, No. 1, it's well beyond the

25  scope of direct examination.  There was no testimony at all on

1    direct, other than the fact that he had been a drug dealer and

2    he was convicted for drug-trafficking.  But I haven't objected

3    because I think it's fair to allow some of this to come in,

4    but now --

5            THE COURT:  You can't object because it -- much of

6    it is in, so at this point what's the objection?

7            MR. LAYMON:  But at this point the objection is, is

8    that now we've got -- now this is not even relevant at all.  I

9    mean, this doesn't have anything do with his credibility.

10   This doesn't have anything to do with the facts of the case.

11   Now what we've got is a trial within a trial.  Now we're

12   retrying him on what he did.

13           And I think it's simply not relevant.  Again, it's

14   beyond the scope, No. 1, way beyond the scope.  No. 2, it's

15   just not relevant to either his credibility or his impeachment

16   or to the facts of this case.  That's my objection.

17           THE COURT:  All right.  The objection is relevance

18   and beyond the scope.

19           MS. HERNANDEZ:  Well, it's relevant somewhat to his

20   bona fides as a semi-expert cocaine trafficker since he's been

21   spending a day-and-a-half explaining what --

22           THE COURT:  That's not what you're examining him as.

23           MS. HERNANDEZ:  That's part of it.  The second part

24   of it is it's impeachment.  Let the jury know who they're

25   dealing with.  And third, Your Honor, I didn't hear the

```
 1   Government objecting when he was giving me a hard time and
 2   running on and piddling all over my questions.  I'm not -- I'm
 3   not -- he likes to speak on this.  He's doing that.  But I
 4   think, Your Honor, this is impeachment.
 5           THE COURT:  I'll cut through this, and I think it
 6   was a permissible question, but we need to bring it to an end.
 7   We're not going to talk about the past much longer.  We don't
 8   need to have an afternoon of examination about what he did in
 9   the 1980s, so you need to figure out a couple of questions to
10   bring this to an end.
11           MS. HERNANDEZ:  Can I move it to the '90s now?
12           THE COURT:  Not in terms of his past in drug dealing
13   activities, okay.  We just need to wrap that phase up.
14           MS. HERNANDEZ:  You know, I would object to being
15   cut off on the impeachment, but I hear you.
16           THE COURT:  You're not being cut off except that
17   you've been at it with him for about 15 minutes, and I'm
18   saying, take a couple of more minutes to wrap it up.  If you
19   think that 20 minutes of talking about his drug dealing in the
20   1980s is cutting you off, so be it.  The record will reflect
21   what the record reflects.
22           MS. HERNANDEZ:  Let me just say this.  When he
23   was -- as I say, when he started talking about the American
24   dream, the Government didn't have any problems with it.  But
25   it ended up where it did, and that's the problem.
```

```
 1              THE COURT:  And I haven't sustained the Government's

 2    objection.  I focussed on something else which is we need to

 3    wrap this up.

 4              MS. HERNANDEZ:  Can we take a break now?

 5              THE COURT:  We'll take a break in 12 minutes.

 6              MS. HERNANDEZ:  So I have to wait.

 7              THE COURT:  You have 12 minutes of questioning.

 8              (OPEN COURT.)

 9    Q    (BY MS. HERNANDEZ)  Did I understand that in addition to

10    cocaine, you also trafficked in the broadest sense of the term,

11    in marijuana?

12    A    I did.

13    Q    And did that also come out of Colombia?

14    A    No, Jamaica.

15    Q    So, just give me a brief overview of what that -- what

16    that -- what your role in that was, in the marijuana out of

17    Jamaica?

18    A    I did a load from Jamaica on an airplane of marijuana.

19    Q    One load?

20    A    Yes.

21    Q    And how did -- was it -- who were the people in Jamaica

22    who were giving you the drugs?

23              MR. LAYMON:  Objection, going beyond back to what I

24    originally said.

25              THE COURT:  I'll sustain that objection to this
```

```
 1   question as to who the people were.  He can explain -- I'll

 2   allow you to ask a couple of questions about what he did.

 3   Q    (BY MS. HERNANDEZ)  The marijuana, was it the same people

 4   who were shipping you the cocaine, the same --

 5   A    No.

 6   Q    So it was a new contact?

 7   A    Yes.

 8   Q    Were they also Colombians?

 9   A    No.

10   Q    Were they people from -- what nationality were they?

11   A    Jamaicans.

12   Q    Okay.  And --

13   A    And Bahamians.

14   Q    Okay.  And your role in that was also the transportation

15   from outside the United States into the United States?

16   A    Yes.

17   Q    And once it got here, just briefly, what you did with it?

18   A    They took over the --

19   Q    Who is "they"?  I mean --

20   A    The people who would sell it, the people who were

21   expecting the load to come in.

22   Q    In other words, someone here in the United States will

23   say to you, "I have some marijuana in Jamaica and I want to

24   bring it to the United States," and that was your role in it?

25   A    I'm sorry?
```

1  Q   Your role in it was to get it from Jamaica to the U.S,

2  and then you gave it off and they gave you cash?

3  A   Yes.

4  Q   Okay.  And were you still working at the airline or in

5  the -- was it the airlines during this period of time?

6  A   No.

7  Q   You stopped working at the airlines?

8  A   Yes.

9  Q   When did you stop working at the airlines?

10  A   When?

11  Q   When?  When?

12  A   If I'm not wrong, in about 1985, '86.  I'm not sure.

13  Q   And so from '85 til you were arrested in '90 -- I'm not

14  sure if you were arrested in '92 or '93.

15  A   No, I got arrested in 1993.

16  Q   Okay.  So from '85 to '93, your entire source of income

17  was either the cocaine or the marijuana trafficking or

18  transportation?

19  A   No, I did some other things legally.  I shipped goods to

20  Colombia for, you know, real merchandise into Colombia.

21  Q   Okay.  In containers?

22  A   No, ma'am.

23  Q   And did you report your income during those years to --

24  on your tax returns?  The trafficking, the drug-trafficking

25  income, did you report that?

```
 1    A    No.

 2    Q    So for '85, '86, '87, '88, '89, '90, '91, '92, '93, about

 3  nine years you didn't report any income from the

 4  drug-trafficking?

 5    A    Drug-trafficking income, no, I did not.

 6    Q    What happened to all that cash?

 7    A    I'm sorry?

 8    Q    What happened to all that cash?

 9    A    All gone.

10    Q    Spent traveling to Switzerland?

11    A    No, ma'am.

12    Q    Okay.

13    A    I traveled to Switzerland on the morning that I met with

14  the Government now.

15    Q    So your trip to Switzerland was a vacation?

16    A    Yes, it was.

17    Q    And how long were you there?

18    A    That's personal.

19          MR. LAYMON:  Objection, relevance.

20          THE COURT:  Overruled.

21    Q    (BY MS. HERNANDEZ)  Your trip to -- how long were you in

22  Switzerland with the money you earned from DEA informant work?

23    A    Couple of days.

24    Q    With your wife?  With your family?

25    A    That's personal stuff.  That doesn't pertain -- that was
```

```
 1   legal morning, legal traveling, personal vacation.  I don't
 2   think I have to mix my personal life with the job I do for
 3   DEA.
 4   Q    Do you know how much it was you spent there on that trip?
 5   A    How much I spend?
 6   Q    Yeah.
 7   A    I don't think it's necessary for me to disclose my
 8   personal business.
 9   Q    Can you answer the question, please, approximately?
10   A    I just told you, I don't think it's necessary to disclose
11   how much I spend of my own money on my own vacation time with
12   my own family.
13              MS. HERNANDEZ:  Your Honor, could I have the witness
14   directed to answer the question?  There's no objection.
15              MR. LAYMON:  There is an objection, Judge.  I
16   objected to it as not relevant.
17              THE COURT:  There is an objection, and we'll take
18   our afternoon break now and we'll be back in 15 minutes.
19              THE DEPUTY CLERK:  Leave your notebooks, please.
20              (JURY NOT PRESENT.)
21              THE COURT:  All right.  The relevance.
22              MS. HERNANDEZ:  Your Honor, he's the one who said he
23   spent it with DEA informant money.  I think it's relevant
24   because my -- I'll tell the Court.  My understanding of how
25   the DEA pays is they pay in cash.  There's no W-2, there's no
```

```
1    1099, and then they rely on the agent -- on the person to
2    report it.  We know that he has received over $2 million in
3    Government largesse, and I think it's relevant to his
4    motivation for testifying.
5              THE COURT:  How much he spent on a trip to
6    Switzerland is relevant to his motivation?
7              MS. HERNANDEZ:  Well, I am entitled --
8              THE COURT:  We already know that he's gotten over
9    $2 million.
10             MS. HERNANDEZ:  But you know, there's --
11             THE COURT:  How he distributed it is what we're
12   talking about.
13             MS. HERNANDEZ:  Well, there's two things.  One is
14   the Government's -- as they said in opening statements,
15   $2 million over 10 years, it really only comes to $200,000 a
16   year.  It's more than that, Your Honor, becomes it comes to
17   $200,000 of cash.  No W-2, no 1099, no FICA taxes withdrawn,
18   no Social Security taxes withdrawn.
19             THE COURT:  You can be able to explore and argue
20   that if you wish.  We've already had some testimony.
21             MS. HERNANDEZ:  I'm entitled --
22             THE COURT:  You can explore it.
23             MS. HERNANDEZ:  I know that trials blend into each
24   other.  I'm entitled to explain how -- what $2.2 million gives
25   you.  I frankly have never been to Switzerland, and just for
```

1   the record, I'm an immigrant, dirt poor when my family came

2   here and I never had to deal in drugs to, you know, to reach

3   the American dream.  I think the jury's entitled to know, to

4   get the flavor.

5           THE COURT:  That's not an argument you are intending

6   to make.

7           MS. HERNANDEZ:  No, I'm not, obviously not, but I

8   just -- I want the jury to get the flavor of the man because

9   his motivation is key in this case.

10          THE COURT:  All right.  But the problem that I see

11  is that you could take three days to ask him about every trip

12  he took, every car he owned, every plasma television he might

13  have bought, every suit he bought.

14      What's the limit that we're talking about here?  Does it

15  just happen that you stumbled into a trip to Switzerland and

16  you just want to complete that by having him answer the

17  question as to how much he spent on that trip and that's the

18  end of it, or we talking about the first of 1,462 steps you're

19  going to take?

20          MS. HERNANDEZ:  Well, let me say the following.

21  One, I did stumble onto the Switzerland trip.  Two, I can

22  guarantee you, if this were the government and they had 1,242

23  trips to show, we would see every single one of them in

24  technicolor.  We have one -- they spent a day-and-a-half --

25  they spent three days, or however number of days we've been at

1    it, to show -- to show --

2              THE COURT:  Those are the events of the alleged

3    conspiracy.

4              MS. HERNANDEZ:  To show my client speaking for one

5    minute.

6              THE COURT:  I understand that.  And that argument

7    you've already got to make to the jury.

8         I'm just -- let's stick to what we're dealing with.

9              MS. HERNANDEZ:  Your Honor --

10             THE COURT:  Let's stick to what we're dealing with.

11   I've asked you a question.  I'm going to allow you to get the

12   answer to the question you posed.  But I'm not going to allow

13   you to do this for the next two-and-a-half hours, so what I'm

14   asking you is, where are we drawing the line?

15             MS. HERNANDEZ:  No. 1, Your Honor, I will answer the

16   following.  I don't think I've been dilatory in this case.

17   I've allowed the Government -- you know, I've tried to go

18   through stuff that doesn't cost anybody anything, that, you

19   know, there's no -- no value in having him say the magic words

20   in front of each document.

21        Two, yes, I stumbled on this, but I would like, if I

22   stumble on 10 others, to get the flavor of 10 others.  I have

23   no idea.  Frankly, I thought the trip was going to be a DEA

24   informant trip.

25             THE COURT:  That's what I would have assumed, too.

 1          MS. HERNANDEZ:  But it turned out it was a family

 2     trip, and it turns out obviously he has some concerns about

 3     disclosing how much he spent, so now I'm beginning to wonder.

 4          And as I say, I mean, I don't think everybody gets a

 5     chance to travel to Switzerland off -- even off a

 6     200,000-dollar income.  You know, I have children.

 7          Anyway, I don't want to -- but I just think -- part of

 8     this is, I'm going with the flow.  And one last thing, Your

 9     Honor.  I mean, you know, cross-examination --

10          THE COURT:  You haven't really answered my question.

11     That's why I'm not inclined to let you keep going even though

12     you let the witness go on.

13          MS. HERNANDEZ:  Your Honor, I expected it to be a

14     quick and short answer.  I mean, I came in here trying to cut

15     his answers, and he's the one who's been, you know, giving me

16     10-minute dissertations on anything.

17          I didn't except it to be what it was, but I don't think

18     I'm -- I don't want to cut myself.  If each one is as -- is

19     the gift that he's giving me, I think I'm entitled to explore.

20          THE COURT:  If each one.  All right.  Here's the

21     rules that we're going to operate under.  You may complete

22     this questioning.  It may take one question, it may take two

23     or three, but not many.  And then if something else is

24     stumbled into, I will deal with it when and if it's stumbled

25     into.

1    But, I'm using the term that you've used, "stumbled

2    into."  If I sense that you've got a pattern of exploring

3    everything he's done that has spent money, we're not going to

4    do that.

5            MS. HERNANDEZ:  But I would like to know --

6            THE COURT:  Wait a minute.  I'm making that clear.

7    We're not going to do that and you're going to get cut off.

8            MS. HERNANDEZ:  One, I would like no know how many

9    trips he's been on.  I would like to ask that question.

10           THE COURT:  How many personal trips he's taken over

11   what period of time?

12           MS. HERNANDEZ:  There was a Rome trip, I think

13   even --

14           THE COURT:  How many personal trips he's taken over

15   what period of time?

16           MS. HERNANDEZ:  Since he's been working for the DEA.

17           THE COURT:  12 years.

18           MS. HERNANDEZ:  I just think, Your Honor, you

19   know -- the cross-examination -- you know, there are few

20   places where -- let me -- How do I say this nicely?

21    Cross-examination is the greatest engine of truth that we

22   have in our criminal justice system.  Two, it is often the

23   only thing criminal defense attorney -- or criminal defendants

24   have.  I don't -- you know, I can't fly in people from

25   Guatemala.  I can't give them, you know, travel and give them,

1  you know -- I can't bring in, for example, Constanza Bran or

2  anybody else to defend my client.

3      So I mean, I think the Court should give me great leeway,

4  and I believe that's what the law provides, *Davis versus*

5  *Alaska, et al*, and I -- you know, I think this is the flavor

6  of the man.  Until he started expressing himself to us, he

7  was, you know, a hard working, flag waving DEA informant.

8              THE COURT:  Mr. Laymon, did you have something you

9  wish to say?

10              MR. LAYMON:  Very briefly, Judge.  You know,

11  Ms. Hernandez has a great deal she can cross-examine this

12  witness on.  I mean, there's --

13              THE COURT:  I think she would agree.

14              MR. LAYMON:  -- a treasure trove of things.

15  However, for us to sit here and allow her -- for us to sit

16  here and have her question him about the legitimate ways in

17  which he has spent the money that he has earned is extremely

18  irrelevant.  I can't imagine this scenario coming up in almost

19  any context where a witness who comes before this court --

20              THE COURT:  She believes that a lavish lifestyle is

21  relevant.  That's her contention.

22              MR. LAYMON:  Well, that may be her contention,

23  Judge.

24              THE COURT:  Why is it not?

25              MR. LAYMON:  My contention is --

1          THE COURT:  Because she thinks that that, for

2   impeachment purposes, gives a flavor of the man, which she

3   thinks is a sour flavor.

4          MR. LAYMON:  Well, you know, I understand that may

5   be what Ms. Hernandez says or thinks, but my response to that,

6   really, and I don't want to appear rude, but so what?  So what

7   if he does have a lavish lifestyle?  I mean, so what?

8       That's simply not relevant to either the facts of this

9   case or his credibility as a witness.  If, for example -- if,

10  for example -- let's say, for example, that she wanted to ask

11  him -- I mean, let's say he came in here in a thousand dollar

12  Italian-made suit and she had gone to his tailor and gotten

13  evidence of that, are we going to have to -- are we going to

14  allow cross-examination on that?

15         THE COURT:  That's extrinsic evidence, I mean, in

16  terms of something from the tailor.  And we'll be dealing with

17  that in another setting later on.

18         MR. LAYMON:  Let's say that, you know, that she has

19  that evidence and she starts asking him about how much his

20  suits cost.  I mean, where is the relevance in that?  I don't

21  see that's any different from whether he goes to a restaurant

22  and orders steak or whether he goes to McDonald's and orders a

23  quarter pounder.  So he takes a trip to Switzerland?  How is

24  that possibly relevant?  How is his lavish lifestyle, if we

25  assume that he leads a lavish lifestyle, possibly relevant to

```
 1   whether he's telling the truth as an informant in this matter?
 2             THE COURT:  All right.  Point made and response to
 3   be made.
 4             MS. HERNANDEZ:  It isn't just the flavor of the man,
 5   although Your Honor framed it quite well, better than I could
 6   have, but it's also about motivation.  His motivation for what
 7   he -- why he does and why he -- why he wants to say that "it"
 8   means cocaine.  You know, what "it" is and when he interprets
 9   words that mean nothing but what the paper says.
10             THE COURT:  That's if you can connect it, as you
11   will try to do, at least inferentially.
12             MS. HERNANDEZ:  Right.
13             THE COURT:  To get him paid for results.
14             MS. HERNANDEZ:  Exactly.  Again, you put it better
15   than I might have been able to.  But it goes straight to
16   motivation.
17             THE COURT:  I am -- Go ahead, Mr. Laymon.
18             MR. LAYMON:  Gosh, I'm really at a loss here.
19   Now -- now we're saying that taking a trip to Switzerland is
20   somehow connected to this witness interpreting the word "it."
21   I mean -- I mean, that's just so patently illogical.  You
22   know, it's just --
23             THE COURT:  I am where I was, and that is, I'll
24   allow you to complete this and I'll deal with any stumbles
25   that comes up in the future.  I'm going to give you some
```

1    reasonable latitude to ask a few questions to get a sense of

2    the man and the man's habits so that you can, if you're able

3    to, connect it as you think you can.

4        But you have severe time constraints.  We are not going

5    to spend much time on that.  I do not think I am unreasonably

6    limiting your cross-examination by limiting the time that

7    you'll be permitted to explore such things.

8        I'll let you wrap this one up with the bow that you hope

9    to wrap it up with by getting an answer to the question that

10   is pending, and I'm not going to prejudge that you cannot

11   explore other similar things you happen to stumble into.

12       Now, stumbling into means some unusual type thing.  It

13   does not mean asking about every purchase that he's made,

14   whether it's for a trip, a car, a suit or a television.  We

15   are not going to do that.  All right.

16               MS. HERNANDEZ:  Yes, sir.

17               THE COURT:  See you in nine minutes.

18               THE DEPUTY CLERK:  All rise.

19               (A BRIEF RECESS WAS TAKEN.)

20               THE DEPUTY CLERK:  All rise.  This honorable court

21   is again in session.  Please be seated, come to order.

22               THE COURT:  All right.  Are we ready for the jury?

23   Sounds like we are.  But before we bring them in, I'll tell

24   you that I did talk to Mr. Rodriguez with respect to the

25   PSR -- and let's not bring the witness in yet.

 1        And logistically, it does not look like it's going to

 2   happen.  It's been returned to archives.  It will take them a

 3   couple of days to get it, and even before they do that, they

 4   would have to go to the sentencing judge, in their view, to

 5   get the sentencing judge's permission to release it to me.

 6              MS. HERNANDEZ:  I could extend the

 7   cross-examination.

 8              THE COURT:  I'm sorry, what?  What did you say?  Or

 9   was it facetious?

10              MS. HERNANDEZ:  I could extend the

11   cross-examination.

12              THE COURT:  I'll reserve comment.  Given the

13   situation and the material that's been provided to Defense

14   counsel with respect to Mr. Cortez and his prior conviction, I

15   don't think we can extend this case for several days in order

16   to get the PSR, nor do I think it's necessary.  So that's

17   where we are.

18        With that, are we ready for the jury?

19              MS. HERNANDEZ:  Yes, sir.

20              THE COURT:  All right.

21              (JURY PRESENT.)

22              THE COURT:  Welcome back, ladies and gentlemen.

23        We are ready to proceed, Mr. Cortez.  I remind you,

24   you're still under oath.

25        Ms. Hernandez.

1    Q    (BY MS. HERNANDEZ)   Okay.  Mr. Cortez, the last question

2    that I asked was approximately how much money you think you

3    spent on the Switzerland trip, vacation?

4               THE COURT:  You may answer that question to the

5    extent you remember, approximately how much.

6    A    It was a tour that I went and it cost me about $2500 a

7    person to go.

8    Q    (BY MS. HERNANDEZ)   And how many people went that you paid

9    for?

10   A    My family.

11   Q    Well, just tell me the number.  I don't want to know

12   their names --

13              THE COURT:  You don't have to identify the people.

14   Q    (BY MS. HERNANDEZ)   Or tell me the total amount.

15   A    Personally -- personally I spent $10,000.

16   Q    And have you taken any other vacation -- Back off.

17        Now, in the transcript, you -- there was one moment where

18   you talked about going, I believe, to either Spain or Rome.

19   In the middle of the case you said you would be away for a few

20   days because you were going away to, as I say, I think either

21   to -- to Europe; do you remember that?

22   A    That's the same trip.

23   Q    Excuse me?

24   A    That's at the same time I went to Switzerland, I went to

25   Italy as well.

```
 1   Q    So the trip you were talking about -- so there was

 2   another trip into --

 3   A    No, what happened, I went on a tour, and with the tour

 4   operator, that takes you to various countries for one single

 5   price, which is $2500 a person.

 6   Q    I see.  So have you been to any other personal vacations

 7   to Europe?

 8   A    Yes, I have.

 9            MR. LAYMON:  Objection, Judge, for the same reasons

10   that were raised before.

11            THE COURT:  You may answer that question.  Well,

12   what time period are we talking about?

13   Q    (BY MS. HERNANDEZ)  Since 1993 -- I'm sorry, since 1996

14   when you started as a confidential informant for the DEA and

15   other government agencies, have you been on other vacations to

16   Europe?

17   A    Yes, I have.

18   Q    How many?

19   A    Once more.

20   Q    One other?

21   A    Yes.

22   Q    And was it a similar type --

23   A    Yes.

24   Q    -- travel?  And am I correct that your only income right

25   now, since 1996, is the income you receive from DEA and the
```

1 | other agencies you work for?

2 | A   Today, yes.  Today is my only income.  Previously, I

3 | was -- I earn some money in real estate.

4 | Q   And when you say "today," you don't literally mean this

5 | day?

6 | A   I mean today because I'm not dealing in real estate no

7 | more.

8 | Q   Since when have you not been dealing in real estate?

9 | A   In the last two years.

10 | Q   Okay.  I would like to now talk about the money you get

11 | paid for these cases for DEA.  And I want to talk -- You -- I

12 | just want to talk right now -- Just a second.

13 |         (PAUSE.)

14 | Q   (BY MS. HERNANDEZ)  Before I get to the money you get paid

15 | by DEA, I just want to know, you have done some confidential

16 | informant work for a -- is it a sheriff's office in Florida?

17 | A   No, it's a city police department.

18 | Q   A city police department.  And that's also been since

19 | 1996?

20 | A   That is correct, approximately.

21 | Q   Okay.  And do you remember how much money you earned from

22 | that?

23 | A   I don't have an exact amount, no.

24 |         MS. HERNANDEZ:  I'm sorry, Your Honor.

25 |         (PAUSE.)

1    Q    (BY MS. HERNANDEZ)  And other than the DEA, you also

2    worked for the FBI?

3    A    Yes, ma'am.

4    Q    And do you remember how much money you got from that?

5    A    In all three, about 5-, $6,000.

6    Q    Okay.  And that was only on one case?

7    A    I don't know how they list it, but this is recently.  I

8    didn't start doing something with FBI until very recently.

9    Q    Okay.  So most of your work has been for the DEA; is that

10   correct?

11   A    That is correct.

12   Q    And when you work for the DEA, they give you money for --

13   they reimburse you for expenses?

14   A    Yes.

15   Q    And when you get reimbursed, you tell them how much you

16   spent, and they give you money; is that it -- is that correct?

17   A    They do.

18   Q    And sometimes you give them receipts?

19   A    Sometimes.

20   Q    But a lot of times you can't give them receipts?

21   A    Most of the times.

22   Q    And they just give you the money?

23   A    They just give me the money.

24   Q    And when they give you the money, they give you cash?

25   A    They give me cash.

```
 1   Q   And they don't give you a -- Okay.  So they just give you

 2   cash for the reimbursements.  They also give you money for

 3   your services; is that correct?

 4   A   They pay me an award for the cases that I do.

 5   Q   Okay.  And they also give you money just for information?

 6   A   Part of the case.  As part of the case.

 7   Q   I see.

 8   A   Yes.

 9   Q   And when they give you this money, they give it to you,

10   again, as cash?

11   A   The reimbursements, yes.  The information services, yes.

12   Award monies comes by a check.

13   Q   Okay.  And when they give you the -- so when they gave

14   you $10,000 in this case, that was $10,000 in cash?

15   A   Yes, it was.

16   Q   And at the time, they didn't give you a W-2 form.  They

17   did not give you a W-2 form?

18   A   They never do.

19   Q   At the end of the year -- at the end of each year, they

20   don't give you a W-2 form?

21   A   No, they don't.

22   Q   And they also don't give you what is known as a 1099

23   form, do they?

24   A   No.

25   Q   And so -- and they don't take out any money for Social
```

1    Security taxes?

2    A    No, they don't.

3    Q    Or for FICA taxes?

4    A    No, they don't.

5    Q    And so when -- when we're told that you have earned at

6    least $1.8 million since 1993 from DEA alone, that means they

7    gave you $1.8 million without taking any -- any Social

8    Security taxes or FICA taxes or any other taxes from that?

9    A    They don't take any taxes, but I pay my taxes.

10    Q    Okay.  And when you pay your taxes -- Let me back up.

11         So, do you keep -- do you have an accountant who does

12    your -- who keeps your books?

13    A    The income taxes, yes.

14    Q    But when you get paid the 10,000, do you keep notes or

15    something of how much you got paid on any given case?

16    A    No, but what I do at the end of the year, every year, I

17    call every single agent or group that I have worked with and I

18    ask them to please let me know how much money you pay me when

19    I work for information services or for money that I earned or

20    money that was reimbursed for expenses.  They do tell me that

21    verbally.

22    Q    So -- but when you -- when I file my income tax returns,

23    I have to attach a W-2 form or a 1099 form that tells the U.S.

24    Government how much income I had that year.  You don't have

25    those?

1    A    I don't put any.  I just put the amount that I earn, and

2    I specify what do I do, and IRS knows what I do.

3    Q    What do you specify?  Confidential informant?

4    A    Legal consultant.

5    Q    You put down "legal consultant"?

6    A    Yes.

7    Q    And it's completely -- have you ever been audited by the

8    IRS?

9    A    No.

10    Q    So it's completely up to you what you put down?

11    A    It's completely the truth to be put down.

12    Q    It's completely the truth that you put down.  But there's

13    no document that the IRS gets that says how much money you

14    received?

15    A    That's correct.

16    Q    Okay.  So -- and you don't pay quarterly taxes either?

17    A    No, I don't.

18    Q    So that means at the end of the year you report, "I got

19    $200,000 in cash from the IRS, this year -- from DEA this

20    year, and I owe," and then what, they send you a bill?

21        Oh, no, then you -- so then you pay the IRS tens of

22    thousands of dollars every year?

23    A    That's the intention.  I do pay and -- I do pay on my

24    taxes every year tens of thousands of dollars, literally.  I

25    pay thirty -- all depends on different years 30-, 40-, $60,000

1    on my taxes a year, and that's declared.

2    Q    So at the end of April 15th, you write a check out to

3    the IRS for --

4    A    That is not the case.  Previously, the day before

5    yesterday or yesterday actually, I declare here that I'm

6    unable to pay on time because of the circumstances surrounding

7    my payments from the Government.  And what I do, I send

8    partial payments, and they take those partial payments.

9         They do accumulate, and I do owe them some money, but I

10   have to pay interest on that money.  So it's a loss for me,

11   but at least they know that I'm making the best intentions to

12   pay them.

13   Q    And has the IRS ever had to sue you to get the money back

14   from you?

15   A    At one given time they put a lien on -- against me.  That

16   lien was satisfied, but it still showing on my public record

17   because they don't erase that, although that one in particular

18   was paid for, the only one they put against me, but they do

19   not erase that from the record because I still owe them money

20   from other years.

21   Q    And -- and when -- and -- so, for example, in -- you owe

22   the IRS $17,000 as of --

23   A    1987?

24   Q    The year 2000.

25   A    I pay that money.

```
 1    Q    You paid them 17,000?

 2    A    Yes, I did.

 3    Q    When?

 4    A    I don't recall the date, but it was paid.  I got

 5   documentation for that fact.

 6    Q    Okay.  And so you just what, wrote a check out for

 7   $17,000?

 8    A    I sure did.

 9    Q    And I did establish, I think, that your -- except for

10   real estate, how much money -- so how much money did you earn

11   in real estate?

12    A    I don't have an amount, exact amount.  I made some

13   substantial money when everybody was, what it was called at

14   the time, flipping houses in real estate.  I was buying new

15   construction and close on the deal, and I did that about --

16   the time I did it, about three years -- about three times,

17   three or four times.

18    Q    Three or four times you did it, and other than that, your

19   income for the last, since 1996 has been DEA or FBI or --

20    A    Absolutely.

21    Q    Okay.  So -- let me -- you said earlier that you get

22   money for service -- for -- the money for services is really

23   depending on the case, is that correct; did I understand you

24   correctly?

25    A    The money for services?
```

1  Q    The money that you get from DEA on a particular case.

2  A    Okay.

3  Q    It depends -- what's the biggest amount of money that

4  you've gotten from DEA on any single case?  A biggest award,

5  cash award that you've gotten?

6  A    On a single case, I received a check for $250,000.

7  Q    For $250,000.  How long ago was that?

8  A    Early in my career.  I was -- I can't remember.  '97 or

9  '98, somewhere in the '90s.

10  Q    Around the time that you weren't paying your taxes?

11  A    That was a time -- about the time that I didn't pay the

12  taxes.

13  Q    So you got the money -- so you got the money in 1997 or

14  '98, and yet in 2001, the IRS was telling you and filed a lien

15  against you because you hadn't paid taxes for '96, '97 or

16  1998?

17  A    I paid them afterwards.

18  Q    But you got the $250,000 during this period of time when

19  you weren't paying the IRS their money?

20  A    I used the money to make a living.

21  Q    I see.  Instead of paying your taxes?

22  A    I need to survive.  My family have to eat.  I don't get a

23  paycheck like anyone else as a normal citizen.  I have to wait

24  until I get a check.  And when the checks get in, I already

25  owe most of that money to everybody, including IRS.  And most

1    of the times I'm behind on my mortgage payments because I

2    don't have money to pay, because the money don't get on time.

3    That's the system.  That's the way it works and that's the way

4    I have to work it.

5    Q    I see.  Now, talking about the money you get on a

6    particular case, and the reason you got $250,000 on that

7    case -- Let me back up.

8         In this case, they have -- they're going to give you a

9    cash award also?

10   A    In this case?

11   Q    Yes.

12   A    They have not give me a cash award yet.

13   Q    Do you know how much it's for?

14   A    $50,000.

15   Q    Okay.  And do you know why you haven't gotten it yet?

16   A    They're slow in paying.  It's just the way it works.

17   Q    Well, they decided they were going to give you a

18   50,000-dollar award -- when did they tell you that they were

19   going to give you 50,000-dollar award?

20   A    Last year.

21   Q    Last year.  And is it usually that they wait until you

22   don't have to testify again, until the case is completely

23   closed before they give you the actual cash award?

24   A    No, not necessarily.

25   Q    Sometimes they've paid you before you finish testifying?

1    A   Yes.

2    Q   But in this case they haven't?

3    A   They haven't.

4    Q   Okay.  And have they told you when they're going to pay

5  you in this case?

6    A   Soon.

7    Q   That's the word they use?

8    A   That's the word they use.

9    Q   Okay.  So what are you living on right now then?

10    A   I'm sorry?

11    Q   What are you living on right now?

12    A   Difficulties.  It's hard to live on no money.

13    Q   I see.  So the extent of the award that you get depends

14  on the -- on the amount of drugs involved in the case or --

15    A   Not necessarily.  That is a question to be asked direct

16  to an agent because I can probably speculate on what I think

17  is right, but I have never seen anything in writing, what the

18  rules say, but I know that -- what I believe is that they

19  consider the amount of money they take, the amount of drugs

20  they take and importance of the individuals that get arrested.

21    Q   I see.  Okay.  So when you go on these -- when you're

22  doing these undercover cases, do you -- you have to dress well

23  in order to play the part?

24    A   By all means.

25    Q   And you have to stay at fancy hotels?

1    A    Yes, ma'am.

2    Q    And drive fancy cars?

3    A    Yes, ma'am.

4    Q    Okay.  And throw money around sometimes?

5    A    No.  What do you mean by throw money around?  Throwing

6    money, no.  I don't throw money around.  I spend money.

7    Q    You -- you have -- you eat well when you're in these

8    meetings and you drink a lot and you have to -- to play the

9    part, you have to live a lavish lifestyle.

10   A    I appear well, I don't drink a lot and I do my part as I

11   am portraying to be.

12   Q    Okay.  Now, on these -- when you're playing the part,

13   have you ever had to use cocaine?

14   A    No.

15   Q    Have you ever used cocaine?

16   A    That question has been asked to me before and the answer

17   is I have tasted cocaine as a test driving a car, as a tasting

18   the food that is cooked but -- is cooking, but I have never

19   used cocaine as a user or as a habit.

20   Q    So you've never snorted cocaine?

21   A    No, I have not.

22   Q    Okay.  As a habit you haven't?

23   A    No.

24   Q    But when you say you tasted it, was it just one time in a

25   case or was it multiple times?

```
 1    A    Not necessarily in a case.  It was not in a case.  I
 2  never said it was on a case.
 3    Q    Oh, it wasn't on a case.  Okay.
 4    A    I don't -- you know, I can probably smell on a case if
 5  I'm there with the individual and say, "Oh, looks good and
 6  smells good," but if I ever taste the cocaine, it's probably
 7  to see if, you know, if the texture was good and if it tasted
 8  like cocaine, but that's what I've done.
 9    Q    Okay.  Well, you told me that you did -- that you have,
10  in fact, tested or tasted.  Tasted?
11    A    Well, it's test.  It's two different words, and perhaps
12  when I described that in the past, I didn't use the -- I don't
13  know if I did or not, but I know if I use the appropriate word
14  to --
15    Q    I'm asking you now.  Did you taste it as in sticking it
16  on your tongue and savoring it?
17    A    I test -- well, tasted.  I can say I tasted it, yes.
18    Q    Okay.  So you have done that?
19    A    I have done it.
20    Q    And how many times?
21    A    I don't know.  Maybe once, maybe twice, I don't know.
22    Q    When was the last time?
23    A    I don't remember.  This is not a -- whenever it happens
24  is because the question was asked to me and I honestly answer
25  it, but it wasn't like I taste this cocaine every time I do a
```

1   deal.

2   Q    Okay.  So you didn't become a -- you didn't start

3   trafficking in cocaine because you yourself were addicted to

4   cocaine?

5   A    Never.

6   Q    Okay.  All right.  Let me get then to -- let me get then

7   a little bit into how -- into your conviction and the benefits

8   you received from the Government for your conviction.

9        When you were arrested in 1993, you were charged with

10  trafficking offenses, correct, cocaine trafficking offenses?

11  A    I don't know exactly the --

12  Q    You were charged with trafficking --

13  A    Okay, the charge.  I don't know the exact words, but yes,

14  I was charged with trafficking or smuggling cocaine.

15  Q    Or importation?

16  A    Importation, yes.

17  Q    But it was cocaine and it was a felony and it was a

18  violation of the laws of the United States?

19  A    That's correct.

20  Q    And the maximum penalty -- and one of the counts was an

21  importation count?

22  A    Yes.

23  Q    And the maximum penalty was life?

24  A    It was.

25  Q    And it was -- the charge was for 5 kilograms or more of

1  cocaine?

2  A   Might have changed since the time I got arrested, but I

3  think that's been changed since, but yeah, it was a long-term

4  time in prison.

5  Q   Okay.  But, in fact, you pleaded guilty?

6  A   I did.

7  Q   So instead of getting life in prison, the sentence

8  imposed was much less?

9          MR. LAYMON:  Judge, I object to that.  Ms. Hernandez

10  knows full well what the sentencing guidelines and sentencing

11  range is for this kind of sentence.  For her to imply, as she

12  has just done --

13          THE COURT:  All right.  Let's not argue that

14  anymore.  Let's ask a fair question, Ms. Hernandez.

15  Q   (BY MS. HERNANDEZ)  The maximum penalty for the offense

16  was life, before cooperation.  The sentence that you received

17  was around -- do you remember what the sentence was before

18  cooperation?

19  A   It was 10 years.  As you pled guilty to the charge, it

20  goes to a minimum of 10 years if you plea.

21  Q   So you got a mandatory minimum of 10 years for pleading?

22  A   That's right.

23  Q   And then your sentence got reduced?

24  A   That's correct.

25  Q   And the reduction was to about six years?

```
 1    A    No, three years.

 2    Q    The first reduction?

 3    A    Three years.

 4    Q    You got two reductions, didn't you?

 5    A    No, I did not.

 6    Q    You got one reduction at the sentencing and then --

 7    A    10 years.  From 10 years it went down to three years.

 8    Q    Are you sure you didn't get -- what we call a 5K1.1 that

 9    applies at sentencing, and then they came back afterwards and

10    gave you what's called a Rule 35, and that's when it got

11    reduced to three years?

12    A    I have a 5K1, but it was 10 years.

13    Q    Right.  You mean the 5K1 got you down to 10 years?

14    A    It was in my plea agreement that I pled to one charge and

15    they give me 10 years.

16    Q    And that was -- and at the same time they gave you the

17    5K1?

18    A    The 5K1 was included there, but in reality -- now, I'm

19    not completely sure about the book, what the book says, but in

20    reality, once you take the 5 -- they apply the 5K1 to tell the

21    judge and the judge can analyze what you have done in terms of

22    cooperation or disclosing your previous activities, but I got

23    10 years.

24    Q    You got 10 years?

25    A    Uh-huh.
```

```
 1    Q   And that's -- you got 10 years -- Okay.  You got 10
 2   years.  And then you got a cooperation and your sentence got
 3   reduced to three years.  You did more cooperation and you get
 4   sentenced later?
 5    A   Yes, I did.
 6    Q   So in total you only did three years -- about three
 7   years.  You only got sentenced to three years, but actually
 8   you served less than that with the good time credit, I think
 9   you told me.
10    A   That's correct.
11    Q   And almost immediately after you left, that's when you
12   started working for DEA?
13    A   Immediately.
14    Q   Immediately.  Okay.  So -- and that's -- that was -- that
15   was the first benefit that the DEA gave you, right, was reduce
16   your sentence?  Let me back up.  Let me -- I withdraw that
17   question.
18        The first benefit that you received was a reduction -- a
19   substantial reduction of sentence for your cooperation?
20    A   Through the U.S. Attorney's office.
21    Q   Okay.  The second reduction that you received was --
22         THE COURT:  Reduction or benefit?
23    Q   (BY MS. HERNANDEZ)  I'm sorry.  The second benefit that
24   you received was you -- instead of being deported, because you
25   were here in the United States legally, but you were not a U.S.
```

1    citizen, right?

2    A    That's correct.

3    Q    And once you committed a felony, you were subject to

4    deportation?

5    A    That's correct.

6    Q    And one of the other benefits that you have received is

7    that you have been allowed to stay in the United States?

8    A    That's correct.

9    Q    And you do not -- Do you have a permanent Visa right now?

10    A    Yes, I do.

11    Q    Or do you have a Visa that says you're an essential

12    person and that's why you're in the U.S.?

13    A    I just answered that.  I have a permanent Visa.

14    Q    When did it become -- when you first -- originally,

15    though, it was not a permanent resident Visa; is that correct?

16    A    After I left --

17    Q    After you came out of jail?

18    A    Let's put it this way:  They give me -- the Visa is

19    always there.  You never lose that number, but then I was --

20    in order for me to travel abroad, they give me a parole, what

21    is called in immigration.  So I was under the sponsorship of

22    the DEA.

23    Q    So your Visa -- at any time, it was not a Visa that you

24    received because the DEA said you were an essential person in

25    the U.S., do you know?

1    A    I'm sorry, ma'am?

2    Q    At any time while you were -- after you got convicted,

3    was the Visa one which is called an essential person Visa and

4    you were only here because the DEA was saying you were

5    essential to them?  Do you know that at all?  If you don't

6    know, you can say you don't know.

7    A    I don't think it was a Visa.  My Visa -- they give me a

8    document.  Again, the only document I saw was like a parole

9    document.  I don't want to call it a Visa, but every time that

10   I needed to go out of the country, they give me that document.

11        And my Visa was -- as far as I can tell, it was never

12   revoked, and indeed, down the road, a judge -- immigration

13   judge ruled that my residence Visa was never revoked.

14   Q    Okay.  So, do you know -- do you know right now whether

15   if you stop working for DEA your -- you would be deported?

16   A    I'm sorry?

17   Q    If you stopped working for DEA, would you be deported?

18   A    No.

19   Q    Okay.  Now, how many times have you testified under oath

20   in a case?

21            THE WITNESS:  I'm waiting for her to turn around.

22            THE COURT:  He is waiting for you so he can answer

23   you rather than your back.

24            MS. HERNANDEZ:  I'm sorry, I'm sorry, my apologies.

25   A    In cases -- how many cases is the question?

1    Q    (BY MS. HERNANDEZ)  Other than in this courthouse?

2           THE COURT:  Other than in this courthouse.

3    Q    (BY MS. HERNANDEZ)  Before this courthouse.  Not in this

4    courthouse.  Forget this testimony, or in this courthouse.

5    Before then.

6    A    Perhaps about more or less 10 times perhaps.

7    Q    10 times in federal court?

8    A    In federal, state and in foreign countries.

9    Q    Okay.  In federal court, can you make that distinction?

10   You testified once in Florida?

11   A    No, I testified more than once in Florida.

12   Q    In federal court?

13   A    Yes.

14   Q    There was one case that you testified in -- in -- I

15   believe it was in -- hold on a second, please.

16        Do you remember testifying around 2002 in Tampa, Florida?

17   A    I remember testifying in Tampa, Florida on different

18   occasions.

19   Q    Okay.  Do you remember testifying against a gentleman by

20   the name of Smith?

21   A    Smith?

22           MR. LAYMON:  Your Honor, I would -- I think this

23   might be an appropriate time to approach the bench.

24           THE COURT:  Come on up.

25           (AT THE BENCH; ON THE RECORD.)

 1            MR. LAYMON:  I thought we were going to discuss this

 2  before we got into it.

 3            THE COURT:  Where are we going?  Is this the case?

 4  I thought we were going to discuss it.  You jumped into it.

 5            MS. HERNANDEZ:  I'm sorry, I didn't -- my mistake if

 6  we were.  My apologies.

 7            THE COURT:  All right.  What are you intending to

 8  do?

 9            MS. HERNANDEZ:  I'm going to attempt to try to ask

10  him if he remembers testifying and whether he's telling the

11  truth or not.

12            THE COURT:  Well, I'm really concerned about the way

13  you've embarked upon this, because I think I have made clear

14  my concern that you can't use extrinsic evidence.  Now, you

15  have already identified a particular case to a witness.

16            MS. HERNANDEZ:  I didn't -- let me -- I apologize.

17  He --

18            THE COURT:  And you're holding up a document from

19  the case.

20            MS. HERNANDEZ:  Okay.  I didn't know the date on the

21  case.  He clearly -- when I have given him information that's

22  not precise -- I apologize, Your Honor.  I think you know I

23  don't play these kind of games.

24            THE COURT:  I do know that, but I'm a little

25  concerned with what's happened here.

 1          MS. HERNANDEZ:  I don't play these kind of games.  I

 2   just -- I need -- with him, if I don't give him precise

 3   information, he starts having a discussion and conversation

 4   with me.

 5          THE COURT:  You've had worse witnesses than this to

 6   deal with.

 7          MS. HERNANDEZ:  Well.  So that's the only reason

 8   I -- you know, I mean...

 9          MR. LAYMON:  Judge, this is exactly the problem that

10   we saw.  Because the whole problem here is the manner in which

11   this question is asked.  One problem that we've now had come

12   to life, which is what we were trying to avoid was

13   Ms. Hernandez standing in front of the witness and giving

14   enough information which is -- effectively amounts to the

15   introduction of extrinsic evidence, which is entirely

16   impermissible.  But secondly, the form of the question is

17   extremely crucial.

18          THE COURT:  It is crucial.  That's why I want to

19   know what the form and substance --

20          MR. LAYMON:  For example, a question that says did

21   you ever lie under oath is one thing, but if she stands up

22   there and says, you know, in May of 2002, when you testified

23   in such and such a case before Judge Such and Such and Such,

24   did you lie under oath.  That's -- that's just should not be

25   permitted.  I mean, that's clearly a violation of 608.

1          THE COURT:  Well, that's not clearly a violation of

2     608 because it doesn't actually introduce any extrinsic

3     evidence.  It's still only a question.  The only extrinsic

4     evidence that it introduces, if you will, is the fact that he

5     testified in a case, and that's not problematic, not really

6     relevant either.

7         It's not problematic.  Nonetheless, what I allow is up to

8     me.  It's in my discretion.  That's what the Rule says.  And

9     so the scope of cross-examination and the type of

10    cross-examination that I'm going to permit is what I believe

11    is fair and consistent with the ruling, and I'm not going to

12    allow you -- and the case law.  I'm not going to allow you to

13    ask questions in a manner that effectively introduces the

14    extrinsic evidence that is not admissible.

15          MS. HERNANDEZ:  Your Honor, No. 1, the truth -- you

16    know, we -- going through the situation.  The reason I reached

17    for the document is because I first said, "Have you ever" --

18    you know, I tried to narrow it to Florida, federal, so that he

19    could at least say -- to sharpen his mind to what I was asking

20    about.

21        I mean, as you say, he's already been asked this

22    question, so he should have known that it was coming, and yet

23    he wasn't giving me that.  That's why I turned around to get

24    the document.

25          THE COURT:  I don't think he was being particularly

 1    evasive.

 2              MS. HERNANDEZ:  Okay.  But, Your Honor, let me --

 3    because if this becomes an issue -- if this becomes an issue

 4    on appeal, No. 1, my understanding of extrinsic evidence is

 5    bringing another witness in, bringing a judge in to say this

 6    is what I found.

 7              THE COURT:  A document is extrinsic also.

 8              MS. HERNANDEZ:  Okay.  Bringing in evidence, I

 9    thought we discussed before Your Honor before --

10              THE COURT:  But you can't effectively bring that

11    evidence in through your question.

12              MS. HERNANDEZ:  Your Honor, in fact, that's not what

13    the D.C. circuit case says.  The D.C. circuit case says I can

14    ask the question with reference to a particular situation,

15    otherwise --

16              THE COURT:  I haven't yet ruled that you can't.

17              MS. HERNANDEZ:  Well, so if you're saying that

18    extrinsic evidence is introducing it through my question, I

19    don't --

20              THE COURT:  Extrinsic -- let's be clear.  The

21    extrinsic evidence that is plainly not permissible is a

22    judicial finding, so you cannot mention that at all.

23              MS. HERNANDEZ:  Okay.  I take exception to that.

24              THE COURT:  Well, you may take exception to it, but

25    you will comply with it.

```
 1              MS. HERNANDEZ:  I'm not -- I'm not...

 2              THE COURT:  Whether you can refer to a proceeding is

 3    not something I have yet ruled on.

 4              MS. HERNANDEZ:  I had understood also --

 5              THE COURT:  I have ruled --

 6              MS. HERNANDEZ:  Okay.  Go ahead.

 7              THE COURT:  -- that you can ask the witness certain

 8    questions, and now we're going to identify what those

 9    questions are.  You can ask the witness whether he's ever

10    lied, and, you know, however you choose to formulate that

11    question.  The next step in that process is whether you can

12    ask the witness whether when he testified on such and such an

13    occasion he lied under oath.  Why can't she ask that?

14              MR. LAYMON:  I think --

15              THE COURT:  And if the answer's "no," she's stuck

16    with it.

17              MS. HERNANDEZ:  I thought I could refresh his

18    recollection.  Now, you left this up in the air or whatever.

19              THE COURT:  No, no, no, I haven't ruled on that yet.

20              MS. HERNANDEZ:  Can I go get the case, the D.C.

21    circuit case?

22              THE COURT:  Sure.  Go ahead if you need it.

23              (PAUSE.)

24              MS. HERNANDEZ:  I thought I didn't have the floor.

25    I just wanted to get the --
```

1          THE COURT:  Okay.  You got the case.  So the

2   question I actually asked of you, Mr. Laymon, is whether the

3   Government has an objection to her being able to ask -- let's

4   assume she either has or hasn't asked generally whether he's

5   had to lie under oath, and she wants to follow up by asking

6   whether he lied under oath when he testified on June 2nd,

7   2001 in federal court in Florida.

8          MR. LAYMON:  I think -- I think the answer to that

9   is that no, it's not admissible and here's my analysis.

10         THE COURT:  Admissible.  You mean it's not a proper

11  question?

12         MR. LAYMON:  It's not a proper question.

13         THE COURT:  Why not?

14         MR. LAYMON:  I think the analysis begins with 608(b)

15  which talks about extrinsic evidence and says that extrinsic

16  evidence cannot be used to prove truthfulness.

17     Secondly, then the analysis goes to 403, which says that

18  evidence, even if it's relevant, even if it's minimally

19  relevant, that you have to balance the probative value of that

20  evidence or that information with its prejudice or its

21  confusion of the issue.

22     I think, Judge, that when you take the concern in 608(b),

23  which is that extrinsic evidence not be used in this manner,

24  which is I think what we're doing, at least in part.

25         THE COURT:  We're not really doing that.  I think

1    that's where the quibble with the law is, is because I am not

2    going to permit her to use any document or to ask a question

3    that refers to a judicial determination.

4        My question is whether she can, in her cross-examination

5    that is effectively saying have you ever lied under oath, can

6    she specify, now, when you testified in this case, when you

7    testified in that case, did you lie under oath?  That's really

8    extrinsic evidence.

9            MS. HERNANDEZ:  Let me say.  In Whitmore, the

10   Government didn't even argue that it was 608.  They conceded

11   608.  The issue in Whitmore was whether it was 403 --

12   precluded under 403.

13           MR. LAYMON:  That's what we just said.

14           THE COURT:  That's what he said.

15           MS. HERNANDEZ:  Yeah, but you're talking about --

16   and, in fact, the D.C. Circuit said no because it's highly

17   probative and reversed the case.  And in fact --

18           THE COURT:  But wait a minute.

19           MS. HERNANDEZ:  Okay.

20           THE COURT:  They were not allowing extrinsic

21   evidence.  They were allowing the kind of cross-examination

22   that I'm talking about.

23           MS. HERNANDEZ:  Well, you know, at page -- at the --

24   whatever, page 619, this paragraph, they, in fact, cite to a

25   Second Circuit case, the other case.

1          THE COURT:  That's an immigration case.

2          MS. HERNANDEZ:  You know, in which a party tried to

3  cross-examine a key witness regarding a finding by another

4  court.

5          THE COURT:  I don't think the court reporter can

6  keep up with you.

7          MS. HERNANDEZ:  I'm sorry.  Nothing --

8          MR. LAYMON:  You are talking too fast.

9          MS. HERNANDEZ:  I'm sorry.  (Reading) Nothing can be

10  more probative of a witness' character for truthfulness than

11  evidence that the witness has previously lied under oath.

12  Indeed, as the Second Circuit observed, in a remarkably

13  similar case before the enactment of Federal Rule of Evidence

14  608(b) in which a party sought to cross-examine a key witness

15  regarding a finding by another court that the witness had,

16  quote, intentionally given false testimony, the rule seems to

17  be well settled that although the opponent is not permitted to

18  adduce extrinsic evidence that a witness lied on a previous

19  occasion, he may, nonetheless, ask questions to that end.

20      Then they cite *Walker versus Firestone Tire & Rubber*

21  *Company*, 412 F.2d 60, 63 to 64, 2d Circuit 1969.  And they

22  also cite the previous Second Circuit, and then in -- in

23  paren.  This is the key.  Sorry.  (Reading)  While a witness'

24  testimony regarding collateral matters here -- here an

25  unrelated trial -- may not be refuted by calling other

1  witnesses or by production of extrinsic evidence, there is

2  nothing improper in asking questions relating to extrinsic

3  matters in the hope of undermining the witness' credibility.

4         The next case they cite, (reading)  Proof that a

5  judge -- before whom the witness had testified as an expert

6  had found that the witness had guessed under oath was

7  probative of the weight to be accorded his testimony.

8         *U.S. versus Whitehead*.  (Reading)  Approving

9  cross-examination of lawyer-defendant --

10        MR. LAYMON:  You got to slow down.  I can't keep up

11 with what you're saying.

12        THE COURT:  I read the case.  I don't think you have

13 to read me the case.

14        MS. HERNANDEZ:  I'm sorry.

15        THE COURT:  We're dealing specifically here with a

16 question.  You know, the question I asked is whether -- of the

17 Government was whether they have an objection to your

18 saying -- your asking whether he lied under oath on such and

19 such an occasion, and quite frankly, I haven't heard anything

20 convincing from the Government as to why you can't ask that

21 question.

22        MR. LAYMON:  Judge, I think it's okay for her to ask

23 a question, "Have you lied under oath?"  The problem that I

24 have is when she starts loading her question with what the

25 jury can only assume are obvious facts about a day, a time, a

1   place, a court, and then she asks did you ever lie under oath

2   in that case, because to me that implicates 403 and I think

3   the prejudicial value of that far outweighs the probative

4   value -- any probative value that it might have because, and

5   this is the difference between this case -- our case today and

6   the case you're talking about.

7       Because we know, or at least I know, and if we want to

8   have an out-of-court hearing, I think it will be shown

9   conclusively, that any question in this area that's posed to

10  this witness is going to elicit a hearsay response.  This

11  witness does not have any personal knowledge about what it is

12  that Ms. Hernandez wants to ask him about, and fundamentally,

13  a witness can only testify about what he has personal

14  knowledge about.

15      This witness has no knowledge, other than from another

16  Defense counsel in another companion case that there was ever

17  anything put on record about him from another court.  So not

18  only in my opinion is it prejudicial just on its surface, but

19  it's inherently prejudicial because now we're eliciting a

20  hearsay response, and the response itself is prejudicial.  So

21  now we have double prejudice.

22      THE COURT:  Well, I'm going to control the

23  questioning, and quite frankly, having the witness answer the

24  actual question presented, and this is what I'm going to do.

25      I'm going the allow you to ask the general question,

1  whether he's ever lied under oath, and I'm going to allow you

2  to ask, without giving too much specifics, I'm going to allow

3  you to refer to a particular testimony.  But you can't start

4  talking about, okay, did you lie under oath about such and

5  such, that you said and such and such that you said and such

6  and such that you said.

7       MS. HERNANDEZ:  When you say -- you refer to a

8  particular testimony, I don't --

9       THE COURT:  A particular case.

10       MS. HERNANDEZ:  Okay.  So in a case -- in *U.S.*

11  *versus Smith* or against Mr. Smith or however.  I don't want --

12  I just want to make sure I understand what the Court said.

13       THE COURT:  Whatever you wish -- whatever to -- you

14  know, hone him in on testimony that he's given, particular

15  case and that's it.

16     Now, I'll consider this further overnight, and if you

17  wish -- you have a choice.  You can do what I'm allowing now

18  and you're going to have to stop then, or if you want to

19  postpone this until your examination tomorrow, you can

20  postpone it until your examination tomorrow and we'll discuss

21  it further before you begin that examination tomorrow, but

22  today -- and this is what I thought we were doing.  What we

23  were reviewing it again, but I'm not going to keep the jury

24  sitting there while we review it.

25     So you'll have to make up your mind if you want to go

1    further than that, you'd be advised to wait to do it in the

2    morning because we'll have a chance to talk further about it.

3    I'm not saying that I'm going to allow you to, but I'll

4    consider it further.  But for right now, my ruling is that you

5    can only ask the general question and you can ask a question

6    that refers to a particular case but only to refer to that

7    case, not to refer -- not to get any more specific about it

8    because I think that gets into the area where it's beginning

9    to be extrinsic evidence and we have a 403 issue as well.

10          MS. HERNANDEZ:  Can we -- can we resolve that now?

11          THE COURT:  No, I said we can't because what I

12    expected --

13          MS. HERNANDEZ:  No, no, I don't mean --

14          THE COURT:  -- Ms. Hernandez, what I expected, and

15    I'm sorry that it's turned out this way timing-wise, was that

16    we would have a chance to discuss it further, but you didn't

17    indicate to me that you were about to do it, and I'm not going

18    to have the jury sit there for another 20 minutes while we

19    resolve it.

20          MS. HERNANDEZ:  Okay.  I just --

21          THE COURT:  I am willing to resolve it, but the only

22    way you're going to get me to resolve it is for --

23          MS. HERNANDEZ:  For me to spend another 20 minutes

24    or 40 minutes cross-examining.  I just don't know that I have

25    40 minutes of --

1          THE COURT:  That's not what you told me earlier.

2     You said you were going into the morning.

3          MS. HERNANDEZ:  That's what I thought.  He actually,

4     you know, my primary point I got from him quite easily.  And I

5     mean, I don't -- I can't check and see what other lines -- I

6     cut off a lot of examination early on because I got what I

7     believe I needed.

8          THE COURT:  Why don't you do everything else and see

9     where you are and then either we'll adjourn for a couple of

10    minutes to resolve it and let you continue today or we'll

11    reserve -- we'll adjourn for the day and you can finish it up

12    in the morning.  All right.

13         MS. HERNANDEZ:  Okay.  Give me a minute then.

14         THE COURT:  Sure.

15         (OPEN COURT.)

16         THE COURT:  Don't hold this against Ms. Hernandez,

17    Members of the Jury.  I changed the order of things a little

18    bit.  It may even lead to us adjourning a little bit earlier

19    today.

20       Take your time, Ms. Hernandez.

21         MS. HERNANDEZ:  Sorry, Your Honor.  Let me --

22    Q    (BY MS. HERNANDEZ)  Let me ask you some questions about

23    what led you to cooperate in the first place.  You were sent --

24    you were arrested; is that correct?

25    A    I was arrested.

1    Q    You were arrested in 1993?

2    A    Yes, ma'am.

3    Q    Okay.  That's where I want to go.  And you were

4    immediately sent to prison?

5    A    I'm sorry?

6    Q    You were immediately detained and sent to prison, to wait

7    trial or resolution?

8    A    Yes, ma'am.

9    Q    And it is a pretty awful period of time when you're

10   arrested, am I correct?

11   A    I'm sorry?

12   Q    It's pretty awful to get arrested and thrown in prison?

13   A    Absolutely.

14   Q    Being behind bars is a very bad thing?

15   A    It is.

16   Q    You -- your -- your privacy is completely curtailed?

17   A    That's right.

18   Q    You are in very tight quarters?

19   A    Yes.

20   Q    It's pretty noisy?

21   A    Yes.

22   Q    The food is pretty bad?

23   A    Yes.

24   Q    The company is not necessarily good.  You don't get to

25   choose who's in the cell with you?

1    A    That's right.

2    Q    Some people are pretty dangerous?

3    A    Yes.

4    Q    You have to watch your back and your front.  You don't

5    want to get into a fight, for example?

6    A    No, you don't.

7    Q    Every moment of your life is controlled?

8    A    Yes.

9    Q    You're told when to get up, when to eat, what to eat,

10   what you can read, when you can see your -- you can say "yes."

11   You can say "yes" or "no."  I'm not -- I mean --

12           THE COURT:  You stopped in your questioning.

13   Q    (BY MS. HERNANDEZ)  You're told when to get up, yes?

14   A    Yes.

15   Q    You're told when to go to sleep?

16   A    Yes.

17   Q    When to eat?

18   A    Yes.

19   Q    What to eat?

20   A    Not necessarily.

21   Q    Well, you can't decide.  It's not a menu you're given,

22   are you?

23   A    Either you eat or you don't eat.

24   Q    Okay.  You can't see your family at will?

25   A    That's right.

1    Q    They only come to visit you on certain days?

2    A    That's correct.

3    Q    And only for a short period of time?

4    A    That's correct.

5    Q    If you have children, it's a pretty bad -- it's pretty

6    hard, the separation?

7    A    It is.

8    Q    So would you say that you -- most people faced with that,

9    and you, in particular, try to figure out a way to either

10   reduce the sentence or get out, am I right?

11   A    Most people do -- do that.  My circumstances, when I was

12   detained, the moment I got detained, I didn't take any of that

13   under consideration.  I just did what I needed to do to

14   cooperate because I was caught.

15   Q    And -- now, let me then go back to --

16        Okay.  So you say that the reason you -- you cooperated

17   is because you were caught and you knew --

18   A    I can't hear.

19   Q    The reason you pled guilty is because you were caught and

20   you knew you had -- you were guilty?

21   A    Yes.

22   Q    But you tried to reduce your sentence as much as you

23   could?

24   A    That's the benefit that comes with that.  That's the

25   program.  That's -- it was set up by the Government.

1  Q   And, in fact, you had your wife try to cooperate with the

2  Government to give -- so that whatever she did could benefit

3  you?

4  A   That's correct.

5  Q   So that wasn't about knowing that you were guilty or not

6  guilty.  That was just trying to reduce your sentence.

7  A   Guilty or not guilty was at the moment of the arrest.

8  After that -- after the fact is when you call to know what are

9  the benefits of pleading guilty and what the Government offers

10 to you.

11 Q   But going farther and having your wife cooperate, that's

12 an extraordinary remedy or an extraordinary action?

13 A   For my wife, it is.  That's ordinary extraordinary action

14 to help her husband.

15 Q   In all your time that you've been working the criminal

16 justice system, how many people have you known who had their

17 wives cooperate to benefit the husband?

18        MR. LAYMON:  Judge, objection.  I didn't see how

19 that is relevant.

20        THE COURT:  I'll allow the question.  You may answer

21 the question.  How many have you known.

22 A   Multiples.  I heard that a lot.

23 Q   (BY MS. HERNANDEZ)  You heard it?

24 A   Yes.

25 Q   But in any event, that aspect of it had nothing to do

1    with you pleading guilty because you were guilty.  That aspect

2    of it, having your wife cooperate, that was about reducing

3    your sentence.

4    A    That was after the fact that I -- that I got arrested and

5    I learned that I could benefit by cooperating, and if my wife

6    was to assist me, it would make things better for me, of

7    course.

8    Q    Right.  To gain a benefit?

9    A    To gain a benefit.

10   Q    Okay.  And so when you started cooperating -- I mean,

11   we've talked about some of the money you've gained from your

12   work.  You also -- for the first 18 months after you were

13   released from prison, you also received money from DEA,

14   correct?

15   A    For the first?

16   Q    18 months after you were released from prison.

17   A    I received money from DEA after I was released from

18   prison like a couple of three months later.

19   Q    Well, you received 18 months' worth of monthly payments

20   from DEA.

21   A    Oh, I understand what you're saying.  I don't know how

22   long it was, but I did get monthly payments for a period of

23   time.

24   Q    About $2500 a month.  Or not about, $2500 a month.

25   A    If that is the right amount, that's the way it is.

1  Q    And the reason they gave you that was to allow you to be

2  set up after you came out of prison?

3  A    For the most part, but it was also to set up an apartment

4  to work undercover in Miami.

5  Q    And you received -- I have the numbers.  You received

6  $270,000 from the Sarasota Police Department during the time

7  you've helped them?

8  A    For the years that I've been helping them, that's

9  possible, the right amount, yes.

10  Q    Okay.  And from FBI, you received about $4500?

11  A    That's probably right.

12  Q    And from the U.S. Customs, you received about 120,000,

13  $119,000?

14  A    Correct, if that's what the record shows.

15  Q    So when you add up all these amounts of money that you've

16  received, you've received about more than $2 million?

17  A    Is that's what it add to, that's what it is.

18  Q    Okay.  And is it your intent or your expectation or your

19  hope that you will continue to work for the rest of your life

20  for DEA?

21  A    I haven't had the time to stop to think about it, but

22  right now I'm a benefit for the Government, so I'm going to

23  continue doing it.

24  Q    And, therefore, other than that, you have no other source

25  of income right now?

1    A    No.

2    Q    Which means that -- would you say that you -- you need to

3    do well for the DEA in order to keep on getting money from

4    them?

5    A    I probably need to do well -- do good cases for DEA, but

6    in order for me to live, I don't necessarily have to depend on

7    DEA.  I can always find work to do, and I'm intelligent enough

8    to do something that will make me money.

9    Q    Okay.  And -- but really, the big money that you get from

10    DEA is when you make the case; is that correct?

11    A    I don't make the case.  I work the cases for DEA.

12    Q    All right.  But if all you do is -- reimbursement for

13    expenses, that's not income to you?

14    A    I'm sorry?

15    Q    When you get reimbursed for expenses, that's not income

16    to you?

17    A    That's right.

18    Q    And when you get payment for the time you're working,

19    that really also is relatively -- that's limited income; is

20    that correct?

21    A    I'm sorry?

22    Q    That's not very much money when it's just the small

23    amounts that you get paid?

24    A    That's money.

25    Q    What allows you to live in the manner in which you live

1    are the big sums of money that you get from DEA, the awards?

2    A    The awards, yes.

3    Q    And those awards are given only if you have been able to

4    bring to the DEA cases where they can arrest and charge people

5    and go to trial and convict them?

6    A    At this point, I don't bring in cases to DEA at this

7    point.  DEA is bringing me to the cases.

8    Q    But they don't give you the awards unless you're

9    successful?

10    A    Unless the case is proven to be a fact that they breaking

11    the law.

12          THE COURT:  You just let me know when you reach a

13    point.

14          MS. HERNANDEZ:  Your Honor, I think I'm at a point

15    where I'm just really not very organized to continue to ask

16    the questions.

17          THE COURT:  Okay.  Well, we'll adjourn for the day

18    then and we'll resume tomorrow morning.  I think the schedule

19    tomorrow morning will be as follows:  I hope that we'll start

20    at 9:30, but my best guess is we'll probably be a couple of

21    minutes late, so forgive me if you're waiting a couple of

22    minutes but just a couple of minutes.

23        So be here ready to go at 9:30.  My guess is we probably

24    won't get started for 10 or 15 minutes after that.  All right.

25    Thank you.  Have a pleasant evening.

1              (JURY NOT PRESENT.)

2              THE COURT:  All right.  Why don't we do this, why

3    don't we take about a 15-minute break and then get together

4    for a couple of minutes on this issue, and then we'll see what

5    we need to do in the morning on it, all right?

6              MR. LAYMON:  Fine, Judge.

7              THE COURT:  Does that work for you, Ms. Hernandez?

8              MS. HERNANDEZ:  Yes, sir.

9              THE COURT:  All right.  So I'll see you in about 15

10   minutes.

11             MS. HERNANDEZ:  Thank you.

12             THE COURT:  Forgive me, I'm going to be up here for

13   a moment.

14             THE DEPUTY CLERK:  This honorable court is in recess

15   15 minutes.

16             (A BRIEF RECESS WAS TAKEN.)

17             THE DEPUTY CLERK:  All rise.  This honorable court

18   is again in session.

19             THE COURT:  All right.  So we're on this issue of

20   the permissible cross-examination and/or use of extrinsic

21   evidence with respect to Mr. Cortez's past testimony,

22   including, most specifically, his past testimony in this one

23   case where there's a judicial, we'll call it a finding, of

24   untruthfulness.

25        In this circuit, the most important case is *Whitmore*,

1   right?  Anybody disagree with that?

2           MR. LAYMON:  No.

3           MS. HERNANDEZ:  No.

4           THE COURT:  We've got a number of issues, analytical

5   frameworks intersecting here.  There's the 608 extrinsic

6   evidence issue, there's the 608 discretionary control of the

7   scope of cross-examination and then there's the 403

8   examination, which plays into the discretionary scope of

9   cross-examination, and then there is the issue the Government

10  is inserting in here as well, which is some sort of hearsay

11  knowledge question unique to this case.

12      Let's start there.  I don't understand what that is

13  intended to do in this analysis, Mr. Laymon.  In all these

14  instances of judicial findings or observations as to

15  truthfulness, the individual being examined will only know

16  that through some means other than being present when that

17  observation was made.

18      If the person was an expert witness, this is true in some

19  cases, or a police officer, this is true in other cases, that

20  judicial observation on the truthfulness of the testimony is

21  not going to be made in front of the witness.  The witness

22  isn't going to be there.  So I don't understand why there's

23  some unique problem here that you're focusing on because of

24  some hearsay acquisition of information by Mr. Cortez.  Could

25  you explain that to me?

 1          Okay.  Hold on for a second, Mr. Laymon.

 2               MR. LAYMON:  All right.

 3               THE COURT:  Okay.  We are only going to go -- off

 4     the record.

 5               (OFF-THE-RECORD DISCUSSION.)

 6               THE COURT:  Okay.

 7               MR. LAYMON:  I think in part, Judge, the -- this

 8     objection that we have to the question eliciting a hearsay

 9     response is a separate analysis because although I -- although

10     I think it can play into the analysis under 403, which is what

11     I said earlier, I also do think it's a separate analysis.

12     Because let's say you decide that --

13               THE COURT:  But playing in on a 403, how is this

14     case any different than any other case that would be dealing

15     with the admissibility of a judicial finding or permissible

16     cross-examination as to whether someone's been found to have

17     lied?

18               MR. LAYMON:  Well, for example, in the *Whitmore* case

19     which we acknowledge is certainly a pivotal D.C. Circuit case,

20     that case turned factually on the cross-examination of

21     Mr. Soto.  And in particular, in that case, the issue was

22     whether his 1999 appearance in court in which a D.C. Superior

23     Court judge had found that Mr. Soto had lied, whether he could

24     be cross-examined on that.

25          So in *Whitmore* itself we have the distinction, Judge, in

1    that we have the witness who is being cross examined, is being

2    cross-examined on a finding presumably that he knew about.

3            THE COURT:  Presumably that he knew about it.  Well,

4    the presumption -- why is the presumption any different than

5    in this case?  He was a witness in an earlier case.

6            MR. LAYMON:  Right.

7            THE COURT:  There was a judicial finding with

8    respect to his testimony.

9            MR. LAYMON:  Right.

10           THE COURT:  But there is no indication that in Soto

11   that judicial finding was made in front of the witness, and in

12   this case, there's no indication the judicial finding, indeed

13   we know it wasn't made in front of the witness.

14           MR. LAYMON:  Right.

15           THE COURT:  What's the fundamental difference?

16           MR. LAYMON:  Well, again, I don't want --

17           THE COURT:  For purposes of 403 or some independent

18   analysis, I don't understand what the fundamental difference

19   is.  And I do agree that, you know, hearsay nature may play

20   into one side of the 403 balance.

21           MR. LAYMON:  Well, I think here is the -- here is

22   where I -- my take on this, Judge.  Let's get away from the

23   context of 608(b) and 403 and just say that what we're

24   asking --

25           THE COURT:  Then we're left with nothing.

1          MR. LAYMON:  No.  Here's what we're left with.

2    We'll asked with a lawyer, it could be a prosecutor or defense

3    counsel, we'll ask with a lawyer asking a witness a question.

4    That's the context in which we find ourselves in.  We just

5    happen to be within 608 and 403 in terms of impeachment.  But

6    what we have, big picture, is a lawyer asking a witness a

7    question, and within that context, I'm saying, that that

8    witness has no personal knowledge of the question that is

9    being proposed to ask of him.  We know that going in.  I know

10   that going in.  If we were to have --

11         THE COURT:  They probably knew that in Soto going

12   in.

13         MR. LAYMON:  Let's say we have an out-of-court

14   hearing and we bring this witness in and we ask him, you know,

15   do you have personal knowledge, do you know what this judge

16   had to say of you?  No, I have no idea what this judge had to

17   say of me, period.

18       All right.  Let's just say that was his answer.  This is

19   the first time I'm ever hearing about this.  Then -- then why

20   would we ask a witness a question that he has absolutely no

21   personal knowledge of and we know -- if we know that he

22   doesn't have any personal knowledge?

23         THE COURT:  Isn't that inconsistent with all these

24   other cases that -- I say all.  With these other cases that do

25   permit not extrinsic evidence but questioning about judicial

 1    determinations of untruthfulness?  It's -- I don't understand

 2    why you think this case is unique because of a lack of

 3    personal knowledge.

 4        All those cases the -- to the extent that the witness

 5    knows anything about a judicial finding of untruthfulness,

 6    they picked it up from some means other than being present

 7    when that finding was made, and that's all we have here is

 8    that the witness has picked it up from some means other than

 9    being present when the finding was made.

10        What's the difference?

11            MR. LAYMON:  Well, beyond the witness not having any

12    personal knowledge, the only knowledge that he has is hearsay

13    knowledge.  So that let's say, for example, that the question

14    is --

15            THE COURT:  You say knowledge because it came from

16    the lawyers in this case?

17            MR. LAYMON:  Right, from the lawyers in the prior

18    case.

19            THE COURT:  In the prior case or in this case?

20            MR. LAYMON:  In the prior case.

21            THE COURT:  So it came from the Defense lawyer, you

22    mean the questioning, not from your discussions with him?

23            MR. LAYMON:  Right, it came up.  It came up in

24    Constanza Bran.

25            THE COURT:  Right.

1          MR. LAYMON:  Right.

2          THE COURT:  And I permitted some questioning.

3          MR. LAYMON:  Right.

4          THE COURT:  And the questioning I permitted...

5          MR. LAYMON:  Well, actually it just came out.  I

6   don't know that --

7          THE COURT:  I didn't allow the extrinsic evidence to

8   come in.

9          MR. LAYMON:  No, but the questioning came out

10  because I don't think anybody was aware of it, and it just

11  came out.  That's how that happened.  So that's his knowledge

12  of this issue.  Now, subsequently, as I indicated to the Court

13  previously, I asked him --

14         THE COURT:  Right.

15         MR. LAYMON:  -- if he had any personal of that or if

16  he had ever heard that the judge had made such a finding, and

17  he said no.

18     So that -- Judge, that's all I'm saying is that -- is

19  that if we know that we're asking a witness a question of

20  which he has no personal knowledge or of which it's going to

21  call for a hearsay response, then generally, generally, that's

22  objectionable and he's not entitled to answer.

23         THE COURT:  Let's boil this down as follows.  Let's

24  assume that -- and this will probably be the end of our day

25  because we need to let the marshals take care of

1    transportation, but let's assume that under the case law and

2    the rules of evidence I determined in the first Constanza Bran

3    case that the appropriate questioning -- that the extrinsic

4    evidence could not come in but that the witness could be

5    examined on whether he had ever lied and whether he had lied

6    in this particular case and whether he was aware that a judge

7    had found him to be untruthful in some case.  Let's assume all

8    those questions were allowed.

9            MR. LAYMON:  Okay.

10            THE COURT:  And he answered, let's assume, as well,

11    because I think this is consistent with the facts here, was

12    "no, I ever lied" and "no, I'm not aware that the judge ever

13    found me to have been untruthful."  Okay.  That's the first

14    Constanza Bran case.

15            MR. LAYMON:  Okay.

16            THE COURT:  And then subsequently prosecutors talked

17    to him about it, and the second Constanza Bran case is

18    occurring.  Does that mean that because of the prosecutor's

19    discussions with the witness, that the defense attorney cannot

20    ask the same questions again because the prosecutors have

21    informed the defendant of things?  I can't believe that that's

22    the result.

23            MR. LAYMON:  No, it's not.

24            THE DEPUTY CLERK:  You said the defendant.

25            THE COURT:  Okay, the witness.  I mean, certainly

1    the question can be asked again and the answer might be

2    different because he now knows that a judge has found him to

3    be untruthful, right?  The answer will be different.

4              MR. LAYMON:  Well --

5              THE COURT:  But you can't constrain the Defense and

6    say they can't ask it in the second trial, can you?  Make sure

7    you answer my question.

8              MR. LAYMON:  All right.  Let me think about that,

9    Judge.  Let me think on that, since --

10             THE COURT:  We're going to think overnight on this.

11             MR. LAYMON:  All right.  But let me also throw this

12   out.  Let's say, for example, that this court or any court in

13   this -- on this particular -- let's say the question is

14   allowed to be specific, or you know, are you -- Have you ever

15   lied under oath, first question.

16        Second question, Did you ever lie under oath in the *Smith*

17   case?  No.

18        Third question, Are you aware that Judge so-and-so on May

19   14th, 2002, found that you had lied in the *Smith* case?

20        Okay.  So now we've got all three questions, okay.  So

21   then the question I'm pointing -- then the point I want to

22   make is, All right, how is the Government allowed to respond

23   to that?  When we get to redirect or we get to some other part

24   of our case or we get to rebut --

25             THE COURT:  Depends what the answer has been.

1   What's the answer been?

2           MR. LAYMON:  Well, that's what I'm saying.  You

3   know --

4           THE COURT:  If the answer is no, no, no, you're not

5   going to do anything more.

6           MR. LAYMON:  Well, yeah.  I mean, let's say, for

7   example, that we have evidence -- let's take something that's

8   absurd, all right.  Let's just go to an absurdity for a moment

9   just to prove my point.  Let's say we have evidence that this

10  judge was insane at the time of the trial.

11          THE COURT:  That's extrinsic evidence.

12          MR. LAYMON:  Okay.  But --

13          THE COURT:  Just like the Defense is limited to

14  their questions and they get the answers to the questions and

15  they can't use extrinsic evidence, so, too, you're limited to

16  your questions and you get the answers to your questions and

17  you can't use extrinsic evidence.

18          MR. LAYMON:  Well, but the Government, though,

19  Judge, has got to have a way -- or even the Defense.

20  Whether -- which side has got to have a way to fairly respond

21  to that -- to that kind of measure, to that kind of analogy.

22          THE COURT:  You mean the insinuation that is

23  contained in the question asked.

24          MR. LAYMON:  Right.  Because let's say, for example,

25  let's just say that the Government has conclusive evidence

1   that this witness told the truth and that the judge was

2   incorrect.  All right.  And that that could be shown.  There

3   has got to be a way, there has got to be a mechanism for the

4   Government to be able to respond to that.

5            THE COURT:  I think the mechanism, quite frankly, is

6   within me, not within you.  I think the mechanism is that I

7   can give a specific instruction based on what occurs.  I can

8   give a specific instruction even at the time to say that what

9   is contained in the lawyer's question is not evidence in this

10  case.  You should not assume the truth or the falsity of it.

11  It is not evidence in the case.  If that's the concern, I can

12  give an instruction.

13           MR. LAYMON:  But if the witness' response now,

14  because now the witness is responding.

15           THE COURT:  Right.

16           MR. LAYMON:  So if the witness is asked that

17  particular question, Are you aware that on certain day Judge

18  so-and-so found you were not credible, and the witness now

19  says, Yes, I'm aware of it, okay.

20           THE COURT:  Okay.

21           MR. LAYMON:  Which would be, I guess, literally a

22  truthful response even though it is a response based on

23  hearsay.

24           THE COURT:  Right.

25           MR. LAYMON:  Now we've got -- so if you tell the

1   jury that no, they can't consider the question, it doesn't

2   matter.  They're going to consider the question because now

3   they've got the answer.

4               THE COURT:  That's why I said it depends upon the

5   answer given by the witness.

6               MR. LAYMON:  Exactly.  So that kind of instruction,

7   I think, is --

8               THE COURT:  I don't think the instruction works in

9   that hypothetical.

10              MR. LAYMON:  It's relatively meaningless, actually.

11              THE COURT:  And I was speaking to the hypothetical

12  of the no, no, no answer.

13              MR. LAYMON:  Right.  But we're liable to get a "no,

14  no; well, yes, now I know" answer, because someone's told me.

15              THE COURT:  Right.

16              MR. LAYMON:  All right.  So in that particular

17  instance, the instruction has no meaning.  But the Government

18  has got to be able to -- or either side has got to be able to

19  respond to that in some meaningful way.

20              THE COURT:  The most meaningful way is with the

21  witness by saying did you lie on that occasion and getting the

22  witness to explain why he didn't lie.  That's the most

23  meaningful way.

24              MR. LAYMON:  Okay.  Then follow up on that.  Let's

25  say that now the Government has on redirect an opportunity to

1    ask Mr. Cortez about this.  So where do we draw the line?  Are

2    we now going to be -- are we now going to retry, relitigate

3    that case and allow him to testify in depth?

4        THE COURT:  That's what I have to take into account

5    in deciding this 403 problem here.

6        MR. LAYMON:  Because I think that's where the

7    Government is going to have to go is that you're going to have

8    to allow us some ability to question this witness fairly.  So

9    now he's answered the question, he's been -- he's been

10   impeached.

11       THE COURT:  Okay.  But what you have to do

12   overnight, in addition to thinking about some of the questions

13   I've asked, is look at *Whitmore* and say -- and decide if what

14   you're suggesting isn't inconsistent with *Whitmore.*

15       MR. LAYMON:  Well, no.  All right.  What I'm --

16       THE COURT:  *Whitmore* seems to be allowing -- it's

17   not necessarily all that was precisely in front of the Court

18   in *Whitmore*, but in terms of its citations and reliances, some

19   of which Ms. Hernandez read up at the bench, seems to be

20   permitting or expressing a favorable view on questioning of

21   the witness that includes specific reference to the judicial

22   determination.

23       MR. LAYMON:  And *Whitmore* does say that in a close

24   case, the Court should err on the side of allowing the

25   question to come in.

1          THE COURT:  That's because 403 requires that.

2          MR. LAYMON:  Right.  So I acknowledge that, you

3    know, *Whitmore* does have something to say about this issue,

4    but what *Whitmore* does not have anything to say about, though,

5    although it hints at it in its initial discussion on the

6    issue, but what *Whitmore* doesn't have anything to say about is

7    what is the permissible response because --

8          THE COURT:  That's true.

9          MR. LAYMON:  Because what is the permissible

10   response?  I mean, are we -- are you going to give me two

11   hours to question Mr. Cortez about the facts of that case to

12   sufficiently allow --

13         MS. HERNANDEZ:  No, no, that's extrinsic.

14         MR. LAYMON:  No, that's not extrinsic evidence

15   because that's coming from the witness.  Am I going to be able

16   to take an hour or two hours to go in depth into the facts of

17   that case?  I don't think, and the reason I don't think so is

18   because we've got to balance the 608(b), 403 rule and which

19   comes across in *Whitmore* with the other rule which they give

20   short shrift to, which is that you don't have a trial within a

21   trial.

22         THE COURT:  That's really a 403 analysis.

23         MR. LAYMON:  Well, it is partly a 403 analysis.

24         THE COURT:  That's a 403 analysis, a waste of

25   time -- the waste of time part of 403.

1          MR. LAYMON:  Right.  But you can't -- but you

2     can't -- I mean, you can't say over here that it's not a waste

3     of time to bring this in, and over here say, Oh, now, okay,

4     Government, you're wasting my time.  The defense isn't but you

5     are.

6          THE COURT:  Well, waste of time is always analyzed

7     on how much time it's going to take, so -- but you're right,

8     I'm not going -- I'm not going to impose a ruling that is

9     beneficial to one side and not fair to the other, you're

10    right.  Let me hear the pithy comment Ms. Hernandez has to

11    make tonight so that we can all then retire for the evening.

12         MS. HERNANDEZ:  First of all, the Court gave short

13    shrift, as Mr. Laymon said, because the Government did not

14    challenge the 608 finding.  The Government's only challenge in

15    *Whitmore* was a 403.  But 403, Your Honor, the undue prejudice,

16    if any, is not that -- I don't want the jury to think that

17    I'm -- that I'm asking a question without foundation.

18         The only undue prejudice is the jury will hear that

19    another judge found him to have been less than credible and

20    that they'll say he's a liar.  So the only limiting

21    instruction is the fact that another judge found it doesn't

22    excuse you, the jury, to make a finding in this case.

23         I don't want -- you know, I don't think the limiting

24    instruction is --

25         THE COURT:  Well, the limiting instruction that I

1    was throwing out was only in the circumstance where you had

2    nothing from the witness conceding that that had occurred, but

3    you had in the record an implication through the question that

4    that had occurred.  And you know, that's -- that's a situation

5    that we may not face in this case.

6           MS. HERNANDEZ:  And let me say -- I mean, this is a

7    finding by a judge which written into a -- into a -- into a --

8    into a memorandum in a case.  In other words, the judge --

9           THE COURT:  I want a copy of it now because I don't

10   have a copy of that, I don't think.

11          MS. HERNANDEZ:  I cited the relevant portion in

12   my -- but I will give you a copy, Your Honor, or I'll make a

13   copy.  Here...

14          THE COURT:  I think I need a copy of it to look at

15   because it could impact on what I think is permitted and is

16   not under 403.

17          MR. LAYMON:  Judge, I need to get a copy as well.  I

18   don't have one.

19          MS. HERNANDEZ:  But --

20          THE COURT:  But nobody is suggesting that it should

21   come into evidence because everybody is conceding that it is

22   extrinsic evidence.

23          MS. HERNANDEZ:  Yes.  But so would be a two-hour

24   recitation of the facts of that case.  Let me say this, the

25   judge --

1          THE COURT:  That wouldn't be extrinsic but it might

2   be something that I wouldn't permit, but not because of

3   608(b).

4          MS. HERNANDEZ:  Well, am I going to have four hours

5   then to get into the facts of the case?  Then it's not fair.

6   Then I need discovery.  But let me say this -- let me say

7   this:  There is --

8          THE COURT:  This is why I have a headache at the end

9   of the day, right?

10         MS. HERNANDEZ:  There is a memorandum issued by the

11  Court.  It wasn't even that the judge said it from the bench.

12  The judge said it from the bench and then issued a memorandum.

13  And not only that, but there was an adverse finding to the

14  Government.  That is, the Court, over the Government's

15  objection, granted a safety valve, and the key issue was

16  whether the Defendant was being truthful, and the Court said

17  the only contrary evidence the Government has presented to me

18  is this guy, and I'm going to -- and this guy is less than

19  truthful and I'm going to believe it.  And not only that, the

20  jury had found him less than truthful.

21         THE COURT:  I think the jury's issue, quite frankly,

22  is irrelevant.  That's not a finding of truthfulness.  That's

23  a finding of whether the Government satisfied its burden of

24  proof.  Go ahead.

25         MS. HERNANDEZ:  Then the judge issued a memorandum.

1   The Government had -- the Government, in my opinion, is res

2   judicata, equitably estopped.  They could have taken that case

3   up to the Eleventh Circuit and said the findings -- I mean,

4   the allegation here from Mr. Laymon is that you had a crazy

5   judge on the stand.

6           THE COURT:  I'm not going to -- if I -- well, I

7   can't judicially estop -- I mean, that isn't the right

8   terminology, or find res judicata against the Government for

9   every other criminal case that's ever occurred?

10          MS. HERNANDEZ:  Well, they had a snitch who lied

11  according to -- or was less than truthful.  I don't want to

12  overstate what the judge said, was less than truthful, and now

13  the Government wants to retry -- you know, the extrinsic --

14  Okay.  That's all I want to say.  I'm tired, too.

15     I'm just saying, I don't want the jury -- well, I just

16  don't want the remedy to be -- to impugn my -- the -- you

17  know, the basis of my question.  I don't want the jury to be

18  told there's no basis of fact in my question.

19          THE COURT:  The only -- I would never tell them that

20  there's no basis of fact in your question.  If the answers

21  from the witness are all no's, so the only thing in the record

22  that indicates there was a judicial finding is --

23          MS. HERNANDEZ:  My question.

24          THE COURT:  -- your question, and I will instruct

25  the jury at the end of the case, in any event, that the

1    lawyers' questions are not evidence, and I will consider

2    instructing the jury on the spot that the lawyer's question is

3    not evidence.

4        I don't think we're going -- that's where this is going

5    to go.  It doesn't sound to me like this is -- that's likely

6    where this is going to go, so let's not lose sleep over that

7    aspect of it.  We've got lots of other aspects of this to lose

8    sleep over.

9            MS. HERNANDEZ:  And I think it's a remedy

10   inconsistent with Rule 608(b)because the theory of 608(b) is

11   that he can be impeached with this -- this fact.

12           THE COURT:  Well, the theory of 608(b) is that he

13   can be, it's in my discretion, but you would concede that the

14   instruction is correct.

15           MS. HERNANDEZ:  Yeah, but not --

16           THE COURT:  You just don't want it at that time.

17           MS. HERNANDEZ:  I just don't want it at that moment.

18   That's not the limiting instruction at that moment.  That's a

19   generalized instruction.  The only limiting instruction is the

20   fact -- that fact doesn't -- doesn't mean that you now shut

21   your -- now you follow that finding.  You still have to make

22   an assessment in this case.

23       That's what I think the limiting instruction is, but I

24   think they can weigh that in making their determination.

25           THE COURT:  All right.  You better be prepared, Ms.

1  Hernandez, specifically to indicate precisely what you wish to

2  do when we're next together at 9:15 in the morning.

3          MS. HERNANDEZ:  Ex parte, I'm giving you my

4  questions; is that what the Court is asking for?

5          THE COURT:  No, you can do that.  If you feel that

6  it would be revealing too much to these Government attorneys,

7  as if they don't know already, then you can do it ex parte.

8          MS. HERNANDEZ:  Three of them.  Not one, three of

9  them.

10          THE COURT:  Well, they only have two right now.

11          MS. HERNANDEZ:  Yeah, you know why she went home?

12  To prepare closing.  Judge, under no circumstances are we

13  going to go -- are we going to do closing tomorrow afternoon,

14  are we, please?  If we finish the evidence --

15          THE COURT:  I will guarantee you that we won't do

16  closing tomorrow afternoon because there's no way that we're

17  going to be ready.

18          MS. HERNANDEZ:  Okay.  Because I don't want to have

19  to finish the trial and be told that I have to close that

20  afternoon.

21          THE COURT:  I haven't even given you the jury

22  instructions yet.

23          MS. HERNANDEZ:  That's what I thought, but just in

24  case.

25          THE COURT:  All right.

1              MR. LAYMON:  Judge, before -- I know Ms. Hernandez,

2    like all of us, would like to go home.  Before we go, can we

3    get a copy of that?

4              MS. HERNANDEZ:  No, not until I get -- not until I

5    get the snitch file.

6              THE COURT:  Ms. Hernandez, Mr. Bradley will assist

7    you in making a copy for me --

8              MS. HERNANDEZ:  I will, Your Honor.

9              THE COURT:  -- in chambers right now.

10             MS. HERNANDEZ:  I will get a copy.

11             THE COURT:  And you can deal with Mr. Laymon as you

12   see fit, and he, of course, can suggest to me that you've been

13   unfair to him.  Have a good evening, and thank you everyone

14   for staying late and helping.  We appreciate it.

15                  (PROCEEDINGS END AT 5:30 P.M.)

16                          *-*-*-*-*

17

18

19

20

21

22

23

24

25

1                          I-N-D-E-X

2                          WITNESSES

3     Augustine Cortez
      Direct Examination.............................    2
4     Cross-Examination..............................    8

5                     EXHIBITS RECEIVED

6     Government Exhibit 16..........................    4
      Government Exhibit 17..........................    4
7     Government Exhibit 18..........................    4

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6

**CERTIFICATE OF REPORTER**

7       I, Catalina Kerr, certify that the foregoing is a

8  correct transcript from the record of proceedings in the

9  above-entitled matter.

10
11
12
13
14

_____    _____
Catalina Kerr                      Date
15
16
17
18
19
20
21
22
23
24
25