```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF COLUMBIA
   ------------------------X
 3 UNITED STATES OF AMERICA,

 4          Plaintiff,

 5          v.                    CR 06-0248-05 (JDB)

 6
   ALVARO AUGUSTIN MEJIA,         Washington, D.C.
 7                                Friday, February 29, 2008
           Defendant.            1:50 p.m.
 8

 9                               AFTERNOON SESSION
   ------------------------X
10
                      DAY 5
11            TRANSCRIPT OF JURY TRIAL
         BEFORE THE HONORABLE JOHN D. BATES
12            UNITED STATES DISTRICT JUDGE
   APPEARANCES:
13 For the Government:    BRIAN TOMNEY, ESQ.
                          KIA M. HABISREITINGER, ESQ.
14                        PAUL W. LAYMON, ESQ.
                          U.S. Department of Justice
15                        1400 New York Avenue, N.W.
                          Washington, D.C.  20530
16                        202.307.1383

17 For the Defendant:     CARMEN D. HERNANDEZ, ESQ.
                          P.O. Box 70
18                        7166 Mink Hollow Road
                          Highland, MD  20777
19                        240.472.3391

20 Court Reporter:        CATALINA KERR, RPR
                          Official Court Reporter
21                        U.S. Courthouse, Room 6716
                          333 Constitution Avenue, NW
22                        Washington, D.C.  20001
                          202.354.3258
23
   Proceedings recorded by mechanical stenography, transcript
24 produced by computer.

25
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2           THE COURT:  All right.  Are we ready for the jury?
 3           MS. HERNANDEZ:  Your Honor, I'd like to challenge
 4   the -- challenge the experts that are going to be put on, on
 5   the same grounds that have been challenged, relevance and --
 6           THE COURT:  Well, there's only one additional
 7   expert, I believe.
 8           MS. HERNANDEZ:  Okay.
 9           THE COURT:  And that would be Mr. Carrillo Garcia;
10   correct, Mr. Laymon?
11           MR. LAYMON:  Yes, sir.
12           THE COURT:  All right.  And that preliminary general
13   challenge is denied.  Now we'll see what happens during voir
14   dire.  There may be further basis for the challenge.  All
15   right.
16           THE DEPUTY CLERK:  There's a witness in the room.  I
17   just wanted you to know that.
18           THE COURT:  Okay.  I'm not going to say anything
19   else.  Are we ready for the jury?
20           MR. LAYMON:  Yes.
21           THE COURT:  Okay.  Let's bring the jury in.  By the
22   way, I will ask you at the break this afternoon to give me a
23   pretty clear estimate of timing.
24       In other words, when you anticipate Government finishing
25   your case, I'm going to ask the Defense what you anticipate
```

1    timing-wise because I want to advise the jury of what the

2    expectations will be as we go into a second week.

3        Okay.  Bring them in.  And I'll give counsel, before the

4    end of the day, a set of jury instructions so we'll have

5    something that we're working on.

6        Mr. Bradley, there's some feedback over here so you may

7    have to help them out a little bit, but bring the jury in

8    first.

9                (OFF-THE-RECORD DISCUSSION.)

10                THE COURT:  If either Mr. Mejia can't hear, he

11    should let me know that by letting his counsel know, or if the

12    interpreters think it's a serious enough problem, let me know

13    so we can stop.  We'll have our expert come up and let's bring

14    the jury in.

15                THE DEPUTY CLERK:  We're ready.

16                (JURY PRESENT.)

17                THE COURT:  Welcome back, ladies and gentlemen.

18        Mr. Laymon, we ready to move forward?

19                MR. LAYMON:  We are, Judge.

20                THE COURT:  And is it you or someone else who's got

21    this one?

22                MR. LAYMON:  It's me.

23                THE COURT:  All right.

24                THE DEPUTY CLERK:  Name?

25                THE COURT:  Name of the witness?

1          MR. LAYMON:  Oh, Leo Garcia.

2          THE DEPUTY CLERK:  Good afternoon, sir.  Please

3  raise your right hand.

4          (WITNESS SWORN BY THE DEPUTY CLERK.)

5          THE DEPUTY CLERK:  Please be seated.

6          THE COURT:  Good afternoon, Mr. Garcia.

7          THE WITNESS:  Good afternoon.

8          THE COURT:  Mr. Laymon, please proceed.

9          MR. LAYMON:  Thank you, Judge.

10                  LEONARDO GARCIA,

11  having been duly sworn, testified as follows:

12                  DIRECT EXAMINATION

13  BY MR. LAYMON:

14  Q    Mr. Garcia, would you state your full name for us,

15  please.

16  A    Leonardo Garcia.

17  Q    And Mr. Garcia, how were you formally employed?

18  A    Formally employed with the U.S. Customs Service, changed

19  over to what is known as Custom Border Protection nowadays,

20  and also worked with the Narcotics Affairs Section, which is

21  under the International Narcotic Law Enforcement in Guatemala,

22  with the U.S. Embassy in Guatemala.

23  Q    Okay.  Let's look at your customs experience first.  How

24  long did you serve with either the United States Customs

25  Agency or its predecessor agency?

1    A    31 years.

2    Q    And when did you begin that service?

3    A    In September 1975.

4    Q    Okay.  And when did you complete that service?

5    A    Completed it, let's see, three years ago, 2004.

6    October -- September, 2004.

7    Q    In the last several years of your -- of your career with

8    the United States Custom Service, were you stationed abroad?

9    A    Yes, sir.

10    Q    And where were you stationed?

11    A    In Guatemala with the U.S. Embassy or the Narcotics

12    Affairs Section under the INL.

13    Q    Okay.  And again, looking in terms of your customs

14    experience, how long were you in Guatemala?

15    A    Total with the contract, a total of nine years, four

16    months.

17    Q    Okay.

18              THE COURT:  Just a second, Mr. Laymon.

19          (TO COURT REPORTER.)  Is that a problem?

20              COURT REPORTER:  Oh, yes, it is, Judge.

21              THE COURT:  Hold on for a second.

22              (OFF-THE-RECORD DISCUSSION.)

23    Q    (BY MR. LAYMON)  Mr. Garcia, I think you said that the

24    last nine years and four months of your service you actually

25    lived in Guatemala; is that correct?

1    A    Yes, sir.

2    Q    And tell me what years you served in Guatemala.

3    A    From May 1998 till last year, September.  September 2007.

4    Q    Okay.  And in the last three years of that service you

5    were in a slightly different status; is that correct?

6    A    Yes.  When I retired in September of 2004, I got a what

7    they call a personal service contract, a PSE with the

8    Narcotics Affairs Section in Guatemala, stayed on another

9    three years.

10   Q    Okay.  Let's focus specifically on those last couple of

11   years in Guatemala.  Well, before we get to that, let me ask

12   you.

13        In terms of your nine years, four months of service in

14   Guatemala, did you -- what generally were your duties there?

15   A    My duties and responsibility were titled as an advisor, a

16   customs advisor, and my duties and responsibility were maining

17   dealing with the training and oversight in the areas of

18   antinarcotic, antiterrorist, anticontraband.

19             COURT REPORTER:  Slow down.  (Reading)  Dealing

20   with the training...

21   A    And oversight with the police or for the police in the

22   areas of antinarcotics, antiterrorist, anticontraband.

23   Q    (BY MR. LAYMON)  And in that -- in that role, did you have

24   a few or many occasions to travel throughout Guatemala?

25   A    Guatemala and Central America, as a matter of fact.

```
 1    Q   Okay.  Few or many occasions to do that?

 2    A   Many occasions.

 3    Q   All right.  Focusing on your last several years in

 4   Guatemala, in particular, what -- what did you do in

 5   particular in that last year or so -- last year or two, I

 6   guess?

 7    A   Well, our main goal has always been -- my main goal has

 8   always been the seaports in looking at the aspect of training

 9   the people that worked over the police units that were

10   selected to do that particular activity, and like I mention

11   before, I covered the training and the oversight.

12        So at the field, went out to seaports themselves; not

13   only that but also land border locations at the airport but

14   mainly the seaports, oversight for the purposes of what we

15   trained them on, that they implemented those techniques and

16   procedures, processes that were supposed to be applied at the

17   seaports.

18    Q   And in terms of that, again in the last several years

19   that you were there, did you work with -- or did you help to

20   start up a particular agency?

21    A   Yes.

22    Q   And what agency was that?

23    A   By abbreviation, it's called DIPA.  And if I can extend

24   the abbreviations.

25    Q   Please do.
```

1    A    It's in Spanish, Division De Protecion, De Puertos,

2    Aeropuertos y Fronteras, and in translation, I guess the

3    police is in charge of security at these locations, airport,

4    seaport, airports and in between also.

5    Q    Okay.  Now, you've -- you have described this

6    organization by it's acronym DIPA; is that correct?

7    A    DIPA, D-I-P-A.

8    Q    D-I- --

9    A    P-A.

10    Q    -- P-A.  Okay.  When did DIPA start up?

11    A    It had its preliminary beginnings back in October 2005

12    when the director of PNC approached the NAS director and

13    myself wanting to form a division that could do the work at

14    the seaports mainly, more like a customs inspector does it

15    here in the U.S., so that was the preliminary.

16        We set up the plans for it and we actually had the first

17    training in June of 2006, first 40, 45 police that had been

18    selected, embedded actually before going through the course

19    itself.

20    Q    So the first group of police officers that would be

21    working with DIPA starts training in June of '06; is that

22    correct?

23    A    June of '06, correct.

24    Q    And approximately when did they begin their jobs as DIPA?

25    A    The first course we had for them was something like six,

1  seven weeks long, and then the following two or three courses

2  we had with DIPA, there were actually four that I was part of.

3       The course was for 12 weeks long.  So we started with

4  six, seven, ending up with 12 weeks.  No. 2, 3 and 4 courses.

5  Q   And when did that agency actually start up then?

6  A   I would say we're looking at probably June, July, August,

7  more or less, because we still had to set up the site, the

8  location, equipment that they needed and also getting the

9  clearance from the seaport authority and people as such.

10 Q   You mentioned that DIPA had customs authority; is that

11 right?

12 A   No, customs, it's a little different from what we have

13 here in the States versus what you have in Mexico, Central

14 America, South America.  The authority of customs in Central

15 or in the other countries besides the U.S., customs has their

16 authority, which is mainly the anticontraband side of the

17 house and making sure the importation, exportation,

18 commodities are properly handled.

19      This particular unit was more in line with the

20 antinarcotic, antiterrorist, and of course, the

21 anticontraband.

22 Q   Let me ask you to focus on the antinarcotics mission of

23 DIPA.

24 A   Okay.

25 Q   What did that involve?

1   A    Well, basically it involved -- the training we provided

2   and of course the oversight we did, it involved the receiving

3   of the -- especially being at seaport cargo, document

4   information, analyzing that information for what we consider

5   as a high risk, and from that high risk, a selection was made.

6       After the selection, we did the inspection or examination

7   of whatever may be the cargo or the unit itself or type of

8   transport that it may have been moving on.

9       Also in line with that, we train the police people

10  selected to search vessels; likewise, looking at their

11  documentation that they presented, analyzing it and doing a

12  selection and then going through the vessel itself and

13  searching it completely.

14  Q    What, if any, role would DIPA and the officers who worked

15  for DIPA have with inspecting say 40-foot containers that

16  might come into the port in Guatemala?

17  A    I would say if -- unless selection was 100 percent,

18  whatever was selected.  Of course, as we well know, normally

19  selections that we do, you're looking at maybe 10, 15 percent

20  of what's coming or leaving the country that is selected for

21  the examinations.

22  Q    Okay.

23          MR. LAYMON:  Your Honor, I have what is actually

24  page 16 of Tab C previously introduced into evidence, and I

25  would like to show it to the witness at this point if I might.

1          THE COURT:  If it's in evidence, you may show it to

2    the witness.

3    Q    (BY MR. LAYMON)  Okay.  Mr. Garcia, I'm going to approach

4    and hand you page 16 of Tab C of this notebook that we have.

5          MR. LAYMON:  May I approach, Your Honor?

6          THE COURT:  You may.  I mean, an alternative, maybe

7    it wouldn't be big enough, would be to put it on the Elmo.

8          MR. LAYMON:  That's fine.  I can do that, Your

9    Honor.

10         THE COURT:  So long as it's in evidence.

11         MR. LAYMON:  It is.

12         THE COURT:  Probably blow it up a little bit.

13   Q    (BY MR. LAYMON)  All right.  Mr. Garcia, can you see, this

14   is -- for the record, this is page 16 from Tab C of our

15   notebook.

16         THE COURT:  Which is exhibit?

17         MR. LAYMON:  Excuse me, Judge?

18         THE COURT:  That's what the record needs is the

19   exhibit number.

20         MR. LAYMON:  Excuse me just a second, Your Honor.

21   Q    (BY MR. LAYMON)  6B as in boy.  Are you able to see that

22   exhibit, Mr. Garcia?

23   A    Yes, starting with "Mejia" on the left?

24   Q    Right.  You see the first entry for Mr. Mejia there and

25   then in that first entry for Mr. Mejia, there's a reference to

1    DIPA, and then if you go down the page to the last entrance

2    under "Mejia," there's another reference to DIPA.  Do you see

3    that?

4              THE COURT:  If you slide it over to the left just a

5    little bit, you'll catch all that is on the right-hand side.

6    There we go.  Thank you.

7    Q    (BY MR. LAYMON)  Can you see that, Mr. Garcia?

8    A    Yes.  Is that the second "Mejia," to the right of the

9    second "Mejia"?

10   Q    Uh-huh.  You've got at the top of -- I think you and I

11   are looking at the same thing.  At the top?

12             THE COURT:  It's the third "Mejia," I think.

13   Q    (BY MR. LAYMON)  The first "Mejia" entry begins, "There

14   are going to go" -- or "there are going go."

15   A    Yes.

16   Q    And then the last "Mejia" beings "instead of well."  Do

17   you see that?

18   A    Yes.

19   Q    Do you see those references to DIPA --

20   A    Yes.

21   Q    -- in that portion of the transcript?

22   A    Yes.

23   Q    Now, does that D-I-P-A -- do you know of any other

24   D-I-P-A, DIPA, other than the one that you have described for

25   us in Guatemala?

1    A    Negative.  The one and only, DIPA.

2    Q    Okay.  Now, in another part of the transcript there is a

3    reference to BIPA.  Have you ever heard of a BIPA?

4    A    Negative.

5    Q    Now, you'll notice in the middle entry for "Mejia,"

6    you'll see the English translation of the Spanish is "instead

7    of what narcotics was."  Do you see that?

8    A    Yes.

9    Q    In the very middle of the page.  You do see that?

10    A    Yes, I do.

11    Q    Okay.  At the time that you were working with DIPA, the

12    time that you described for us, did it have an antinarcotics

13    role?

14    A    Yes.

15    Q    Now, you mentioned, Mr. Garcia, that in the course of

16    your nine years, four months in Guatemala, that you had

17    occasions to drive all over Central America; is that correct?

18    A    Yes, sir.

19    Q    Specifically, did you have the occasion to drive from

20    Guatemala to the capitol of El Salvador, San Salvador?

21    A    Yes, I did, sir.

22    Q    Have you done that few or many occasions?

23    A    Many occasions.

24    Q    All right.  Can you tell me generally, let's talk about

25    that for just a moment.  Let's focus on the capitol of

1    Guatemala for a moment, Guatemala City?

2    A    Uh-huh.

3    Q    Can you drive from Guatemala City to San Salvador, El

4    Salvador?

5    A    Yes, sir, you can.    There is basically three different

6    main -- four routes that you can take -- three to four routes

7    that you can take to San Salvador.

8    Q    Tell me about those.    For example, talk to me about the

9    distance, the length of time, the difficulty of the route and

10   so on.

11   A    Well, as you may or may not know, the country, Guatemala

12   and Central America, it's mountainous, a lot of curves and

13   whatnot, but three different routes -- the main three

14   different routes, one would be the coastal route.    I don't

15   know if I should name the crossings.    Would that be okay, sir?

16   Q    Certainly.

17   A    Okay.    Pedro de Alvarado would be the crossing into El

18   Salvador, and the other one would be Valle Nuevo, which is the

19   most direct and probably the better road to take to San

20   Salvador via El Salvador, and then the other one is called San

21   Cristobal, which is a little bit farther up in the higher

22   country.    It's another good route, yes, but it's a much more

23   hills or mountains to travel through and a little longer

24   distance to get to San Salvador.

25   Q    Approximately, how long is the driving distance from --

1    A    Main road would take us probably four-and-a-half to five

2    hours to get to -- from Guatemala to San Salvador.

3    Q    Okay.  And do you have to cross -- well, do you have to

4    cross from one country into another to get from Guatemala City

5    to San Salvador?

6    A    Yes, sir, we did.

7    Q    Okay.  And in crossing that border, are there any

8    obligations for motorists?

9    A    There are some obligations.  You got to present your

10   documentation, also the registration of vehicles.  Sometimes

11   they will give you written permits for the vehicles to enter

12   the country itself.

13   Q    So you don't just drive across the border on a highway?

14   A    You do not.

15   Q    All right.  And then I take it -- Well, let me ask what

16   might seem to be a dumb question, but going back from San

17   Salvador to Guatemala City, about the same amount of time?

18   A    Likewise.  I was going to say, it's in both directions,

19   you know.

20   Q    Okay.

21   A    Any location, going into El Salvador or coming back from

22   El Salvador to Guatemala.

23   Q    All right.  Are you familiar with that region of

24   Guatemala that is Escuintla?

25   A    I'm familiar, yes.

1    Q    And tell me where that is?

2    A    It's located, I would say, probably southwesterly

3    direction from Guatemala, probably 60 kilometers, more or less

4    about an hour's drive, and that's going towards the southern

5    coast, towards the Pacific coast.

6    Q    Can you drive from the Escuintla area of Guatemala to San

7    Salvador, El Salvador?

8    A    Yes, sir.  That would be the coastal route.  Probably the

9    nearest would be that coastal route through Pedro Alvarado,

10   Guatemala.

11   Q    Okay.  And about how long does that take?

12   A    It's about 100 kilometers.  Let's see, I would probably

13   eventually say five, maybe five-and-a-half hours from

14   Escuintla to San Salvador.

15   Q    And again, having to cross over the border?

16   A    Affirmative, yeah, Pedro Alvarado into -- Pedro Alvarado,

17   Guatemala into Hachadura, El Salvador.

18   Q    Okay.  Now, are you familiar with the phrase "La Dea"?

19   A    Affirmative, yes.

20   Q    And how are you familiar with the phrase "La Dea"?

21   A    It's the Drug Enforcement Administration.

22   Q    And where have you heard it -- where have you heard DEA

23   referred to as "La Dea" before?

24   A    Mainly in Central -- Central America, the country central

25   and also South America that I worked.

1      MR. LAYMON:  Could I have just one moment, Judge?

2      THE COURT:  Certainly.

3      (PAUSE.)

4  Q   (BY MR. LAYMON)  Mr. Garcia, thank you for bearing with

5  us.  A last couple of questions.

6  A   Yes, sir.

7  Q   In your -- in your job with U.S. Customs and then for the

8  last three years as a contract employee for the Embassy, I

9  think you indicated that you worked closely with the police in

10  Guatemala; is that correct?

11  A   Yes.  It was mainly the police that I worked with.  The

12  DIPA is a division under the, what we call the PNC police,

13  Policia Nacional Civil, which is a national police and civil

14  police in Guatemala.

15  Q   Okay.  Talk to me a little bit about the national police

16  organization.  What -- what is the national police in

17  Guatemala?

18  A   Well, the PNC, shortness of the term, the name, Policia

19  Nacional Civil is under the ministry of government.  It's, I

20  guess, a division within the ministry of government, and PNC

21  at this time has something between, I guess, 22-, 23,000

22  officers and management people within.

23  Q   And what is the -- what is the role of the PNC, the

24  national police in Guatemala?

25  A   Provide security for the country at all locations, sites,

```
 1   throughout the country.

 2   Q    Is there a U.S. equivalent to the PNC?

 3   A    I would venture to say probably --

 4            MS. HERNANDEZ:  Objection, Your Honor.  He said

 5   "venture to say."

 6            THE COURT:  Well, let's -- if -- the question

 7   specifically was is there an equivalent, all right.  And you

 8   should answer it if you think there is an equivalent.  If not,

 9   then say "no."

10   Q    (BY MR. LAYMON)  Is there an equivalent to the Guatemalan

11   national police in our country, United States?

12   A    I would have to say "no" because at least, it's a vague

13   area as to how to describe it, how to compare it.  Yeah, there

14   are some, but there is some differences when it comes down to

15   it.

16   Q    Okay.  And are you familiar with the rankings that one

17   might obtain --

18   A    Yes.

19   Q    -- in the Guatemalan national police?

20   A    Yes.

21   Q    In particular, are you familiar with the rank of

22   subcommissario?

23   A    Subcommissario, yes.

24   Q    And what -- describe to me what a subcommissario is.

25   A    Subcommissario could be in charge of a station or what we
```

1    call a substation out in the -- out in the field locations or

2    sites, and he could be responsible, I would say, anywhere from

3    maybe 20, 25 or more people up to 30, maybe 50 people,

4    depending on the size of the station or substation.

5    Q    And would such substations be located throughout the

6    country?

7    A    Throughout the country, yes.

8    Q    And say Guatemala City or Escuintla?

9    A    You got various in Guatemala City, Escuintla and other

10   cities within the country of Guatemala.

11   Q    Okay.

12            MR. LAYMON:  I don't believe I have any further

13   questions at this time for Mr. Garcia, Your Honor.

14            THE COURT:  Ms. Hernandez.

15                       CROSS-EXAMINATION

16   BY MS. HERNANDEZ:

17   Q    Good afternoon.

18   A    Good afternoon.

19   Q    Let's start where you ended.  You started to identify or

20   explain what a subcommissario was, which is a ranking in the

21   Guatemalan national police?

22   A    Yes.

23   Q    Can you tell me what the highest rank is?

24   A    It's like a general commissioner who is more like a -- a

25   subdirector of one of the sections of the PNC.

```
 1    Q    Okay.  And what goes beneath?

 2    A    It would be commissario.

 3    Q    Well, is there an inspector?

 4    A    That would be way down below as an inspector.  You've got

 5    like the general commissario, and I'm saying it in Spanish.  I

 6    guess that can be translated, commissarios, subcommissarios,

 7    officiales -- and you got three levels of officiales, primero,

 8    segundo y tercero, 1, 2 and 3.

 9    Q    Okay.

10    A    And then the inspectors, you got a inspector and a

11    subinspector and then your agent.

12    Q    Okay.  So you got agent?

13    A    Agent at the very bottom.

14    Q    The bottom.   Okay, Agent at the bottom.

15    A    Uh-huh.

16    Q    Subinspector?

17    A    Uh-huh.

18    Q    Inspector?

19    A    Inspector.

20    Q    And I am -- for the record, I am stepping up the ladder

21    with my hand.

22         THE COURT:  Yes, you are stepping up.

23    Q    (BY MS. HERNANDEZ)  And then you said there was an officer

24    or official?

25    A    There is three levels of officers, you got the third,
```

```
1  second and first officer.

2  Q   Okay.  And the third is lower than the first?

3  A   Exactly.  It's kind of reversed there in the way it's set

4  up.

5  Q   And then the subcommissario.

6  A   Subcommissario.

7  Q   Then the commissario.

8  A   Commissario.

9  Q   And then the general?

10 A   Commissarios generales, and those could be like people in

11 charge of a division or what they call out there,

12 subdireciones.

13 Q   Okay.  Now, as far as the DIPA, D-I-P-A?

14 A   Uh-huh.

15 Q   That is not -- that agency was not primarily concerned

16 with -- with drug -- drug crimes or drug investigations; is

17 that correct?

18 A   Quite the contrary.  It was formed basically, to some

19 extent, or main -- the main purpose of DIPA was to attack the

20 narcotic activity at these locations that I mentioned.

21 Q   And what was SAIA or SAYA (ph.)?

22 A   SAIA is more --

23 Q   I'm sorry, and it's S-A ...?

24 A   S-A-I-A.

25 Q   Okay.  Go ahead.
```

1    A    And the translation, if you want, is Servicio Analisis

2    Informacion Antinarcotica, and the key there in SAIA is

3    investigative.

4    Q    Okay.  So that is -- is that the primary investigative

5    agency antinarcotica or antinarcotics?

6    A    I would say yes.

7    Q    Okay.  And then this DIPA is --

8    A    DIPA -- okay, to clarify it, the SAIA falls under -- it's

9    like a branch under the director of the PNC.  That's why it's

10    called Secretaria, okay.  Then DIPA falls under one of the

11    subdirections, the one subdirection called Unidades

12    Specialistas, Unit Specialist, that's either No. 5 or No. 6

13    direction, and within that subdirection or subdireccion, we

14    got the division of DIPA.

15    Q    Okay.  And was -- where was DIPA originally formed?

16    A    It had, as I mentioned, its preliminary beginnings back

17    in October of 2005 when the plans were presented, talked about

18    and whatnot.

19    Q    I'm sorry, I didn't --

20    A    October 2005, preliminary plannings for it started then.

21    Q    And was it publicly known?  Did it -- did it come out in

22    the news or newspapers or magazine or was it discussed

23    publicly that there was this new DIPA being formed?

24    A    Probably not right after the moment, but this is

25    something that I guess from the president and on down to the

```
 1   minister and minister to the director of PNC, it was announced
 2   and this is what we went for, and when we got started, yes, it
 3   was publicized in the newspapers.
 4   Q    And when would it have been publicized in the newspapers;
 5   do you recall?
 6   A    When?  Probably -- I would say probably at the beginning
 7   of the year, 2006.  Maybe January or something like that,
 8   because October we talked about the planning it and whatnot.
 9   Q    Okay.  And -- and you say you worked with customs, did
10   you?
11   A    For 31 years.
12   Q    Okay.  And by that, you worked for U.S. Customs?
13   A    U.S. Customs, correct.
14   Q    But you were in Guatemala for some period of time?
15   A    Yeah.  Actually with the U.S. Customs which changed over,
16   converted after 9/11 to the Customs Border Protection.  I was
17   detailed by U.S. Customs or CBP, Custom Border Protection for
18   six years.  When I retired, I obtained a personal service
19   contract with the Embassy the last three years that I was
20   there.
21   Q    Were you double-dipping?
22   A    Double-dipping?  Well, I got my retirement and contract.
23   I guess you could call it double-dipping.
24   Q    That's all right.  I don't mean to --
25   A    No problem.  I guess a lot of people do it.
```

```
1    Q    Being in the Washington, D.C. area, we're more familiar

2    with such things than the rest of the country.  I don't mean

3    any disrespect.  My apologies.

4    A    No problem.

5              THE COURT:  One of the few things we're more

6    familiar with inside the beltway.

7    Q    (BY MR. LAYMON)  That's right.  Other states make potatoes

8    or machines but we -- Anyway, I'm sorry.

9         Did you know a gentleman by the name of Edwin Rene

10   Sapon-Ruiz, or did you know of him?

11   A    No, I can't say that I did.  The name sounds familiar,

12   but, you know, those names flow to and fro.

13   Q    Okay.  Did you know the head of customs for Guatemala?

14   A    When was this?  Because we've had, I think, maybe two or

15   three different heads since I've been there.

16   Q    Say in the 2006 period, the year 2006?

17   A    Yes, I do know it's a lady superintendent.

18   Q    It's a lady?

19   A    It's a lady in charge of that, unless the last three

20   months she has been changed or moved.

21   Q    Okay.  But it isn't Mr. Mejia, is it?

22   A    Pardon me?

23   Q    It was not Mr. Mejia.  He's not the head of customs?

24   A    I don't know Mr. Mejia, and I don't recall him being in

25   any position of SAT.  You're talking about customs, not the
```

```
 1    police, DIPA, right?

 2    Q   No, I'm talking about customs.

 3    A   Customs in Guatemala.

 4    Q   Yeah.

 5    A   No, not that I am aware of.

 6    Q   And you don't know him otherwise?

 7    A   I don't know him, no.

 8            MS. HERNANDEZ:  Okay.  I have no other questions,

 9    Your Honor.

10            THE COURT:  Mr. Laymon.

11            MR. LAYMON:  Nothing further of this witness, Your

12    Honor.

13            THE COURT:  Mr. Garcia, thank you very much for

14    coming.  You may step down.

15            MR. LAYMON:  Your Honor, also we would ask if

16    Mr. Garcia could be excused.

17            THE COURT:  Any objection, Ms. Hernandez?

18            MS. HERNANDEZ:  No, thank you.

19            THE COURT:  You may be excused.  Thank you,

20    Mr. Garcia again.

21        And next witness, please.

22            MR. LAYMON:  We call Carrillo Garcia, Your Honor.

23            THE DEPUTY CLERK:  Good afternoon, sir.  Please

24    raise your right hand.

25                (WITNESS SWORN BY THE DEPUTY CLERK THROUGH THE
```

```
 1   INTERPRETER.)

 2            THE COURT:  Good afternoon.

 3            THE WITNESS:  Good afternoon.

 4            THE COURT:  Ms. Habisreitinger.

 5                      CARRILLO GARCIA,

 6   having been duly sworn through interpreter, testified as

 7   follows:

 8                    DIRECT EXAMINATION

 9   BY MS. HABISREITINGER:

10   Q   Senor Carrillo Garcia, where are you employed?

11   A   With the police, directly for SAIA.

12   Q   And what is SAIA?

13   A    It is the counter-narcotics data and analysis

14   administration of the National Civil Police, Guatemala.

15   Q   When you refer to the National Civil Police, is that the

16   same as PNC?

17   A   Yes.

18   Q   How long have you worked with SAIA?

19   A   (ANSWER GIVEN IN SPANISH.)

20            THE INTERPRETER:  May the interpreter ask for a

21   clarification?

22            THE COURT:  You may.

23   A   SAIA has undergone several changes.  Prior, it was known

24   as Duan, D-U-A-N, but I have worked in this area since 1984.

25   Q   (BY MS. HABISREITINGER)  Within SAIA, what position do you
```

1  hold?

2  A    Currently, I am an officer, second rank officer, and I

3  offer assistance in securing ports and airports through DIPA.

4  Q    How long have you been working with DIPA?

5  A    Three or four months, more or less.

6  Q    Is that a permanent assignment to DIPA?

7  A    My boss would have to say.  I don't know for how long it

8  will be.

9  Q    Are you still with SAIA?

10  A    Yes, I work for SAIA.  I'm only working there with DIPA

11  as an assistant, as an advisor.

12  Q    Could you explain to the ladies and gentlemen of the jury

13  what your duties and responsibilities entail.

14  A    Yes.

15  Q    And what are those duties and responsibilities?

16  A    My role consists in giving orientation, training,

17  direction and supervision to all activities related to DIPA's

18  work, especially at the ports; to a lesser degree, at

19  airports.  Every job focussed on finding and fighting

20  drug-trafficking.

21  Q    In the course of your employment with SAIA, do you also

22  have an opportunity to gather drug intelligence?

23  A    Yes.

24  Q    And what type of intelligence do you gather?

25  A    Everything related to the movement of drugs, that is, the

1    way that organizations, different organizations work and how

2    they cooperate among themselves in order to ease or facilitate

3    their movement of drugs.

4    Q    Have you ever had an opportunity to act as a liaison

5    between your country in Guatemala and other countries?

6    A    Yes.

7    Q    And what other countries have you acted as a liaison for?

8    A    We, as a liaison officer, well, we've exchanged

9    information with the countries of Colombia, Panama, all of

10   Central America, which is Mexico, and also I participated in

11   meetings.  The last one was in Bogota, Colombia.

12   Q    In the course of your employment with the PNC and/or

13   SAIA, do you have -- did you gain any hands-on experience or

14   knowledge in the drug-trafficking area?

15   A    Yes.

16   Q    And very briefly, what type of experience did you obtain?

17   A    Well, in terms of drug-trafficking, well, we work or have

18   relationships with other organizations in terms of discoveries

19   that are made.  In the last year-and-a-half or year and two

20   months, more or less, for example, there was the discovery of

21   700 kilos at one point, and there have been other discoveries

22   prior to that.

23   Q    Do you have -- Well, let me ask this question:  How many

24   total years have you been working in the area of narcotics

25   investigations?

1    A    14, almost 15.

2    Q    And prior to your employment with SAIA, did you have

3    other law enforcement experience outside of that group?

4    A    Yes, I worked for a short amount of time, for example, in

5    things related to safety on the streets; again, dealing with

6    common crimes, but my specialty has been that of SAIA.

7    Q    And, for example, in your law enforcement experience,

8    have you had assignments at, for example, the airport or at

9    the borders?

10   A    Yes, mostly in airports and ports later on.  Later on, on

11   the borders.

12   Q    Did you have an opportunity to prepare --

13   A    A few times on the border.

14          THE INTERPRETER:  Correction.  I finished it.

15          MS. HABISREITINGER:  Thank you.

16   Q    (BY MS. HABISREITINGER)  Did you have an opportunity to

17   prepare a curriculum vitae?

18   A    Last time we presented some document on that but...

19          MS. HABISREITINGER:  May I approach the witness,

20   please?

21          THE COURT:  You may.

22   Q    (BY MS. HABISREITINGER)  Sir, I am showing you what has

23   been marked as Government Exhibit 35 and ask if you can identify

24   that document.

25   A    Yes, that's mine.

1            THE COURT:  Can counsel approach for just a second?

2            (AT THE BENCH; ON THE RECORD.)

3            THE COURT:  You need to be careful with this witness

4    when referring to "last time."

5            MS. HABISREITINGER:  Perhaps one of the questions

6    that I will ask is trying to --

7            COURT REPORTER:  I'm sorry, I am not hearing.

8            THE COURT:  We got it covered up.

9            MS. HABISREITINGER:  One of the questions I do ask

10   about, as far as qualifying him as an expert, is have you ever

11   qualified as an expert in the United States.  So there may be

12   a question that we would want to forewarn him not to talk

13   about previous trials, but his answer I would hope should be,

14   "yes, two other times," but I don't know what.

15           MS. HERNANDEZ:  At least one time.

16           THE COURT:  Or two times.  I guess the question I'm

17   raising, and I will say it outside of the jurors now,

18   addressing is whether it might be prudent just to take the

19   witness aside up here, I guess, for the moment and just advise

20   him not to refer to specifically to other trials in this court

21   he's participated in.

22           MS. HERNANDEZ:  In connection with these defendants,

23   because I mean it could be --

24           THE COURT:  Okay.  So let's bring him up here to do

25   that and we'll have to bring one of the translators up here,

1    too.

2              MS. HABISREITINGER:  Judge --

3              THE COURT:  Wait a minute, wait a minute.  Go ahead.

4              MS. HABISREITINGER:  I'm just thinking, so we that

5    don't make a big deal about it, if we could go a little bit

6    farther as far as -- well, I don't know how much further we

7    can go, but I'm thinking maybe break-wise if we could excuse

8    the jury for just a few minutes.

9              THE COURT:  How long do you think you're going to be

10   with him?

11             MS. HABISREITINGER:  I have to look at what my notes

12   are.  Probably just a few more questions, a few more minutes,

13   maybe five minutes until I get to that issue, maybe a little

14   bit more with the translations, my best guess.

15             THE COURT:  I am not anxious to break, to take the

16   afternoon break.

17             MS. HABISREITINGER:  Would the Court consider

18   letting the jury be excused for five minutes so that we could

19   accomplish this and outside the presence of the jury?

20             THE COURT:  You think rather than doing it up here.

21             MS. HABISREITINGER:  I think it would be better.

22             THE COURT:  I'm not sure that matters, but okay.  If

23   one counsel wants to do it, we'll do it that way.

24             MS. HABISREITINGER:  Thank you, Judge.

25             THE COURT:  And do you want to do that now just to

```
 1   be safe?

 2            MS. HABISREITINGER:  Sure, sure.

 3            THE COURT:  Okay.

 4            (OPEN COURT.)

 5            THE COURT:  There's something new you don't get to

 6   experience every day, and what you're going to experience now

 7   is just being asked to leave.  Go to the jury room two or

 8   three minutes.  That's all we'll take and have you back in

 9   here.  This is not your afternoon break.  This is just a

10   momentary pause.

11            (JURY NOT PRESENT.)

12            THE COURT:  Mr. Garcia, I just wanted to advise you,

13   please avoid referring to your testimony relating to this case

14   on the other occasions that you've been here.

15      I don't want you to advise the jury that there have been

16   earlier cases, all right.  That's relating to these

17   defendants.

18            THE WITNESS:  I'm sorry, Judge.

19            THE COURT:  That's quite all right.

20      All right.  Now bring the jury in.

21            MS. HABISREITINGER:  Judge, with the Court's

22   permission, I would like to add one thing to that.  I just

23   want -- the Court can do it, but I will ask him if he has been

24   qualified as an expert, and he can say that he has in two

25   other times as long as...
```

THE COURT: We're not telling you that you can't answer truthfully to any question, including the question as to whether you've been qualified as an expert previously. Just don't mention those cases.

THE WITNESS: I'm sorry. I understand.

THE COURT: All right. Thank you. Bring the jury back.

(JURY PRESENT.)

THE COURT: Ms. Habisreitinger, please proceed.

Q (BY MS. HABISREITINGER) Senor Carrillo Garcia, I showed you what has been marked as Government Exhibit No. 35, which you identified as your curriculum vitae. Was that document prepared by yourself?

A Yes.

MS. HABISREITINGER: Your Honor, at this time the Government offer, files and introduces into evidence Government Exhibit No. 35.

MS. HERNANDEZ: No objection.

THE COURT: Without objection, Government 35 is admitted.

(GOVERNMENT EXHIBIT 35 ADMITTED.)

MS. HABISREITINGER: The Government also moves to offer, file and introduces into evidence 35.1, which is the English translation of the curriculum vitae of Senor Carrillo Garcia.

1    THE COURT:  Without objection, Government's 35-1 is

2  admitted as well.

3    (GOVERNMENT EXHIBIT 35-1 ADMITTED.)

4  Q   (BY MS. HABISREITINGER)  Do you have -- based on your

5  experience and your knowledge, do you have special information

6  or do you have information regarding drug transportation groups

7  in Guatemala?

8  A   Yes.

9  Q   Are you familiar with the drug-trafficking routes in

10  South and Central America?

11  A   Very familiar.

12  Q   Are you familiar with the methods of transportation

13  utilized by drug-trafficking organizations in Guatemala?

14  A   Yes.

15  Q   Are you also familiar with the methods of transportation

16  for narcotics coming into Guatemala and leaving Guatemala?

17  A   Yes.

18  Q   Are you also familiar with the price of cocaine in

19  Guatemala?

20  A   Yes.

21  Q   Are you familiar with the consumption habits of the

22  people of Guatemala?

23  A   Yes.

24  Q   And briefly, how did you obtain special knowledge in

25  those areas that I just asked you about?

1    A    Well, I started out in 1994 training at the canine school

2    here in Front Royal, Virginia.   Then I also got domestic

3    training in Guatemala, I got training in country.   I also

4    received training from DEA and Customs personnel, and as a

5    matter of fact, Mr. Leo Garcia who was here, he also provided

6    us with some training regarding our knowledge and -- of

7    drug-trafficking and how we would confront the problem.   I

8    also received training in Colombia on how to handle

9    intelligence related to drug-trafficking.

10   Q    Have you ever been called to testify in court in

11   Guatemala?

12   A    Yes, I've testified many times with the public ministry

13   of Guatemala, and in courts I've testified in about 12 to 15

14   trials, more or less, both dealing with national and

15   international traffic -- trafficking.

16   Q    Have you ever testified as an expert in a United States

17   court?

18   A    Yes.

19   Q    How many times?

20   A    Twice.

21   Q    Have you ever been denied qualification as an expert?

22   A    No.

23        MS. HABISREITINGER:   Your Honor, at this time the

24   Government moves to qualify Senor Carrillo Garcia as an expert

25   in the field of drug-trafficking activity as it relates to

1    Guatemala, specifically drug transportation groups,

2    trafficking routes, methods of transportation, prices of

3    cocaine in Guatemala and the consumption habits of the people

4    in Guatemala.

5         THE COURT:  All right.  The motion is to qualify

6    Mr. Carrillo Garcia as a Guatemalan law enforcement officer,

7    as an expert in the field of drug-trafficking and

8    transportation activities as they relate to Guatemala,

9    including drug transportation groups, trafficking groups,

10   methods of transportation, prices of cocaine in Guatemala and

11   the consumption of cocaine by Guatemalans in Guatemala.

12         MS. HABISREITINGER:  Correct.

13         THE COURT:  Ms. Hernandez, voir dire?

14         MS. HERNANDEZ:  A few questions, Your Honor.

15         THE COURT:  Certainly.

16                  VOIR DIRE EXAMINATION

17   BY MS. HERNANDEZ:

18   Q    Good afternoon.

19   A    Good afternoon.

20   Q    Have you written any books on the subjects that you're

21   testifying about?

22   A    No, no, no.

23   Q    How about reports?

24   A    Oh, yes.

25   Q    Do you have them with you?

1    A    No, no.

2    Q    And how many of these reports have you prepared?

3    A    Many.  I couldn't tell you how many, because in 14 or 15

4    years, you can imagine how many.

5    Q    What's the nature of the -- I'm sorry.

6              THE INTERPRETER:  I couldn't finish the last

7    sentence.

8              MS. HERNANDEZ:  I'm sorry, Your Honor.  I understand

9    what he says so I start to ask the next question before -- I

10   stepped on the translator's lines.

11             THE COURT:  Go ahead.

12             MS. HERNANDEZ:  Sorry.

13   Q    (BY MS. HERNANDEZ)  How many -- what is the nature of

14   these reports that you prepare?

15   A    Well, if it has to deal with some discovery of drugs or

16   work in the area of drug-trafficking, it's always going to

17   deal with drugs.  I've never worked in any other activity.  My

18   experience is in the area of drug-trafficking activities, so

19   my reports will always have to do with drug-trafficking.

20   Q    Are these reports related to individual cases?

21   A    Well, generally, I have worked in the area of

22   investigation, so sometimes the information circulates without

23   it being directly linked to one specific case, but in a number

24   of cases I have been with, it has been a real discovery and I

25   have worked with the information that has come to light prior,

1  in the early stages and then have taken the case through to

2  the courts.  I brought the drugs into the court and also I've

3  been involved with bringing those responsible for the drugs

4  into the courtroom.

5  Q    What I'm trying to inquire about is whether you have

6  prepared reports that are published in magazines or scientific

7  journals or other educational or types of publications?

8  A    Well, my role is an internal one.  In Guatemala, by law,

9  when we are working with information, that information is not

10  published.  Now, whether my boss decides to publish it or the

11  Government decides to publish it, I don't know about that.  I

12  know what my job is.  I work with the information, and it's

13  others who make the decision as to whether to publish things

14  or not.

15  Q    Okay.  Have you ever, for your own self, made a survey or

16  a compilation of the information in your own cases and

17  reports?

18  A    As I said, all the information in a case must be -- one

19  moment.  Must be gathered and brought together before the

20  appropriate authority, whether it be my boss or brought before

21  the public ministry or if it has to be brought before a judge,

22  it will be so, obviously.

23  Q    What I'm trying to inquire about is whether you

24  personally have ever summarized or compiled the information in

25  your own cases so that you can say 10 of the cases involved

1    this type of situation, a few others involved another type of

2    situation and some others involved some other information?

3    A    Well, yes, I was the head of the office for

4    information -- information gathering and analysis, and we did

5    keep statistics about drugs or any crimes related to

6    drug-trafficking.  We kept those statistics, but that was

7    about four months, maybe six months back.  And yes, in my work

8    I have worked in the entire area of drug-trafficking.  That is

9    my job, to work within that entire area in Guatemala.

10   Q    And are those statistics published in some fashion?

11   A    No, no, no.  This is internal information in Guatemala.

12   The internal information is kept within the department that's

13   handling it, unless somebody comes and asks for that

14   information specifically and has the prerequisites in order to

15   be able to access that information; otherwise, it would stay

16   within the -- internal to that department.

17   Q    And have you provided those statistics or that type of

18   information to the prosecutors here in the United States?

19   A    No, no, no.

20   Q    And so -- and you don't have those compilations of

21   statistics with you right now; is that correct?

22   A    No, no, no.

23   Q    And did you review those statistics before you came here

24   to testify?

25   A    No, no, no.

```
 1    Q    Okay.

 2            MS. HERNANDEZ:  I have no more questions, Your

 3    Honor.

 4            THE COURT:  All right.  The motion is to qualify

 5    Senor Carrillo Garcia as an expert in the area that I

 6    indicated.

 7            MS. HERNANDEZ:  May we approach for two seconds?

 8            THE COURT:  You may.  Indeed, it's almost five after

 9    3:00.  Why don't we -- since we have something to discuss, why

10    don't we take our afternoon break and we'll see you again in

11    15 minutes.

12            THE WITNESS:  Would you like me to leave?

13            THE COURT:  Yes, he can step down.  You'll have to

14    come back but.

15            (JURY NOT PRESENT.)

16            THE COURT:  Yes, Ms. Hernandez, you know the motion.

17            MS. HERNANDEZ:  I would object.  Again, I think we

18    have an insufficient basis to qualify him, even in spite of

19    his two previous qualifications before this court.

20        And there's really no -- again, as with the other expert,

21    the -- as I understand the reasoning for having expert

22    testimony and for having that expert provide the basis of his

23    opinion is to be able to -- to review the basis of the

24    opinion, to cross-examine on that basis.  In essence, an

25    expert provides a particular type -- is authorized to provide
```

1    testimony beyond fact based for the very reason that you can

2    replicate or you can review or you can compare or you can test

3    his testimony against some known data, and we don't have that

4    ability because these experts are just, you know, people

5    testifying from their own memory of knowledge of what -- of

6    what it is from their personal experience rather than from any

7    formalized analysis of evidence.  So again, I would object.

8            THE COURT:  And I understand your objection and I

9    think it actually cuts both ways, as they say, because for the

10   most part, Mr. Carrillo Garcia, my guess is, based -- it's an

11   educated guess based on past experience, won't really be

12   providing testimony.  He'll be providing factual testimony

13   based on his knowledge and facts and not opinions.

14       To the extent that there are opinions, there are likely

15   to be very few, and nonetheless, I think that those opinions

16   are permitted with respect to this witness because of his

17   specialized expertise relating to the particular focussed area

18   of Guatemala and drug-trafficking and routes and

19   transportation methods that are used in Guatemala.

20       So I think he has the expertise, he's demonstrated a

21   sufficient base of the expertise and I will qualify him,

22   although I will also note that most of the testimony he's

23   going to be giving is not really traditional expert testimony

24   because it's simply his factual experience based knowledge

25          MS. HERNANDEZ:  Well, I think that creates a serious

1    problem when you've got people testifying not about the facts

2    of case.  It's sort of this mixed expert fact based which

3    allows him to -- to testify beyond his personal knowledge in

4    many respects based on hearsay that he's read or seen or heard

5    about, which is -- which is beyond my ability to test.

6            THE COURT:  Well, there have got to be people in

7    this world who have an expertise in the methods of

8    transportation and the routes of transportation of drugs

9    through Guatemala, and I think he's demonstrated a base of

10   knowledge to testify on that subject matter that is sufficient

11   to enable him to do so, and you can test him on his knowledge

12   and his base of knowledge.

13       To some extent you have already, but you certainly can do

14   that further in cross-examination, and he doesn't base it, in

15   particular, on a study or a report or a journal and the fact

16   that he doesn't does not preclude him from being qualified as

17   an expert.  So I would qualify him as an expert in that

18   subject matter, and we will receive his testimony in about 10

19   minutes.

20           MS. HERNANDEZ:  Thank you.

21           THE COURT:  Thank you, Ms. Hernandez.  Be thinking

22   about schedule because I'll ask you that as soon as I come

23   back in before I bring the jury in so that I can advise the

24   jury of what they should anticipate for next week, and I'll

25   see you in a few minutes.

```
 1            THE DEPUTY CLERK:  All rise.

 2            (A BRIEF RECESS WAS TAKEN.)

 3            THE COURT:  All right.  Well, we need to avoid

 4    keeping the jury waiting.

 5         Are we ready for the jury, Ms. Habisreitinger?

 6            MS. HABISREITINGER:  Yes, Judge.

 7            THE COURT:  Ms. Hernandez?

 8            MS. HERNANDEZ:  Yes, sir.

 9            THE COURT:  Well, wait a minute, we can't bring them

10    in because I need to review the schedule with you first.  I

11    can't talk to the jury about the schedule unless I review with

12    it you first.  For the Government, expectations.

13            MR. LAYMON:  Judge, of course, we have two witnesses

14    after -- we could possibly have a third one because we might

15    have to call an interpreter translator, but it will be very

16    brief.  Essentially, two witnesses after this one, but you

17    know, we're starting to slow, so I don't know that we're going

18    to finish today.

19         Realistically, it looks like it may be Monday morning

20    that we finish.  If we don't finish today, Monday morning.  It

21    won't take long Monday morning.

22            THE COURT:  You're not going to finish today.

23            MR. LAYMON:  Probably not, probably not.  So we go

24    into Monday morning.  We don't have that much more to do.

25            THE COURT:  Pretty confident you'll finish Monday
```

```
 1      morning, though.

 2              MR. LAYMON:  I think so, I think so, and then we

 3      should be ready for opening statements, my guess.

 4              THE COURT:  Opening?

 5              MR. LAYMON:  Closing statements.  The second opening

 6      statement.

 7              THE COURT:  Statements.

 8              MR. LAYMON:  Statements, arguments, something.

 9      We're going to do something.  Yeah, and then instructions in

10      that afternoon.  I think they should get the case by mid to

11      late afternoon on Monday.

12              THE COURT:  All right.  Ms. Hernandez.

13              MS. HERNANDEZ:  You're talking about my case?

14              MR. LAYMON:  Yes, I did.

15              THE COURT:  Anything you can tell me with respect to

16      the Defense case?

17              MS. HERNANDEZ:  At most, one witness.

18              THE COURT:  Lengthy or short?

19              MS. HERNANDEZ:  It would be short, I think.

20              THE COURT:  Okay.

21              MS. HERNANDEZ:  And I'm not positive, but at most.

22              THE COURT:  Okay.  I will advise the jury at the end

23      of the day that it's my expectation that they will receive the

24      case and begin deliberations, if not at the end of the day

25      Monday, then on Tuesday.
```

1    MS. HERNANDEZ:  Your Honor, what I would definitely

2  ask is that the Government not get to go home and come back

3  with rebuttal overnight.  That is, if we start closing, we

4  should finish.

5    THE COURT:  I'll worry about that as we schedule

6  that out.  I'm just worried now about what I'm going to tell

7  the jury.  I'm just going to tell them that they'll receive

8  the case either at the end of the day Monday or on Tuesday.

9    Bring them in, please.  And please, someone get

10 Mr. Garcia.

11    (JURY PRESENT.)

12    THE COURT:  Mr. Carrillo Garcia, I remind you, you

13 are still under oath.

14    Ms. Habisreitinger.

15    MS. HABISREITINGER:  Thank you, Judge.

16    THE COURT:  And good afternoon and welcome back

17 ladies and gentlemen.

18                DIRECT EXAMINATION (CONT'D.)

19 BY MS. HABISREITINGER:

20  Q    Did you have any involvement in the investigation of an

21 individual by the name of Alvaro Augustin Mejia?

22  A    No.

23    THE COURT:  By the way, I have qualified

24 Mr. Carrillo Garcia to testify as an expert in the field of

25 drug-trafficking and transportation activities as they relate

```
 1    to Guatemala, including drug transportation groups,

 2    trafficking groups, methods of transportation, prices of

 3    cocaine in Guatemala and the consumption of cocaine by

 4    Guatemalans in Guatemala.

 5        And you may proceed, Ms. Habisreitinger.

 6            MS. HABISREITINGER:  Thank you, Judge.

 7    Q    (BY MS. HABISREITINGER)  You mentioned that although

 8    you're working for SAIA, you're currently assigned to DIPA.  Why

 9    are you assigned to DIPA?

10            MS. HERNANDEZ:  Objection, relevance.

11            THE COURT:  Overruled.

12    A    I'm working with DIPA because the people who have -- are

13    working in that special group do not have the experience --

14    have neither the experience nor the knowledge to work within

15    that field that they've been designated, and so I'm there

16    acting -- I'm working with DIPA because of that.

17    Q    (BY MS. HABISREITINGER)  I want to talk a little bit about

18    the -- the price of cocaine in Guatemala.  How much -- how much

19    would, for example, 1 kilogram of cocaine sell for within the

20    country of Guatemala?

21    A    It depends where this deal is going down.  If it's in the

22    capitol, it would be around 50,000 quetzales, more or less,

23    and if you're talking about the border of Mexico, it would be

24    about 60,000.

25    Q    And what is a quetzales?
```

1    A    It's the national currency in Guatemala.

2    Q    Why would a kilo have two different prices in Guatemala?

3    A    For the very simple reason that, as in any legal product,

4    transportation plays a role in the price, and so owing to the

5    difficulty in transporting the product, there is a risk of

6    theft in this case, the authorities could seize or arrest the

7    shipments and so all of that increases the cost, and

8    therefore, that's why there is a change in the pricing.

9    Q    Are you able to convert for us the price of cocaine in

10   Guatemala into -- from quetzales into U.S. dollars?

11   A    Yes.  If you gave me a calculator, it would be easier.

12              MS. HABISREITINGER:  May I approach the witness?

13              THE COURT:  You may.

14              MS. HABISREITINGER:  Thank you, Judge.

15   A    In the first case, the case that I gave you with the

16   first price that would be in the capitol.  In dollars,

17   according to the calculator, approximately, the price would be

18   6,578 or -79 dollars in Guatemala.

19       In the case that I mentioned what -- that includes the

20   whole transportation of the product through national

21   territory, to the Mexican border, the conversion of kilos --

22   of the kilo in dollars would be $7,895, more or less.

23   Q    (BY MS. HABISREITINGER)  I'd like to talk a little bit

24   about the consumption habits of the people in Guatemala.

25   A    Go ahead.

```
 1   Q   What are those?  What are the consumption habits of the

 2   people in your country?

 3           THE COURT:  For cocaine, please.

 4           MS. HABISREITINGER:  I'm sorry.  Thank you, Judge.

 5   Q   (BY MS. HABISREITINGER)  Regarding, specifically cocaine.

 6           MS. HERNANDEZ:  Your Honor, can I have a continuing

 7   objection to the testimony?

 8           THE COURT:  Certainly.

 9           MS. HERNANDEZ:  Based on the previous objection?

10           THE COURT:  That is noted.

11   A   Yes.  The habits of consumption are basically rooted in

12   the poorer areas of the country and the poorer classes

13   associated with the gangs and common crime, and the middle

14   class there is little consumption, and in the class that has

15   the most financial power in the country, there is consumption

16   but it remains slight.

17       It is really in the marginalized zones and in the poorer

18   areas where the use is much greater, particularly when there

19   is -- when there is great trade in it or crime.

20   Q   (BY MS. HABISREITINGER)  Let's talk a little bit about

21   the -- the ability for the people of Guatemala to purchase

22   cocaine.  What is the average monthly salary of an individual in

23   Guatemala?

24           MS. HERNANDEZ:  Objection.  Is he an expert on that

25   also?
```

1          THE COURT:  The objection is overruled.  I don't

2     think this is expert testimony.  It's just factual testimony

3     to give a context to any expert testimony.

4     A    Monthly, there are people who earn 1200, 1300 quetzales a

5     month, and depending on their qualifications, if they've got

6     some academic background, they could earn more, but that would

7     be the general, more or less, the general monthly salary.

8     Q    And how -- is that per month?

9     A    Yes.

10    Q    And how would that translate to U.S. dollars?

11    A    May I have a moment?

12    Q    Sure.

13         MS. HERNANDEZ:  Same objection.

14         THE COURT:  It's noted and overruled.

15    A    It's around $158 a month.  It's been dropping, but that's

16    what it oscillates around.

17    Q    (BY MS. HABISREITINGER)  Now, you mention that there was a

18    category of poor who could afford or who were using cocaine.

19    What -- can you be more specific?  What category are you

20    referring to?

21    A    Yes, if we're talking about the people who are members of

22    gangs, they can afford it, the consumption because they are

23    constantly robbing, involved in extortion, so they do all

24    kinds of illicit activities in order to -- and get ill-gotten

25    gains as a result of that in order to be able to pay for their

1   drug use.

2        And when we're talking about the middle class, they have

3   more financial means; however, their consumption is still

4   relatively infrequent.

5        When you're talking about the higher classes, of course,

6   they can afford any kind of drugs that they would like to but

7   the percentage of their consumption is minimal.

8   Q    Would the country of Guatemala, as a whole, be able to

9   absorb 1300 kilograms of cocaine?

10              MS. HERNANDEZ:  Objection, Your Honor.

11              THE COURT:  I think you have to give a little more

12   specificity for that question.  Let's wait for the interpreter

13   to tell him that and then you can ask another question.

14              THE INTERPRETER:  Your Honor, would you like the

15   interpreter to interpret the original question?

16              THE COURT:  I think you should.  He should know it.

17              (INTERPRETER INTERPRETING THE LAST QUESTION.)

18   A    No.

19              THE COURT:  Wait a minute, no answer, and you need

20   to give a more specific question.  The answer will be

21   stricken.  We'll now get it -- at it more specifically.

22   Q    (BY MS. HABISREITINGER)  If, for example, 1,300 kilograms

23   of cocaine was to make its way into Guatemala, would

24   Guatemala -- would the people of Guatemala be able to absorb or

25   consume that amount of cocaine at any given time?

```
1              MS. HERNANDEZ:  Your Honor, I'm going to -- I'm
2    sorry, I can't be heard, but I'm going to object to the form
3    of the question.
4              THE COURT:  The objection is sustained.  We need to
5    rephrase the question somewhat.  Don't answer it.
6    Q    (BY MS. HABISREITINGER)  Sir, in your opinion, if
7    1300 kilograms was -- kilograms of cocaine was to make its way
8    into Guatemala, would it stay within the borders of Guatemala?
9    A    No.
10   Q    The majority of the cocaine coming into Guatemala is
11   headed where?
12             MS. HERNANDEZ:  Your Honor, objection.  This goes
13   way beyond the scope of his expertise.
14             THE COURT:  Overruled.  His expertise includes
15   trafficking routes and that would indicate the end place of
16   the route.  You may answer.
17   A    Could you repeat the question, please?
18   Q    (BY MS. HABISREITINGER)  Yes.  The majority of the cocaine
19   that comes into Guatemala is headed where?
20   A    The largest market in the world for any kind of product
21   is the United States, and that is also the case for cocaine,
22   unfortunately.
23   Q    How is the cocaine getting into Guatemala?
24   A    Well, there is several ways, but the most commonly used
25   means right now is by air or water, those are the first two,
```

1    and the third most popular means is by land.  There is so

2    little control right now in the country that airplanes can

3    easily land in the northern part of the country, such as

4    Escuintla, and in the south you have boats, fast boats, other

5    aquatic vehicles coming in with the drugs, and by land you

6    have different types of vehicles, cars, trucks that travel

7    through all of Central America, and primarily the lack of

8    control is due to the lack of experience of those who are in

9    charge of controlling the routes by land.

10       And there are other factors that the lacks -- lacking

11   experience in other things, those are the factors that play

12   into the lack of control in these areas.

13            MS. HABISREITINGER:  Your Honor, at this time I

14   would like to show the witness what has already been

15   introduced into evidence as Government Exhibit 1B, which is a

16   map of Guatemala.

17            THE COURT:  You may.

18            MS. HABISREITINGER:  I ask if I could do that by way

19   of the Elmo.

20            THE COURT:  You may.  Is it on?

21            THE DEPUTY CLERK:  Yes.

22            MS. HABISREITINGER:  And I am also going to ask the

23   Court's indulgence to allow Senor Carrillo Garcia to approach

24   the Elmo momentarily.

25            THE COURT:  You may.

 1              (WITNESS WALKS TO ELMO.)

 2    Q    (BY MS. HABISREITINGER)  Senor Carrillo Garcia, how many

 3    ports does Guatemala have?

 4    A    Well, ports where you have the --

 5              THE COURT:  Can you use the microphone?  It's

 6    probably more important that you do so.

 7              THE INTERPRETER:  Since I can't hold both.

 8    A    Well, ports that receive merchandise both on the national

 9    and international level, there are three of them.  There is

10    Puerto Barrios in this area, there is Puerto Quetzal and which

11    is next to Puerto Santo Tomas, and there is Puerto Santo Tomas

12    de Castilla, which is next to Puerto Barrios.

13    Q    (BY MS. HABISREITINGER)  And you also testified about

14    drugs coming in from El Salvador.  Could you point out generally

15    the route through Guatemala that would -- that a drug trafficker

16    would utilize to transport the drugs through El Salvador toward

17    the Mexican border?

18              MS. HERNANDEZ:  Your Honor, is he qualified as to

19    routes to El Salvador?

20              THE COURT:  I don't think that's the question, but I

21    wonder what the relevance of a route from El Salvador through

22    Guatemala is because I don't understand the evidence in this

23    case to have involved a route from El Salvador.

24              MS. HABISREITINGER:  Judge, I can withdraw that

25    question.

```
 1              THE COURT:  All right.

 2              MS. HABISREITINGER:  That's it for Mr. Carrillo

 3    Garcia at the Elmo.  Thank you.

 4              (WITNESS GOES BACK TO WITNESS STAND.)

 5    Q    (BY MS. HABISREITINGER)  Sir, the borders that you pointed

 6    out to the members of the jury, are those borders heavily

 7    policed?

 8    A    Well, that's precisely the reason why I have been working

 9    directly assisting DIPA in the area of the ports, port

10    security, because precisely, their personnel is weak in terms

11    of experience, knowledge and other things, and that is the

12    purpose that I was assigned -- that is the reason why I was

13    assigned to that area.

14    Q    How easy is it for a drug trafficker to get cocaine into

15    the -- within the border of Guatemala?

16    A    Currently, I would say it's very easy.

17    Q    And why is that?

18    A    Well, for the very same reason that I had mentioned

19    before, because as authorities, unfortunately, we face many

20    problems such as corruption, a lack of knowledge on the part

21    of security personnel, lack of experience, expertise, so that

22    facilitates matters for the drug trafficker wanting to move

23    his drugs.

24    Q    How is corruption a problem within the police ranks?

25    A    Well, recently there have been many dismissals of police
```

```
 1   personnels for allowing themselves to become involved in
 2   activities that are completely prohibited to them, and this is
 3   primarily due to corruption.
 4   Q    How could a police officer in Guatemala contribute to the
 5   passage of drugs across a border?
 6   A    Well, first, with money.  That would be the No. 1.  In
 7   exchange for payment, the policeman can abandon his post and
 8   move away from his area of work or he can simply ignore some
 9   whatever information has been received, and in terms of the
10   ports, well, any container coming through can be left
11   unopened.  It just wouldn't be opened, and it would be let
12   through easily.  Those are the methods that have been most
13   recently used.
14   Q    Now, putting that aside for the moment, in general, is
15   Guatemala able to check every single container that comes into
16   the ports?
17        MS. HERNANDEZ:  Your Honor, again, this is within
18   the scope of his -- is this within the scope of his area of
19   expertise?
20        THE COURT:  I'm not sure it is.  You'll have to ask
21   a foundational question, although it seems to me that as
22   framed, the answer to the question is pretty obvious.
23        MS. HABISREITINGER:  Judge, I'll reserve my right to
24   revisit that question, but I'll move on.  This might take care
25   of where I'm trying to go with this.
```

```
 1              THE COURT:  I appreciate that.

 2   Q    (BY MS. HABISREITINGER)  For the containers that are

 3   searched, are there any impediments that would prevent a police

 4   officer from successfully locating illegal drugs within a

 5   container of goods?

 6   A    (ANSWER GIVEN IN SPANISH.)

 7              MS. HERNANDEZ:  Your Honor, I know that we've got

 8   great interpreters and translators, but when the answer is

 9   that long, it's difficult to have an accurate translation.

10              THE COURT:  She'll indicate if she needs him to

11   stop.  That's part of her experience and training, and I have

12   trust in it.

13   A    Well, in terms of impediments, it could be the way in

14   which the drug has been hidden in the container or perhaps in

15   the case of Guatemala where we lack so many of the tools and

16   the techniques that we need to work and search properly, a

17   container, for example, could be labeled as containing

18   dangerous chemicals, and so a person who sees this will see

19   that it contains products that are dangerous to anyone's

20   health, so they will let it through rather than search it and

21   run any risk, and this is primarily due to the lack of

22   experience of the personnel because they don't know how to

23   detect this.

24   Q    (BY MS. HABISREITINGER)  In your experience, is cocaine

25   oftentimes hidden within a container among other types of items?
```

```
1              MS. HERNANDEZ:  Objection, leading.

2              THE COURT:  Sustained.

3    Q   (BY MS. HABISREITINGER)  In your experience, in what other

4    ways can cocaine be hidden within a container?

5    A   There is a thousand and one ways.  Well, the drugs could

6    be hidden in so many other ways.  There is no one way as yet

7    that we can say this is the way it will be.  The only type of

8    use that I haven't seen in terms of hiding drugs is that I've

9    yet to see anything hidden in glass.

10       Other than that, the field is wide open as to what can be

11   used.  The area is constantly changing.  There is not one way

12   that has been established where we can detect the pattern and

13   say, "This is the way they're getting it; this is the way

14   they're hiding it."  The methodology, the means are constantly

15   changing.

16             MS. HERNANDEZ:  Your Honor, may we approach?

17             THE COURT:  Certainly.

18             (AT THE BENCH; ON THE RECORD.)

19             MS. HERNANDEZ:  I'm not sure where we are going with

20   this expert testimony, given the nature of this case.  The

21   supposed agreement was for corrupt government -- the nature of

22   the agreement was supposedly for corrupt government officials

23   to grease the skids, using Vaseline, I believe, to get them

24   through customs.  So all this about how it's hidden and how it

25   can come in and the thousand and one ways that it can come in
```

1    really is not relevant to the facts in this case.

2        I mean, it may be an interesting discussion of cocaine

3    trafficking through Guatemala, but it's not relevant to the

4    charged -- to the offense that the Government has tried in

5    this case.  I mean, we can stay here until all time.  I'm just

6    trying to --

7            THE COURT:  I appreciate the concern about the

8    timing.  I have concerns about that, too, but part of the

9    proof in this case and part of the Government's theory is that

10   there was a conspiracy that involved the receipt of cocaine

11   into Guatemala in containers coming on board ships.  That's

12   part of the conspiracy that was, in the Government's view,

13   being discussed and entered into.  So I'm going to allow them

14   to develop that with this witness.

15           MS. HERNANDEZ:  We don't have that in evidence yet?

16           THE COURT:  Oh, I think this is somewhat cumulative.

17   That's why I'm concerned about the time, but I'm sure

18   Ms. Habisreitinger will move it along.

19           MS. HABISREITINGER:  I'm ready to move on.

20           THE COURT:  All right.  Good.

21           MS. HERNANDEZ:  Thank you.

22           (OPEN COURT.)

23   Q    (BY MS. HABISREITINGER)  Are you familiar with the term

24   "front company" or "fake company"?

25   A    Yes.

1   Q   And what is that?

2   A   Well, front companies work, for example, you may be given

3   a legal name in a document, so they're given the appearance of

4   being legal companies, but actually in the follow-up, if you

5   look into the central authority for registering companies,

6   within those documents, that company won't be registered.  The

7   company will only be a company by name.

8        For example, the address, if you look into the address,

9   it may give an address of a bread company, a bakery known as

10  San Julian, but if you go to look into that and verify it,

11  what it actually is is land that's not being used or it's some

12  building that has nothing to do with what is recorded in the

13  actual documents for that company.  That's just one way of

14  doing it.

15  Q   Is the use of a front company a common tool for drug

16  traffickers in Guatemala?

17  A   Yes, it is quite common.  In fact, even what's being used

18  now is, for example, there may be a legal company that

19  actually exists, but it's used as kind of a front company.

20       For example, on the documents pertaining to the arrival

21  of the container into the country, you may have a name of a

22  legal company, but the container never gets to its final

23  destination, so there's really two ways that they're going

24  about this.

25  Q   Can you describe Guatemala's role in the drug-trafficking

1    arena?

2            MS. HERNANDEZ:  Objection.

3            THE COURT:  Overruled.

4            THE INTERPRETER:  Overruled?

5            THE COURT:  Yes.

6    A    Bueno -- well, sadly, and to my embarrassment, in my

7    country, we're being used practically as a storehouse for

8    large scale drug arrangements.  The amount of drugs actually

9    consumed in the country is minimal versus the huge amount that

10   is being moved through the country and stored there

11   temporarily, either to be repacked or to be reconditioned for

12   its later route towards Mexico and eventually to the United

13   States.

14        So I don't know if you saw in the news recently, but in

15   Mexico there was a huge shipment of cocaine, 23 tons,

16   actually, that was found there, and now we know, based on

17   official information, that the drugs actually transitted

18   Guatemala, sadly, but by the time that information came out,

19   the drugs had already left the country.  So Guatemala is

20   really being used as the Central American storehouse for

21   drugs.  That is the truth and a very sad fact.

22   Q    (BY MS. HABISREITINGER)  Now, we talked about drugs coming

23   into Guatemala and Guatemala's role in the drug-trafficking

24   arena.  How -- could you explain how the drugs are getting out

25   of Guatemala?

1          THE INTERPRETER:  Did the interpreter understand how

2    the drugs arrived or leave Guatemala?

3          MS. HABISREITINGER:   How the drugs leave Guatemala.

4    A    Well, the drugs, in general, in order to get to

5    Guatemala, as they come into Guatemala, first they are put in

6    storage and then they are repackaged in order for them to be

7    able to get past the authorities.

8          Then they are taken to the border of Mexico where they

9    are received in general by large scale Mexican drug

10   traffickers.

11         And at the Guatemalan/Mexican border, there is very

12   slight control, if any.  Really, sometimes there's hardly any

13   controlling of the borders, and what does pass through is

14   basically based on favors that are paid off or basically

15   paying the authorities, so it's easily passed through.  The

16   way in which it's hidden is that it can be hidden within the

17   merchandise or it can be hidden within false bottom

18   containers.

19         The -- let's see, the amount that is -- and this depends

20   on the amount of drugs that's being moved.  The information we

21   have now is that the large drug-trafficking organizations and

22   what they're using to move their drugs is they move large

23   amounts of drugs, and then, see, look what we've been able to

24   move, and they do that in order to show the power that they

25   have in the region.  And sometimes they say, for example,

1  "Look, we haven't even been paid for this."

2           THE INTERPRETER:  The interpreter would correct a

3  certain part.

4      What little control exists at the border, even that is

5  bought off, again with favors to the authorities.

6  Q    (BY MS. HABISREITINGER)  You mentioned little control at

7  the border between Guatemala and Mexico.  How much of

8  Guatemala's land borders -- actually borders Mexico?

9  A    The size of the Guatemala is approximately 108 square

10 kilometers, and 50 percent of that borders Mexico.

11          MS. HABISREITINGER:  Judge, I would once again ask

12 permission to be able to display Government Exhibit No. 1B to

13 the members of the jury and also to the witness.

14          THE COURT:  Which exhibit?

15          MS. HABISREITINGER:  Government Exhibit 1B, which is

16 the map of Guatemala.

17 Q    (BY MS. HABISREITINGER)  Senor Carrillo Garcia, the

18 border --

19          MS. HERNANDEZ:  Your Honor, I'm going to object as

20 cumulative.  We heard -- the borders are pretty self-evident.

21          THE COURT:  Let's not take too much time on it.

22          MS. HABISREITINGER:  Yes, Your Honor.

23 Q    (BY MS. HABISREITINGER)  The border between Guatemala and

24 Mexico, is the entire border policed?

25 A    No.  If you would allow me, I could show you exactly.  I

```
 1    could show everyone here in the courtroom which zones or areas
 2    are the ones that have a police presence.
 3               MS. HABISREITINGER:  I would ask permission for the
 4    witness to briefly approach the Elmo.
 5               THE COURT:  You may.
 6               MS. HERNANDEZ:  Objection, relevance.
 7               THE COURT:  Overruled.
 8    A    The Mexican border begins here in the area of San Marcos,
 9    and then as you go up here, there is control but slight
10    control of the borders.  And then all of this area through
11    here --
12               THE DEPUTY CLERK:  You want her to point?
13               THE COURT:  She can.
14               THE INTERPRETER:  If the interpreter remembers.
15    A    Then all of this area through here has really no control.
16    The people who live in this region through here are mostly
17    indigenous, and due to civil war that we had in my country,
18    they don't tend to share information with the police or
19    national forces.
20       All of this area through here is where flights arrive
21    directly from Colombia, and again, this is the entire border
22    with Mexico.
23               MS. HABISREITINGER:  You can take a seat now.
24    Q    (BY MS. HABISREITINGER)  If we could take a few moments
25    and talk a little bit about the drug transportation groups
```

1   within Guatemala.  Do drug traffickers in Guatemala openly

2   discuss their product?

3   A    No, they have their own specialized terminology, and they

4   use certain phrases that aren't commonly known by anyone else,

5   except only in their group.  For example, between one drug

6   trafficker to another drug trafficker, they know exactly what

7   they're saying but anyone else wouldn't be able to decipher

8   what is being said.  For example, speaking of 1 million

9   quetzales worth of drugs, they might speak about one melon,

10  and they're referring to fruit but that fruit obviously

11  doesn't have anything to do with the business at hand.

12  Q    Do members of drug transportation or drug-trafficking

13  groups in Guatemala utilize any type of weapons?

14          MS. HERNANDEZ:  Objection, relevance.  I don't think

15  we've had any evidence regarding this, Your Honor.

16          THE COURT:  I'll overrule.  I don't think it matters

17  whether we've had any evidence, but limited questioning in

18  this area.

19          THE INTERPRETER:  May the interpreter repeat the

20  question?

21          THE COURT:  Yes.

22  A    Yes, high-caliber weaponry.

23  Q    (BY MS. HABISREITINGER)  You testified about police

24  officers within Guatemala who use their position to facilitate

25  the transfer of cocaine through Guatemala and across the

1   borders.  Do former police officers also maintain sufficient

2   power to accomplish such things?

3           MS. HERNANDEZ:  Objection.

4           THE COURT:  Is the objection based on beyond the

5   scope of expertise or foundational objection?

6           MS. HERNANDEZ:  Both.

7           THE COURT:  I think you're going to have to ask --

8           MS. HERNANDEZ:  And it's also a leading question.

9   Of course, the question is being already translated so...

10          THE COURT:  Well, that would be true with an English

11  speaking witness as well, they would hear the question.  I

12  think you're going to have to ask a foundational question or

13  two before you can ask this question.

14          MS. HERNANDEZ:  Your Honor, can we approach?

15          THE COURT:  You may.

16          (AT THE BENCH; ON THE RECORD.)

17          MS. HERNANDEZ:  This is an expert who's being -- I'm

18  sorry, this is an expert who's being qualified on the basis of

19  nothing but his own statements.  That is, we have not a single

20  document to support the level of his expertise.  He hasn't

21  given us a single document he's read or published or prepared,

22  and now we're going to have him explaining the key to this

23  case.

24      You know, there has to be some fundamental fairness, and

25  you know, the question of expert testimony, as the Supreme

Court has stated, Your Honor is the -- what is the term used

in the expert cases, which it's -- at 4:30 in the afternoon, I

can't remember.  *Kung Hung Tire* and the other one.

MR. LAYMON:  *Daubert.*

MS. HERNANDEZ:  *Daubert.*  Your Honor, you're

supposed to stand as a --

THE COURT:  Gatekeeper.

MS. HERNANDEZ:  -- gatekeeper.  Thank you.  I mean,

this is a little outrageous, in my opinion.

THE COURT:  All right.  Well, your

outrageous specifically focussed on this witness testifying.

He's been qualified as an expert.  I'm not retracting that

qualification.  Your outrage is focussed on his testifying as

to former police officers.

MS. HERNANDEZ:  Right.  For one, we've got a

conspiracy which, according to the Government's witnesses,

involved high level government officials greasing the skids so

that drugs could pass into Guatemala and to the border with

Mexico.  That's it.

Now -- and high government officials, since my client is

in fact not a high government official, just playing one, now

we're going to try to bring in expert testimony supported by

nothing.  We don't have a single document published that says

that this is, in fact, is true.

THE COURT:  You're repeating yourself.  I understand

1    that.

2          MS. HERNANDEZ:  To say, "Oh, yes, of course, not

3    only can high government officials grease the skids, but

4    people who were once police officers can also grease the

5    skids.  Even though we have yet to hear any testimony that my

6    client is either -- well, we know that he wasn't, but now we

7    don't even know that he, in fact, was a former police officer,

8    nor how long ago he was a police officer.

9          THE COURT:  I will allow this testimony only if you

10   first establish that he has actual experience with situations

11   where former police officers were involved in these types of

12   activities.  Unless he can testify that he has such

13   experience, I'm not going to allow the question.

14          (OPEN COURT.)

15          MS. HABISREITINGER:  Judge, if I could just have one

16   moment.

17          THE COURT:  Certainly.

18          (PAUSE.)

19          MS. HABISREITINGER:  Thank you, Judge.

20   Q    (BY MS. HABISREITINGER)  In your experience, do you have

21   any knowledge of former police officers utilizing their contacts

22   within PNC?

23          MS. HERNANDEZ:  Leading.  Can we please not have

24   the -- can I ask the question not be interpreted?

25          THE INTERPRETER:  For the record, the interpreter

```
1    just interpreted the fact there is an objection.

2              THE COURT:  Overruled.  You may answer the question.

3              THE INTERPRETER:  May the interpreter have the

4    entire question repeated?

5              MS. HABISREITINGER:  Just so that there is no error,

6    if we could have it read back.

7              THE COURT:  I think it started with "in your

8    experience."

9              COURT REPORTER:  (Reading)  In your experience, do

10   you have any knowledge of former police officers utilizing

11   their contacts within PNC?

12             THE INTERPRETER:  Thank you.

13    A   (ANSWER IN SPANISH.)

14             MS. HERNANDEZ:  Your Honor, the question called for

15   a "yes" or "no" answer, "in your experience, do you know."

16   It's either "yes" or "no."

17             THE COURT:  Wait a minute, if the interpreter --

18   it's very hard for me to rule on these when I don't know what

19   the answer is.

20             MS. HERNANDEZ:  Well, it was more than a "yes" or

21   "no."

22             THE COURT:  I understand.  What I would like to

23   establish, if it's possible, is to have him first answer the

24   question "yes," and then the interpreter can -- if it's a

25   "yes" answer, can give the remainder of the answer.
```

```
 1    A    Yes.  In fact, there are formal --

 2             THE COURT:  All right.  You may go ahead.

 3    A    -- police -- police officials who do use their contacts,

 4    and in fact, one of the recent casualties to give an example

 5    is that there are people who -- these are people who

 6    still have -- people within the police forces and they do this

 7    and they coordinate them.

 8    Q    (BY MS. HABISREITINGER)  Could you explain what you mean

 9    by people within the police who coordinate?

10             MS. HERNANDEZ:  Objection, may I have a

11    continuing -- may I have a continuing objection to this line

12    of questioning?

13             THE COURT:  You have that continuing objection.

14    With respect to the questioning thus far, it is overruled.

15             MS. HERNANDEZ:  And foundation and area of expertise

16    is beyond the scope.

17             THE INTERPRETER:  Now the interpreter does need to

18    have the question read back.  Oh, what do they mean when they

19    say they do this and they coordinate?

20             MS. HABISREITINGER:  Correct, thank you.

21    A    Yes, what I tried to say is that within the active police

22    officials, there are those who still follow the lead of the

23    former police officers, and these former police officers

24    coordinate, they have an agreement basically, and they will

25    carry out certain activities that are not professional.
```

1    And what I mean by that is that their functions are not

2    governed -- they're -- carry on activities that do not fall

3    within their functions as is described by the law regarding

4    the national -- Civil National Police in Guatemala, and so

5    what they do is they order these members to carry out

6    activities in -- and this could be within SAIA or DIPA or

7    whatever other police jurisdiction there is.

8    Q    If you could, briefly explain to the members of the jury

9    the ranking system within the PNC.

10                 MS. HERNANDEZ:  Objection, previously testified to.

11                 THE COURT:  I do think we're doing some cumulative

12    evidence here and taking a lot of time with this.

13                 MS. HABISREITINGER:  Judge, this is -- I'm getting

14    ready to wrap it up, but I do believe that this would not be

15    cumulative.  If I could lay this foundation.

16                 THE COURT:  Well, you don't have to lay any

17    foundation.  It seems to me this is testimony that the

18    previous Mr. Garcia gave, but I will allow this question to be

19    answered, but we need to wrap up.  Things that are cumulative,

20    we need to avoid.

21    A    When you're talking about the ranks, do you mean

22    individual people or you talking about the different police

23    jurisdictions?

24    Q    (BY MS. HABISREITINGER)  I'm talking about the individual

25    personal rankings.

```
 1      A    Within the law, the national police law in Guatemala, the

 2   ranks are as follows:   The basic ranks would be agent and then

 3   subinspector and then inspector, so those are the basic

 4   levels.

 5               THE INTERPRETER:   May the interpreter have one

 6   moment?

 7               THE COURT:   Yes.

 8      A    And then come the secondary officers and there are three

 9   ranks there.   There's third, the second grade, which should be

10   myself fall in that category, and then there will be first

11   grade -- first rank.

12         Then we move to superior officers.   There is the deputy

13   commissioner, the commissioner, the general commissioner and

14   then there will be the directorate commissioners and that

15   would be how the hierarchy is labeled within the Guatemalan

16   National Police.

17      Q    (BY MS. HABISREITINGER)   Where would someone with the

18   ranking of a subcommissario fall?

19      A    The subcommissioner would have -- it's the first rank of

20   the superior officers.   That would be his rank.

21      Q    And very generally and very briefly, what type of

22   responsibility would a subcommissario have?

23               MS. HERNANDEZ:   Objection, beyond the scope of the

24   Court's determination of the expertise.

25               THE COURT:   I think we're going to cut it off here.
```

1    I don't think that he really has been put up as an expert in

2    all the different structures and rankings of the police in

3    Guatemala, and so we'll limit his testimony as to the fields

4    that he's been qualified as an expert.

5            MS. HABISREITINGER:  Judge, I just have a couple of

6    more questions.

7    Q    (BY MS. HABISREITINGER)  Senor Carrillo Garcia, what

8    happens in Guatemala when an individual rips off or tries to

9    swindle a Colombian drug trafficker?

10            MS. HERNANDEZ:  Objection, relevance.

11            THE COURT:  Overruled.

12            THE INTERPRETER:  One moment, please.

13            THE COURT:  Certainly.

14    A    In Guatemala, in general, just as you would see in

15    Colombia, the price for robbing or taking drugs from or

16    damaging drugs that belong to a drug trafficker, the price is

17    your life, and your age does not -- is not important in this.

18    You could be young, middle-aged or elderly or you could be a

19    man or woman.  It would be the same answer.

20    Q    (BY MS. HABISREITINGER)  And last question.  What happens

21    in Guatemala if an individual attempts to, for example, steal

22    from a fellow drug trafficker?

23    A    If he were to try another -- to rob another drug

24    trafficker, as I said, he would pay with his life.  That would

25    be the price of the damage or the atrocity, if you look at --

1  as seen from the point of view of the drug trafficker.  It

2  doesn't matter what your economic level is, what kind of

3  administrative level or with the nature of your work, you

4  would pay with your life.

5          MS. HABISREITINGER:  No further questions.

6          THE COURT:  Ms. Hernandez.

7                      CROSS-EXAMINATION

8  BY MS. HERNANDEZ:

9   Q    Good afternoon?

10  A    Good afternoon.

11  Q    How much do you weigh?

12          MS. HABISREITINGER:  Objection, relevance.

13          THE COURT:  I'll allow the question, presuming that

14  you can link it up with something relevant, Ms. Hernandez.

15          MS. HERNANDEZ:  Absolutely.

16  A    I'm sorry, but my own personal opinion is that my weight

17  does not have anything to do with what I do.

18          MS. HABISREITINGER:  Your Honor, I'm going to

19  object.  That's personal information that is not appropriate.

20  It's not appropriate for Defense counsel to ask that question.

21          THE COURT:  If you want to pursue this, you're going

22  to have to come up to the bench and convince me that it's

23  worth pursuing this, Ms. Hernandez.

24          (AT THE BENCH; ON THE RECORD.)

25          MS. HERNANDEZ:  Perhaps too cute, but I just want to

1    establish that kilo is the measure of weight in Guatemala, and

2    he's going to answer, I'm sure, by telling me he weighs X

3    number of kilos, because, you know, there was some

4    conversation about kilos, and the Government, of course, says

5    any time you mention kilos --

6              THE COURT:  I think there's a different way to do

7    it.  He's sensitive to it, so let's not make him uneasy.

8              (OPEN COURT.)

9              THE COURT:  Take another route, okay, Ms. Hernandez.

10   Q    (BY MS. HERNANDEZ)  I'm sorry, I don't mean to make you

11   uncomfortable?

12   A    Don't worry about it.

13   Q    What is the measure of weight in Guatemala?

14   A    Well, in Guatemala there are various ways of measuring

15   weight because it's a multicultural society.  In some places

16   it can be measured in pounds, in others in kilos, and yet in

17   others using a different measure.

18   Q    What is -- is there a formal weight in the government of

19   Guatemala, measure of weight?  Is there a formal measure of

20   weight in the country of Guatemala?

21   A    Forgive me for the answer that I'm about to give you but

22   I am not an expert in weight.  I'm an expert in drugs, and

23   that answer I cannot determine.  It would have to be

24   determined by another.

25   Q    Okay.  Can you tell me how much you weigh then?

1    MS. HABISREITINGER:  Objection, Judge.  I thought we

2    dealt with that issue.

3    MS. HERNANDEZ:  Your Honor, I tried to get it

4    another way and I'm not getting it, so let's see if he tells

5    me he weighs pounds or kilos.

6    THE COURT:  Let's do it this way:  Ask this

7    question.

8    MS. HERNANDEZ:  I'm sorry.

9    THE COURT:  If you're asked your weight, would you

10   give an answer in pounds or kilograms or something else?  You

11   may answer that question.

12   THE WITNESS:  I don't mix personal matters with my

13   work.

14   THE COURT:  I'll ask the question.  We don't want to

15   know how much you weigh, but if you were asked how much you

16   weigh, would you give the answer in kilograms or in pounds or

17   in some other weight of measure?

18   THE WITNESS:  I'm sorry, yeah, it would be pounds.

19   Q   (BY MS. HERNANDEZ)  When you went to school in Guatemala,

20   in elementary school, did you learn pounds or kilos?

21   A   They teach it in all different ways.  They teach you all

22   different types of measurements in the first and second year

23   of school.

24   Q   Okay.  You earlier said that the -- in response to a

25   question from the prosecutor about the cost of cocaine.  You

```
 1   said that it depended in the location because of several

 2   factors.  Do you remember that?

 3              THE INTERPRETER:  One moment, Your Honor.

 4   A    I wasn't speaking to a specific location.  I was talking

 5   about an area within the national territory, and I mentioned

 6   the capitol city, and the Mexican -- the area of the Mexican

 7   border.

 8   Q    (BY MS. HERNANDEZ)  Well, you said that the value would

 9   depend because there was -- because of the risk of theft,

10   because authorities could seize the docu-  -- the drugs and for

11   other factors, and because of -- I'm sorry -- Strike that.

12        You said that -- you mentioned three factors.  Do you

13   remember that?

14   A    Factors related to what?

15   Q    To the price of cocaine in the capitol city.

16   A    (SPANISH ANSWER.)

17   Q    And one was --

18   A    Yes, I mentioned three factors.

19   Q    I'm sorry.  And one was the risk of theft?

20   A    Yes, that could be one of them.

21   Q    The second one would be that the authorities could seize

22   the drugs?

23   A    Yes.

24   Q    And one of the other factors you mentioned was the -- the

25   popularity of use or the fact that -- how little or how much
```

1  people would want to buy the cocaine?

2  A    Well, I mentioned there was very little consumption,

3  except it was in areas with a higher criminal activity.  I

4  mentioned the maras, the gangs where within certain criminal

5  groups they can consume the drugs because they can buy it with

6  ill-gotten gains.

7  Q    And you mentioned two populations that consumed cocaine

8  within Guatemala, correct?

9  A    No, no, no.  I mentioned it in general terms not in

10 specific terms, these different places where it is consumed.

11 I didn't mean just those two specific areas.

12 Q    Okay.  Here's the question.  You mentioned two

13 populations that consumed cocaine within Guatemala, "yes" or

14 "no"?

15 A    I repeat, I mentioned areas around certain settlements of

16 population.  It's not that these areas were the only ones that

17 consumed the cocaine.  I can give you a whole list of names, a

18 whole series of names of the areas where there is drug

19 consumption.  I cannot give you a simple "yes" or "no."

20 Q    Great.  So now you have the poorer areas, as you

21 mentioned, the criminal element, including gangs, correct?

22 A    Well, if gangs or the maras function on a national level.

23 In the couriers -- surrounding the couriers, primarily they're

24 concentrated in the capitol cities in municipalities such as

25 Villanueva and Mixco, which are areas that are very close to

1    the capitol city, and that's where they concentrate their

2    operations.

3    Q    And you also said that people with financial resources

4    consume cocaine within Guatemala?

5    A    I said that people with resources, with money consume

6    drugs.    They consume some in small amounts, not great amount,

7    and they do so because they have the income and the means.

8    Q    And the reason you believe this is because you're basing

9    your opinion on the number of arrests; is that correct?

10   A    No, I believe -- well, no, I am sure.    I'm not basing

11   this solely on the number of arrests.    We have statistics that

12   we've garnered from the intelligence that's been gathered and

13   a lot of this is due to the corruption that exists and the

14   lack of control.    You can see a person and based on their

15   appearance you can see what their economic status is, and this

16   is part of the work that we do in intelligence.

17              THE COURT:    Could counsel approach.

18              (AT THE BENCH; ON THE RECORD.)

19              THE COURT:    All right.    We're at 5:00 o'clock now.

20   We're going to have to adjourn for the day, unless you have

21   only two minutes left.    I'm not rushing you.    You're entitled

22   to take the time you want to take.

23              MS. HERNANDEZ:    He doesn't -- you know, and this is

24   typical of Latin Americans.

25              THE COURT:    Unless it's something that's going to be

1    two minutes.

2              MS. HERNANDEZ:  I doubt it.

3              THE COURT:  Okay.  So we're going to adjourn for the

4    day.  And that means your witness is going to have to be back

5    here Monday morning, and I will inform the jury that while

6    it's possible they may have the case by the end of the day

7    Monday, it's more likely they will have it Tuesday because I

8    think that's more realistic.  All right.

9              (OPEN COURT.)

10             THE COURT:  All right.  We're at 5:00 o'clock and we

11   need to adjourn for the day.  I am going to give the jury a

12   little bit of a guesstimate, although I'm usually not too bad

13   at making these predictions, so I would say that it's possible

14   that you will have the case to begin deliberations by the end

15   of the day Monday, but it's more likely that it will be on

16   Tuesday, and that is my best assessment of where we are.

17        So we'll have a full day Monday, unless we get to a point

18   on Monday that we've completed the evidence in the case and I

19   don't think there's time left for closing arguments, in which

20   case we'd leave early and come back Tuesday morning to begin

21   the closing arguments.

22        But in any event, by Tuesday you should have the case and

23   begin deliberating on the case.

24        All right.  Have a very pleasant weekend.  Thank you

25   again for your patience, your attention and courtesy

1    throughout the course of the trial, and we'll see you on

2    Monday morning ready to go at 9:30.  Thanks again.

3              THE INTERPRETER:  Your Honor, may the witness --

4              THE COURT:  The witness may step down, and the

5    witness probably needs to consult schedule-wise with the

6    prosecutors.

7              (JURY NOT PRESENT.)

8              THE COURT:  All right.  Anything we need to review?

9    You have the jury instructions, and there's some obvious

10   things that need to be changed about them, but I've just

11   included some things in there that we may not need, and we

12   should have a conference on instructions sometime, but I need

13   a little bit more information on best guesses, now that we are

14   where we are.

15       Ms. Hernandez, rough guess as to how much longer with

16   this witness, rough guess.

17             MS. HERNANDEZ:  You want to know how many questions

18   I have or how long his answers are going to be?

19             THE COURT:  Factor both in.

20             MS. HERNANDEZ:  I will try to weed it out.

21             THE COURT:  I'm not rushing you.  You haven't taken

22   much time with this witness yet, so I'm not rushing you.

23             MS. HERNANDEZ:  I don't think it will be that long,

24   and by that, I mean maybe an hour, but I'll try to focus on

25   what questions I really need.

```
 1              THE COURT:  All right.

 2              MS. HERNANDEZ:  It's -- however, I just want the

 3   record to reflect that because I was not allowed to ask the

 4   question I wanted, what we got is, in my opinion, a -- an

 5   evasive answer.  I mean, I can't imagine that --

 6              THE COURT:  What question would you like to ask,

 7   refresh me?

 8              MS. HERNANDEZ:  How much he weighed.  I don't think

 9   he would have come back with, well, this or that or both, you

10   know, most people would answer one number, but --

11              THE COURT:  Okay.

12              MS. HERNANDEZ:  -- in any event --

13              THE COURT:  The jury can make its assessments of

14   witnesses and their -- how forthcoming or evasive they are.

15              MS. HERNANDEZ:  So, I mean, in my -- I had

16   anticipated that it would not be very long, but...

17              THE COURT:  Okay.  You have given me your best

18   guess, and that's all I'm asking for.

19       And then based on that, Mr. Laymon, with the two

20   remaining witnesses that you have and your educated prediction

21   of cross-examination, what do you think?

22              MR. LAYMON:  Noon.

23              THE COURT:  You think you'll still get it done in

24   the morning?

25              MR. LAYMON:  12:30.
```

1          THE COURT:  If I ask you again, what will it be?

2          MR. LAYMON:  12:30, Judge.

3          THE COURT:  All right.  And then a brief, if any,

4  Defense case.

5          MS. HERNANDEZ:  Right.

6          THE COURT:  And, you know, that's the worst of all

7  worlds if we don't get it done until -- "it" meaning the

8  evidence done until 3:00 o'clock because then it's going to

9  jam us in terms of the closings.

10     But let's do this:  Mr. Bradley, what do I have

11  tomorrow -- on Monday morning?

12          THE DEPUTY CLERK:  Just the trial.

13          THE COURT:  All right.  Let's get together at

14  9:00 o'clock.  We'll do half-an-hour of jury instructions.

15          MS. HERNANDEZ:  I have several objections, just from

16  reviewing them.

17          THE COURT:  To the instructions?

18          MS. HERNANDEZ:  Yes.

19          THE COURT:  Then we better get together at 8:30.

20          MS. HERNANDEZ:  No, Judge, don't do that.

21          THE COURT:  I'm just teasing you, Ms. Hernandez,

22  seeing the expression on your face.  All right.  But we'll

23  start at 9:00 o'clock, all right, so we can do a little bit on

24  the instructions, and then we'll be working during the noon

25  hour, perhaps.

1    MS. HERNANDEZ: We're not going to do closing

2    tomorrow, are we?

3    THE COURT: I thought maybe Sunday would be

4    preferrable to tomorrow, Ms. Hernandez.

5    MS. HERNANDEZ: Monday. We're not going to do

6    closing on Monday, are we?

7    THE COURT: Are you making a request that we not do

8    closing?

9    MS. HERNANDEZ: Yes, I'm making a request that we

10    not. I would like to be able to -- unlike the Government, I

11    can't send me home or me back to the office to prepare for

12    closing while the other me stays here and finishes up, and

13    there's a lot of evidence, and given everything, I think it

14    would be better to start first thing in the morning and

15    instruct -- you know, closings, instruct the jury, they can

16    take the case, you know, on Tuesday.

17    That's my request, Your Honor, respectfully.

18    THE COURT: And the Government's view? Who's doing

19    the closing?

20    MR. LAYMON: Ms. Habisreitinger and I, Judge. She

21    is doing closing, and I do rebuttal.

22    MS. HERNANDEZ: Well, here's the problem, and I've

23    had this in another case, and it's completely unfair. By the

24    time the Court gives, you know, preliminary instructions --

25    THE COURT: Well, I don't give any preliminary, but

1    by the time we finish with the instructions...

2              MS. HERNANDEZ:  By the time -- no, even worse than

3    that.  The Government will give a closing, I'll give a closing

4    and then lo and behold it's 5:00 o'clock and they're going to

5    go home and come back and hammer me with their rebuttal.

6              THE COURT:  We're not starting unless we can finish,

7    so give me estimates of time.  I'll get all the information,

8    and then I'll make a decision.

9              MR. LAYMON:  You're talking about how much time do

10   we want to close?

11             THE COURT:  Yes.  You've done it before.  You'll be

12   able to come up with a pretty good estimate, I assume.

13             MR. LAYMON:  Yeah, seems like you gave us last time

14   45 minutes, I think.

15             THE COURT:  Ms. Habisreitinger, how long do you

16   think your opening and closing will be?

17             MS. HABISREITINGER:  My opening and closing will --

18   I don't foresee it going any longer than maybe 60 or 70

19   minutes.

20             THE COURT:  I'm sorry?

21             MS. HABISREITINGER:  A little over an hour.

22   Probably close to the hour.

23             THE COURT:  All right.  I think I'll pick Mr. Laymon

24   up off the floor.

25        Ms. Hernandez.

```
 1            MS. HERNANDEZ:  I really think it would be much
 2   fairer --
 3            THE COURT:  What's your estimate?
 4            MS. HERNANDEZ:  A few hours.  Three.
 5            (LAUGHTER.)
 6            THE COURT:  Let me make the decision.  What's your
 7   estimate?
 8            MS. HERNANDEZ:  You know, I prefer to be brief, but
 9   I can't -- I can't say -- I haven't -- unlike the Government,
10   I have not done closing in this particular case.
11            THE COURT:  Before.  I understand you're at a
12   disadvantage.
13            MS. HERNANDEZ:  And, you know, I think --
14            THE COURT:  An hour or so?
15            MS. HERNANDEZ:  Yeah, I would like not to speak
16   beyond an hour.  That's what I would like, but I want to say,
17   I'm not sure we're going to close by 12:30.  We've got two
18   witnesses.
19            THE COURT:  I agree with you.  I am making my
20   assessment here, and my assessment is that it is highly
21   unlikely that we will be able to fit all of the closings in on
22   Monday, given the evidence that remains, our work on jury
23   instructions that remains.
24        So I think that you can bank on us not closing on Monday.
25   However, you should also bank that we will work every minute
```

1    necessary on Monday so that all we have to do is have the jury

2    come in, hear closings Tuesday morning and my instructions.

3    Not wasting any time.

4        Be ready to go at -- well, actually on Tuesday, do we

5    have anything else on Tuesday morning, Mr. Bradley?  I think

6    we do.  That might make Ms. Hernandez start at 8:30 again.

7              MS. HERNANDEZ:  Actually, we also have motions for

8    judgment of acquittal.

9              THE COURT:  I know.

10             THE DEPUTY CLERK:  We have one scheduling

11   conference, civil.

12             THE COURT:  So we probably won't start at 9:30.

13             MS. HERNANDEZ:  More meritorious than usual.

14             THE COURT:  More what?

15             MS. HERNANDEZ:  Meritorious than usual.

16             THE COURT:  All right.  So we'll be closing on

17   Tuesday morning.  All right.  Anything else we need to discuss

18   tonight?  Any other issues that are going to come up with

19   witnesses or evidence or anything?

20             THE INTERPRETER:  Your Honor, may the interpreter

21   say something.  For the record, because this interpreter did

22   not say it on the record, but she, too, never interpreted the

23   entire question of the U.S. Attorney until the objection had

24   first been rendered and you had ruled on it.  That is simply

25   our standard practice, something we can't deviate from, so

1    that's what happened, and I believe that's it.

2            THE COURT:  I appreciate that from both of you, and

3    I will take a moment now to appreciate the quality of the job

4    and the professionalism that the interpreters have existed --

5    have exhibited throughout and their ability to avoid any

6    intrusions or interference with the smooth presentation of the

7    case, and I appreciate that on a daily basis.

8            THE INTERPRETER:  Your Honor, also might we request

9    a copy of the jury instructions?

10            THE COURT:  Yes, I'll have that for you, but we

11    don't have it finalized yet, so I'll wait until we have it

12    finalized.  All right.  So we'll see you-all.

13            MS. HERNANDEZ:  I think they probably want it even

14    for our discussions.

15            THE COURT:  Yeah, I'll give you a copy when we're

16    ready to go with jury instructions, discussing them, and then

17    I'll give you a final copy when we're ready to instruct, so

18    you can just be reading from that.  All right.

19            THE INTERPRETER:  Thank you.

20            THE COURT:  And so when did I decide we were going

21    to get together, Ms. Hernandez?  8:15?

22            MS. HERNANDEZ:  10:30.

23            THE COURT:  All right.  We are going to start at

24    9:00 o'clock on Monday, because we need to begin addressing

25    the jury instructions, and then we'll bring the jury in at

```
 1    9:30 to complete the evidence in the case, and at some point

 2    we'll have to discuss your client's decision with respect to

 3    testifying.

 4        All right.  Have a wonderful weekend everyone and get

 5    lots of rest, and that's right, Ms. Hernandez, work hard.

 6              MS. HABISREITINGER:  Thank you, Judge.

 7              THE COURT:  Did you have something else,

 8    Ms. Hernandez?

 9              MS. HERNANDEZ:  No, Your Honor.

10              THE COURT:  All right.  I'll see you-all.  Thank

11    you.

12              THE DEPUTY CLERK:  All rise.

13              (PROCEEDINGS END AT 5:15 P.M.)

14                            *-*-*-*-*

15

16

17

18

19

20

21

22

23

24

25
```

1                          I-N-D-E-X

2                          WITNESSES

3    Leonardo Garcia
     Direct Examination.............................  4
4    Cross-Examination..............................  19

5    Carrillo Garcia
     Direct Examination.............................  26
6    Voir Dire Examination..........................  36
     Direct Examination Continued...................  45
7    Cross-Examination..............................  73

8                     EXHIBITS RECEIVED

9    Government Exhibit 35..........................  33
     Government Exhibit 35-1........................  34
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7                    **CERTIFICATE OF REPORTER**

8            I, Catalina Kerr, certify that the foregoing is a

9    correct transcript from the record of proceedings in the

10   above-entitled matter.

11

12

13

14

15   _____    _____

16   Catalina Kerr                       Date

17

18

19

20

21

22

23

24

25