1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF COLUMBIA
    ------------------------X
3   UNITED STATES OF AMERICA,

4           Plaintiff,

5           v.                    CR 06-0248-05 (JDB)

6
    ALVARO AUGUSTIN MEJIA,        Washington, D.C.
7                                 Tuesday, February 26, 2008
            Defendant.            1:48 p.m.
8

9                                 AFTERNOON SESSION
    ------------------------X
10
                            DAY 2
11                  TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE JOHN D. BATES
12              UNITED STATES DISTRICT JUDGE
    APPEARANCES:
13  For the Government:    BRIAN TOMNEY, ESQ.
                           KIA M. HABISREITINGER, ESQ.
14                         PAUL W. LAYMON, ESQ.
                           U.S. Department of Justice
15                         1400 New York Avenue, N.W.
                           Washington, D.C.  20530
16                         202.307.1383

17  For the Defendant:     CARMEN D. HERNANDEZ, ESQ.
                           P.O. Box 70
18                         7166 Mink Hollow Road
                           Highland, MD  20777
19                         240.472.3391

20  Court Reporter:        CATALINA KERR, RPR
                           Official Court Reporter
21                         U.S. Courthouse, Room 6716
                           333 Constitution Avenue, NW
22                         Washington, D.C.  20001
                           202.354.3258
23

24  Proceedings recorded by mechanical stenography, transcript

25  produced by computer.

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2            THE DEPUTY CLERK:  All rise.  This honorable court

 3    is again in session.  Please be seated and come to order.

 4            MS. HERNANDEZ:  Judge, can I just preserve the

 5    confrontation and hearsay issues with respect to any

 6    statements before my client is alleged to have joined the

 7    conspiracy and -- and after, to the extent that there is no --

 8    that there has been no -- there is no conspiracy.

 9        I understand it's the judge that -- Your Honor gets to

10    make that preliminary determination, but I just wanted to

11    preserve.

12            THE COURT:  Those objections and request, to the

13    extent that there were motions involved, are preserved and the

14    rulings are the same as I have ruled in earlier versions of

15    this case.

16            MS. HERNANDEZ:  Do you want me to -- when the

17    question is asked, just to make the objection, or we'll just

18    have a standing objection?

19            THE COURT:  I think that for the record when the

20    first -- when it comes up for the first time, you might make

21    the objection, and then you can just note it as a continuing

22    objection.

23            MS. HERNANDEZ:  Right.  Thank you.

24            THE COURT:  Thank you, Ms. Hernandez.  We're ready?

25            MS. HABISREITINGER:  Yes, Your Honor.
```

1          THE COURT:  Let's bring them in.

2          (JURY PRESENT.)

3          THE COURT:  Welcome back and good afternoon, Members

4   of the Jury.

5          Ms. Habisreitinger, we're ready to proceed?

6          MS. HABISREITINGER:  Yes, Your Honor.  At this time

7   the Government calls Agent Steve Fraga to the stand.

8          THE DEPUTY CLERK:  Good afternoon, sir.

9          (WITNESS SWORN BY THE DEPUTY CLERK.)

10          THE DEPUTY CLERK:  Please be seated.

11          THE WITNESS:  Thank you.

12          THE COURT:  Good afternoon, Agent Fraga.

13          THE WITNESS:  Good afternoon, Your Honor.

14          THE COURT:  Ms. Habisreitinger.

15          MS. HABISREITINGER:  Thank you, Judge.

16                    STEPHEN FRAGA,

17   having been duly sworn, testified as follows:

18                    DIRECT EXAMINATION

19   BY MS. HABISREITINGER:

20   Q    Agent Fraga, where are you employed?

21   A    I'm employed by the United States Drug Enforcement

22   Administration as a special agent.

23   Q    Are you assigned to any particular group?

24   A    Yes, ma'am.

25   Q    And what is that group?

1    A    I'm assigned to the Bilateral Investigations Unit,

2    otherwise known as the 959 Unit.

3    Q    Would you explain to the Ladies and Gentlemen of the Jury

4    what type of work the 959 Unit does?

5    A    Yes, the Bilateral Investigations Unit or the 959 Unit

6    conducts primarily foreign-based investigations, bilateral

7    investigations with foreign counterparts as opposed to

8    unilateral investigations without the assistance of foreign

9    counterparts.

10        The 959 part comes from a particular statute that we

11    focus on.  It's Title 21, United States Code Section 959.

12    That statute basically says that it's unlawful for anyone to

13    manufacture or distribute a controlled substance knowing or

14    intending that that controlled substance is to be imported

15    into the U.S.

16    Q    What is your educational background?

17    A    I have a bachelor of science degree with a major in

18    criminal justice that I received in 1986.

19    Q    Do you have any special training in the field of

20    narcotics investigations?

21    A    Yes, ma'am.

22    Q    What is that training?

23    A    As a DEA agent, I was assigned to the DEA Quantico Basic

24    Agent course.  That was in 1991, which was a 14-week academy

25    that involved narcotics identification, narcotics

```
 1    investigations, various legal courses of instruction to
 2    include search and seizure, constitutional law, rules of
 3    evidence, rules of criminal procedure as well as practical
 4    drug investigation matters to include surveillance, use of
 5    informants, interviews, interview techniques, the various
 6    employment of various investigative techniques as well as
 7    tactical and self-defense matters.
 8    Q    Other than your experience with the 959 group, do you
 9    have any other previous law enforcement experience?
10    A    Yes, ma'am.
11    Q    And explain to the members of the jury what that
12    entailed.
13    A    I was employed by the FBI from 1986 to 1987, for
14    approximately one year.  In the fall of 1987 I was employed as
15    a special agent of the U.S. Naval Criminal Investigative
16    Service.
17         In that capacity as an NCIS agent, I attended a federal
18    law enforcement training center, basic agent class that was a
19    14-week academy in Clinton County, Georgia.  Much like the DEA
20    academy, that academy included legal matters such as rules of
21    criminal procedure again and rules of evidence and again
22    the -- the practical investigative matters.
23         I was employed with NCIS until March of 1991, at which
24    time I accepted employment as a special agent with DEA.
25    Q    And what type of assignments have you worked for the Drug
```

1    Enforcement Administration?

2    A    I was assigned to the Los Angeles, California field

3    office from 1991 until 1999.  In that capacity from 1991 until

4    1996, I was specifically in the City of Los Angeles assigned

5    to a high-intensity drug-trafficking area task force.  As a

6    member of that task force, our primary focus was the

7    investigation of Colombia based and Mexico based distribution

8    and transportation sales operating in Southern California.

9         In 1996, still within the Los Angeles field division,

10   but I transferred down to the Orange County or Santa Ana,

11   California resident office.  In that capacity there, I

12   primarily was asked to go there because they had a noted

13   proficiency in wiretap investigations.  In my assignment in

14   Santa Ana, California, again the primary duties were the

15   investigation of Colombia based drug-trafficking sales

16   operating in Southern California and also a significant focus

17   on Mexico based methamphetamine trafficking organizations and

18   operations and laboratory operations that were operating in

19   southern California.

20   Q    After your assignment in California, did you venture into

21   a different area of the Drug Enforcement Administration?

22   A    Yes, I did.  In 1999, I left California and I transferred

23   to the Dallas, Texas field division of DEA.  Specifically, I

24   was assigned to the Tulsa, Oklahoma resident office, and I was

25   there for two years until 2001.

1    Q    And what type of work did you do in Tulsa?

2    A    Primarily, in Tulsa, again because of my proficiency in

3    wiretap investigations, I was requested to go to Tulsa to

4    initiate a program there in Tulsa.  We focussed primarily on

5    Mexico based methamphetamine trafficking organizations and

6    distribution sales of the California based organizations as

7    they transitted the midwest for distribution throughout

8    different points of the United States.

9    Q    During the course of all of your law enforcement

10   experience, approximately how many narcotic-related cases

11   would you say that you've worked on?

12   A    It would be hundreds, ma'am.  In excess of 500 anyway.

13   Q    Okay.  When you're investigating international drug

14   traffickers, what type of investigative tools do you utilize?

15   A    Investigative tools in the course of drug-trafficking

16   investigations would include but certainly not limited to the

17   use of informants, the use of search warrants and the

18   execution of search warrants, the analysis of documents

19   obtained pursuant to the search warrants, interviews of

20   witnesses and defendants, surveillance and other investigative

21   tools that might include wiretaps or consensual and/or

22   nonconsensual recordings of communications, et cetera.

23   Q    What is the difference between a wiretap and a consensual

24   recording?

25   A    A wiretap is what is considered, or what is termed as a

1    nonconsensual intercept of communications, whether that be

2    telephone communications or e-mail or internet communications.

3    A nonconsensual intercept requires the approval of a judge and

4    probable cause documents and applications and -- to be able to

5    do an intercept like that.

6         A consensual -- a consensual intercept is the -- where

7    one party in the communication consents to the communication

8    being intercepted or recorded.

9    Q    And is a court order required for a consensual recording?

10   A    No, ma'am.

11   Q    Now, the first type of investigative tool that you

12   mentioned was informant.  Explain to the members of the jury

13   what you mean by informant.

14   A    Informants are cooperating sources, are used by DEA as

15   well as other law enforcement entities.  You know, in the

16   course of investigations, there are people that cooperate with

17   law enforcement in the furtherance of investigations.

18   Q    And why is it necessary to use an informant in your

19   investigations?

20   A    The primary need for the use of informants is that

21   typically informants, to some degree, are going to possess

22   a -- maybe a certain cultural background, maybe a certain

23   proficiency in the drug-trafficking industry itself that would

24   lend to the -- the -- lend to the credibility of the

25   informant's presence in those -- in those capacities.

1    Q    Could just anyone walk into an investigation and pose as,

2    for example, a Central American drug-trafficker?

3    A    No, ma'am.

4    Q    Why would an informant agree to put themselves in that

5    position by working with you?

6             MS. HERNANDEZ:   Objection.

7             THE COURT:   Sustained.   You can rephrase it.

8    Q    (BY MS. HABISREITINGER)   In your experience, why do

9    individuals work as confidential sources or informants?

10            MS. HERNANDEZ:   Your Honor, objection.

11        Can we approach, Your Honor?

12            THE COURT:   You may.

13            (AT THE BENCH; ON THE RECORD.)

14            THE COURT:   Come on up here.   Mr. Bradley is going

15   to ask you a couple of questions in a moment, but let's finish

16   this first.

17            MS. HERNANDEZ:   Your Honor, I haven't been

18   objecting, but there's -- I'm aware that there is some

19   background to put on a witness, but there seems to be more and

20   more of sort of a -- he's being asked questions as if he were

21   an expert rather than get to the facts of this case, and this

22   is the latest.   Why an informant would work in that capacity

23   is really not material to any fact in issue.

24            THE COURT:   That's a different question.   You

25   first -- I sensed that you were objecting because this witness

1    wasn't, quote/unquote, qualified to provide the testimony.

2            MS. HERNANDEZ:  Right.

3            THE COURT:  But then your second objection is a

4    relevance objection.  Which one do you want to talk about

5    first?

6            MS. HERNANDEZ:  I want to do both.  As I said, I've

7    given some leeway to kind of fill in the background.

8            THE COURT:  In terms of the qualification, I will

9    allow you to ask this witness -- this witness questions so

10   long as there's a foundation for the witness having firsthand

11   actual experience, and the fact that the witness may have

12   worked with a number of informants would enable the witness to

13   testify on the basis of his experience with those informants.

14   It doesn't necessarily mean that he would be able to say

15   informants generally.  It all depends what --

16           MS. HERNANDEZ:  Because he's not been --

17           THE COURT:  He's not qualified as an expert.  With

18   respect to the relevance, I do think that this is relevant

19   because I sense from your opening that you're going to attack

20   the credibility of the informant and the fact that the

21   informant, consensual informant in this case, has received

22   certain, as you would put it, incentives.  I think it's

23   relevant for the Government to discuss with this witness, to

24   the extent this witness is qualified to testify, rather, what

25   drives informants to do what they do.

1          MS. HERNANDEZ:  Well, this --

2          THE COURT:  You're going to make it seem -- and as

3    is your right and your obligation as counsel for the Defense,

4    you're going to make it seem that informants do things for

5    certain reasons and that should question the credibility.  The

6    Government's entitled to explore that issue.

7          MS. HERNANDEZ:  I would -- unless this witness is an

8    informant, I don't think he -- and since he's not been

9    qualified as an expert, I don't think he can say why

10   informants do what they do.  I mean, he can say why the

11   informants he's worked with and --

12         THE COURT:  He can testify as to --

13         MS. HERNANDEZ:  -- that would be hearsay, Your

14   Honor.  How does he know why somebody does what they do unless

15   somebody told him?  Now, I don't know why Your Honor does what

16   you do unless you have explained it to me.

17         THE COURT:  Even then, I mean, it would be very

18   difficult to ascertain.

19         MS. HERNANDEZ:  You know...

20         THE COURT:  All right.  Now we move to another

21   objection.  Any objection from Defense?

22         MS. HERNANDEZ:  The whole area of testimony, as I

23   said, I mean, there is some leeway with background, but my

24   primary objection, which Your Honor sustained, was, I thought,

25   on the basis of why someone else would do what they would do.

1    He's not -- we can only --

2              THE COURT:  He can testify based on his experience

3    that informants that he has worked with have done such and

4    such for such and such a reason, to the extent that he knows,

5    except to the extent that you now have a hearsay objection.

6              MS. HERNANDEZ:  Right.

7              THE COURT:  All right.  You have any response to the

8    hearsay objection?

9              MS. HABISREITINGER:  Judge, in this case, it

10   certainly would not be hearsay because, for example, as the

11   Court will see with this witness' testimony, in a case of the

12   confidential source that will be testifying today or possibly

13   tomorrow, this agent actually sat down with the individual and

14   knew, based on his communications with the CS that he was

15   being paid.

16        And his motivation was a financial one because this was

17   the witness -- this was the agent who actually filled out the

18   forms for him to get payment.  So I think that he does, and if

19   he can answer that question that he has --

20             THE COURT:  But the general question of why

21   informants do what they do would be eliciting testimony from

22   this witness based on his experience and particularly based on

23   what informants have told him, and so the objection is that

24   that would be hearsay.

25        What those informants, including Mr. Cortez, have told

1    him would be hearsay.  It would be admitted, I take it, for

2    the truth of the matter asserted, which is why informants do

3    what they do.  So why isn't there a hearsay problem?

4            MS. HABISREITINGER:  Judge, I mean, not necessarily.

5    First of all, we're trying to establish the agent's state of

6    mind when he deals with these informants.  What he has in his

7    mind as he sits down with each and every informant.  I'm not

8    necessarily trying to introduce it for the truth of the matter

9    asserted in that, for example, this confidential source on Day

10   3 of 1990 participated in this investigation for altruistic

11   purposes or for monetary purposes, which is --

12           THE COURT:  And what's the relevance of the agent's

13   state of mind?  I don't understand why the agent's state of

14   mind is of importance here.

15           MS. HABISREITINGER:  Well, Judge, I just think that

16   based on the fact that he is dealing with an informant who got

17   paid, I think it's an overview for the jury as to what this

18   officer was dealing with at the time that he made the

19   decisions that he made in dealing with this particular

20   informant, based on the experience that this agent has had

21   with other informants in the past.

22           THE COURT:  All right.  Anything else on that?

23           MS. HERNANDEZ:  From me?  You know, if she wants to

24   ask him what she did with this particular -- did you pay him

25   or what did you -- you know, how did he come to work for you?

1   That's why I'm -- otherwise -- and I allowed that and I didn't

2   object when, you know, he said that he needs someone to

3   infiltrate or cultural or whatever, but I think the problem

4   is, instead of asking the fact questions relating to this

5   case, we're going into this sort of generalized questioning.

6   That's why we're getting into this problem which to me is

7   clearly hearsay.

8           THE COURT:  So your objection --

9           MS. HERNANDEZ:  And irrelevant.

10          THE COURT:  Well, I don't think -- I reject the

11  relevance objection.  But you're objecting to them eliciting,

12  through this witness' testimony, that other informants he's

13  worked with have also been paid, because he only knows that

14  from them telling him that?  He doesn't only know that from

15  them telling him that.

16          MS. HERNANDEZ:  No, but that's not the question that

17  was asked.  The question is why do people -- I mean, people

18  can do things for a hundred different reasons.

19          THE COURT:  I think that what you'll have to do is

20  be specific in your question.  You can ask did you pay other

21  informants, because he would have firsthand knowledge of that.

22          MS. HERNANDEZ:  If he has firsthand knowledge.

23          MS. HABISREITINGER:  Correct.

24          THE COURT:  And anything that he has firsthand

25  knowledge of that is not from the mouth of the informant, I

1   think that it's certainly relevant for reasons I expressed

2   before and this witness would be competent to testify to it.

3        The only problem would be a hearsay problem with respect

4   to something that an informant told him, and that, I would

5   sustain the hearsay objection because that informant is not

6   here.  That's an out-of-court statement and it's being used

7   for the truth of the matter asserted.  I don't find that the

8   state of mind of the agent is particularly important.

9             MS. HERNANDEZ:  Okay.

10            (OPEN COURT.)

11            THE COURT:  Mr. Bradley, did you need to talk to

12   Mr. Laymon?

13            THE DEPUTY CLERK:  No, Judge.

14   Q    (BY MS. HABISREITINGER)  Agent Fraga, how many years have

15   you worked in law enforcement?

16   A    Well, I have a bachelor of science degree in criminal

17   justice.  That program was from 1982 to 1986.  I began working

18   for the FBI in the fall of 1986.  Technically, since 1982

19   would start my background, so I guess that's 26 years; is that

20   right?

21   Q    So over 20 years of law enforcement experience?

22   A    Yes, ma'am.

23   Q    And during that time, have you had the occasion to work

24   with confidential informants?

25   A    Yes, ma'am.

1   Q    And did some of these confidential informants work for

2   monetary purposes?

3   A    Yes.

4   Q    Were there any other reasons that you worked with

5   informants other than for monetary purposes?

6   A    Yes, ma'am.

7   Q    And what were some of those reasons?

8   A    Some of those reasons might be consideration -- judicial

9   consideration for pending cases that they may have.  Some

10  considerations may be relocation and other reasons may be just

11  purely altruistic reasons that people are providing

12  information for the --

13              MS. HERNANDEZ:  Objection, Your Honor, move to

14  strike.

15              THE COURT:  I'll strike the last part of the

16  testimony, which is the altruistic.  There is no foundation

17  for that.  If we establish a foundation, we can --

18              MS. HABISREITINGER:  I can move on, Judge.  Thank

19  you.

20  Q    (BY MS. HABISREITINGER)  Agent Fraga, if we could take a

21  moment to talk about those types of informants who work for

22  monetary purposes.  How are those individuals paid?

23  A    I'm sorry, ma'am?

24  Q    How are they paid, the individuals who work for monetary

25  reasons?  I guess what I'm asking, what -- what are they

1   getting paid for?

2   A    They're getting paid for -- they could be being paid for

3   their information and services.  They're paid for

4   reimbursement of expenses that they incur themselves in the

5   course of investigations.  They are paid -- they are paid

6   money and given instruction how to expend that money.

7        Those would be the primary reasons that I could think

8   that they would be paid for.

9   Q    Do they also get money for the information and the

10  services that they provide to the -- to the Government?

11  A    Yes, ma'am.

12  Q    Does anyone keep track of the amount that informant is

13  paid?

14  A    Yes.

15  Q    And how are those amounts being tracked?

16  A    My understanding is that those are figures that are

17  coordinated and maintained in a cooperating source database.

18  Those are --

19  Q    Okay.  I'm asking you personally, how do you keep track

20  of what you pay an informant that you work with?

21  A    When I pay an informant that I work with, I have to

22  execute with that informant what's called a DEA Form 103.

23  It's a payment form for the purchase of evidence or for

24  information and services.

25       Each time an informant is paid, the informant and two

```
1    controlling agents are required to complete that form, and

2    those forms are then submitted to the case file and that's how

3    I personally would track that.

4    Q    An informant who is paid for information provided or for

5    his service, who decides how much that person gets

6    compensated?

7    A    Initially, it's the recommendation of the case agent.

8    The case agent takes that recommendation to his or her

9    supervisor.  The supervisor either concurs or doesn't --

10   doesn't agree with that figure, may modify the figure, and if

11   the figure reaches a certain dollar amount -- I don't recall

12   what that dollar amount is -- it may require a third -- a

13   third tier level of approval before any payment is made to an

14   informant.

15   Q    Can an informant who is working, for example, with you,

16   with the 959 group, also work with another division of the

17   Drug Enforcement Administration?

18   A    May they?

19   Q    Can they?  Is it allowed?

20   A    Yes, ma'am.

21   Q    Can an informant who is working with the Drug Enforcement

22   Administration also work for other federal agencies?

23   A    Yes.

24   Q    And would you have access to all of that information?

25   A    No, not necessarily.
```

1  Q    If you could explain to the members of the jury the types

2  of confidential sources that you've worked with in the past.

3  A    There are confidential sources that I've worked with in

4  the past that may maintain a unique position within a

5  community that may be close to or involved in

6  drug-trafficking, for instance, a boat captain or an air

7  traffic controller or a shipping industry, container

8  shipments.

9      Some of those informants, or type of informant, I would

10  kind of refer to that informant as someone that we would

11  generally protect, in that instance, not to disclose their

12  identity because of the sensitive positions that they operate

13  in.  There are other informants that -- that provide

14  information that are more hands-on that they actually would --

15  would have meetings or they're directed to purchase drugs or

16  move drugs or receive drug shipments or record phone calls,

17  and some of those informants are willing to testify in court

18  and to be exposed.

19      So there is varying degrees of informants that we work

20  with that range, in that spectrum.

21  Q    Okay.  Are you familiar with the geographic makeup of

22  Central America?

23  A    Yes, ma'am.

24  Q    Have you ever had to travel to Central America?

25  A    Yes.

1   Q    And was that work related?

2   A    Yes, ma'am.

3          MS. HABISREITINGER:  May I approach the witness,

4   please?

5          THE COURT:  You may.

6   Q    (BY MS. HABISREITINGER)  Agent Fraga, I'm showing you what

7   has been marked as Government Exhibit 1, 1A and 1B and ask if

8   you can identify those documents for the record.

9   A    Yes, ma'am.

10  Q    And generally, what are they?

11  A    Government Exhibit 1 is a general overview of Central

12  America as it's depicted northward from Colombia to the

13  southern border of Mexico, to include Mexico.

14       Government Exhibit 1A is a depiction of the same region,

15  but more specific with the -- with the particular country

16  names depicted.

17       And Government Exhibit 1B is a more detailed depiction

18  of the country of Guatemala.

19          MS. HABISREITINGER:  At this time the Government

20  moves to offer, file and introduce into evidence Government

21  Exhibit No. 1, Government Exhibit No. 1A and Government

22  Exhibit No. 1B.

23          THE COURT:  Without objection, Government's 1, 1A

24  and 1B are admitted.

25          (GOVERNMENT'S EXHIBITS 1, 1A AND 1B ADMITTED.)

1        MS. HABISREITINGER:  And ask permission to briefly

2    publish it to the jury at this time.

3        THE COURT:  You may publish.

4        MS. HABISREITINGER:  For the record, I am showing

5    the jury Government Exhibit No. 1, also Government Exhibit 1A

6    and Government Exhibit No. 1B.

7    Q    (BY MS. HABISREITINGER)  And while I have 1B on the

8    screen, Agent Fraga, are you familiar with any ports that

9    Guatemala might have?

10   A    Yes, ma'am.

11   Q    In your -- what ports would that be, if you know?

12   A    On the southern side of Guatemala, on the Pacific ocean

13   side is the ports of San Jose.  On the northern --

14   northeastern corner of Guatemala is the borders of Honduras

15   and Belize is the Puerto Barrios or Puerto Barrios on the

16   Caribbean side, and there's a third port in Guatemala that's

17   called Puerto Santo Tomas.

18   Q    Based on your experience in traveling in Central America,

19   do individuals have a difficult time going back and forth

20   through the Central American countries?

21       MS. HERNANDEZ:  Objection.

22       THE COURT:  Sustained.  It's a leading question.

23   Q    (BY MS. HABISREITINGER)  Agent Fraga, what obstacles, if

24   any, do individuals have traveling between the countries in

25   Central America?

1    A    That would -- that would vary.  There are border

2    operations, but -- but border operations are porous.  For

3    instance, in recent -- in recent months I've traveled between

4    Guatemala and Belize with no interdiction and no problems

5    whatsoever.

6    Q    Are you familiar with the arrests of Eric Donaire

7    Constanza Bran, Alvaro Rene Augustin Mejia and Juan Daniel Del

8    Cid Morales?

9    A    Yes, ma'am.

10    Q    And were you involved in that case?

11    A    Yes, ma'am.

12    Q    What was your involvement?

13    A    I assumed case agent responsibilities in that

14    investigation in approximately May of 2006.  Prior to that, I

15    was assisting in a separate investigation that culminated in

16    November of 2005, that ended up being related to the

17    investigation of the subjects that you mentioned.

18    Q    You also familiar with an individual named Jorge Bardales

19    Bourdet?

20    A    Yes, ma'am.

21    Q    And who is that individual?

22    A    Jorge Bardales Bourdet was a Guatemalan citizen who was

23    identified subsequent to the completion of a phase of

24    investigation that ended in November of 2005 by the bilateral

25    case script.

1    Q    Based on that investigation, what did you do?

2    A    Based on that investigation, Jorge -- Jorge Bardales was

3    identified as having a specific role as a conduit between

4    Colombian drug-trafficking organizations and corrupt

5    Guatemalan law enforcement officials.

6         In that capacity, Mr. Bardales facilitated the use of

7    corrupt law enforcement officials in Guatemala to move -- and

8    or to receive safely in Guatemala and move shipments of

9    cocaine as they transitted Guatemala.

10        After the identification of Mr. Bardales, a DEA

11   confidential source was identified that had received contact

12   from Mr. Bardales, and that confidential source was requested

13   to perform specific activities for Mr. Bardales.

14   Q    And who was this individual that you're referring to?

15   A    The confidential source?

16   Q    Not by name, but is this an individual that you had

17   brought into the case or an individual that -- I'm sorry.

18        The confidential source that you're referring to, how did

19   he become involved in the case?

20   A    The confidential source became involved in the case.  As

21   Jorge Bardales was identified, there were queries through DEA

22   systems and other DEA offices.  It was determined that there

23   existed a confidential source in another country that had

24   prior dealings with Jorge Bardales, and in fact, was being

25   requested by Jorge Bardales at that time to assist in the

1    movement of container shipments of cocaine.

2    Q    And that particular confidential source was utilized in

3    your investigation?

4    A    Yes, ma'am.

5    Q    Was there a second confidential source that was also

6    utilized in your investigation?

7    A    Yes, ma'am.

8    Q    And what was the purpose of using the second confidential

9    source?

10   A    The purpose of the second confidential source was for the

11   second confidential source to be introduced to Jorge Bardales

12   by the first confidential source.

13   Q    And the second confidential source, how was he posing

14   himself?

15   A    He was representing himself as a person who was

16   associated with Colombian laboratory operations in the

17   production of cocaine.  He represented himself as a person who

18   had 300 kilograms of cocaine and that he needed assistance

19   transitting that cocaine through Guatemala safely and that the

20   cocaine was destined for the United States.

21   Q    At some point was a third confidential source brought in

22   to work in this investigation?

23   A    Yes, ma'am.

24   Q    And why was that necessary?

25   A    The third confidential source was brought into the

1  investigation to pose as the boss for the Colombian source of

2  supply of the second confidential source.

3  Q   And why could the second confidential source not pose as

4  the Colombian source of supply?

5  A   Frankly, the second confidential source doesn't have the

6  experience to represent himself as a Colombian source of

7  supply.  He had already represented himself as a -- as a

8  laboratory operation working at Colombian laboratories, and

9  certainly, once he had committed himself to that, couldn't

10 then represent himself as a source of supply.

11 Q   Now, this third individual that was brought in, the third

12 confidential source, did he have a Colombian background?

13 A   Yes, ma'am.

14 Q   And what was that background?

15 A   He's Colombian.  He was born in Colombia.

16 Q   Okay.  The -- what was the name utilized by the third

17 confidential source during the investigation?

18 A   The third confidential source used the name Augustine

19 Cortez.

20 Q   Agent Fraga, I'm going to turn your attention to

21 April 26, 2006.  Are you aware of a meeting between Bardales

22 Bourdet and the first two confidential sources?

23 A   Yes, ma'am.

24 Q   And what was the purpose of that first meeting?

25 A   The purpose of that meeting was for the first

1  confidential source to introduce the second confidential

2  source to Mr. Bardales Bourdet.  The purpose, furthermore, was

3  the second confidential source represented to Mr. Bardales

4  that the second confidential source had 300 kilograms of

5  cocaine that he required the assistance or requested the

6  assistance to transit that cocaine through Guatemala safely.

7  Q    After that first meeting, what happened?

8  A    After that first meeting, there were a series of phone

9  calls that were consensually recorded phone calls that took

10  place between the second confidential source and Mr. Bardales.

11      During those phone calls there were particular quantities

12  of cocaine that was discussed, and the facilitation of the

13  introduction of the third confidential source by the second

14  confidential source took place in those phone calls and

15  ultimately a meeting was set up to take place in Panama.

16  Q    So after the phone calls, setting up the meeting, was the

17  third confidential source, in fact, introduced to the other

18  individuals at this meeting?

19  A    Yes, ma'am.

20  Q    Turning your attention to June 20th, 2006, at

21  approximately 1:38 p.m. in the afternoon, are you aware of

22  that meeting that occurred at Parador Restaurant in Panama

23  City, Panama?

24  A    Yes.

25  Q    And what was the -- what was the purpose of that

1  particular meeting?

2  A   The purpose of that meeting was the introduction of the

3  third confidential source to Jorge Bardales as a Colombian

4  cocaine source of supply.

5  Q   Was that the first time Augustine was introduced into the

6  investigation?

7  A   Yes, ma'am.

8  Q   Prior to him going to the meeting, was he searched?

9  A   Yes, ma'am.

10  Q   And why was that necessary?

11  A   That's standard DEA policy with a confidential source

12  going to a meeting to document what may be on the confidential

13  source going into the meeting and what may be on the

14  confidential source coming out of the meeting.

15  Q   Before he went to the meeting, were any funds given to

16  him?

17  A   Yes, ma'am.

18        MS. HERNANDEZ:  Your Honor, can I object to the

19  passive nature of the questions?  Does the witness know

20  he's -- the answers to these questions or is he summarizing

21  someone else's knowledge.

22        THE COURT:  Well, ask a foundational question or two

23  in terms of the source of his knowledge.

24  Q   (BY MS. HABISREITINGER)  Agent Fraga, were you case agent

25  on this case?

1    A    Yes, ma'am, from May of 2006 to the present.

2    Q    On June 20th, 2006, for the first meeting at the

3    Parador Restaurant in Panama City, Panama, were you the

4    agent -- lead agent on the case?

5    A    Yes, ma'am.

6    Q    Did you have full contact with the confidential source

7    during the course of this particular meeting?

8    A    Yes.

9    Q    Did you search the confidential source prior to him going

10   into the meeting?

11   A    Yes, I did.

12   Q    Did you give him anything prior to him going into the

13   meeting, any type of funds?

14   A    Yes, ma'am.

15   Q    And what type of funds?

16   A    I provided him $2,500 of U.S. currency that was to be

17   given to Mr. Bardales, and I also had provided him $1300 of

18   U.S. currency that was provided to him for reimbursement of

19   his own expenses, travel expenses, hotels, meals and

20   incidentals.

21   Q    Was that for his travel to get to Central America and

22   particularly to this meeting?

23   A    Yes, ma'am.

24   Q    Now, the $2500 to given to Bardales, what was the purpose

25   of the $2500?

```
 1   A    The purpose was, in the conversations that had set up the

 2   meeting, it was understood by Mr. Bardales that his travel

 3   arrangements of himself -- for himself and any associate that

 4   traveled with him would be paid for.

 5   Q    Okay.  By the -- by whom?

 6   A    By Augustine.

 7   Q    Okay.  During the course of the meeting, did you have an

 8   opportunity to survey the area?

 9   A    Yes, ma'am.  Yes, ma'am, I did.

10   Q    Were you working with any other agents at that time?

11   A    Yes.

12   Q    And what type of agents?

13   A    I was working with several agents from the DEA office in

14   Panama City, Panama, and also there was a surveillance team of

15   the Panamanian National Police that conducted the

16   surveillance.

17   Q    And approximately how many of the Panamanian National

18   Police were present for the surveillance?

19   A    I believe approximately eight.

20   Q    Who was present at that first meeting on June 20th,

21   2006, in Panama?

22   A    Jorge Bardales Bourdet, Augustine Cortez, the first

23   confidential source, an individual that accompanied Jorge

24   Bardales Bourdet, his name was Edgar Chiu-Serrano.  That's

25   C-H-I-U, hyphen, S-E-R-R-A-N-O.
```

1    And later in the meeting, the second confidential source

2  joined the meeting.

3  Q    Was there a reason that the second confidential source

4  joined the meeting at a later time?

5  A    Yes, ma'am.

6  Q    And what was that reason?

7  A    The second confidential source was -- was intricately

8  involved in the first investigation that ended in November of

9  2005, which ended with the arrest of three Guatemalan law

10  enforcement officials.

11    It was my decision to have the second confidential

12  source hold back from being present at this second meeting

13  until it was determined that any of the people were present

14  wouldn't recognize him from the first investigation.

15  Q    Approximately how long did that first meeting last?

16  A    Approximately one hour.

17  Q    And after the meeting, did you meet with the third

18  confidential source known as Augustine?

19  A    Yes, ma'am.

20    MS. HERNANDEZ:  Objection.  Are we talking about --

21  I'm sorry, we're talking about a June 30th meeting.

22    THE COURT:  Yes, ask the witness.  Just clarify what

23  time frame we're talking about that Ms. Hernandez needs that

24  clarification.

25  Q    (BY MS. HABISREITINGER)  Officer -- Agent, I'm still

1   talking about the June 20th, 2006 meeting.  After that meeting,

2   did you search the confidential source known as Augustine?

3   A    Yes, ma'am.

4   Q    And did you receive anything from Augustine after that

5   June 20th, '06 meeting?

6   A    Yes.

7   Q    And what did you receive?

8   A    I received a recording device from him that I had

9   provided to him prior to the meeting.

10  Q    When you provided the recording device to him, what did

11  you instruct him to do with it?

12  A    To utilize it to record the audio and video of the

13  June 20th meeting.

14  Q    And can you describe for the members of the jury the type

15  of video device you're referring to?

16  A    Yes.  That particular device is a covert audio and video

17  recorder that was further contained in a, what we would call a

18  leather fanny-pack.  The camera actually -- the camera and

19  microphone actually is contained within a button, and the

20  wires were concealed inside the fanny-pack itself.

21  Q    And after the meeting on June 20th, 2006, did you receive

22  the actual CD or DVD from the confidential source known as

23  Augustine?

24  A    No, ma'am.

25  Q    You did not.  When did you receive that?

```
1    A    I -- what I received from Augustine was the actual

2    equipment itself, and I maintained possession of that

3    equipment and brought it back to Virginia and transferred and

4    downloaded the audio and video from the equipment and

5    ultimately downloaded it to CD.

6              MS. HABISREITINGER:  May I approach the witness,

7    please?

8              THE COURT:  You may.

9    Q    (BY MS. HABISREITINGER)  Agent Fraga, I'm showing you what

10   I marked for identification as Government Exhibit -- Government

11   Exhibit 2 and ask if you can identify that item for the record.

12   A    Yes, ma'am.

13   Q    And what is that?

14   A    It's three compact disks that contain the audio and video

15   recording of the June 20th meeting in Panama.

16   Q    Keeping your attention on June 20th, 2006, after that

17   meeting in Panama City, did anything significant in your

18   investigation arise shortly thereafter?

19   A    Yes, ma'am.

20   Q    And what was that?

21   A    The confidential source, Augustine, received a telephone

22   call at approximately, I think it was about 6:00 p.m. that

23   evening.

24   Q    And do you know who made that call?

25   A    Yes, ma'am.
```

1    Q    And who was that?

2    A    The individual identified himself as Eric Constanza,

3    C-O-N-S-T-A-N-Z-A.

4              MS. HABISREITINGER:  May I approach the witness,

5    please?

6              THE COURT:  You may.

7    Q    (BY MS. HABISREITINGER)  Agent Fraga, I'm showing you what

8    I've marked as Government Exhibit No. 3 and ask if you can

9    identify that item for the record.

10   A    Yes, ma'am.

11   Q    And what is that?

12   A    It's a compact disk that contains the consensually

13   recorded phone call between Augustine and Eric Constanza on

14   June 20th, 2006.

15   Q    Agent Fraga, how were these -- how were these

16   consensually recorded phone calls actually recorded?

17   A    That -- that particular call on June 20th was recorded

18   by a digital audio -- a digital audio recorder that Augustine

19   possesses himself and uses in the furtherance of

20   investigations.

21   Q    And are you present when he makes these calls?

22   A    I was, in that instance, and in the remaining calls

23   throughout the investigation, several of them I placed myself

24   as three-way calls.  Some of the calls Augustine placed

25   himself and recorded and forwarded me the audio portions of

1  those calls.

2  Q    At that point in your -- at this point in your

3  investigation, who did you determine Eric Constanza to be?

4  A    Eric Constanza represented himself as the boss of Jorge

5  Bardales and Edgar Chiu-Serrano.

6  Q    Now, after that June 20th meeting and then that

7  subsequent phone call that came in at about 6:00 p.m., are you

8  aware of any additional calls between Augustine and this

9  individual known as Constanza Bran?

10  A    Yes, ma'am.

11        MS. HABISREITINGER:  May I approach the witness,

12  Your Honor?

13        THE COURT:  Yes.

14  Q    (BY MS. HABISREITINGER)  Agent Fraga, I'm now showing you

15  what I've marked as Government Exhibit No. 4 and ask if you can

16  identify that item for the record.

17  A    Yes, ma'am.

18  Q    And what is that?

19  A    It's a compact disk that contains consensually recorded

20  calls between Augustine and Eric Constanza between July 6 and

21  July 19th of 2006.

22  Q    And what was the purpose of those phone calls?

23  A    The purpose of those phone calls was the coordination of

24  setting up a meeting that was to occur in San Salvador, El

25  Salvador.

1    Q    Turning your attention to the second meeting on

2    July 19th, 2006, at Senor Tenedor Restaurant in San Salvador,

3    El Salvador, was Augustine working with you for that meeting?

4    A    Yes, ma'am.

5    Q    And what was the purpose of setting up that second

6    meeting in El Salvador?

7    A    The purpose of that meeting was, in the conversations

8    that Augustine had had with Eric Constanza, Eric Constanza had

9    represented that he had associations with Guatemalan law

10   enforcement officials that could provide protection for

11   shipments of cocaine that were entering in transit in

12   Guatemala.  The purpose of that meeting was for Eric Constanza

13   to introduce those people to Augustine.

14   Q    At the time of the -- of the meeting, the beginning of

15   the meeting, did you know who those two people would be who

16   could provide the protection for the cocaine?

17   A    No, ma'am.

18   Q    Were you able to do surveillance during the course of

19   this second meeting?

20   A    Myself, no.

21   Q    And why not?

22   A    Essentially, I didn't fit in.  I was in El Salvador.  I

23   attempted to be part of their surveillance but just culturally

24   and ethnically didn't fit in, so removed myself from the area.

25   Q    Who was present at this particular meeting?

```
 1    A    Augustine, Jorge Bardales Bourdet, the first confidential
 2   informant, Eric Constanza Bran, an individual who identified
 3   himself as Edwin Rene Sapon-Ruiz, S-A-P-O-N, hyphen, R-U-I-Z,
 4   and an individual who identified himself as Ovidio Fajardo
 5   Aldana.
 6    Q    The individuals who represent themselves -- or the
 7   individual representing himself to be Ovidio Fajardo Aldana,
 8   during the course of the investigation, did you have an
 9   opportunity to determine if that individual was, in fact, a
10   legitimate government official?
11    A    Yes, ma'am.
12    Q    And was he?
13    A    Ovidio Fajardo Aldana was, yes.
14    Q    Were you able to ascertain whether Ovidio Fajardo Aldana
15   was the correct person that was at that meeting?
16    A    Yes, I was able to ascertain that.
17    Q    And was he?
18    A    No.
19    Q    Who did you determine -- or did you determine who the
20   individual posing as Ovidio Fajardo Aldana was?
21    A    Yes.
22    Q    And who was that?
23    A    It was an individual identified as Juan Daniel Del Cid
24   Morales.
25    Q    Now, the second individual, Edwin Rene Sapon-Ruiz, did
```

1    you -- who was that individual?  Who did you determine him to

2    be?

3    A    The -- I'm sorry?

4    Q    I guess what I'm asking you, is Edwin Rene Sapon-Ruiz

5    also a government official?

6    A    Yes, ma'am.

7    Q    And did you determine that he was the actual one present

8    at that particular meeting?

9    A    That determined that it was -- it was not him at the

10   meeting.  It was a person who represented himself as him.

11   Q    And who was that person?

12   A    Rene Augustin Mejia.

13   Q    Now, these two individuals, Ovidio Fajardo Aldana and

14   Edwin Rene Sapon-Ruiz, did your investigation reveal whether

15   these were the two individuals who were to provide protection

16   for the transportation of the cocaine?

17         MS. HERNANDEZ:  Your Honor, objection.

18         THE COURT:  Sustained.

19   Q    (BY MS. HABISREITINGER)  Prior to the beginning of the

20   meeting, was Augustine provided with any money?

21   A    Yes, ma'am.

22   Q    And what was the purpose of giving him money?

23   A    He was to provide the money to the persons that

24   represented themselves as Guatemalan law enforcement officials

25   to culminate a narcotics transaction.

1   Q    And what amount was given to him for that purpose?

2   A    $10,000.

3   Q    In what denominations?

4   A    100-dollar bills.

5   Q    Was the money recorded in any way?

6   A    Yes, ma'am.

7            MS. HABISREITINGER:  May I approach the witness,

8   please?

9            THE COURT:  You may.

10  Q    (BY MS. HABISREITINGER)  Agent Fraga, I'm showing you what

11  I've marked for identification as Government Exhibit No. 5 and

12  ask you if you can identify that for the record.

13  A    Yes, ma'am.

14  Q    And what is that?

15  A    This is a Xerox copy of the 100-dollar bills that I

16  provided to Augustine on July 19th.

17           MS. HABISREITINGER:  At this time the Government

18  would offer, file and introduce into evidence Government

19  Exhibit No. 5.

20           MS. HERNANDEZ:  Subject to cross or --

21           THE COURT:  Do you need to approach?

22           MS. HERNANDEZ:  It's okay.

23           THE COURT:  We'll admit Government Exhibit No. 5;

24  either without or overruling the objection.

25               (GOVERNMENT EXHIBIT 5 ADMITTED.)

1    Q    (BY MS. HABISREITINGER)  Was the July 19th, 2006,

2   meeting recorded the same way as the June 20th meeting?

3    A    Yes, ma'am, it was.

4          MS. HABISREITINGER:  May I approach the witness,

5   please?

6          THE COURT:  You may.

7    Q    (BY MS. HABISREITINGER)  I'm now showing you what I've

8   marked as Government Exhibit No. 6 and ask if you can identify

9   that item for the record.

10    A    Yes.

11          THE COURT:   Identify it for the record.

12    A    It's five compact disks that contain the audio and video

13   recording of the July 19th meeting.

14    Q    Okay.

15    A    Excuse me.

16    Q    Did -- after the -- after the meeting, did the

17   confidential sources have any additional contact with Bran,

18   Mejia and Morales that day?

19    A    Yes, ma'am.

20    Q    Where was that contact?

21    A    One of the confidential sources had contact with those

22   people at a social environment at a restaurant.

23    Q    Did you instruct the confidential source to do anything

24   at the restaurant?

25    A    Yes, ma'am.

1    Q    And what did you instruct the confidential source to do?

2    A    I instructed the confidential source that while he was in

3    the social company of -- of the subjects, that in the event

4    that they expended 100-dollar bills, to try and retrieve or

5    switch some of those 100-dollar bills.

6    Q    Were you -- what was the purpose of doing that?

7    A    The purpose of doing that was that the -- the persons

8    that were meeting with -- with the confidential sources on

9    that day were representing themselves as Guatemalan law

10   enforcement officials.

11        The purpose of trying to retrieve some of that money was

12   primarily is -- that if they were Guatemalan law enforcement

13   officials in conducting an investigation, they rightfully

14   would have seized the monies that were given to them and

15   processed them into evidence.  In an attempt to retrieve some

16   of that money, if it were expended in a social setting, it was

17   indicative that there was no official investigation being

18   conducted.

19             MS. HABISREITINGER:  May I approach the witness,

20   please?

21             THE COURT:  You may.

22   Q    (BY MS. HABISREITINGER)  Agent, I'm now showing you what

23   I've marked as Government Exhibit No. 7 and ask if you can

24   identify that item for the record.

25   A    Yes, ma'am.  This is a Xerox copy of two 100-dollar bills

1    that was retrieved by one of the DEA confidential sources on

2    the night of July 19th, 2006.

3              MS. HABISREITINGER:  Your Honor, at this time the

4    Government offers, files and introduces into evidence

5    Government Exhibit No. 7.

6              MS. HERNANDEZ:  Your Honor, I'm going to object;

7    foundation.

8              THE COURT:  Overruled.  Government's Exhibit 7 is

9    admitted.

10             (GOVERNMENT EXHIBIT NO. 7 ADMITTED.)

11   Q    (BY MS. HABISREITINGER)  Agent Fraga, did you have an

12   opportunity to compare the two 100-dollar bills that you

13   received to the copy of the 10,000 100 -- the $10,000 that you

14   had photocopied previously?

15   A    Yes, ma'am.

16   Q    And what was the purpose of comparing?

17   A    To compare the serial numbers.

18   Q    And the two 100-hundred dollar bills that you retrieved

19   from the confidential source, did it match some of the

20   originals?

21   A    Yes, ma'am.

22   Q    And did you mark the original in any way?

23   A    Yes, I did.

24   Q    And what did you do?

25   A    I marked it with a yellow highlighter.

1    Q    And you marked what with a yellow highlighter?

2    A    The original copy, the color copy.

3    Q    Would that be the serial number?

4    A    Yes.

5    Q    Okay.  After the meeting in El Salvador, are you aware of

6    additional calls to set up a second meeting also in El

7    Salvador?

8    A    Yes, ma'am.

9              MS. HABISREITINGER:  May I approach, the witness?

10             THE COURT:  You may.

11   Q    (BY MS. HABISREITINGER)  Agent Fraga, I am now showing you

12   what I have marked for identification as Government Exhibit

13   No. 22 and ask if you can identify that for the record.

14   A    Yes, ma'am.  Exhibit 22 is a compact disk that contains

15   consensual recorded calls between confidential source and

16   Jorge Bardales.

17   Q    And also Government Exhibit No. 8?

18   A    Is a compact disk containing consensually recorded calls

19   between a confidential source and Eric Constanza.

20   Q    What was the purpose of those calls that you just

21   testified about?

22   A    The purpose of those calls was to set up a --

23             MS. HERNANDEZ:  Objection.  Those calls can speak

24   for themselves.

25             THE COURT:  Well, lay a foundation as to whether he

1    had a purpose to the calls, and if there's an objection on the

2    ground other than speaking for themselves, you can make it.

3    Q    (BY MS. HABISREITINGER)   During the course of this

4    investigation, did you instruct the confidential source as to

5    what he should be doing?

6    A    Yes, ma'am.

7    Q    Did you at times instruct him to make phone calls?

8    A    Yes, ma'am.

9    Q    Did you at times instruct him to make phone calls --

10           MS. HERNANDEZ:   Objection; leading.

11           THE COURT:   Overruled.

12   Q    (BY MS. HABISREITINGER)   Did you at times make -- instruct

13   him to make phone calls to an individual known as Eric Constanza

14   Bran?

15   A    Yes, ma'am.

16   Q    And what was the purpose of you asking him to call Eric

17   Constanza Bran?

18   A    The purpose was reactionary to the events that took place

19   in the meetings in Panama and in El Salvador.  Mr. Constanza

20   and Mr. Bardales had represented that they were going to

21   facilitate the structure of a business in Guatemala that was

22   actually going to be used to receive container shipments that

23   would enter the country of Guatemala.

24           Mr. Bardales and Mr. Constanza had represented that in

25   order to set up that business, there were certain monies that

1  were required.  In the phone calls that were made by the

2  confidential source, were to find out from Mr. Constanza and

3  Mr. Bardales exactly how much money was required and to -- to

4  set up future meetings to discuss the payment of those monies

5  and the establishment of the business.

6  Q    Now, turning your attention to that third meeting on

7  August 23rd, 2006, approximately what time did that meeting

8  occur?

9  A    My recollection is approximately 11:00, 11:30 in the

10  morning.

11  Q    And where did that meeting take place?

12  A    At the same location, at the Senor Tenedor Restaurant in

13  San Salvador, El Salvador.

14  Q    How long did that meeting last?

15  A    It was fairly brief.  It was only about 30 minutes.

16  Q    Who was present for that meeting?

17  A    Eric Constanza Bran, Augustine, the individual who

18  represented himself as Edwin Rene Sapon-Ruiz and the

19  individual who represented himself as a Ovidio Fajardo Aldana.

20  There was also an additional individual who accompanied them

21  who was later identified as Hector Barrios.

22      Hector Barrios did not sit at the same table with the

23  meeting, but he sat in a separate table in the restaurant and

24  overlooked the meeting.

25  Q    Were you able to do surveillance during that meeting?

1    A    No.  Myself, no, ma'am.

2    Q    Were you present in the area for the meeting?

3    A    I was -- I was in the general area but not within

4    eyesight.

5             MS. HABISREITINGER:  May I approach the witness,

6    please?

7             THE COURT:  You may.

8    Q    (BY MS. HABISREITINGER)  Agent, I am now showing you what

9    I've marked as Government Exhibit No. 9 and ask if you can

10   identify that item for the record.

11   A    Yes.  This is two compact disks that depict the audio and

12   video recording of the August 23rd meeting in San Salvador.

13   Q    In addition to receiving the recording of that particular

14   video, did you receive anything else from the confidential

15   source known as Augustine?

16   A    Yes, ma'am.

17   Q    And what did you receive?

18   A    Was paperwork that was provided to me by Augustine.

19            MS. HABISREITINGER:  May I approach the witness,

20   please?

21            THE COURT:  You may.

22   Q    (BY MS. HABISREITINGER)  Agent Fraga, I'm going to show

23   you what I've marked as Government Exhibit No. 10 and ask if you

24   can identify that item.

25   A    Yes, ma'am.

```
 1    Q    And what is that?

 2    A    This is a piece of paper depicting a handwritten drawing

 3    that was provided to me by Augustine on August 23rd.

 4               MS. HABISREITINGER:  Your Honor, at this time the

 5    Government would offer, file and introduce into evidence

 6    Government Exhibit No. 10.

 7               MS. HERNANDEZ:  No objection.

 8               THE COURT:  Without objection, Government 10 is

 9    admitted.

10               (GOVERNMENT EXHIBIT 10 ADMITTED.)

11    Q    (BY MS. HABISREITINGER)  And I'm also showing you

12    Government Exhibit No. 11 and ask if you can identify that for

13    the record.

14    A    Yes, ma'am.  And this is a compilation of paperwork that

15    was provided to me by Augustine on August 23rd, 2006.

16    Q    And what type of paperwork does that purport to be?

17    A    Purports to be the Guatemalan business entity paperwork

18    and the reference of a business.

19               MS. HABISREITINGER:  Government offer, files and

20    introduces into evidence Government Exhibit No. 11.

21               THE COURT:  Let Ms. Hernandez see it, please.

22          Any objection, Ms. Hernandez?  Or you still considering

23    it?

24               MS. HERNANDEZ:  I have no objection to it coming in

25    as -- I have objections to relevance only -- only after I
```

 1   review it, Your Honor.

 2            THE COURT:  All right.  Subject to that objection,

 3   we will admit it conditionally.

 4            (GOVERNMENT EXHIBIT 11 ADMITTED.)

 5            THE COURT:  I guess I don't understand.

 6       Ms. Hernandez, are you intending to review it and then

 7   perhaps make further objection?

 8            MS. HERNANDEZ:  No.  It's the relevancy is not

 9   obvious to me, so subject to --

10            THE COURT:  We'll reserve that objection to it, and

11   you may proceed, Ms. Habisreitinger.

12            MS. HABISREITINGER:  Okay.  Judge, if I could just

13   get clarification.  Defense counsel has objected to the

14   introduction of both Government Exhibit No. 10 and 11?

15            THE COURT:  No, just 11.

16            MS. HABISREITINGER:  Just 11.  At this time then I

17   would like to just briefly publish to the jury Government

18   Exhibit No. 10.

19            THE COURT:  You may.

20   Q    (BY MS. HABISREITINGER)  Agent Fraga, after this shorter

21   meeting on August 23rd, are you aware of an additional call

22   between Augustine and Eric Constanza Bran?

23   A    Yes, ma'am.

24            MS. HABISREITINGER:  May I approach the witness,

25   please?

1          THE COURT:  You may.

2     Q    (BY MS. HABISREITINGER)  I am now showing you what is

3     marked as Government Exhibit No. 50 and ask if you can identify

4     this item for the record.

5     A    Yes, ma'am.  It's a compact disk that depicts the

6     consensually recorded phone call between Augustine and Eric

7     Constanza that occurred on the afternoon of August 23rd.

8     Q    After that August 23rd meeting, are you aware of

9     additional phone calls that took place on August 29th, 2006

10    and then later, through September 21st -- from September 21st,

11    2006 through September 26th, 2006?

12    A    Yes, ma'am.

13         MS. HABISREITINGER:  May I approach the witness?

14         THE COURT:  You may.

15    Q    (BY MS. HABISREITINGER)  Agent Fraga, I'm now showing you

16    what has been marked as Government Exhibit No. 12 and ask if you

17    can identify that item for the record.

18    A    Yes.  It's one compact disk that depicts consensually

19    recorded calls between Augustine and Eric Constanza between

20    August 29th, 2006 and --

21    Q    And also Government Exhibit No. 13?

22    A    And that first one, between August 29th and

23    September 12th.

24         Exhibit 13 are consensually -- is a compact disk

25    containing consensually recorded calls between Augustine and

1   Eric Constanza between September 19th and September 26th

2   of 2006.

3   Q   For Augustine's participation in this investigation, has

4   he been -- other than his expenses, has he been paid anything?

5   A   Yes, ma'am.

6   Q   What has he been paid?

7   A   He was paid, up to this date, $10,000 for his information

8   and services.

9   Q   Has he been -- based on his work in this particular case,

10  has he been submitted for additional payments?

11  A   Yes, ma'am.

12  Q   And how much was that?

13  A   I believe it was $50,000.

14  Q   And do you know if he's been paid that?

15  A   He has not been paid that, no.

16  Q   Prior to entering into an agreement with a confidential

17  informant, is there a certain form or paperwork that you fill

18  out with the individual who will work as the informant?

19  A   Yes.

20          MS. HABISREITINGER:  May I approach the witness,

21  please?

22          THE COURT:  You may.

23  Q   (BY MS. HABISREITINGER)  Agent Fraga, I'm now showing you

24  what has been marked as Government Exhibit No. 14 and ask if you

25  can identify that item for the record.

1    A    Yes, ma'am.  This is a redacted copy of a confidential

2    source agreement between Augustine and myself and another DEA

3    agent that was executed on July 19th of 2006.

4    Q    Had -- you said it was redacted.  Why was it redacted?

5    A    It's redacted to redact the initials of Augustine from

6    the document as well as his original signature.

7    Q    And what is the purpose of that?

8    A    Because this document and this proceeding becomes public

9    record.  In an effort to protect his identity, those initials

10   and signature have been redacted.

11   Q    And you said the date on the document was July...?

12   A    19th of 2006.

13   Q    Had he been working with you prior to July of '06?

14   A    Yes, ma'am.

15   Q    And was he under agreement with the DEA at that time

16   also?

17   A    Yes.

18          MS. HABISREITINGER:  Your Honor, the Government

19   offer, files and introduces into evidence Government Exhibit

20   No. 14.

21          THE COURT:  Any objection?

22          MS. HERNANDEZ:  I'm sorry.  No, Your Honor.

23          THE COURT:  Thank you.  Government 14 is admitted

24   without objection.

25          (GOVERNMENT EXHIBIT 14 ADMITTED.)

1  Q    (BY MS. HABISREITINGER)   What does the confidential source

2  agreement obligate Augustine to do?

3  A    It's a -- it's a guideline of the acknowledgment and

4  instructions to the confidential source.   It's a -- basically

5  a contract between a DEA confidential source and DEA.   It's a

6  document that is executed once per calendar year and reviewed

7  once per calendar year with any confidential source that works

8  with DEA.

9  Q    Agent Fraga, when you keep track of money paid to a

10  confidential informant, are these documents that you execute

11  yourself?

12  A    Yes, ma'am.

13        MS. HABISREITINGER:   May I approach the witness,

14  please?

15        THE COURT:   You may.

16  Q    (BY MS. HABISREITINGER)   Agent Fraga, I'm showing you what

17  is marked as Government Exhibit No. 25 and ask if you can

18  identify that document for the record.

19  A    Yes.   This is a copy of a memorandum that I wrote on May

20  8th of 2007 that basically documents the provision of $10,000

21  to Augustine for him to expend pursuant to the instructions

22  that I had given him.

23  Q    That would not be money for him to keep?

24  A    Correct.

25  Q    And Government Exhibit No. 26?

1    A    Is a DEA-103 voucher for purchase of evidence or payment

2    to a confidential source.  This is dated July 19th, 2006,

3    and this is a documentation of that same $10,000 that was

4    given to him to expend pursuant to the instructions that I had

5    given him.

6              THE COURT:  That's July 19, 2006?  I just want to

7    make sure -- the exhibit list happens to list a different

8    date, so I'm just trying to clarify.

9              THE WITNESS:  No, July 19th, 2006, because it was

10    given to him on the morning of that -- just prior to him going

11    to the meeting.

12              THE COURT:  All right.

13    Q    (BY MS. HABISREITINGER)  And also Government Exhibit

14    No. 27?

15    A    This is a DEA-103 again dated July 19th, 2006, in the

16    amount of $2800, and the purpose for that was to provide that

17    to him for reimbursement of his expenses.

18    Q    And Government Exhibit No. 28?

19    A    This is a DEA Form 103 dated August 23rd, 2006, for a

20    payment of $1500, which was for reimbursement of his expenses.

21    Q    And Government Exhibit No. 29?

22    A    Again, a DEA-103.  This was dated September 26th of

23    2006, for $2500, and this was again a payment for

24    reimbursement of expenses.

25    Q    Government Exhibit No. 30?

1    A    This is a DEA Form 103 that's dated November 16th of

2    2006 in the amount of $10,000, and this was a payment to

3    Augustine for his information and services.

4    Q    And Government Exhibit No. 31?

5    A    This is a DEA Form 103 that was executed on June 20th

6    of 2006 in the amount of $2500, and this was $2500 that was

7    given to him to expend pursuant to the oral instructions.

8    This is the $2500 that he provided to Mr. Bardales in the June

9    20th meeting.

10    Q    And finally, Government Exhibit No. 32?

11    A    A DEA Form 103 dated June 20th of 2006.  This is in the

12    amount of $1300, and this is the $1300 that was provided to

13    him on that day for reimbursement of his expenses.

14          MS. HABISREITINGER:  At this time the Government

15    offer, files and introduces into evidence Government Exhibit

16    No. 25, 26, 27, 28, 29, 30, 31 and 32?

17          MS. HERNANDEZ:  No objection, Your Honor.

18          THE COURT:  Without objection, Government

19    Exhibit 25, 26, 27, 28, 29, 30 and 31 and 32 are admitted.

20          (GOVERNMENT EXHIBITS 25 THROUGH 32 ADMITTED.)

21    Q    (BY MS. HABISREITINGER)  Agent Fraga, regarding the video

22    evidence that you testified about, did you have an opportunity

23    to watch the videos at any time?

24    A    Yes, ma'am.

25    Q    And for what purpose?

1    A     Several purposes.  I reviewed the videos with Augustine

2   in an effort to identify who the participants were in the

3   videos, and then secondly, I reviewed the videos with the --

4   with a Spanish translator in my office for the purpose of

5   preparing a summary translation or a summary transcript of the

6   videos and the audio portions of the videos.

7    Q     The actual -- the actual recordings themselves, what did

8   you do with them?

9    A     I maintained custody of those, transported them to the

10   DEA office that I work at, processed them, made copies of them

11   for working copies, sealed the originals in original evidence

12   bags and submitted them to the DEA nondrug evidence custodian.

13   Q     Did you -- were you able to retrieve these videos for

14   trial today?

15   A     Yes, ma'am.

16   Q     Have there been any alterations or deletions on the

17   videos?

18   A     No, ma'am.

19   Q     Did you make any duplicate or working copies?

20   A     Yes.

21   Q     And for what purpose?

22   A     For the purpose of providing those working copies to

23   prosecutors and defense attorneys.

24            MS. HABISREITINGER:  At this time the Government

25   moves to introduce into evidence Government Exhibit No. 2,

```
 1   Government Exhibit No. 6 and --

 2          THE COURT:  Excuse me.

 3          MS. HABISREITINGER:  Government Exhibit No. 2, which

 4   is the --

 5          THE COURT:  I know what they are.  Go ahead.  Give

 6   me the whole list.

 7          MS. HABISREITINGER:  It's 2, 6 and 9.

 8          THE COURT:  Just 2, 6 and 9?

 9          MS. HABISREITINGER:  Correct.

10          THE COURT:  2, 6 and 9, Ms. Hernandez?

11          MS. HERNANDEZ:  The only question I would have is

12   chain-of-custody from the -- from the slide to him.  If the

13   Court will allow me to do that during cross-examination.

14          THE COURT:  You can certainly explore that during

15   cross-examination.

16          MS. HABISREITINGER:  Judge, at this time I am moving

17   to introduce those exhibits into evidence.

18          THE COURT:  2, 6 and 9 will be admitted.

19          (GOVERNMENT EXHIBITS 2, 6 AND 9 ADMITTED.)

20   Q   (BY MS. HABISREITINGER)  Now, Agent Fraga --

21          MS. HERNANDEZ:  Subject to my cross-examination.

22          THE COURT:  Subject to your cross-examination, yes.

23   Q   (BY MS. HABISREITINGER)  Agent Fraga, regarding the

24   consensually recorded telephone calls that you testified about,

25   did you have permission to record the individual calls that you
```

1    testified about?

2    A    Yes, ma'am.

3    Q    While they were in your possession, have there been any

4    deletions or alterations of any kind?

5    A    No, ma'am.

6    Q    What did you do with the audio-taped recording that you

7    had received?

8    A    The ones that I had received, I received by Augustine

9    e-mailing those digital recordings to me.  I would then

10   transfer the audio portion of those digital recordings through

11   a format that could be downloaded on disk.  The disks were

12   then processed as an original piece of evidence and following

13   the DEA's evidence procedures.

14        I would make a working copy of it for translation --

15   transcription purposes, maintain custody of the original in a

16   sealed evidence bag and submit that original piece of evidence

17   to the nondrug evidence custodian.

18   Q    And did you retrieve these items for court today?

19   A    Yes, ma'am.

20        MS. HABISREITINGER:  Your Honor, at this time the

21   Government moves to introduce into evidence Government Exhibit

22   No. 3, Government Exhibit No. 4, Government Exhibit No. 8,

23   Government Exhibit No. 22, Government Exhibit No. 50,

24   Government Exhibit No. 12 and Government Exhibit No. 13.

25        THE COURT:  Ms. Hernandez?

1          MS. HERNANDEZ:  Your Honor, same chain-of-custody

2    objections, if I understand the testimony that has been given.

3          THE COURT:  Well, you can cross-examine on that and

4    reserve that, and I will conditionally admit them.

5          Now we have to go through what they are.  They are

6    Government Exhibit 3, 4 -- just a second.  8, 12 -- I am doing

7    them in numerical order.  13, 22, and 50 are admitted with

8    that reservation subject to cross-examination on

9    chain-of-custody.

10          (GOVERNMENT EXHIBITS 3, 4, 8, 12, 13, 22 AND 50

11    ADMITTED.)

12          MS. HABISREITINGER:  Thank you, Your Honor.  At this

13    time the Government tenders for cross-examination with the

14    understanding that Agent Fraga will be called during the

15    latter part of the trial.

16          THE COURT:  All right.  And we will take our

17    afternoon break for 15 minutes, and then resume with

18    cross-examination of Agent Fraga.

19          THE DEPUTY CLERK:  Please close your notebooks up

20    and leave them in your chair.

21          (JURY LEAVES COURTROOM.)

22          THE COURT:  See you in 15.

23          THE DEPUTY CLERK:  All rise.

24          (A BRIEF RECESS WAS TAKEN.)

25          THE COURT:  Are we ready for the jury?

 1          Agent Fraga, you may resume the witness stand.  Please

 2    bring the jury in.

 3              (JURY PRESENT.)

 4              THE COURT:  Welcome back, Members of the Jury.

 5          I remind you, Agent Fraga, you are still under oath.

 6              THE WITNESS:  Yes, Your Honor.

 7              THE COURT:  Ms. Hernandez.

 8                          CROSS-EXAMINATION

 9    BY MS. HERNANDEZ:

10    Q    Good afternoon.

11    A    Good afternoon, ma'am.

12    Q    Now, I noticed that on the compact disk related to

13    June 20th meeting there were --

14              (MICROPHONE FEEDBACK.)

15              THE COURT:  I'm not going to assign any blame.

16    We'll just continue on.  Must be the electric nature of your

17    questioning, Ms. Hernandez.  You haven't even warmed up.

18              (LAUGHTER.)

19              MS. HERNANDEZ:  I'll make sure it's not my phone.

20    Q    (BY MS. HERNANDEZ)  There are three separate numbers -- CS

21    numbers for the three confidential informants that you used.

22    Does that ring a bell?

23    A    Could be, yes, ma'am.

24    Q    You want to look at the document?

25    A    If I may, yes.

1    Q    Sure.  Well, let me ask you:  Does -- each confidential

2    informant is given a number; is that correct?

3    A    Yes, ma'am.

4    Q    And so, for example, if the number is CS96, dash, six

5    numbers, does that mean that person started working in 1996?

6    A    It means that they would be -- yes, that would be their

7    CS number, which means they started working in '96.

8    Q    And so in that document, if you -- so is CS -- is the

9    gentleman that we've been talking about here, CI No. 3, did he

10   start working in 1996?

11   A    I believe so, yes.

12   Q    And that particular CI started working because he was

13   charged with drug-trafficking; is that correct?

14   A    I believe so, yes.

15   Q    And after he was charged, he began cooperating with the

16   Government?

17   A    That's my understanding, yes.

18   Q    Okay.  And you were not the first agent to work with him;

19   is that correct?

20   A    That's correct.

21   Q    Is he a DEA informant rather than an FBI informant?

22   A    I -- certainly he is assigned as a DEA informant.  I

23   believe that he also does confidential source work for other

24   agencies, too.

25   Q    Now, when you work with a informant, you prepared a

1    couple of documents that you showed us.  There is the

2    confidential source agreement; is that correct?

3    A    Yes, ma'am.

4    Q    Now, is that the only document that you maintained on

5    file for a confidential informant?

6    A    No, ma'am.

7    Q    What other types of documents do you maintain on file?

8    A    Every payment document, every DEA-103.

9    Q    What a -- that's the payment document?

10    A    DEA-103 is the payment document.  Every DEA-6 report that

11    is a report that is attributed to work or --

12    Q    Can you start again.  Every DEA-6...?

13    A    Yes, every DEA-6, which is the DEA reporting format that

14    references that confidential source or is investigative

15    material that comes from that confidential source is

16    maintained in a DEA confidential source file that's attributed

17    to that confidential source.

18    Q    Let's just go over this.  I know you and I know what

19    we're talking about.

20    A    Uh-huh.

21    Q    These numbers that we're referring to, DEA-103 and DEA-6,

22    is it a number that appears at the bottom of these forms,

23    these preprinted forms?

24    A    Yes, ma'am.

25    Q    So DEA-6 is just Form DEA-6?

1    A    A DEA-6 is the form number for DEA's report of

2    investigation.

3    Q    So every time an agent -- a DEA agent is involved in an

4    investigation and something happens that's related to that

5    case, they prepare a report of that -- of whatever occurred,

6    whether there was an arrest or a seizure of -- of drugs or

7    whatever else, they prepare a report which is drafted on

8    this -- these DEA-6s; is that correct?

9    A    Yes.

10    Q    Okay.  So for a confidential informant, you would keep

11    the confidential source agreement; you also have the DEA-103,

12    which is the records of payments made to that person; you also

13    would keep the DEA-6s, which are the reports -- the

14    investigation report from the individual DEA agent.  What

15    else?

16    A    Fingerprints, photograph.

17    Q    Of that particular informant?

18    A    Of that particular DEA confidential source.

19    Q    What about if the -- if the source gets in trouble

20    somehow?  What about if he gets arrested on unrelated?  That

21    happens from time to time, right?

22    A    I would assume after a report of that nature, that that

23    would -- if there were a report written or DEA-6 written, that

24    references that confidential source.

25    Q    Are you -- let's say one of your informants does

1  something wrong in the investigation.

2  A    Uh-huh.

3  Q    Do you prepare a report?

4  A    Yes.

5  Q    And what kind of report would you prepare?  What number?

6  What's the form number?

7  A    It would be on a DEA-6, and typically, it would be a

8  DEA-6 that references the termination of the relationship

9  between DEA and that confidential source.

10  Q    And what would be the ground -- on what kind of grounds

11  would you terminate a confidential source?

12  A    Confidential sources are -- or we call it deactivated.

13  It would be a Deactivation 6, but for instance, in this

14  particular case right now, Augustine is deactivated as far

15  as -- as far as my particular office, and that's only because

16  there is no current investigation that we're utilizing him in.

17  There is various reasons why you deactivate a confidential

18  source.

19  Q    Like what?  Give me some of those various reasons.

20  A    One of which there is not a current investigation that

21  requires the use of that informant, so we deactivate the

22  informant.

23  Q    Okay.  Well, let me put it this way:  Say he testified

24  and the judge were to find that --

25          MS. HABISREITINGER:  Objection, Judge, may we

1    approach?

2              THE COURT:  Sure, come on up.

3              (AT THE BENCH; ON THE RECORD.)

4              MS. HABISREITINGER:  Judge, this is highly

5    inappropriate.  I believe Defense counsel has been made privy

6    and is aware of the previous trial transcripts, particularly

7    the issue about the other judge's finding in Florida regarding

8    Augustine, and I think Defense counsel is attempting to

9    introduce inadmissible evidence through a back door, which I

10   think is highly objectionable and unappropriate.

11             THE COURT:  Well, if this case plays out the way

12   that case plays out, then it will with respect to my rulings,

13   I believe.  She won't be able to introduce the extrinsic

14   evidence of that judicial finding, but she will be able to ask

15   Mr. Cortez if he has ever been found to be a liar, and he

16   would probably answer the same way he answered in the last

17   trial, which is no.

18        So she'll have here some cross-examination she did on a

19   subject matter and then nothing to connect it with later on.

20   So what's wrong with this cross-examination?  All she's doing

21   is saying, okay, well, if he shot someone, would he be --

22   would an informant be deactivated?  If he stole money, would

23   he be deactivated?  If he were found by a judge to be liar,

24   would he be deactivated?  He can answer that.

25             MS. HABISREITINGER:  And I'm not trying --

1          THE COURT:  You know, if the testimony plays out the

2    same way that it played out in the earlier trial, it won't

3    mean anything, right?

4          MS. HABISREITINGER:  I just think it's a little bit

5    too far afield.  I think, for example, if the agent had

6    personal knowledge that he stole something, that he was

7    drug-trafficking on the side, he's got personal knowledge of

8    that, that's one thing.  But take it to another level and ask

9    if a third party, in fact, a judge -- if a judge has this

10   finding.

11         THE COURT:  This witness may be able to answer that

12   and may not be.  The question, I assume that you're going to

13   ask or you have asked and on a -- is if a judge were to find a

14   confidential informant to be untruthful, would that result in

15   deactivation.  I mean, this witness can answer that however he

16   answers it.  I don't understand -- her question isn't

17   evidence, so it's not coming into evidence.

18         MS. HERNANDEZ:  We'll have a foundation for asking

19   it, too.

20         MR. LAYMON:  What about this, Judge?  I mean, I

21   think, what's the relevance of this?  Why is this even

22   relevant?  Because the agent has already testified that the

23   witness was deactivated because he's no longer acting in the

24   case, so why are we even concerned with additional reasons for

25   why this informant could be deactivated?  That doesn't seem to

1    me to be particularly relevant, and in addition --

2              THE COURT:  It depends on the timing.  If -- it

3    depends on the timing, and I don't know the timing.  If,

4    hypothetically, let's say, if a confidential informant, during

5    the course of an investigation, without provocation or

6    justification, shot and killed someone.  It would be

7    legitimate to wonder whether that confidential informant was

8    deactivated at that point or whether DEA allowed him to

9    continue.

10             I don't know what the timing was here, and I can't

11   remember with respect to the judicial determination or

12   judicial comment with respect to Mr. Cortez's truthfulness.  I

13   understand your relevance objection, but I can see some

14   timings -- some sequences where it would be relevant.

15             MR. LAYMON:  All right.  Let's, for example, let's

16   take the question, would you deactivate an informant if he

17   shot and murdered someone?  It seems to me that -- that not

18   only is that not relevant because there is absolutely no

19   facts -- there's no factual basis upon why you would even want

20   to ask that question.

21             THE COURT:  But here, there is a factual basis.

22             MR. LAYMON:  Not as to that.

23             THE COURT:  No, but here is a factual basis as to

24   the hypothetical test that --

25             MR. LAYMON:  Right, but if he used the -- talking

1    hypothetical, you ask the question, you know, can you

2    deactivate someone if he shot someone.  Not only is that not

3    relevant but it's prejudicial.  I mean, why would you even

4    interject that into a jury, implying -- it's what you're

5    implying is the informant shot and killed someone.

6         Why should you be allowed to do that?  Likewise, with

7    this stuff about the judge, you've already ruled that --

8    subject to our motion in limine in the previous trial, that

9    that was not proper evidence to bring before the jury.

10         THE COURT:  Via extrinsic evidence, but I allowed

11    the questioning of Cortez.

12         MS. HERNANDEZ:  There are two issues here.  I'm

13    sorry, there is two reasons why I want it.  No. 1 is for the

14    fact that he lied, and I understand the judge's ruling.

15         THE COURT:  You take it through --

16         MS. HERNANDEZ:  I understand that, Your Honor.  I

17    understand.  But the other one on relevancy is here.  If --

18    let's say that he killed 17 people.  I mean, he doesn't care,

19    continues to use him, I think that's relevant to what they do

20    with informants and what informants can get away with, so

21    there is two separate lines of inquiry.

22         THE COURT:  But you're not -- where are you going to

23    go with that line of inquiry?

24         MS. HERNANDEZ:  Well, I don't know where the answers

25    are going.  I mean, if he says to me, "I don't care, frankly,

 1   what a confidential informant does."

 2           THE COURT:  Let's say he says that.

 3           MS. HERNANDEZ:  Then I think I can say to the jury,

 4   the agent's -- this is what -- they don't even -- they don't

 5   care whether they're dealing with an honest person or a

 6   dishonest person, whether they're dealing with a criminal or

 7   not.  What a confidential informant does is a confidential

 8   informant can be out of control and that does not --

 9           THE COURT:  That would mean that notwithstanding Mr.

10   Laymon's observations, you could ask this witness anything you

11   damn well pleased, about whether they murdered 20 people --

12   about whether a confidential informant would be deactivated if

13   he murdered 20 people or if he molested 16 children.  I

14   mean -- but I'm not going to let you do that.

15           MS. HERNANDEZ:  We spent the first half of his

16   direct testimony with all these hypotheticals about how he

17   conducts, you know, his investigations and why he uses

18   confidential informants and why he -- you know, how he -- it

19   wasn't all -- it wasn't all related to the facts in this case.

20   It was all this background.  I want to know some background.

21       And second of all, Your Honor, it is my belief -- it is

22   my belief that there is a file.  There's a DEA file on each

23   informant which -- with evaluations, with legal evaluations.

24   I want that file.

25           THE COURT:  That's a different issue all together.

1  That doesn't relate to this question.

2          MS. HERNANDEZ:  I need to know -- I need to

3  establish that there is such a file, and if there is, I want

4  it.

5          MR. LAYMON:  But that's a different issue.

6          THE COURT:  Totally different issue.  You can ask

7  him that.  Why are you interjecting that into this question?

8          MS. HERNANDEZ:  You should say shut up and not so

9  much --

10         THE COURT:  I am a little bit concerned, though,

11 because my belief as to the record in this case will be that

12 you want to get into evidence anything concerning a prior

13 judicial finding relating to Mr. Cortez, and then Mr. Cortez

14 will say that he's not aware of that.  So there will be

15 nothing in evidence to support the question that you want to

16 ask with respect to discharge or deactivation of a

17 confidential informant based on a prior finding of

18 untruthfulness by a judge, just like there would be nothing in

19 evidence to support a question if a confidential informant

20 shot and killed somebody.

21     So I'm not sure this is in much different a posture,

22 or -- although you do have the existence of something that you

23 cannot get into evidence.

24         MS. HERNANDEZ:  But all I need is a good faith basis

25 to ask a question.  All I need is a good faith basis and I

```
 1   have a good faith basis for believing that this -- that the
 2   confidential informant in this case -- in this case lied.
 3          THE COURT:  Well, you also need to connect it
 4   relevance-wise, and the relevance may depend upon your being
 5   able to get something into evidence related to this.
 6          MS. HERNANDEZ:  Well, I think -- not -- well, one, I
 7   need a good faith -- one, it is absolutely relevant if this
 8   witness has lied in a judicial proceeding in the past.  I may
 9   not be able to get it in the door, as Your Honor has said, but
10   if a witness -- any witness --
11          THE COURT:  I'm not questioning the relevance of
12   that if you have admissible evidence.  I am questioning the
13   relevance of this questioning.
14          MS. HERNANDEZ:  Well, I think I can ask the question
15   of the informant.  He can deny it, but I think I can ask the
16   question.
17          THE COURT:  I already ruled in the other case you
18   can and certainly the law supports that ruling.  I researched
19   it more since that other case.
20          MS. HERNANDEZ:  Two, I think -- so I have a good
21   faith -- I mean, so...
22          THE COURT:  Indeed, it's sitting right here.
23          MS. HERNANDEZ:  Can I see the case?  So, two, I
24   believe -- my line of question, even in any case -- forget the
25   good faith basis in this case.  My line of questioning to any
```

1   agent using a confidential informant is what are the limits

2   that you place on the informant?  How much control do you have

3   over an informant?  I mean, some of the testimony this

4   informant is going to give is uncorroborated by either

5   videotape, or you know, surveillance by an agent.

6       So -- and I think his motive, his -- all the -- the

7   whole area of cross-examination of a witness -- at such a

8   time, the witness is open to me.  I understand the Court's

9   ruling.  I'm not going to, you know, slip out the question,

10  well, did you know that in this case, this particular -- if I

11  can figure out a way to do it and get it in without -- I don't

12  play games.

13      THE COURT:  That's your job, Ms. Hernandez, and I

14  appreciate and respect that.

15      MS. HERNANDEZ:  You know, if I could figure out a

16  way to get it in and get this evidence in, I will attempt to.

17  And I'm happy to let Your Honor know if I want to spring it on

18  them.

19      THE COURT:  So let's return to the question.  The

20  question she wishes to ask is if you knew of a judicial

21  finding of untruthfulness, would that be something that would

22  cause you to deactivate, and let's get on the record the

23  objection.

24      MR. LAYMON:  All right.  The objection --

25      THE COURT:  I have heard from both of you, but let's

1   summarize it.

2        MR. LAYMON:  Okay.  All right.  First, I think we

3   need to move in limine, because I don't know that we did

4   officially -- maybe we're relying too much on prior trials.

5        The Government would move in limine at this point to

6   prevent the Defense from asking any witness about this issue

7   of this judicial finding in Florida where the judge put on the

8   record that in her opinion the informant was not credible in

9   that trial.  I understand the informant testified so...

10       THE COURT:  But I can't -- I'm not going -- I mean,

11  the ruling that I made before said no extrinsic evidence.

12       MR. LAYMON:  Right.

13       THE COURT:  But yes, the witness could be asked.

14       MR. LAYMON:  Right.  I understand that.  I

15  understand that, and then I don't know what the witness'

16  response will be.  All right.

17       THE COURT:  Because the witness has once responded,

18  so you suspect it.

19       MS. HERNANDEZ:  Maybe he wants to lie on the stand

20  here.

21       MR. LAYMON:  All right.  Well, that's a -- that's an

22  issue we're going to have to deal with tomorrow or the day

23  after when we get there, but right now we're dealing with

24  Fraga.

25       So we still got this motion in limine which prevent --

1    which we would seek to prevent this information from coming

2    before the jury.  So it seems to me that our judgment really

3    is, No. 1, that it's not relevant because we've already heard

4    testimony that this witness was deactivated in this case

5    because he's no longer acting in the case.

6            THE COURT:  She's concerned about what happened

7    while he was active, and I don't know the timing.

8        Again, unless it's tagged to the specific issue of a

9    judicial finding of untruthfulness and there being some

10   support or basis for that question, we have an open-ended, she

11   could ask him anything about murders, about rapes --

12           MR. LAYMON:  Child abuse, anything.

13           THE COURT:  -- child abuse, you name it.  I don't

14   think that's where we're going.  Is that where we're going,

15   Ms. Hernandez?

16           MS. HERNANDEZ:  No.  I mean, I'm happy to ask those

17   questions if you would like me to.  That's not where I'm

18   going.  I'm trying to --

19           THE COURT:  You are going to this one matter.

20           MS. HERNANDEZ:  Right.  And I think that -- one

21   could argue, it seems to me --

22           THE COURT:  Let me put it this way to Mr. Laymon.

23   Why would it not be relevant if Mr. Fraga -- Agent Fraga knew,

24   during the course of the use of Mr. Cortez, that Mr. Cortez

25   had been found to be untruthful?  Why would it not be relevant

1    whether that was the basis to deactivate at that time?  Not a

2    question of whether he's active now or not, but at that time

3    that Agent Fraga found it out, why would that not be relevant?

4                 MR. LAYMON:  If he knew, Judge.  If he knew.

5                 THE COURT:  If he knew, that's what I'm saying.

6                 MR. LAYMON:  Then it might -- I won't concede but I

7    can least see the possible relevance of it.

8          However, he couldn't have known, and the reason he

9    couldn't have known, while the record is clear about that, is

10   because nobody knew until the public defender, initially

11   representing Bran, dug it out of the record.  And that didn't

12   occur until after these guys were indicted and arrested and

13   brought back to the United States, so nobody knew about it, at

14   least nobody in D.C.  I don't know how the agent could have

15   known about it because we didn't know about it.

16                 MS. HERNANDEZ:  Maybe he spoke to another agent.

17   Maybe there is a file that he's reviewed that shows it.

18                 MR. LAYMON:  But I think that shows the argument.

19                 THE COURT:  Okay.  Okay.  Wait a minute.  I know how

20   to handle this.

21                 MS. HERNANDEZ:  I'm sorry.

22                 THE COURT:  I am handling this.  If you think you

23   have a basis for him perhaps knowing, then we'll dismiss the

24   jury and I'll let you ask to see if he has a basis of

25   knowledge.  If he doesn't, you're not going anywhere with it.

```
 1    If he does, then we are where we are.

 2            MS. HERNANDEZ:  My belief is that -- that

 3    confidential informants are reviewed on a regular basis, and

 4    that records of sort of evaluations, you know, annual

 5    evaluations are maintained, or are to be maintained.  That's

 6    my understanding.  You can't keep an -- you can't keep a

 7    confidential informant on for six years without having some

 8    evaluative process.

 9            THE COURT:  Okay.  So where are you going with that?

10            MS. HERNANDEZ:  And I believe --

11            THE COURT:  And I'll let you ask that.  I mean, I

12    already indicated that.

13            MS. HERNANDEZ:  And identify the file, too.

14            THE COURT:  I'll let you ask that.

15            MS. HERNANDEZ:  So is there a reason -- do I have a

16    good faith basis for believing that he may have known?  Yes.

17    I mean, I would expect --

18            THE COURT:  But what I'm telling you is, I'm not

19    going to let you ask the question just on that --

20            MS. HERNANDEZ:  Whether you know.

21            THE COURT:     -- vague possibility that he knows.

22    We'll discharge the jury, we'll find out if he knows and then

23    you can pursue it if he does know.  That's how it becomes

24    relevant in my view.  I'm not going to let you introduce into

25    this trial the --
```

1          MS. HERNANDEZ:  Can I ask the Court a question about

2   your previous ruling?

3          THE COURT:  -- a prospect or a -- your belief that

4   forms the basis for your question that there is such a juris

5   determination because it's otherwise not likely to come into

6   evidence in this case.

7          MS. HERNANDEZ:  Let me ask the Court, my

8   understanding of the Court's ruling is that the concern is

9   that somehow, because it was a judge, it gives a certain --

10          THE COURT:  That's part of the concern, yes.

11          MS. HERNANDEZ:  If it had been an AUSA who --

12          THE COURT:  Because we have no respect for AUSA.

13   Sorry.

14          (LAUGHTER.)

15          MS. HERNANDEZ:  Okay.  If it had been a defense

16   attorney -- No.

17       Because it seems to me that credibility -- while it may

18   be a weighing aspect to murder or child abuse, is it more

19   prejudicial than not.  I mean, the key to any witness is

20   credibility.  So it seems to me both in the weighing -- in the

21   balancing of the question, if I -- except for the fact of that

22   it's a judicial finding, the fact that he was found to be not

23   believable -- say some agent, say the agent who was handling

24   him at the time wrote a report who said this guy lied on the

25   stand, perjured himself and put that in the file, is the Court

```
 1    saying that would not be admissible?
 2              THE COURT:  You would probably get that in through
 3    that witness.
 4              MS. HERNANDEZ:  That's all I'm saying.  So the
 5    disqualifying factor here is not the finding that the guy
 6    lied.
 7              THE COURT:  The disqualifying factor starts with the
 8    fact that it's extrinsic evidence.  It has nothing to do with
 9    this case.
10              MS. HERNANDEZ:  Well, I didn't argue the motion
11    before.  It seems to me that credibility is the sort of
12    touchstone of the witness.
13              THE COURT:  Whose credibility?
14              MS. HERNANDEZ:  The witness' credibility.
15              THE COURT:  Not this witness.  Whose credibility?
16    The confidential informant.
17              MS. HERNANDEZ:  CI-3.
18              THE COURT:  And that's why I allowed last time
19    around and will allow this time around the question to be
20    asked again, but not the introduction of the extrinsic
21    evidence or the formation of the question to insert in the
22    extrinsic evidence because at this time I would rule that it's
23    inadmissible.
24              MS. HERNANDEZ:  The second --
25              THE COURT:  I think it's supported by cases that I
```

```
 1   didn't cite last time around, including United States versus
 2   Whitmore in the D.C. Circuit of 2004.
 3            MS. HERNANDEZ:   The other area of relevance is
 4   how -- the other area of relevance, in addition to the
 5   witness' credibility that he's subject to be questioned on,
 6   the confidential informant, is the area of how the FB -- how
 7   this agent uses -- how he controls the confidential informant.
 8   His -- his investigative --
 9            THE COURT:   All right.
10            MS. HERNANDEZ:   -- other side.
11            THE COURT:   I will allow you to question generally
12   about how he controls and uses confidential informants.   I
13   will allow you to ask this witness questions leading to
14   exploration of whether he has a file that you've -- Sir, do
15   you believe exists with respect to this confidential informant
16   like there would be for any confidential informant, do you
17   believe.   You can ask those questions.
18       With respect to the particular question that we are up
19   here on, however, I am not going to let you ask that question.
20            MS. HERNANDEZ:   Your Honor, we get to disclose to
21   the judge as I did.
22            THE COURT:   That's right.   I'm not going to let you
23   ask that question unless and until I inquire of this witness
24   whether he had personal knowledge at the time that Mr. Cortez
25   was inactive, on a confidential informant.   He obviously has
```

 1  knowledge now, and we'll do that outside the presence of the

 2  jury.

 3          MS. HERNANDEZ:  You know, I want to pursue this line

 4  of questioning, and I just want to say one last thing, Your

 5  Honor.  It was never my intent to try to back door.  I just

 6  want the Court to be -- I'm --

 7          THE COURT:  It's just an unusual circumstance in the

 8  trial.  I'm not offended.

 9          MS. HERNANDEZ:  I am not the kind of lawyer that I

10  would try to sneak it in the back door.

11          THE COURT:  If I am concerned about something you

12  do, I'll let you know.

13      All right.  So either you can continue with your

14  questioning under the constraints that I just outlined, or if

15  you want me to discharge the jury for a minute so we can ask

16  that other question, we can do that.  That judgment is yours,

17  because you run your cross-examination.

18          MS. HERNANDEZ:  Well, if -- let's say we determine

19  that he had no actual knowledge.  My position would be that I

20  can still ask him in front of the jury whether -- whether --

21  whether the fact that someone lied would be important to him

22  in using that person.  Whether; not if.

23          THE COURT:  I will allow you to ask a general

24  question of if you were to discover that someone was

25  untruthful, yes, but I will not allow you to ask a question

 1   that includes within it a judicial finding.

 2          MS. HERNANDEZ:  Okay.  Well, I'm happy however --

 3   you know, I would like to explore extensively what he -- what

 4   he -- what kind of information was available to him or is

 5   available to him.

 6          THE COURT:  Why don't you go over that, and if we

 7   reach a point that you want to get into -- not the question

 8   about the judge, specifically, but, you know, start down that

 9   line, and we need to ask him about whether he knew something

10   during the course of the investigative work of the

11   confidential informant, then we can discharge the jury and do

12   that, okay.  We all clear?  Okay.

13          (OPEN COURT.)

14          THE COURT:  Sorry for that delay, ladies and

15   gentlemen.  We're ready to proceed.

16   Q   (BY MS. HERNANDEZ)  We were talking about CI-3, which is a

17   gentleman by -- you referred to as Mr. Augustine, correct?

18   A   Yes, ma'am.

19   Q   And Mr. Augustine has been a confidential informant since

20   at least 1996, correct?

21   A   That's my understanding, yes.

22   Q   Okay.  And the next question I want to know is -- let me

23   first ask you personally.  Do you, in using any informant, do

24   you prepare any record to place in that informant's file,

25   either good or bad?

1    In other words, if you find an informant to be -- you

2  know, to have worked above and beyond the call of duty and

3  been excellent and the most laudatory terms, would you prepare

4  a report that said so and put it in that man's file?

5  A   Ma'am, I may not prepare that myself, but the current DEA

6  policies are that a quarterly management review is conducted

7  of each confidential source.  That's done each three months,

8  and whether they would be a positive or negative reflection of

9  that cooperating source, that's contained in that quarterly

10 management review and that's a document that's actually

11 prepared by my managers and not myself.

12 Q   I see.  So someone who is your manager or any other -- By

13 the way, let me clarify.  When we refer to you as a special

14 agent.

15 A   Yes.

16 Q   That's a term that everyone in your pay grade or in your

17 area of responsibility is referred to.  It's not that you --

18 I'm sure you're very special.

19 A   Thank you.

20 Q   It's not that you personally are special; is that

21 correct?  Everybody is a special agent.

22 A   It's a good thing my mother is not here.

23       (LAUGHTER.)

24 Q   (BY MS. HERNANDEZ)  Correct?

25 A   Yes, ma'am.

1    Q    Okay.  So someone -- some supervisor to you prepares a

2    quarterly management review with respect to each confidential

3    informant?

4    A    Yes.

5    Q    So for Mr. CI-3, he should have about 48 quarterly

6    reports somewhere?

7    A    I don't believe that that quarterly management review

8    process is something that's older than maybe a year-and-a-half

9    or so.

10   Q    Really.  Was there a biannual management report before

11   then?

12   A    My re- -- maybe so.

13   Q    Okay.  So there is some regular basis by which agents are

14   able to communicate their assessment of these confidential

15   informants?

16   A    Yes.

17   Q    And all those management reports are maintained in some

18   file, some depository, some government building somewhere?

19   A    I assume so, yes.

20   Q    And do you ever, before you use a confidential informant,

21   say, "Let me go look and see what this guy is about"?

22   A    Not necessarily, ma'am, no.

23   Q    Not necessarily.  If you had said "yes" or "no," I'd be

24   happy.  When you say "not necessarily," then I want to know

25   what that means.

1          THE COURT:  The question was, do you ever?

2     A    No.

3     Q    (BY MS. HERNANDEZ)  So you've never done it?

4     A    No.

5     Q    But there is such a file somewhere that, if you wanted

6     to, you could go dig it out and review?

7     A    I would assume so, yes.  I'm not aware of where those are

8     maintained, but I would assume that there is, yes.

9     Q    And to your knowledge, are -- Let me back off.

10         There have been informants that have been deactivated for

11    malfeasance, let's call it, for doing wrong; is that correct?

12    A    Absolutely, yes.

13    Q    And there have been some pretty infamous cases?

14    A    I guess so, yes.

15    Q    I don't want you to guess.  You can either say "yes" or

16    "no."

17    A    Well, I don't know that we would -- what we would

18    categorize as infamous, but there have been cases where DEA

19    confidential sources have been deactivated for malfeasance, as

20    you referred to it as.

21    Q    And sometimes they are -- sometimes agents continue --

22    Let me back off.

23         There have been news reports about agents continuing to

24    use confidential informants after they commit wrong.

25         MS. HABISREITINGER:  Objection, Judge, relevance.

1          THE COURT:  Unless you want to come up here and

2    argue it, I would sustain the objection.

3          MS. HERNANDEZ:  I don't want to take up the Court's

4    time, but...

5          THE COURT:  It's your decision.  Proceed.

6          MS. HERNANDEZ:  I understand.  Thank you.

7    Q    (BY MS. HERNANDEZ)  Okay.  Let me get back to -- let me --

8    so just one last question.  Do you now have in your possession

9    or could you find, locate, if you were -- Let me back off.

10         Do you now have in your possession CSI's file with all

11   these quarterly or annual or biannual report?

12         THE COURT:  When you say CSI, you're talking

13   about --

14   Q    (BY MS. HERNANDEZ)  The particular one we're talking

15   about, Mr. Augustine.

16   A    No, ma'am, I don't.

17   Q    Could you locate it if you were asked to?

18   A    I believe I could, yes.

19   Q    I'm asking you to please locate it.  I don't know if we

20   can do this --

21         THE COURT:  We'll talk about it at the end of the

22   day.

23         MS. HERNANDEZ:  All right.

24   Q    (BY MS. HERNANDEZ)  But in any event, you first started

25   using CSI-3 -- I'm sorry, CI-3, Mr. Augustine, when exactly?

1    A    The first time I met him was on June 19th of 2006.

2    Q    The day before the second meeting that you described in

3    your testimony?

4    A    Yes, ma'am.

5    Q    And at that point you knew nothing about him except

6    what -- except that he had some ties or that he could be used

7    in this investigation; is that correct?

8    A    No, ma'am, that's not accurate.

9    Q    Okay.  You knew about his previous activities?  What did

10   you know about him?

11   A    I had requested of other agents in the office, and one

12   agent in particular, that I was in need of a reliable

13   confidential source that could pose as a Colombian cocaine

14   source of supply.  This coworker had previously worked with

15   Mr. Augustine and referred him to me to --

16   Q    Use in this case?

17   A    To use in this investigation, right.

18   Q    All right.  Let me start from the beginning of your

19   testimony.

20        You mentioned that there had been a previous

21   investigation which ended in November of 2005; is that

22   correct?

23   A    Yes, ma'am.

24   Q    And that investigation involved three Guatemalan police

25   officers?

1    A   Guatemalan law enforcement officials, one was the

2    director of the Federal Narcotics Unit; the second was the

3    subdirector of the Federal Narcotics Unit; and the third was

4    the -- was an official within one of the ports in Guatemala.

5    Q   And they were fairly high up in the hierarchy, from what

6    you describe?

7    A   Yes, ma'am.

8    Q   And they were, in fact, found with cocaine?

9    A   There was a seizure of 997 kilograms of cocaine that was

10    attributed to those persons, yes.

11    Q   And they were, in fact, found -- or there was an

12    exchange -- they had been paid for their services by

13    drug-traffickers?

14    A   I'm not aware, ma'am.

15    Q   Okay.  They didn't receive -- oh, they only -- you only

16    found them with cocaine.  You didn't find them with any --

17    they were -- Strike that.

18        So the difference between that case and Mr. Mejia's case

19    is that Mr. Mejia was only posing as a high Guatemalan

20    official, correct?

21    A   No, ma'am.

22    Q   Well, at the time that Mr. Mejia was arrested, he was not

23    a high Guatemalan official.  He was not a Guatemalan official,

24    period?

25    A   Due to his removal from that capacity by --

```
 1    Q    Can you answer my question?  The question is:  At the
 2   time that you arrested him, he was not a Guatemalan official.
 3   That's a "yes" or a "no."
 4    A    Yes, ma'am, that's correct.
 5    Q    He was not?
 6    A    Right.
 7    Q    And the I.D. that he showed was phony?
 8    A    Not that I'm aware of ma'am, no.
 9    Q    Well, the -- you mentioned that he had been identified as
10   Sapon-Ruiz?
11    A    The identification that he showed was, to my
12   understanding, an official Guatemalan identification
13   identifying Mr. Augustin Mejia as a subcommissioner within the
14   Guatemalan government.
15    Q    But he, in fact, is not a subcommissioner with the
16   Guatemalan government?
17    A    Currently, no.
18    Q    Right.  Was he, in 2006, during any part of this
19   investigation?
20    A    No, ma'am.
21    Q    Thank you.  And the name that you -- that was identified
22   on that card and the name you used earlier, Sapon-Ruiz, is
23   that the name?
24    A    Ma'am, we may be confused as far as what card that I'm
25   referring to.
```

1   Q    You indicated -- you indicated that during the July

2   meeting he was identified as Edwin Rene Sapon-Ruiz, correct?

3   A    During the July meeting he identified himself as Edwin

4   Rene Sapon-Ruiz.

5   Q    But he, in fact, is not Edwin Rene Sapon-Ruiz, correct?

6   A    That's correct, yes.

7   Q    Edwin Rene Sapon-Ruiz is a different human being?

8   A    Yes, ma'am.

9   Q    That person exists?

10  A    Yes, ma'am.

11  Q    And it is not him?

12  A    That's correct.

13  Q    So at least one difference between the November 2005 case

14  and this case is that at the time of this investigation and

15  his arrest, he was not a Guatemalan official?

16  A    That's correct.  At the time of his arrest, he was not.

17  Q    Now, with respect to the meeting in June, I believe, you

18  testified -- I'm sorry, with the May 2006 -- the May 2006

19  meeting.  You testified that you gave --

20          (MICROPHONE FEEDBACK.)

21          MS. HERNANDEZ:  Is that me?  I think it may be my

22  hair.

23          THE COURT:  No.  Move on.

24  Q    (BY MS. HERNANDEZ)  With respect to the May 2006 meeting

25  in which Mr. Augustine, your informant, met with Mr. Bardales,

1  the gentleman who died in a car accident, you testified that you

2  gave your informant $2500 to give to Mr. Bardales, correct?

3          (MICROPHONE FEEDBACK.)

4          THE COURT:  All right.  Mr. Bradley, that's likely

5  to be it, if you have the microphone there.  Go ahead and give

6  it another try; otherwise, I'm going to ask you and Agent

7  Fraga to have no breathing.

8          MS. HERNANDEZ:  Can he be the first to stop

9  breathing?  Nothing personal.

10          (LAUGHTER.)

11          MS. HERNANDEZ:  Maybe does somebody have a phone on?

12  Q    (BY MS. HERNANDEZ)  Okay.  There was a May 2006 meeting

13  with your informant, CI-3, Mr. Bardales; am I correct?

14  A    No, ma'am.

15  Q    Okay.  There was an April meeting, April 2006?

16  A    The first -- the first meeting that Mr. Augustine was

17  present at was on June 20th of 2006.

18  Q    Okay.  There was a meeting with Mr. Bardales and some

19  other -- and three informants -- two informants?  One -- the

20  first -- there was an April 2006 meeting?

21  A    Yes, ma'am.

22  Q    And that was Mr. Bardales, Mr. Serrano Chiu and three

23  informants?

24  A    No, ma'am.

25  Q    How many informants?

```
 1    A    The April 2006 meeting was Mr. Bardales and two DEA
 2   confidential sources.
 3    Q    Okay.  And then there was -- when was the next meeting,
 4   June or May?
 5    A    I would say that would be the June 20th meeting in
 6   Panama.
 7    Q    All right.  The June 20th meeting, that was your CI-3?
 8    A    Yes, ma'am, Augustine.
 9    Q    Okay.  Augustine.  Mr. Bardales?
10    A    Correct.
11    Q    And you gave Augustine $2500 to give to Bardales?
12    A    Yes, ma'am.
13    Q    And the reason was because Mr. Bardales was going --
14   wanted his travel expenses to Panama paid for?
15    A    Yes.
16    Q    It wasn't to purchase cocaine or anything like that?
17    A    No, ma'am.
18    Q    Okay.  And then there was --
19              (MICROPHONE FEEDBACK.)
20              THE COURT:  Excuse me for just a second.
21              (PAUSE.)
22              THE COURT:  The only thing I would ask is that --
23   and occasionally this happens -- and I'm not asking just Agent
24   Fraga.  I'm not asking just Ms. Hernandez.  But if anyone has
25   a BlackBerry on, any member of the jury or anybody at counsel
```

1    table, BlackBerrys, cell phones, let's turn them off, okay.

2    Sometimes there is interference.  It's sporadic, but

3    occasionally it happens, and I appreciate that.  Let's see if

4    we can move forward, Ms. Hernandez.

5              MS. HERNANDEZ:  I think DOJ issues BlackBerrys, Your

6    Honor.

7              THE COURT:  DOJ issues BlackBerrys.  Is that

8    relevant?  Do we want that in the record?

9              (LAUGHTER.)

10   Q    (BY MS. HERNANDEZ)  So then there was -- there was an

11   occasion in July, was it, that you gave CI-3 $10,000?

12   A    Yes, ma'am.

13   Q    To give to the other people that were meeting?

14   A    Yes.

15   Q    And that was to cover travel expenses?

16   A    No, ma'am.

17   Q    Well, why was Mr. Bardales given money for travel

18   expenses?

19   A    The money was -- the money was physically given to

20   Mr. Del Cid Morales, and that money was given as

21   representation of the union or the culmination of a

22   drug-trafficking activity that the parties at the meeting were

23   engaged in.

24   Q    You were not at that meeting, correct?

25   A    No, ma'am.

1    Q    Were you surveilling it?

2    A    No.

3    Q    Personally?

4    A    No.

5    Q    And you indicated that you then out of those -- those

6    were 10,000 U.S. dollars?

7    A    Yes.

8    Q    And you had noted the serial numbers?

9    A    Yes.

10    Q    And when Mr. Del Cid Morales was ultimately arrested in

11    September, were any -- did he have in his possession any of

12    the money from that meeting?

13    A    No, ma'am.

14    Q    How about the Eric Constanza, the other person arrested?

15    A    No, ma'am.

16    Q    Did they have in their possession U.S. dollars, those

17    other two gentlemen?

18            MS. HABISREITINGER:  We would object.

19            COURT REPORTER:  I can't hear you.

20            THE COURT:  Come on up.

21            MS. HABISREITINGER:  I'm going to object only to the

22    timing of this questioning.  I understood that we were going

23    to recall Agent Fraga to testify about the arrest at a later

24    part during the trial, and I think that this line of

25    questioning is best --

1          THE COURT:  It's sort of the scope question,

2    Ms. Hernandez.  Do you think the examination could comply with

3    that --

4          MS. HERNANDEZ:  That's fine, Your Honor.  I was just

5    bringing it up because the U.S. dollars had been mentioned.

6    Q    (BY MS. HERNANDEZ)  Well, with --

7          MS. HERNANDEZ:  This was testimony -- I'm happy to

8    reserve all this area of testimony for later.

9    Q    (BY MS. HERNANDEZ)  But you testified that --

10          THE COURT:  Just try to limit yourself to the scope

11    of the direct examination, and then I think it will move

12    smoothly.

13    Q    (BY MS. HERNANDEZ)  You testified that -- that your --

14    Mr. Augustine, your informant, returned to you, at your

15    direction, a couple of the 100-dollar bills that he said were

16    spent shortly after the meeting with the -- Does anybody follow

17    what I'm asking?

18          There was a meeting in July, correct?

19    A    July 19th, yes, ma'am.

20    Q    July 19th.  Mr. Augustine, your confidential informant,

21    handed $10,000 to Del Cid Morales?

22    A    Yes.

23    Q    It is -- Mr. Augustine told you that they -- after that

24    meeting, they went out and drank some more and ate and

25    partied; is that correct?

1    A    No.

2    Q    Okay.  Did they, in fact -- Okay.  No?  What do you mean?

3    A    The circumstances of that, I was -- I was present with

4    Mr. Augustine and a second DEA confidential source conducting

5    a debriefing when the second DEA confidential source received

6    a --

7              (MICROPHONE FEEDBACK.)

8              THE COURT:  Well, Mr. Rhoades may have found the

9    problem, since that's getting worse as he's fiddling.

10             THE DEPUTY CLERK:  It's not that either.  Go ahead.

11   A    Sorry, ma'am.  But myself and another agent who were

12   present with Mr. Augustine, and the second confidential

13   source, when the second confidential source received a

14   telephone call from, I believe it was from Mr. Constanza.  At

15   that time they requested the second confidential source, and

16   when I say "they," I mean Mr. Constanza, Mr. Del Cid and

17   Mr. Mejia requested that the second confidential source join

18   them in a social setting and have dinner with them and in fact

19   return to Guatemala with them the following day.

20   Q    (BY MS. HERNANDEZ)  The person on the phone call was

21   Mr. Constanza?

22   A    I don't recall who it was, ma'am.

23   Q    Well, you're the case agent, correct?

24   A    Yes, I am.

25   Q    Are there any -- was that conversation recorded -- that

 1    telephone conversation recorded?

 2    A    I don't believe it was, no.

 3    Q    So CS-2 and CS-3 went and had -- went drinking and eating

 4    and partying with the others?

 5    A    No, ma'am, only CS-2.

 6    Q    Only CS-2?

 7    A    Yes, ma'am.

 8    Q    And CS-2 is not -- is not Mr. Augustine?

 9    A    That's correct.

10    Q    I thought you testified on direct that Mr. Augustine gave

11    you $200 back from the amount that he had paid him?

12    A    I'm sure that I did, ma'am, because it wasn't -- it

13    wasn't Mr. Augustine that gave me that.

14            COURT REPORTER:  I'm sorry, Judge, I couldn't really

15    catch what he said.

16            (MICROPHONE FEEDBACK.)

17            THE COURT:  Let's just hold on for a second.

18    Mr. Bradley is on the phone and I think you need to get

19    John -- somebody up here now.

20        All right.  Let's ask the question again and make sure

21    your feet don't kick anything.  I don't know if there is

22    anything under -- under that there could be a problem.

23            THE WITNESS:  That's what I'm trying to find out,

24    but no, there doesn't appear to me.

25    Q    (BY MS. HERNANDEZ)  Okay.  Let me go over the testimony.

1    On direct you said that you gave CS-3, Augustine, $10,000 to be

2    given to -- and he gave it to Del Cid Morales?

3    A    Yes.

4    Q    You said that, in fact, you got back $200?

5    A    That's correct.

6    Q    And it's Exhibit -- and it's one of the exhibits and you

7    identified it?

8    A    Yes, ma'am.

9    Q    And that money came from a different CI -- came back to

10   you from a different CI?

11   A    Yes.

12   Q    So whatever we know about that money is what that CI said

13   to you?

14   A    What I know about that money is that the serial numbers

15   match the serial numbers on the original $10,000.

16   Q    But you don't know -- you got that -- those two matching

17   serial numbered 100-dollar bills from CS-2 or from CI-2?

18   A    Yes.

19   Q    And however he got them, we don't know, other than

20   whatever he may have told you?

21   A    That's correct.

22   Q    Okay.  So you don't have any personal knowledge of how he

23   got those $200?

24   A    No, ma'am, I don't.

25   Q    You don't know whether he got those -- you, personally,

```
1    don't know whether he got those $200 from CI-3 directly?

2    A    I --

3    Q    You personally don't know?

4    A    I would disagree with that.  I know that he didn't get it

5    from CI-3 because CI-3 was with me.

6    Q    Well, he was not with you from -- didn't he leave you to

7    go to this meeting, to go to the July 19th meeting?  You

8    gave him -- you gave CI-3 $10,000?

9    A    Yes, ma'am.

10   Q    You were not with him at the July 19th meeting.

11   A    I reviewed the videotapes of the July 19th meeting and

12   have seen the transcripts and I've observed the $10,000 being

13   provided to Mr. Del Cid Morales.

14   Q    Are you telling me that on the videotape you can see the

15   counting out of $10,000?

16   A    No, ma'am.

17   Q    So you don't know whether he only gave him $10,000 less

18   200, or $10,000 less 500, or $10,000 less 3,000?

19   A    I do know.

20   Q    Were you present?

21   A    No.

22   Q    You didn't observe it with your eyes?

23   A    No, ma'am.

24   Q    And you weren't there to count it as it was being

25   transferred?
```

```
1    A    No, I wasn't.

2    Q    Okay.  Did you fingerprint the $200 that you received?

3    A    No, ma'am.

4    Q    Now, you identified a series of CDs, correct?

5    A    Yes.

6    Q    And those CDs were -- contained the consensual telephone

7    calls or the videotape of the meeting?

8    A    Both.

9    Q    With respect to the telephone calls, were those monitored

10   by a U.S. government agent at the time they were being made

11   contemporaneously?

12   A    Some of those calls, ma'am, were actually placed by me,

13   and I would facilitate a three-way call between the informant

14   and either Mr. Bardales or Mr. Constanza.

15   Q    So those would have been monitored by you at the time

16   that they were being made?

17   A    Yes, ma'am.

18   Q    Okay.  And then others?

19   A    Others were made by Mr. Augustine without my presence, on

20   his own, and those were forwarded to me by Mr. Augustine.

21   Q    And when you say "forwarded to you," he mailed you the

22   disks?

23   A    No.  He would have e-mailed me the audio -- audio file.

24   Q    Did you say "e-mailed"?

25   A    Yes, it could be e-mailed and some of them I would get
```

1  from him at -- when I would meet him at meetings and they

2  would be provided to me.  Each individual -- each individual

3  exhibit or nondrug exhibit, as it relates to the audio

4  recordings, has a -- has an individual chain-of-custody as far

5  as how I acquired that from Mr. Augustine.

6  Q   But there's no chain-of-custody until they reach you; is

7  that correct?

8  A   No, I would say that that's not correct.  Certainly there

9  is.

10  Q   Well, you have -- when he -- when Augustine makes the

11  recordings, how do you know what he does with them until you

12  receive them?

13  A   When Augustine makes a recording, he places a -- what we

14  refer to as a preamble and a post-amble on any of the

15  recordings.  He will state, prior to the call being made, what

16  the time is, what the date is, what the telephone number is

17  that he's calling and who he's -- who his intended caller or

18  recipient of the phone call is.

19      After the call is recorded, at the completion of the

20  phone call, there'll also be possibly a post-amble where he

21  states what time it was, same thing.

22  Q   So that's how you -- that's how you keep track of whether

23  something else is recorded after he completes his call?

24  A   I'm not sure I understood, ma'am.

25  Q   Is that how you -- is that why you say there is a

1    chain-of-custody because of that preamble or post-amble or

2    postscript?

3    A    Yes, ma'am, it's a documentation of the date and time

4    that the phone call was made, and the recording is a

5    documentation of the contents of the phone call itself.

6    Q    Okay.  And can you -- did you or can you keep track of

7    how -- of whether he made additional calls and you didn't get

8    a copy of them?

9    A    I could, yes.

10   Q    And have you?

11   A    No, ma'am.

12   Q    So might there be other calls that you don't have?

13   A    I have no reason to believe that.

14   Q    The recording device that he used, was that something you

15   gave him, or he purchased it with money you gave him, or how

16   did that work?

17   A    That was a recording device of several that he possesses.

18   He had them prior to my first meeting with him on June 20th.

19   Q    But are they like official government issue or is it just

20   something he went to a local store and purchased some

21   recording device; do you know?

22   A    The same 200-dollar digital recording device that I used.

23   Q    Okay.  Does that mean that you happened to purchase the

24   same one or that you both got them from DEA or FBI or some

25   other government agency?

1    A    We --

2              MS. HABISREITINGER:  Objection, relevance, Judge.

3              THE COURT:  Overruled.  You can answer the question.

4    A    Purchase on his own as I purchased my equipment on my

5    own, too, because it's better.

6    Q    (BY MS. HERNANDEZ)  And the video camera that was used to

7    videotape the meetings, was that something you gave him or did

8    he purchase that on his own?

9    A    That's something that I gave him.

10             THE COURT:  Now, speaking of better equipment for

11   the benefit of someone who's in the courtroom, I am just going

12   to interrupt for a minute.

13             John, the problem seems to have been fixed for the

14   moment.  There is, ladies and gentlemen, some circumstantial

15   evidence that it may have been Mr. Laymon, since when he left,

16   it fixed itself.  And if he has done something that may have

17   contributed to fixing it, why doesn't he step out with John in

18   the hall and perhaps explain it so we have some idea.  If you

19   haven't done anything, then that's fine, but it is corrected

20   at the moment at least.  And let's continue, Ms. Hernandez.

21             MS. HERNANDEZ:  It's like when you carry an umbrella

22   and it doesn't rain?

23             THE COURT:  Not quite.

24   Q    (BY MS. HERNANDEZ)  So you gave him the video equipment

25   that he used for videotaping the meetings; is that correct?

1    A    Yes, ma'am.

2    Q    And is that -- that was official DEA or is that also

3    something that you purchased?

4    A    It's something that's purchased by DEA from the actual

5    sole source manufacturer of the equipment.

6    Q    Okay.  And you said you do have an -- an audio recorder?

7    You said you had the same audio recorder that Mr. Augustine

8    used?

9    A    Yes.

10   Q    And do you carry it along with you for investigation or

11   is it personal use?

12   A    For investigations.

13   Q    Okay.  And I assume it's fairly compact?

14   A    Yes, ma'am.

15   Q    Now, you also said that Mr. -- Confidential Informant 3,

16   Mr. Augustine, has $50,000 owing to him from this case; is

17   that correct?

18   A    Yes.

19   Q    Now, the case -- his part of the case or his

20   investigative aspect of the case was completed in September of

21   2006; is that correct?

22   A    No, ma'am.

23   Q    Has he -- it was not?

24   A    No, ma'am.

25   Q    The $50,000 that you owe him is a continuing expense, or

1    I understood from your testimony that it was $50,000 owing

2    back to the investigative activities up to September of 2006.

3    A    No, the $50,000 was submitted as an award for his

4    information and services.  His information and services

5    continued to include his testimony in court, which has not

6    been completed yet.

7    Q    Okay.  So, was he paid some regular money during the

8    period of time when he was investigating the case?

9    A    On November 16th of 2006, he was provided a

10   10,000-dollar payment that was for his information and

11   services.

12       Prior to November 16th, he was only provided money to

13   reimburse his own expenses or money that he was to provide to

14   the subjects of investigation.

15   Q    And do you recall how many times you gave him either the

16   reimbursement money or money for others during the period --

17   during the period July 19th through today?

18   A    No, ma'am.  The DEA-103s, or the vouchers for payment or

19   purchase of evidence that we discussed before would be

20   reflective of how many times that was.

21   Q    Okay.  So he doesn't get paid by the hour, does he?

22   A    No, ma'am.

23   Q    He gets paid by the activity?  Let me ask you:  How do

24   you decide when to pay him?

25   A    Attempt to timely reimbursement for his expenses that he

 1    incurs by himself and then assessments are made after that as

 2    far as his -- as far as his exposure as a confidential

 3    informant.  In this particular case, his true identity has

 4    been disclosed to Defendants and Defense counsel.  There is

 5    certain risks associated with that, and he's paid or

 6    recommended payments for his information and services.

 7    Q    Now, his true identity was disclosed more than a year

 8    ago; is that correct?

 9    A    I'm not sure, ma'am.

10    Q    He's not been injured by my client since his name was

11    disclosed to him, has he?

12              MS. HABISREITINGER:  Objection, Judge, relevance.

13              THE COURT:  I'll overrule the objection.  You can

14    answer the question.  To your knowledge, has he been injured

15    by the Defendant?

16    A    Not that I'm aware of, no.

17    Q    (BY MS. HERNANDEZ)  So there is timely reimbursement.

18    There is some additional amounts of money at your discretion or

19    within some guidelines, which is it, that you give him as he --

20    just for working?

21    A    I'm sorry?

22    Q    You said there was some additional monies that you gave

23    him and you indicated that his true identity had been

24    disclosed and you take that into account in giving him money.

25    Is that the $10,000, or is that another amount of money?

1    A    That would be -- that would be inclusive of the -- the

2    award payment that he was recommended for that he hasn't

3    received yet.

4    Q    The 50,000?

5    A    Yes, ma'am.

6    Q    So does that mean that the amount of money -- I'm sorry.

7    And you also said that in November 16th, 2006, you gave him

8    $10,000?

9    A    Yes.

10    Q    And that was because you -- because the arrest had been

11    made?

12    A    Partly but not entirely.

13    Q    Okay.  If no arrest had been made, then either he would

14    have gotten less or nothing?

15    A    No, ma'am.

16    Q    He would have gotten the same?

17    A    Yes.

18    Q    Then part -- you just said that in part you gave him the

19    $10,000 because it was an arrest?

20    A    In part, but that's inclusive of his identification as a

21    confidential source, too.  It varies, I mean, from June until

22    September, regardless if there was an arrest made.

23    Q    Okay.  And the 15,000 -- the 50,000 that you recommended,

24    is that your decision alone or is that done in conjunction

25    with some other people?

1    A    My initial recommendation but certainly in conjunction

2    with the approvals of three tiers above me to concur with that

3    recommendation.

4    Q    Okay.  And -- but that -- he will not get that money

5    until he has no more testimony to provide?

6    A    That's not accurate, no.

7    Q    Well, you've already recommended the $50,000.  He

8    still -- why has he not yet given the 50- -- Back up.

9         When did you recommend the $50,000, a general time,

10   month and year would be fine?

11   A    Generally, I would say late 2006, maybe December

12   timeframe.

13   Q    Okay.  So we're now mid- -- or no, beginning of 2008,

14   more than a year later.  Is the U.S. Government that late in

15   making -- in paying its bills, or is there some reason why he

16   has not yet been paid?

17   A    The U.S. Government is that late on paying its bills.

18   Q    More than a year?

19   A    Yes, ma'am.

20   Q    It has nothing to do -- but it has, in part, to do

21   because, as you said earlier, he has not completed his work in

22   this case and that includes testimony?

23   A    It has nothing to do with that.  It has to do with the

24   Drug Enforcement Administration operates on a -- an October to

25   October financial budget, and in October of 2007, the DEA and

1    the U.S. Government was under a continuing resolution, and the

2    payment has -- the delay in that payment has nothing to do

3    with his completion or noncompletion of testimony.  It has to

4    do with U.S. Government budgetary issues.

5    Q    It's a continuing resolution.  We're now in a new fiscal

6    year and the continuing resolution has been lifted, no?

7    A    Yes, it has, but he hasn't been paid yet.

8    Q    Okay.  Will he -- do you have the authority to make

9    additional awards to him?

10   A    No, ma'am.

11   Q    Since it's been more than a year?

12   A    No.

13   Q    Are you working with him any longer in an investigative

14   capacity?

15   A    I have no current investigations that Mr. Augustine and

16   myself are involved in.

17   Q    Let me go back to where I started with this.  If at any

18   time -- Well, I'm not going to ask that question.

19        MS. HERNANDEZ:  Your Honor, subject to obtaining the

20   file that I -- that apparently exists, I would request an

21   ability to cross-examine further on that point.

22        THE COURT:  All right.

23        MS. HERNANDEZ:  Other than that, I have no other

24   questions.

25        THE COURT:  For the moment, we'll pass the witness

1    on for redirect.

2                        REDIRECT EXAMINATION

3    BY MS. HABISREITINGER:

4    Q    Agent Fraga, I just have a couple of follow-up questions

5    for you.

6              The $50,000 that you recommended for payment for

7    Augustine's service, what time period does that cover?

8    A    It covers June of 2006 through -- actually through the

9    present, for that matter.

10   Q    And he will receive no other additional recommendations

11   for his service in this particular investigation?

12   A    No, ma'am, he won't.

13   Q    And is his payment of that $50,000 dependent on the

14   outcome of any given trial?

15   A    No.

16   Q    So if a trial came back as a "guilty" or a "not guilty,"

17   that would have no bearing on whether he got paid?

18   A    That's correct, it would have no bearing.

19              MS. HABISREITINGER:  No further questions.

20              MS. HERNANDEZ:  Your Honor, I have a couple of

21   questions.

22              THE COURT:  Excuse me?

23              MS. HERNANDEZ:  I have a couple more on that.

24              THE COURT:  All right.  We don't usually allow

25   recross-examination, and I think this is recross, but I'm

1   going to go ahead and give you one opportunity for recross.

2           MS. HERNANDEZ:  I'll try to not abuse that grant,

3   Your Honor.

4                    RECROSS-EXAMINATION

5   BY MS. HERNANDEZ:

6   Q   You're saying that the 50,000 is through the present, but

7   you're not involved in any investigation with him at present.

8   You said that earlier.

9   A   Technically, he's going to be here to testify in this

10  same investigation, so I can't say that the answer to that is

11  no.  I'm not involved in any separate investigations with him

12  at the present.

13  Q   So if a payment is through the present and it does not

14  involve any investigation other than his testimony, you

15  haven't sent him out to investigate Mr. Mejia, have you?

16  A   Ma'am, the only -- the only reason that he hasn't been

17  paid is because of U.S. Government budgetary issues.  It

18  really has no bearing on his testimony here today.  It was

19  submitted for that award in late 2006, maybe early 2007.

20  Q   So that award then was for the months of July when he

21  started working with you through whenever you recommended the

22  payment?

23  A   Yes.  And that award -- that award was based on his

24  information and services, his collection of evidence, his

25  exposure and his disclosure as a DEA confidential source

 1  and -- and matters such as that.

 2   Q    And each time he testifies in any case, his true name is

 3  disclosed, is it not --

 4            MS. HABISREITINGER:  Objection, Judge.

 5   Q    (BY MS. HERNANDEZ)  -- to Defense counsel?

 6            MS. HABISREITINGER:  Objection.

 7            THE COURT:  Just a second.

 8            MS. HABISREITINGER:  This is far afield of Defense

 9  counsel's right to recross on the limited two questions that I

10  asked.

11            THE COURT:  I think we're limited strictly to the

12  couple of questions that were asked.

13            MS. HERNANDEZ:  He gives --

14            THE COURT:  I think we'll limit it strictly to the

15  couple of questions that were asked.  Keep it within that

16  scope.

17   Q    (BY MS. HERNANDEZ)  Do you know -- does he have another --

18  does he have gainful employment other than as a DEA confidential

19  informant?

20            MS. HABISREITINGER:  Objection.

21            THE COURT:  The objection is sustained.

22            MS. HERNANDEZ:  No more questions, Your Honor.

23            THE COURT:  All right.  Thank you.  You may step

24  down, Agent Fraga.  We've got 15 minutes.  We have another

25  witness?

```
 1              MR. LAYMON:  Sure, Judge.  We'll call Augustine
 2    Cortez.
 3              (PAUSE.)
 4              MR. LAYMON:  Mr. Cortez, would you come to the
 5    stand, please.
 6              THE DEPUTY CLERK:  Good afternoon, sir.
 7              THE WITNESS:  Good afternoon.
 8              THE DEPUTY CLERK:  Please raise your right hand.
 9              (WITNESS SWORN BY THE DEPUTY CLERK.)
10              THE DEPUTY CLERK:  Please be seated.
11              THE COURT:  Good afternoon.
12              THE WITNESS:  Good afternoon, sir.
13                        AUGUSTINE CORTEZ,
14    having been duly sworn, testified as follows:
15                        DIRECT EXAMINATION
16    BY MR. LAYMON:
17    Q   You are testifying here today as Augustine Cortez; is
18    that correct?
19    A   That is correct.
20    Q   Now, that is not your real name; is that right?
21    A   That's correct.
22    Q   But is that the name that you used in this case?
23    A   Yes, I did.
24    Q   And you understand you're being permitted to testify
25    under that name?
```

1   A   Yes, that's correct.

2   Q   Okay.  And so I will refer to you as Mr. Cortez.

3   A   That's good.

4   Q   All right.  Mr. Cortez, you were born in what country?

5   A   Colombia, South America.

6   Q   And at some time did you come to the United States?

7   A   Yes, I did.

8   Q   And tell me when that was.

9   A   1967.

10  Q   How old were you when you came to the United States?

11  A   Approximately 17 years old.

12  Q   When you were living in Colombia, what part of Colombia

13  did you live in?

14  A   In a city called Barranquilla.

15  Q   Which is where in Colombia?

16  A   In the north coast of Colombia.

17  Q   What language did you speak as a child growing up?

18  A   Spanish.

19  Q   At some point, did you learn English?

20  A   I'm sorry?

21  Q   At what point did you learn English?

22  A   Back in Colombia.

23  Q   When did you start learning to speak English?

24  A   As a child.

25  Q   You've indicated that you came to the United States in

```
 1   1967; is that what you said?

 2   A   Yes, that's what I said.

 3   Q   How long have you been in the United States?

 4   A   Over 40 years.

 5   Q   Of what country or countries are you a citizen?

 6   A   I'm a citizen of Colombia.

 7   Q   And what is your status in the United States?

 8   A   I'm a legal alien here.

 9   Q   Are you legally present in the United States?

10   A   Yes, I'm legally here.

11   Q   And for how long have you had that legal resident alien

12   status?

13   A   Since 1970.

14   Q   Mr. Cortez, are you married?

15   A   Yes, I am.

16   Q   Do you have children?

17   A   Yes, I do.

18   Q   And in what country are you presently living?

19   A   Here in the United States.

20   Q   Let's go back just a little bit to when you first came to

21   the United States.

22       Did you -- did you work or were you employed when you

23   first came to this country?

24   A   Yes, I did.

25   Q   In what industry were you -- did you work in?
```

1    A     In the airline industry.

2    Q     Just tell me a little bit about that.  What did you do in

3    the airline industry?

4    A     I worked for -- at the time for an airline in New York

5    City in the airline catering department and various -- also in

6    various cities within the states.

7    Q     Okay.  Did you work for a number of airlines after that?

8    A     I worked for airlines and I worked for private

9    contractors as well.

10   Q     Okay.  And within -- within that industry, what did you

11   do, in particular?

12   A     I started as an hourly employee, and I was promoted by

13   age 19 to a -- what I was called supply and cost controller.

14   I was in charge of all the purchasing for the airline at JFK

15   Airport in New York City.

16   Q     Did you work in airline operations or in some other part

17   of the airline?

18   A     Airline catering.

19   Q     I'm sorry?

20   A     Airline catering.  The catering department.

21   Q     Okay.  Food?

22   A     Yes, food department.

23   Q     All right.  And for how long did that kind of employment

24   go on?

25   A     For a few years up until around the mid '80s.

1  Q   Okay.  What happened to you in the mid '80s?

2  A   In the mid '80s I went to the wrong side of the

3  employment line and I became a drug smuggler.

4  Q   When you say "a drug smuggler," what was your particular

5  role in drug-trafficking?  What did you do?

6  A   I was heading transportation from Colombia or from the

7  islands of the Caribbean, of drugs into the United States.

8  Q   What drugs were you involved in transporting?

9  A   I was involved with some marijuana and with cocaine.

10 Q   For how long did that go on?

11 A   Approximately until about 1990 -- well, actually I've up

12 till about 1993 when I got arrested by the DEA in Miami,

13 Florida.

14 Q   Do you recall the precise date that you were arrested by

15 DEA?

16 A   October 21st, 1993.

17 Q   And where were you at when you were arrested?

18 A   In Miami.

19 Q   What happened after your arrest?

20 A   I cooperated with authorities and I pled guilty of one of

21 two counts that I was charged with at the time.

22 Q   Do you recall what count you were charged with?

23 A   No, I don't.

24 Q   Do you know what kind -- what basic -- do you know what

25 kind of basic offense you pled guilty to?

1    A    Smuggling prohibited substances into United States.

2    Q    And in particular, what prohibited substances?

3    A    Cocaine.

4    Q    Now, at the time of your arrest in October of 1993, what

5    was your custody status at that time?  Did you make bond?  Did

6    you go to jail?  What happened?

7    A    I did not make bond because they didn't give me a bond.

8    They kept me in prison -- in jail for the time of the process

9    that went on.

10   Q    Okay.  How long -- for how long were you in jail before

11   you pled guilty to that cocaine offense?

12   A    Approximately five, six months while the due process was

13   done.

14   Q    All right.

15   A    If I might say this, I did agree with the Government

16   immediately and cooperated with the Government at the time of

17   the arrest.

18   Q    Did you continue to cooperate in those first five or six

19   months?

20   A    Yes, sir.

21   Q    Do you recall what your sentence was?

22   A    Originally I was sentenced to 10 years.

23   Q    In terms of that 10-year sentence, Mr. Cortez, did the

24   Government -- before you were sentenced to 10 years, did the

25   Government, that is, the Federal prosecutors ask the judge to

1  sentence you to a lesser sentence?

2  A    Yes, they did.

3  Q    Okay.  And is that how you came to be sentenced to 10

4  years?

5  A    Yes, sir.

6  Q    Okay.  Now, what happened to that 10-year sentence?  Did

7  it remain 10 years?

8  A    No, it did not.  Due to my cooperation, it was reduced to

9  three years.

10  Q    Okay.  Tell me how long you remained in jail on that

11  sentence.

12  A    Minus the time they give you for good conduct or whatever

13  it's called, I was in for approximately two years and six --

14  and eight months.

15  Q    Okay.  Your sentence reduction to three years, was that

16  again at the request of prosecutors?

17  A    Yes, it was.

18  Q    Okay.  But in each instance that your sentence was

19  reduced, who sentenced you?

20  A    The judge.

21  Q    Okay.  And where was that judge located?

22  A    In Key West, Florida.

23  Q    Did you appear in front of the same judge for each of

24  your sentencings?

25  A    Yes, sir.

1    Q    Now, in addition to being sentenced to a period of

2    incarceration, were you also sentenced to some kind of a like

3    probation or parole?

4    A    Yes, I was.

5    Q    Tell me about that.

6    A    Along with the sentence, I was put in what is called

7    supervised release for five years, and eventually that was

8    also reduced after I became free from the time I did on the

9    basis that the Government requested to the judge.

10   Q    And did you eventually have to do any of this supervised

11   release?

12   A    I did approximately two-and-a-half, three months until I

13   was in front of the judge again and he canceled the supervised

14   release.

15   Q    And do you know why he canceled your supervised release?

16   A    By request of the U.S. attorneys and the DEA.

17   Q    Okay.  But for what reason?  Why was that canceled?

18   A    Because they wanted me to do some cases and it was a need

19   that I was able to travel and be free to move without any

20   preconditions from the supervised release.

21   Q    And for how long -- you are obviously working as an

22   informant with the DEA; is that right?

23   A    That is correct.

24   Q    For how long have you been doing that?

25   A    Officially with assigned number, from 1996 when I stepped

1    out of prison, but of course, I started cooperating on 1993

2    upon my arrest.

3    Q    Since you've been in the United States, have you ever

4    been deported?

5    A    No, I have not.

6    Q    Have you ever, though, faced a deportation hearing?

7    A    Yes, I have.

8    Q    Tell me about that.

9    A    As an alien here in this country, anyone that is

10   convicted of a felony is subject or is ordered to be deported

11   to their original country.  In my case, the Government kept me

12   on a status.  I was able to stay here until I went in front of

13   a judge in Louisiana, and up there in Louisiana, that judge

14   decided that I was to remain in the country as a legal

15   resident of the country without any lapse of my residence

16   status.

17   Q    Now, did the United States Government or the DEA

18   intervene on your behalf with the administrative law judge?

19   A    Yes, they did.  The DEA and the Sarasota Police

20   Department went in front of the judge on my behalf and they're

21   the one to explain the judge and the judge came to agreement

22   with them.

23   Q    Now, have you worked continuously with the DEA since

24   1996?

25   A    Every day.

1    Q    In that period of time, I guess the last 11 or 12 years

2    or so with DEA, have you had the occasion to do a few or many

3    cases with the DEA?

4    A    I have done many cases for DEA.

5    Q    Throughout your experience with the DEA, have they

6    provided you with any equipment that allows you to do your

7    job?

8    A    Yes, sir, they have.

9    Q    Tell me what that might be.

10   A    They have give me recording devices, video devices; to

11   phone people, they have give me telephones.  That's about it.

12   Q    Okay.  Have you, throughout your time with the DEA, have

13   you had to buy some of your own equipment?

14   A    Absolutely.

15   Q    Tell me some of the equipment that you've had to buy?

16   A    Voice recorders, video recorders, telephones.

17   Q    And why would you have to buy your own equipment?

18   A    So I can perform a better job.

19   Q    Why doesn't the Government just give it to you?

20   A    The Government gives it to me but sometimes it's not

21   available because there is not enough equipment to be hand out

22   and sometimes I have to use my own equipment.

23   Q    As part of your employment with the DEA, are you required

24   to travel?

25   A    Yes, I do.

```
 1    Q    And --
 2              THE COURT:  Mr. Laymon, we're going to have to break
 3    at 5:00 o'clock, so you pick the moment.  You have about a
 4    one-minute window.
 5              MR. LAYMON:  This is a good time, Judge.
 6              THE COURT:  I thought it might be.
 7              MR. LAYMON:  Yeah.
 8              THE COURT:  We'll break for the day.  I have another
 9    matter, which is why we have to do it exactly timely.  And we
10    will resume again at 9:30 tomorrow morning.
11         Ladies and gentlemen, please remember my admonition not
12    to discuss the case among yourselves or with anyone else, but
13    have a very pleasant evening and we will see you tomorrow
14    morning.  And thank you for your promptness this morning, and
15    we'll see you in the morning tomorrow.
16              THE DEPUTY CLERK:  Please bring your notebooks with
17    you.
18              (JURY NOT PRESENT.)
19              THE COURT:  All right.  Counsel, I do have to run to
20    something else, but we have a request from Ms. Hernandez for
21    whatever files may exist.
22         We'll wait a second.  Whatever files may exist within
23    DEA's coffers on reviews with respect to Mr. Cortez, why
24    should you not review and provide those?  I don't know whether
25    you've already reviewed them or not.
```

1          MR. LAYMON:  We haven't, Judge, and actually, as I

2     was telling Ms. Hernandez earlier, I was not aware of the

3     existence of these, and I'm not even sure that there are any

4     files that exist that -- since it's a relatively new

5     requirement apparently.

6          I tell you what, we will do this, Judge.

7          THE COURT:  It's not clear how new it is.  The

8     testimony from Agent Fraga is a year-and-a-half in quarterly

9     reviews but there were biannual reviews before that.

10          MR. LAYMON:  I think certainly we have an obligation

11     to review and to look into the matter.  Clearly we do.  We

12     will do that.  Clearly we'll have to have Agent Fraga probably

13     first thing in the morning figure out what -- what files

14     exist, where they are, how quickly we can get access to them.

15          We'll take a look at them, Judge, and then we will talk

16     to Ms. Hernandez about it.  I'm sure we'll, you know, have to

17     revisit this issue.

18          THE COURT:  All right.

19          MS. HERNANDEZ:  Your Honor, while I'm asking, I also

20     would ask the Government to contact the AUSA involved in the

21     case where the judge made the finding and find out whether

22     there is *Giglio* or *Brady* or other material.  It seems to me we

23     have a particular event, so there should be a specific

24     obligation.  To the extent that the Government's obligation is

25     dependent on my specific request, I am hereby making -- you

1  know, the level of their obligation differs.

2      I'm hereby making a specific request with respect to a

3  specific incident.

4          MR. LAYMON:  I've already checked that out, Judge.

5  I've already made those phone calls and talked to the people.

6          THE COURT:  All right.  Well, why don't you discuss

7  it with --

8          MR. LAYMON:  I'll discuss it with Ms. Hernandez.

9          THE COURT:  Discuss it with Ms. Hernandez, and then

10  if there is anything further for me to be made aware of, I'm

11  sure one or the other of you will make me aware of it.

12      In the meantime, have a productive and pleasant evening.

13  We will see you in the morning.

14      Mr. Bradley, I have two short matters in the morning?

15  One short matter in the morning.  So in case there are any

16  preliminary matters, if there is anything we need to discuss

17  tomorrow morning, I would like to do so at 9:15.

18          MS. HERNANDEZ:  Yes, sir.

19          MR. LAYMON:  Judge, as I mentioned yesterday, and

20  I'll be very quick, I have this hearing that Judge Sullivan

21  initially scheduled as an emergency.  He was kind enough to

22  move that to 9:00 o'clock, so I'm not certain that I can be

23  here at 9:15.

24          THE COURT:  Oh, it's moved to tomorrow to

25  9:00 o'clock.  It was Friday, you know.

1          MR. LAYMON:  No, it was originally set for tomorrow

2    morning at 9:30.

3          MS. HERNANDEZ:  I was the one --

4          THE COURT:  You were Friday.

5          MR. LAYMON:  She was Friday.  I'm tomorrow morning

6    at 9:30.  He moved it to 9:00.

7          THE COURT:  Okay.  You ought to be able to take care

8    of that, and hopefully, there will be enough coordination so

9    that if there is something we need to do here, we can start at

10   9:15 without you, and then, to the extent you're necessary,

11   we'll wait for you.

12         MR. LAYMON:  Fair enough.

13         THE COURT:  But you'll have to be here at 9:30 to

14   begin with the witness, and we'll see you then.  Thank you

15   very much.

16         THE DEPUTY CLERK:  All rise.

17

18         (PROCEEDINGS END AT 5:05 P.M.)

19                          *-*-*-*-*

20

21

22

23

24

25

```
1                        I-N-D-E-X

2                        WITNESSES

3      Stephen Fraga
       Direct Examination.............................    3
4      Cross-Examination..............................   58
       Redirect Examination...........................  107
5      Recross-Examination............................  108

6      Augustine Cortez
       Direct Examination.............................  110
7

8                    EXHIBITS RECEIVED

9      Government Exhibit 1, 1A, 1B...................   20
       Government Exhibit 2...........................   55
10     Government Exhibit 3, conditionally............   57
       Government Exhibit 4, conditionally............   57
11     Government Exhibit 5...........................   38
       Government Exhibit 6...........................   55
12     Government Exhibit 7...........................   41
       Government Exhibit 8, conditionally............   57
13     Government Exhibit 9...........................   55
       Government Exhibit 10..........................   46
14     Government Exhibit 11, conditionally...........   47
       Government Exhibit 12, conditionally...........   57
15     Government Exhibit 13, conditionally...........   57
       Government Exhibit 14..........................   50
16     Government Exhibit 22, conditionally...........   57
       Government Exhibit 25..........................   53
17     Government Exhibit 26..........................   53
       Government Exhibit 27..........................   53
18     Government Exhibit 28..........................   53
       Government Exhibit 29..........................   53
19     Government Exhibit 30..........................   53
       Government Exhibit 31..........................   53
20     Government Exhibit 32..........................   53
       Government Exhibit 50, conditionally...........   57
21

22

23

24

25
```

1
2
3
4
5
6
7
8
9
10                    **CERTIFICATE OF REPORTER**

11         I, Catalina Kerr, certify that the foregoing is a

12   correct transcript from the record of proceedings in the

13   above-entitled matter.

14
15
16
17
18   _____    _____
     Catalina Kerr                  Date
19
20
21
22
23
24
25