```
 1                    UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF COLUMBIA
     -------------------------X
 3   UNITED STATES OF AMERICA,

 4           Plaintiff,

 5           v.                        CR 06-0248-05 (JDB)

 6
     ALVARO AUGUSTIN MEJIA,            Washington, D.C.
 7                                     Wednesday, February 27, 2008
               Defendant.             1:40 p.m.
 8

 9                                     AFTERNOON SESSION
     -------------------------X
10
                            DAY 3
11                   TRANSCRIPT OF JURY TRIAL
              BEFORE THE HONORABLE JOHN D. BATES
12                 UNITED STATES DISTRICT JUDGE
     APPEARANCES:
13   For the Government:    BRIAN TOMNEY, ESQ.
                            KIA M. HABISREITINGER, ESQ.
14                          PAUL W. LAYMON, ESQ.
                            U.S. Department of Justice
15                          1400 New York Avenue, N.W.
                            Washington, D.C.  20530
16                          202.307.1383

17   For the Defendant:     CARMEN D. HERNANDEZ, ESQ.
                            P.O. Box 70
18                          7166 Mink Hollow Road
                            Highland, MD  20777
19                          240.472.3391

20   Court Reporter:        CATALINA KERR, RPR
                            Official Court Reporter
21                          U.S. Courthouse, Room 6716
                            333 Constitution Avenue, NW
22                          Washington, D.C.  20001
                            202.354.3258
23
     Proceedings recorded by mechanical stenography, transcript
24   produced by computer.

25
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2            THE DEPUTY CLERK:  Counsel, we ready?

 3            MR. LAYMON:  We are almost ready, Judge.

 4            THE DEPUTY CLERK:  Oh, that's your job.

 5            THE COURT:  That's all right.  I was giving them a

 6   moment.  We all ready, Ms. Hernandez?

 7            MS. HERNANDEZ:  Yes, sir.

 8            THE COURT:  All right.  Everybody's here,

 9   everybody's ready, let's bring the jury in.

10            (JURY PRESENT.)

11            THE COURT:  Welcome back, ladies and gentlemen.

12   Mr. Cortez, I remind you, you're still under oath.

13            Mr. Laymon, please.

14            MR. LAYMON:  Thank you, Judge.

15                        AUGUSTINE CORTEZ,

16   having been duly sworn previously, testified as follows:

17                    DIRECT EXAMINATION (CONT'D.)

18   BY MR. LAYMON:

19    Q   Mr. Cortez, when we finished off, we had just completed,

20   I think, discussing the bottom of page 32 with the comment,

21   "the minimum is one thousand," and that takes us, I believe,

22   to the top of page 33, still in Tab A, right.

23            MR. LAYMON:  Mr. Rhodes, are you -- I'm sorry.

24            THE COURT:  Mr. Bradley, have you got everything on?

25            THE DEPUTY CLERK:  I have it on.  I thought I had
```

```
 1    everything on.

 2              (PAUSE.)

 3              THE COURT:  You need to get to a different document.

 4    Are you in the right one so we sure now so we can turn it on?

 5              MR. LAYMON:  We are right where we need to be.

 6    Q    (BY MR. LAYMON)  Page 33, Mr. Cortez.

 7              THE DEPUTY CLERK:  One second.  Now you're on.

 8              THE COURT:  We're at the bottom of page 32.

 9              MR. LAYMON:  Right, top of page 33, bottom of 32.

10    Mr. Rhodes, please.

11              (VIDEO PLAYED.)

12    Q    (BY MR. LAYMON)  On page 33, Mr. Cortez, the first -- the

13    first notation of Confidential Source 1 at the top of page 33.

14    "Are you guys going to invest something with us, too?"

15         Do you see that phrase?

16    A    I do.

17    Q    "Are you guys going to invest something with us, too?"

18    What did you mean by that?

19    A    Well, they going to be --

20              MS. HERNANDEZ:  Your Honor, again objection to

21    rephrasing it.  The words speak for themselves.

22              THE COURT:  Overruled.

23    Q    (BY MR. LAYMON)  All right, please.

24    A    The question was that -- whether they were going to be

25    able to or if they were interested on also shipping cocaine on
```

1    the same load.

2    Q    What do you mean by that?

3    A    Invest is that they were -- if I have a thousand kilos, I

4    offer them to -- the opportunity to make -- or participate in

5    the transportation to make more money by buying part of the

6    load up front and take it along with mine, cocaine, to the

7    states.

8    Q    Okay.  Towards the middle of the page, again,

9    Confidential Source 1 you say, "If it's one thousand, you're

10   talking about each of us putting five hundred," and then so on

11   and based on what you say there.

12       All right.  But the first part of that, "If it's one

13   thousand, you're talking about each of us putting five

14   hundred."  What did you mean by that?

15   A    Each of us putting 500 kilos of cocaine.

16   Q    Okay.  Now, Bardales' response to that at the bottom of

17   page 33, "But look, the one that benefits there is me.  I'm

18   totally the one that benefits.  You send me the one thousand,

19   and I'll pay you when it arrives five hundred."  You see that?

20   A    I do.

21   Q    Do you understand what he meant by that?

22   A    Yes, I do.

23   Q    And what did that mean?

24   A    Well, he was trying to short-change me really in this.

25   Q    I'm sorry, you said he was trying to what?

1    A    He was trying to short-change me by saying these

2    sentences here previously, because he says if I buy 500,

3    that's fine, but then he offer to pay the 500 once the 500

4    arrive in the States, which is not the purpose of any

5    transporter.  Anything you're going to ship, you have to pay

6    up front so you can really owe it.  You don't owe nothing, you

7    don't risk anything.

8    Q    How would you get short --

9            MS. HERNANDEZ:  Your Honor, can I have a continuing

10   object to --

11           THE COURT:  Your continuing objection is noted,

12   although, if there are particular points that you think -- I

13   mean, my problem with continuing objection is there may be

14   points at which I agree with your objection, depending upon

15   what the question is and what he's been asked to do.  But I

16   will consider the continuing objection and I will try to catch

17   those points myself.

18           MS. HERNANDEZ:  Thank you.

19   Q    (BY MR. LAYMON)  You explained or you noted that you would

20   be short-changed in such an agreement.  How would you be

21   short-changed?

22   A    Because I be the one he -- the way he propose that one

23   particular moment, he wanted me to come up with a thousand

24   kilos and at the end of the road or at the end of the deal,

25   then he would pay me for the 500 kilos, which in reality is

1  not paying anything if it was to work like that, because he

2  has -- I would owe him in any event, and he would just deduct

3  it from the money I supposedly owe him, and that would put me

4  on the spot because he's really not disbursing any money up

5  front to purchase those kilos.

6  Q   And at the bottom of page 33, your response.  "No,

7  obviously before sending it, I'm going to want to... if, if

8  you want five hundred, you pay me five hundred."

9      And again, what did you mean by that?

10  A   As exactly what I meant in the previous statement here,

11  that he needed to pay me right up front for the 500 kilos that

12  he wanted to purchase.

13  Q   Okay.  Let's continue at the top of page 34.

14          (VIDEO PLAYED.)

15  Q   (BY MR. LAYMON)  Okay.  Still on page 34 going back to the

16  top of the page, and Mr. Bardales, at the top of page 34 says,

17  "That's another type of negotiation.  It's not mine."

18      Below that he says, "My role is to do the general

19  structure of the companies.  I only get it out and structure

20  it.  I'll get the warehouses, the companies... I'll get the

21  safe conducts."  Do you see that passage?

22  A   Yes, I do.

23  Q   Let me ask you specifically about.

24  A   Well, he walk away --

25  Q   Well, first, you understand -- did you understand what he

1    was saying?

2    A    Yes, I do.

3    Q    Okay.    Then let me break it down because we're talking

4    about several different things there.    First, his statement,

5    "My role is to do the general structure of the companies that

6    want to send to Guatemala."    You see that sentence?

7    A    Yes, I do.

8    Q    Did you understand what that meant, "yes" or "no"?

9    A    Yes, I do.

10    Q    And what did that mean?

11        MS. HERNANDEZ:    Objection to the form of the

12    question.

13    Q    (BY MR. LAYMON)    What did you understand that to mean?

14        THE COURT:    I think the objection to the first form

15    is sustained and you may now answer the second question.

16    A    Will you repeat the second question.

17    Q    (BY MR. LAYMON)    Yes.    What did you understand his

18    statement, "My role is to do the general structure of the

19    companies."    What did you understand that to mean?

20    A    That his role -- he changed the subject.    Once I asked

21    him for money for the 500 kilos, now he went back that he

22    doesn't buy dope to invest but he would -- his role was to be,

23    to organize and to give me safe passage through Guatemala with

24    those kilos of cocaine.

25    Q    And what does the word "companies" mean?    What's the

```
 1    significance of that?

 2              MS. HERNANDEZ:  Objection.

 3              MR. LAYMON:  Well, all right, let me rephrase that.

 4              THE COURT:  Sustained.

 5    Q    (BY MR. LAYMON)  Do you know what the significance of the

 6    word "companies" is?

 7              MS. HERNANDEZ:  Again, objection.

 8              THE COURT:  You may answer that question.

 9              THE WITNESS:  Can I answer.

10              THE COURT:  You may answer that question.  Do you

11    know?

12    A    Yes, I do.

13    Q    (BY MR. LAYMON)  And what -- what did that mean to you?

14    What did you understand that to mean?

15    A    Companies meaning the Colombians that want to see cocaine

16    through Guatemala.

17    Q    Now, he says later in that same passage, "I'll get the

18    warehouses, I'll get the safe conducts for you."  Do you see

19    that statement?

20    A    Yes, I do.

21    Q    And also, did you have an understanding as to what that

22    meant?

23    A    Yes, I do.

24    Q    And what did you understand that to mean?

25    A    That he would organize what the stash houses will be on
```

1  the transhipment course of the cocaine and he will guarantee

2  the safe passage of those kilos onto the border.

3  Q   What border?

4  A   Mexican border.

5  Q   Okay.  And then again, he goes on to say, "I'll get

6  everything for you.  I'll do an entire company for you so that

7  you only import."  Do you see that?

8  A   Yes, I do.

9  Q   And then later in that same passage, "and deliver to you

10  at a warehouse, that's my role."  You see that?

11  A   Yes, I do.

12  Q   And did you understand what he was saying there?

13  A   Yes.

14  Q   And what did you understand that to mean?

15  A   That he -- it says to me that he definitely would obtain

16  all the -- all the stuff necessary to do the operation and he

17  will organize the companies and the importation to his

18  country, and I have just to put my company down, meaning

19  Panama, and then to ship it to him into his warehouse.

20  Q   All right.  So let's pick up with the bottom of page 34

21  then, after "That's my role."

22          (VIDEO PLAYED.)

23  Q   (BY MR. LAYMON)  Before we leave page 35, Mr. Cortez, let

24  me refer you to the top of -- the very top of page 35, the last

25  part of that first paragraph.  Mr. Bardales says, "It's most of

1   all a business of trust."  Do you see that?

2    A    Yes, I do.

3    Q    And I want to focus your attention on the phrase, "a

4   business of trust."

5         Did you understand what it was he meant there?

6    A    Yes, I do.

7    Q    And what was your understanding of what was meant to be

8   conveyed there?

9    A    That it was a gentleman's agreement that we need --

10  whatever we agree upon, we would comply with, trust each

11  other.

12              MR. LAYMON:  Mr. Rhodes, please, picking up on page

13  36.

14              (VIDEO PLAYED.)

15   Q    (BY MR. LAYMON)  We are onto page 37, Mr. Cortez, but let

16  me back up just a minute to page 36.  Top of page 36, very

17  briefly, second and third line down.  A reference to a God, and

18  he says, "He has given us many blessings because we've never

19  come down."  Do you see that?

20   A    Yes, I do.

21   Q    Did you understand what he meant by that?

22   A    Yes, I do.

23   Q    And what was your understanding of what he meant?

24   A    That God have protected them and they've been able to be

25  successful in all the transactions of cocaine they have done.

1    Nothing has gone down, meaning nothing has been confiscated by

2    the authorities.

3    Q    And further down that same page --

4            MS. HERNANDEZ:  Objection, Your Honor.

5            THE COURT:  You're objecting to the answer or to the

6    next question?

7            MS. HERNANDEZ:  I'm objecting to the answer.  It's

8    one thing to interpret a word and --

9            THE COURT:  I think he's giving his understanding of

10   what he took it to mean, and the objection is overruled.

11   Q    (BY MR. LAYMON)  And then lastly on that page 36, in the

12   first typed in entry for Mr. Bardales where he begins by saying,

13   "because look, truthfully," and in that same paragraph,

14   Mr. Cortez, I want to call your attention to the, quote, I am

15   never going to do a business deal if I know I'm going to lose,

16   end quote.

17       And did you understand what he meant by that?

18           MS. HERNANDEZ:  Objection.

19   A    Yes, I do.

20           THE COURT:  I think in the interest of moving along,

21   that's -- those are pretty self-evident words.

22           MR. LAYMON:  That's fine.  Thank you, Judge.

23           THE COURT:  Let's make sure we pick and choose a

24   little bit what we ask him to interpret.

25           MR. LAYMON:  Mr. Rhodes, play, please.

1          (VIDEO PLAYED.)

2    Q    (BY MR. LAYMON)  Last question about this video,

3    Mr. Cortez.  Bottom of page 39, more than two-thirds of the way

4    down the page, Confidential Source 1, you posed the question.

5    "What's the name of the guy you work with?"  Do you see that?

6    A    Yes, I do.

7    Q    Who did you direct that question to?

8    A    To Chiu-Serrano.

9    Q    Okay.  And so at the bottom of page 39, "Yeah, Eric.

10   Eric Constanza."  Who's responding to that?

11   A    Chiu-Serrano.

12          MS. HERNANDEZ:  Objection.  That's another one, Your

13   Honor, where there's an unidentified male voice.

14          THE COURT:  I understand that.  And the objection is

15   overruled.  The witness is giving the testimony the witness is

16   giving.

17   Q    (BY MR. LAYMON)  Now, at the conclusion of this meeting,

18   Mr. Cortez -- sir, at the conclusion of this video, obviously we

19   can tell it's still -- still afternoon, still daylight; is that

20   right?

21   A    Right.

22   Q    And what did you do after this video was completed, after

23   the meeting was completed, what happened?

24   A    I left that occasion and I met at a nearby street with

25   Special Agent Fraga.

```
 1    Q    Okay.  Now, were there other police officers involved in

 2    the surveillance of this meeting?

 3    A    Yes, sir.

 4    Q    Okay.  Now, the man purse that contained the video

 5    recorder, what did you do with that?

 6    A    I turn that to Mr. Fraga.

 7    Q    Okay.  Now, sometime shortly after that meeting, did you

 8    receive a phone call?

 9    A    Yes, I did.

10    Q    And where were you when you received this phone call?

11    A    In Panama still.

12    Q    Okay.  Was anyone with you?

13    A    Yes, sir.

14    Q    And who was that?

15    A    Agent Fraga and other people around me.

16    Q    Okay.  Let's talk about this phone call.  First off, what

17    phone did you get this phone call on?

18    A    On a --

19    Q    Not what was the number, but what -- where was the phone

20    at?

21    A    It's a prepaid phone that I purchased or SIM card that I

22    purchased in Panama.

23    Q    Was that your cell phone?

24    A    Yes, it was.

25    Q    Okay.  And the call that you received, did the caller
```

1    identify himself?

2    A    Yes, he did.

3    Q    And how did the caller identify himself?

4    A    He says that his name was Eric Constanza.

5    Q    Now, had you heard that name before?

6    A    Previously, a couple hours earlier, an hour earlier from

7    Chiu-Serrano.

8    Q    Who did you understand Constanza Bran to be?

9    A    The man in charge of the group of policemans that wanted

10   to work with me.

11   Q    Now, did you, in fact, have a conversation with the

12   person who called and identified himself as Constanza Bran?

13   A    Yes, I did.

14   Q    Okay.  Were you able to record that conversation?

15   A    Yes, sir.

16   Q    And tell me how you recorded that conversation.

17   A    I had a recording device on standby because I always do,

18   and when the man call and I learn who he was, I immediately

19   turned that equipment on and I proceeded to tape the

20   conversation, record the conversation.

21   Q    And tell me in terms of the recording device, how does it

22   work?  What do you have to do to make it work?

23   A    It's a digital recorder that we use a wire with a mic or

24   a speaker box that you put in your ear and you're able to

25   record your voice and as well as the people who is calling.

```
 1   Q   Okay.  And when you completed this telephone call --
 2   Well, let me back up.
 3       Was Special Agent Fraga there for the whole call?
 4   A   Yes.
 5   Q   And once you completed the phone call, what did you do
 6   with the call itself, the recording of the call?
 7   A   Before I shut the equipment off, I dictated the time of
 8   the date and the date of the phone call and the person who
 9   call in.
10   Q   Okay.  And then what did you do with it?
11   A   I pass it on to Mr. Fraga.
12   Q   Now, at some point, did you see a transcript of that
13   telephone call?
14   A   Yes, I did.
15   Q   And did you have an opportunity to review that
16   transcript?
17   A   Yes, sir.
18   Q   And was that transcript an accurate transcription of that
19   particular phone call that day on June 20, 2006?
20   A   To the best of my knowledge, it was very accurate.
21   Q   Okay.  Let me ask you and you alone, Mr. Cortez, to turn
22   to Tab N of your notebook, Tab N as in Nike.
23   A   Okay, sir.
24   Q   Okay.  And if you could take just a moment to look
25   through Tab N.  It's relatively short.
```

```
 1              MS. HERNANDEZ:  While this is going on, may we
 2    approach the bench for a few minutes, Judge?
 3              THE COURT:  Now, that they are done with what
 4    they're doing, you can.  It would be hard to have everybody
 5    approach while they were visiting.
 6              (AT THE BENCH; ON THE RECORD.)
 7              THE COURT:  Yes, ma'am.
 8              MS. HERNANDEZ:  I just realized that Agent Fraga is
 9    in the courtroom but not at counsel table.  It was my
10    understanding that the purpose behind the exclusion of the
11    rule of sequestration for a Government agent is that that
12    person can sit with Government counsel and assist with the
13    trial, not so that he can sit in the back of the room and hear
14    the testimony.
15        Whatever -- my understanding of the purpose of the
16    exception is not being fulfilled in this case, and if that's
17    the case, then I ask that he not be allowed in the courtroom
18    because all he's doing then is listening to the testimony.
19              THE COURT:  Mr. Laymon?
20              MR. LAYMON:  Judge, the -- of course, the Rule
21    allows for the Court to permit a case agent to remain in the
22    courtroom during a trial.
23              THE COURT:  But she's right as to what the purpose
24    of that is.
25              MR. LAYMON:  Certainly the purpose is to --
```

1          THE COURT:  Is generally to assist counsel, and I

2    think we all have to say that at the moment Special Agent

3    Fraga is not assisting counsel.

4          MR. LAYMON:  Well, I would note, Judge, that in the

5    first few trials Mr. Fraga commonly sat in the back, in part

6    because we're just congested up here, and you know, to put

7    five people at that table is a bit crowded.

8          THE COURT:  So three wrongs make a right?

9          MR. LAYMON:  I don't know about that, Judge.

10   However, he is certainly capable of assisting us from where he

11   is.  I mean, we can easily talk with him from there.  He can

12   talk with us and approach us.  I mean, certainly the Rule

13   doesn't say that counsel -- that an agent has to sit at the

14   table.  I mean, I don't -- I understand the objection, but I

15   don't think that's well taken.

16         THE COURT:  Well, I think there is some validity to

17   the objection.  I will say that so long as I have a

18   representation from the Government that Agent Fraga is

19   continuing to assist the Government as case agent -- and I do

20   have that representation, do I?

21         MR. LAYMON:  Yes, sir.

22         THE COURT:  Then I think that the purpose of the

23   Rule is being fulfilled even if not perfectly.  And I think

24   that his simply sitting in the back of the courtroom lessens

25   his utility as case agent but doesn't eliminate it.

1       I would add to that in terms of my ruling that any harm

2   from him sitting in the courtroom is likely to be minimal

3   since he sat through two prior trials and probably read the

4   transcript of those trials, so while I understand and

5   appreciate the objection, I will overrule it at this time.

6           MS. HERNANDEZ:  I -- you know, the Court is correct.

7   He sat through two trials, but I assume some of the testimony

8   has changed, some of the questioning has changed.  I just --

9   I've never in my entire life seen a case agent just sit in the

10  back of a room, you know, taking in the evidence.

11          THE COURT:  I guess I have to say that I have seen

12  it.

13          MS. HERNANDEZ:  Well, in this case.

14          THE COURT:  Primarily.  All right.  If I have the

15  representation that he's continuing to be of assistance as a

16  case agent, I will allow him to be at various places in the

17  courtroom.

18          MR. LAYMON:  Thank you, Judge.

19          THE COURT:  All right.  Continue.

20          (OPEN COURT.)

21  Q   (BY MR. LAYMON)  Mr. Cortez, have you had a chance to look

22  through Tab N of Government's Exhibit 33A?

23  A   Yes, sir.

24  Q   And is that, in fact, a transcript of this telephone call

25  that you were describing from the man who identified himself

1    as Constanza Bran?

2    A    Yes, sir.

3    Q    And does that accurately depict the telephone call?  Is

4    that an accurate rendition of a telephone call?

5    A    Yes, it is.

6           MR. LAYMON:  Your Honor, at this time I would offer

7    into evidence -- Let me state, first, Judge, that previously

8    and in an earlier witness' testimony, the actual call itself,

9    the recording, which was marked as Government Exhibit 3, was

10   previously admitted, and I would offer what's been marked as

11   Government Exhibit 3A, which is the transcript of that call

12   and which is actually Tab N, but I would offer that at this

13   point as 3A.

14          THE COURT:  3A is offered.

15          MS. HERNANDEZ:  Subject to the conspiracy hearsay

16   objection.

17          THE COURT:  All right.  Subject to that objection,

18   which is overruled, and therefore, Exhibit 3A will be

19   admitted.

20          (GOVERNMENT EXHIBIT 3A ADMITTED.)

21   Q    (BY MR. LAYMON)  Just to make it clear, Mr. Cortez, this

22   obviously -- there's no video to this telephone call as we had

23   with the previous meeting.  This is a call that you recorded the

24   audio portion of; is that correct?

25   A    That's correct.

1    Q    All right.  Now, before we actually get to the playing of

2    the call, let me ask you, up to this point, which is June 20

3    of 2006, had you ever met the person that would be identified

4    to you as Constanza Bran?

5    A    No, sir.

6    Q    Okay.  Let me jump ahead just a little bit.  Would you

7    later meet Mr. Constanza Bran?

8    A    Yes, I did.

9            MR. LAYMON:  All right.  And, Judge, I think perhaps

10    we can ask the jury to turn to Tab N at this point.

11            THE COURT:  The jury may turn to Tab N now.  So

12    we'll make sure they are on the right page at the top

13    right-hand side it says, "Call No. N-14."

14            (AUDIO PLAYED.)

15    Q    (BY MR. LAYMON)  Before we get rolling too long into it,

16    Mr. Constanza says, "I'm Antonio Serrano's boss, Eric

17    Constanza."  Again, who is Antonio Serrano?

18    A    The same individual who met with me previously also

19    called Chiu-Serrano.

20    Q    Okay.

21            MR. LAYMON:  Go ahead, Mr. Rhodes, please.

22            (AUDIO PLAYED.)

23    Q    (BY MR. LAYMON)  Mr. Cortez, let me call your attention to

24    page 2 of that transcript.  Less than one-half way down on the

25    page you say, "I'm going to be in Europe for the next fifteen or

```
 1   twenty days."  Was that, in fact, the case?
 2   A   That was the case, sir, yes.
 3   Q   And did you go to Europe?
 4   A   I went to Europe, yes, sir.
 5   Q   All right.  And then lastly, in terms of this call, if I
 6   could ask you to turn to page 4, about halfway down the page
 7   under the heading for Eric Constanza, he says, "Okay.  It was
 8   good talking to you.  I'm at your service.  Antonio told me
 9   everything about the meeting."
10        Do you see that part of the conversation?
11   A   Yes.
12   Q   Okay.  First, let me ask you, did you understand who he
13   was referring to when he referred to Antonio?
14   A   Yes, sir.
15   Q   And who was that?
16   A   Antonio Chiu-Serrano.
17   Q   Okay.  And lastly, when he said "about the meeting," did
18   you understand what that was in reference to?
19   A   I'm sorry?
20   Q   Did you understand what that was in reference to when he
21   said "about the meeting"?
22   A   Understand -- yes, about the meeting, about the meeting
23   that I previously had with Antonio Chiu-Serrano and Bardales.
24   Q   Okay.  Now, you indicated that you did go to Europe; is
25   that right?
```

1    A    Yes, sir.

2    Q    And for approximately how long were you there?

3    A    Two weeks.

4    Q    Okay.  Did you -- did you make another call to Constanza

5    Bran or did you participate in another phone call with Eric

6    Constanza while you were in Europe?

7    A    Yes, sir.

8    Q    All right.  And again, did you record that telephone

9    call?

10   A    Yes, sir.

11   Q    Tell me how you did that.

12   A    Using the same equipment that I previously used and the

13   same ear piece, I called Mr. Constanza and I was able to

14   record and document that phone call.

15   Q    Okay.  I take it that Special Agent Fraga was not

16   standing there with you when you talked to Bran?

17   A    No, he didn't make it to Europe.

18   Q    Okay.  And at some point, did you -- were you able to get

19   the recording of that phone call to Special Agent Fraga?

20   A    Yes, sir, I did.

21   Q    How did you do that?  Explain that to me.

22   A    Either I -- at this point, to the best of my

23   recollection, either I give him the copy of the recorder or I

24   forward it to him via e-mail.  I don't recall exactly how I

25   did it.

```
 1    Q    Okay.  But bottom line is, did you eventually do that?

 2    A    I did.

 3    Q    All right.  Have you had a chance to go back and listen

 4    to the recording of this telephone call?

 5    A    Yes, sir, I have.

 6    Q    And is it an accurate rendering of the call as it

 7    occurred?

 8    A    To the best of my knowledge, sir, yes.

 9    Q    Have you also had an occasion to view or to look at the

10    transcript of the telephone call?

11    A    Yes, sir.  Yes, I did.

12    Q    And was that an accurate rendition of the call?

13    A    Yes, sir.

14    Q    All right.  Let me ask you and you alone to turn to Tab O

15    of the notebook and ask you to take just a minute or two to

16    look at the transcript again, which is relatively short.

17    A    I reviewed this transcript previously and I --

18    Q    Okay.

19    A    To the best of my knowledge, it's accurate.

20    Q    And have you had an opportunity to compare the transcript

21    with the call?

22    A    Yes, sir.

23    Q    And is it accurate?

24    A    Yes, sir.

25    Q    I take it that you and Constanza were the only two
```

1   participants in this phone call?

2    A   Yes, sir.

3    Q   All right.

4           MR. LAYMON:  Your Honor, I have previously marked

5   Tab O of Exhibit 33A as Government Exhibit 4A.  I would note

6   for the record that the recording, which was marked as Exhibit

7   4, was previously admitted yesterday, and at this time I would

8   move to admit what's been marked as Government Exhibit 4A.

9           MS. HERNANDEZ:  Judge, the same continuing

10  objection, Your Honor.

11          THE COURT:  The same objections are noted.  They are

12  overruled, and Government Exhibit 4A is admitted.

13          (GOVERNMENT EXHIBIT 4A ADMITTED.)

14          MR. LAYMON:  If we could ask the jury to turn to Tab

15  O, Your Honor.

16          THE COURT:  The jury may turn to Tab O.  In the

17  upper right, it says, "Call No. N-15, Track 3."

18   Q   (BY MR. LAYMON)  Now, before we actually start playing

19  this call, Mr. Cortez, let me ask you:  What was your purpose in

20  calling Mr. Constanza from Europe?

21   A   To keep in touch with him and to plan a future meeting

22  with him.

23   Q   Okay.  Let's jump ahead just a little bit.  Was there, in

24  fact, a future meeting?

25   A   Absolutely.  It was more than one meeting.

```
1    Q    Okay.  And this future meeting that you just referred to,
2    where did that occur?
3    A    In El Salvador.  Republic of El Salvador.
4    Q    Okay.
5              MR. LAYMON:  Mr. Rhodes, we're talking about N-15,
6    Track 3.
7              (AUDIO PLAYED.)
8    Q    (BY MR. LAYMON)  Mr. Cortez, let me call your attention to
9    page 2 of the transcript, about a third of the way down under
10   the heading "Confidential Source."  The paragraph that begins,
11   "Look, brother."  Do you see that, page 2, paragraph that
12   begins, "Look, brother.  I'm going to..."  Do you see that?
13   A    Yes, I do.
14   Q    Okay.  You say, "I'm going to... be delayed for a few
15   days," and then, "I think I'm going to drop by over there at
16   Uncle Sal's."  You see that statement?
17   A    I do.
18   Q    And what did you mean by "I'm going to drop by over there
19   at Uncle Sal's"?
20   A    San Salvador, El Salvador.
21   Q    Why not just say, "I'm going to drop by San Salvador"?
22   A    Because for security reasons, you want to say the least
23   and be -- kind of talk on code so in case authorities are
24   listening, they don't know what are you talking about.
25   Q    A little more than halfway down the page, again entry for
```

1   "Confidential Source,"  "Are the two friends you told me about

2   going to go or what?"  You see that statement?

3   A   Yes, I do.

4   Q   Okay.  Let me ask you to jump down to the very last lines

5   of page 2, response by Constanza.  "No, they two different

6   people, not the ones you spoke with."  Do you see that?

7   A   I do.

8   Q   Okay.  Now, first, let me ask you about your question,

9   "Are the two friends you told me about going to go or what?"

10  What was that in reference to?

11  A   Talking about the two friends that I spoke to before.

12  Q   And who would that be?

13  A   Chiu-Serrano and Jorge Bardales.

14  Q   Okay.  At the bottom of page 2 when Constanza responds to

15  you, "No, they are two different people, not the ones you

16  spoke with," did you understand -- or what did you understand

17  him to mean?

18  A   He, right there, is clarify and establish that there were

19  to be two new participants that were going to meet me in San

20  Salvador.

21  Q   And on page 3, about two-thirds of the way down the page,

22  an entry for Mr. Constanza, and it begins with, "OK, OK."  Do

23  you see that entry?

24  A   I do.

25  Q   And he says, "The two people going with me are from

```
 1    another level, or different than the one you know."

 2         Do you see that entry?

 3    A    Yes, I do.

 4    Q    When he says "the two people going with me," did you

 5    understand -- did you have an understanding as to where these

 6    people were going?

 7    A    Yes, I do.

 8    Q    And what was your understanding as to where these people

 9    were going?

10    A    They were going to San Salvador.

11    Q    To meet with whom?

12    A    With me.

13    Q    Now, let's jump ahead.  You told me that there was, in

14    fact, such a meeting in San Salvador?

15    A    Yes, there was.

16    Q    Is that correct?

17    A    That's correct.

18    Q    And did Mr. Bran show up with two other people?

19    A    Yes, he did.

20    Q    And who were those two people?

21    A    One of them here, present, now who I know as Mr. Mejia,

22    and the other gentleman who was now known to me as Mr. Del Cid

23    Morales.

24    Q    Okay.  Now, were either of the two people you just named,

25    Mr. Mejia or Mr. Del Cid Morales, were they at the June
```

1   meeting in Panama?

2   A   No, sir.

3   Q   So you concluded that phone call with Mr. Bran, and I

4   take it eventually you came back to the United States from

5   Europe; is that right?

6   A   That's correct.

7   Q   Okay.  Let's jump ahead.  As you indicate in that call,

8   it was in July.  Let's jump ahead a couple of days.  You would

9   make another phone call to Mr. Bran before the meeting on the

10  19th; is that right?

11  A   That's correct.

12  Q   All right.  Now, again, this other phone call that you

13  make, did you record that phone call?

14  A   Yes, I did.

15  Q   And how were you able to do that?

16  A   With the same device I used previously.

17  Q   And once that call was recorded, did you have an

18  opportunity or did you go back and listen to it?

19  A   Eventually I did.

20  Q   Okay.  And did you also look at the transcript that was

21  produced related to that phone call?

22  A   Yes, sir, I did.

23  Q   Was both the recording and the transcript an accurate

24  rendering of the actual phone call?

25  A   To the best of my knowledge, yes.

1    Q    Okay.  Let me refer you and let me ask you and only you

2    to turn to Tab P of your notebook.  If you could, take a

3    moment to look at that.

4    A    Yes, sir.

5    Q    And is that, in fact, the transcript of this phone call

6    that occurred on July the 14th?

7    A    Yes.

8    Q    All right.

9              MR. LAYMON:  Your Honor, at this point, and again I

10   would note for the record that the video recording of this

11   call was previously admitted yesterday as Government

12   Exhibit 4, and the transcript at Tab P, which I've marked as

13   Government Exhibit 4B, B as in bravo, I would offer at this

14   time as Government Exhibit 4B.

15             MS. HERNANDEZ:  Do you mean audio?

16             THE COURT:  He meant audio.  He said "video" but he

17   meant "audio."

18             MR. LAYMON:  I'm sorry, that's right.  Audio.

19             THE COURT:  And subject to the same objections,

20   which are overruled, Government Exhibit 4B is admitted.

21             (GOVERNMENT EXHIBIT 4B ADMITTED.)

22             MR. LAYMON:  And could we ask the jury to turn to

23   Tab P, Your Honor.

24             THE COURT:  The jury may turn to Tab P.

25   Q    (BY MR. LAYMON)  In Tab P, Mr. Cortez, before we actually

```
 1   start it, is again another phone call between you and

 2   Mr. Constanza; is that correct?

 3    A   That's correct.

 4    Q   And again, are you the only two participants in the phone

 5   call?

 6    A   That is correct.

 7    Q   All right.  What is the purpose of your calling

 8   Mr. Constanza on this day?

 9    A   To set up and confirm a particular date on which we were

10   to meet in San Salvador.

11    Q   All right.

12           MR. LAYMON:  Mr. Rhodes, I believe that's N-15,

13   Track 4.

14           (AUDIO PLAYED.)

15    Q   (BY MR. LAYMON)  Just to ask you for a moment, Mr. Cortez.

16   About the phone numbers in Guatemala.  It's got more numbers in

17   it than an American number would have.  Is that a typical phone

18   number -- I mean, is that a legitimate phone number in

19   Guatemala?

20    A   Yes, it is.

21    Q   All right.

22           MR. LAYMON:  Okay.  Mr. Rhodes, if you would,

23   please.

24           (AUDIO PLAYED.)

25    Q   (BY MR. LAYMON)  Now, up to this point, July the 14th,
```

1  2006, have you met Mr. Bran -- Constanza Bran yet?

2  A   Not at that point yet.

3  Q   Now, would you eventually meet him?

4  A   Yes, sir.

5  Q   And was that several days after this phone call?

6  A   That's correct.

7  Q   And where did that meeting occur?

8  A   At a restaurant in San Salvador.

9  Q   Okay.  Now, was this meeting during the day or the

10 nighttime?

11 A   During the day.

12 Q   All right.  And eventually who would attend this meeting

13 in San Salvador?

14 A   Mr. Constanza Bran, Bardales, Mr. Mejia, Mr. Del Cid

15 Morales and another individual, AKA, El Filipino, the

16 Philippine.

17 Q   Okay.  Now, tell me where -- and we're going to -- we'll

18 get to the video in a minute, but set the stage for me.

19    You say you're at a restaurant, but describe the setting

20 for me.

21 A   Pretty much the same setting as we did in Panama.  It's a

22 restaurant, and we went outside to the patio in a big plaza in

23 downtown San Salvador where we met with these individuals.

24 Q   Okay.  And from where you were at the table that you were

25 seated at, what could you see?

```
 1    A    Again, it's a big plaza where I could see all the

 2   buildings and stores surrounding the restaurant and as well as

 3   the entrance -- or one of the entrances from the parking lot

 4   into that plaza.

 5    Q    Okay.  Now, were you the only DEA informant present at

 6   this meeting?

 7    A    No, I was not.

 8    Q    And who else was there as an informant?

 9    A    Iberia.

10    Q    Okay.  Also known as the Spaniard?

11    A    The Spaniard, that's correct.

12    Q    Now, were you equipped with any kind of recording device?

13    A    Same video recorder and voice device that I used

14   previously in Panama.

15    Q    Okay.  And when you said the same, was it in the man's

16   purse?

17    A    It was in the man's purse, the same one.

18    Q    Okay.  Now, how did you get -- if you can recall, how did

19   you get from the United States to El Salvador?

20    A    I flew down in an airliner.

21    Q    Okay.  And where was Special Agent Fraga?

22    A    In San Salvador as well.  I met with him over there.

23    Q    Okay.  Did you meet with Special Agent Fraga before this

24   meeting?

25    A    Yes, sir.
```

1    Q   Did you meet with other law enforcement officers before

2    this meeting?

3    A   Yes, sir.

4    Q   Okay.  And again, similar to the question I asked you

5    before, did you carry any firearms to this meeting?

6    A   No, sir.

7    Q   Okay.  And do you know where the officers were located

8    during the meeting?

9    A   Huh?

10   Q   Do you know where the officers were located during the

11   meeting?

12   A   I couldn't get the first part.

13   Q   Do you know where the officers were located during the

14   meeting?

15   A   Pretty much so.  Some of them I could see from the place

16   where I was sitting at, a couple of them sitting across from

17   me on the second floor balcony, and the rest were just walking

18   around the area.

19   Q   Okay.  Now, who arrives first to the meeting?  Yourself

20   or the people that you're meeting with?

21   A   We arrive first, meaning the Spaniard and myself.

22   Q   Okay.  And then ultimately, after that, who arrives?

23   A   The Guatemalans that came from Guatemala.

24   Q   Okay.  Now, going back to your earlier meeting, why was

25   El Salvador chosen as the place for this meeting?

```
 1    A    A better environment for law enforcement to do their job.

 2    Q    Now, you've indicated you had your man purse with the

 3   camera in it.  Were you able to record, make an audio and

 4   video recording of this meeting?

 5    A    Yes, sir.

 6    Q    After the meeting was completed, what did you do with

 7   that audio and video recording?

 8    A    I turn it to Special Agent Fraga.

 9    Q    Okay.  There in El Salvador?

10    A    Right there in El Salvador.

11    Q    All right.  Later on, did you have -- did you go back and

12   look at this video?

13    A    Yes, sir.

14    Q    Okay.  In addition to that, were you given a transcript

15   of the video?

16    A    Yes, sir.  I reviewed the transcript.

17    Q    Okay.  And did you compare the transcript to the video?

18    A    Yes, I did.

19    Q    Were both the video and the transcript an accurate

20   rendering of the meeting as it occurred on that day?

21    A    Very accurate.

22    Q    All right.  Now, before we actually get to the video

23   itself, Mr. Cortez, describe for us generally what happened at

24   this meeting with Mr. Bardales, Mr. Constanza and Mr. Mejia

25   and Mr. Del Cid Morales?
```

1    A    They arrived at the location and they were introduced one

2    by one -- or they introduce themselves one by one to me, and

3    we proceeded to sit down, socialize some, order some food and

4    drinks and went to talk about the business that we were there

5    to discuss.

6    Q    Okay.  And what did you tell them about the business that

7    you were there to discuss?

8    A    That I was interested in transporting multiple kilos of

9    cocaine through their country.

10              MS. HERNANDEZ:  Objection, Your Honor, this is

11   hearsay.

12              THE COURT:  What did he tell them?

13              MS. HERNANDEZ:  A statement outside this courtroom.

14              THE COURT:  What he told them is not hearsay.

15   Objection is overruled.  If that's what the objection is

16   directed to.  There is no question pending.  That was the

17   answer.  That answer can stand.  Next question.

18   Q    (BY MR. LAYMON)  Now, in your conversation with these

19   folks, did you use the word "cocaine" or did you use some other

20   word to refer to cocaine?

21   A    I don't think I used the word "cocaine," but I used -- I

22   can't determine if that word I use, or I use a code word.

23   Q    Okay.  And what -- tell me what -- what you and these

24   other people at the meeting discussed about -- about this

25   cocaine?

 1          MS. HERNANDEZ:  Your Honor, these are out-of-court

 2    statements being introduced for the truth of the matter

 3    asserted.

 4          THE COURT:  He can testify to what the general

 5    subject matter was and what he said.  We're going to hear in a

 6    moment.

 7          MS. HERNANDEZ:  Well, then the best evidence rule.

 8          THE COURT:  That's what I'll say.  We'll only let

 9    him testify to what the general subject matter of the

10    discussion was and what he said, and then we'll listen to the

11    audiotape.  So, to that extent, the objection is sustained.

12       Mr. Laymon.

13    Q    (BY MR. LAYMON)  What was the general subject of the

14    conversation that day, Mr. Cortez?

15    A    The planning of the safe passage of those kilos of

16    cocaine to Guatemala.

17          MR. LAYMON:  Judge, we --

18    Q    (BY MR. LAYMON)  Let me ask you, Mr. Cortez, to -- and

19    only you, not the Ladies and Gentlemen of the Jury, to turn to

20    Tab C, C as in Charlie, of your notebook.

21          MS. HERNANDEZ:  Your Honor, I understand the ruling,

22    but I just want to object to the previous response on the same

23    grounds.

24          THE COURT:  The objection is noted.

25    Q    (BY MR. LAYMON)  Excuse me.  I'm sorry, Mr. Cortez, I

```
1    misspoke.  Tab B, B as in bravo.  If you would turn first to Tab
2    B.  If you could take just a moment to look at Tab B.  Again,
3    it's just a few pages, and just take a moment to look at it.
4    A    Yes, sir.
5    Q    Okay.  And have you had an opportunity to look at Tab B?
6    A    Yes, sir, I have.
7    Q    And does that accurately depict the beginning of this
8    meeting in El Salvador in July of 2006?
9    A    Yes.
10   Q    And is that an accurate transcription?
11   A    Yes.
12           MR. LAYMON:  Judge, the -- I would offer at this
13   time -- and I would note that what's been previously marked as
14   Government Exhibit 6 was admitted into evidence yesterday.
15   That's the actual recording.
16       And I would offer what's been marked as Government
17   Exhibit 6A, 6, Alpha, which is Tab B of the notebook into
18   evidence at this time as 6A.
19           THE COURT:  Ms. Hernandez?
20           MS. HERNANDEZ:  The same continuing objection.
21           THE COURT:  Subject to those objections, which are
22   overruled, and therefore, Government Exhibit 6A is admitted.
23           (GOVERNMENT EXHIBIT 6A ADMITTED.)
24           MR. LAYMON:  Judge, if we could have the jury turn
25   to Tab B.
```

```
 1              THE COURT:  The jury may turn to Tab B as in Boy.

 2              MR. LAYMON:  Mr. Rhodes, if you would, please.

 3              (VIDEO PLAYED.)

 4    Q    (BY MR. LAYMON)  Okay.  Set the scene for us here.  What's

 5    happening?

 6    A    Sitting at the table at the restaurant and serving the

 7    individuals approaching the front of the restaurant, which --

 8    Should I continue?

 9    Q    Yes.  Can you -- the gentleman on the right, just --

10    A    The gentleman on the right, here present, Mr. Mejia.

11    Q    First, let me ask you:  The gentleman that's in the

12    foreground right, for whom we see the back of his shirt, is

13    that the waiter?

14    A    That's the waiter, yes, sir.

15    Q    Okay.  Now, let's go to the background.  We can see three

16    faces.  Do you see that?

17    A    Yes, I do.

18    Q    Three faces that are above the railing?

19    A    Yes.

20    Q    Is that picture clear enough for you to identify those

21    people?

22    A    Yes, sir.

23    Q    Okay.  Can you identify those people for me?

24    A    Right.  From my right, Mr. Mejia, Mr. Del Cid Morales and

25    Filipino.
```

```
 1   Q    Okay.  Now, let's be clear.  Which one of those people is
 2   Mr. Mejia?
 3   A    The one to -- on the screen to my right.  Of the three of
 4   them, the one to the right.
 5   Q    Okay.  Is he the last one walking in?
 6   A    Yes.
 7   Q    All right.
 8             MR. LAYMON:  Go ahead.
 9             (VIDEO PLAYED.)
10   Q    (BY MR. LAYMON)  Okay.  There is a person displayed
11   prominently in the center of the screen with his hand on the
12   chair.  You see that?
13   A    I do.
14   Q    Who is that person?
15   A    Eric Constanza Bran.
16             THE COURT:  Perfect cinematography is going to be
17   difficult, Mr. Laymon.
18             MR. LAYMON:  That's right, Judge.  That's why I
19   didn't win that Oscar.
20   Q    (BY MR. LAYMON)  Okay.  It's not perfect, but can you
21   identify the people in that -- in that part of the video?
22   A    Yes.  Standing from my left, as the way I see the screen
23   here, is Mr. Mejia.  The foreground in front is Mr. Bardales.
24   Behind him is Mr. Del Cid Morales, and to the right, the guy
25   with the reddish shirt, is the Constanza Bran.
```

1   Q    Okay.

2              (VIDEO PLAYED.)

3   Q    (BY MR. LAYMON)  All right.  Who's depicted on the scene

4   right here?

5   A    Mr. Mejia to the right; Mr. Bardales to the left.

6   Q    Okay.  Now, is there anyone present in this courtroom

7   today that is shown on that video?

8   A    Yes, it is.  It's standing -- next to the counsel there,

9   Mr. Mejia.

10  Q    Can you point to him and identify him for me, please?

11  A    The gentleman with the ear pieces sitting in front of the

12  computer -- or the screen.

13             MR. LAYMON:  Your Honor, if the record could reflect

14  he identified the Defendant, Mr. Mejia, as the person on the

15  videotape.

16             THE COURT:  The record will so reflect.

17  Q    (BY MR. LAYMON)  Now, your camera is still in that -- that

18  bag?

19  A    Yes, sir.

20  Q    And where is it located?

21  A    On top of the table.

22  Q    And where are you seated in relationship to both

23  Mr. Bardales and Mr. Mejia?

24  A    Across from them.

25  Q    All right.  And about how far away from you from say

1    Mr. Mejia?

2    A    Perhaps two feet.  Whatever the table wide was, that's

3    the width.  That was it.

4    Q    All right.

5              MR. LAYMON:  Mr. Rhodes, please.

6              (VIDEO PLAYED.)

7    Q    (BY MR. LAYMON)  All right.  So we stopped the video.

8    Tell us who's depicted in the video at this point.

9    A    Filipino to the right.  In the center of the screen in

10   the picture is Mr. Mejia.  Mr. Bardales to the left.

11   Q    Okay.  Now, where would -- though they're not depicted on

12   the screen apparently, where would Mr. Del Cid Morales and

13   Mr. Bran be located?

14   A    As you go around, Mr. Del Cid Morales was sitting next to

15   Filipino.  After Del Cid Morales was Eric Constanza, and next

16   to Eric Constanza, it was me sitting.

17   Q    All right.  Okay.  Let me ask you, now, this meeting

18   would certainly continue beyond this point; is that correct?

19   A    That's correct.

20   Q    Okay.  Now, let me ask you, if I might, Mr. Cortez, to

21   turn to -- and only you and not the jury -- to turn to Tab C

22   of your notebook.

23             MS. HERNANDEZ:  Your Honor, subject to the same

24   objections, I'm not going to object to them introducing it.

25             THE COURT:  All right.  So I think that

1    Ms. Hernandez, reserving the same objections and I will rule

2    appropriately on them, is saying go ahead and move it into

3    evidence.

4            MR. LAYMON:  Judge, there is one thing we need to

5    discuss about this particular transcript and we would --

6            THE COURT:  Before we start or is it a little

7    further into the transcript?

8            MR. LAYMON:  Before we start.

9            THE COURT:  So you need to approach?

10            MR. LAYMON:  I do.

11            THE COURT:  Come on up.

12        All right.  Why don't we take an early afternoon break.

13    That means we'll have little more packed into the latter part

14    of the afternoon, but there's only about a 10-minute

15    difference, and we might as well be more efficient and we'll

16    take our break now.  See you in 15 minutes.

17            (JURY NOT PRESENT.)

18            THE COURT:  I think we can do it in the open

19    courtroom now.  Mr. Laymon.

20            MR. LAYMON:  Judge, there was an issue in the first

21    trial, Bran, which we didn't really -- well, we resolved it in

22    the second trial, but just in the interest of full disclosure,

23    I thought I'd mention it.

24        Judge, if we could jump ahead for just a moment on page

25    20.  Because it's on page 20 of Tab C where, to refresh the

1    Court's memory, I know you're going to recall this, because we

2    talked about --

3              THE COURT:  You're either being facetious or you

4    have great confidence.

5              MR. LAYMON:  No.  We talked about this a lot last

6    time, Judge.  This is the point where the informant is going

7    to tell everybody, "We're going to send 1300 units up to the

8    United States, that's where you guys come in," and so on and

9    so on.

10       So starting with that as just a focal point.  At the

11   first trial of Mr. Constanza Bran, Ms. Amato objected to the

12   introduction of pages 4 through 7.

13             THE COURT:  4 through 7.

14             MR. LAYMON:  Right, 4 through 7.

15             THE COURT:  And we were on page 20.  Now we're back

16   to 4 through 7.

17             MR. LAYMON:  Correct.

18             THE COURT:  Okay.

19             MR. LAYMON:  At the second trial of Del Cid Morales,

20   Ms. Shaner objected to pages 4 through 9.

21             THE COURT:  All right.

22             MR. LAYMON:  So to further complicate this matter,

23   in the first trial of -- of Mr. Bran, the Court excluded pages

24   4 through 7, and I would note over strong Government

25   objection.

1    In the second trial, the Court did not exclude pages 4

2  through 9 because --

3         THE COURT:  Because 8 and 9 were included,

4  obviously.

5         MR. LAYMON:  Right, exactly.

6         THE COURT:  Makes perfect sense.

7         MR. LAYMON:  So I wanted to mention that.  I know

8  that I said we would keep up with this, and we are -- you

9  know, we went back and we looked at those portions of the

10  various transcripts that the Court kept out and --

11         THE COURT:  My first job is -- of Ms. Hernandez's,

12  and that is for her to decide whether she's objecting to pages

13  4 through anything.

14         MR. LAYMON:  Right.  Anyway.

15         MS. HERNANDEZ:  Well, in light of the Court's --

16         THE COURT:  Consistent earlier rulings.

17         MS. HERNANDEZ:  Right.  Not wanting to be

18  inconsistent -- not wanting to be consistent because we all

19  know what consistency leads to, I'm going to object to the

20  entirety of the clip.

21    Now, I'm only being facetious.

22    Your Honor, let me add an additional layer of objection.

23  The problem with this particular videotape, unlike the others,

24  unlike the phone calls, for sure, is that we have a lot of

25  people at the table, a lot of talking.  The reason for

```
 1    introducing this or the relevancy of this would be if my
 2    client heard any of this or participated in any of this, and I
 3    don't think you can make that preliminary finding because --
 4              THE COURT:  But the jury can make that determination
 5    based on looking at the tape and I can make that determination
 6    based on looking at the tape in terms of volume, in terms of
 7    who's speaking, where they're situated compared to your
 8    client.  I mean, we're seeing the tape, so I can make that
 9    assessment based on the tape, can't I?
10              MS. HERNANDEZ:  Well, I --
11              THE COURT:  Not on the transcript but based on the
12    tape I can make that assessment.
13              MS. HERNANDEZ:  Well, that's -- I'm not sure you
14    can.  As a preliminary matter, the problem is, as the -- as
15    the interpreter told us, ordinarily, I mean, she -- the
16    problem with the manner in which this particular -- but I
17    understand that the Court heard testimony from the previous
18    interpreters, is that in order to understand what's going on
19    here, you have to stop and rewind, stop and rewind.  I'm
20    sure -- you know, I can make a representation to the Court
21    that --
22              THE COURT:  But my job on the basis of the objection
23    you're making is not to understand it but to determine how
24    much of it your client likely heard.
25              MS. HERNANDEZ:  I submit to the Court that you can't
```

1    make that determination.

2         THE COURT:  But how long it takes an interpreter to

3    do a translation by stopping and starting has nothing to do

4    with that.

5         MS. HERNANDEZ:  No, I wasn't -- well, it has

6    something to do with it.  Because --

7         THE COURT:  Not much.

8         MS. HERNANDEZ:  Well, it has something to do with

9    it, because part of the reason they have to start and stop is

10   because of the multiple noises.  There's music, there's

11   multiple people speaking.

12        THE COURT:  But their job is to determine exactly

13   what was said.  I don't need to do that on -- with respect to

14   your objection.

15        MS. HERNANDEZ:  What -- if the -- well, I know you

16   don't have to watch it again because you've seen it multiple

17   times.  It is -- my argument to the Court is --

18        THE COURT:  Yeah, what is the objection?

19        MS. HERNANDEZ:  The objection is that there is

20   insufficient basis for a preliminary finding, it seems to me,

21   that my client heard any particular conversation, except

22   perhaps my understanding, my recollection is he speaks only

23   once, and other than that, one could -- the Court -- I submit,

24   the Court could say that he obviously heard something before

25   or after his statement, but other than that, it seems to me

1    what -- the presumption would be that he heard -- that he was

2    unable to adequately hear any of the other conversations.

3        There were multiple conversations going on at once in

4    this particular tape more than in any other tape, it seems to

5    me.   And that without -- particularly -- I mean, it's one

6    thing to say this took place.   It's another thing to -- which

7    is what the Government intends to do is to say, because of

8    what took place, you can -- you, the jury, can infer that he

9    understood and knew and heard what was said.   And I don't

10   think you can.

11       And in fact, you know, the original entry to this is that

12   the CI came in to say that -- to tell them that he was

13   shipping drugs here and there and everywhere.   Well, that's

14   fine and well.   If you were there and didn't understand a word

15   that was said, to introduce the tape against -- let's not say

16   you, against an English speaker who doesn't understand

17   Spanish, would be -- is tantamount to what is being proposed

18   here.

19       Until they can prove that my client actively participated

20   in the any of the key segments, I would argue the only thing

21   that could be introduced would be that very short statement.

22           THE COURT:   Now, I understand your objection.

23       And Mr. Laymon, did you have anything you wanted to say?

24           MR. LAYMON:   Judge, the only thing I would add is

25   that I think the reason the Court kept it in the second time

1   was because -- was because of the importance of what occurs on

2   page 20, and the pages that lead up to that clearly show

3   everybody is present, especially, particularly as to

4   Mr. Mejia.  This is very relevant because the camera is

5   actually focussed on him and -- and while I would agree, there

6   is, you know, some overlapping conversation, a little bit.

7       By the time we get down to the nuts and bolts of this

8   thing, it's -- you know, you can hear a pin drop, the camera

9   is on Mejia, we've got this discussion and that's why I think

10  it's very relevant, but I did want to mention it because, you

11  know, we did have those objections earlier.

12          THE COURT:  I appreciate the Government raising it.

13  I understand Ms. Hernandez's objection, and it's not a -- a

14  insignificant objection.  I've carefully listened to and

15  watched this taped on two prior occasions in the not too

16  distant past.  So I'm very familiar with the tape, I'm very

17  familiar with the conversation, the -- who's being shown on

18  camera by virtue of the translation with what is being said,

19  but more importantly, how loud, how clear, et cetera, with

20  respect to the spoken portion of the tape.

21          And it's my conclusion, based on that, that there's

22  a sufficient basis to conclude that the Defendant in this case

23  did, for the most part -- and I think that's all that I can

24  say -- but for the most part, he was in a position to hear

25  that which was being said and which is transcribed here.

1    Now, there may be occasions that based on a particular

2    volume of the tape or camera angle, if -- if there was such an

3    occasion, I don't think there is any, if Mr. Mejia ducked

4    under the table or something like that, but I don't remember

5    anything like that.

6    And for that reason, in terms of this additional layer of

7    objections that Ms. Hernandez is placing on it, I will reject

8    that and overrule that objection because I do think there's a

9    sufficient basis for me to conclude that Mr. Mejia was a

10   participant in the sense of being there and present and able

11   to hear what was going on around him and to absorb what was

12   being said.

13        MS. HERNANDEZ:  Obviously, the Court is just making

14   a preliminary foundational --

15        THE COURT:  I'm making an assessment based on the

16   tape, and I think that's what you're telling me you don't

17   think I can do, but I'm saying I do think I can do that and

18   that's my assessment, and therefore, that will be overruled.

19        MS. HERNANDEZ:  That doesn't limit my ability to

20   cross or argue.

21        THE COURT:  Exactly.  You can cross and argue all

22   you want, and I expect you to.

23    All right.  So we'll see you in a healthy 10 minutes.

24        (A BRIEF RECESS WAS TAKEN.)

25        THE DEPUTY CLERK:  All rise.  This honorable court

```
 1   is again in session.

 2            MR. LAYMON:  We're on Tab C.

 3            THE DEPUTY CLERK:  She's apparently downstairs, Ms.

 4   Hernandez.

 5            THE COURT:  I'll sit here and wait.  I don't have

 6   much choice.

 7            (PAUSE.)

 8            THE COURT:  All right.  Are we ready?  Let's bring

 9   the jury in.

10            MS. HERNANDEZ:  Does that mean the judge -- Never

11   mind.

12            THE COURT:  Before you bring them in.

13            MS. HERNANDEZ:  I said never mind, Your Honor.

14            THE COURT:  No, I need to just make sure something

15   is clear.  You can sit down, Mr. Cortez.

16        And That is, the ruling that I made a moment ago is that

17   I overruled your objection and that I also determined that I

18   would -- in terms of the earlier arguably inconsistent

19   rulings, that I determined that pages 4 through 9 and indeed

20   the entire transcript can come into evidence.  I took a moment

21   and re-reviewed them and I understand the merit of the

22   argument that they should come in connecting back to page 20,

23   and we'll go with that ruling.  Not solely to avoid reversing

24   myself again, but rather because it's the right ruling.

25            Bring them in.
```

1           (JURY PRESENT.)

2           THE COURT:  Welcome back, Members of the Jury.

3       Mr. Cortez, I remind you, you're still under oath.

4           THE WITNESS:  Yes, sir.

5           THE COURT:  Mr. Laymon, you've disappeared.

6           MR. LAYMON:  Just grabbing my notes, Judge.

7           THE COURT:  Please proceed.

8           MR. LAYMON:  Thank you.

9    Q    (BY MR. LAYMON)  Mr. Cortez, I think, when we left off, I

10   think you had stated that you had, in fact -- let's see, you've

11   turned to page -- you turned to Tab C; is that correct,

12   Mr. Cortez?

13          THE COURT:  I think what we need to do is admit on

14   the record --

15          MR. LAYMON:  That's right.

16          THE COURT:  -- what is Exhibit 6B; is that correct,

17   Mr. Laymon?

18          MR. LAYMON:  Yes, Judge.  At this point I would note

19   that Government Exhibit 6, the recording was admitted earlier,

20   and we would move into evidence Government Exhibit 6B, the

21   transcript found at Tab C of the notebook.

22          THE COURT:  And based on my rulings that have been

23   expressed, it is admitted and objections are overruled, and it

24   may be published, as we say, which means the jury may turn to

25   Tab C in their notebooks.

```
 1              (GOVERNMENT EXHIBIT 6B ADMITTED.)

 2              MR. LAYMON:  Let's see, Mr. Rhodes, that's 19(a)(2).

 3   Hold on.  Give him a chance to turn.

 4   Q    (BY MR. LAYMON)  Mr. Cortez, are you at page 2 of Tab C?

 5   A    Yes, sir.

 6              MR. LAYMON:  All right.  Mr. Rhodes, please.

 7              (VIDEO PLAYED.)

 8   Q    (BY MR. LAYMON)  Mr. Cortez, we're not far into this --

 9   this video here, but who do we see here?  In particular, let me

10   ask you, who are the two faces that we see at the end of the

11   table?

12   A    Filipino, and to the right -- to the left of Filipino,

13   Del Cid Morales.

14   Q    Okay.  In other words, to Filipino's left would be Del

15   Cid Morales?  To Filipino's left would be Del Cid Morales; is

16   that correct?

17   A    Yes, yes.

18   Q    All right.  Now, we see at the bottom left hand -- my

19   left hand of the photograph, there is a hand, which appears to

20   be holding a straw.  You see that?

21   A    Yes, I do.

22   Q    Who is that?

23   A    Mr. Mejia.

24              MR. LAYMON:  Okay.  Mr. Rhodes, if you would.

25              (VIDEO PLAYED.)
```

1    Q    (BY MR. LAYMON)  All right.  Far left-hand side of the

2    screen, a person partly obscured who appears to be holding a

3    fork.  Do you see that person?

4    A    I do.

5    Q    Who is that?

6    A    Mr. Mejia.

7    Q    All right.

8              MR. LAYMON:  Go ahead.

9              (VIDEO PLAYED.)

10   Q    (BY MR. LAYMON)  Now, Mr. Cortez, we are up to page 6 of

11   the transcript, and again, describe for me who is depicted in

12   the video right here.

13   A    In the middle of the screen is Mr. Mejia; to his left,

14   Mr. -- the guy that's called Filipino; and to the right hand

15   of Mr. Mejia is Bardales.

16   Q    Okay.

17             MR. LAYMON:  Go ahead, Mr. Rhodes.

18             (VIDEO PLAYED.)

19   Q    (BY MR. LAYMON)  Page 8, Mr. Cortez, in the middle of the

20   page, Mr. Bardales, in the middle of that page, says, "Well, I'm

21   telling you that we also have an acquaintance on the inside."

22   Do you see that?

23   A    "Well, I'm telling you" -- is that what it is?

24   Q    I'm sorry, page 8 of Tab C.

25   A    Okay.

```
 1    Q    About the middle of the page, Bardales, "Well, I'm

 2   telling you that we also have an acquaintance on the inside."

 3    A    I see it.

 4    Q    You see that statement?

 5    A    Yes, sir.

 6    Q    Okay.  Now, I'd like you to look at the screen.  Who was

 7   seated next to Mr. Bardales when he made that statement?

 8    A    Mr. Mejia.

 9    Q    Okay.

10         MR. LAYMON:  Please go ahead, Mr. Rhodes.

11         (VIDEO PLAYED.)

12         MS. HERNANDEZ:  Objection; relevance.

13         THE COURT:  Stop the tape, please.  Overruled.

14         (VIDEO PLAYED.)

15    Q    (BY MR. LAYMON)  Page 10, Mr. Cortez, bottom of the

16   page -- very bottom of the page, 10, Confidential Source 1 says,

17   "The day we're already working, and that way I'll go."

18         Do you see that?

19    A    Yes, sir.

20    Q    Okay.  Now, was Mr. Mejia present when you said that?

21    A    Yes, he was.  He's right there in the middle of the

22   screen.

23    Q    All right.

24         MR. LAYMON:  If you would, please, Mr. Rhodes, go

25   ahead.
```

```
 1              (VIDEO PLAYED.)

 2    Q    (BY MR. LAYMON)  All right.  Now, we're on page 13 of the

 3    transcript, Mr. Cortez.  Let me ask you, up to this point and in

 4    this conversation with these gentlemen, are you able to hear

 5    what is being said from the gentlemen who are speaking from

 6    across the table?

 7    A    Absolutely, yes, sir.

 8    Q    Are they able to hear you?

 9    A    Absolutely, they should.

10              THE COURT:  But you'll have to ask --

11              MR. LAYMON:  Okay.

12              THE COURT:  Rephrase that question.  The objection

13    is sustained.

14              MR. LAYMON:  Certainly.

15    Q    (BY MR. LAYMON)  You're seated about how far away from

16    Mr. Bardales and Mr. Mejia at this point in the video?

17    A    A couple of feet away -- perhaps two feet away.

18    Q    Okay.  Are you exchanging conversation with them?

19    A    I am, and they also acknowledge what I'm saying or I

20    acknowledge to them whatever they say, too.

21    Q    Okay.  Do you have an opinion as to whether they were

22    able to hear you as you exchanged conversation with them?

23              MS. HERNANDEZ:  Objection.  He's a fact witness,

24    Your Honor.

25              THE COURT:  I'm going to sustain the objection to
```

```
 1    the question as framed.

 2              MR. LAYMON:  Okay.

 3    Q   (BY MR. LAYMON)  Did you engage Mr. Bardales and Mr. Mejia

 4    in conversation?

 5              MS. HERNANDEZ:  Objection, compound.

 6              THE COURT:  Overruled.

 7    Q   (BY MR. LAYMON)  Did you engage Mr. Mejia and Mr. Bardales

 8    in conversation up to this point in the conversation?

 9    A   We have talked, yes.

10              MS. HERNANDEZ:  Objection.

11              MR. LAYMON:  What's the objection to that?

12              MS. HERNANDEZ:  Your Honor --

13              THE COURT:  Wait a minute, wait a minute.

14         Mr. Layman, why don't you go ahead and break it out and

15    clarify.

16    Q   (BY MR. LAYMON)  All right.  Did you engage Mr. Bardales

17    in conversation up to this point in the conversation?

18    A   Yes, sir.

19              MS. HERNANDEZ:  Leading.

20    Q   (BY MR. LAYMON)  Okay.  Did you also engage with Mr. Mejia

21    in conversation up to this point in the conversation?

22              MS. HERNANDEZ:  Leading.

23              THE COURT:  Overruled.

24    A   I spoke to every single individual toward the meeting.

25    Q   (BY MR. LAYMON)  Were they able to respond -- Now, listen
```

```
 1    to my question.  Were they able to respond to your conversation?

 2              MS. HERNANDEZ:  Objection.

 3    A    Yes, sir.

 4              THE COURT:  Wait a minute.

 5              MS. HERNANDEZ:  Were they able to respond?

 6              THE COURT:  Why don't you break it in two -- break

 7    the pronoun.

 8    Q    (BY MR. LAYMON)  Was Mr. Bardales able to respond to your

 9    conversation with him?

10    A    Yes.

11    Q    Was Mr. Mejia able to respond to your conversation?

12              MS. HERNANDEZ:  Your Honor, ability to respond and

13    actual response are two different things, you know.  Do they

14    have a mouth and a tongue and can they speak?  Yes.  I'll

15    stipulate to that.

16              THE COURT:  All right.  Well, let's not get buried

17    too much.  Why don't you ask him what appeared to him, what he

18    could observe.

19              MS. HERNANDEZ:  Your Honor, may I --

20              THE COURT:  May you approach?  Yes.

21              (AT THE BENCH; ON THE RECORD.)

22              MS. HERNANDEZ:  Your Honor, we have a videotape, we

23    have a transcript, names assigned to the thing.  These whole

24    offered questions about were they able to respond, sure, they

25    all have a mouth.  The question is did they, is there a
```

1    conversation, and there is at least one conversation.  He can

2    get to that but throughout the rest of it --

3            THE COURT:  You are going to be arguing and you are

4    going to be attempting to establish, you've already indicated,

5    that Mr. Mejia didn't participate and that maybe he didn't

6    hear what was said.  So there -- why can't they explore

7    whether to the observer who was present it appeared that they

8    could hear?

9            MS. HERNANDEZ:  Well, that's not the question being

10   asked.  First of all, he has no ability to say whether they

11   could hear.  How do you determine whether they could hear or

12   not?  Did he respond to you?  Yes.  Do they have the ability

13   to do it?  Everybody has the ability to do it.

14           THE COURT:  Ms. Hernandez, of all the people in this

15   courtroom, there is only one who really has much ability to

16   say whether -- only two really have.  Your client and the

17   other person present, who is Mr. Cortez.

18           MS. HERNANDEZ:  Your Honor, this a key area of the

19   case.  As I say, the best evidence of whether he could or

20   could not engage is this tape-recording.

21           THE COURT:  You'll be able to argue that.

22           MS. HERNANDEZ:  And if we're going to go into this

23   very, you know, base -- primary evidence, then the least I

24   can -- I can request, and I have been really good about not

25   objecting to hearsay that comes in and to leading because, you

1    know, eventually he's going to rephrase.

2         The questions ought to be precise, the questions ought to

3    be within his ability to respond as a matter of law, as a

4    matter of fact, and -- you know, I'm just asking in this very

5    key area that the Court stick to the rules of evidence.

6              THE COURT:  I don't disagree with the general

7    observation, and let's try to stick to the rules of evidence.

8    And what I was going to say, before we came up here, but

9    better said up here is, why don't you ask the questions in a

10   way that is less troublesome from Ms. Hernandez's perspective,

11   which is, did it appear to you that, you know.  Let's get his

12   impression, not his opinion, what his impression, based on the

13   facts and the -- and his presence there.

14             MR. LAYMON:  Okay.  Sure.

15             THE COURT:  Okay.

16             (OPEN COURT.)

17   Q    (BY MR. LAYMON)  Mr. Cortez, up to this time in the

18   conversation that's occurred on the video, tell me your

19   observations.  What did you observe about Mr. Mejia in terms of

20   his ability to communicate with you?

21   A    He was pretty much -- Let me say it better.  He was

22   always in attention of whatever came out from me and

23   Mr. Constanza Bran, and I observed him in occasions

24   acknowledging and going with his head up and down to

25   acknowledge what we had been discussing and agree upon the

1    conversation.

2    Q    And the same question with, for example, Mr. Bardales,

3    what observations did you make about his ability to

4    communicate with you?

5    A    By the same situation.  The gentleman, Bardales, was

6    pretty much engaged in the conversations and he definitely

7    acknowledge and make his own comments about what was discussed

8    at the time.

9    Q    Okay.  Now, let's look at page 13 of the transcript, a

10   little below the middle of the page.  Mr. Bardales says,

11   "They're the ones in charge of everything that has to be done.

12   Of everything, of everything, of everything."

13        And I'd ask you to look at the video, because that, we

14   just -- that's where we stopped this video.

15        Now, at the time that Mr. Bardales said that, "they're

16   the ones in charge of everything that has to be done," where

17   was Mr. Mejia?

18   A    Sitting next to Mr. Bardales.

19   Q    Okay.  And did you -- do you -- did you then, do you now

20   have an understanding as to what Mr. Bardales meant when he

21   said "They're the ones in charge of everything that has to be

22   done"?

23   A    Yes, I do.

24   Q    And what was your understanding?

25   A    That the gentlemans that he brought to the table and this

1  particular meeting, were the ones who were going to be

2  handling the transportation and the responsibility of giving

3  me a secure passage through their country.

4          MR. LAYMON:  Okay.  Mr. Rhodes, if you would,

5  please, starting at the bottom of page 13.

6          (VIDEO PLAYED.)

7  Q   (BY MR. LAYMON)  All right.  Mr. Cortez, we're on page 16.

8  I want you to go back to page 15 of the transcript.  At the

9  bottom of page 15, "Confidential Source 1."   "Let's check a

10 conversation.  Just a moment, just a moment."  Is that you that

11 said that?

12 A   Yes, sir.

13 Q   All right.  Now, as we go to page 16, top of page 16,

14 Mr. Del Cid Morales, "We can work three months starting

15 today."  Do you see that?

16 A   I do.

17 Q   And then after that, Mr. Mejia, "There are going to go --

18 "There are going to go some new changes.  They're going to

19 create a new unit, DIPA, over in Guatemala, DIPA."

20      All right.  Did you hear him say that?

21 A   I did.

22 Q   Okay.  Now, at this time, in your participation in this

23 case, up to this point in your participation in this case, did

24 you know what DIPA was?

25 A   I never heard that term before until Mr. Mejia mention it

1  to me.

2  Q    Okay.  All right.  Now, next, Mr. Mejia, "instead of what

3  Narcotics was."  Do you see that?

4  A    I do.

5  Q    Now, let me -- let me refer you in that passage to the

6  Spanish word "narcoticos."  Do you see that?

7  A    I do.

8  Q    Are you familiar with the Spanish word "narcoticos"?

9  A    Absolutely.

10  Q    And why are you familiar with that word?

11  A    Because that translate or means narcotics, an illegal

12  substance that we were doing there or whatever you traffic on,

13  which is illegal.

14  Q    Now, Mr. Mejia goes on to tell you, "DIPA starts working

15  ports and airports.  New command, new contacts and new

16  structures."  And then he says, "What we have to control is

17  the structure."

18       Now, you previously had told me that you didn't know what

19  DIPA was; is that correct?

20  A    Yes.

21  Q    All right.  So listen to my question.  When Mr. Mejia

22  told you "what we have to control is the structure," did you

23  understand what he meant?

24  A    Yes.

25  Q    Okay.  And what did you understand what he meant?

1    A    That he needed to control the commanders, the people who

2    controls DIPA.  That's the insiders -- structures themselves

3    of the organization.

4    Q    All right.  Now, that part of the conversation that's

5    reflected on page 16, all right, what we've just gone over,

6    were you able to hear Mr. Mejia say these things?

7    A    Absolutely I was.

8    Q    Describe for me the background noise that was going on in

9    the restaurant at the time you're having this conversation.

10   A    There is more people in the restaurant, more clients, or

11   whatever it's called.  There were conversation between

12   Bardales and Iberia, and there were the servers.

13   Q    Okay.

14   A    Perhaps some music.

15   Q    All right.  But at this time, when you're having this

16   conversation, were you able to hear Mr. Mejia?

17   A    Loud and clear.

18            (VIDEO PLAYED.)

19   Q    (BY MR. LAYMON)  All right.  Page 17, Mr. Cortez.  Again,

20   the only -- the only entry there for Confidential Source 1, you

21   have just heard yourself say the words that are reflected there

22   in the transcript.  Did you hear that?

23   A    Yes.

24   Q    Okay.  Was Mr. Mejia present at the meeting when you said

25   that?

1    A    Yes, he was.

2    Q    All right.

3         MR. LAYMON:  Go ahead, Mr. Rhodes.

4         (VIDEO PLAYED.)

5    Q    (BY MR. LAYMON)  Top of page 18.  Top of page 18 that

6    we've just heard Confidential Source 1.  That's you; is that

7    correct?

8    A    That's correct.

9    Q    All right.  Now, as you were talking and saying what you

10   said there, there was -- you saw on the video, a person

11   nodding his head.

12   A    Yes, I did.

13   Q    And who was that?

14   A    Mr. Mejia.

15   Q    In the middle of that passage when you said, "You guys

16   are the ones that tell me, 'Look, man, this is what I can

17   do.'"  You see that?

18   A    Yes, I do.

19   Q    What was that in reference to?

20   A    That -- because they were in the country.  They're the

21   ones who put the ground rules as to how to proceed to do the

22   transportation of the cocaine through their country.

23        MS. HERNANDEZ:  Your Honor, objection as to the last

24   phrase.  There is nothing in this record that supports his

25   statement of this tape-recording.

 1          THE COURT:  Just a second.  I'm going to overrule

 2    the objection.  You'll have a chance to examine the witness.

 3          (VIDEO PLAYED.)

 4    Q    (BY MR. LAYMON)  Page 20, Mr. Cortez, this is where we are

 5    in the transcripts.  Confidential Source 1, the second entry for

 6    Confidential Source 1, you begin by saying, "This is what's

 7    happening."  Do you see that?  You see that paragraph that

 8    begins with those words?

 9    A    Yes, I do.

10    Q    Okay.  Now, you say, "He has a company established for

11    many years."  "And he's a foreigner in Panama."  Do you see

12    that?

13    A    Yes, I do.

14    Q    Now, when you use the pronoun "he" there, to whom were

15    you referring?

16    A    To Iberia, also known as the Spaniard.

17    Q    Okay.  And why were you talking about Iberia having a

18    company in Panama?  What was the meaning of that?  What's the

19    significance of that?

20    A    Iberia was the one who was going to do the shipping of

21    the illegal product from Panama to Guatemala.

22    Q    Okay.

23          MS. HERNANDEZ:  Your Honor, again, there is no

24    foundation for his statements in this record.

25          THE COURT:  Overruled.

1    Q    (BY MR. LAYMON)  Now, Mr. Cortez, at this point in the

2    conversation, right here, who's seated across from you?

3    A    Mr. Mejia.

4    Q    All right.  Now, do you see Mr. Mejia in this part of the

5    video?

6    A    Yes, I do.

7    Q    All right.  Who is Mr. Mejia looking at right there?

8    A    At me.

9    Q    At who?

10   A    The question is?

11   Q    Who is Mr. Mejia looking at right there in this video?

12   A    Looking at me.

13   Q    All right.

14            MR. LAYMON:  Mr. Rhodes, please.

15            (VIDEO PLAYED.)

16   Q    (BY MR. LAYMON)  All right.  Still on page 20,

17   Confidential Source 1 in the paragraph that begins, "What

18   happens?"  Do you see that?

19   A    Yes.

20   Q    Okay.  Now, who's sitting across from you at the time you

21   begin the -- at the time you begin that part of the

22   conversation that begins "What happens?"

23   A    Mr. Mejia.

24   Q    And who else is sitting across from you at this time?

25   A    Besides him, there was also Filipino and Bardales.

1    Q    Okay.  At the time that you say this part of the

2    conversation that begins with "what happens" and goes through

3    the word "border," who is the person talking in the video at

4    this time?

5    A    I am.

6    Q    Okay.  Who else is talking?

7    A    Mr. Mejia, Mr. Bardales.

8    Q    Okay.

9              MS. HERNANDEZ:  Objection, Your Honor.

10   Q    (BY MR. LAYMON)  Well, who else is talking --

11             THE COURT:  Well, wait a minute.  The objection is

12   that it's inconsistent with the video?

13             MS. HERNANDEZ:  Yeah.

14             THE COURT:  It seems to be.  You can ask another

15   question, but the jury can assess that.

16   Q    (BY MR. LAYMON)  When you are talking right here in this

17   conversation, Mr. Cortez -- let me make sure you understand my

18   question.  When you're talking right here in this conversation

19   with the words that begin, "what happens" and end with "at the

20   border," is anybody other than you talking?

21   A    Did anybody heard me talking?

22   Q    Is anybody other than you talking?

23   A    There was background noise.

24   Q    Okay.  Other than that?

25   A    Not that I can --

1    Q    All right.  Now, let's look at that part of the

2    transcript, going a couple of words in, after the words "what

3    happens."  "An amount, one thousand three hundred units to

4    take up to the United States."  Do you see that?

5    A    Yes, I do.

6    Q    Okay.  Who said that?

7    A    I did.

8    Q    Okay.  What did that mean, "one thousand three hundred

9    units to take up to the United States"?

10             MS. HERNANDEZ:  The words speak for themselves, Your

11   Honor.

12             THE COURT:  I overrule that objection.  You can

13   explain what you meant.

14   A    1,300 units means 1,300 kilos of cocaine to be sent to

15   the United States.

16             MS. HERNANDEZ:  Objection, move to strike.

17             THE COURT:  Overruled.

18   Q    (BY MR. LAYMON)  After that you say, "But that's where you

19   guys come in."  You see that?

20   A    Yes.

21   Q    All right.  Now, you go on to say, "We're going to pass

22   through your country."  You see that?

23   A    Yes, I do.

24   Q    When you say "your country," to what country are you

25   referring?

1    A    Guatemala.

2    Q    You go on to say that you will take care of the logistics

3    and the security so that if he puts it in the container.

4         Now, the use of the word "container," do you see that?

5    A    Yes, I do.

6    Q    What did you mean by that?

7         THE COURT:  Well, how about what were you referring

8    to?

9    Q    (BY MR. LAYMON)  What were you referring to when you

10   referred and you used the word "container"?

11   A    A cargo container is what is -- is a metal box that is

12   used by the shipping companies to put the product -- whichever

13   product might be, inside and put it on the cargo ships.

14   Q    Okay.

15        MS. HERNANDEZ:  Your Honor -- I withdraw.

16        THE COURT:  All right.

17   Q    (BY MR. LAYMON)  And then lastly, Mr. Cortez, about that

18   part of the conversation, you say, "and from there it gets to

19   where you all will put it at the border."  Do you see that?

20   A    Yes, I do.

21   Q    All right.  The phrase "at the border," to what border

22   were you referring?

23   A    Guatemala/Mexico border.

24   Q    Now, as you look at the video, you see that?

25   A    I do.

1    Q    Okay.  Who is Mr. Mejia looking at right there?

2    A    At me.

3              MR. LAYMON:  Mr. Rhodes, if you would, please, top

4    of page 21.

5              (VIDEO PLAYED.)

6    Q    (BY MR. LAYMON)  Page 22, Mr. Cortez.  Mr. Bardales, top

7    of the page.  He says -- one sentence in -- "The price is to the

8    city of Guatemala to go up to the border and we can give you

9    guys all the logistical support and whatever you want.

10   Security... one hundred percent."

11        Focusing on that "the price is to the city of

12   Guatemala."  Did you understand what he meant when he said

13   "the price"?

14   A    The price of --

15   Q    Well, first, did you understand that?

16   A    I'm sorry?

17   Q    Did you understand what he meant when he said "the

18   price"?

19   A    Yes, I do.

20   Q    And what did you understand that to mean?

21   A    The price of giving me security and a safe passage

22   through the city of Guatemala of the kilos of cocaine that I

23   was shipping from Panama.

24   Q    Okay.

25              MS. HERNANDEZ:  Objection.

```
 1              THE COURT:  Overruled.

 2    Q    (BY MR. LAYMON)  Now, you respond to that --

 3              MS. HERNANDEZ:  Your Honor, can I -- what this

 4    witness understood is not material to the --

 5              THE COURT:  No, he's explaining what he said.

 6              MS. HERNANDEZ:  No, he's explaining what he

 7    understood about what Mr. Bardales said.

 8              THE COURT:  I'm sorry, you're right, you're right.

 9    But I find that that is relevant because it explains the

10    context of other parts of the conversation, so it's overruled.

11              MS. HERNANDEZ:  To him but not to my client, Your

12    Honor.

13              THE COURT:  Other parts of the conversation that he

14    participated in.  "He" meaning the witness.

15    Q    (BY MR. LAYMON)  Now, looking at the video, Mr. Cortez, as

16    this conversation between you and Mr. Bardales is taking place,

17    who is seated next to Mr. Bardales?

18    A    Mr. Mejia.

19    Q    Now, you respond to Mr. Bardales about a third of the way

20    down the page and you say, "No, I need it at the border."  You

21    see that?

22    A    Yes, I do.

23    Q    Okay.  Then Mr. Bardales responds to you and says, "No

24    problem.  We'll take it where you say... that's inside the

25    national territory."  Do you see that?
```

1    A    I do.

2    Q    Now, I want to focus your attention on the phrase "that's

3    inside the national territory."  Did you understand what he

4    meant by that?

5    A    I do.

6    Q    And what was your understanding of what that meant?

7    A    Inside of the national territory meaning inside within

8    the borders of his home country, Guatemala.

9         MS. HERNANDEZ:  Your Honor, I want a continuing

10    objection to what he understood about this whole conversation.

11         THE COURT:  All right.  Your continuing objection is

12    noted.

13    Q    (BY MR. LAYMON)  And then Mr. Bardales, responding to you,

14    says, "No problem at all.  To the national territory is the same

15    price."  Do you see that?

16    A    I do.

17    Q    And my question is, did you understand what he meant when

18    he said "the same price"?  The same price as what, would be my

19    question.  Did you understand that?

20    A    I do understand.

21    Q    And what was your understanding of that?  The same price

22    as what?

23    A    For transporting the cocaine within their Guatemalan

24    territory.

25    Q    Okay.

```
 1                MR. LAYMON:  Go ahead, Mr. Rhodes.

 2                (VIDEO PLAYED.)

 3    Q    (BY MR. LAYMON)  Page 25, Mr. Cortez.  That's where we are

 4    in the transcript.  A little bit below the middle of the page,

 5    Confidential Source 1.  "What I didn't hear were the names.

 6    Started."  Do you see that?

 7    A    I do.

 8    Q    And who asked that question?

 9    A    I did.

10    Q    And of whom were you asking that question?

11    A    Pardon?

12    Q    To whom -- or to whom did you direct that question?

13    A    To Mr. Mejia and company.

14    Q    Okay.  And Mr. Mejia responds "Edwin Roberto Sapon Ruiz."

15    Is that -- was that his response?

16    A    Yes, it was.

17    Q    Did you hear that response?

18    A    Yes, I did.

19                MS. HERNANDEZ:  Your Honor, I'm sorry, where are we?

20                MR. LAYMON:  Page 25, two-thirds of the way down.

21                THE COURT:  Page 25.

22                MR. LAYMON:  Page 25.

23          Mr. Rhodes, that's okay.  You can go ahead.

24                (VIDEO PLAYED.)

25    Q    (BY MR. LAYMON)  Now, we're on, transcript-wise, page 28.
```

1    The second entry for Confidential Source -- and again -- excuse

2    me, Confidential Source 1, and is that you; is that correct?

3    A    Yes.

4    Q    You say, "Understand?  No, honestly.  Okay?  I'm very

5    thankful to you guys.  Edwin Rene Sapon Ruiz."  You see that?

6    A    Yes, I do.

7    Q    And to whom did you direct that comment?

8    A    Mr. Mejia.

9    Q    Now, look at the video.  You see the picture that's

10   described here on the video?

11   A    Yes, I do.

12   Q    What's about to happen here?

13   A    I'm returning Mr. Mejia's I.D. that at the time he

14   presented to me as an officer or official member of the law

15   enforcement group in Guatemala with the name of, as he

16   mentioned before, Edwin Rene Sapon-Ruiz.

17   Q    Okay.  Now, as I look at the two hands that are almost

18   joined there, do you see that?

19   A    I do.

20   Q    What is the -- what is that between the two hands?

21   A    His credential.

22   Q    All right.  And who presented that to you?

23   A    Mr. Mejia.

24   Q    And what did you do with it?

25   A    I read it out loud.  That's when I repeated the name, and

1   then I returned it to him.

2   Q   All right.

3           (VIDEO PLAYED.)

4   Q   (BY MR. LAYMON)   That's the end of that portion of the

5   transcript -- excuse me -- that portion of the video,

6   Mr. Cortez.

7       And lastly, let me ask you:   During the entire portion of

8   the video that is represented by Tab C, what we've just been

9   looking at, this transcript, was Mr. Mejia present the entire

10  time?

11  A   Yes, sir.

12  Q   Did he ever get up and leave for any reason?

13  A   No, sir.

14  Q   Now, the -- the meeting continues with the -- even though

15  this is the end of this particular part of the video, the

16  meeting continues; is that right?

17  A   That's right.

18  Q   All right.   Now, Mr. Cortez, and just you, not the Ladies

19  and Gentlemen of the Jury, if you could turn to Tab D of

20  your -- D as in Delta.   Not the jury, just Mr. Cortez.

21      If you could turn to Tab D, we're going to look at

22  another portion of this video, and I'll ask if you'll take

23  just a moment to look through that.   It's just a couple of

24  pages.

25          MS. HERNANDEZ:   Your Honor, assuming that he's going

1    to testify to the same thing he's been testifying that he

2    reviewed the papers, he reviewed the video, I have no

3    objection, subject to the substantive objections that I've

4    been making.

5            THE COURT:   Subject to the same objections and with

6    the same ruling, are you moving it into evidence, Mr. Laymon?

7            MR. LAYMON:   Yes, Judge, what's marked as Government

8    Exhibit 6C, which is at Tab D, we move that into evidence at

9    this point.

10           THE COURT:   You said, so it's 6C which is at Tab D,

11   and it will be admitted.

12           (GOVERNMENT EXHIBIT 6C ADMITTED.)

13           THE COURT:   And the jury may turn to Tab D as in

14   David.   Yes, that's correct.

15           MR. LAYMON:   And Mr. Rhodes, that's 19(b)(1).

16           (VIDEO PLAYED.)

17   Q    (BY MR. LAYMON)  Now, let me ask you about that

18   transcript, Mr. Cortez.   As this meeting goes on and the talk

19   turns to other subjects, for example, here, who continues to sit

20   across from you?

21   A    Mr. Mejia.

22   Q    And who else?

23   A    Mr. Bardales and Filipino.

24   Q    Okay.   Now, let me ask you, Mr. Cortez, to turn to Tab F,

25   F as in Frank.

```
 1              THE COURT:  Mr. Hernandez, the same position with
 2    respect to admission of Tab F, which is what exhibit?
 3              MR. LAYMON:  6E, Your Honor.
 4              MS. HERNANDEZ:  Unless you want me to go through
 5    the --
 6              THE COURT:  I don't need you to go through it.
 7    So -- so Exhibit 6E, which is at Tab F, will be admitted.
 8                   (GOVERNMENT EXHIBIT 6E ADMITTED.)
 9              THE COURT:  Same objections are noted but overruled,
10    and Exhibit 6E is in evidence, and the jury may turn to Tab F.
11    At Tab F, the front page will say "Video Transcript 19(b)(3)
12    and the first line in English will be "Buyers there aren't
13    enough"; correct, Mr. Laymon?
14              MR. LAYMON:  I'm sorry, Judge.  Yes, that is
15    correct.
16              THE COURT:  All right.  That's where you should be,
17    ladies and gentlemen.
18              MR. LAYMON:  Judge, I have to apologize.  I have to
19    ask if we could go back just briefly to Tab D as in Delta, the
20    one that we just heard, to page 2 of Tab D.
21              THE COURT:  D as in, again, page 2?
22              MR. LAYMON:  Page 2, which is actually the first
23    page of tab -- of that tab, the first transcripted page.
24    Q    (BY MR. LAYMON)  Mr. Cortez, briefly, let me ask you, top
25    of page 2, Eric Constanza says to you -- or says, "What was
```

1   already talked about, already... you know.  Now... and this is a

2   gentlemen's agreement."  And "I think the gentlemen are people."

3   Do you see that?

4    A   Yes, I do.

5    Q   Okay.  The reference there that -- to Mr. Constanza,

6   "what was already talked about," do you see that?

7    A   Yes, I do.

8    Q   Did you have an understanding of what Mr. Constanza was

9   referring to there?

10   A   Yes.

11   Q   And what was that?  What was your understanding?

12   A   The discussion of transportation of the cocaine to the

13   country.

14           MS. HERNANDEZ:  Same objection, Your Honor.

15           THE COURT:  Noted but overruled.

16   Q   (BY MR. LAYMON)  Now, let's again go back to Tab F, the

17   beginning of Tab F.

18           MR. LAYMON:  And Mr. Rhodes, that's 19(b)(3).

19           (VIDEO PLAYED.)

20   Q   (BY MR. LAYMON)  Now, we're actually at the bottom of page

21   4, Mr. Cortez, but I want to ask you, what have you done with

22   the camera at this point?

23   A   I switched it around to focus Mr. Del Cid Morales.

24   Q   Okay.  All right.  Now, set the stage for us here.  Who

25   is the person with his elbows on the table seated closest to

1  that cell phone?

2  A   Mr. Constanza Bran.

3  Q   Okay.  Who would be the person around the head of the

4  table from him?

5  A   Mr. Del Cid Morales.

6  Q   Okay.  Now, why, at this point, have you repositioned the

7  camera?

8  A   Because I was about to continue, as instructed, with my

9  meeting, and there was going to be an exchange of money.

10  Q   I'm sorry, there was going to be a what?

11  A   An exchange of money.

12  Q   Okay.  Explain that to me.  How much money are we talking

13  about?

14  A   $10,000.

15  Q   Okay.  And where did you get this $10,000 from?

16  A   From Special Agent Fraga from DEA.

17  Q   Okay.  And what was the purpose of your having this

18  $10,000?

19  A   To bribe them in order for them to set up the

20  transportation of the cocaine to the country of Guatemala.

21  Q   Now, who did you ultimately give the $10,000 to?

22  A   Mr. Del Cid Morales.

23  Q   Okay.  And tell me how you went about doing that.

24  A   I reach out the man's purse, put the money out under the

25  table and pass it under the table to Mr. Del Cid Morales.

1    Q    Okay.  Now, is this the same purse that contains the

2   camera?

3    A    Yes.

4    Q    So, as we're going to see in a second, what happens when

5   you remove the money from the purse?

6    A    I take the money and I pass it on past Constanza and to

7   Mr. Del Cid Morales.    Sorry.

8    Q    In the process of doing that, though, what happens to

9   your camera?

10    A    The camera gets shifted around and you can -- you see the

11   movement very fast.

12    Q    All right.

13          MR. LAYMON:  Mr. Rhodes, if you would, please.

14          (VIDEO PLAYED.)

15    Q    (BY MR. LAYMON)  Now, what has just happened there,

16   Mr. Cortez?

17    A    The exchange took place.  I unzipped the bag, took the

18   money out.  As you can see the bag -- the camera moving to

19   various positions because I needed to reach for the money, and

20   I passed that onto Del Cid Morales.

21    Q    At the bottom of page 5, this one apparently identifies

22   you as Augustine Cortez.  Are you the Augustine Cortez that's

23   identified in this transcript?

24    A    Yes.

25    Q    Okay.  And you say, "Put it away, put it away, put it

```
 1   away."  Was that you who said that?

 2   A    Yes.

 3   Q    And to what were you referring there?

 4   A    To the money.

 5   Q    And why did you say that?

 6   A    Because they needed to hide it so people won't see it.

 7            (VIDEO PLAYED.)

 8   Q    (BY MR. LAYMON)  All right.  Now, we don't see this often,

 9   you don't turn it up that much, but who is the person depicted

10   in the far right-hand part of the screen?

11   A    That was me.

12   Q    All right.

13            MR. LAYMON:  Go ahead, Mr. Rhodes.

14            (VIDEO PLAYED.)

15   Q    (BY MR. LAYMON)  Just briefly, Mr. Cortez, a couple of

16   quick questions about what we just heard on page 18, and I'll be

17   very brief.  Mr. Bardales, at the bottom of the page, says,

18   "We'll give you your safe conduct without you having the least

19   amount of problems."  You see that?

20   A    Page 18?

21   Q    Uh-huh, page 18.  Bottom of page 18.

22   A    Yes.

23   Q    "We'll give you your safe conduct without you having the

24   least amount of problems."

25   A    I see it.
```

1   Q   Now, when Mr. Bardales says this, is this before or after

2   the money has exchanged hands; if you know?

3   A   I'm not sure.

4   Q   Okay.  Now, this meeting would continue a little bit

5   longer; is that right?

6   A   Yes, sir.

7   Q   All right.  Let me invite your attention to -- and just

8   you, Mr. Cortez, to Tab G.  G as in golf.

9           THE COURT:  And that is Exhibit what?

10          MR. LAYMON:  Judge, that would be Exhibit 6F, and

11  it's at Tab G.

12          THE COURT:  Same position, Ms. Hernandez?

13          MS. HERNANDEZ:  Same position, Your Honor.

14          THE COURT:  You may introduce Exhibit 6F at Tab G.

15          MR. LAYMON:  And I would introduce that -- offer

16  that into evidence at this point, Judge.

17          THE COURT:  It will be admitted.

18          (GOVERNMENT EXHIBIT 6F ADMITTED.)

19          THE COURT:  The objections are overruled, and

20  Government Exhibit 6F at -- found at Tab G of Exhibit 33A is

21  admitted, and the jury may turn to Tab G as in golf.

22          MR. LAYMON:  Mr. Rhodes, that's 19(b)(4).

23          (VIDEO PLAYED.)

24  Q   (BY MR. LAYMON)  The meeting continues, Mr. Cortez, and I

25  would ask you to turn to Tab H.

1          MR. LAYMON:  Judge, Tab H marked as Government

2   Exhibit 6G, I would offer that as Government Exhibit 6G.

3          THE COURT:  Subject to the same objections, which

4   are overruled.

5          MS. HERNANDEZ:  Yes, sir.

6          THE COURT:  Government Exhibit 6G found at Tab H is

7   admitted.

8          (GOVERNMENT EXHIBIT 6G ADMITTED.)

9          THE COURT:  The jury may turn to Tab H.

10         MR. LAYMON:  And again, Mr. Rhodes, it's 19(b)(5).

11         (VIDEO PLAYED.)

12  Q   (BY MR. LAYMON)  Now, we're page 2 of Tab H, Mr. Cortez.

13  A   Yes, sir.

14  Q   All right.  The person identified as Confidential Source

15  2, and again, who was that?  What did you know that person as?

16  A   Yes, I do.  I know him as the Spaniard Iberia.

17  Q   Okay.  Middle of the page, Confidential Source 2 says,

18  "He puts in a thousand three.  I go with you now over there."

19  Do you see that comment?

20  A   Yes, I do.

21  Q   Okay.  Now, if you'll look at the video, that comment has

22  just been said and tell me who's -- who is seated across from

23  you when CS-2 makes that comment?

24  A   Mr. Bardales, Mr. Mejia and Filipino, as well as Mr. Del

25  Cid Morales.

1          MR. LAYMON:  Mr. Rhodes, if you would, please.

2          (VIDEO PLAYED.)

3   Q    (BY MR. LAYMON)  Now, page 2 -- excuse me -- page 3 of

4   this very brief transcript at Tab H, Mr. Constanza, on page 3,

5   is -- there is two entries for Mr. Constanza.

6       He says at the top of the page, "You guys arrange it.

7   We're from here."  And then just a little bit later he says,

8   "Whatever you guys arrange."  You see that?

9   A    I do.

10  Q    Now, who was seated across from you when Mr. Constanza

11  said that?

12  A    Mr. Mejia, Mr. Bardales, Filipino, as well as Mr. Del Cid

13  Morales and Iberia.

14  Q    Okay.  Now, if you would, please, Mr. Cortez and

15  Mr. Cortez only, not the jury, not the Ladies and Gentlemen of

16  the Jury, if you would turn to Tab J, J as in Juliet.

17          THE COURT:  And that is Exhibit what?

18          MR. LAYMON:  6I, Your Honor.

19          THE COURT:  All right.  Same position,

20  Ms. Hernandez?

21          MS. HERNANDEZ:  Yes.

22          THE COURT:  You may offer, and as offered,

23  Government Exhibit 6I is admitted with the objections

24  overruled.

25          (GOVERNMENT EXHIBIT 6I ADMITTED.)

```
 1              THE COURT:  And the jury may turn to Tab J, as in
 2   July, in your book.  It will have as the first page, "Video
 3   Transcript 19(e)(1)" and begin in English with the words, "I
 4   want to tell you."
 5              MR. LAYMON:  Mr. Rhodes, that's 19(e)(1).
 6              (VIDEO PLAYED.)
 7   Q    (BY MR. LAYMON)  Who is the person depicted on the far
 8   left portion of the video?
 9   A    Mr. Mejia.
10   Q    Okay.  Now, if you would, Mr. Cortez, and just you,
11   please, not the Ladies and Gentlemen of the Jury, if you would
12   turn to Tab K.
13              MR. LAYMON:  And Judge, I've got Tab K marked as
14   Government Exhibit 6J.
15              THE COURT:  Same position, Ms. Hernandez?
16              MS. HERNANDEZ:  Yes, sir.
17              THE COURT:  6J is admitted.
18              (GOVERNMENT EXHIBIT 6J ADMITTED.)
19              THE COURT:  It is at Tab K of the binder, and the
20   jury may turn to Tab K.  Wait a minute.  It's 6J, yes.  Tab K.
21              MR. LAYMON:  Right.
22              THE COURT:  That begins with the words "Let me know,
23   understand?"
24              MR. LAYMON:  That's correct, Judge.
25          And Mr. Rhodes, that's 6 -- excuse me, 19(e)(2).
```

1          (VIDEO PLAYED.)

2    Q    (BY MR. LAYMON)  Now, before we actually get into the

3    playing of the video, Mr. Cortez, let me ask you:  The meeting

4    would come to an end, right?

5    A    Yes, sir.

6    Q    Okay.  And at the end, as you were walking away, did you

7    have the opportunity to talk with any particular individual

8    that you had been meeting with?

9    A    Yes, I did.

10   Q    And who was that?

11   A    Mr. Mejia.

12   Q    Well...

13   A    Mr. Del Cid Morales.

14   Q    Okay.  And in particular, did you --

15            MS. HERNANDEZ:  Your Honor, can we have the record

16   be clear on that?

17            THE COURT:  Okay.  Let's ask the question again.

18            MR. LAYMON:  I will.

19   Q    (BY MR. LAYMON)  In particular, did you have a

20   conversation with Del Cid Morales that was recorded as the

21   meeting broke up?

22   A    Yes.

23   Q    Okay.  And is that what we're about to see?

24   A    Yes.

25   Q    All right.  Now --

```
1            MR. LAYMON:  All right.  Go ahead.

2            (VIDEO PLAYED.)

3   Q    (BY MR. LAYMON)  Page 2 of this part of the transcript,

4   Mr. Cortez, Mr. Del Cid Morales tells you, "I'm telling you

5   three months... because BIPA starts in three months."

6       And then he goes on to say, "To see what the hell the DEA

7   says."  Do you see that?

8   A    Yes, I do.

9   Q    Now, in Spanish, how is DEA said?  How is it rendered in

10  Spanish?

11  A    DEA, each word by word is called DEA, D-E-A, Dea, La Dea.

12  Q    Okay.

13  A    DEA.

14  Q    All right.  So when Mr. Del Cid Morales came up to you

15  after the meeting and was speaking to you, did he use the

16  words "DEA" or did he use the words "La Dea"?

17  A    La Dea.

18  Q    All right.  And La Dea is a reference to what?

19  A    To DEA.

20  Q    How do you know that?

21  A    That's exactly what I translated into English from

22  Spanish.

23  Q    Now, Mr. Del Cid Morales tells you that the DEA -- "So

24  then the DEA leaves, our people are left and then we can start

25  working."  Do you see that?
```

1    A    I do.

2    Q    And did you understand what he was -- what he meant?

3    A    Absolutely, yes.

4    Q    What did you understand that to mean?

5    A    That after DEA will do the round, they leave and his

6    people, meaning the people that works for him, will stay

7    behind to help us with the deal.

8    Q    All right.

9             MR. LAYMON:  Go ahead, Mr. Rhodes.

10             (VIDEO PLAYED.)

11    Q    (BY MR. LAYMON)  Now, the meeting ends, everybody walks

12    away.  Where do you go at that point?

13    A    I went to an undercover vehicle that was waiting for me,

14    and we took off and went to meet with Mr. Fraga, the agent

15    from DEA.

16    Q    And what did you do when you met with Mr. Fraga?

17    A    Turned the man's purse to him.

18    Q    Okay.  And what was in that man's purse?

19    A    The evidence of this case.

20    Q    All right.  So, this meeting in El Salvador is over.  Do

21    you go back to the United States at this point?

22    A    Yes, sir.

23    Q    All right.  Now, after this meeting, would you continue

24    to have telephonic contact with Eric Constanza?

25    A    Yes, sir.

1    Q    And after this meeting, would you make more phone calls

2    to Mr. Constanza Bran?

3    A    Yes, that's correct.

4    Q    All right.  And again, in terms of those phone calls, did

5    you record them?

6    A    Yes, I did.

7    Q    And again, without belaboring the point, did you record

8    them in the same manner that you've already described?

9    A    Yes, I did.

10   Q    All right.  And once you recorded those phone calls, what

11   did you do with the recording?

12   A    Turned it over to the special agent in charge of the

13   case, Mr. Fraga.

14   Q    All right.  Now, as July turned into August, did you, in

15   fact, call Mr. Constanza again?

16   A    I'm sorry?

17   Q    As July turned into August, did you, in fact, call

18   Mr. Constanza again?

19   A    Yes, sir.

20   Q    Okay.

21            MR. LAYMON:  If I could just have one moment, Judge.

22            THE COURT:  Certainly.

23            (PAUSE.)

24   Q    (BY MR. LAYMON)  Mr. Cortez, if you would, please, turn to

25   Tab R, and just you, not the Ladies and Gentlemen of the Jury.

 1   If you would, turn to Tab R of your notebook.  Are you there?

 2   A    I'm there.

 3   Q    Okay.  Again, this reflects a telephone call to

 4   Mr. Constanza and I believe Filipino was also part of this

 5   call; is that correct?

 6   A    That's correct.

 7   Q    And --

 8              MR. LAYMON:  Your Honor, as long as we're operating

 9   in this mode, I marked this as Government Exhibit 8 and would

10   offer this transcript of the --

11              THE COURT:  This is 8A.

12              MR. LAYMON:  Excuse me, 8A, I'm sorry.  8A, I'm

13   going to offer it as Government Exhibit 8A.

14              THE COURT:  Same position, Ms. Hernandez?

15              MS. HERNANDEZ:  Subject to the substantive

16   objection.

17              THE COURT:  And those are noted.  The Exhibit 8A

18   will be admitted.

19              (GOVERNMENT EXHIBIT 8A ADMITTED.)

20              MR. LAYMON:  Now, if we could ask the Ladies and

21   Gentlemen of the Jury, Your Honor, to turn to Tab R.

22              THE COURT:  Tab R.  You may turn to Tab R, please.

23   Q    (BY MR. LAYMON)  And as they're turning to Tab R,

24   Mr. Cortez, let me ask you:  In this telephone call, you speak

25   with both Filipino and with Eric Constanza; is that correct?

1    A    That is correct.

2    Q    As the telephone conversation starts out, what -- what is

3    the topic of the conversation?  What do you learn and what do

4    you talk about?

5    A    I was told or advised that Mr. Bardales was in a car

6    accident in Guatemala, and we started talking about his health

7    conditions first.

8    Q    Okay.  And as the conversation ended, what essentially

9    was your position with Mr. Constanza?

10   A    Mr. Constanza was to continue with the operation and that

11   we will continue business as planned.

12              MR. LAYMON:  Okay.  Mr. Rhodes, that would be N-24,

13   Track 1.

14              (AUDIO PLAYED.)

15   Q    (BY MR. LAYMON)  Now, as we wrap this up for the day or

16   get close to that, Mr. Cortez, let me just ask you a few

17   questions about this call.

18        One of the people that's identified that you speak with

19   is Filipino; is that correct?

20   A    That's correct.

21   Q    Had you encountered Filipino prior to this phone call?

22   A    Yes, sir.

23   Q    And where was that?

24   A    In San Salvador.

25   Q    In the July meeting?

1    A   Yes, sir.

2    Q   Okay.  Now, on page 2, let me ask you quickly.  On page 2

3    of the transcript at Tab R, two-thirds of the way down the

4    page, the Filipino says, "I was in the passenger seat.  I

5    always...  Travel with the company manager."  Do you see that?

6    A   Yes, I do.

7    Q   And did you understand who he was referring to when he

8    said "the company manager"?

9    A   Yes, he was referring to Mr. Bardales.

10   Q   All right.  And if you would, please, go to page 8.  Page

11   8 of the transcript, Mr. Constanza, a little bit below the

12   middle of the page in the paragraph that begins, "but I hope

13   to God."  And Mr. Constanza says in that paragraph, "I told

14   him again that we want to continue with the project."

15       You see that?

16   A   Yes, sir.

17   Q   Did you understand what he meant?

18   A   I'm sorry?

19   Q   Did you understand what he meant when he said "I want to

20   continue with the project" or "we want to continue with the

21   project"?

22   A   Yes.

23   Q   And what did -- what did you understand that to mean?

24   A   That he has continued talking to the -- his law

25   enforcement friend about the enterprise we were about to do.

1   Q   Now, bottom of page 8, going to the top of page 9.  You

2   refer to the two guys, the two men, the other friends.   To

3   whom were you referring?

4   A   Mr. Mejia and Mr. Del Cid Morales.

5   Q   And lastly, on that same page 9, Mr. Bran -- in the first

6   Bran entry, that long paragraph that begins, "Yes, but we have

7   a plan."  If you'll go through that to the fourth sentence

8   from the bottom, begins "can tell you is that they will be

9   able to go to the neighbor's."  Do you see that?

10  A   Yes, I do.

11  Q   Okay.  So the sentence really reads, "What I can tell you

12  is that they will be able to go to the neighbor's because it's

13  easier for them to pass over," blah, blah, blah.

14      The phrase, "to go to the neighbor's," did you understand

15  what that meant?

16  A   Absolutely, yes.

17  Q   And what did you understand that to be a reference to?

18  A   That's in reference to San Salvador, El Salvador.

19  Q   Now, did he say "San Salvador, El Salvador"?

20  A   No, he did not.

21  Q   All right.

22          MR. LAYMON:  Judge, would that be a good place to

23  stop?

24          THE COURT:  I guess so.  You are costing us four

25  minutes here, Mr. Laymon, but I think we can live with it.

 1      All right.  We will break for the day.  We'll be back

 2   tomorrow morning.  I have two short matters in the morning,

 3   which means we should have no trouble beginning at

 4   9:30 tomorrow morning, and I pledge to you, Ladies and

 5   Gentlemen, that I will make sure we do begin on time tomorrow

 6   morning.

 7      So please be here timely, as you always have been, and we

 8   will start on time at 9:30 and continue with the testimony in

 9   the case.  Have a good evening.  Again, please don't talk

10   about the case among yourselves or with anyone else.  See you

11   in the morning.

12           Mr. Bradley, make them a good breakfast.

13           (JURY NOT PRESENT.)

14           THE COURT:  All right.  So, how do you think we're

15   doing time-wise, Mr. Laymon?

16           MR. LAYMON:  Judge, I think we're actually moving

17   much faster than I would have anticipated.  I'll be done with

18   Mr. Cortez probably in the morning at some point and then we

19   can be ready for cross.

20           THE COURT:  Mid-morning, you figure?

21           MR. LAYMON:  Well, we've got -- let me think about

22   it just a minute.  We've got the one more videotape meeting.

23   We've got to introduce some documents, a couple of phone

24   calls.  You know, it might be late in the morning.  It could

25   be even lunch by the time I get done, but I might get done

1    before lunch.

2            THE COURT:  All right.  And then we'll be into

3    cross-examination, and it will take at least the rest of

4    tomorrow, do you figure, Ms. Hernandez?

5            MS. HERNANDEZ:  I was hoping you would take through

6    the weekend and let me start on Monday.

7            THE COURT:  Hope springs eternal.  And then once

8    that's done, which I think will take us, as I said, probably

9    through tomorrow; if not, longer, into Friday.

10           MR. LAYMON:  And we have -- once Mr. Cortez is

11   finished, Judge, we have four witnesses remaining; the two DEA

12   agents and then the officer from Guatemala, and then the

13   officer -- the customs -- retired customs agent who comes to

14   talk about DIPA.

15           THE COURT:  So, my recollection is three of those

16   witnesses are fairly brief.  One of them tends to take a

17   little bit longer.

18           MR. LAYMON:  And then there's the agent from

19   Guatemala, so there's actually five.  I'm sorry, Judge, it's

20   five.

21           THE COURT:  No, four.

22           MR. LAYMON:  No, the two DEA agents talking about

23   the statement; the one DEA agent from Guatemala, that's three;

24   and we've got the Guatemalan officer, that's four; and then

25   the retired customs guy is five.

```
 1            THE COURT:  All right.  So once -- someone isn't
 2   listed on your list of witnesses, I guess, because we're into
 3   the fourth witness and you have eight total, which means you
 4   would have four more, so one is not listed.
 5            MS. HERNANDEZ:  Fraga is twice.
 6            MR. LAYMON:  Right, Fraga is twice.
 7            THE COURT:  All right.
 8            MS. HERNANDEZ:  It took us awhile to figure it out.
 9            THE COURT:  Well, I guess I was confused because you
10   said two DEA agents.  We have Agent Johnson and Agent
11   Sandoval.
12            MR. LAYMON:  Correct.
13            THE COURT:  And then we have a third DEA Agent,
14   Agent Fraga.
15            MR. LAYMON:  Right.
16            THE COURT:  All right.  Now I'm straight.  All
17   right.  Anything preliminarily that we need to talk about, and
18   I see too fingers up in the air.
19            MS. HERNANDEZ:  Two things, although I'm told you
20   should always talk in trilogies.
21            THE COURT:  Who told you that?
22            MS. HERNANDEZ:  A lot of trial practice advocates.
23   I am told --
24            THE COURT:  Mr. Mejia, you can have a seat.  You
25   don't need to stand up.
```

1          MS. HERNANDEZ:  I am told they found the file, the

2    DEA file with the quarterly reviews or whatever and that the

3    Government is reviewing it.  Now, that's all fine and good

4    but...

5          THE COURT:  So far so good.

6          MS. HERNANDEZ:  Yeah.  Now, I must say I have no

7    complaints, but I don't want to be given something at noon

8    that I need to use by 12:30.

9          THE COURT:  Well, let's talk about that.  Which

10   member of the Government team have you been dealing with who's

11   going to deal with this?

12         MR. LAYMON:  I guess it's me, Judge, because I'm the

13   one who has been looking at it.

14         THE COURT:  Ms. Hernandez would like sufficient time

15   to look at the materials that are going to be disclosed to

16   her.

17      Now, of course, let's -- let's get straight what the

18   ground rules for the Government's decision making.  I'm not

19   saying that it's necessarily the final decision, but for the

20   Government's decision making as to what it believes it needs

21   to disclose.  I mean, are you viewing this under some

22   particular *Rubric* or *Brady, Giglio,* or how are you assessing

23   this?

24         MR. LAYMON:  Well, initially, Judge, I was just

25   looking at it to see if there was anything that, you know,

that common-sensically ought to be turned over in terms of

fairness, apart from *Brady* or *Giglio*, but quite frankly, I

don't see anything, but let me -- I haven't really had an

opportunity to look at it closely, but as Ms. Hernandez can

see, it's actually quite brief.

MS. HERNANDEZ:  Is that it?  Is that the quarterly

since 1996?

MR. LAYMON:  Well, quarterly since apparently the

requirement took place.

MS. HERNANDEZ:  That's not -- that was --

THE COURT:  No one said quarterly since 1996.  The

testimony was quarterly for the last year-and-a-half.  That

would be a total of six.

MS. HERNANDEZ:  And then he also said there was a

requirement previous to that.

THE COURT:  He said he believed there was a biannual

requirement.

MS. HERNANDEZ:  Okay.  So that would be at least a

few -- another six or --

THE COURT:  We don't know how long it existed for.

You may know, but I don't know.  I don't think the witness

said.

MS. HERNANDEZ:  I know, but my understanding is,

frankly, that they have to keep these regular reports.  I

mean, you're not giving people money and you're not sending

1    them out to represent you without --

2             THE COURT:  Right, so whatever there is, there is,

3    and if you feel that they haven't turned over something,

4    you'll make that known to me and we'll deal with it.

5             MS. HERNANDEZ:  And if that's -- I'm sorry.

6             THE COURT:  Wait a minute.  I assume that Mr. Laymon

7    is aware of that and so will be, with his team, very thorough

8    in making sure that he has everything that exists.

9             MS. HERNANDEZ:  And, Your Honor, if what we're

10   talking about is six pages, frankly, they ought to hand them

11   over to me this afternoon because I really have a lot to do in

12   terms of coordinating the information and cross-examining.

13            THE COURT:  It's not an unreasonable request.  My

14   view is that, in the past, Mr. Laymon's been very reasonable

15   in dealing with such things.  Maybe he can take a few minutes

16   and look them over this afternoon and take care of it this

17   afternoon.

18            MS. HERNANDEZ:  Second thing, Your Honor.  In light

19   particularly -- Well, let me back off.  We have -- or my

20   predecessors have asked for the PSR in the confidential

21   informant's -- the PSR for the confidential informant, and it

22   has not been produced.  I think the Government's position was

23   it was not going to produce.

24       I think we're entitled to it, but in particular, we're

25   entitled to it given the --

1        THE COURT:  Usually, on PSRs from witnesses, I

2   review them quite frequently to determine whether, consistent

3   with whatever the Government's representation is, whether

4   there is *Brady* or *Giglio* in it.  Is the view that there -- I

5   mean, I don't understand what the basis for the position is,

6   so I'll ask.

7      Does the Government have a position that it need not turn

8   over the PSR?  That's the presentence report for Mr. Cortez

9   dated, as it may be, from 1996.

10        MR. LAYMON:  I'll tell you what I do know about

11  that, Judge, and that is that I spoke with -- I'm trying to

12  remember.  I believe it was the -- I spoke with someone.  I

13  don't want to say it was the actual probation officer that

14  wrote the report, because it may not have been.  It may have

15  been the supervisor.

16      I spoke to someone in the office in a position of

17  responsibility because we tried to track down the PSR.  Of

18  course, they declined to provide it to me, but what we did do

19  was we reviewed it together, and I was convinced that, you

20  know, apart from the -- you know, the -- obviously there is

21  going to be some mention --

22        THE COURT:  You went to the probation office, which

23  is part of the Court, rather than going to the Department of

24  Justice.

25        MR. LAYMON:  Oh, I tried.  I tried my colleague in

1  the Department of Justice, and they couldn't locate it.  It's

2  been -- I mean, it's been 1993 or '94, I guess.  '93, I think,

3  in Miami and we couldn't find it.  But I did find a copy with

4  the probation office in Miami, and we reviewed it and I did

5  not think --

6           THE COURT:  So they let you see it.

7           MR. LAYMON:  No, no, we discussed it over the

8  telephone.

9           THE COURT:  Okay.

10           MR. LAYMON:  We reviewed it in that way, and you

11  know, I didn't think there was any *Brady* or *Giglio* material,

12  so that's -- you know, that's my response.

13           THE COURT:  All right.  The response, as I

14  understand it on the record is, and I'm going to frame this a

15  little differently.  That the Government, meaning the

16  prosecutors, what I use the term "government" to mean, cannot

17  locate within its coffers a copy of a PSR for Mr. Cortez, but

18  it has identified that within the Court's coffers, that is,

19  the probation office, which is part of the Court, a copy

20  exists.

21     It has asked for that copy but the probation office has

22  declined to provide it to the Government, but the probation

23  office did engage in a discussion with Mr. Laymon about the

24  contents of the presentence report, and based on that

25  discussion, it is your view, Mr. Laymon, that there is no

1    *Brady* or *Giglio* or other material that needs to be turned over

2    to the Defense, even if you had it to turn it over?

3              MR. LAYMON:  Right.  And let me say also, Judge,

4    it's -- there is more to it than that.  For example, I've

5    already turned over the judgment of his conviction, the

6    rule -- the 5K motion the Government filed, the 35 motion the

7    Government filed, the Defense 35 motion, although I know there

8    is no such thing.  They filed a Rule 35 motion setting out

9    their side of the 35.  The transcript of the sentencing

10   hearing, and you know, assorted documents like that.

11        So really, when you look at it, there wouldn't be that

12   much more in the PSR to begin with, but I satisfied myself, I

13   established that he didn't have a prior record.  It was noted

14   in the PSR that wasn't otherwise noted in the NCIC report that

15   I turned over.

16        He didn't make any statements that are inconsistent --

17   that were inconsistent or are in any way really relevant at

18   all, and so really, that's what we discovered.

19              THE COURT:  All right.  That's where we are, Ms.

20   Hernandez.  What's your position?

21              MS. HERNANDEZ:  Your Honor, I'm going to ask if the

22   Court could request of the probation office in, I guess, the

23   Middle District of Florida, that it be sent to you for your

24   review.

25        You know, there may be information that is relevant.  The

1  Defendant testified, I think, that he was charged with -- he

2  was arrested in 1993 but that he had spent the '80s and '90s

3  drug-trafficking, so that there may be more information there,

4  impeachment information in the presentence report that would

5  disclose that, the length of his participation in

6  drug-trafficking and his role in that drug-trafficking that I

7  would like to see.

8      And also, I guess you're saying there was no criminal

9  history or no --

10         MR. LAYMON:  Other than -- other than the instant

11  offense.

12         THE COURT:  And nothing -- no criminal history

13  inconsistent with what's reflected in the other materials that

14  you've already provided to Defense counsel?

15         MR. LAYMON:  Right, because, for example, we ran --

16  the DEA ran its NCIC report, and of course, this -- his

17  '93-'94 conviction was reflected in there.  There wasn't

18  anything else.

19         THE COURT:  All right.  So your request is that I

20  get, through whatever means, from the probation office in

21  Miami --

22         MS. HERNANDEZ:  In the Middle District.  It's not

23  Miami.

24         THE COURT:  Middle District of Florida, I'm sorry --

25  the PSR and review it to determine whether there is any

1    *Giglio, Brady*, et cetera, material, although I'm not going to

2    know what's already been turned over, so I'll be a little

3    hamstrung in that assessment, but I probably can pull it off.

4        Any problem with that, Mr. Laymon, other than the

5    logistical problem?

6        MR. LAYMON:  No, certainly not.  I mean, Judge, it's

7    just been my previous experience that, you know, when the

8    only -- because this has happened before where --

9        THE COURT:  Sure.

10        MR. LAYMON:  -- you know, cases are dated and you go

11    trying to look for a PSR, and the only one you can find is in

12    the hands of the Article III side of the Government, and of

13    course, you know, judges don't like to turn those over.

14        THE COURT:  Understandably.

15        MR. LAYMON:  So, no, I certainly don't have any

16    problem with that.

17        THE COURT:  All right.  How best do you think we can

18    effectuate that since you have had the conversation with the

19    probation office?

20        MR. LAYMON:  Right.  And I'll have to -- hopefully,

21    I kept notes of who that was that I spoke with.

22        THE COURT:  We hope so.

23        MR. LAYMON:  We hope so, but if not, we can quickly

24    figure out who that was.

25        THE COURT:  Do you think that you can get in touch

1    with them, if not today -- it's already after 5:00 o'clock and

2    they're in the same time zone -- then first thing tomorrow

3    morning, and if necessary, have them call my chambers so that

4    I can discuss, you know -- if I need to communicate personally

5    with them, I can do so if you have them call my chambers.

6                MR. LAYMON:  Certainly.  What's your number, Judge?

7                THE COURT:  354-3430.

8                MR. LAYMON:  354-3430?

9                THE COURT:  Yes, sir.

10               MR. LAYMON:  Okay.

11               THE COURT:  And I guess, you know, even though it

12   may be lengthy, I would ask them to fax it to me.  It's not

13   likely to be that lengthy, but you know, it may be -- may be

14   20, 25 pages.  So let's see where we are.

15        Now, the problem will be having this completed by the --

16   by sometime tomorrow, but there is a reasonable chance that

17   we'll get it sometime tomorrow, and I can take a few minutes

18   at lunch to look over it.

19               MR. LAYMON:  Okay.

20               THE COURT:  Let's see if we can pull that off.

21               MS. HERNANDEZ:  Okay.  And I again, I guess, request

22   the Government to search its files on a confidential

23   informant.

24               THE COURT:  That request has been made of the

25   Government, and I expect the Government to -- and not only

1   expect, but I've been pleased that they have operated in good

2   faith and conscientiously and would have no reason to suspect

3   that they would do otherwise here.

4           MS. HERNANDEZ:  Well, yeah.  The concern is that

5   these documents are not within the control of the DOJ or of --

6           THE COURT:  Much of which relates to a criminal

7   case.  It's not originally within the control of the DOJ, but

8   we've got substantial DEA involvement here.

9           MS. HERNANDEZ:  That's my concern, and that's hard

10  to get information from DEA because, I mean, this isn't the

11  usual cooperating witness.  This is someone who's been working

12  for pay for multiple agencies.

13          THE COURT:  It should make it easier to get ahold of

14  it.

15          MS. HERNANDEZ:  So there should be a lot more

16  material than six pages is my sense in a case like this.

17          THE COURT:  I hesitate to say "should be" when the

18  United States Government is involved because you never can

19  tell.

20      But please, Mr. Laymon, Mr. Tomney and everyone else

21  involved, do what you can to make sure that your

22  representations that you have the complete file are accurate.

23  I would expect no less.

24      With that, have we covered the two that you wanted to

25  turn into three matters?

1           MS. HERNANDEZ:  Well, I can turn it into three.  I

2   mean, the other thing that may still be in issue is the

3   cross-examination on the -- on the truthfulness of his --

4           THE COURT:  Yeah, we'll talk about that probably

5   tomorrow morning.  And are you expecting to file something in

6   reply to the response on the rendition motion?

7           MS. HERNANDEZ:  Has there been something filed?

8           THE COURT:  Yes.

9           MR. LAYMON:  Uh-huh.

10           MS. HERNANDEZ:  I haven't seen it.

11           THE COURT:  You just haven't seen it yet.

12           MS. HERNANDEZ:  Last night?

13           MR. LAYMON:  Very brief.

14           THE COURT:  It's very brief.  It's two pages.  It

15   goes on to the third page, but the third page is just

16   "accordingly."

17           MS. HERNANDEZ:  You gave me until Friday.

18           THE COURT:  I know I did.  I'm just wondering if

19   you've seen it or -- you may have looked at it already and

20   said, "Jeez, they said nothing.  I'm not going to say anything

21   either."  Or you know, I may be shocked and you may have

22   looked at it and said, "Oh, they're right."  I said I'd be

23   shocked.

24       All right.  So we'll probably talk more in the morning

25   about the cross-examination, which leads me to suggest that

1    you should all be here at 9:15 for us to do that.  I promised

2    the jury we're going to start at 9:30 and we will.

3         All right.  Anything else?

4              MR. LAYMON:  No more questions.

5              MS. HERNANDEZ:  Thank you, Your Honor.

6              THE COURT:  Have a pleasant evening.  Work out those

7    document issues.  And Mr. Bradley?

8              THE DEPUTY CLERK:  The Tab E and Tab I.

9              THE COURT:  Can we take care of removing Tabs E and

10   I from the jurors' books overnight so that they don't have

11   those that aren't going to be in evidence and accidentally

12   turn to them?

13        Okay.  Thank you-all, and by all, I mean everybody that's

14   been participating.  Thank you very much.  Marshals included.

15             THE DEPUTY CLERK:  All rise.

16             (PROCEEDINGS END AT 5:15 P.M.)

17                         *-*-*-*-*

18

19

20

21

22

23

24

25

1                          I-N-D-E-X

2                          WITNESSES

3     Augustine Cortez
      Direct Examination.............................   2

4

5                     EXHIBITS RECEIVED

6     Government Exhibit 3A...........................   19
      Government Exhibit 4A...........................   24
7     Government Exhibit 4B...........................   29
      Government Exhibit 6A...........................   37
8     Government Exhibit 6B...........................   51
      Government Exhibit 6C...........................   75
9     Government Exhibit 6E...........................   77
      Government Exhibit 6F...........................   82
10    Government Exhibit 6G...........................   83
      Government Exhibit 6I...........................   84
11    Government Exhibit 6J...........................   85
      Government Exhibit 8A...........................   90

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8                        **CERTIFICATE OF REPORTER**

9

10          I, Catalina Kerr, certify that the foregoing is a

11  correct transcript from the record of proceedings in the

12  above-entitled matter.

13

14

15

16  _____    _____

17  Catalina Kerr                    Date

18

19

20

21

22

23

24

25