```
 1                    UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF COLUMBIA
      -------------------------X
 3    UNITED STATES OF AMERICA,

 4             Plaintiff,

 5             v.                     CR 06-0248-05 (JDB)

 6
      ALVARO AUGUSTIN MEJIA,          Washington, D.C.
 7                                    Tuesday, March 4, 2008
               Defendant.            2:00 p.m.
 8

 9                                   AFTERNOON SESSION
      -------------------------X
10
                             DAY 7
11                  TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE JOHN D. BATES
12                UNITED STATES DISTRICT JUDGE
      APPEARANCES:
13    For the Government:    BRIAN TOMNEY, ESQ.
                             KIA M. HABISREITINGER, ESQ.
14                           PAUL W. LAYMON, ESQ.
                             U.S. Department of Justice
15                           1400 New York Avenue, N.W.
                             Washington, D.C.  20530
16                           202.307.1383

17    For the Defendant:     CARMEN D. HERNANDEZ, ESQ.
                             P.O. Box 70
18                           7166 Mink Hollow Road
                             Highland, MD  20777
19                           240.472.3391

20    Court Reporter:        CATALINA KERR, RPR
                             Official Court Reporter
21                           U.S. Courthouse, Room 6716
                             333 Constitution Avenue, NW
22                           Washington, D.C.  20001
                             202.354.3258
23
      Proceedings recorded by mechanical stenography, transcript
24    produced by computer.

25
```

```
1                        P-R-O-C-E-E-D-I-N-G-S

2              THE DEPUTY CLERK:  All rise.  This honorable court

3    is again in session.  Please be seated and come to order.

4              THE COURT:  All right.  Ready?

5              THE DEPUTY CLERK:  Ready.

6              THE COURT:  No. 1, are we ready for the jury?  And I

7    have taken your theory of the case.  Did you provide it to the

8    Government?

9              MS. HERNANDEZ:  Yes.

10             THE COURT:  All right.  I'm having it incorporated

11   into the jury instructions.

12             MS. HERNANDEZ:  The only thing I would add is --

13             COURT REPORTER:  I can't hear you, Ms. Hernandez.

14             MS. HERNANDEZ:  I'm sorry.

15             THE COURT:  Nor can I.

16             MS. HERNANDEZ:  The only sentence I guess I would

17   add is something to the effect of if you so agree, you must

18   find the Defendant not guilty or something about -- there's a

19   sentence.  I just couldn't remember what it is.  It says --

20             THE COURT:  All right.  We'll figure that out.  And

21   we need to proceed and we'll deal with the issues as they come

22   up.

23        Mr. Bradley, bring the jury in.

24             (JURY PRESENT.)

25             THE COURT:  Welcome back, ladies and gentlemen,
```

```
 1   we're ready to proceed.

 2        Agent Fraga, I remind you, you're still under oath.

 3            THE WITNESS:  Yes, Your Honor.

 4            THE COURT:  Ms. Hernandez.

 5                    STEPHEN FRAGA,

 6   having been duly sworn, testified as follows:

 7                 CROSS-EXAMINATION (CONT'D.)

 8   BY MS. HERNANDEZ:

 9   Q    Good afternoon.

10   A    Good afternoon.

11   Q    Okay.  So when we last were up here, we were talking

12   about the statement that you have testified was given by

13   Mr. Mejia.  Now, after this -- do you know when the entire

14   interview ended?

15   A    No, ma'am.  I recall that it was a -- it was a fairly

16   brief interview.  The whole process from start to finish

17   wasn't more than maybe 30 to 35 minutes.

18   Q    Okay.  Now, we've already, I think, established that you

19   don't have an exact -- you don't have any documents exactly

20   documenting what you -- what you said and what Mr. Mejia said,

21   right?

22   A    Right.

23   Q    You did, however -- it is your statement today that

24   Mr. Mejia, at some point during this brief interview, told you

25   that he knew that the cocaine was coming to the United States,
```

1   correct?

2   A    Yes, ma'am.

3   Q    Okay.  Now, you asked Mr. Mejia to begin with his name

4   and other identifying information; is that correct?

5   A    Yes.  The first information that was obtained was

6   biographical information for himself and other members of his

7   family.

8   Q    And when you say "biographical," you mean what's your

9   name?

10  A    Name, date of birth, employment, address, telephone

11  numbers, family members, to include parents, mother, father,

12  spouse, paramour, girlfriend and children.

13  Q    And he told you that he was married?

14  A    I don't recall.

15  Q    Did he tell you that he had a child?

16  A    I believe so, but I specifically don't recall.

17  Q    Okay.  Did he tell you what he did for a living?

18  A    He told me that he was formerly a police official with

19  Guatemala for 15 years.

20  Q    That's what he was formerly.  Did he tell you what he did

21  for a living at that moment?

22  A    He told me that he sold water, I believe.

23  Q    Did he tell you that, or someone else told you that?

24  A    Initially, Mr. Constanza had told me that, but I believe

25  that Mr. Mejia may have said that same thing.

```
 1    Q    Did he tell you that he sold food?

 2    A    No.

 3    Q    That you remember?

 4    A    No.

 5    Q    Okay.  Did you ask him whether in fact he was the head of

 6    customs?

 7    A    Not in that form, but a -- a discussion regarding that

 8    topic took place, yes.

 9    Q    Did he tell you he was the head of customs?

10    A    No, ma'am.

11    Q    Now, at one point during this case you referred to him as

12    John Doe; is that correct?

13    A    Yes, ma'am.

14    Q    And that's because you didn't know what his real name

15    was?

16    A    Right.

17    Q    Did you know what his real name was when you started

18    questioning him?

19              THE COURT:  Counsel, approach.

20              (AT THE BENCH; ON THE RECORD.)

21              THE COURT:  Just a fair warning that you are

22    eliciting from this witness statements made by

23    co-conspirators.  You are asking the questions, and I'm just

24    giving you fair warning that he's going to answer the

25    questions.
```

 1          MS. HERNANDEZ:  Okay.  I didn't understand that when

 2    I asked him --

 3          THE COURT:  You asked him if he learned it from

 4    someone else.

 5          MS. HERNANDEZ:  No, the question -- well, there was

 6    nothing in his report about the water.  The only reference to

 7    water was in somebody else's report.

 8          THE COURT:  I don't know what's in the report or

 9    not, but you're asking questions that are likely to be

10    responded to with statements by co-conspirators.  All I'm

11    doing is advising you of that, and you're entitled to try your

12    case.

13          MS. HERNANDEZ:  Okay.  Thank you, Your Honor.

14          (OPEN COURT.)

15          THE COURT:  Agent Fraga, I'm not sure I reminded you

16    when we began this afternoon that you're still under oath.

17          THE WITNESS:  Yes, sir.

18          THE COURT:  So I remind you now.

19       Ms. Hernandez.

20    Q   (BY MS. HERNANDEZ)  Okay.  Agent Fraga, he told you that

21    Mr. Constanza had asked him to act as a police officer -- or I'm

22    sorry, as an official; is that correct?

23    A   Yes.

24          (CELL PHONE RINGING.)

25          MS. HERNANDEZ:  My apologies, Your Honor.

1    Q    (BY MS. HERNANDEZ)  And he told you that Constanza had

2    asked him or had told them that he wanted to open a company so

3    he could move a container, correct?

4    A    To my recollection, yes.

5    Q    And he did not tell you at that point anything about

6    cocaine or knowing that cocaine was intended to come to the

7    United States; is that correct?

8    A    No, I would say that that's not accurate, ma'am.

9    Q    Okay.  Well, you took notes, as we discussed earlier; is

10   that correct?

11   A    Yes.

12   Q    And those notes are contained in -- in a piece of paper

13   which -- the copy I received, apparently, was ripped out of a

14   stenographer's notebook, correct?

15   A    Yes.  It was Xeroxed from that notebook, correct.

16   Q    Okay.  And so the question is, do you recall him -- when

17   he first mentioned the container and when he first mentioned

18   what he had been asked to do by Mr. Constanza, that he said

19   nothing about cocaine?

20   A    No, I don't recall that, ma'am.

21   Q    Okay.  I'm going to show you what's been marked as

22   Defendant's Exhibit 6, and I'm going to ask you to review it.

23            MS. HERNANDEZ:  May I approach?

24            THE COURT:  There's two pages.  You going to show

25   him just the first page or what are you doing?

 1          MS. HERNANDEZ:  Well, there's two pages.  I was

 2    going to show him page 1.

 3          THE COURT:  Okay.  Just so we have it for the

 4    record.

 5          MS. HERNANDEZ:  May I approach?

 6          THE COURT:  You may.

 7    Q    (BY MS. HERNANDEZ)  Have you reviewed that?

 8    A    Yes, ma'am.

 9    Q    And those are your notes?

10    A    Yes.

11    Q    Your contemporaneous notes?

12    A    Yes, ma'am.

13    Q    And does that refresh your recollection that when he

14    first told you about the container and about being asked to

15    act as an official, that he said nothing about cocaine?

16    A    It does reflect my recollection, but the -- the drawing

17    that's depicted on the bottom of these notes is a discussion

18    regarding the movement of a container of cocaine.

19    Q    Okay.  Can you -- the first question I asked was, does

20    that refresh your recollection that when he first told you

21    about this, he did not mention cocaine, and you can say "yes"

22    or "no."

23    A    Ma'am, I'm confused as far as the notes if we're --

24          THE COURT:  Well, let's ask the question again.

25    Q    (BY MS. HERNANDEZ)  Yeah.  The first question I'm asking

1   you is does that refresh your recollection that when he first

2   mentioned the -- the container and being asked to act as an

3   official, he did not say anything about cocaine?

4   A    When he first mentioned the container, the discussion was

5   in reference to a container that was to be used to move

6   cocaine.  The discussion regarding his being requested to act

7   as an official was in conjunction with the discussion about

8   the container.

9   Q    Okay.  In those notes, in the handwritten notes that you

10  have in your handwriting, correct?

11  A    Yes, ma'am.

12  Q    In the handwritten notes, it does not use the word

13  "cocaine," correct?

14  A    No, ma'am, it does not.

15  Q    Okay.  And do you know when those notes -- Strike that.

16       Now, you also took a --

17            MS. HERNANDEZ:  Can I have that document back, Your

18  Honor?

19            THE COURT:  No.  Yes, certainly.

20            (LAUGHTER.)

21  Q    (BY MS. HERNANDEZ)  And this is the note that has the 1:53

22  time, correct?

23  A    Yes, ma'am.

24  Q    Okay.  Now, you also have a second page to this -- Let

25  me, before I move on to the second page.  There are four

1    sentences on that note that you just reviewed, correct?

2            MS. HERNANDEZ:  Is it possible to show it so

3    that the jury doesn't see it?  It's not in evidence but --

4            THE COURT:  You can put it on the Elmo and not have

5    it displayed to the jury.

6            MS. HERNANDEZ:  It's not on here.  Mine is not.  I

7    think mine is off.

8            THE COURT:  He's seeing it.

9            MS. HERNANDEZ:  I'm not.  Thank you.  Okay.

10   Q    (BY MS. HERNANDEZ)  Okay.  So you have essentially his

11   name and three sentences, correct?

12   A    From what I can see, or on the entire paper, ma'am?

13   Q    I'm sorry.  There's the entire page, okay.  And in the

14   handwritten portion, you have his name and three sentences?

15   A    Yes.

16   Q    Okay.  And in those written out notes, you don't -- it

17   doesn't say anything about cocaine or the U.S., correct?

18   A    As I explained, ma'am, the drawing that's exhibited on

19   the bottom portion of that note is a discussion regarding the

20   movement of a container of cocaine from Colombia, ultimately

21   to the United States through Panama, Guatemala and Mexico.

22   Q    Okay.  When you say "the drawing," you mean some lines

23   and scratchings that's -- with arrows?

24   A    Ma'am, it clearly depicts from the bottom, Colombia

25   northward to Panama northward, to Guatemala northward, to

1   Mexico and northward to the United States.

2            THE COURT:  I do want the record to reflect that you

3   are putting it into evidence the substance of the notes,

4   but...

5            MS. HERNANDEZ:  I'm actually not.  He's --

6            THE COURT:  But he is through your questioning.  You

7   asked him what the chicken scratching was.

8            MS. HERNANDEZ:  I didn't ask him what it was.  He

9   offered it.

10            THE COURT:  All right.  Go ahead.

11   Q    (BY MS. HERNANDEZ)  The chicken scratch, quote/unquote,

12   were you -- in your handwriting -- that's your handwriting?

13   A    Yes, ma'am.

14   Q    And it doesn't say -- nowhere on there does it say

15   "Colombia," correct?

16   A    Yes, it does.

17   Q    The word "Colombia" appears on there?

18   A    It says the initial "CB" on the bottom.

19   Q    CB for Constanza Bran?

20   A    CB for Colombia.

21   Q    I see.  And those are your -- you didn't get him to

22   initial this, did you?

23   A    No, ma'am.

24   Q    Okay.  That was one option that was at your disposal?

25   A    Yes.

1    Q    Okay.

2              THE COURT:  Wait a minute.  Was it a meaningful

3    option to get a Spanish speaking witness to initial a document

4    in English?

5              THE WITNESS:  No, sir, but that -- that wasn't the

6    thought process at the time.

7    Q    (BY MS. HERNANDEZ)  Well, let me expound on the Judge's

8    question.

9              THE COURT:  Go ahead.

10   Q    (BY MS. HERNANDEZ)  You had an interpreter sitting next to

11   you?

12   A    Yes, ma'am.

13   Q    Or someone who was acting as an interpreter?

14   A    Yes.

15   Q    And the chicken scratch doesn't actually write out

16   "Colombia," does it?

17   A    In -- yes, it does.  To me it does.

18   Q    It doesn't say, "C-O-L-O-M-B-I-A," does it?

19   A    No, ma'am, it doesn't.

20   Q    Okay.  And in any event, Colombia in English or Spanish

21   is written almost the same, if not identical, correct, as far

22   as you know?

23   A    Yes, with the exception of one letter.

24   Q    Actually, I don't -- what letter would that be?

25   A    Can you ask the question again?  I was confused.

1    Q    It actually is identical in English or Spanish, is it

2    not, Colombia?

3    A    Yes.

4    Q    Okay.  And you have another chicken scratch that says,

5    "U.S."?

6    A    Yes.

7    Q    You had, at your disposal, the ability to either have

8    that translated to Mr. Mejia, correct?

9    A    It was translated to Mr. Mejia as it was drawn in his

10   presence as it described the movement of a container from

11   Colombia through -- a cocaine shipment from Colombia to Panama

12   and a container that was moving from Panama to Guatemala and

13   the movement of that container from Guatemala to the Mexico

14   border for further distribution to the United States.  That

15   was translated to Mr. Mejia.

16   Q    Okay.  That's your testimony today?

17   A    Yes, ma'am.

18   Q    Which means that if it was translated to him, it would

19   have taken only an additional second or two to ask him to

20   initial your translation, correct?

21   A    That's true.

22   Q    But you didn't?

23   A    Correct.

24   Q    Okay.  Okay.  Now, you said here that the initials "CB"

25   refer to Colombia.  Is that what you're -- that's what you

1    just testified to, correct?

2    A    Yes, ma'am.

3    Q    Okay.  Now, on the second page of your notes, which has

4    six lines -- seven lines of writing, you also used the

5    initials "CB," correct?

6    A    Yes, ma'am.

7    Q    And in that instance, "CB" reflects to Constanza Bran,

8    not to Colombia, correct?

9    A    No, ma'am, it does not.

10   Q    So when you write "CB was moving dope," you meant

11   Colombia was moving dope?

12   A    No, ma'am.  In this reference on page 2, CB is reference

13   to the Colombian -- or reference to Augustine.

14   Q    I see.  Not -- not Augustine, but CB?

15   A    The Colombian was moving dope and the Colombian had a

16   network to move the dope to the United States as is further

17   corroborated in the videotaped and translations of the

18   recorded meetings.

19   Q    Now, "CB" are also the initials for Constanza Bran?

20   A    They happen to be, yes.

21   Q    And the initials for Augustin Mejia would be "AM"?

22   A    But Mr. Mejia knew him as a Colombian.

23   Q    Objection.  Answer the question first before you go to

24   explain.

25        The initials for Augustin Mejia would be "AM"?

1   A   Yes, ma'am.

2   Q   Okay.

3          THE COURT:  Let me ask you.  The Augustine you

4   referred to a moment ago, was that in -- with respect to CB,

5   was that in reference to Augustin Mejia or Augustine Cortez?

6          THE WITNESS:  In reference to Augustine Cortez.

7          THE COURT:  Thank you.

8          THE WITNESS:  The Colombian.

9          MS. HERNANDEZ:  Thank you for correcting the record,

10  Your Honor.  I misspoke.

11         THE WITNESS:  I'm sorry, ma'am.

12  Q   (BY MS. HERNANDEZ)  You don't have to be sorry.  I'm the

13  one that needs to be sorry.  The Augustin Mejia is the

14  cooperating witness or the informant -- the paid informant?

15         THE COURT:  No, no, not Augustin Mejia.

16  Q   (BY MS. HERNANDEZ)  I'm sorry, Alvaro Mejia.  My client --

17  Mr. Mejia's middle name happens to be Augustin, correct?

18  A   Yes, ma'am.

19  Q   His first name is Alvaro?

20  A   Yes.

21  Q   The paid informant's name or made up name is Augustin

22  Mejia?

23  A   Right, that's correct.  Augustine Cortez, ma'am, I'm

24  sorry.

25         THE COURT:  Yes.

1   Q    (BY MS. HERNANDEZ)   The paid -- next time, could you

2   please not use names that are similar or identical?

3   A    I'll try.

4   Q    I apologize to everyone.   It must be the post-lunch.

5        The paid informant's assumed name was Augustine Cortez,

6   correct?

7   A    Yes, that's correct.

8   Q    Now, you don't know exactly the question you asked of

9   Mr. Mejia.   You don't have anywhere written down the question

10  you asked of Mr. Mejia which elicited the answers that you

11  noted on this note?

12  A    No, I don't have the questions written down.

13            (PAUSE.)

14  Q    (BY MS. HERNANDEZ)   You did not seize any cocaine from

15  Mr. Mejia, did you?

16  A    No, ma'am.

17  Q    Or from Mr. -- or from the other defendants that were on

18  the plane at the time?

19  A    No.

20  Q    And neither did the Salvadorian government?

21  A    That's correct, they did not.

22  Q    And with respect to this case, there was no cocaine ever

23  actually shown or presented to anyone, correct?

24  A    Correct.

25  Q    Now, at one time -- there were two occasions when you

1    gave cash to the paid informant, correct, at least two

2    occasions?

3    A    Yes, ma'am.

4    Q    Okay.   On the first occasion you gave him $2500 for the

5    purposes of reimbursing Bardales for his experiences, correct?

6    A    Yes.

7    Q    And we actually see a video of the June meeting where

8    there is an apparent transfer of cash?

9    A    Yes, ma'am.

10   Q    And at that time the amount of money you gave for that

11   purpose was $2,500, correct?

12   A    That's correct, yes.

13   Q    And there is a payment record that you maintain whenever

14   you give the informant cash, correct?

15   A    Yes.

16   Q    And in that case, the -- the money you gave to the paid

17   informant was $2,500?

18   A    Yes.

19   Q    And you reported it on this listing, your payment record

20   as a purchase of evidence, correct?

21   A    I don't -- that's not my listing, ma'am.   That listing is

22   completed by a confidential source coordinator.

23   Q    At your request?

24   A    No.

25   Q    The $2500 was not at your request?

1    A    I think -- you asked me that when we were making

2    reference to a listing.

3    Q    Okay.  The $2500, you had to go to someone above you to

4    obtain permission to get $2500; is that correct?

5    A    Yes, ma'am.

6    Q    And it was transferred to the paid informant through you?

7    A    Yes, it was.

8    Q    In other words, you're the one who handed it over?

9    A    Yes.

10   Q    And do you personally have to fill out a form in order to

11   get that cash?

12   A    Yes.

13   Q    And you are aware also that there is a form, a DEA form

14   that is also completed by someone who is managing this cash in

15   some way or other?

16   A    They -- they only sign the form -- the request form for

17   the cash that I provide.  They sign it as that cash being paid

18   to me.

19   Q    Okay.  Well, what is DEA Form 356?

20   A    DEA Form 356 is a list of expenditures, which is

21   completed and made by a confidential source coordinator that's

22   not a person who's in the process of authorizing payment or in

23   the process of keeping that accounting for those payments.

24   Q    Okay.  So he's the coordinator.  How does he know how

25   much money is being transferred to the informant?  Is it

1   because you tell him?

2   A   He knows that based on the DEA Form 103s, which are the

3   payment forms to confidential sources.  He calculates -- or he

4   or she, for that matter, calculates the form that you're

5   referring to from those DEA-103s.

6   Q   Okay.  June 20th, 2006, you obtained $2500 to give it

7   to the informant, correct?

8   A   Yes, ma'am.

9   Q   Do you explain on whatever form you have to fill out what

10  the purpose of that $2500 is?  Do you write some notation?

11  A   Yes, ma'am.

12  Q   And do you know, for that $2500, what notation you wrote?

13  A   The category that would have been checked on that DEA

14  Form 103 was for that money to be expended in -- at the

15  direction of oral instruction that was provided to the

16  informant.

17  Q   Well, on the DEA Form 356, who would have completed

18  that -- when this coordinator completed it, who would have --

19  how would he -- who would have told him how to describe the

20  reason for the payment?

21  A   I don't know.  I can only assume that he -- that he gets

22  that information from the DEA Form 103, but it's certainly not

23  based on any discussion with any agents involved with the

24  investigation.

25  Q   From the DEA Form 103 which you would have completed?

1    A    Yes, ma'am.

2    Q    Do you have those DEA Form 103s?

3    A    I believe it was entered into this proceeding as an

4    exhibit.

5    Q    DEA Form 103?  Well, assume that it wasn't, do you have

6    the originals with you or copies, your own copies?

7    A    No, ma'am.

8                 THE COURT:  Ms. Hernandez.

9                 MR. LAYMON:  You want him to introduce a copy?

10                MS. HERNANDEZ:  This is not 103.

11                (OFF-THE-RECORD DISCUSSION BETWEEN COUNSEL.)

12                MS. HERNANDEZ:  If the Court will allow me, I want

13   to show him this form, and I'll mark it as Defendant's 7.

14                THE COURT:  No, 8.

15                MS. HERNANDEZ:  8.

16                MR. LAYMON:  This is a 103?

17                MS. HERNANDEZ:  No, this is 356.

18                THE COURT:  356.

19                MS. HERNANDEZ:  DEA Form 356.

20                THE COURT:  All right.

21                MS. HERNANDEZ:  Can we do this again, not with the

22   jury?

23   Q    (BY MS. HERNANDEZ)  Okay.  Just so you can see, that's DEA

24   Form 356.

25                THE COURT:  Question?

```
 1   Q    (BY MS. HERNANDEZ)  That has several items of -- several

 2   amounts listed on different lines, correct?

 3   A    Yes, ma'am.

 4   Q    The -- the reason for payment -- for the June 20th

 5   payment is identical to the reason for payment for the

 6   July 19th payment; is that correct?

 7   A    What's depicted on that form is identical, yes.

 8   Q    And, in fact, the June 20th payment, according to your

 9   testimony earlier in the trial, was to reimburse Mr. Bardales

10   for his expenses, correct?

11   A    Yes, ma'am.

12   Q    And the June 19th 10,000-dollar payment, according to

13   your earlier testimony --

14            THE COURT:  July.

15   Q    (BY MS. HERNANDEZ)  I'm sorry.  July 19th, 2006 payment,

16   according to your earlier testimony, was for a different

17   purpose?

18   A    Yes.

19   Q    But they were picked up on this form for the same reason?

20   A    I don't complete this form, ma'am.  I don't have anything

21   to do with this form.

22   Q    Okay.  According to this form, you reimbursed the paid

23   informant on June 20th to the tune of $1300; is that

24   correct?

25   A    Yes.
```

1    Q    Okay.  And you also reimbursed him to the tune of $2800

2    on July 19th?

3    A    Yes, ma'am.

4    Q    And on August 23rd, you gave him $1500, again for

5    reimbursement of expenses?

6    A    Yes.

7    Q    And on September 26 you reimbursed him for $2500?

8    A    Yes.

9    Q    And then on -- do you know what that last date would be?

10   A    It would be November 16th.

11   Q    Okay.  And then on November 16th you gave him $10,000

12   for information and service?

13   A    Right.

14   Q    On the reimbursement of expenses, did you receive any

15   receipts for those?

16   A    No.

17   Q    Is that just a sum he told you?

18   A    No, ma'am.

19   Q    Okay.  Well, how did you come up with those amounts?

20   A    I come up with the amounts because the informant e-mails

21   me the flight itinerary which depicts the cost of the flights

22   that he incurs.  Their per diem rates are based on the U.S.

23   government per diem rates that would include lodging, meals

24   and incidentals.

25   Q    Do you know what the per diem rate was at the time for

1  those localities?

2    A   No.

3            THE COURT:   Could counsel approach for a second.

4            (AT THE BENCH; ON THE RECORD.)

5            THE COURT:   You know what, I'm somewhat concerned

6  with time.   This seems to me to be far beyond the scope of the

7  direct examination of this witness on his second time on the

8  stand.

9      Are you anticipating just going into whatever you want

10  relevant to this case or do you think that you're just going

11  to examine within the scope of the direct examination?

12            MS. HERNANDEZ:   I was -- I didn't realize that he

13  hadn't prepared this form, and I was trying to establish a

14  point -- I wasn't going over how much money the informant had

15  been paid.   I was trying to establish that, in fact, both

16  payments reflected the same category, although one

17  testimony --

18            THE COURT:   That's still beyond the scope.

19            MS. HERNANDEZ:   Well, Your Honor, he testified

20  before the informant the last time.

21            THE COURT:   And that's why I asked you a question as

22  to what your intent is here so I'm clear on what we're going

23  to be dealing with.

24            MS. HERNANDEZ:   I -- my intent was to examine him on

25  information that's come out since his original testimony,

```
 1   because it was bifurcated, so I couldn't ask him those
 2   questions the first time, Your Honor.
 3            THE COURT:  If they had put him on all at once, to
 4   begin with, you wouldn't be able to ask him those questions
 5   either.
 6        Well, I'll give you some reasonable latitude, but we're
 7   not going into everything about this case.  I mean, he's put
 8   on some evidence with respect to this time on the stand, and I
 9   want that to be the primary focus of what we're dealing with
10   now.
11            MS. HERNANDEZ:  Okay.  I mean, as I say, I thought
12   this was his form, so the questions were -- the questions
13   weren't to review, once again, the amount of money made to the
14   informant.  I was just trying to establish another point, but
15   I didn't realize he had --
16            THE COURT:  I'll give you reasonable latitude, but
17   I'm not going to give you unlimited latitude.
18            MS. HERNANDEZ:  Thank you.
19            (OPEN COURT.)
20   Q    (BY MS. HERNANDEZ)  When you spoke to Mr. Mejia on the
21   plane, did you ask him anything about DIPA?
22   A    No, ma'am.
23   Q    Now, at some point in some of the -- in the July
24   videotape, there was a discussion about DIPA; is that correct?
25   A    Yes.
```

 1   Q    But, in fact, the information that Mr. Mejia and Mr. Del

 2   Cid provided about DIPA was not entirely accurate, correct?

 3   A    I don't know that I'm in a position to answer that

 4   question, ma'am.

 5   Q    Well, you prepared a form, a DEA-6 in reference to the

 6   July 19th meeting on DIPA, correct?

 7   A    I don't believe I prepared any report that references

 8   solely DIPA.

 9   Q    Did you prepare a DEA-6 in reference to the July 19th

10   meeting in the outdoor cafe?

11   A    I believe so, yes.

12   Q    Okay.  And in that report, do you recall stating that --

13   that although -- that -- do you report writing anything about

14   DIPA and whether what Mr. Mejia and Mr. Del Cid said at that

15   meeting about DIPA was inaccurate?

16   A    Do I recall writing what was said at the meeting was

17   inaccurate?

18   Q    Yes.

19   A    I don't recall something like that, ma'am.

20   Q    Okay.  Let me show you what I'm marking as Defendant's

21   Exhibit 9.

22           MS. HERNANDEZ:  May I approach, Your Honor?

23           THE COURT:  You may.  You want him to read the whole

24   document or refer to a particular place?

25           MS. HERNANDEZ:  Well, I pointed the section out, but

1    I don't want to limit.

2            THE COURT:   Thank you.

3    Q    (BY MS. HERNANDEZ)   Okay.   May I have it back?

4    A    Yes.

5    Q    Now, does that refresh your recollection about what you

6    wrote about the inaccuracy of the statements made by Mr. Mejia

7    and Mr. Del Cid?

8    A    It refreshes my recollection, but I don't agree that it

9    reflects any inaccuracies.

10   Q    Well, what you wrote in there is that it is likely that

11   the subjects had it wrong, isn't that correct, and the

12   subjects being Mr. Del Cid and Mr. Mejia?

13   A    No, ma'am, that's not what I wrote there.

14   Q    Okay.   What is it that you think you wrote?

15   A    What I wrote there was that the subjects of the

16   investigation perceived that the DIPA program was run by DEA.

17   What that report says there, that after queries that I

18   conducted with the Guatemala City Country office, the

19   Guatemala City Country office informed me that the DIPA

20   program is actually not run by DEA, but it's perceived by many

21   people as being run by DEA.

22   Q    Well, that's not exactly what you wrote here, is it?

23   A    In essence, it's the same thing, ma'am.   It may not be

24   the same words.

25   Q    Okay.   What you wrote -- or let's parse that a little.

1    First of all, in fact, what you're saying here is what --

2    that what the subject stated was not quite accurate; is that

3    correct?   In fact, what they said about the DEA was not

4    correct?

5    A    Their perception was not correct, yes.

6    Q    What they -- that's -- we're not talking about

7    perception.   We're talking about what they said about DIPA

8    being run by DEA was not correct?

9    A    I'd have to refer to what they said, ma'am.   If they said

10   that DIPA is run by DEA, then they would be incorrect in

11   that -- in that perception, yes.

12   Q    It doesn't say -- the word "perception" doesn't appear in

13   this paragraph -- in these sentences that we're discussing,

14   does it?

15   A    No.

16   Q    Okay.   What you said -- what -- what you wrote is that it

17   is likely that the subjects believed that it is, but it

18   doesn't say anything about perception.   That's your view,

19   correct?

20   A    Can you rephrase the question?

21   Q    Can you rephrase the question?   Or you're asking me to

22   rephrase?

23        THE COURT:   Rephrase the question, please,

24   Ms. Hernandez.

25        MS. HERNANDEZ:   Okay.   Okay.   Thank you.

 1   Q    (BY MS. HERNANDEZ)  You are trying to explain what you

 2   perceive -- you are trying to explain -- Let me rephrase that.

 3        You are trying to explain that what they said was not

 4   accurate?

 5   A    I was trying to explain that their perception of who ran

 6   DIPA was inaccurate.

 7   Q    You don't know what their perception was, right?

 8   A    I have reviewed the videotapes and transcripts of those

 9   meetings, and what they articulated in those meeting in

10   recorded conversations is that they believe that DIPA was run

11   by DEA.

12   Q    That's what they articulated.  You don't know what their

13   perception was; you only know what they articulated, correct?

14   A    If they are -- if they articulated that DIPA was run by

15   DEA and DIPA is not run by DEA, they were mistaken in their

16   perception or mistaken in what they articulated.

17   Q    Okay.  So they were mistaken in what they articulate --

18   in what they said.  Let's use common language.

19        They said that DIPA was run by DEA, correct?

20   A    Yes.

21   Q    And, in fact, DIPA was not run by DEA?

22   A    That's right.

23   Q    Okay.  And, in fact, we're talking really about Mr. Mejia

24   having said -- Mr. Del Cid having said that, correct?

25   A    Not necessarily, ma'am.  I don't recall.

 1  Q   You don't recall who said what on that tape; is that what

 2  you're telling me now?

 3  A   I recall that there were references to DIPA by both

 4  Mr. Del Cid and by Mr. Mejia, but I don't recall --

 5  Q   Who said what?

 6  A   -- which said what you just referred to.

 7  Q   Okay.  But the -- but the point I'm trying to make is

 8  that the statement that they made, one or the other or both,

 9  about DEA running DIPA was not accurate?

10  A   Correct.

11  Q   And anyone involved with DIPA would have known that?

12  A   No, that's not accurate.

13  Q   Anyone inside DIPA would have known that?

14  A   Not necessarily, no.

15  Q   You mean DEA was holding itself out as being involved and

16  it wasn't in fact?

17  A   I'm saying, as is reflected in that report, is that there

18  is a perception in Guatemala that DIPA is run by DEA.  What

19  the Guatemala City Country office informed me is, as is

20  reflected in that report, is that although it's perceived that

21  that's the case, DIPA, in fact, is not run by DEA.

22  Q   Okay.  Can you read this and point to me where it says

23  that DIPA is -- there's some wholesale perception that DEA

24  runs DIPA or is involved with DIPA?

25           MS. HERNANDEZ:  May I approach, Your Honor?

1            THE COURT:  You may.

2    Q    (BY MS. HERNANDEZ)  Just don't -- this isn't in evidence,

3    so just look at it and then I'll ask a few questions.  Okay?

4    A    Yes, ma'am.

5            MS. HERNANDEZ:  May I get it back, Your Honor?

6            THE COURT:  You may.

7            MS. HERNANDEZ:  Thank you.

8            THE WITNESS:  You're welcome.

9    Q    (BY MS. HERNANDEZ)  First of all, there's no reference to

10   "perception" in that paragraph; is that correct?

11   A    I believe that there is, ma'am.

12   Q    Okay.  Where?  Can you tell me where on that?

13   A    In the last sentence where it says that the -- although

14   the DIPA program is not run by DEA, it is likely that the

15   subjects believe that the program is run by DEA.  That, to me,

16   is the perception.

17   Q    It's likely that's the subject, but there's nothing there

18   about why that would be?

19   A    There's nothing in that sentence, but there is material

20   in the investigation that provides information that they

21   believe that DIPA is run by DEA.

22   Q    There is -- where is that?

23   A    In the videotapes.

24   Q    So you're going back to what they said, and from that,

25   you're making an assumption?

 1    A    Ma'am, I've made no assumption.    I reported here in this

 2    report what has been reported to me by the Guatemala City

 3    Country office.

 4    Q    And the only thing the Colombian Country office has

 5    reported to you is that DEA is, in fact, not involved in the

 6    running of DIPA, correct?

 7    A    That's right.

 8    Q    And that, in fact, it's the state department, not DEA?

 9    A    That's correct.

10    Q    And nothing there in what you wrote there says that

11    somehow it's been published to the public, for example, that

12    DEA is involved in DIPA?

13    A    I'm not sure I understood the question, ma'am.

14    Q    There's nothing -- nothing in this report that reflects

15    that -- why anyone would have a misconception about who's

16    running DIPA, correct?

17    A    No, not that I can see there, ma'am, no.

18    Q    And, in fact, the only sentence about any misconception

19    is that sentence that you just read?

20    A    I'd have to review the whole report, ma'am.

21         MS. HERNANDEZ:    Your Honor, may I?

22         (PAUSE.)

23    A    No, ma'am, that's not the only reference to DIPA in the

24    report.

25    Q    (BY MS. HERNANDEZ)    That's not the only reference to DEA

1  with respect to DIPA?

2  A   No, ma'am, it's not.

3  Q   Okay.  Can you tell me --

4         MS. HERNANDEZ:  May I retrieve the document, Your

5  Honor?

6         THE COURT:  You may.

7  Q   (BY MS. HERNANDEZ)  Can you tell me what exactly you think

8  is in there that supports your statement?

9  A   Yes.  Midway through the same paragraph, it states that

10 after the third month, that the DEA is to institute a new

11 program that's to be called DIPA within Guatemala.

12 Q   Well, that's not -- what it says is that's what the --

13 either -- that's what the subject said.  That's not what

14 happened.  That's what the subject said.

15 A   That's right.

16 Q   It's not the -- it's not the fact that was given to you

17 by the Guatemalan DEA agent, correct?

18 A   Correct.

19 Q   All it tells you is it's relating what was on the

20 videotape?

21 A   What it tells me is that the subjects of the

22 investigation had a perception that the DEA ran the DIPA.

23 Q   Right.  In other words, what it tells you is that the --

24 what the subjects said on that videotape is not accurate.

25 That's what this -- that's what this paragraph states.

1    A    To some degree, yes.

2    Q    Right.  That what the subjects were telling on that

3    videotape and telling others about the DEA and the new program

4    was not accurate.  That's what you concluded in that

5    paragraph?

6    A    It's -- it's not what I'm concluding in that paragraph,

7    ma'am.

8    Q    What is it that you're concluding in that paragraph?

9    A    That the --

10        MR. LAYMON:  Judge, may I object?  This has been

11   asked and answered now for --

12        THE COURT:  I'll let this answer come in and then we

13   need to move on.

14   A    That the DIPA program is run by -- or sponsored by or run

15   by a United States entity and that their perception is that

16   the DEA runs the DIPA, as where -- where from discussions

17   here, it's actually the State Department but the perception of

18   the people involved in those discussions was that it was the

19   DEA.

20   Q    Okay.  Let's be clear because I don't want to go over

21   this again.

22        MR. LAYMON:  Objection, Your Honor.

23        MS. HERNANDEZ:  Just two or three questions to wrap

24   this up, Your Honor.

25        MR. LAYMON:  Asked and answered, asked and answered,

1    can't we move on to something else?

2          THE COURT:  One question.

3          MS. HERNANDEZ:  A compound question?

4          THE COURT:  No, one question.  You want to make

5    something clear, make it clear.

6    Q    (BY MS. HERNANDEZ)  The statement that was made by what

7    you referred to as the subjects being Mr. Mejia or Mr. Constanza

8    Branza -- Bran or Mr. Del Cid, that was made on the

9    August 19th videotape -- on the July 19th videotape about

10   DIPA is not accurate?

11   A    The statement that the DEA runs DIPA is not accurate.

12   Q    Okay.  Let me see if you agree with this.  At the

13   June 20th meeting, which was videotaped, Bardales and Chiu

14   Serrano were present, correct?

15   A    Yes, ma'am.

16   Q    They had a conversation about what happens to someone

17   whose arrested by SAIA; do you recall that?

18   A    Arrested by?

19   Q    SAIA, the DEA counterpart in Guatemala.

20   A    I believe I'm familiar with what you're referring to,

21   yes.

22   Q    And when I say "DEA counterpart," I don't mean that they

23   have any connection to DEA other than that they are the drug

24   enforcement group in Guatemala.

25   A    Yes, ma'am.

1    Q    I don't mean to impugn DEA with that?

2    A    No, no, they're the equivalent, the federal narcotics

3    entity in Guatemala.

4    Q    And, in fact, the conversation, which is on tape, is

5    about the torture that goes on when someone is arrested and

6    questioned by SAIA, correct?

7    A    The conversation is about that, yes.

8    Q    And it's pretty graphic?

9    A    Yes.

10   Q    And there are -- their discussion is that you -- that, in

11   fact, people talk and say anything when they're arrested by

12   SAIA and questioned?

13   A    That's what the discussion in the meeting is about, yes.

14   Q    And that is as a result of their perception of what

15   happens when you're interrogated and questioned by SAIA,

16   correct?

17   A    I'm not sure I can answer that.

18   Q    You can't answer what their perception is in this

19   instance; is that what you're saying?

20   A    I don't know what their perception is based on with that.

21   I don't know.

22   Q    Do you know whether Mr. -- the paid informant

23   participated in that discussion?

24   A    The paid informant was present and a participant in that

25   discussion, yes.

1    Q    And so he added to that discussion?

2    A    I don't know to what degree, ma'am.

3    Q    Excuse me?

4    A    I don't know to what degree.

5    Q    Okay.

6         MS. HERNANDEZ:  Your Honor, I would like to play

7    that section for the jury.  It's not in their books.  I have

8    copies of it.  It may take a couple of minutes to set it up,

9    so perhaps after the break we could do that.

10        THE COURT:  After the break, you can do it.

11        MS. HERNANDEZ:  Okay.  All right.

12        THE COURT:  Unless there happens to be an objection,

13   but we'll deal with that.

14   Q    (BY MS. HERNANDEZ)  So do you know to what extent

15   Mr. Mejia or any of the other people you questioned on the plane

16   had that view of what happens when someone's questioned?  Do you

17   know?  If you don't know, you can say you don't.

18   A    No, I don't know.

19   Q    Okay.  You have a responsibility as a DEA agent with

20   respect to paid informants to prepare, I think you told us, a

21   report, correct?

22   A    Yes.

23   Q    And among the things that -- the reason -- part of the

24   reason you do that is to allow others to know other agents who

25   come after you, to know whether there are any problems with a

1  particular informant, correct?

2  A   No, ma'am.  The -- the reports that I prepare are in

3  reference to debriefings and information that are provided by

4  those informants.

5  Q   And when you have a paid informant, you have -- you --

6  there are certain rules that you have to read to them,

7  correct?

8  A   Yes, which is articulated in the confidential source

9  agreement that each informant signs.

10  Q   Including such things as that they cannot engage in

11  violations of the law?

12  A   Yes, ma'am.

13          MR. LAYMON:  Judge, can we approach?

14          THE COURT:  You may.

15          (AT THE BENCH; ON THE RECORD.)

16          MR. LAYMON:  This is the point where we get into the

17  question about the Florida comment.

18          THE COURT:  I'm ready for it.

19          MR. LAYMON:  I mean, the lead into this, the basis

20  for her springboard for this is that he fills out forms.

21          THE COURT:  Evaluations.

22          MR. LAYMON:  Evaluations that tip off agents in the

23  future to potential issues they should be aware of to which he

24  responded no.

25          If that's the basis for why we're asking this

```
 1   question, then I object because it's clearly not relevant.  If

 2   that's the offered basis, I object.  It's not relevant.

 3            THE COURT:  Ms. Hernandez?

 4            MS. HERNANDEZ:  Well, I'm going to explore what else

 5   these evaluations are used for, if they are maintained in a

 6   central file, and that the Attorney General has a set of

 7   guidelines for use of paid informants and among those

 8   guidelines -- I mean, I can go into this more thoroughly if

 9   the Court requires or if Mr. Laymon's objection --

10            THE COURT:  At the moment I'm going to overrule the

11   objection to the question that's been posed.  You may continue

12   your questioning.

13            MS. HERNANDEZ:  Do you want me to go -- this was my

14   last area of cross-examination, other than the other videotape

15   that I wanted to show.  I mean, if the Court wants me to go

16   into detail as to why these forms are -- I can't -- I have the

17   Attorney General's guidelines.

18            THE COURT:  You can do what you wish until there's

19   an objection that I sustain.

20            MS. HERNANDEZ:  Okay.  I mean, I don't want to go

21   into -- I don't want to spend 15 minutes setting it up, but I

22   can if that's what -- if that's what --

23            THE COURT:  I overruled the objection to the

24   question that's been asked.

25            MS. HERNANDEZ:  Okay.
```

```
 1              (OPEN COURT.)
 2    Q    (BY MS. HERNANDEZ)  Now, with respect to the paid
 3  informant in this case, Mr. Augustine Cortez, have you been made
 4  aware or have you made anybody else aware that a Federal Judge
 5  in Florida --
 6              MR. LAYMON:  Objection, Judge.  May we approach?
 7              THE COURT:  Sustained.
 8    Q    (BY MS. HERNANDEZ)  Do you know whether Mr. Augustin
 9  Mejia --
10              MR. LAYMON:  Objection.
11              THE COURT:  I have to hear a little bit more of
12  this.
13    Q    (BY MS. HERNANDEZ)  Do you know whether the paid informant
14  was found not to be entirely --
15              MR. LAYMON:  Objection.
16              THE COURT:  Sustained.
17    Q    (BY MS. HERNANDEZ)  Would it -- would it make a difference
18  to you in using a paid informant, whether he in a previous --
19              MR. LAYMON:  Same objection, Judge.
20              THE COURT:  Sustained.
21    Q    (BY MS. HERNANDEZ)  There are -- there's a main file in
22  every informant that's a paid informant, correct?
23    A    Yes, ma'am.
24              MS. HERNANDEZ:  With the Court's indulgence.
25              THE COURT:  Certainly.
```

1          (PAUSE.)

2     Q     (BY MS. HERNANDEZ)   You're aware that the Attorney General

3     has issued -- Let me back up.

4          The DEA is part of the -- is an agency of the Department

5     of Justice; is that correct?

6     A     Yes, ma'am.

7     Q     And the Attorney General is the head of the Department of

8     Justice; is that correct?

9     A     Yes.

10    Q     And are you aware that the Attorney General has issued a

11    set of regulations for the supervision and control of paid

12    informants?

13    A     There are -- there are various items that come out

14    regarding the supervision and control of paid informants, but

15    I'm not aware of the specific item that you're referencing.

16    Q     But you have certain obligations as a DEA special agent

17    when you are using a paid informant; is that correct?

18    A     Yes, ma'am.

19    Q     And among those obligations are these -- the preparation

20    of evaluations, correct?

21    A     No, ma'am, I don't prepare evaluations of informants.

22    Q     You prepare a DEA Form 512?  You don't know all the form

23    numbers.   I didn't mean to catch you on that.

24         There is a form that you fill out with respect to paid

25    informants; is that correct?

```
 1   A    In the process in which a -- an informant is being -- is

 2   being signed up, so to speak, or established as an informant.

 3   Q    And at the end of the case also?

 4   A    Only a -- well, no, not necessarily.

 5   Q    Well, did you, in fact, prepare a form with respect to

 6   the paid informant in this case?

 7   A    Can you ask me that again, ma'am?

 8   Q    Did you, in fact, prepare a form called "a confidential

 9   source deactivation form" with respect to the confidential

10   informant in this case?

11   A    Yes, I did.

12   Q    And that form is a DEA form, preprinted form?

13   A    Yes, ma'am.

14   Q    And it's a form that a DEA agent who has used a paid

15   informant must file, must prepare?

16   A    Yes.

17   Q    And that form calls for certain information?

18   A    Yes, ma'am.

19   Q    Including the amount of money you've paid that person?

20   A    I believe so, yes.

21   Q    And including whether the paid informant has testified?

22   A    I believe so, yes.

23   Q    And that form is then maintained in the paid informant

24   central paid informant file?

25   A    Yes.
```

1   Q   And if you, as an agent, wanted to review the paid

2   informant's history, you could go to that file and review it?

3   A   I could, but that form wouldn't be -- wouldn't be present

4   in that file beyond maybe the last 12 months.

5   Q   Where does -- really?

6   A   I believe that confidential source deactivation form is a

7   form that was instituted by DEA maybe within the past year or

8   so.  I don't think it's a form that's always been part of the

9   DEA procedure with informants.

10  Q   Well, are you saying that the form gets destroyed after

11  12 months?

12  A   No.  I'm saying that the form was instituted as a new

13  form within the past year.  I believe that there would be a

14  date on the bottom left-hand portion of it which would --

15  Q   But there was a different form before then, no?

16  A   I don't -- I don't recall if there was a different form

17  before that.

18  Q   Are you saying that before the last year, DEA agents who

19  utilized paid informants didn't have to report at all?

20  A   They would report, but I believe it would be in the form

21  of a DEA-6 or a report of investigation.  I don't think it was

22  pursuant to that DEA form that you're referring to now.

23  Q   Okay.  So you would prepare a certain form which related

24  your experience with the agent -- with the paid informant?

25  A   Yes.  And as the -- as the policies regarding informant

1   use and informant utilization changed or became more

2   stringent, as you referred to with the Attorney General's

3   policy, the reporting regarding the deactivation of those

4   informants are, in fact, the things that create the forms that

5   you're referring to.

6   Q   And the Attorney General's policy was issued sometime in

7   2001, was it not?

8   A   I don't recall, ma'am.

9   Q   Okay.  Would you -- and I'm asking you a hypothetical.

10  As a DEA agent, would you find it important --

11          MR. LAYMON:  I object, Judge.

12          THE COURT:  Well, we better approach because we

13  don't quite know what you're objecting to.  Why don't we do

14  this.  Why don't we take our afternoon break while we deal

15  with this issue.  See you in 15 minutes.

16          (JURY NOT PRESENT.)

17          THE COURT:  All right.  The objection is?

18          MR. LAYMON:  She's about to formulate a hypothetical

19  to -- excuse me.  She's about to formulate a hypothetical to

20  Special Agent Fraga that goes something like this:  Given what

21  you've just said, isn't it important for you to note that this

22  informant was accused of lying under oath by a federal judge

23  in 2002.

24      That's where we're going with that.

25          THE COURT:  Ms. Hernandez, is that where we're going

1    with that?

2            MS. HERNANDEZ:  Yes.

3            THE COURT:  The same ruling is going to be made with

4    respect to that question.

5            MS. HERNANDEZ:  Would the Court explain to me why?

6            THE COURT:  I think we discussed this at length

7    outside the presence of the jury.  I am not convinced, based

8    on what the -- Well, first of all, I already explained to you

9    that to some extent this is a flanking movement to get to

10   evidence that I allowed you to explore with the confidential

11   informant, and this is an attempt to impeach the confidential

12   informant through another witness, and I'm not going to permit

13   that.

14       Secondly, to the extent that you've already argued that

15   it's relevant because DEA agents -- Agent Fraga is not here,

16   is he?  No.  DEA agents would be keeping records or making

17   evaluations.  I find that that relevance is minimal, at best,

18   because I have no information to indicate that he knew of this

19   during the course of the investigation of this case, up to and

20   including the beginning of trials in this case.  Not this case

21   meaning with respect to your Defendant, but with respect to

22   other defendants.

23       Now, if you think to the contrary, let me know, but you

24   haven't let me know that yet.

25           MS. HERNANDEZ:  Well, my understanding is before we

1    started this case, Mr. Mejia's case, he knew.

2              THE COURT:  And what do you base that understanding

3    on?  Oh, before -- yes, before we started this case, yes, yes.

4              MS. HERNANDEZ:  And so if -- I thought that's what

5    the Judge's -- what Your Honor's measure was, "Did he know

6    before he started this case?"

7              THE COURT:  No, no, my measure was, "Did he know

8    during the course of working with this informant in developing

9    this case?"

10             MS. HERNANDEZ:  As I.

11             THE COURT:  He's learned it in the course of other

12   cases, trials with respect to other defendants through the

13   hard work and investigation and questioning at trial of other

14   Defense counsel.

15             MS. HERNANDEZ:  Right, and he now knows.

16             THE COURT:  And he now knows.  Well, he knows

17   something because of that.

18             MS. HERNANDEZ:  So the question is, have you

19   reported it?  Have you passed that information on?

20             THE COURT:  No.  And I have -- I already determined,

21   this is what I said a moment ago --

22             MS. HERNANDEZ:  Okay.

23             THE COURT:  -- that the relevance of that with

24   respect to post-investigation learnings that this agent may

25   have been the beneficiary of, is not great.

1      MS. HERNANDEZ:  Well, the problem is, Your Honor,

2  what the Court's -- what the Government's objection, what the

3  Court's ruling does is it insulates this confidential

4  informant from ever -- and every agent thereafter and every

5  prosecutor thereafter from ever owning up to it because --

6      THE COURT:  No, you had the chance to explore it

7  with the confidential informant who answered your questions

8  the way he answered them.

9      MS. HERNANDEZ:  And -- and the Court asked, and I

10  have not had a chance to review the record, whether he in fact

11  lied when he said he didn't know anything about it.

12      THE COURT:  I asked the Government that to make

13  sure -- out of the presence of the witness and the jury, to

14  make sure that we didn't have a situation where the Government

15  was concerned that a witness had presented perjured testimony.

16      MS. HERNANDEZ:  Right, but the point is that --

17      MR. LAYMON:  And they said they had no concern.

18      MS. HERNANDEZ:  And neither he nor I have reviewed

19  the record, I don't believe.  He, being Mr. Laymon nor I, have

20  reviewed the record to see whether in fact Mr. -- the

21  informant lied.

22      But the problem is, the objection by the Government and

23  the Court's ruling essentially insulates this informant from

24  ever having to answer in any future investigation.  DEA is

25  forever insulated because no one has reported and no one is

1    passing on this information on the record.

2        So the next time this informant testifies, the agent

3    won't know before he uses him, the prosecutor won't know

4    before the case comes before them.

5            THE COURT:  I'm not trying that case.  I'm trying

6    this case.

7            MS. HERNANDEZ:  Well, you know, I think I'm entitled

8    to bring this information out, both with respect to how this

9    agent handles confidential informants -- I don't want to beat

10   a dead.

11           THE COURT:  It doesn't depend upon when Agent Fraga

12   knew because you'll concede that he didn't know until he

13   learned in the course of the trials.

14           MS. HERNANDEZ:  I know nothing to the contrary.

15   I've already made myself clear that I think I can use it to

16   impeach the agent, and I think --

17           THE COURT:  How is it impeaching the agent?

18           MS. HERNANDEZ:  His -- the fact that he doesn't pass

19   it on, to me, impeaches the agent because it says, "I, as an

20   agent, don't care whether a witness that I used has been found

21   to be" or don't care to -- "Now that I've learnt this, don't

22   care to put it in the file for someone else to find out."

23   I think I've made my point.

24        I think the idea that this wastes too much time.  We

25   wasted more time arguing over this point than would have taken

1  up the jury's time had I been allowed to ask one or two

2  questions.

3       THE COURT:  That's my fault for giving you the

4  opportunity to say your peace and argue your position,

5  Ms. Hernandez, and I apologize for that.

6       MS. HERNANDEZ:  No, I don't -- that's not -- you

7  know, that's not my point at all.  As I told you earlier, I'm

8  appreciative of the Court's patience and consideration of the

9  arguments.  I am actually casting aspersions on the

10  Government's continued objection to something that frankly

11  they ought to be bringing out, in my opinion, and I say that

12  even as I say that I have dealt with few prosecutors whom I

13  respect more than Mr. Laymon.  That may be --

14       THE COURT:  Let's not explore that any further.

15       MS. HERNANDEZ:  Let me rephrase that.  Let me

16  affirmatively state that I respect Mr. Laymon's honorable

17  conduct.  But I believe I'm entitled to it.  I believe I'm

18  particularly entitled to it given the evidence that the

19  Government has been allowed to introduce, which in my opinion,

20  I understand not in the Court's opinion, is even more

21  attenuated to the issues -- to the matters at issue in this

22  case.

23    But if -- you know, I can't apparently find the correct

24  question to ask that will thread that needle, so the only

25  thing I have to play is the video that I left to be played,

1    and my cross-examination of this witness will be done.

2          THE COURT:  Mr. Laymon, did you have anything

3    further you wanted to say on Ms. Hernandez's plea and argument

4    that there is relevance to how this witness, Agent Fraga,

5    handles informants and a question and answer that revealed

6    that even recently his awareness that the confidential

7    informant had been found not to be entirely truthful and the

8    fact that he didn't report it would be relevant to this case?

9          MR. LAYMON:  Judge, it seems to me that the -- the

10   issue that Ms. Hernandez is raising is precisely -- All right.

11   Let me back up.

12      The issue that she's raising involves an allegation by

13   her, explicitly or implicitly, of informant misconduct.

14          THE COURT:  But also of --

15          MR. LAYMON:  Right.

16          THE COURT:  -- agent less than complete performance.

17          MR. LAYMON:  Right.  But the broader issue that

18   she's -- that she's talking about would be informant

19   misconduct.  Within that broader issue would be -- would be

20   the more narrow issue that she's talking about.

21          THE COURT:  Of what the agent has done with it.

22          MR. LAYMON:  What has the agent done, you know.  And

23   so my point is this:  Is that what she's trying to say in a

24   broad context is this informant is guilty of some impropriety

25   during the course of this investigation.  Within that broader

1   context -- within that broader context, more narrowly she's

2   saying that this brings -- this implicates the controlling

3   aspect or this implicates whether the agent improperly and

4   sufficiently controlled this particular informant.  You know,

5   and she's --

6           THE COURT:  Or continues to.

7           MR. LAYMON:  Or continues to.  And she has not

8   stated it specifically, but she has hinted that, for example,

9   the informant pocketed some of the $2500 from the June

10  meeting.

11      Again, although she has not said that specifically, there

12  are certainly indications that she is claiming that, for

13  example, the informant pocketed some of the money from the

14  June meeting.

15      And so she's raising, as an issue, whether Special Agent

16  Fraga was adequately supervising this informant.  And it might

17  come up in terms of, you know, were you there during the

18  surveillance; how close were you during the surveillance; did

19  you search him beforehand; did you search him afterwards, and

20  so on.  I guess it could come up in any variety of ways.

21      That might be a legitimate issue.  For example, it

22  certainly would be legitimate to ask Special Agent Fraga, you

23  know, did you search him before you gave him the money; did

24  you search him when he came back; you know, were you

25  conducting surveillance or did someone you trust conduct

1    surveillance, and so on and so on and so on.  Those might be

2    legitimate questions.  I understand that.

3        The issue that she's raising now is similar to that, but

4    the problem is, as we've already pointed out, is that Special

5    Agent Fraga didn't know about this judge in Florida who made

6    this comment in 2002.  He didn't learn about it until these

7    trials started.  So if the broader issue, and then within

8    that, the more precise issue is did he exercise sufficient

9    control over this informant at the time this investigation was

10   ongoing, which is arguably relevant?

11       And if she's trying to say that he didn't exercise

12   sufficient control over this informant at the time the

13   evidence was ongoing, then it makes no sense to question him

14   about something that he didn't know about.

15           THE COURT:  Well, it does and it doesn't.  What he's

16   done more recently may be circumstantial evidence as to how he

17   performed his obligations during the time of the investigation

18   with respect to overseeing the informant.  Wouldn't it be

19   circumstantial evidence that would have some relevance?  For

20   instance, let me, for our -- hypothetically, let's say that it

21   had come to light that -- let's say it had come to light and

22   only been learned recently that the confidential informant was

23   engaging in his own drug transactions, trafficking and

24   transporting cocaine from Colombia to the United States and

25   that they -- there was a sealed indictment that had been

1    returned with respect to that activity against the

2    confidential informant and the agent knew it, because the

3    agent had helped to develop that.  Is that something that

4    would be off limits if the agent did nothing with that

5    information?

6        And I say "sealed indictment" because that way the

7    confidential informant doesn't know anything about it.

8            MR. LAYMON:  Well, in terms of your hypothetical, it

9    would certainly make it easier if you had said a conviction,

10   the informant had been convicted.

11           THE COURT:  The rules cover that.

12           MR. LAYMON:  Right.

13           THE COURT:  I'm talking about something the rules

14   don't cover explicitly, and that the agent is aware of a

15   sealed indictment that has been returned with respect to this

16   confidential informant for drug-trafficking.  First of all,

17   you'd have to let the Defense know about that.

18           MR. LAYMON:  I suppose.  Yeah, okay.

19           THE COURT:  In here, that's not an issue because the

20   Defense knows about this --

21           MR. LAYMON:  Right.

22           THE COURT:  -- prior incident of alleged

23   untruthfulness.

24       Secondly, though, the question is, could that be explored

25   with the agents?  Confidential informant doesn't know anything

 1  about it, in my hypothetical, we don't have that issue.  Could

 2  that be explored with the agent?

 3          MR. LAYMON:  All right.  So you've got a sealed

 4  indictment of the informant which occurs --

 5          THE COURT:  After the investigation is completed but

 6  before the agent is on the stand.

 7          MR. LAYMON:  Right.

 8          THE COURT:  Occurred two weeks ago.

 9          MR. LAYMON:  And you're assuming the agent knows

10  about it.

11          THE COURT:  Sure.

12          MR. LAYMON:  Okay.  Well, unless it's -- All right.

13  Look at it fundamentally, Judge.  If it's not the agent's

14  case, assume that he's not part of that investigation but

15  someone else's investigation that he's aware of, then I guess

16  we'd have to determine the basis of his knowledge.  Does he

17  have personal knowledge or does he have hearsay knowledge of

18  that?  And then it's -- because any objection is going to be

19  subject to whether he knows personally or what the basis of

20  his knowledge is.  Is it hearsay or is it personal?

21          THE COURT:  Let's assume that he isn't the case

22  agent in the case but has been informed of it in the course of

23  his official responsibilities.

24          MR. LAYMON:  I don't think that it's proper to ask

25  the agent those questions.  I think that it's proper to

1  impeach, under 608(b), the informant because we're assuming --

2          THE COURT:  The informant doesn't know about it.  I

3  already told you that, and that's the case here based on his

4  testimony as well.  The informant doesn't know about it.

5  That's my hypothetical.

6          MR. LAYMON:  Okay.  So you impeach the informant

7  with that and he says he doesn't know.

8          THE COURT:  Right.

9          MR. LAYMON:  All right.  Then I don't think at that

10  point it's permissible to further question the agent about it.

11  There's got to be another way to get that in but it's not

12  through the agent.

13          THE COURT:  What's the other way?

14          MR. LAYMON:  I don't know.  You call another

15  witness.  Just like here, just --

16          THE COURT:  You mean you call another witness; you

17  mean you call another government official who has personal

18  knowledge of it as opposed to being informed in the course of

19  his official duties?  Do you think that's what it rests on?

20          MR. LAYMON:  I think it partly rests on that, Judge,

21  but I think it also turns on this as well.  Under 608(a)or 60

22  -- well, under -- under 608, the Defense could call the

23  federal judge.

24          MS. HERNANDEZ:  Your Honor, I'll call Agent Fraga in

25  my case-in-chief as a 608 witness.  I think that's where

```
 1    you're going.

 2              MR. LAYMON:  No, that's not where I'm going.

 3              THE COURT:  He still has a hearsay issue that he's

 4    interjecting here.

 5              MR. LAYMON:  Right.  I mean, no, I don't think,

 6    Judge -- I mean, I'm going to -- I don't think that a

 7    witness -- your hypothetical aside.  I don't think a witness

 8    with no personal knowledge of a subject, I mean, because --

 9              THE COURT:  We're at 608?

10              MR. LAYMON:  No, I'm going back to 602.  I mean, 602

11    states specifically (reading)  A witness may not testify to a

12    matter unless evidence is introduced sufficient to support a

13    finding that the witness has personal knowledge.

14         And then it goes on to talk about what the Court

15    mentioned already, and that the exception to that is testimony

16    by expert witnesses.  And so it always comes back to the

17    fundamental point, the starting point.  It doesn't end there,

18    but the starting point is, under 602, because when you go to

19    608(b) or you go back to 404(b) or go to 403, there's no

20    exception that says, "Oh, and by the way, 602 doesn't apply

21    here."

22         So, fundamentally, we always begin with 602, whether the

23    witness has personal knowledge.  This witness does not.  If we

24    want to put that aside, Judge, then we go to what the Court

25    has said, "Well, is there relevance?"  And I don't think it's
```

1    relevant at this point for her to be able to impeach the

2    informant through this agent.  I don't think that's

3    permissible under 608(b).

4            THE COURT:  How does the personal knowledge

5    requirement intersect with the hearsay issue here?  Is it the

6    same issue that you're raising?  When you say Agent Fraga

7    doesn't have personal knowledge, are you -- is that just

8    a euphemism for this is hearsay?

9            MR. LAYMON:  No, it's not a euphemism at all.  I

10   mean, he doesn't have -- it's a positive statement.  He

11   doesn't have personal knowledge.  Beyond that, Judge, if we

12   want to go to 800 --

13           THE COURT:  What if it did fit within the hearsay

14   objection, would that take care of the personal knowledge

15   problem?

16           MR. LAYMON:  That's what I'm saying.  There isn't a

17   hearsay exception that fits this.

18           THE COURT:  But if there were, would that take care

19   of the personal knowledge problem?

20           MR. LAYMON:  Well, it might.  I mean, I don't want

21   to -- I mean, I know we can stand --

22           THE COURT:  I know you want to be careful about my

23   hypotheticals.

24           MR. LAYMON:  We can spin hypotheticals.  I mean --

25           MS. HERNANDEZ:  I think 405 plays into this.

1          THE COURT:  You know, this isn't an evidence course.

2     It just would be nice if we had the time.

3          MR. LAYMON:  405?  Method of proving character.

4     Well, yeah, 405 plays into it because it plays into it in

5     terms of 608.  It's not -- it's not Special Agent Fraga's

6     character that's in question here.

7          THE COURT:  That's definitely right.

8          MS. HERNANDEZ:  No, but it is Mr. Informant's

9     character that's in question, and I think under 608 -- I

10    believe I can attack the credibility of the informant by

11    cross-examining the agent with respect to reputation evidence,

12    which does not have to be personal knowledge.

13         THE COURT:  No, because if you look at 608(b), which

14    is what you're talking about, I believe, it's talking about

15    the conduct of the witness, not being provable by extrinsic

16    evidence, and the exception is cross-examination of that

17    witness.

18         MS. HERNANDEZ:  Right.  But I think I can put on a

19    character witness -- I could bring in the judge, for example.

20    Let's get hypothetical.  I could put in the judge and use the

21    judge to attack the credibility of a witness; not of the

22    witness, but of a witness.  The credibility of a witness, not

23    of the witness on the stand may be attacked.

24         THE COURT:  Where are you?

25         MS. HERNANDEZ:  608(a) (Reading)  The credibility of

1    a witness may be attacked by evidence in the form of opinion

2    or reputation.

3        So the opinion would be the judge's -- Let me back up.

4    Forget the judge hypothetical.

5        The credibility of the witness --

6            THE COURT:  Yeah, you can do that under 608(a) with

7    respect to the judge.

8            MS. HERNANDEZ:  No, not bringing in the judge.

9    Let's have a witness.  The credibility of a -- the credibility

10   of the informant -- I'm going on 608(a) -- may be attacked by

11   evidence in the form of opinion or reputation but subject to

12   these limitations.  So I'm attacking the credibility of the

13   informant.

14           THE COURT:  Through Agent Fraga.

15           MS. HERNANDEZ:  Right.  The evidence may refer only

16   to character for truthfulness or untruthfulness, which this

17   is, and the evidence of truthful character is admissible only

18   after the character of the witness for truthfulness has been

19   attacked.  So I think I've attacked the credibility of the --

20           THE COURT:  That's evidence of truthfulness.  Don't

21   worry about that part.  That doesn't apply here.

22           MS. HERNANDEZ:  I think I'm under 608(a).  I'm using

23   Fraga -- it's not him I'm attacking.  I mean, I had that

24   argument.  You said, no, I can't go into what his

25   responsibilities are as the caretaker of the -- but I think I

1    can attack the credibility of the informant by evidence in the

2    form of opinion or reputation and that's the --

3            THE COURT:  You can ask Agent Fraga, if you wish,

4    whether he has an opinion as to the character of Mr. Cortez

5    for truthfulness or untruthfulness.  If he says, yes, he has

6    an opinion, you can ask him what that opinion is, or you can

7    ask him whether he has a reputation, but you're going to be

8    stuck with the answer.

9            MS. HERNANDEZ:  No.  I think I can ask him in the

10   form of -- I think I can ask him.  Obviously, I don't want

11   Agent Fraga to tell me he's got a great -- he believes the

12   informant.  I think I can ask Agent Fraga whether his opinion

13   of the informant's reputation for truthfulness is affected by

14   the fact that a federal judge has found him to be less than

15   truthful.

16           THE COURT:  Mr. Laymon, you can go ahead and

17   respond.  She now is pointing to 608(a).  You know, we bounce

18   around from route to route.  She's pointing to 608(a) and

19   wants to use 608(a) as a basis to attack the credibility of

20   Mr. Cortez by evidence from Agent Fraga through the form of

21   opinion or reputation, referring to Mr. Cortez's character for

22   truthfulness or untruthfulness.

23       And she wants to follow up -- if Agent Fraga says that he

24   does have an opinion or that Mr. Cortez does have a

25   reputation, and that that opinion or reputation is that that

1    is one of truthfulness, she wants to follow up by saying,

2    "Well, would your view change based on the fact that he's been

3    found to have been less than entirely truthful by a federal

4    judge?"

5            MR. LAYMON:  I think that's a fairly easy question,

6    Judge.  First, we start with 608(a), which says that the

7    credibility of a witness may be attacked or supported, so

8    subject to these limitations.  The evidence may refer only to

9    character for truthfulness or untruthfulness.

10           So I think she could ask Special Agent Fraga, because I

11   think he does have a basis for having an opinion about --

12   about the informant.  She could ask Special Agent Fraga if he

13   has an opinion as to the informant's character for

14   truthfulness and untruthfulness, and then he can answer that.

15   He can say, yes, I have an opinion; he can tell us what that

16   opinion is.

17           All right.  I don't know what his answer is going to be,

18   but let's assume that his answer is, "I have an opinion and I

19   find that he's a truthful human-being, okay."

20           All right.  Then we go to 608(b), which says

21   specifically, specific instances of conduct may not be, other

22   than conviction of crime, may not be proved by extrinsic

23   evidence.

24           Now, there is the exception which says that in the

25   discretion of the Court, if -- probative for truthfulness or

1    untruthfulness, you may allow it; however, as I read that

2    portion of 608(b), that specifically applies to the testimony

3    of the witness.

4           THE COURT:  This is cross-examination of the

5    witness.  That's correct.

6           MR. LAYMON:  Cortez.

7           THE COURT:  That's right.

8           MR. LAYMON:  Not Fraga.

9           THE COURT:  That's correct.

10          MR. LAYMON:  So that there is no -- for Fraga -- for

11   Fraga, there is no exception for 608(b).  She cannot ask him

12   about specific instances of conduct.  She's stuck with his

13   answer.  608(b) doesn't.

14          THE COURT:  She can't even ask him if he's aware of

15   a specific instance of conduct.

16          MR. LAYMON:  No, in my opinion -- in my opinion, if

17   you apply the fair requirements of 608(b).  Because, Judge, I

18   think this gets back to the other fundamental issue here.  Why

19   do we keep trying to come in the back door on this issue?  I

20   mean, my goodness gracious, these people have known about this

21   issues for months.

22          MS. HERNANDEZ:  I'm happy to move the judge's

23   decision into evidence if the Court will admit it.

24          MR. LAYMON:  No, that's not what I'm saying.

25          THE COURT:  I think that's the initial problem in

```
 1    terms of extrinsic evidence.

 2            MR. LAYMON:  Anyway.  I'm not --

 3            THE COURT:  I don't understand why you say why we're

 4    coming through the back door.  You mean they should have

 5    subpoenaed this federal judge.

 6            MR. LAYMON:  Bring the judge down.  You know, let's

 7    stop going through the back door and let's bring the judge up

 8    here and then she can be cross-examined as to why she made

 9    such a statement.  I mean, she can have to defend it.  It's

10    only the fair.

11            THE COURT:  It's only fair.  It's not only

12    realistic, though, and indeed, my guess is that your position

13    would have been that would be a waste of time, Judge Bates, to

14    drag this federal judge in here.  That's my guess as to what

15    the Government's position would have been.

16            MR. LAYMON:  I don't know, Judge.

17            THE COURT:  Now that it's not a possibility, you may

18    be a little more gracious in being willing to have a federal

19    judge subpoenaed and brought to testify here, but I'm not sure

20    that would have been your position two weeks ago.

21            MR. LAYMON:  I don't know, Judge.

22            THE COURT:  You don't know.  Well, that's a candid

23    response, and I appreciate that.  So I'm not sure that's the

24    complete answer here.  All right.

25            MS. HERNANDEZ:  I do note 608(b) --
```

1              THE COURT:  608(b)?

2              MS. HERNANDEZ:  Yeah, advisory notes for 1972.

3              THE COURT:  For 1972.  Notes to subdivision (b).

4              MS. HERNANDEZ:  (b) 2.

5              THE COURT:  Two particular instances of conduct?

6              MS. HERNANDEZ:  Though not the subject of --

7              THE COURT:  Let me just read it to myself, okay,

8    rather than...

9              MS. HERNANDEZ:  Okay.

10             (PAUSE.)

11             THE COURT:  All right.  You better read it, too,

12   Mr. Laymon.

13             MR. LAYMON:  I'm sorry, what are we referring to,

14   Judge?

15             MS. HERNANDEZ:  Advisory committee notes.

16             THE COURT:  1972.  The note to subdivision (b) and

17   it's subparagraph 2.  Do you see it?  I'll read it now.

18   (Reading)  Particular instances of conduct, though not the

19   subject of criminal conviction, may be inquired into on

20   cross-examination of the principal witness himself, or of a

21   witness who testifies concerning his character for

22   truthfulness.

23     (Reading)  Effective cross-examination demands that some

24   allowance be made for going into matters of this kind, but the

25   possibilities of abuse are substantial.  Consequently,

1    safeguards are erected in the form of specific requirements

2    that the instances inquired into be probative of truthfulness

3    or its opposite and not remote in time.

4        Ms. Hernandez would argue that that is precisely this

5    situation.  We have a particular instance of conduct that she

6    wishes to inquire into on cross-examination, not of the

7    principal witness, but of a witness who she is calling under

8    608 -- I'm sorry, under 405 -- well, no, it's 608.

9        Under 608(a), she's calling that witness to testify

10   concerning the character of Cortez for truthfulness, and she

11   believes that the constraints that are noted in this advisory

12   committee note are in play, that cross-examination will be

13   limited by the safeguard that the instance involved here, and

14   that is, the judicial determination, is one that is probative

15   of truthfulness or it's opposite, in this case,

16   untruthfulness.

17       All right.  Why doesn't that note apply here?  And while

18   you mull that over for the next 10 minutes, I'll take my break

19   and we'll be back together.

20              MR. LAYMON:  Okay.

21              THE DEPUTY CLERK:  All rise.

22              (A BRIEF RECESS WAS TAKEN.)

23              THE COURT:  Everybody has been madly reading the

24   rules of evidence, but I'll make my ruling without hearing

25   from anyone further.

1            MS. HERNANDEZ:   Thank God.

2            THE COURT:   Thank God is right.   All right.   The key

3   here is to refer back to 405 as well, where we know that the

4   rule says that character or trait of character of a person is

5   admissible but the proof may be made -- and proof may be made

6   by testimony as to reputation or by testimony in the form of

7   an opinion.

8        On cross-examination, inquiry is allowable into specific

9   instances of conduct.   And then the portion of the note to

10  subdivision (b) of Rule 608 that Ms. Hernandez referred us to

11  is consistent with that.   But here, the important thing is

12  that Agent Fraga has not been called as a witness to testify

13  to the character of Cortez, whether by reputation or opinion.

14       He's -- that's only been brought up in cross-examination,

15  and you may not, in your cross-examination, refer to specific

16  instances of conduct.   So your request to do so is denied.

17           MS. HERNANDEZ:   Can I ask the Government -- can I

18  ask the Court not to excuse Agent Fraga after he completes his

19  testimony because I may call him in my case-in-chief?

20           THE COURT:   Certainly he will not be excused and

21  you-all can deal with the question of whether he may be called

22  at that point.

23           And now, shall we bring in Agent Fraga and the jury

24  and you have --

25           MS. HERNANDEZ:   I have a part of the tape.

1          THE COURT:  All right.  So we ready for the jury, or

2    do you need a second?  You ready for the jury or you need a

3    second?

4          MS. HERNANDEZ:  No, I think we're ready.

5          THE COURT:  Okay.  Bring them in.

6          (PAUSE.)

7          THE COURT:  Let me just say on the record, so we

8    don't have unanticipated problems, we'll hold Agent Fraga and

9    you may call him if you have a basis to call him.  That won't

10   necessarily cure your problem because when you call him as a

11   witness to testify as to character or -- character through

12   reputation or opinion, you're not allowed to go into specific

13   instances of conduct.  It's only in cross-examination that

14   that can be done.

15         MS. HERNANDEZ:  It says to support or -- I thought

16   608 says the character of a witness may be attacked or

17   supported.

18         THE COURT:  Right.  And you can go into opinion or

19   reputation and Agent Fraga can testify as to that, but with

20   respect to specific instances of conduct, that can only be

21   inquired into on cross-examination, and you will not be the

22   cross-examiner in that instance.

23         MS. HERNANDEZ:  Well, every -- any -- I'll ask that

24   he be designated an adverse witness and every -- every person

25   can cross-examine their own witness.

```
 1              THE COURT:  No.  That's just an allowance in terms
 2    of the form of questioning.  That doesn't turn it into
 3    cross-examination.
 4         All right.  Are we ready for the jury?
 5              MS. HERNANDEZ:  These are pages of the transcript
 6    that were left out of their books.  They are the Government's
 7    transcripts.
 8              THE COURT:  Okay.
 9              MS. HERNANDEZ:  I think I can give the Court one.
10              THE COURT:  Sure.  Give it to Mr. Bradley and he'll
11    give it to me, and as long as the Government doesn't have a
12    problem with it, you can give them to the jury.
13              MS. HERNANDEZ:  Your Honor, may the interpreters
14    also have a copy?
15              THE COURT:  If she has enough, absolutely.
16              MS. HERNANDEZ:  Can I have the copy you guys --
17              THE COURT:  What did she say?
18              MS. HERNANDEZ:  I have 12, but I need one more.
19              (PAUSE.)
20              THE COURT:  Mr. Laymon, you have something you want
21    to say on this?
22              MR. LAYMON:  I do, Judge.  We're going to object to
23    the playing of this portion of the tape.  I think we left it
24    out because we thought that it was -- that it was unduly
25    prejudicial.
```

1          THE COURT:  Unduly prejudicial to?

2          MR. LAYMON:  Just to everybody.

3          MS. HERNANDEZ:  Himself.

4          THE COURT:  What do you mean to everybody?  That's

5     not --

6          MR. LAYMON:  The whole world, Judge.

7          THE COURT:  Unduly prejudicial to which side?

8          MR. LAYMON:  Well, we left it out, Judge.  We've not

9     introduced this into any trial, and the reason we didn't do it

10    was because we thought that it was unduly prejudicial, period,

11    because of the rather graphic language here.

12         THE COURT:  All right.

13         MR. LAYMON:  However, going beyond that, No. 1, I

14    don't know who says what here.  No. 2, Ms. Hernandez has

15    represented that this is a discussion about SAIA.  There's no

16    indication in this part of the transcript that this is a

17    discussion about SAIA.  I have no idea what's being discussed

18    here.  This doesn't necessarily even have to pertain to

19    Guatemala.  I mean, for all I know, they're talking about the

20    Godfather movie.  I mean, her --

21         MS. HERNANDEZ:  Well, the problem is I asked --

22         THE COURT:  What do you want to ask Agent Fraga

23    about with respect to this?

24         MS. HERNANDEZ:  I've already asked him with no

25    objection.  He said he was familiar with the subject matter.

1    I asked him.

2              THE COURT:  You mean the subject matter meaning the

3    videos?

4              MS. HERNANDEZ:  He was familiar with the video and

5    he was familiar with these passages, that it involved torture

6    and how people will say anything when interrogated, and I

7    asked him whether he knew whether my client or the others had

8    this in mind when they were responding to his questions, and

9    there was no objection, and I said --

10             THE COURT:  You mean responded to his questions on

11   the plane?

12             MS. HERNANDEZ:  Yes.  There was no objection.  I

13   said, you know, I wanted to play, and I said, "Your Honor,

14   there is a clip; could we do it after the break," and you

15   said, yes, and no one objected.

16             THE COURT:  Well, I said -- they didn't know what it

17   was, and I said, "Subject to the Government's objection."

18             MS. HERNANDEZ:  What do you mean they didn't know

19   what it was?  I mentioned the words "torture," and I mentioned

20   that it was in response to interrogation and it was the date

21   of the -- I mentioned it was the June 20th --

22             THE COURT:  I don't think they've waived any

23   objection, so, you know, we'll deal with the objection on its

24   merits, not through an argument that they have waived it.

25             MS. HERNANDEZ:  Okay.  My concern is that the jury,

1    you know, heard the whole -- I don't want them to think I'm

2    not producing this.  I mean, I don't want them to -- because

3    the way I left it was I would be --

4              THE COURT:  You didn't tell the jury you were going

5    to refer to any transcript.

6              MS. HERNANDEZ:  No, I told the jury that I would be

7    playing the -- I said, "Your Honor, I want to play the

8    videotape," but --

9              THE COURT:  That's not going to make it admissible.

10   The fact that you said you want to play the videotape is not

11   going to make it admissible.  Now, tell me why it should be

12   admissible.

13             MS. HERNANDEZ:  I think I already -- I thought I

14   already did, which is, the questions related to whether this

15   was in the -- this is a conversation between Chiu Serrano,

16   Bardales and the informant about what people do when they're

17   interrogated and tortured, and not just people but drug

18   defendants, I believe.

19        And I asked him whether any of this was in the minds

20   of -- of the -- of the witness -- of the Defendant, and I say

21   it's in reference to SAIA, or to some Guatemalan agency

22   because the reference is that -- from Chiu Serrano is that

23   this is what happens, you know, where he works or something to

24   that effect.

25             THE COURT:  Well, I'm not sure exactly how the dots

1    are connected in terms of relevance, but it is part of the

2    videotape taken with respect to a meeting that's been

3    introduced into this case, part of it has been introduced in

4    this case by the Government, and I doubt that Agent Fraga is

5    going to be able to provide much testimony with respect to

6    this.

7        Unless the Government can give me some argument as to why

8    it is prejudicial in some concrete sense, then I'm probably

9    going to allow it to be admitted.

10            MR. LAYMON:  And I'll be very brief, Judge.  First

11   off, this is part of the transcript from the Panama meeting

12   with several of the informants, Bardales and Chiu Serrano.

13            THE COURT:  But there's a videotape of it.

14            MR. LAYMON:  There's a video tape of it.  So I

15   understand the rule of completeness, and I know she's entitled

16   to, you know, to under normal circumstances to bring that in.

17   I don't quibble with that.  However, this Defendant Mejia is

18   not part of this conversation.

19            THE COURT:  It doesn't matter.  You've already

20   introduced it into evidence in this case, some of this.

21            MS. HERNANDEZ:  Against him?

22            MR. LAYMON:  Admittedly.  We've introduced part of

23   it, but Mejia was not present for this conversation.

24            THE COURT:  That's true.

25            MR. LAYMON:  All right.  Now, in a few minutes when

 1    we have closing -- or not in a few minutes, it may be a few

 2    days -- when we have closing argument, one of Ms. -- one of

 3    Ms. Hernandez's arguments is going to be that the Government

 4    cannot impute what happened at that July -- excuse me -- that

 5    June meeting between Bardales and Chiu Serrano to the

 6    Defendant.  I mean, we're going to get that for as many

 7    minutes as the Court will allow her to say that.

 8              THE COURT:  You're allowed to say it, too.

 9              MR. LAYMON:  That's true.  He wasn't there, you

10    can't impute what he said, there's no evidence that he knew

11    what was being discussed between Bardales and Chiu Serrano.

12              Well, likewise here.  He wasn't there.  There is no

13    evidence that he was privy to the conversation or had anything

14    to do with it.  And not only that, Judge --

15              MS. HERNANDEZ:  Let's strike the whole --

16              MR. LAYMON:  Not only that, but there's no evidence

17    in the record that this Defendant Mejia is aware of anything

18    like this, thinks anything like this, believes anything like

19    this is true.

20              THE COURT:  And that's what argument is all about.

21    I love closing arguments and you'll be able to say all of

22    that.

23              MR. LAYMON:  But there has got to be some relevance.

24    I mean, you know --

25              THE COURT:  I am already concluding that with

1   respect to the rule of completeness, it's coming in unless you

2   can give me some reason why it's prejudicial in a concrete

3   viable sense.

4          MR. LAYMON:  Well, I mean, let's look at the first

5   page.  There's a discussion in which they -- several times

6   somebody says they don't use electric shocks, and then

7   apparently that's agreed to, and then someone apparently says,

8   they don't -- bottom of page 1, which is really page 36, they

9   tie your balls.  No, but that is done, it's done under the

10  table meaning --

11         THE COURT:  I don't think that's prejudicial.  We've

12  got a jury of grownups, and if those terms were used in an

13  important passage to the Government's case, it would have come

14  in.  So that's not a reason to keep it out.

15         MR. LAYMON:  All right.  Well, I don't want to

16  belabor the point, Judge.  That's all I got.

17         THE COURT:  All right.  You can do it, but I'm not

18  going to let unfair questioning occur with respect to Agent

19  Fraga.  I mean, if he doesn't know anything about it, he

20  doesn't know anything about it.  If he doesn't know who said

21  what, he doesn't know who said what.

22         MS. HERNANDEZ:  I think he's already testified that

23  he was familiar with this passage.

24         THE COURT:  Generally familiar with it.  All right.

25  Let's bring the jury in and Agent Fraga, please.

1           MS. HERNANDEZ:  I think I gave you 13 copies.

2           THE COURT:  No, you can't pass them out until we

3    actually get to the point.  Don't pass them out as they come

4    in.

5           THE DEPUTY CLERK:  Got you.

6           (JURY PRESENT.)

7           THE COURT:  You got it lined up, Mr. Rhodes?

8       All right.  Welcome back, members of the jury.  Sorry for

9    the delay, again.  I said that a lot.

10      Agent Fraga, I remind you you are still under oath.

11          THE WITNESS:  Yes, sir.

12          THE COURT:  Ms. Hernandez.

13   Q    (BY MS. HERNANDEZ)  Okay.  Agent Fraga, before the last

14   break, we spoke about a segment of the meeting on June 20th,

15   and I'd like to play it for you to see if you can identify the

16   voices first.

17          THE COURT:  All right.  Wait a minute.  I will allow

18   it.  You're just going to play it for the agent or you going

19   to play it for the jury?

20          MS. HERNANDEZ:  Actually, Your Honor, this is -- my

21   understanding is this tape -- the entirety of the tape has

22   been introduced, and this segment has not been played for the

23   jury.  I would like to play it for the jury first.  I have

24   copies of the transcripts that we can hand out if the Court

25   will allow.

1           THE COURT:  So you want to just play it once.  So

2    you want to play it for the jury as well as Agent Fraga.

3           MS. HERNANDEZ:  Right.  But they don't have the

4    transcripts, so I would ask --

5           THE COURT:  They will in a moment.  Mr. Bradley is

6    going to give them the relevant transcript and they can follow

7    along with it.  And that portion of the transcript is

8    admitted.

9           MS. HERNANDEZ:  Okay.  I have a copy for Agent

10   Fraga, if the Court will allow me.

11          THE COURT:  You may.

12      Mr. Rhodes.

13          (VIDEO PLAYED.)

14          THE COURT:  It seems to be frozen, Mr. Rhodes.

15   He'll take it off the screens and fix it.

16          MS. HABISREITINGER:  Judge, may we approach,

17   briefly?

18          THE COURT:  Pardon me?

19          MS. HABISREITINGER:  May we approach briefly?

20          (PAUSE.)

21          MS. HABISREITINGER:  May we approach briefly, Judge?

22          THE COURT:  I guess so.  Come on up.

23          (AT THE BENCH; ON THE RECORD.)

24          MS. HABISREITINGER:  Judge, there is going to be a

25   problem with the Sanctions aspect of playing the video.  The

1  only thing that got put in Sanctions by Mr. Rhodes is what we

2  gave him to put in, so although you can watch the video and

3  follow along in the transcript, it's going to be what happened

4  in the Bran case.  We didn't have it side by side.  The video

5  in the Bran case, we didn't have Sanctions.  We just had the

6  video and they had their book.  We didn't set up.  We didn't

7  know she was going to play that.

8        THE COURT:  I don't know what we can do.

9        MS. HERNANDEZ:  It doesn't matter because they're

10 not reading what's on Sanctions.  They've got the transcript.

11        THE COURT:  Okay.  So that's fine.

12        (OPEN COURT.)

13        THE COURT:  We'll start all over, and whatever way

14 you can do it technologically, Mr. Rhodes.

15        MS. HERNANDEZ:  Your Honor, and just to the record,

16 this is Tab A of the document --

17        MR. LAYMON:  Tab A of the document.

18        MS. HERNANDEZ:  Of the book that the Government has

19 been using with the video and audio transcripts.  It is -- I

20 believe it's designated N-12 and it is -- actually, we're

21 going to go over pages 36 through 38.

22        THE COURT:  Wait a minute.  Tab A, page 36 is

23 different than what you have here.

24        MS. HERNANDEZ:  Okay.  I was given a different

25 notebook.

1        THE COURT:  So it's not pages 36 through 38 in Tab

2   A.

3        MS. HERNANDEZ:  Well, it is pages 36 through 38 of

4   the notebook that the Government gave me, but I'm told this is

5   the full original, unrevised, unredacted, which is not what

6   the jury has been given, because only portions have been --

7        THE COURT:  Right.

8        MS. HERNANDEZ:  -- played for the jury.

9        THE COURT:  And the portion that the jury was given

10  in Tab A, page 36, is different than the page 36 that you're

11  now referring to.

12      Just for the record, we need to clarify that, but all we

13  need to do now is everyone agrees that this is part of the --

14  everyone agrees this is part of the transcript or video of the

15  June 20th -- June 20, 2006 meeting.

16      MR. LAYMON:  We agree with that, Judge, it is.

17      THE COURT:  Right.

18      MR. LAYMON:  It's the last part that's recorded.

19      THE COURT:  And we can play it.  Mr. Rhodes can play

20  it.  It may not come across to the jury exactly the same as

21  earlier portions because you may not be seeing the video,

22  watching the rolling transcript and reading the transcript all

23  the same way.  It may not be matched up as cleanly, but you'll

24  see the video and you'll have this transcript in front of you.

25      All right.  Mr. Rhodes.

```
 1              MR. RHODES:  Yes, sir.

 2              MS. HERNANDEZ:  Your Honor, may I approach the

 3    witness?  He's asking for a pen.

 4              THE COURT:  All right.

 5              (VIDEO PLAYED.)

 6              MS. HERNANDEZ:  Can you stop it right there, please.

 7    Q    (BY MS. HERNANDEZ)  Agent Fraga, I think we read the first

 8    paragraph designated "MV" on page 36 of the document that

 9    we've -- do you know who was speaking?

10    A    Just to clarify, ma'am, the first paragraph that starts

11    with "Si, Eric, Eric Constanza"?

12    Q    Yes.

13    A    I believe that's Mr. Chiu Serrano.

14    Q    Okay.  Thank you.

15              MS. HERNANDEZ:  Yes, go ahead.

16              (VIDEO PLAYED.)

17    Q    (BY MS. HERNANDEZ)  Were you able, Agent Fraga, to

18    determine who the different voices going down the line were or

19    do you need to play segments again?

20    A    I think I would need to -- I believe I have a general

21    idea, ma'am, but I think I'd need to play segments again.

22    Q    Okay.  You can tell me when.  So the first one that we

23    identified, the paragraph on page 36 that starts with "Si,

24    Eric," blank, blank, blank, that was Chiu Serrano.  Do you

25    know who the next little paragraph is that's also an
```

1    unidentified male voice?

2    A    I believe that's Mr. Bardales.

3    Q    Okay.  And do you know who the next male voice is right

4    after that?

5    A    I would have to listen to it again, ma'am.

6              MS. HERNANDEZ:  Okay.  Can you go back to 2400?

7              (VIDEO PLAYING.) )

8              THE COURT:  Stop this.  Where is this?

9              MS. HERNANDEZ:  This is -- we are ahead of where --

10   we are on page -- we're a couple of paragraphs before where we

11   started.

12             THE COURT:  All right.  Well, don't play anything

13   other than this.

14             MS. HERNANDEZ:  Okay.  We're just trying to get to

15   the spot, Your Honor.

16             THE COURT:  Get to the spot.  If it's just two or

17   three paragraphs, play it, get to the spot.

18             MS. HERNANDEZ:  Yes.

19             (VIDEO PLAYED.)

20             MS. HERNANDEZ:  Stop.

21   Q    (BY MS. HERNANDEZ)  Do you know who said that, just --

22             MS. HERNANDEZ:  Your Honor, for purposes of this

23   hearing, let me just cut through so that we don't delay this

24   any longer.

25         This -- this whole passage that has been read is the

1  continuation of this videotape of June 20th, correct?

2  A   Yes, ma'am, it's a portion of it.

3  Q   And all the voices we hear are either Chiu Serrano,

4  Bardales or the paid informant?

5  A   Yes.

6  Q   Or the other two informants that were there, correct?

7  A   Yes, ma'am.

8  Q   Okay.

9        MS. HERNANDEZ:  Your Honor, unless someone wants to

10  identify the individual voices --

11        THE COURT:  You're conducting your testimony.  I'm

12  happy for you not to go any further than that.

13        MS. HERNANDEZ:  At the risk of having -- I think

14  it's -- for my purposes, sufficient that I --

15        THE COURT:  Okay.  Move along.

16        MS. HERNANDEZ:  I would have the -- that the jury be

17  provided these -- this transcript that we just handed out as

18  part of the documents that they have, so I would move that

19  segment of the transcripts into evidence.

20        THE COURT:  Any problem, Mr. Laymon?

21        MR. LAYMON:  No, no objection, Your Honor.

22        THE COURT:  All right.  It needs to be marked then

23  as an exhibit and it can be slid into the front flap of the

24  book for the moment.

25        MS. HERNANDEZ:  I believe that's Defendant's Exhibit

1   9 --

2           THE COURT:  It would be Defendant's Exhibit 9 -- no,

3   10.

4           MS. HERNANDEZ:  10.

5           THE COURT:  It will be Defendant's 10, and it is

6   these three pages of transcript and it is admitted.

7           (DEFENDANT'S EXHIBIT 10 ADMITTED.)

8           MS. HERNANDEZ:  Now, the transcript the jury has

9   doesn't say Defendant's Exhibit 10.

10          THE COURT:  But they're not going to be taking those

11  books back anyway.  I think, based on our conversation, right?

12          MS. HERNANDEZ:  Well, in that case maybe I should

13  read -- Your Honor, that will conclude my testimony -- my

14  cross-examination.

15          THE COURT:  All right.  Mr. Laymon.

16          MR. LAYMON:  Thank you, Judge.

17          THE COURT:  Redirect.

18          MR. LAYMON:  Very brief, Your Honor.

19                      REDIRECT EXAMINATION

20  BY MR. LAYMON:

21  Q   Special Agent Fraga, very briefly, I'm only going to take

22  a few minutes.  Let's go back to the last El Salvador meeting

23  where the Defendants were arrested, all right.

24  A   Yes, sir.

25  Q   There was a fourth person there with the three

1    defendants; is that correct?

2    A    Yes.

3    Q    Did you see that person?

4    A    Yes, I did.

5    Q    And was that person searched?

6    A    Yes.

7    Q    With what result?

8              MS. HERNANDEZ:  Your Honor, no leading, please.

9              THE COURT:  Well, we'll have no leading, but you may

10   continue with your question.

11   Q    (BY MR. LAYMON)  With what result?

12   A    He was found to have two weapons, two handguns.

13   Q    What kind of handguns?

14   A    One was a -- was a .22 caliber pen gun, similar actually

15   to the size of this pen here that would fire a .22 caliber --

16             MS. HERNANDEZ:  Your Honor, I object, and may we

17   approach, please?

18             THE COURT:  Well, of course you may approach.

19             (AT THE BENCH; ON THE RECORD.)

20             MS. HERNANDEZ:  Your Honor, this is the person who

21   wasn't arrested.  Apparently there are firearms now involved

22   in the case.  You know, I have been asked to put on the record

23   and -- ahead of time, and I'm not blaming the Court, every

24   time there's a possibility that we're going to go to areas

25   that are, you know, of question.

1    I wish Mr. Laymon would have alerted us that he was going

2    to get into the matter of firearms when my client never had

3    one at any meeting, so now we've got this that someone at the

4    location had firearms, even though he wasn't arrested and not

5    charged in the case.  So I object.  I move to strike.  I move

6    for a mistrial, and this is the last witness that the

7    Government's going to put on on recross, and the Court's

8    usual --

9              THE COURT:  On redirect.

10             MS. HERNANDEZ:  On redirect.  The Court's usual rule

11   is I don't get to cross-examine, so to bring it up on

12   redirect, I don't know how that's relevant to the cross.

13             THE COURT:  Why is it beyond the scope of the

14   examination of this witness?

15             MR. LAYMON:  First, it's highly relevant.  Secondly,

16   it's not beyond the scope because -- because Ms. Hernandez

17   spent a great deal of time questioning this agent about the

18   possession of firearms by people at that meeting, getting him

19   to testify in great detail that Mejia didn't have a firearm,

20   that Del Cid Morales didn't have a firearm, that nobody at

21   that meeting had a firearm.

22             THE COURT:  "Meeting" meaning the date of the

23   arrest?

24             MR. LAYMON:  Right, this meeting of the date of the

25   arrest.  I think it's -- not only is it incredibly relevant

1    that somebody with Mr. Mejia had two firearms.

2                    MS. HERNANDEZ:  Someone who wasn't charged.

3                    THE COURT:  But --

4                    MR. LAYMON:  He actually was arrested, whether we

5    indicted him or whether somebody else indicted him.  I think

6    it's incredibly relevant and it's not beyond the scope to

7    properly respond to somebody's -- it's redirect.  It properly

8    responds to her cross.

9                    MS. HERNANDEZ:  Your Honor, my cross, if I recall

10   correctly, was three questions primarily whether my client

11   ever had a firearm at all in any of the meetings, and he said

12   not to his knowledge.  Again, this is someone not charged, so

13   his firearm can't even be imputed.

14                   THE COURT:  Didn't you ask if anybody, not just your

15   client but any of the defendants?

16                   MS. HERNANDEZ:  You know, I can't -- but this person

17   is not a defendant.

18                   THE COURT:  I know, but he's with them at the

19   meeting.

20                   MS. HERNANDEZ:  First of all, no, I -- well, he's

21   with them at the meeting but he's not charged.  We going to

22   impute his conduct when he's not charged in the conspiracy to

23   my client?

24       Already -- Your Honor, my recollection -- I've already

25   objected to two introduction of all the information about

1    firearms, as the Court knows.  Your Honor admitted it over 403

2    objection, but now this is once removed and it is being

3    brought out on redirect.  I think it's highly prejudicial.

4    It's not a co-defendant, and it's relevant to what?  What --

5    how does that make any issue or any question -- any fact in

6    question in this trial more likely than not?  My client is not

7    charged with a -- with an aggravated drug conspiracy involving

8    firearms.  He's not charged in a 924C, so I would move to

9    strike this testimony -- frankly, I would move for a mistrial,

10    but I would absolutely move to strike the testimony.

11            THE COURT:  Anything further, Mr. Laymon?

12            MR. LAYMON:  Yes, Judge.  Now, clearly, not only is

13    it relevant, but, I mean, you know, we're going to hear about

14    how this is all about -- about this meeting was all about

15    Christmas tree ornaments that Mr. Bran and Mr. Mejia were

16    going to lawfully import into Guatemala and distribute, and so

17    the question I think this evidence fairly raises is, is who is

18    more likely to carry a firearm, a distributor of Christmas

19    tree ornaments or a guy who's there for a drug deal.

20       I just think it's very relevant, and it -- and it is well

21    within the scope of the cross-examination.

22            THE COURT:  Well, I'm a little disappointed that

23    it's come up at this stage in this way.  But I have made

24    rulings that questions relating to firearms, or exhibits

25    relating to firearms are admissible.  They are relevant, so

1    I've made those rulings.

2         With respect to this evidence, the question is whether

3    there is some probative value to the fact that this individual

4    who accompanied people to the meeting had weapons.  There's

5    some probative value to that.

6         So, in my view we are into a 403 analysis, and the

7    question is whether that is outweighed by -- or substantially

8    outweighed by the prejudice.  There's no delay here.  I'm not

9    going to have some side issue.  Is outweighed by the prejudice

10   of testimony that another individual, not a charged

11   individual, not a defendant, another individual on the scene

12   with those individuals, with the Defendant, had weapons.

13        Unfortunately, 403 works -- not unfortunately, but 403

14   works to allow the evidence in, and I think that we need to

15   cut short the examination of this.  I'm not intending to allow

16   you to go into some great examination of these weapons.  I

17   think you've probably done what I'm going to allow you to do,

18   but I'm not going to -- I'm going to overrule the objection,

19   and I am not going to strike the testimony.

20        I do think it's relevant, and I think under a 403

21   analysis it passes and that is because the prejudice does not

22   substantially outweigh the probative value.

23             MS. HERNANDEZ:  Your Honor, could we have a proffer

24   as to who this individual is?  Was he a member of the police

25   department?

1          THE COURT:  I think there's some evidence on this.

2          MR. LAYMON:  He's the guy that appears in the

3    videotape.  He's the fourth guy that walks in at the rear.

4          MS. HERNANDEZ:  Who Constanza Bran says was a driver

5    from the vice president's office?

6          MR. LAYMON:  I don't know if Constanza Bran says it,

7    but I know the informant said that he was the driver and that

8    he sat at the table adjoining them.

9          MS. HERNANDEZ:  You know --

10         THE COURT:  I think the informant said he wouldn't

11   let him sit at the --

12         MR. LAYMON:  Right.

13         MS. HERNANDEZ:  Right.  But I think there's a whole

14   lot of reference to whether Constanza Bran was being driven in

15   the vice president's car, so for all -- so for all we know,

16   this guy is a police officer or, you know, a security guard

17   for the vice president, but now, am I going to be allowed to

18   cross-examine on that?

19         THE COURT:  Well, I'm going to allow you to

20   cross-examine on this subject if you want.

21         MS. HERNANDEZ:  Do you know who he is?  Do we have a

22   proffer as to whether he, in fact, was authorized or whether

23   he was one of the security detail for the vice president?

24         MR. LAYMON:  Well, Constanza Bran didn't work for

25   the vice president at that time, so it's most likely that

 1    that's the case.

 2              MS. HERNANDEZ:  Well, I thought you guys had said --

 3    I mean, I asked specifically after that conversation, and I

 4    believe it was Brian who told me that you didn't know whether

 5    in fact he was driving the vice president's car because you

 6    believed that he was working somewhere in the vice president's

 7    office.

 8              MR. LAYMON:  He was the minister of science and

 9    technology.  That was prior to this.

10              THE COURT:  I'll allow cross-examination, and I'm

11    not going to allow further redirect on this.

12              (OPEN COURT.)

13    Q    (BY MR. LAYMON) Special Agent Fraga, going back to the

14    last meeting in El Salvador where everyone was arrested.  You've

15    testified previously about the one document that came from the

16    CD, Government Exhibit 20, I believe?

17    A    Yes, sir.

18              MR. LAYMON:  Your Honor, I have, at this point, what

19    we previously discussed, the English translation of Exhibit

20    51, which is the printout of that.  I marked this as

21    Government Exhibit 52.

22              MS. HERNANDEZ:  No objection.

23              THE COURT:  Why isn't it 20B?

24              MR. LAYMON:  It can be 20B, Judge.  We were trying

25    to keep it consistent with 51, but 20B works just --

```
 1                    THE COURT:  Or consistent with 20A.

 2                    MR. LAYMON:  Right.

 3                    THE COURT:  But 51 is in evidence and 20A is not in

 4       evidence, so what are we going to mark it as?

 5                    MR. LAYMON:  Let's call it 52, Judge.

 6                    THE COURT:  52.

 7                    MR. LAYMON:  To be consistent.

 8                    THE COURT:  All right.  And 52 has been moved into

 9       evidence.  No objection?

10                    MS. HERNANDEZ:  No, Your Honor.

11                    THE COURT:  Then Government's 52 is admitted.

12                    (GOVERNMENT EXHIBIT 52 ADMITTED.)

13                    MR. LAYMON:  Thank you, Judge.

14       Q    (BY MR. LAYMON)  And just -- Special Agent Fraga, let me

15       show you this for a moment.  Just so you're clear about what

16       we're talking about.

17           You briefly discussed this form on cross-examination.

18       This is the -- this is the English translation of that form,

19       is that correct, you've seen this before?

20       A   Yes, sir.

21       Q   All right.  Lastly, in terms of the last meeting in El

22       Salvador, Special Agent Fraga, you testified on

23       cross-examination about a DEA special agent Sara Laccone; is

24       that correct?

25       A    Yes, sir.
```

1    Q    And was she present at the scene of the arrest?

2    A    Not at the time of the arrest, no.

3    Q    Correct.  But shortly after that, was she present?

4    A    Yes.

5    Q    And what was her role for the hour-and-a-half after --

6    after the arrest of the three defendants?

7         MS. HERNANDEZ:  Your Honor, objection.  He wasn't

8    present, so he wouldn't know.

9         THE COURT:  Ask a foundational question.

10   Q    (BY MR. LAYMON)  Were you present with Special Agent

11   Laccone -- Sara Laccone there at -- in the vicinity of the

12   arrest site?

13   A    Yes, sir.

14   Q    Okay.  And how long after the arrest was that that you

15   and Special Agent Laccone were there?

16   A    It was maybe in that 10 minutes after the arrest itself

17   when I traveled over to the parking lot at the first -- at the

18   time of the first instance where I saw Mr. Del Cid, Mr. Mejia

19   and Mr. Constanza.

20   Q    Okay.  And what was Special Agent Laccone's role in the

21   case at that point?  What was she supposed to be doing?

22   A    Primarily, to accompany and/or liaison with the El

23   Salvadorian counterparts that were assigned to -- that were

24   conducting that operation.

25   Q    Did she accompany the three defendants?

1    A    I'm not aware, sir.

2    Q    All right.  Did she -- as far as you know, did she have

3    any contact with them after the arrest?

4              MS. HERNANDEZ:  Your Honor, he wasn't with her

5    except for that 10 minutes.

6              THE COURT:  Let's establish that.

7    Q    (BY MR. LAYMON)  Did you see her after the initial 10

8    minutes of the arrest -- 10 minutes later you and she are there,

9    did you see her after that?

10   A    Not until approximately an hour-and-a-half later at the

11   tarmac at the airport.

12   Q    Okay.  And do you know where she had been in that

13   hour-and-a-half?

14             MS. HERNANDEZ:  Objection.

15             THE COURT:  If he knows.

16   Q    (BY MR. LAYMON)  If you know.

17             THE COURT:  If you know, you may answer.  Overruled.

18   You may answer.

19   A    No.

20   Q    (BY MR. LAYMON)  Okay.  Fair enough.  Let me refer you to

21   what has been previously marked by Ms. Hernandez as Defense

22   Exhibit 6, and I think you have been -- consisting of two pages.

23             MR. LAYMON:  May I approach Your Honor?

24             THE COURT:  You may.

25   Q    (BY MR. LAYMON)  If you will take a moment to look at

1   that, Special Agent Fraga.

2          MS. HERNANDEZ:  Your Honor, it's refreshing

3   recollection?

4          THE COURT:  Not doing anything yet, so we'll see

5   where we are.

6          MR. LAYMON:  We're just identifying, Judge.

7          THE COURT:  We'll see where we are.  Let's have a

8   question posed before we have an objection.

9   Q   (BY MR. LAYMON)  My first question in regards to these

10  notes is, who wrote these notes?

11  A   I did, sir.

12  Q   Okay.  When did you write these notes?

13  A   At the time I conducted an interview of Mr. Mejia.

14  Q   Okay.  How many pages are these notes?

15         MS. HERNANDEZ:  Your Honor, these are all questions

16  that were brought out in cross-examination.  I'm not sure why

17  we're going over --

18         THE COURT:  Let's not waste time unnecessarily,

19  Mr. Laymon.

20         MR. LAYMON:  Thank you, Judge.  I'll be very quick.

21  Q   (BY MR. LAYMON)  How many pages are these notes?

22  A   Two pages, sir.

23  Q   All right.  And are these the notes that you took during

24  your interview with Mr. Mejia?

25  A   Yes.

 1           MR. LAYMON:  All right.  Judge, I would offer into

 2 evidence what has been previously marked as Defense Exhibit 6.

 3           MS. HERNANDEZ:  Objection.

 4           THE COURT:  Hearsay?

 5           MS. HERNANDEZ:  Yeah.

 6           THE COURT:  Does counsel need to approach?

 7           MR. LAYMON:  Yes.

 8           (AT THE BENCH; ON THE RECORD.)

 9           THE COURT:  The objection is hearsay.

10           MR. LAYMON:  Rule 612, Judge.

11           THE COURT:  612.  Let's see, Ms. Hernandez, 612.

12           MS. HERNANDEZ:  Yeah, what's the proffer?

13           THE COURT:  The proffer is that you used it to

14 refresh recollection during the course of your examination,

15 and therefore, they believe that they're entitled to have the

16 writer not only produced but to examine the witness on it and

17 to introduce in evidence those portions which relate to the

18 testimony of the witness.

19      Have I captured your position, Mr. Laymon?

20           MR. LAYMON:  Yes, sir.

21           MS. HERNANDEZ:  First of all, I did not use the

22 second page.  I used the first page.

23           THE COURT:  You agree, Mr. Laymon?

24           MR. LAYMON:  No, I think she used both pages.  I

25 think she cross-examined him from both pages.

1          THE COURT:  If she counted the number of lines on

2     the second page --

3          MS. HERNANDEZ:  But that was not to refresh his

4     recollection.

5          THE COURT:  What for?

6          MS. HERNANDEZ:  Because I was trying to establish

7     how many notes -- how many notes of the -- of the

8     contemporaneous notes he had taken.

9          THE COURT:  All right.  Go ahead.

10          MS. HERNANDEZ:  And my recollection is that I asked

11     him a couple of questions on the first -- on the first page,

12     and the part about refreshing recollection, I don't -- it was

13     a very specific and narrow question.  I mean, to try to

14     wholesale, put this in through the back door, extrinsic

15     evidence or whatever you want to say, you know, this is

16     frankly, I'm really a little annoyed.

17       We spent the whole afternoon outside the presence of the

18     jury for him to pull this stuff that is, you know,

19     questionable; maybe it comes in, maybe it doesn't but for him

20     to pull this stuff that's questionable so we can stand up here

21     for another X number of minutes when, as I said, I've had to

22     preview every question that may possibly be objectionable.

23          THE COURT:  But you're seeking to introduce the

24     entirety of the two pages of notes?

25          MR. LAYMON:  Uh-huh.

1          THE COURT:  Because you believe that she --

2          MS. HERNANDEZ:  Opened the door?

3          MR. LAYMON:  Well, it's not a question --

4          THE COURT:  -- she cross-examined relating to those

5     pages?

6          MR. LAYMON:  And just a few minutes ago, Judge --

7     Ms. Hernandez said, both in her cross-examination, just a few

8     minutes ago, she -- she cross-examined Special Agent Fraga on

9     this document under the pretense that she was using it to

10    refresh his memory or under the --

11         MS. HERNANDEZ:  Excuse me?

12         MR. LAYMON:  -- rubric that she was using it to

13    refresh his memory.

14         THE COURT:  There was no objection to it.  I was

15    sitting up here saying, "What the heck is going on here,"

16    because substantial portions of the document were coming into

17    evidence not to refresh memory, although initially that was

18    the purpose.

19         MR. LAYMON:  Well, I didn't object.  I mean, I was

20    happy to have her questions of Agent Fraga about this

21    document, but she specifically did it under the rubric to

22    refresh his memory.

23         THE COURT:  Let me see the document.  I don't have

24    the document in front of me.

25         MS. HERNANDEZ:  Frankly, I think 612 is not intended

 1    for this purpose.  612 is intended for when an agent uses his

 2    notes before he takes the stand, and I then say, "Well, let's

 3    introduce it."

 4           THE COURT:  No, it says "while testifying."  It

 5    covers both.

 6           MS. HERNANDEZ:  An adverse party is entitled to have

 7    the writing produced at the hearing.  In other words, my

 8    understanding is that I would be the adverse party to the

 9    witness.

10           THE COURT:  I will allow the Government to introduce

11    only a portion that I believe was the subject matter of the

12    testimony of the witness, and that's the diagram.  None of the

13    rest of this was really the subject matter of the testimony of

14    the witness.

15           MS. HERNANDEZ:  Well, Your Honor --

16           THE COURT:  That's what we're limited to, the

17    subject of the testimony of the witness as he read it.  Yes,

18    it was shown on the screen to us, not the jury, but the only

19    portion that was the subject of the testimony of the witness

20    was the diagram, and he talked about Colombia.  He talked

21    about this tracking.  Yeah, he talked about the CD on the

22    second page, but that wasn't substantive.  That was just a

23    reference to CD.

24           MS. HERNANDEZ:  So are you going to introduce just

25    half of this document, just the --

1          THE COURT:  I think that's what the rule says.  It

2     says to introduce in evidence those portions.  It speaks of

3     portions which relate to the testimony of a witness.

4          MS. HERNANDEZ:  Well, No. 1, I don't think this 612

5     applies in this situation because it's the adverse party

6     that's entitled to have the writing produced.  I don't think

7     that the Government is the adverse party to the witness.

8          I don't think the Government can try to put in through

9     the back door what it can't put in directly.  If the Court is

10    going to allow 612 to be used in this manner, then I would ask

11    that the entire page and not just this little diagram be

12    introduced.

13         MR. LAYMON:  If we're going to introduce the first

14    page, Judge, we have to introduce the second page because

15    that's the essence of my problem here, is because

16    Ms. Hernandez, in her cross-examination, which she is entitled

17    to do, raised the specter that she didn't say anything about

18    dope on the first page, conveniently ignoring that it appears

19    on the second page.

20         MS. HERNANDEZ:  Well, I brought that out on the

21    second page, but Your Honor -- I brought it out.  I brought it

22    out that he said it in the second page because I was concerned

23    that the Government was going to bring this out.

24         But Your Honor, he -- the Government is not the adverse

25    party to the witness, which I think is what 612 speaks to.

1      THE COURT:  I'll allow you to examine this witness

2  on the subject matter that he was examined, and that means if

3  she didn't bring out the second page, you may be able to frame

4  the question to that extent and use this to refresh his

5  recollection, but that doesn't mean that we have to introduce

6  the whole document.

7      MS. HERNANDEZ:  Your Honor, I did bring out -- I

8  mean, this wouldn't be redirect because I did bring out -- I

9  mean, I'm not stupid.  I'm not going to set him up so that on

10  redirect they're going to make me out to be a liar.  I did

11  bring out the fact that the second page did say that.

12      My point was that it only comes in later; that the person

13  only speaks about cocaine later.

14      THE COURT:  But it won't be much longer to my

15  allowing them to do that, so I'll allow them to do that but

16  we're not going to introduce the document.  I think normally

17  notes don't come in.  I think there's a strong argument that

18  all the notes wouldn't come in, but then you're each taking

19  different positions about how much of the notes come in, and I

20  think that what we'll do is we'll allow you to conduct your

21  redirect examination but we're not going to introduce this

22  document into evidence.

23      MR. LAYMON:  Just so we're clear, Judge.  I'm not

24  going to go -- I want to hear the line here of what you're

25  allowing me to do.  You're going to allow me to question about

1    what pages?

2            THE COURT:  I'm going to allow you to ask, for

3    instance, this question:  Agent Fraga, on cross-examination

4    you were asked whether there was a reference to cocaine,

5    or we're showing these notes, we're showing you notes to try

6    -- you know, and get him to answer and then -- and did you

7    make a -- was there a reference to cocaine?  Yes.  And did you

8    reflect that in your notes?  I don't know.  Let me show you

9    these to refresh your recollection.

10            MR. LAYMON:  All right.

11            MS. HERNANDEZ:  Your Honor, I did bring out -- I

12    mean, I'm going to object to mischaracterization of my cross

13    if he comes out.  I did not, you know, I'm not stupid.

14            THE COURT:  Okay.  I've made a ruling on it.

15            MR. LAYMON:  And you'll allow me to question about

16    the map?

17            THE COURT:  To the extent that your -- your redirect

18    of what she asked him about, yes.

19            MR. LAYMON:  Okay.

20            MS. HERNANDEZ:  Before we leave, my recollection of

21    the cross was that he clearly said, "CB meant Colombia," and I

22    said doesn't that mean Constanza Bran, so he got to say

23    exactly what he believed that diagram meant.

24            THE COURT:  So if your objection is asked and

25    answered, I'll deal with that.

```
 1              MS. HERNANDEZ:  Yes.  I mean --

 2              THE COURT:  We'll deal with that.

 3              (OPEN COURT.)

 4    Q    (BY MR. LAYMON)  Special Agent Fraga, can you see what's

 5    been marked as Defense Exhibit 6?

 6    A    Yes, sir.

 7    Q    You can see that, right?

 8    A    Yes, I can't see the very top portion but the --

 9    Q    Yeah, I'm really focusing on the bottom portion, which is

10    what you had previously testified to on cross-examination by

11    Ms. Hernandez.

12    A    Yes, sir.

13    Q    There are initials, CB, PNG, and so on.  Can you explain

14    to me how you -- how it was that you came to draw this map?

15    What's the source of information for the information that you

16    put down there?

17    A    The source --

18              MS. HERNANDEZ:  Asked and answered during cross.

19              THE COURT:  For this question, overruled.

20    A    The source of information is Mr. Mejia, my interview with

21    Mr. Mejia.

22    Q    (BY MR. LAYMON)  Okay.  And what did he tell you, though,

23    that caused you to draw this map?

24    A    It was a -- the map was drawn in conjunction with the

25    translation of Mr. Sandoval, and I can describe what fashion
```

1    this drawing came to be.

2    Q   Go ahead, please.

3            MS. HERNANDEZ:  Your Honor, again, objection, asked

4    and answered.

5            THE COURT:  I don't think this was fully explored.

6            MS. HERNANDEZ:  Your Honor, may we approach a

7    moment?

8            THE COURT:  Sure.

9            (AT THE BENCH; ON THE RECORD.)

10           MS. HERNANDEZ:  I will tell the Court how far we --

11   I, in fact, questioned him about why he didn't have the --

12   Mr. Mejia, if, in fact, those were his words, initialed that

13   diagram.  So I mean, this was completely explored.  He said it

14   was Mr. Mejia's words and all of that.  I'm just, for the

15   record, saying that.  We're going over --

16           THE COURT:  The objection is simply asked and

17   answered.

18           MS. HERNANDEZ:  Right.  And it's already been asked.

19   He described how it is that he came about to doing that, and I

20   said, "Well, why didn't you get his initials?"  Well, he

21   didn't answer.

22           THE COURT:  You know, it's pretty common in

23   cross-examination that we go into an area that the -- I'm

24   sorry, redirect -- we go into an area in cross-examination.

25   Overruled.

1          (OPEN COURT.)

2    Q    (BY MR. LAYMON)  Special Agent Fraga, if you'd go ahead

3    and please answer the question.

4    A    The questions that I posed to Mr. Mejia, initially the

5    drawing started from the bottom to the top and from south to

6    north, if you will, from Colombia to the United States.

7          During that conversation with Mr. Mejia, I described that

8    I was aware, pursuant to the investigation, that a shipment of

9    cocaine that originated in Colombia had been coordinated in

10   Panama to be shipped from Panama to Guatemala.  That is why we

11   see on the drawing, Colombia on the bottom, there's a line and

12   then "PN" for Panama is north of Colombia.

13         There's a depiction on the drawing of an arrow that goes

14   from Panama into Guatemala, which is a representation of the

15   discussion that we had that we were aware that a container was

16   to move from Panama into Guatemala.

17         There's then a drawing, a line above Guatemala and a

18   depiction of a north to south line from the Guatemala line to

19   a line on the drawing of Mexico, and in that discussion

20   there's a depiction of our discussion of the knowledge of that

21   container shipment to move through Guatemala up to the Mexico

22   border.

23         MS. HERNANDEZ:  Your Honor, I'm going to object.

24   The document itself is hearsay.  What is evidence is what my

25   client purportedly said on that day?

1    THE COURT:  Correct.

2    MS. HERNANDEZ:  If you wanted to have my client's

3  words presented to the jury, he could have audiotaped it or

4  have him sign the document.  He didn't.

5    THE COURT:  This is argument.  I understand your

6  objection.  We are going to bring this to a close.  I overrule

7  the objection.  It was an area that was explored on

8  cross-examination with the aid of this very document, so I'm

9  allowing redirect limited to the portion of the document that

10  was examined in cross-examination.

11  Q   (BY MR. LAYMON)  And lastly, Special Agent Fraga, as to

12  this Defendant's Exhibit 6, Ms. Hernandez asked you if there was

13  a reference to cocaine on page 1 of the -- of your notes.  I'll

14  ask you, is there a reference --

15    THE COURT:  Do you remember that?

16    THE WITNESS:  Yes, sir, I do.

17  Q   (BY MR. LAYMON)  Okay.  And I'll ask you then, is there a

18  reference to cocaine on page 2 of your notes?

19    MS. HERNANDEZ:  Your Honor, I'm going to object to

20  the extent there's an implication that I did not ask him about

21  page 2, which I definitely did.

22    THE COURT:  The objection is sustained to the extent

23  that the record and the jurors' recollection will suffice for

24  that.

25  Q   (BY MR. LAYMON)  Is there a notation -- in fact, is there

1   a notation, in fact, twice in page 2 of your notes?

2   A    Yes, sir.

3   Q    All right.  And do you recall what word you used in your

4   notes to refer to cocaine?

5   A    No, I don't, sir.

6   Q    Okay.  If I show you page 2 of your notes, would that

7   refresh your recollection?

8   A    Yes.

9          MR. LAYMON:  May I approach, Your Honor?

10         THE COURT:  You may.

11  Q    (BY MR. LAYMON)  Have you now had your memory refreshed?

12  A    Yes, sir.

13  Q    An on page 2 of your notes, what word did you use to?

14  A    It would be the word "dope," D-O-P-E.

15  Q    And meaning what?

16  A    Meaning cocaine.

17  Q    Okay.  Lastly, Special Agent Fraga, at the very end of

18  her cross-examination, Ms. Hernandez played a portion, the

19  last portion of the June 20 meeting in Panama.  Was Mr. Mejia

20  present for that meeting?

21  A    No, sir, he was not.

22         MR. LAYMON:  Okay.  No further questions for this

23  witness, Your Honor.  Thank you.

24         THE COURT:  Ms. Hernandez, I said I would allow you

25  very brief further cross as to a subject that came up in

1   redirect, if you wish.

2                    RECROSS-EXAMINATION

3   BY MS. HERNANDEZ:

4   Q   The first questions you were asked was about someone at

5   the September arrest situation who had firearms, correct?

6   A   Yes, ma'am.

7   Q   That person was not arrested -- was not charged in this

8   case, was he?

9   A   Not in this case, no.

10  Q   And that person supposedly is the same person who drove

11  Mr. Constanza Bran to the meeting in August; is that correct?

12  A   Yes, Mr. Barrios, yes.

13  Q   And according to Constanza Bran --

14             MR. LAYMON:  Objection.

15  Q   (BY MS. HERNANDEZ)  In the tape recordings that were

16  admitted into evidence --

17             THE COURT:  You can ask him if he knows about the

18  tape based on the tape recordings.

19  Q   (BY MS. HERNANDEZ)  There's a tape recording -- there's an

20  audio -- I'm sorry, there's a video of the August meeting; do

21  you recall that?

22  A   Yes, ma'am.

23  Q   And there's also a telephone call between Mr. Constanza

24  Bran and the paid informant; do you recall that?  There are

25  audiotapes of telephone calls between Constanza Bran and the

1  paid informant, correct?

2  A    Yes.

3  Q    You've listened to them all?

4  A    Listened and/or reviewed.

5  Q    And in one of those, I believe audiotapes, Constanza Bran

6  and the paid informant discussed this person who was there at

7  the August meeting, correct?

8  A    Yes.

9  Q    And Constanza Bran, in that telephone conversation, which

10  was admitted into evidence, states that that is the driver

11  from the vice president's staff, or words to that effect, does

12  he not?

13  A    Yes, he does state that.

14  Q    So --

15          MS. HERNANDEZ:  I have no other questions.

16          THE COURT:  All right.  Agent Fraga, you may step

17  down.

18          THE WITNESS:  Thank you, Your Honor.

19          THE COURT:  Mr. Laymon?

20          MR. LAYMON:  Yes, Judge.

21          THE COURT:  Any other witnesses for the Government?

22          MR. LAYMON:  Judge, I don't believe we have any

23  further witnesses, and we would be prepared to rest.  If you

24  could give us a few minutes just to contemplate that, perhaps

25  even if we can --

1          THE COURT:  We're going to give you overnight to

2    contemplate that, but I just wanted to see, make sure where we

3    were.  And you'll be given a chance to look over your

4    exhibits.

5          That's the close of the Government's case, ladies and

6    gentlemen.  We will continue in the morning.  Now, you

7    undoubtedly have figured out by now that you're not

8    deliberating and that you won't be deliberating today, and my

9    apologies for telling you that you would be.  I honestly

10   believed that you would be, but we haven't reached that point.

11         Tomorrow morning you will be receiving whatever

12   additional evidence in this case will be introduced by either

13   side, and you probably will have a little bit of delay at some

14   point tomorrow, and I apologize for that in advance, but

15   that's normal, in any case, because there are a few things

16   that have to happen without you in the courtroom.

17         But then you will be hearing the closing arguments and

18   receiving my instructions tomorrow.  Again, I apologize for

19   the fact that that did not occur today, as I had hoped and

20   expected it would, but will occur tomorrow.

21         Now, any problems that any of you have in terms of

22   scheduling for tomorrow or can you all be here for the whole

23   day?  I thank you again for your patience and your courtesy to

24   us in being prompt and attentive, and let's continue it

25   tomorrow.  Have a good evening.

1    Please don't discuss the case among yourselves or with

2    anyone else and we'll see you in the morning ready to go.

3        Mr. Bradley, do I have anything in the morning?

4            THE DEPUTY CLERK:  No.

5            THE COURT:  Nothing.  I leave this to the members of

6    the jury.  If you would like to begin at 9:00 o'clock, I am

7    prepared to begin at 9:00 o'clock, and believe me, counsel

8    will, too, if I tell them to.  Would the jury like to begin at

9    9:00 o'clock?  Does anyone have a problem beginning at

10   9:00 o'clock?

11       Let's start at 9:00 o'clock.  I'll make sure the

12   breakfast is here for you, and we'll see you then.  Thank you

13   very much.

14           (JURY NOT PRESENT.)

15           THE COURT:  All right.  Let's deal with one or two

16   matters, if we can.  The record may include one or two

17   exhibits that haven't yet been introduced, but may not.  But

18   assume that the Government's case is closed.

19       Ms. Hernandez.

20           MS. HERNANDEZ:  I will move for a judgment of

21   acquittal, Your Honor.

22           THE COURT:  Is there anything that you would like to

23   specifically reference for me with respect to that motion?

24           MS. HERNANDEZ:  The charged offense in this case is

25   a conspiracy with not -- a conspiracy under Title 21 USC, I

1  think it's 959.  Maybe it's 960.  And he's charged with -- if

2  the Court will -- he's charged with a violation of 21 USC,

3  Section 963, 952 and 960, and which charges that from on --

4  this is a superseding indictment from or about April 26

5  through September 27.  (Reading)  The Defendant, along with

6  others, did knowingly and intentionally combine, conspire,

7  confederate and agree to commit the following offense against

8  United States, knowingly and intentionally import

9  five kilograms or more of a mixture and substance containing a

10  detectable amount of cocaine, and knowingly and intentionally

11  manufacture and distribute five kilograms or more of a mixture

12  and substance containing a detectable amount of cocaine,

13  intending and knowing that such substance would be unlawfully

14  imported into the United States.

15          The thrust of the Government's argument is that

16  the -- and a conspiracy is an agreement.  That's the crime.

17  It's not the importation.  It's not the distribution.  It's

18  the agreement.  The Government has argued that the agreement

19  in this case was that the paid informant represented himself

20  to be a cocaine trafficker who wanted safe passage of cocaine

21  from Guatemala to the border with Mexico, and that safe

22  passage was to be the -- was to be obtained by virtue of high

23  level Guatemalan officials greasing the skids for him.

24      There is, in fact, no evidence that any high level

25  Guatemalan officials were about to grease the skids or that my

1  client -- better, that my client, who only acted as a high

2  level Guatemalan official and not as a Guatemalan official

3  agreed to grease the skids.

4      There has been an absence of evidence that he, in fact,

5  had the ability to carry -- to grease the skids as they say.

6  I mean, there's been an absence of evidence that he contacted

7  someone who would in fact do what he was asked -- what he was

8  purporting to be able to do.

9          THE COURT:  You're arguing some impossibility?

10          MS. HERNANDEZ:  Yeah.  There was no meeting of the

11  mind.  If the agreement was "I have cocaine, you are a high

12  government official who's going to allow my cocaine to pass

13  through undetected," my client never in fact agreed to that

14  because all he agreed to be is to represent himself to be

15  someone he was not.  That's it.

16      There was a virtual impossibility of a meeting of the

17  minds.  This guy wants cocaine -- this guy wants safe passage

18  and my client is saying, "I am the commissioner of customs."

19          THE COURT:  Okay.

20          MS. HERNANDEZ:  Whom he was not.  So there was no

21  meeting of the minds, No. 1, and without a meeting of minds,

22  you have no conspiracy and there is no evidence to the --

23  there is no evidence to the contrary.  There is no evidence

24  that he, in fact, intended to carry out that -- the agreement

25  that was -- that was sought or the -- intended to carry out --

1    or that he entered into an agreement.  There was no -- there

2    is absolutely no evidence that he entered into the agreement

3    which was of providing safe passage through Guatemala.

4        The only agreement that one could infer from his conduct

5    was that he acted as -- he was scamming the other guy.  I

6    mean, the snitch -- in the same manner that the snitch was in

7    fact not a drug dealer, my client was in fact not a high

8    Guatemalan official.  So there was -- you know, there's two

9    ships passing in the night.  There is no agreement, and on

10   that basis, I think the Court must direct a verdict on my

11   behalf.

12       I also think that there is no evidence in the record that

13   my client knew or intended during the course of the

14   conspiracy, which is, as alleged from April through September

15   that what he was transporting was cocaine, that what was

16   the -- not transporting, but that was the subject of the

17   conspiracy was a transfer of cocaine.

18       The only evidence of cocaine, if it is to be believed, is

19   the agent's testimony about what my client says after the

20   conspiracy is over.

21          THE COURT:  That's not the only evidence.

22   Mr. Cortez interpreted the various tapes to be discussing

23   cocaine.

24          MS. HERNANDEZ:  Right.  Right.  That's his

25   interpretation without any evidence that my client was -- that

1    was his interpretation based on 10 phone calls and several

2    meetings at which my client was not even present and to which

3    there's no evidence that he in fact was privy to that

4    information.

5             THE COURT:  All right.  Two meetings of which your

6    client was present at.

7             MS. HERNANDEZ:  Right, July and August.

8             THE COURT:  August.

9             MS. HERNANDEZ:  We've left this and I've never

10   replied.  I actually have never read the Government's response

11   to my challenge early on as to whether the superseding

12   indictment violates the rule of specialty by extending the

13   conspiracy beyond the -- beyond the grounds upon which they

14   were arrested.

15       There was an indictment, a warrant was issued, a request

16   for -- I haven't responded.  I haven't read what they've said,

17   but I know that I researched the issue in advance and I was

18   unable to find any case law --

19             THE COURT:  All right.

20             MS. HERNANDEZ:  -- addressing this situation.  So --

21   but there is -- that's pending, so I would argue the same

22   thing with respect to if in fact the -- then we only have the

23   July meeting, because the other two meetings take place after

24   the --

25             THE COURT:  Change in the indictment.

1          MS. HERNANDEZ:  -- indictment is returned and the

2     warrant.  So I'm happy to answer any of the Court's questions,

3     but I think the most substantive or the most --

4          THE COURT:  All right.

5          MS. HERNANDEZ:  -- meritorious argument that I can

6     make is that there has not been a showing that, in fact, there

7     was a meeting of the minds.

8          THE COURT:  Okay.  Thank you, Ms. Hernandez.

9       Mr. Laymon or one of your colleagues want to say

10    something, briefly?

11         MR. LAYMON:  I'll just very briefly respond to the

12    motion, Judge.  Of course, it's not a meeting of the minds

13    that the Government has to prove, nor is the Government's

14    charge limited to the very narrow grounds that Ms. Carmen

15    would raise.  This a conspiracy among high government

16    officials.

17       Judge, our brief response to the motion is that the

18    Court, when it looks at the evidence most favorably to the

19    Government, can find some evidence as to each of the essential

20    elements of the offense.  I'm happy to point to the evidence.

21    Just to give the Court one example, in the July meeting, at

22    page 20 of the transcript, the informant is very clear that he

23    wants to move 1300 units to the United States.  This is

24    shortly after the Defendant Mr. Mejia has been talking about

25    DIPA, which is of course the antinarcotics agency in

1    Guatemala.  This is even before -- the Defendant himself is

2    talking about an antinarcotics agency even before the

3    informant brings up the question of what he wants to do.

4        I'm happy to go on an discuss it, but I think there is

5    more than enough evidence, Judge, on each of the essential

6    elements.

7        The rule of specialty, we did respond, the Court has our

8    response.

9                THE COURT:  I do.

10               MR. LAYMON:  You know, I guess the bottom line on

11   that would be that even had the Defendant been extradited in

12   specialty cases, even in extradition situations, the

13   Government is routinely allowed to amend or supersede the

14   charges so long as the amendment or superseding concerns the

15   substance of the offense for which the Defendant was

16   extradited.

17               THE COURT:  Yes, you cited case law to that effect.

18               MR. LAYMON:  Right.  And, of course, we also cited

19   cases to the effect that specialty doesn't apply in rendition,

20   but again, even if it did, all the Government did --

21               THE COURT:  There's also case law to the contrary

22   that you cited as well.

23               MR. LAYMON:  Correct, that we cited.  But even if --

24   even if specialty did apply to rendition, again, all the

25   Government did was what El Salvador already knew about,

1    because El Salvador certainly knew that the conspiracy

2    continued up until September 27 because they were there and

3    taking part in the arrest.

4        So I don't think specialty issue has any merit.  That's

5    all we would have to say, Judge.

6                THE COURT:  All right.  Anything in response to

7    Mr. Laymon?

8                MS. HERNANDEZ:  No, Your Honor.

9                THE COURT:  All right.  I'll rule on all this

10    tomorrow morning at 8:55, so be here ready to go five minutes

11    before we're going to bring the jury in, but you should be

12    prepared to put on the Defense case.

13                MS. HERNANDEZ:  Okay.

14                THE COURT:  And we'll go from there.

15                MS. HERNANDEZ:  Your Honor, I would like to ask the

16    Government to bring in the original of Exhibit 6, that is, the

17    notes.

18                THE COURT:  Your Exhibit 6?

19                MS. HERNANDEZ:  Yes.

20                THE COURT:  The notes?

21                MS. HERNANDEZ:  The notes, the original.  I have a

22    copy.  I may move to introduce them, given all that's

23    transpired.

24                THE COURT:  You may move to introduce them given the

25    objection that you raised to introduction of the --

1       MS. HERNANDEZ:  I don't want the jury to walk away

2  thinking that I'm hiding the ball from them, and given, you

3  know, he stood there and pretty much, you know, read the whole

4  thing.  I don't want --

5       THE COURT:  He read much more than you had him read

6  during your examination, but you're entitled to do what you

7  please.  The request has been made to the Government.  Do you

8  think you can bring in the original, Mr. Laymon?

9       MR. LAYMON:  Somebody, Your Honor, on our behalf

10  will have to call Agent Fraga.  I mean, he's got it.  He's got

11  it in his notebook.

12       THE COURT:  Call him and get him to bring it here in

13  the morning.

14       MS. HERNANDEZ:  And he hasn't been excused,

15  remember?

16       MR. LAYMON:  He's coming back, but I just want to

17  make sure he comes back with it.

18       THE COURT:  Get him to bring it back with him.

19       MR. LAYMON:  We'll call him and get him to do that.

20       THE COURT:  All right.  What else?

21       MS. HERNANDEZ:  Well, we have -- we can do it now.

22  Those documents that -- or we can do it tomorrow morning.  The

23  documents, the --

24       THE COURT:  Yeah.  What we're going to do, to warn

25  the interpreters -- Did they receive a copy of these

1  materials?

2          MS. HERNANDEZ:  Yes, Your Honor.

3          THE COURT:  Now, we're probably going to need their

4  help initially in translating the back of the first page, so

5  I'm perfectly aware of exactly what that is, and then the back

6  of the last page.

7          THE INTERPRETER:  Would you be so kind as to give us

8  a --

9          THE COURT:  More specifically --

10          THE INTERPRETER:  We don't have it in our hand.

11          THE COURT:  The first page in my package has the

12  heading under "Direccion General," et cetera, next thing is

13  "Record De Servicio," and that's the first page.  And then the

14  last page is this separate item, at least it's been explained

15  to me as separate from the "Universidad," which has his name

16  in big bold in the middle of it.  And then it has something on

17  the back.  And that's what I will -- it's those two items that

18  I will first need the interpreter's assistance in translating.

19      All right.  Because that will determine for me whether

20  these are admissible.  If they're admissible, then we've got

21  some more work.  And specifically, if they're admissible, Ms.

22  Hernandez will have an issue relating to portion -- what

23  portions you believe are relevant.  All right.

24          MS. HERNANDEZ:  Yes.

25          THE COURT:  But again, I refer you to Rule 902 and I

1    refer you to 18 USC 3505, I think it was that I referred you

2    to before, because those will determine, based on the

3    translation, whether these documents come in.

4              MS. HERNANDEZ:  Your Honor, may I approach the Bench

5    ex parte for -- and it's in reference to my case?

6              THE COURT:  Certainly.

7              MS. HERNANDEZ:  By that I mean, my case on behalf of

8    Mr. Mejia.

9              THE COURT:  Yes, you may.

10             COURT REPORTER:  On the record or off the record?

11             THE COURT:  This will be on the record.  Do you mind

12   them getting it tomorrow?

13             MS. HERNANDEZ:  Yes.  I don't want them to get it --

14   initially they transcribe overnight.

15             THE COURT:  You don't want them to get it at all or

16   you don't want them to get it before some point?

17             MS. HERNANDEZ:  I don't want them to get it until my

18   case is through.

19             (EX-PARTE TRANSCRIPT AT THIS POINT.)

20             (OPEN COURT.)

21             THE COURT:  All right.  I'm going to let you-all go

22   home, meaning everyone in the courtroom, and those who have

23   to, to prepare for tomorrow.  The schedule, as I see it, is

24   that we will go through the Defense case and we'll deal with

25   this one document, the document in Spanish, and that will have

1    to be done outside the presence of the jury.

2        I ask the kindness and generosity of the interpreters to

3    be prepared to interpret those portions for me tomorrow

4    morning when we're ready to do so.  They are short,

5    fortunately, and we will, I believe, have this case completed

6    fairly early tomorrow morning and then we may even get the

7    Government's initial opening -- I'm sorry, initial closing in

8    tomorrow morning.

9        I won't start it unless I think we can finish it in the

10   morning, but I don't have any problem with doing that and then

11   breaking for lunch and having the rest after lunch, but we'll

12   see where we are.

13            MS. HERNANDEZ:  Or you might grant the motion.

14            THE COURT:  Or I might grant the motions.  That's

15   right.  Although I told you to be prepared to put on a Defense

16   case at least.

17            MS. HABISREITINGER:  Judge, should the Government

18   contact Mr. Cramer to have the monitor put up for closing

19   arguments first thing in the morning or should we wait?

20            THE COURT:  Work with Mr. Bradley on that.  Let's

21   have it so we're ready to go, because I think we may only have

22   an hour tomorrow morning before we're ready for closings,

23   correct, Ms. Hernandez?

24            MS. HERNANDEZ:  Yes.  Do you trust my estimation?

25            THE COURT:  No, but I still want it.  All right.  So

1    yeah, we need to be ready to go.  And the instructions, I

2    think we're there on the instructions with the exception of my

3    giving you a final determination on aiding and abetting and

4    I'll give you that first thing in the morning so you're all

5    aware of it before your closings.

6         All right.  See you tomorrow, have a good evening and

7    thank you again to everyone.

8                   (PROCEEDINGS ADJOURNED AT 5:22 P.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            I-N-D-E-X

2                            WITNESSES

3       Stephen Fraga
        Cross-Examination............................   3
4       Redirect Examination.........................  81
        Recross-Examination.......................... 105

5

6                        EXHIBITS RECEIVED

7       Government Exhibit 52........................  89

8       Defendant's Exhibit 10......................  81

9

10                          *-*-*-*

11

12                  **CERTIFICATE OF REPORTER**

13          I, Catalina Kerr, certify that the foregoing is a

14      correct transcript from the record of proceedings in the

15      above-entitled matter.

16

17

18

19

20      _____      _____
        Catalina Kerr                    Date
21

22

23

24

25