1                  UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLUMBIA
   -------------------------X
3  UNITED STATES OF AMERICA,

4           Plaintiff,

5           v.                    CR 06-0248-05 (JDB)

6
   ALVARO AUGUSTIN MEJIA,          Washington, D.C.
7                                  Wednesday, March 5, 2008
            Defendant.             1:50 p.m.
8

9                                  AFTERNOON SESSION
   -------------------------X
10
                          DAY 8
11              TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE JOHN D. BATES
12              UNITED STATES DISTRICT JUDGE
   APPEARANCES:
13 For the Government:    BRIAN TOMNEY, ESQ.
                          KIA M. HABISREITINGER, ESQ.
14                        PAUL W. LAYMON, ESQ.
                          U.S. Department of Justice
15                        1400 New York Avenue, N.W.
                          Washington, D.C.  20530
16                        202.307.1383

17 For the Defendant:     CARMEN D. HERNANDEZ, ESQ.
                          P.O. Box 70
18                        7166 Mink Hollow Road
                          Highland, MD  20777
19                        240.472.3391

20 Court Reporter:        CATALINA KERR, RPR
                          Official Court Reporter
21                        U.S. Courthouse, Room 6716
                          333 Constitution Avenue, NW
22                        Washington, D.C.  20001
                          202.354.3258
23
   Proceedings recorded by mechanical stenography, transcript
24 produced by computer.

25

```
 1                        P-R-O-C-E-E-D-I-N-G-S

 2              THE DEPUTY CLERK:  All rise.  This honorable court

 3    is again in session.  Please be seated and come to order.

 4              THE COURT:  No, not yet.

 5              THE DEPUTY CLERK:  I'm sorry.

 6              THE COURT:  All right.  Please bring the jury in.

 7              (JURY PRESENT.)

 8              THE COURT:  Welcome back, ladies and gentlemen.

 9    We're now ready for the completion of closing arguments, with

10    the Government's rebuttal argument.  Mr. Laymon.

11              MR. LAYMON:  Thank you, Judge.

12         Ladies and Gentlemen, because the Government has the

13    burden of proof, it has the privilege of going first and last

14    in the argument.  I'm going to take a few minutes now to

15    respond to what Ms. Hernandez said.  I will be brief and I

16    will be to the point.

17         This Defendant is charged with a conspiracy.  The judge

18    is going the tell you in a few minutes what a conspiracy is.

19    It's his job to instruct you, not mine.  But I do want to

20    mention something about that instruction, because one of the

21    things that he's going to tell you is that a conspiracy is a

22    common understanding among people involved in whatever they're

23    involved in.

24         The key there is a common understanding.  What the

25    Government has to prove, when it is proving a conspiracy, is
```

```
 1    is there a common understanding, No. 1, and secondly, did this

 2    Defendant knowingly join that conspiracy or that common

 3    understanding?  That's what we have to prove.

 4         All right.  So --

 5              MS. HERNANDEZ:  Your Honor, there's a third element

 6    in this case.

 7              MR. LAYMON:  And there is a third element in this

 8    case.  The Government has to show that the amount of cocaine

 9    was over 5 kilograms.  That is what the Government has to

10    show.

11         Focusing on the first two elements, ladies and gentlemen.

12              THE COURT:  Ms. Hernandez, did you have something?

13              MS. HERNANDEZ:  Your Honor, we're leaving out the

14    intent.

15              THE COURT:  It's not being left out.  He's

16    identified the three elements.  The jury will get an

17    explanation of what those three elements entail when I give

18    them the instructions.

19         And you may proceed, Mr. Laymon.

20              MS. HERNANDEZ:  I object to the -- an intent element

21    is required.  I object to any of the rebuttal.

22              THE COURT:  I understand your objection.

23              MR. LAYMON:  Thank you, Judge.

24         Ladies and gentlemen, let's look quickly at some of the

25    evidence in this case.  In particular, let's look at Tab C of
```

1    our notebook on page 20.  Tab C, page 20.  And what happens at

2    Tab C page 20?  Tab C at page 20, remember let's set the scene

3    for a minute.

4        It's a few minutes into the meeting in July in San

5    Salvador.  The parties have gathered around the table, they've

6    ordered their drinks, the food has not arrived, the

7    conversation has turned serious.  There is quiet at the table.

8    The informant, Mr. Cortez, has essentially commanded the

9    attention of everyone and there is quiet, and he says, at page

10    20 of Tab C of our notebook, he has a company.  He's a

11    foreigner in Panama, referring to Iberia, the other informant

12    who was going to be moving the cocaine up of Panama, and he

13    goes on to say what?  What happens?  An amount, 1,300 units to

14    take up to the United States.

15    (Reading)  That's where you guys come in.  You will take

16    care of the logistics and the security so that if he puts it

17    in the container, he can take it out of Panama and from there

18    it gets to where you-all will put it at the border.

19        Where is Mr. Mejia when the informant is crystal

20    clear about 1300 units being moved to Guatemala and up to the

21    border?  Where is Mr. Mejia?  He is roughly 18 inches to

22    two feet away from the informant listening intently, not

23    drinking, not eating, not being distracted, looking him in the

24    eye and nodding his head.

25        Now, what happens just a few minutes later?  Not even a

1  few minutes later, a few seconds later?  Page 22 of Tab C of

2  the -- of the notebook.

3      Page 22, Tab C.  Bardales responding to the informant

4  says, (reading)  The price is to the City of Guatemala,

5  Guatemala City.  To go up to the border, we can give you guys

6  all the logistical support and whatever you guys want,

7  security, 100 percent, all the way to the border.  We'll take

8  it to where you say, that's inside the national territory.

9          Where is Mr. Mejia when Mr. Bardales makes this

10  response?  Right there with Mr. Bardales, listening intently.

11          Now, ladies and gentlemen, there's something else

12  about Tab C that's important, and it occurs in the beginning.

13  And it -- if you go back to Tab B, that's when they arrive and

14  Constanza is introducing himself, and as Tab C starts, there's

15  a little bit of talk about this Lake Constanza in Switzerland.

16  That's just to identify Constanza.  And then after that, if

17  you were really paying attention, you're going to notice that

18  right after the discussion about Lake Constanza, something

19  important happens.

20      You know what that is?  Everybody at the table starts

21  talking about dope.  Not this particular deal, not this 1300

22  units that's going to go up to the United States, but we've

23  got a bunch of people, and do they talk about anything in

24  particular?  Yes, they talk about dope.  Now, how do we know

25  that?

1      Well, let's look at page 4 of Tab C.  Page 4 of Tab C,

2   Bardales starts talking about trust.  And Mr. Mejia,

3   Mr. Mejia, who is there with him, responds at the bottom of

4   page 4, they thought they had gone down in Guatemala and he

5   responds again at the bottom of page 4, that three had fallen

6   in Guatemala.

7      Now, you look at that and on its face that might not seem

8   like very much, until you turn to the next page, a few

9   sentences later in that conversation, and what are Del Cid

10  Morales and Mr. Mejia talking about?

11     Mr. Mejia, (reading)  What they found was some money in

12  coolers.  It was two-and-a-half million dollars.

13     Now, that, ladies and gentlemen, is a drug conversation.

14  We're not talking about finding Christmas tree ornaments in

15  coolers at the border that are worth two-and-a-half million

16  dollars.  We're talking about finding two-and-a-half million

17  dollars in coolers as a result of trucks breaking down.

18     Now, again, you have to look at that in light of what the

19  evidence is.  These guys are sitting around a table.  The

20  informant hasn't even said anything yet about 1300 units going

21  up to Guatemala, and already we've got Mr. Mejia and the

22  others engaged in drug talk.

23     Now, but it goes on.  Bardales and the others are going

24  to talk a little bit more, and we get to page 16.  Page 16 of

25  Tab C, and Mr. Mejia, in response to general conversation,

says what?  Del Cid Morales, at the beginning of the top of

the page, I'll scoot it down just a bit, Del Cid Morales says,

(reading)  We can work three months, starting today.

     And what does Mr. Mejia respond?  It's extremely

significant.  They are going to go to some new changes, they

are going to create a new unit DIPA.  And then he says,

(reading)  Instead of what narcotics was.

     And then you see what he says about DIPA.  Now, I tell

you this is significant because the informant -- it's

significant for at least two reasons.  No. 1, the informant

has not yet said anything about 1300 units going to the United

States.  This conversation occurs before that, because it's

not for another four pages, for the informant lays out clearly

what it is that the agreement is to be.

     And we have Mr. Mejia in this conversation talking about

DIPA, which is, of course, the customs antinarcotics agency.

So we're talking dope even before we get to the informant

saying what the deal is.

     Now, why else is this significant?  It's significant for

this reason, ladies and gentlemen.  Let's go to the June

meeting.  Ms. Hernandez raises a good point.  She says, "My

client wasn't at the June meeting.  You can't hold him

accountable or responsible for knowing what was said at that

June meeting."

     But, where did this defendant live?  He lived in

1    Guatemala City.  How far is it from Guatemala City to San

2    Salvador, El Salvador?  It's a four- to six-hour ride.  He's

3    riding with Bran, Del Cid Morales, Bardales.  Before the

4    informant even starts talking dope, these guys were talking

5    dope, and what is the reference to?  The reference is to that

6    June meeting where the dope was talked about.

7         And how does Mejia know that?  Because the only

8    conclusion, ladies and gentlemen, is he knows that because he

9    was told.  He was told what that June meeting was about.  But

10   whether he was or not, it doesn't matter because again, four

11   pages after this, the informant clearly says, (reading)  This

12   is the deal.  This is the deal.  It's 1300 units to the

13   border.

14        And so on and so on and so on.  Now, let's look for a

15   moment at the June meeting.  At the June meeting, Mr. Mejia is

16   not there.  He is not there.  Mr. Bardales, Mr. Chiu Serrano,

17   the informant, but what is it that is said there that is so

18   significant?  Well, let's look at page 15 of the June deal,

19   and this is found at Tab A of your notebook.

20        Now, the informant on page 15, (reading)  It can arrive

21   by means of the company, in reference to the company that

22   they've been talking about, send it to you guys.  From there,

23   safe conduct passage to go to Mexico and to the United States.

24   And to the United States.

25        A little bit later in that same -- that same conversation

1    on page 28, page 28 of that conversation, Mr. Bardales

2    responds and he says what on page 28 of that June meeting?

3    (Reading)  The way up to Mexico is one part.  The way up to

4    the United States is another.  Security to the border.

5        So even in the June meeting it is crystal clear that this

6    deal is supposed to involve a container of dope going from

7    Guatemala to the border with Mexico to the United States, and

8    that theme is continued in crystal clear terms in the meeting

9    that Mr. Mejia attends in July in San Salvador.  There is no

10    question that the common understanding with Bardales and Chiu

11    Serrano, who are members of this conspiracy, dope, to the

12    border, to the United States, and when Mejia comes in in July,

13    the common understanding, dope, to the border, to the United

14    States.  That's the common understanding.  Does that ever

15    change?  No.

16        All right.  Let's look, for example, at the very end of

17    the July meeting in a conversation that involves Morales, Del

18    Cid Morales and the informant as the meeting is breaking up.

19    And what do they say there that is so significant?  Del Cid

20    Morales at page 2 of Tab K in your notebook, informers -- the

21    informant at the end of that July meeting, as the meeting is

22    breaking up, and you can go back and look at the video and

23    look at the transcript and you'll see that what Del Cid

24    Morales tells the informant is (reading)  I'm telling you,

25    three months, DIPA -- DIPA starts in three months.

1    And then there's a reference to the DEA.  Why in the

2    world would anybody in this conversation refer to DEA?  Well,

3    the only answer to that is because it's a dope deal, it

4    involves the United States and they're worried about the DEA.

5    Yet, further understanding that here is another conspirator

6    with a clear understanding that this common understanding

7    involves dope going to the United States.

8        Now, as you know, there are three meetings involving Mr.

9    Mejia, July and August and September.  In August, it is -- you

10   know, by then Mr. Bardales has apparently had his automobile

11   accident, so the August meeting, it is Mejia, Del Cid Morales,

12   Constanza Bran, the informant, Cortez.  Now, at that meeting,

13   you will recall, there is a more elaborate discussion of the

14   company that they're trying to set up and how they're going to

15   move this dope.  And what happens at that meeting, ladies and

16   gentlemen?

17       Well, for example, on page 12, this is Tab M of your

18   notebook.  Tab M at page 12, there is a discussion about this

19   company with Bran and the informant.  And Mejia at page 12

20   interjects and says to the informant, in the middle of page

21   12, (reading) We didn't know that, that right now, so then

22   right now, like he said, like he said, we have to get involved

23   because I need your support.

24       Now, what happens, ladies and gentlemen, right after

25   Mr. Mejia says that to the informant?  There is a discussion

1  between the informant and Constanza Bran.  You can see it on

2  the tape, and Constanza Bran pulls out a piece of paper and he

3  draws a diagram for the informant and that's the diagram that

4  I've displayed on the screen, Government Exhibit 10.  And you

5  will recall that is the diagram that the infor- -- that the

6  Constanza Bran drew to show the informant how the cocaine was

7  going to be hidden in a 40-foot container.

8          Now, look at that diagram.  Is there any possible

9  indication that this involves anything other than cocaine?

10 Christmas goods?  Hidden like that in a discussion with

11 Constanza Bran?  No.  Where was Mejia when this diagram was

12 being drawn by Bran?  He was within inches of Bran when he

13 heard him talk about how they were going to ship the goods and

14 hide them and they would have a walkway that the customs

15 agents would have to walk through so that they couldn't get to

16 the back.

17     Again, what is the common understanding of these people?

18 The common understanding of these people is that a load of

19 cocaine is going to come to Guatemala and that Mejia and the

20 others are going to be involved in assisting that.

21     Now, as I say, there were three meetings here, June --

22 excuse me, July and August and September that Mejia attended.

23 He attended three meetings.  Now, the third meeting, the one

24 in September, was the one where he was arrested.  We don't

25 have the video of that, probably wasn't a great deal of

1    discussion, but ladies and gentlemen, when you're trying to

2    decide if this Defendant knowingly and voluntarily joined this

3    conspiracy, then think about it in these terms.  Here's a

4    Defendant, Mr. Mejia, who leaves his home in Guatemala City

5    and drives four to six hours across an international border

6    with another country where he stopped and checked.  He then

7    drives to the Capitol City of El Salvador.

8              MS. HERNANDEZ:  Your Honor, objection.  The record

9    doesn't reflect that he lived in Guatemala City at this point.

10             THE COURT:  All right.  That objection is noted.

11   The jury will rely on its memory of the facts.

12             MR. LAYMON:  He then drives to El Salvador four to

13   six hours down the road, and he does this how many times?  Not

14   once, not twice, not three times.  Now, does this sound like a

15   man who is not committed, who is not involved fully in what it

16   is that the meeting involves?  No.  Does this sound like just

17   innocent negotiation or innocent mistake?  He planned.  He

18   went out of his way to meet with a person he thought was a

19   Colombian drug dealer in the capitol of another country, not

20   once, not twice, but three times.

21      Now, how else do we know that Mr. Mejia voluntarily and

22   knowingly joined this conspiracy?  Well, recall that when he

23   was arrested he had his wallet in his possession and inside

24   that wallet was a list of DEA agents.  Now, that might not

25   seem very significant.  We don't know who wrote it.  I'm not

1    saying that he wrote it.  I don't know who wrote it.  I don't

2    know how long it was there, but those questions are important.

3        The fact is, is that Mejia was involved in an agreement

4    with these folks, an agreement where he was obviously

5    concerned enough about DEA that he had in his wallet the names

6    of the DEA agents in Guatemala.  What do you put in your

7    wallet?  I mean, men, what do men put in their wallet?  They

8    typically put things in their wallet that are important to

9    them.

10        Now, this gentleman, Mr. Mejia, has in his wallet a list

11    of the DEA agents.  Why?  Why is it there?  It's there because

12    Guatemalan police are essentially powerless to deal with the

13    overwhelming number of Colombian drug-traffickers that are

14    sending cocaine into Guatemala, and because they're just

15    recovering from -- not just, but several years ago, they're

16    coming out of a bloody civil war.

17            MS. HERNANDEZ:  Objection, Your Honor, there's no

18    evidence in the record of this.

19            THE COURT:  I think there is minimal evidence, but

20    why don't you move on from that because I don't think there is

21    anything -- certainly nothing more than he's mentioned.

22            MR. LAYMON:  So why is he concerned enough to have

23    these DEA agents' names in his wallet?  Because he want to

24    know who they are.  Why?  Because he's not worried about

25    Guatemalan police or the SAIA.  He's worried about the DEA.

1    Because why?  Why is he worried?  Why is he concerned about

2    the DEA?  Why is Del Cid Morales concerned about the DEA?

3    Because it is only the DEA that has the power to stop them

4    from what they're doing, and that's why.

5         And why is the -- why are they so worried about the DEA?

6    Because they know that any dope, any cocaine that's going to

7    the United States, the DEA is going to try to deal with.  They

8    may not do it successfully every time, but they're going to

9    try, and these defendants were worried about that.

10        How else do we know that Mejia knowingly and voluntarily

11   joined this conspiracy?  Well, look at Del Cid Morales' phone

12   book for a moment.  Now, you go, well, what's that mean?

13   Well, Del Cid Morales had a phone book, and inside that phone

14   book was the number for Bardales and the number for Eric

15   Constanza Bran.

16        Now, as far as I know, Mejia's number is not in that

17   phone book.  So what does that tend to show you?  This is a

18   phone book, little book that Del Cid Morales is carrying

19   around.  It's clear that he has some kind of prior

20   relationship with Eric Constanza Bran and Bardales because,

21   yes, their phone number is in his book.  So they've got -- so

22   we've got Bardales, Del Cid Morales and Bran together.  So why

23   do they need Mejia?  Why not just Bran and Bardales and Del

24   Cid Morales do it?  Why do they need Mr. Mejia to join this

25   conspiracy?

1        Well, the reason they need Mr. Mejia is because he brings

2    to it something that they apparently don't have, and that is

3    law enforcement experience.  15 years, not only as a cop on

4    the beat apparently, but as a supervisor, as someone with a

5    sufficiently sophisticated position that he was planning major

6    operations, and that's why they needed Mr. Mejia.  That's why

7    they recruited him into this conspiracy.

8        Now, let me stop -- and I'm almost done.  Let me stop and

9    just ask a question about Mr. Mejia's identity as Edwin Rene

10   Sapon-Ruiz.  Is it important that he lied about his identity?

11   Does that, for example, point to his innocence?  Or does that,

12   for example, more specifically, point to the fact that he

13   wasn't involved in this conspiracy?

14       My answer to that is no, just the opposite.  The fact

15   that Mr. Mejia would -- or Del Cid Morales, for that matter --

16   would assume the identity of someone else is, in fact,

17   evidence that he joined this conspiracy knowingly and

18   intentionally and fully, and fully intended to carry out the

19   goal of that conspiracy.

20       And why is that the case?  Because it should be patently

21   clear from this evidence that whatever we say about the

22   Defendant Cortez, whether you like him or not, doesn't matter,

23   but one thing can be said about Cortez, he knew how to play

24   the role of a Colombian drug dealer and he had Mejia and Del

25   Cid Morales and Bran convinced that he was a Colombian drug

1    dealer.

2        So what does Mejia do to toutie up, to try to convince

3    the informant, the drug dealer that he was, in fact, a police

4    officer?  But not just any police officer, but a high ranking

5    police officer, why?  Because he wanted to convince the

6    informant, who he thought was a high -- a Colombian drug

7    dealer, that he was worthy of joining that conspiracy, that he

8    could, in fact, do what it was that this informant demanded of

9    them or required of them in this conspiracy.

10       Now, the bottom line, though, is that regardless,

11   regardless of whether he was introduced himself as Mr. Mejia

12   or Sapon-Ruiz, it really doesn't matter because the real

13   question is, is did Mr. Mejia have the ability to do what it

14   is he said that he could do, which is, protect, safeguard a

15   load of cocaine moving from the city to the border?

16       Could he do that?  And I would suggest to you that the

17   answer is definitely yes.  He's a former cop, he knows the

18   deal, it's not that difficult to get a load of cocaine from

19   Guatemala City to the border, at least the evidence would

20   suggest that.  Did he have the ability to do that?  You bet he

21   did, ladies and gentlemen.

22       Now, as I close this out.  Was he intimidated or afraid

23   of the DEA agents that questioned him that night on the plane?

24   Now, this is a guy who was a former police officer for 15

25   years.  He was with, essentially, agents who are police

1    officers.   There is no evidence to suggest that he was

2    intimidated or that he was scared or that he in any way made

3    an involuntary statement.   In fact, the evidence suggests just

4    the opposite, that he voluntarily made that statement and he

5    knew exactly what he was saying.   He didn't do it because he

6    was intimidated, he didn't do it because he was scared, he

7    didn't do it because of some -- some notion that he was flying

8    over Guantanamo.   He did it, because the evidence shows you,

9    in fact what he said was true.

10       Now, the informant Cortez.   Don't know whether you like

11   him or not, probably don't want to have dinner with him,

12   probably would just as soon rather not see your tax paying

13   dollars go to him, but this isn't a referendum on this

14   informant or using informants or paying informants.   Rather,

15   this trial is all about the more narrow question of whether

16   this Defendant, Mr. Mejia, is guilty or not guilty.

17       Doesn't have anything to do with whether the Government

18   should use informants or whether we should pay informants,

19   which, of course, by the way, we are permitted to do.   It is

20   proper to do.   You may not like that.   You may disagree with

21   that, but that's not the issue that brings us here today.

22       Similarly, similarly, we can all have strong feelings

23   about whether marijuana should be legal or cocaine should be

24   legal or what the drug law should be or how they should be

25   enforced, but this is not the time and place for that

1    discussion.  This isn't a debate about that.  Again, the issue

2    is, has the Government shown that this Defendant is guilty of

3    these crimes?  That's the issue.

4        We're not debating these other more -- these other

5    interesting questions, which admittedly are very interesting,

6    but instead we're focussed on the more narrow question of, was

7    there a common understanding with Mr. Mejia and these other

8    defendants?  A common understanding that what was to happen

9    was that this presumed Colombian drug dealer was going to move

10   more than 5 kilograms of cocaine to Guatemala, to the border

11   with Mexico and on to the United States?

12       It's crystal clear that that was their common

13   understanding, ladies and gentlemen.  It is clear that he

14   joined this conspiracy.  Now, why did he join this conspiracy?

15   There's not a good answer to that.  There's not a real answer

16   to that.  Perhaps the best answer to that is just simple.

17   There was a chance to make money in an environment where he

18   could get away with it.  Maybe it just comes down to something

19   as simple as that.  A police officer who's no longer a police

20   officer, who sees a chance to make money and he knows he can

21   get away with it.

22       Now, ladies and gentlemen, the judge is going to give you

23   the instructions.  I thank you for being patient with me, and

24   I would ask you that in your deliberations you consider the

25   instructions carefully, that you consider the evidence

```
 1   carefully, pay attention to it all, put it all together, and
 2   if you do that, then your verdict in this case to this charge
 3   of conspiracy should be that this defendant is guilty, that he
 4   is guilty of conspiring with Bran and Del Cid Morales and
 5   Bardales.  He is guilty of joining this conspiracy, joining
 6   this agreement to bring a load of cocaine to the United
 7   States.  Thank you.
 8              MS. HERNANDEZ:  Can I approach?
 9              THE COURT:  One second, ladies and gentlemen.
10   Counsel approach, please.
11              (AT THE BENCH; ON THE RECORD.)
12              THE COURT:  Ms. Hernandez.
13              MS. HERNANDEZ:  Your Honor, two things.  No. 1, if I
14   understood Mr. Laymon correctly, he told the jury that my
15   client was making this case because they needed a person who
16   had former law enforcement experience.
17      I'm not exactly sure where it came out, but Mr. Del Cid
18   Morales, and the Government will know, is a former general or
19   comisario in the national police, so either he misstated the
20   evidence or -- that came in or he knows otherwise that that's
21   not true, that is, there was -- Del Cid Morales is a former
22   PNC officer.
23              THE COURT:  So what's your point?
24              MS. HERNANDEZ:  Well, I object to the
25   mischaracterization of the evidence; more than
```

1  mischaracterization, it's a wholesale not true.

2           THE COURT:  Mr. Laymon?

3           MR. LAYMON:  Well, since I just said it, Judge, I

4  recall specifically what I said, and that was that the

5  existence of the phone book of Del Cid Morales showed that he

6  was apparently previously acquainted with Bardales and

7  Constanza Bran.

8       And the point I made was that since they already knew one

9  another, why invite Mr. Mejia to the party?  To which I said,

10  in response to my own question, was that he had this unique

11  background as a cop for 15 years with supervisory experience

12  and directing logistical operations, which is true.

13           THE COURT:  I think you also did say that they

14  needed him because he uniquely provided that experience.

15           MR. LAYMON:  Well, he did uniquely provide that

16  experience.  We don't have any idea, really.  We know that Del

17  Cid Morales was a former cop, but we don't know for -- really

18  for how long or what his job was, where he served or what he

19  did.

20           THE COURT:  Certainly the jury does not know that.

21           MR. LAYMON:  And certainly the jury doesn't know

22  that.

23           MS. HERNANDEZ:  It's not true -- it's not true that

24  they needed him -- I don't have it in front of me, but it's

25  not true that they needed -- uniquely needed someone with law

```
1   enforcement experience and that's why they brought in Mejia,

2   because in fact, Mr. Laymon knows and the record is replete

3   with references to the fact that Del Cid Morales is not only a

4   former police officer, but at a higher rank than my client

5   because he was supposed to be a comisario, not -- my client is

6   two steps down.  I think it's completely misstating the facts.

7        I mean, and he's saying, this is --

8            THE COURT:  He's not misstating the facts.  There is

9   nothing inconsistent in the facts before this jury about

10  you're saying it's a misrepresentation of --

11           MS. HERNANDEZ:  He's lying to the -- I'm sorry.

12  He's lying to the jury on information that he personally knows

13  is not true.  He knows that Mr. Mejia is not uniquely the only

14  person with former Guatemalan law enforcement experience.  He

15  knows that.  And I don't think the Government is allowed to

16  make that kind of misrepresentation.

17           THE COURT:  I think you can respond to that,

18  Mr. Laymon, because it's fairly strong language.

19           MR. LAYMON:  Judge, the bottom line with Del Cid

20  Morales is exactly what I said.  For example, Ms. Hernandez

21  seems to think he was some kind of high ranking comisario.  I

22  don't know that.  I don't know exactly what Del Cid Morales

23  did in the police.  Today, as a result of some of the evidence

24  the Defendant put in, we have a much clearer understanding of

25  what Mr. Mejia's role was.  We don't have that kind of
```

1    understanding with Del Cid Morales.  That's it.

2         MS. HERNANDEZ:  There's the DEA-6 that I can submit

3    to the Court in which there was follow-up from a -- from the,

4    whatever, the Government -- it's the country attache' or

5    whatever they refer to the agent, which states that -- what

6    Del Cid Morales' former experience was, and in fact, that

7    DEA-6 says nothing about my client, and I personally

8    questioned that.

9         THE COURT:  All right.  Based on all that I know, I

10   think it's clear there is not a significant representation of

11   facts to the jury.  I think it is fair for the Government to

12   argue that the co-conspirators needed Mr. Mejia for his law

13   enforcement experience.  Whether Mr. Del Cid Morales also

14   supplied some law enforcement experience is not clear on the

15   record.

16       It is clear that everyone thought he did, and that's what

17   the both -- both of them were brought in for security and

18   based on prior relevant law enforcement or related experience,

19   and I think the jury will be able to sort that out with

20   respect to uniquely.  Indeed, to some extent, based on the

21   evidence before me, the jury may be able to conclude that Del

22   Cid Morales was also supplying that experience, but that's an

23   inference the jury can make.

24        MS. HERNANDEZ:  Well, Your Honor, the evidence

25   before the jury is that Del Cid Morales represented himself to

1    be a general, but I'm not sure that there was actual evidence

2    that he was a former general.

3         THE COURT:  I don't think there is evidence to that

4    effect in the record.

5         MS. HERNANDEZ:  I don't think the Government can

6    stand in front of the jury, first of all, than if there is no

7    evidence -- I don't think the Government can stand in front of

8    the jury and argue from a fact, and that's what they've done,

9    that they know to be untrue.  I just don't -- my belief is

10   that they're prohibited.

11        And as you said, I mean, the term you use is "uniquely"

12   because they were looking for someone with law enforcement

13   experience.  They know that's not true.

14        THE COURT:  But his argument in terms of uniquely is

15   not just that he's a cop and nobody else is a cop.  It was

16   that he had certain experience as a cop.  That's what

17   Mr. Laymon said.

18        MS. HERNANDEZ:  Which is also inconsistent because

19   he asked specifically if he's -- if he's drawing that from the

20   witness I put on the stand today, he specifically asked did he

21   have any experience with drug investigations and the gentleman

22   said, no, he did not, that his experience was with delinquency

23   matters.

24        THE COURT:  I think Mr. Laymon went right up to the

25   line but didn't cross the line, because what he said was, if I

1    recollect correctly, he had experience planning operations but

2    he did not say anything about drug-related operations.  Is my

3    memory correct, Mr. Laymon?

4            MR. LAYMON:  Which I said law enforcement

5    operations.

6            THE COURT:  Law enforcement operations.  And that is

7    consistent with the testimony of the witness.  So I'm going to

8    overrule your objection.  I take it it was an objection.

9            MS. HERNANDEZ:  It is an objection, and I would ask

10   that the Court be informed that the --

11           THE COURT:  Court be informed?

12           MS. HERNANDEZ:  I'm sorry, that the jury be informed

13   that Mr. Del Cid Morales was, in fact, a former police

14   officer.

15           THE COURT:  It's not in the record.  I can't inform

16   them of something that's not in evidence before them.  You

17   can't inform them of something that's not in evidence.  You

18   could have asked -- if you wanted to put that in the record,

19   you could have --

20           MS. HERNANDEZ:  I didn't.  But I didn't stand in

21   front of the jury and tell -- and misrepresented what I know

22   to be true.

23           THE COURT:  I don't think it was a

24   misrepresentation.  It certainly was not any kind of a

25   significant misrepresentation, and I cannot provide the jury

1    with, quote/unquote, evidence, facts that are not in evidence

2    before them.

3            MS. HERNANDEZ:  Well, then it's -- then I -- first,

4    if it's done in rebuttal, it is --

5            THE COURT:  I mean, if you and the Government want

6    to stipulate to something, I suppose I could tell them a

7    stipulation even at this point, but I'm not able to provide

8    evidence to the jury.  That's not what the Court can do.

9            MS. HERNANDEZ:  I understand.  Then I think --

10   unless the Government withdraws that statement, I think I

11   would ask again for a mistrial.

12       The second item --

13           THE COURT:  I deny your request for a mistrial.

14           MS. HERNANDEZ:  Second item.  The Court had asked

15   last week, after the paid informant, whether in fact he had

16   missed -- he had not been truthful in response to the

17   questions about Judge Smith, and I believe I found the record.

18   He said -- and that was --

19           THE COURT:  He, who?

20           MS. HERNANDEZ:  The informant.  And the Court's

21   question came as a result of the representations that

22   Mr. Laymon had made that he, in fact, had discussed with the

23   informant the issue.  There's a series of questions, and this

24   is the transcript from Day 5.

25           THE COURT:  This is a series of questions to the

1    jury?

2          MS. HERNANDEZ:  Yeah, to the informant.  Friday,

3    February 29th, it's the morning session at page 63.  I'm

4    asking a series of questions to the informant.

5          (Reading)  So you're testifying here today that you're

6    not aware of a federal judge ever making a finding that you

7    were not entirely truthful?

8          His response, (reading) I have never read or heard any

9    judge, federal judge for that matter, ever saying that I

10   haven't been truthful in any other cases I have testified on

11   behalf of the U.S. Government.

12         (Reading)  Question:  You haven't heard or -- you said

13   you haven't heard or what, question mark.

14         (Reading)  His answer:  Or read about any judge doubting

15   my truthfulness.  I have never seen that before.

16         (Reading)  Question:  But what I'm asking you is whether

17   you are, in fact, aware that this federal judge, Judge

18   Eldridge in that case in Tampa found that you were not

19   entirely truthful when you testified?

20         (Reading)  Answer:  I didn't know any of that.

21         I think that's -- that goes exactly to the question the

22   Court asked.  That's -- he did know of that.  He -- you know,

23   at first he tries to --

24         THE COURT:  They don't know what the witness knew.

25         MS. HERNANDEZ:  Well, we know Mr. Laymon had

1    represented to the Court that he discussed with you that case

2    -- that he discussed with this -- that case after the first

3    trial.

4            THE COURT:  This seems to me to be the subject

5    matter for a posttrial motion, for a motion that I certainly

6    will entertain.  If you can establish, quite frankly, that

7    that witness was untruthful on the stand and the Government

8    knew he was being untruthful, the Government may have a

9    problem.

10           MS. HERNANDEZ:  I was just bringing to the Court's

11   attention, because you asked the question specifically, and I

12   don't think either of us have ever gotten to the record.

13           THE COURT:  But I remember what caused me to ask it,

14   and you've now read it.  And that is what caused me to ask it,

15   and the Government -- once you file a motion, the Government

16   will have to deal with it.

17           MS. HERNANDEZ:  Okay.  I don't know what the remedy

18   is for what just happened.  I know --

19           THE COURT:  Well, what just happened --

20           MS. HERNANDEZ:  And the earlier, what I was --

21           THE COURT:  I decided no remedy is necessary.

22           MS. HERNANDEZ:  Okay.  Thank you.

23           THE COURT:  Thank you.

24           (OPEN COURT.)

25           THE COURT:  All right, ladies and gentlemen, we've

1  now reached the point when all the evidence is in and you have

2  heard the closing arguments of the lawyers.  It's now up to me

3  to instruct you on the law that should control your

4  deliberations in this case.

5      My instructions will be roughly divided into four parts.

6  First, I'll talk with you about some general principles of the

7  law; second, I'll instruct you on evaluating the evidence;

8  third, I'll discuss with you instructions that apply to the

9  elements of the particular offenses charged in this case; and

10  then finally, I will have some closing remarks about your

11  deliberations in this matter.

12      For those of you who are taking notes, I want to let you

13  know that a written copy of these instructions will be

14  available for you as you start your deliberations.

15      Let me begin with some general principles.  First, I'm

16  sure you understand by now that the jury and the Court, you

17  and I, have quite different responsibilities in a trial.  Your

18  function, as -- I'm sorry, my function is to conduct this

19  trial in an orderly, fair and efficient matter, to rule on

20  questions of law and to instruct you on the law which applies

21  in this case.

22      It is your duty to accept the law as I state it to you.

23  You should consider all of the instructions as a whole.  You

24  may not ignore any instruction or question the wisdom of any

25  rule of law.

1    Your function, as the jury, is to determine what the

2  facts are in this case.  You are the sole judges of the facts.

3  You alone decide what weight to give to the evidence presented

4  during the trial.  You decide the value of the evidence and

5  the believability of the witnesses.

6    You should determine the facts without prejudice, fear,

7  sympathy or favoritism.  You should not be improperly

8  influenced by anyone's race, ethnic origin or gender.  Decide

9  the case solely from a fair consideration of the evidence.

10    You may not take anything I may have said or done as

11  indicating how I think you should decide this case.  If you

12  believe that I have expressed or indicated any opinion as to

13  the facts, you should ignore it.

14    It is your sole and exclusive duty to decide the verdict

15  in this case.  If any reference by the Court or the attorneys

16  to evidence does not coincide with your own recollection of

17  the evidence, it is your recollection which should control

18  during your deliberations.

19    During those deliberations, you may consider only the

20  evidence properly admitted in this trial.  The evidence in

21  this case was the sworn testimony of the witnesses and the

22  exhibits which were admitted into evidence.

23    When you consider the evidence, you are permitted to draw

24  from the facts which you find to have been proven such

25  reasonable inferences as you feel are justified in the light

1  of your experience.

2      The statements and arguments of the lawyers are not

3  evidence.  They're only intended to assist you in

4  understanding the evidence.  Sometimes a lawyer's question

5  suggests that something is a fact.  Whether or not something

6  is a fact depends on the witness' answer, not the lawyer's

7  question.  The lawyer's question is not evidence.

8      The indictment is merely the formal way of accusing a

9  person of a crime to bring him to trial.  You must not

10  consider the indictment as evidence of any kind.  You may not

11  consider it as any evidence of the Defendant's guilt or draw

12  any inference of guilt from it.

13      The lawyers in this case sometimes objected when the

14  other side asked the question, made an argument or offered

15  evidence which the objecting lawyer believed was not proper.

16  You must not be prejudiced against the lawyer who made the

17  objections.  It is the lawyer's responsibility to object to

18  evidence which they believe is not admissible.

19      If during the course of the trial I sustained an

20  objection to a lawyer's question, you should disregard the

21  question and you must not speculate as to what the answer

22  would have been.

23      If after a witness answered a lawyer's question, I ruled

24  that the answer should be stricken, you should disregard both

25  the question and the answer in your deliberations.  Likewise,

1    exhibits, as to which I have sustained an objection or which I

2    ordered stricken are not evidence and you must not consider

3    them in your deliberations.

4        Every defendant in a criminal case is presumed to be

5    innocent.  This presumption of innocence remains with the

6    Defendant throughout the trial unless and until he is proven

7    guilty beyond a reasonable doubt.  The burden is on the

8    Government to prove the Defendant guilty beyond a reasonable

9    doubt.  This burden of proof never shifts throughout the

10   trial.  The law does not require a defendant to prove his

11   innocent or to produce any evidence.

12       If you find that the Government has proven beyond a

13   reasonable doubt every element of the offense with which the

14   Defendant is charged, it is your duty to find him guilty.

15       On the other hand, if you find the Government has failed

16   to prove any element of the offense beyond a reasonable doubt,

17   you must find the Defendant not guilty.

18       As I have said several times, the Government has the

19   burden of proving the Defendant guilty beyond a reasonable

20   doubt as to each count or charge against him.  Some of you may

21   have served as jurors in civil cases where you were told that

22   it is only necessary to prove that a fact is more likely true

23   than not true, which we call the preponderance of the

24   evidence.

25       In criminal cases, the Government's proof must be more

 1   powerful than that.  It must be beyond a reasonable doubt.

 2       Proof beyond a reasonable doubt is proof that leaves you

 3   firmly convinced of the Defendant's guilt.  There are very few

 4   things in this world that we know with absolute certainty, and

 5   in criminal cases, the law does not require proof that

 6   overcomes every possible doubt.

 7       If, based on your consideration of the evidence you are

 8   firmly convinced that the Defendant is guilty of the crime

 9   charged, you must find him guilty.  If, on the other hand, you

10   think there is a real possibility that the Defendant is not

11   guilty, you must give him the benefit of the doubt and find

12   him not guilty.

13       There are two types of evidence from which you may find

14   the truth as to the facts of the case, direct evidence and

15   circumstantial evidence.  When a witness, such as an

16   eyewitness, asserts actual knowledge of a fact, that witness'

17   testimony is direct evidence.

18       A chain of facts and circumstances indicating the guilt

19   or innocence of the Defendant is circumstantial evidence.  The

20   law makes no distinction between the weight you should give to

21   either kind of evidence, nor does circumstantial evidence

22   require a greater degree of certainty than direct evidence.

23       In reaching a verdict in this case, you should weigh all

24   the evidence presented, both direct and circumstantial.

25       In determining whether the Government has established the

charge against the Defendant beyond a reasonable doubt, you
must consider and weigh the testimony of all the witnesses who
have appeared before you.  You are the sole judge of the
credibility of the witnesses.  In other words, you alone are
to determine whether to believe any witness and the extent to
which any witness should be believed.

In reaching a conclusion as to the credibility of any
witness, you may consider any matter that may have a bearing
on the subject.  You may consider the demeanor and the
behavior of the witness on the witness stand; the witness'
manner of testifying; whether the witness impresses you as a
truthful person; whether the witness impresses you as having
an accurate memory and recollection; whether the witness has
any motive for not telling the truth; whether the witness had
a full opportunity to observe the matters about which he or
she has testified; whether the witness has any interest in the
outcome of the case, or friendship or hostility toward other
people concerned with the case.

Inconsistencies or discrepancies in the testimony of a
witness or between the testimony of different witnesses may or
may not cause you to discredit such testimony.  Two or more
persons witnessing an incident or transaction may see or hear
it differently.  An innocent misrecollection, like a failure
of recollection, is not an uncommon experience.

In weighing the effects of the inconsistency or

1   discrepancy, always consider whether it pertains to a matter

2   of important or unimportant detail and whether the

3   inconsistency or discrepancy results from innocent error or

4   intentional falsehood.

5       You may consider the reasonableness or unreasonableness,

6   the probability or improbability of the testimony of a witness

7   in determining whether to accept it as true and accurate.

8       You may consider whether the witness has been

9   contradicted or corroborated by other credible evidence.  If

10  you believe that any witness has shown him or herself to be

11  biased or prejudiced, for or against either side in this

12  trial, you may consider and determine whether such bias or

13  prejudice has colored the testimony of the witness so as to

14  affect the desire and capability of that witness to tell the

15  truth.

16      You should give the testimony of each witness such weight

17  as in your judgment it is fairly entitled to receive.

18      You have heard evidence that Augustine Cortez has been

19  convicted of a crime.  A witness' prior criminal conviction is

20  admitted into evidence solely for your consideration in

21  evaluating his or her credibility as a witness.  As a result,

22  you may consider this prior conviction only in evaluating the

23  credibility of that witness' testimony in this case.

24      You have also heard evidence that Augustine Cortez is an

25  informer.  He has an arrangement with the Government whereby

1    he helps the Government obtain introductions to persons

2    suspected of violating the law or helps the Government obtain

3    similar information.  In exchange, he receives money or

4    immunity from punishment or other personal advantage or

5    vindication.  The use of such persons is a recognized means of

6    detecting criminal conduct and the Government is entitled to

7    call such persons as witnesses.

8        However, when an informant -- informer testifies, his

9    testimony should be examined with greater caution than the

10   testimony of an ordinary witness.  You should consider whether

11   what this person receives from the Government has motivated

12   him to testify falsely against the Defendant in order to

13   further his own interests.

14       A law enforcement officer's testimony should be evaluated

15   by you just as any other evidence in the case.  In evaluating

16   the officer's credibility, you should use the same guidelines

17   that you apply to the testimony of any witness.  In no event

18   should you give either greater or lesser weight to the

19   testimony of any witness merely because he is a law

20   enforcement officer.

21       Ordinarily, the rules of evidence do not permit witnesses

22   to testify as to opinions or conclusions.  But there is an

23   exception to this rule for expert witnesses.  Experts are

24   allowed to give opinions or conclusions because they have

25   become expert in some art, science, profession or calling.

1    They may give their opinions or conclusions and the reasons

2    for their opinions.

3        In this case the Court has permitted Special Agent Mike

4    Johnson of the Drug Enforcement Agency to testify as an expert

5    in the field of the manufacturing of cocaine and the

6    trafficking and transportation of cocaine from South America

7    through Central America and on to the United States, including

8    the routes that cocaine would take to the United States, the

9    role of Guatemala in facilitating that trafficking and

10   transportation, and the prices for cocaine in Colombia,

11   Guatemala and the United States.

12       The Court has also permitted Fernando Antonio Carrillo

13   Garcia, a Guatemalan law enforcement officer, to testify as an

14   expert in the field of drug-trafficking and transportation

15   activities as they relate to Guatemala, including drug

16   transportation routes, trafficking routes, methods of

17   transportation, prices of cocaine in Guatemala and the

18   consumption of cocaine by Guatemalans in Guatemala.

19       You are not bound by an expert's opinion.  If you find

20   that the opinion is not based on sufficient education or

21   experience, that the reason supporting the opinion are not

22   sound or that the opinion is outweighed by other evidence, you

23   may completely or partially disregard the opinion.  In other

24   words, give the opinion the weight you think it deserves after

25   you consider it along with all the other evidence.

1     Every defendant in a criminal case has an absolute right

2   not to testify.  The Defendant has chosen to exercise his

3   right to remain silent.  You must not hold this decision

4   against him, and it would be improper for you to speculate as

5   to the reason or reasons for this decision, and I therefore

6   instruct you not to do so.

7     Most importantly, you must not draw any inference of

8   guilt from the Defendant's decision not to testify.

9     Evidence has been introduced that the Defendant made

10   statements to the police about the crime charged.  You should

11   weigh that evidence with caution and carefully consider all

12   the circumstances surrounding the making of the statement.  Do

13   this in deciding whether the Defendant made the statement and

14   what weight to give it, along with all the other evidence when

15   deciding the guilt or innocence of the Defendant.

16     If you decide that the Defendant did make the statement,

17   in examining the circumstances surrounding the statement, you

18   may consider whether the Defendant made it freely and

19   voluntarily with an understanding of what he was saying, you

20   may consider whether he made it without fear or threats,

21   coercion or force, either physical or psychological and

22   without promise of reward.

23     You may consider the conversations, if any, between the

24   police and the defendant.  For example, you may consider where

25   and when the statement was given, the length of time, if any,

1    that the police questioned him, who was present, the physical

2    and mental condition of the Defendant, you may consider the

3    age, disposition, education, experience, character and

4    intelligence of the Defendant, considering all of the

5    circumstances, you should give his statement such weight as

6    you think it deserves.

7        The weight of the evidence is not necessarily determined

8    by the number of witnesses testifying for each side.  Rather,

9    you should consider all the facts and circumstances in

10   evidence to determine which of the witnesses to believe.  You

11   may find that the testimony of a smaller number of witnesses

12   on one side is more believable than the testimony of a greater

13   number of witnesses on the other side, or you may find to the

14   contrary.

15       During the course of this trial, you have heard the phase,

16   consent -- "consensual tape recording."  This term should not

17   be confused with the phrase "wire interception" or "wiretap."

18   A wire interception or wiretap is a court ordered interception

19   of communications which does not require the consent of the

20   parties to the conversation.

21       A consensual tape recording, on the other hand, is a

22   recording where one party to the conversation consents to the

23   conversation being tape recorded.  It is lawful to conduct

24   consensual tape recordings, and the other party or parties to

25   the conversation do not have to consent to the taping.

1    Consensual tape recording -- I'm sorry.  Consensual tape

2    recorded conversations may occur over the telephone or face to

3    face.

4         During the course of the trial, a number of exhibits have

5    been received in evidence, including statements and portions

6    of statements of witnesses or other persons.  Sometimes only

7    those parts of a document or tape recording relevant to your

8    deliberations are received in evidence.  Where this has

9    occurred, I have required the irrelevant parts of the document

10   to be blacked out or deleted.  Only the relevant parts have

11   been received in evidence and will be made available to you;

12   thus, as you examine the exhibits and you see or hear a

13   statement or document where there appears to be omissions, you

14   should consider only the relevant portions that have been

15   received in evidence.  You should not guess or speculate about

16   anything that has been taken out.

17        During the course of the trial, you heard the testimony

18   of witnesses who testified in Spanish.  The evidence you are

19   to consider is only that provided through the official court

20   interpreters.  Although some of you may know Spanish, it is

21   important that all jurors consider the same evidence.

22        Therefore, you must base your decision on the evidence

23   presented in the English translation.  You must disregard any

24   different meaning.

25        Among the exhibits introduced during the trial were

1   recordings that contains conversations in the Spanish

2   language.  You were also provided with transcripts that

3   contains Spanish transcriptions of the conversations as well

4   as English translations.  The transcripts have been provided

5   in order to assist you in understanding the contents of

6   Spanish language conversations on the recordings.

7       Transcripts of the Spanish recorded conversations are

8   evidence in this case along with the recordings.  Although

9   some of you may know Spanish, it is important that all jurors

10  consider the same evidence.  Therefore, you must base your

11  decisions on the evidence presented in the English

12  translations.  If your own translation differs from these

13  translations, you must disregard your own translation and

14  accept only the translation provided to you.

15      You may consider as well, however, the video and audio

16  recordings and any other evidence regarding the accuracy of

17  translations, including the Spanish transcripts.

18      You will recall that at the beginning or in some cases at

19  the end of each tape recording and transcript introduced into

20  evidence in this case, there is an introduction which was made

21  by the confidential informer or by a member of the drug

22  enforcement administration.  You are instructed that with

23  respect to all the tape recordings and transcripts, you may

24  consider the information and the introduction concerning the

25  date and time as evidence in this case.

1    It is, of course, up to you, the jury, to determine the

2  weight you wish to give to the information contained in the

3  introduction based upon your evaluation of all the evidence in

4  the case.

5    In addition, it is up to you, the jury, to determine who

6  the speakers are in any particular conversation based upon the

7  totality of the evidence in the case.

8    One of the questions you were asked when we were

9  selecting this jury was whether the nature of the charges

10  would affect your ability to render a fair and impartial

11  verdict.  There was a reason for that question.

12    You must not allow the nature of the charges themselves

13  to affect your verdict.  You must consider only the evidence

14  that has been presented in this case in rendering a fair and

15  impartial verdict.

16    Excuse me for one moment.  Now, with respect to the

17  charge in this case.  The indictment charges that between

18  about April 2006 and September 27, 2006, Alvaro Augustin Mejia

19  and others conspired to import five kilograms or more of a

20  mixture and substance containing a detectable amount of

21  cocaine, a controlled substance, into the United States from

22  Guatemala and elsewhere in violation of Federal law.

23    The indictment also charges that between April 2006 and

24  September 27, 2006, Mr. Mejia and others conspired to

25  manufacture and distribute five kilograms or more of a mixture

1    and substance containing a detectable amount of cocaine, a

2    controlled substance, intending or knowing that such cocaine

3    would be unlawfully imported into the United States in

4    violation of Federal law.

5        I will now instruct you on the crime of conspiracy to

6    import or to manufacture and distribute five kilograms or more

7    of a mixture or substance containing a detectable amount of

8    cocaine.

9        It is against the law to agree with someone to commit the

10   crime of importing cocaine into the United States or

11   manufacturing or distributing cocaine, intending or knowing,

12   that such cocaine will be unlawfully imported into the United

13   States.

14       To import a substance means to bring or transport that

15   substance into the United States from a place outside of the

16   United States.  The Government is not required to prove that

17   the objective was achieved.  A conspiracy is a separate and

18   different offense from the underlying crimes that are the

19   alleged object of the conspiracy.  This is because it is an

20   offense to conspire or to agree with someone to commit a crime

21   even if that crime is never committed.

22       To find the Defendant guilty of the crime of conspiracy to

23   import or to manufacture and distribute five kilograms or more

24   of cocaine, you must be convinced that the Government has

25   proved each of the following three elements beyond a

1    reasonable doubt.

2        First, that sometime between April and September 27,

3    2006, an agreement existed between two or more people to

4    commit the crime of, one, importing a mixture and substance

5    containing a detectable amount of cocaine into the United

6    States from Guatemala and elsewhere; or, two, manufacturing or

7    distributing a mixture and substance containing a detectable

8    amount of cocaine intending or knowing that such cocaine would

9    be unlawfully imported into the United States.

10       This does not have to be a formal agreement or plan in

11   which everyone involved sat down together and worked out the

12   details.  On the other hand, merely because people get

13   together and talk about common interests or do similar things

14   does not necessarily show that an agreement exists to import

15   cocaine or to manufacture or distribute cocaine for

16   importation to the United States.  It is enough that the

17   Government proves beyond a reasonable doubt that there was a

18   common understanding among those who were involved to commit

19   the crime of importing cocaine or manufacturing or

20   distributing cocaine with the intent to import it into the

21   United States.

22       So, the first thing that must be shown is the existence

23   of an agreement.  In addition to finding an agreement between

24   two or more people, you must all agree on the offense that the

25   participants agreed to commit.  It is not necessary for the

1    Government to prove that the participants intended to commit

2    all of the offenses described, that is, manufacturing cocaine

3    with the intent to import it into the United States,

4    distributing cocaine with the intent to import it into the

5    United States and importing cocaine into the United States.

6        It is sufficient if the Government proves beyond a

7    reasonable doubt that the participants agreed to commit one of

8    those offenses, but in that event, in order to return a

9    verdict of guilty, you must unanimously agree as to which

10   offense the participants agreed to commitment.

11       Although the Defendant need not know all aspects of

12   charged conspiracy, the Defendant must have known or intended

13   that cocaine would be imported into the United States.

14       Second, the Government must prove that the Defendant

15   intentionally, knowingly and willfully joined in that

16   agreement.  It is not necessary to find he agreed to all the

17   details of the crime or that he knew the identity of all the

18   other people the Government has claimed were participating in

19   the agreement.

20       A person may become a member of a conspiracy even if that

21   person agrees to play only a minor part as long as that person

22   understands the unlawful nature of the plan and voluntarily

23   and intentionally joins in it with the intent to advance or

24   further the unlawful object of the conspiracy.

25       Even if the Defendant was not part of the agreement at

1  the very start, he can become a member of the conspiracy later

2  if the Government proves that he intentionally joined the

3  agreement.

4      Different people may become part of the conspiracy at

5  different times.  But mere presence at the scene of the

6  agreement or of the crime or merely being with the other

7  participants does not show that the Defendant knowingly joined

8  in the agreement.

9      Also, unknowingly acting in a way that helps the

10  participants or merely knowing about the agreement itself

11  without more, does not make the Defendant part of the

12  conspiracy.  So the second thing that must be shown is that

13  the Defendant intentionally, knowingly, and willfully joined

14  the conspiracy.

15      Third, the Government must prove that the overall scope

16  of the conspiracy involved at least five kilograms or more of

17  a mixture and substance containing a detectable amount of

18  cocaine.  In deciding whether the Government has proven that

19  the conspiracy involved at least five kilograms of cocaine,

20  you should consider the total amount, which the evidence

21  shows, that any member of the conspiracy agreed to possess,

22  distribute or import in furtherance of the conspiracy, or

23  attempted to possess, distribute or import in furtherance of

24  the conspiracy.

25      The Government is not required to prove that the

1    Defendant or any alleged conspirator committed an act in

2    furtherance of the conspiracy.  The essence of the offense of

3    conspiracy is the agreement to commit a crime, not the

4    commission of overt acts in furtherance of the agreement.

5        Proof of an overt act is not an element of the charge of

6    conspiracy to import cocaine into the United States or

7    manufacturing or distributing cocaine with the intent to

8    import it into the United States, even though you may have

9    heard references to such acts during the course of the trial.

10       The Government must prove beyond a reasonable doubt the

11   existence of the conspiracy itself and the Defendant's knowing

12   and willful participation in it.  The Government is not

13   required to prove that the conspiracy began or ended on a

14   specific date set forth in the indictment.  Rather, the

15   Government is required to prove beyond a reasonable doubt that

16   in fact a conspiracy existed for some time within the period

17   set forth in the indictment.

18       But proof of several separate conspiracies is not proof

19   of the single overall conspiracy charged in the indictment

20   unless one of the several conspiracies which is proved is the

21   single conspiracy which the indictment charges.

22       What you must do is determine whether the single

23   conspiracy charged in the indictment existed between two or

24   more conspirators.  If you find that no such conspiracy

25   existed, then you must acquit the Defendant as to that charge.

1    However, if you are satisfied that such conspiracy existed,

2    you must determine whether the Defendant was a member of that

3    conspiracy.

4        As you consider the evidence, bear in mind that a

5    conspiracy can be prove indirectly by facts and circumstances

6    that lead to a conclusion that a conspiracy existed.  But it

7    is up to the Government to prove that such facts and

8    circumstances existed and lead to that conclusion in this

9    particular case.

10        In deciding whether an agreement existed, you may

11    consider the acts and statements of all the alleged

12    participants.  In deciding whether the Defendant became a

13    member of that conspiracy, you may consider only the acts and

14    statements of that particular defendant.  A defendant cannot

15    be found guilty of conspiracy if you find that he conspired

16    only with a Government agent.

17        In summary, a conspiracy is a kind of partnership in

18    crime.  For the Defendant to be convicted of the crime of

19    conspiracy to import or to manufacture or distribute more than

20    five kilograms of cocaine, the Government must prove three

21    things beyond a reasonable doubt.

22        First, that sometime between April 2006 and September 27,

23    2006, there was an agreement to import a mixture and substance

24    containing a detectable amount of cocaine into the United

25    States from Guatemala and elsewhere or to manufacture or

1    distribute a mixture and substance containing a detectable

2    amount of cocaine, intending or knowing that such cocaine

3    would be unlawfully imported into the United States.

4        Second, that the Defendant intentionally joined in that

5    agreement; and third, that the overall scope of the conspiracy

6    involved at least five kilograms of a mixture and substance

7    containing a detectable amount of cocaine.

8        Now, someone's knowledge ordinarily cannot be proved

9    directly, because there is no way of directly looking into the

10   workings of the human mind, but you may infer the Defendant's

11   knowledge from the surrounding circumstances.  You may

12   consider any statements made or acts done or omitted by the

13   Defendant and all other facts and circumstances received in

14   evidence which indicate the Defendant's knowledge.

15       You may infer but are not required to infer that a person

16   intends the natural and probable consequences of acts

17   knowingly done or knowingly omitted.  It is entirely up to

18   you, however, to decide what facts to find from the evidence

19   received during this trial.  You should consider all the

20   circumstances in evidence that you think are relevant in

21   determining whether the Government has proved beyond a

22   reasonable doubt that the Defendant acted with the necessary

23   state of mind.

24       The indictment charges that offenses were committed on or

25   about certain dates in 2006.  The proof need not establish

with certainty the exact date of the alleged offense.  It is
sufficient if the evidence in the case establishes beyond a
reasonable doubt that the offense was committed on a date
reasonably near the date alleged.

Mr. Mejia asserts that he is not guilty of conspiring to
import cocaine, knowing or intending that it would be imported
into the United States and that he did not knowingly and
intentionally join the charged conspiracy.

Also, Mr. Mejia asserts that at no time did he act
willfully and knowingly to further the conspiracy to import
cocaine, knowing or intended -- intending that cocaine would
be imported into the United States.

Therefore, the Defendant contends that the Government has
failed to prove beyond a reasonable doubt that he committed
the crime charged in the indictment, that is, conspiracy to
import cocaine into the United States.

Now, I'm sure you're glad to hear that I'm ready for some
closing remarks.  When you return to the jury room, you should
select a foreperson to provide -- to preside over your
deliberations and to be your spokesperson here in court.
There are no specific rules regarding how you select a
foreperson.  That is up to you.

However, as you go about the task, be mindful of your
mission, to reach a fair and just verdict based on the
evidence.  Consider whether you wish to select a foreperson

who will be able to facilitate your discussions, who can help
you organize the evidence, who will encourage civility and
mutual respect among all of you, who will invite each juror to
speak up regarding his or her views about the evidence and who
will promote a full and fair consideration of that evidence.

The verdict must represent the considered judgment of
each juror.  In order to return a verdict, each juror must
agree with the verdict.  Your verdict must be unanimous.  I
will be sending it to the jury room with you, the exhibits
that have been received in evidence.  You may examine any or
all of the exhibits as you consider your verdict.

The question of possible punishment of the Defendant in
the event of conviction is no concern of yours and should not
enter into or influence your deliberations in any way.  The
duty of imposing sentence in the event of conviction rests
exclusively with me.  You should weigh the evidence in the
case and determine the guilt or innocence of the Defendant
solely upon the basis of the evidence without any
consideration of the matter of punishment.

If it becomes necessary during your deliberations to
communicate with me, you may send a note by the clerk or the
marshal, signed by your foreperson or by one or more members
of the jury.  No member of the jury should try to communicate
with me by any means other than a signed note, and I will
never communicate with any member of the jury on any matter

touching the merits of this case except in writing or orally here in open court.

Bear in mind, also, that you are never under any circumstances to reveal to any person, not to the clerk, the marshal or to me, how the jury stands on the question of the Defendant's guilt or innocence until after you have reached a unanimous verdict.

That means, for example, that you should never state to the Court that the jury is divided 6/6, 7 to 5, 11 to 1 or in any other fashion, whether for conviction or for acquittal.

I will provide you with a copy of my instructions. During your deliberations, you may, if you want, refer to these instructions. While you may refer to any particular portion of the instructions, you are to consider the instructions as a whole and you may not follow some and ignore others. The fact that you have been provided a copy of my instructions should not discourage you from making an inquiry regarding the meaning of these instructions, if necessary. Please return the instructions to me when your verdict is rendered.

During the trial, I permitted those jurors who wanted to do so to take notes. You may take your notes with you to the jury room, use them during your deliberations, if you wish. As I told you at the beginning of the trial, your notes are only to be an aid to your memory. They are not evidence in

the case and they should not replace your own memory of the evidence.  Those jurors who have not taken notes should rely on their own memory of the evidence.  The notes are intended to be for the note-taker's own personal juice.

At the end of your deliberations, the clerk will collect your notebooks and pencils when you return to the courtroom. We will destroy your notes immediately after the trial.  No one, including myself, will ever look at them.

You will be provided with a verdict form for use when you have concluded your deliberations.  The form is not evidence in the case and nothing in it should be taken to suggest or convey any opinion by me as to what the verdict should be. Nothing in the form replaces the instructions of law I have already given you and nothing in it replaces or modifies the instructions about the essential elements which the Government must prove beyond a reasonable doubt.

The form is meant only to assist you in recording your verdict.  The form is one page.  You should record your verdict on that form only after you have reached a unanimous verdict.  It should then be signed and dated by the foreperson.

Lastly, I want to mention one or two matters before you begin your deliberations.  These concern how your verdict will be delivered.

When you have reached your verdict, just send me a note

telling me you have reached a verdict and have your foreperson
sign the note.  Don't tell me what you verdict is and do not
send your verdict form out.  I will find out your verdict by
asking your foreperson to provide the verdict form and state
the verdict in open court after you have finished your
deliberations and return to court.

Don't be surprised when your verdict is returned if one
of the parties asks that the jury be polled.  The reason for
polling the jury is because each party has a right to be sure
that your verdict is unanimous.  Polling means that after the
foreperson states your verdict, I will ask each of you
individually whether your verdict agrees with that announced
by your foreperson.  Your job is easy.  If you agree with the
verdict, you should simply say "yes" when I call the number of
your jury seat.  If you disagree in any way, you should simply
say "no."  Do not say anything other than "yes" or "no" in
response to a poll of the jury and do not say anything during
the poll unless and until your seat number is called.

Now, ladies and gentlemen, at this time you will retire
to begin your deliberations, but before you retire, I need to
do something that I consider to be a sad thing.  I need to
extend my thanks and appreciation for the participation of one
of the jurors up to this point.  That juror was determined to
be an alternate juror in this matter at the start of the
trial, and I'm required to excuse that juror prior to the

1    beginning of deliberations.

2         Now, one of the alternates has become a regular juror

3    because we lost one of the regular jurors during the course of

4    the proceedings, but at this time, Juror No. 1583 in Seat 12

5    will have to leave the jury.  I thank him for his diligence,

6    patience and attention during the course of these proceedings,

7    and I ask you to return to the jury lounge at this time and

8    thank you again for your service and attention.

9         With that, ladies and gentlemen, you may retire to the

10   jury room to begin your deliberations.  If you have not

11   completed your deliberations today, I will bring you back in

12   the courtroom at 5:00 o'clock to discharge you for the day.

13   And the instructions, as well as the exhibits, will be brought

14   in to you shortly.  They won't be there waiting for you when

15   you get in there, but they'll be brought in to you shortly.

16   Thank you very much.

17              (JURY DELIBERATION BEGINS AT 3:06 P.M.)

18              (JURY NOT PRESENT ).

19         THE COURT:  I know I don't have all counsel in the

20   courtroom.  Ms. Hernandez, did you have something?

21         MS. HERNANDEZ:  Well, I know the record is clear,

22   but I think I -- at some point I need to object after the

23   Court gives the -- I am again objecting 5to the reasonable

24   doubt, the second paragraph --

25         THE COURT:  I think the record is clear.

1    MS. HERNANDEZ:  But I think I'm required to, after

2    the Court gives the instruction, so I'm saying that.  I also,

3    and this is the first time I'm raising this, page 37, the

4    proof of state of mind, the second paragraph, you may infer

5    but are not required to infer that a person intends the

6    natural and probable consequences of acts knowingly done or

7    knowingly omitted.

8    I think in a specific intent conspiracy case, that's an

9    improper instruction, and I would object.  I'm happy to do

10   research on that and present something to the Court, and

11   maybe, if I'm right, then --

12   THE COURT:  Well, if you wish to do that and present

13   something to the Government and the Court, you may do that.

14   Based on where we are in this trial and the fact that this

15   objection is being raised after the jury has retired to

16   deliberate and after they've received the instructions for the

17   first time, means that you have to do more than you've done

18   thus far to convince me to take any action.  And I leave that

19   to you to decide what else you want to do and to discuss that

20   with the Government.

21   All right.  Mr. Bradley has some work to do with you with

22   respect to the exhibits.  Make sure you get them all together

23   properly and certified by each side and Mr. Bradley.

24   And we will be providing -- with respect to the exhibits,

25   we will be providing the jury with a laptop that they can

1    listen to the audiotapes and listen and watch the videotapes.

2    Now, the Government is actually providing that laptop and the

3    Government needs to certify that there's nothing else, no

4    other files, on that laptop.  And so I need an oral

5    certification to that effect by someone on behalf of the

6    Government.

7          MR. LAYMON:  Can Mr. Rhodes make that certification?

8          THE COURT:  No.  He can in conjunction with one of

9    the attorneys who are counsel of record in the case, but I

10   need to hear from one of the counsel of record as well.

11         (PAUSE.)

12         MS. HERNANDEZ:  Your Honor, I think this might be an

13   appropriate moment to apologize if I've stepped on your lines

14   more than once and to thank you, really.

15         THE COURT:  You never stepped on my lines, and you

16   need not thank me.

17         MS. HERNANDEZ:  Well, I do, because I think you were

18   very considerate and thoughtful in your -- in presiding over

19   the case, so thank you.

20         THE COURT:  Thank you, Ms. Hernandez.  And this is

21   an appropriate time for me, even though one of your number is

22   not here, to thank all counsel for the quality of the

23   presentation.  I appreciate the -- having this trial presented

24   in as professional and high quality of manner as it was.

25         And Ms. Hernandez, believe me, I'm not tired of you.  The

```
 1   Government, I've seen several times before, so it may be that
 2   I'm getting a little tired of them.
 3        MS. HERNANDEZ:  You mean this is Ground Hog Three?
 4   And I understand you 're going to have Ground Hog Four on
 5   Monday.
 6        THE COURT:  You are correct in your understanding.
 7        MR. TOMNEY:  Will you come watch?
 8        MS. HERNANDEZ:  I don't think so.  I may.
 9        THE COURT:  So -- All right.  You-all -- the
10   Government seems to be discussing that, so are you going to
11   have a written certification, Mr. Bradley?
12        THE DEPUTY CLERK:  We could, yes.  I have before,
13   not this form but...
14        THE COURT:  If you want to write there so someone
15   can sign it, that's fine; otherwise, I have to sit here for
16   perhaps hours before someone will say something.
17        THE DEPUTY CLERK:  I'll write it in there.
18        THE COURT:  And I will bring the jury in.  The
19   procedure that all are familiar with, but for Ms. Hernandez's
20   sake who is less familiar with it is, I will only deal with
21   simple logistical matters without contacting counsel, that is,
22   if they ask for pens or pencils or yellow stickies, things of
23   that sort, a drink or two, you know, whatever it may be.
24   Anything more than that, I will at least contact counsel.
25        There may be some circumstances where I will talk
```

1    telephonically with counsel and we will collectively agree

2    that we need not bring the jury back into the courtroom, and

3    there may be some situations where we will formulate a written

4    response to the jury and give them a written response to their

5    question, and other circumstances where we will bring them

6    into the courtroom and respond to a note.

7         I will discharge them at 5:00 o'clock today, assuming

8    they haven't reached a verdict, and I will tell them to come

9    back at 9:30, unless they agree with me that they want to

10   start earlier than  9:30.  They do not come into the courtroom

11   to begin their deliberations in the morning.  I will instruct

12   them on what they have to do before they can begin

13   deliberations, but we do not bring them into the courtroom and

14   counsel need not be here in the morning.

15        But you do need to be available in a reasonable time.  My

16   definition of reasonable time is usually a little less than

17   some counsel's definition of reasonable time.  I don't set a

18   specific number, but I guess itchy if it's more than 15

19   minutes.  All right.

20             MS. HERNANDEZ:  When you bring them in this

21   afternoon, will counsel and the Defendant be in?

22             THE COURT:  Counsel and the Defendant should be here

23   for discharge of the jury at the end of the day.

24             MS. HERNANDEZ:  But thereafter, you don't want us in

25   or will you bring us -- will you once a day?

```
 1            THE COURT:  We'll be talking and we'll figure it
 2    out.  It may be that if everyone agrees that I can discharge
 3    the jury at the end of the day if they're still deliberating
 4    tomorrow without having you here, we can do that.  But I'll
 5    only do that -- I'll only speak to the jury with the Defendant
 6    present unless counsel, with the consent of the Defendant,
 7    agree to something other than that.  All right.
 8        All right.  Good luck everybody in patching up the little
 9    logistical details and we'll be talking to you.
10            MS. HERNANDEZ:  Thank you, Judge.
11            MR. TOMNEY:  Thank you.
12            THE COURT:  Thank you.
13            (AWAITING JURY VERDICT.)
14            THE COURT:  All right.  I'm going to go ahead.  All
15    right.  We just need to put on the record where we are with
16    respect to the laptop.  My understanding is that there are
17    files but they are not accessible files, so can someone just
18    speak to that, so it's on the record, so Ms. Hernandez knows
19    exactly what the situation is and can agree or not agree to
20    it?
21            MS. HABISREITINGER:  Yes, Judge.  Obviously, there's
22    going to be a lot of program files, for one, in the computer
23    that we're not going to delete.  They're definitely not case
24    related.  Any case related type --
25            THE COURT:  When you say program files.
```

1           MS. HABISREITINGER:  Word Perfect, Corel --

2           THE COURT:  You must mean software that enables

3  things to run but not substantive information.

4           MS. HABISREITINGER:  That's correct.  Mr. Rhodes has

5  access to certain files in the computer.  He's allowed to

6  create a My Documents to contain all his documents.  We've

7  gone in, completely deleted those out and we took them out of

8  the recycle bin, so those are gone.

9      The problem comes in because we've had other individuals

10 who have used this computer, including an administrative file.

11 They have access to their files that are on the computer but

12 we don't.  If we try to access them or if the jury tries to

13 access them, then they will be denied, but those we can't

14 delete.

15          THE COURT:  All right.  So there are files there,

16 and one example you've given is an administrator's access that

17 exists but cannot be accessed by anyone associated with this

18 case, and particularly, by any of the members of the jury and

19 you cannot delete them from the computer.

20          MS. HABISREITINGER:  That's correct.

21          THE COURT:  All right.  Any problem with that, as

22 you understand it, Ms. Hernandez, with respect to the laptop

23 that will be available for the jury to display audio and

24 videotapes?

25          MS. HERNANDEZ:  Is the Government have -- are the

```
 1    CDs -- is -- let me start again.
 2        There's a listing of the disks and the exhibits that I
 3    can see right now showing on the screen.  Does that mean that
 4    they're downloaded into the computer?
 5            MR. RHODES:  No, we have them on a disk, on a DVD.
 6            MS. HERNANDEZ:  So that's what you're showing now.
 7    And you will take that out?
 8            MR. RHODES:  No.  They're going to get that.
 9            MS. HERNANDEZ:  Is that the exhibit that was
10    introduced?
11            MR. RHODES:  No.  We made this up for them to be
12    able to listen to the transcript through Windows Media Player.
13            MS. HERNANDEZ:  Is this a different disk than the
14    one that was introduced?
15            MS. HABISREITINGER:  Yes, of course.
16            THE COURT:  Is the court reporter catching this full
17    conversation?  Give a hand mic to whoever else is talking so
18    the court reporter can get it.
19            MS. HERNANDEZ:  Why can't they just use the disk --
20    aren't we giving them the exhibits that were introduced?
21            MS. HABISREITINGER:  Judge, the exhibits that were
22    introduced include, for example, with the audio calls, they
23    include tracks that have not been used in evidence.  What we
24    have on CD prepared for the jury are all of the calls and the
25    videos from the transcript -- from the book itself that
```

1    they've been allowed to listen to and view in court.

2        I know that there are some portions of what has been

3    admitted into evidence with the full CDs that have been

4    excluded by the Court and will not be appropriate for the jury

5    to view.

6            THE COURT:  It is true that some of the recordings,

7    just using that term generally, whether video or audio, have

8    been excluded by this court, although it was done in earlier

9    proceedings.

10            MS. HERNANDEZ:  Okay.

11            THE COURT:  And --

12            MS. HERNANDEZ:  Well, for example, I introduced an

13    exhibit.

14            MS. HABISREITINGER:  Yeah, in fact, I'm just asking

15    Mr. Rhodes -- I was trying to check to see what we have on

16    there, if that was one of the ones that was put on there.

17            MR. RHODES:  We have N-12, all the audio of that,

18    which should be fine because you had --

19            THE COURT:  Here is what I suggest.  We are putting

20    the court reporter to a lot of extra work.  Stop.  You guys

21    talk about it so everybody understands so the court reporter

22    and the Court can understand it.

23        Let's go off the record, talk about it, figure it out a

24    little bit so that everybody understands it.

25            (OFF-THE-RECORD DISCUSSION.)

1          THE DEPUTY CLERK:  All rise.  This honorable court

2    is again in session.  Please be seated and come to order.

3          THE COURT:  All right.  Everyone's here.  We have a

4    note from the jury at 3:50 p.m. that simply states, "We have a

5    verdict."  So I will be bringing the jury in to return the

6    verdict.

7       Let me make two comments before we do.  First, if there's

8    any request by either side to poll the jury, please indicate

9    that; and secondly, you-all know the local rule in this court

10   about not talking to jurors, but I will allow, upon request,

11   counsel to speak briefly with the jury after the verdict is

12   returned if I receive such a request.

13      I hesitate a little because to some extent it depends on

14   the verdict, but I'll just say that I expect I will allow

15   counsel to speak with the jury if they wish to; any members of

16   the jury who want voluntarily to remain, just to speak with

17   you, and be sure, if you want to do that, to indicate to me

18   that you would request to do that.

19      With that, Mr. Bradley, let's bring the jury in.

20          (JURY PRESENT.)

21          THE COURT:  Members of the jury, I have the note

22   indicating that you have a verdict.  Who will speak as your

23   foreperson?  And if you could stand for just a second.  Has

24   the jury unanimously agreed on its verdict?

25          FOREPERSON:  Yes, Your Honor.

1          THE COURT:  If you could hand that note to the

2  marshal, please, the verdict form, that is.  And you can have

3  a seat again.  Thank you.

4      All right.  What I will do is I will ask the clerk to

5  actually publish the verdict.  I have looked over the verdict

6  form and it is in order, so the deputy clerk, Mr. Bradley,

7  will actually be publishing the verdict, that is, reading it

8  aloud here in open court.  I remind you of what I said during

9  the instructions, and that is, that you may be polled and will

10  go through the process that I indicated to you, which is, I

11  would ask you individually whether your verdict agrees with

12  the verdict as published in court.

13      But now, Mr. Bradley, would you please publish the

14  verdict.

15          THE DEPUTY CLERK:  Your Honor, here now, the reading

16  of the verdict form in Criminal Action 06-248, United States

17  of America versus Alvarado -- Alvaro, excuse me, Augustin

18  Mejia.  With respect to the offense of conspiracy to import

19  five kilograms or more of a mixture and substance containing a

20  detectable amount of cocaine into the United States or to

21  manufacture or distribute five kilograms or more of a mixture

22  and substance containing in a detectable amount of cocaine,

23  intending or knowing that such cocaine will be unlawfully

24  imported into the United States, we the jury find the

25  Defendant guilty.

1    Hear now that concludes the reading of the verdict form in

2    Criminal Action 06-248.

3            THE COURT:  Any request to poll jury?

4            MS. HERNANDEZ:  Yes, Your Honor.

5            THE COURT:  All right.  As I kind indicated to you

6    previously, ladies and gentlemen, I will, by your jury seat

7    number, be calling that number and asking that juror whether

8    she or he agrees with the verdict as it has just been

9    published.

10    Juror No. 1, do you agree with the verdict?

11            JUROR NO. 1:  I agree.

12            THE COURT:  Juror No. 2?

13            JUROR NO. 2:  Yes.

14            THE COURT:  Juror No. 3?

15            JUROR NO. 3:  Yes.

16            THE COURT:  Juror No. 4?

17            JUROR NO. 4:  Yes.

18            THE COURT:  Juror No. 5?

19            JUROR NO. 5:  Yes.

20            THE COURT:  Juror No. 6?

21            JUROR NO. 6:  Yes.

22            THE COURT:  Juror No. 7?

23            JUROR NO. 7:  Yes.

24            THE COURT:  Juror No. 9?

25            JUROR NO. 9:  Yes.

1        THE COURT:  Juror No. 10?

2        JUROR NO. 10:  Yes.

3        THE COURT:  Juror No. 11?

4        JUROR NO. 11:  Yes.

5        THE COURT:  Juror No. 13?

6        JUROR NO. 13:  Yes, Your Honor.

7        THE COURT:  And Juror No. 14?

8        JUROR NO. 14:  Yes.

9        THE COURT:  All right.  Having polled the jury, I

10   find that the verdict of the jury is unanimous, and I direct

11   the clerk, Mr. Bradley, to file and record the verdict as

12   published.

13        With that, ladies and gentlemen, your task as jurors is

14   completed.  And I thank you-all for your service, for your

15   attention and diligence throughout and your patience for the

16   delays that occasionally occurred, and again, thank you very

17   much.

18        Now, is there any request from counsel?

19        MS. HERNANDEZ:  Yes, Your Honor.

20        THE COURT:  All right.  In this jurisdiction,

21   counsel are not permitted to talk to the jurors after a

22   verdict is returned unless the Court agrees to it and allows

23   them to do so, and I will do so on in occasion.

24        What that means is, it is totally up to each of you

25   individually, whatever you want to do, but anyone who wishes

1   to and is willing to remain for a few minutes, I won't let it

2   go on for too long in the jury room, to allow counsel to come

3   and ask you a couple of questions, which can be helpful to

4   them.  I will allow them to do that.

5       So if you're willing to, I would ask you to please remain

6   in the jury room.  I will accompany counsel and be there while

7   they ask any questions.  It also gives you an opportunity to

8   make any comment or ask any question that you might have of

9   counsel.

10      So if you're willing to do that, and it's up to each of

11  you individually, please remain in the jury room for a few

12  minutes, and I'll try to have that go reasonably quickly.

13  Counsel often appreciate that opportunity, though, and once

14  again, thank you very much.

15          THE DEPUTY CLERK:  Those not stay have to go back to

16  the jury lounge to check out.

17          THE COURT:  Anyone who doesn't remain in the jury

18  room for a few minutes should go to the jury lounge to check

19  out.

20          THE DEPUTY CLERK:  You can leave your notebooks on

21  the chair.  I'll get them and everything.

22          (JURY NOT PRESENT.)

23          THE COURT:  All right.  While I let the jury

24  disperse, Ms. Hernandez.

25          MS. HERNANDEZ:  Your Honor, could I ask for a --

```
 1    well, one, I would move for a judgment notwithstanding the

 2    verdict for the multiple reasons that I objected to the

 3    closing argument, including what I believe to be an inaccurate

 4    statement to the jury during rebuttal that the Government knew

 5    was inaccurate about --

 6              THE COURT:  I'll reserve ruling on that pending the

 7    submission of a written motion.

 8              MS. HERNANDEZ:  Okay.  And on that -- on that score,

 9    I would ask the Court for an extension -- for a 30-day

10    extension of time to file that motion.

11              THE COURT:  30 days from today or 37 days from

12    today?

13              MS. HERNANDEZ:  37.

14              THE COURT:  All right.  And any objection to that

15    from the Government?

16              MR. LAYMON:  No, sir.

17              THE COURT:  All right.  That will be granted, so 37

18    days from today, technically, is March.  Let's see, March

19    12th, April 11th.  Is that a weekday?

20              THE DEPUTY CLERK:  That's a Friday.

21              MS. HERNANDEZ:  Monday?

22              THE COURT:  Monday you want, so we'll make it 40.

23    April 14th your motion will be due.

24        How long does the Government need to respond?

25              MR. LAYMON:  10 days, Your Honor.
```

1          THE COURT:  So that would be April 24th.

2      And then to reply, Ms. Hernandez?

3          MS. HERNANDEZ:  If the Court will give me, I

4  guess -- I know I have some matters the 1st through the 4th of

5  May, so if -- I guess I would want till whatever the 15th of

6  May, if the Court would allow.

7          THE COURT:  That's fine.  All right.  So that's

8  scheduled.  The Defendant will be remanded.  We need to set a

9  sentencing date, but I don't want to keep the jury waiting if

10  you want to talk to the jury.

11          MS. HERNANDEZ:  I would.

12          THE COURT:  So let's go and speak with the jury now

13  and then we can set that sentencing date in a few minutes.

14  All right.

15          THE DEPUTY CLERK:  All rise.

16          THE COURT:  The Defendant can be returned.  Will you

17  need the Defendant further today?

18          MS. HERNANDEZ:  No.  I mean, we don't need the --

19  it's just the sentencing date, correct?  He doesn't need to be

20  present to set the sentencing date?

21          THE COURT:  If you'll waive his presence for the

22  sentencing date.

23          MS. HERNANDEZ:  Yeah, it's just to set the date.

24          THE COURT:  All right.  I'm going to step off.  Just

25  wait one second while I off the record.

```
1              (OFF-THE-RECORD DISCUSSION.)

2              THE COURT:  All right.  We need to set a sentencing

3    date.  And given the motions, dates, any request in terms of

4    sentencing date; not a particular date but approximate time

5    frame?  Normally we would set sentencing for about

6    two-and-a-half months from now.

7              MR. LAYMON:  Judge, of the -- I don't know if the

8    probation officer is seriously trying to get information from

9    Guatemala, but if they are seeking that, then we should

10   probably give them more time.

11             THE COURT:  All right.  Ms. Hernandez, do you agree

12   with that?

13             MS. HERNANDEZ:  I didn't hear what he said.

14             THE COURT:  He said if the probation office were to

15   seek -- seriously seek information from Guatemala, perhaps we

16   should set the sentencing a little further out.

17             MS. HERNANDEZ:  What kind of information?

18             THE COURT:  Got me.  Criminal record; it could be

19   maybe.

20             MS. HERNANDEZ:  There is no criminal record.

21             THE COURT:  All right.  If you tell them that, maybe

22   they won't seek it.

23             MS. HERNANDEZ:  That's fine.  It's clear we're not

24   up against a -- well, maybe we are.  He is safety valve, Your

25   Honor, could depart down, you're not bound by the guideline
```

```
 1    sentence so maybe he's looking at time served.

 2              MR. LAYMON:  Safety valve?

 3              MS. HERNANDEZ:  Yeah, he's safety valve.  He could

 4    be safety valve.

 5              THE COURT:  All right.  We don't have to have a

 6    sentencing argument at this moment.

 7              MS. HERNANDEZ:  What I'm saying is we're not up

 8    against a deadline where depending on -- I don't believe that

 9    the Court would sentence him to less than two months, so --

10              THE COURT:  All right.  Well, let's pick a date.

11    You know your schedules and you know your obligations in this

12    case with respect to posttrial motion, so give me a suggestion

13    as to what kind of a date would work.

14              MS. HERNANDEZ:  Well, we, Mr. Laymon and I, have a

15    trial supposedly starting in May, but I don't know that it's

16    going -- I thought it was may 16th through the --

17              MR. LAYMON:  It got moved to June.

18              THE COURT:  Well, you'll be ready for that one.

19              MS. HERNANDEZ:  I'm still in shock, Judge.  I never

20    in my life had a verdict --

21              THE COURT:  That was a quick verdict.

22              MS. HERNANDEZ:  That's okay.  It will be sweeter

23    when it gets reversed.

24              MR. LAYMON:  There you go.  Maybe.

25              MS. HERNANDEZ:  What day?  March?  March?
```

```
 1              MR. LAYMON:  March to April, April -- sometime in
 2    June, Judge.
 3              THE COURT:  All right.  What would not fit with --
 4              MR. LAYMON:  Ms. Hernandez and I have a trial
 5    together that starts June 16th, and if it goes, will last
 6    for several weeks.
 7              THE COURT:  Will you be sating Fridays or not?
 8              MR. LAYMON:  I don't know yet.  It's with Judge
 9    Huvelle.
10              THE COURT:  She sits Fridays except for a long
11    trial, and I don't whether this is a long trial or not.
12              MR. LAYMON:  It could be, depending on how many
13    defendants are remaining.  It's a six defendant case, so we
14    just don't know.
15              THE COURT:  So what's your suggestion?
16              MR. LAYMON:  April, May, June.  Sometime before
17    June 16, Judge, I don't know.  June the 12th?
18              THE COURT:  Mr. Bradley, how are we in June?  Early
19    June is a problematic time for me because I have two
20    obligations out of town, one for a judicial confession, this
21    circuit's judicial conference and the other for judicial --
22    national judicial conference committee meeting.
23         So tell me what would work, Mr. Bradley.
24              THE DEPUTY CLERK:  We could do a sentencing on
25    Friday the 13th.
```

1          THE COURT:  Friday the 13th.  That would be the

2    Friday before the start of your trial.

3          MS. HERNANDEZ:  You know, I have a trial starting on

4    the 16th.

5          THE DEPUTY CLERK:  You're in trial that day, too.

6    It's a three co-defendant.

7          THE COURT:  All right.

8          MS. HERNANDEZ:  If the Court wants to set it for

9    June 13th.

10          MR. LAYMON:  That's fine.

11          MS. HERNANDEZ:  If there's a problem, we could

12    always come back to the Court with a change of date, if you

13    want.  I don't know.  I mean, the problem is if we in fact are

14    starting a trial on the 16th, I don't necessarily want to be

15    put before --

16          THE COURT:  I agree with you, and I'm sympathetic to

17    that, so if you want to put it some other date, I'm willing

18    to, but that would require us to pick a Friday, right?

19          MR. LAYMON:  Right, or move it into July.

20          THE COURT:  But even in July, if this is a several

21    week trial, a six defendant trial, it may require us to do it

22    on a Friday anyway.  Give them Friday in July, if you have

23    one.  We have one case set for trial that disappeared

24    recently.

25          THE DEPUTY CLERK:  You can do it on July the 11th

```
 1    at 9:00 o'clock.

 2                THE COURT:  July 11th, 9:00 a.m.  That's a Friday.

 3                MR. LAYMON:  That'll work.

 4                THE COURT:  Okay.  That's our sentencing date and

 5    time.  I had one other thing I wanted to mention to all of you

 6    and I can't remember what it was.

 7                MS. HERNANDEZ:  What are the dates?

 8                THE COURT:  Mr. Bradley, do you have that schedule

 9    in front of you?

10                THE DEPUTY CLERK:  Of hers?

11                THE COURT:  The motion schedule.

12                THE DEPUTY CLERK:  Yes.  It's April 14th;

13    response, April 24th and reply May 15th.

14                THE COURT:  Okay.  I think I'm forgetting something

15    but I can't remember what I'm forgetting, obviously, so we

16    won't worry.

17                MR. LAYMON:  Oftentimes, Judge, I know the

18    Government moves to withdraw the evidence but --

19                THE COURT:  You don't have to move to withdraw the

20    evidence.

21                MS. HERNANDEZ:  What evidence?

22                THE DEPUTY CLERK:  This evidence.

23                THE COURT:  All right.  I haven't thought of it, but

24    I will think of it at some pint, and I'll regret not having

25    thought of it while everybody is still here, but it's not
```

1    crucial issue.  Just clean up the courtroom and -- oh, I know

2    what I was going to say.

3        It was just an aside that I wanted to mention.  I

4    didn't -- I wasn't sure how this jury would function because

5    this was a very young jury.  We had four members of this jury

6    who were under age 25 and one who was only 27.  I don't

7    usually have jurors that young, much less five jurors age 27

8    and younger.  I wasn't sure what that dynamic would mean, but

9    it was a very young jury and they were all very attentive, but

10   it was an unusual thing.

11           MR. RHODES:  I couldn't read them either.

12           THE COURT:  No.  And I don't think they were easily

13   read.

14       All right.  That finishes us off and we will see you --

15   all of you around the courthouse and some of you on Monday.

16       And Mr. Bradley, if you weren't there, you need to

17   communicate with the jury office and you need to tell the jury

18   office that we are trying basically the same case on Monday

19   and that these jurors cannot be in that jury pool.  I don't

20   want them coming into this courtroom with the jury that is the

21   jury pool.

22           THE DEPUTY CLERK:  Right.

23           THE COURT:  So the jury office has got to take care

24   of keeping them off the jury pool because it's essentially the

25   same case.  I don't want to see them.

```
 1              THE DEPUTY CLERK:  This will be the end of the two
 2    weeks, I think.  They only come in --
 3              THE COURT:  It may be.  They said that they thought
 4    they were on service through Monday.
 5              THE DEPUTY CLERK:  It's possible, yeah, I'll check.
 6              THE COURT:  So you need to check with the jury
 7    office and make sure that they're not in the pool.
 8              THE DEPUTY CLERK:  Got you.
 9              THE COURT:  None of the 14.
10              THE DEPUTY CLERK:  14.
11              THE COURT:  Okay.
12              THE DEPUTY CLERK:  All right.
13              THE COURT:  Thank you-all.
14              MR. LAYMON:  Thank you, Judge.
15              (PROCEEDINGS END AT 4:35 P.M.)
16                         *-*-*-*
17
18
19
20
21
22
23
24
25
```

1

2                        I-N-D-E-X

3          Rebuttal Closing Statement by Mr. Laymon........  2
           Jury Instructions Read by the Court............. 28
4          Verdict......................................... 63
           Sentencing Date Set............................. 68

5

6

7

8

9

10

11

12

13                        *-*-*-*-*

14

15               **CERTIFICATE OF REPORTER**

16          I, Catalina Kerr, certify that the foregoing is a

17   correct transcript from the record of proceedings in the

18   above-entitled matter.

19

20

21

22

23   _____    _____

24   Catalina Kerr                       Date

25