UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | Case No. 06-Cr-0248 (JDB) |
| | : | |
| **ALVARO AUGUSTIN MEJIA,** | : | |
| Defendant | : | |
| | ***** | |

**DEFENDANT MEJIA'S REPLY TO THE GOVERNMENT'S
OPPOSITION TO HIS MOTION FOR JUDGMENT OF ACQUITTAL
AND FOR NEW TRIAL**

Mr. Mejia, by his counsel, hereby replies to the Government's Opposition to his Motion for Judgment of Acquittal and for a New Trial. He respectfully requests that this Court enter a judgment of acquittal as the evidence was insufficient to prove a meeting of the minds with others to conspire to import cocaine into the United States. In the alternative, Mr. Mejia respectfully requests that the Court grant him a new trial. The reasons are more fully set forth below.

**I.  MR. MEJIA IS ENTITLED TO A JUDGMENT OF ACQUITTAL BECAUSE THE EVIDENCE FAILED TO SHOW THAT HE INTENDED TO CONSPIRE TO IMPORT COCAINE INTO THE UNITED STATES – AN ELEMENT OF THE OFFENSE AND A JURISDICTIONAL REQUIREMENT FOR CONVICTION OF 21 U.S.C. §§ 959, 960 and 963.**

In opposing Mr. Mejia's Motion for a Judgment of Acquittal the government argues that the motion has no merit but fails to submit any particularized evidence to refute Mr. Mejia's claim that as to him, the evidence did not show a meeting of the minds to a conspiracy to import cocaine into the United States. The evidence showed that during the life of the conspiracy, Mejia was not a Guatemalan official. Although Mejia had misrepresented himself to be Edwin Renee Sapon-Ruiz, the Guatemalan Customs Commissioner, there was no evidence that he knew Sapon-Ruiz, or had reached out to him, or had influence with him or any other high governmental official in DIPA,

SAIA, or any other Guatemalan government agency. Indeed, Mejia's statement about DEA's involvement with DIPA (made during the July 2007 videotaped meeting) was factually incorrect, thus supporting the inference that he had no real inside knowledge of the working of DIPA. His knowledge of DIPA's existence was consistent with public pronouncements on the subject. No evidence was introduced that Mejia had attempted, in furtherance of the conspiracy or otherwise, to contact any officials at DIPA, who according to the testimony were intensely vetted to prevent corruption. Thus, there was no evidence that he would be able to or intended to carry out his part of the alleged bargain – to provide safe passage of cocaine through Guatemala to the border with El Salvador[1].

Moreover, although the government points to his alleged post-arrest statement to DEA agents in support of its argument, in fact the alleged statement does not support its contention. Indeed, Special Agent Fraga direct testimony supports Mr. Mejia's claim that there was insufficient evidence of a meeting of the minds. During Fraga's direct examinatio, the government elicited that

> Mr. Mejia advised of his -- his own intention of what he intended to possibly do with that cocaine. [Q. And what did he tell you about his intention?] He told us that he had given thought to stealing the cocaine and reselling the cocaine in Guatemala for $4500 per 1 kilogram.

Direct Testimony of DEA Special Agent Fraga, TR 03/04/08 PM at 100-01. It is noteworthy that this evidence, which would have been inadmissible hearsay if introduced by Mejia, was introduced by the government in its case in chief. *See* FRE 801.

---

[1] The testimony elicited from – that former police officers were able to dictate to officers within the force – which was admitted over defense objection, was purely hypothetical and not within the scope of expertise for which the Court admitted the testimony of Carillo-Garcia and did not meet the Daubert/Kumho-Tire requirements for the expert testimony.

That evidence, introduced by the government, supports Mejia's claim that there was insufficient evidence that he had the necessary intent to make out the charged offense. The government's evidence is that Mejia intended to steal the cocaine and sell it in Guatemala. Unrefuted by other evidence, it defeats the importation element of the charged offense because there was no meeting of the minds sufficient to satisfy the intent element. *See United States v. Arbane*, 446 F.3d 1223 (11th Cir. 2006):

> The only conspiracy charged in this case was a conspiracy to import drugs into the United States. The venture or plan to which two culpable co-conspirators must have agreed is thus the importation of drugs into the United States. *See United States v. Badolato*, 701 F.2d 915, 919-20 (11th Cir. 1983), *rehearing denied*, 708 F.2d 734 (" The most basic element of such a conspiracy is an agreement between two or more persons to violate federal narcotic laws."). Of course, conspiracy to possess drugs in Ecuador, to export drugs from Ecuador, or to distribute drugs in South America are not crimes in the United States. The government was therefore obligated to prove that two co-conspirators agreed to a United States crime – to be precise, the crime charged in the indictment.

*United States v. Arbane*, 446 F.3d at 1229-30 (reversing § 959 conspiracy). Thus, Mr. Mejia is entitled to a judgment of acquittal.

That evidence of Mr. Mejia's intent to steal the cocaine and resell it in Guatemala rather than assist in its shipment to the United States remained unrefuted throughout the trial. The government's argument that Carillo-Garcia, the Guatemalan police officer, undermines this testimony is wrong. Carillo-Garcia, the Guatemalan police officer, did not testify as the government contends "about the unlikelihood of someone in Guatemala 'ripping off' a Colombian drug trafficker." Gov't Memo at 10. To the contrary, Carillo-Garcia's 'expert' testimony on this subject necessarily means that such scams and thefts do occur. *See* TR 2/29/08 PM at 72-73.

>   [BY MS. HABISREITINGER] Senor Carrillo Garcia, what happens in Guatemala when an individual rips off or tries to swindle a Colombian drug trafficker?
>
>>   [MS. HERNANDEZ:  Objection, relevance.
>>   THE COURT:  Overruled.
>>   THE INTERPRETER:  One moment, please.
>>   THE COURT:  Certainly.]
>
>   In Guatemala, in general, just as you would see in Colombia, the price for robbing or taking drugs from or damaging drugs that belong to a drug trafficker, the price is your life, and your age does not -- is not important in this. You could be young, middle-aged or elderly or you could be a man or woman. It would be the same answer.
>
>   [Q    (BY MS. HABISREITINGER)   And last question.  What happens in Guatemala if an individual attempts to, for example, steal from a fellow drug trafficker?]
>
>   If he were to try another -- to rob another drug trafficker, as I said, he would pay with his life. That would be the price of the damage or the atrocity, if you look at – as seen from the point of view of the drug trafficker. It doesn't matter what your economic level is, what kind of administrative level or with the nature of your work, you would pay with your life.

TR 2/29/08 PM at 72-73.

Carillo-Garcia was testifying as an expert not as a factual witness. His testimony must necessarily have been based on the incidence of murders that are perpetrated when drug traffickers are 'ripped off.' *See* FRE 701-705. Thus, his testimony confirmed the incidence of such scams and double-crosses, however dangerous such conduct might be to the scammer.

Consequently, there was insufficient evidence that Mejia had the specific intent to further the common unlawful objective of the conspiracy. The Court should therefore vacate the conviction and enter a judgment of acquittal.

**II.    IN THE ALTERNATIVE, THE DEFENDANT IS ENTITLED TO A NEW TRIAL**

In opposing Mr. Mejia's request for a new trial, the government relies on cases that are inapposite in that they did not involve prosecutorial misstatements but instead involved other errors. Rather than the multiple misstatements of facts present in this case, the cases relied on by the government are distinguishable because they involve (1) prosecutorial expressions of opinions, (2) comments that did not rise to errors or misstatements, or (3) were reviewed for plain error because not objection was lodged. . *See, e.g., United States v. North*, 910 F.2d 843, 897-98 *amended in part on other grounds*, 920 F2d 940 (D.C. Cir. 1990) (new trial not granted "for single inappropriate remark" and in light of defense counsel's ability to take advantage in "forceful reply" to prosecutor's "ill-advised" comment), *cert. denied,* 111 S.Ct. 2235 (1991); *United States v. Monaghan*, 741 F.2d 1434 (D.C. Cir. 1984), *cert. denied*, 470 U.S. 1085 (1985)(asking jury to issue "public condemnation" of defendant and "advocacy of exaggeration" eliciting sympathy for the victim did not result in prejudice to the defendant); *United States v.* Walker, 899 F. Supp. 14, 15 (D. D.C. 1990) (new trial not appropriate because juror was not untruthful about a stale prior conviction); *United States v. Rogers*, 918 F. 2d 207(D. D.C. 1991)(challenge to jury instruction).

Moreover, because Mejia objected to the errors, the government not Mejia bears the burden of showing that the errors were 'harmless.' *See United States v. Henry*, 472 F.3d 910, 917 (D.C. Cir. 2007) (plain error inquiry "normally requires the same kind of inquiry [as harmless error], with one important difference: It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice").

The Supreme Court has made it clear that the Fourteenth Amendment does not allow a

"criminal conviction obtained by the knowing use of false evidence." *Miller v. Pate,* 386 U.S. 1, 7 (1967) (granting habeas relief to defendant where prosecutor had knowingly misstated evidence); *accord Mooney v. Holohan*, 294 U.S. 103, 112 (due process prohibits conviction based on testimony known by prosecution to be perjured). This prohibition applies even where the perjury concerns impeachment and not just where the evidence pertains to guilt or innocence.

> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. As stated by the New York Court of Appeals in a case very similar to this one, People v. Savvides, 1 N.Y.2d 554, 557, 154 N.Y.S.2d 885, 887, 136 N.E.2d 853, 854-855:
>
> 'It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. * * * That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.'
>
> Second, we do not believe that the fact that the jury was apprised of other grounds for believing that the witness Hamer may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one.

*Napue v. People of State of Ill.,* 360 U.S. 264, 269-270 (1959).

In Mr. Mejia's case, the more illustrative cases are those where the DC Circuit has granted a new trial based on prosecutorial misstatements. *E.g.*, *United States v. Watson*, 171 F.3d 695 (D.C. Cir. 1999) (prosecutor's misstatement of evidence in closing argument was not harmless error, but

instead warranted new trial); *United States v. Iverson*, 637 F.2d 799 (D.C. Cir. 1981) (granting new trial, holding that prosecutor had duty to alert court that witness had not been sentenced where principal prosecution witness testified that she had already been sentenced, implying that she had nothing to gain from testimony). The government has failed adequately to explain and excuse its multiple misstatements.  This Court should therefore vacate the conviction and grant a new trial.

    **A.**    **Prosecutors' Testifying to Facts Not In Evidence, Which They Knew To Be False Requires a New Trial**

The D.C. Circuit has been clear that prosecutors cannot comment on facts that have not been introduced in evidence and that a district court errs when it fails to sustain an objection in such a circumstance.  In *United States v. Maddox*, the Court explained why this is so.

> The district court erred in overruling the objection. The prosecution had introduced no evidence regarding what happened to the car and to the key and key ring after Maddox's arrest. We have held many times before, and we hold once again, that in closing argument counsel may not refer to, or rely upon, evidence unless the trial court has admitted it. *See, e.g., United States v. Small,* 74 F.3d 1276, 1280 (D.C. Cir.1996); *United States v. Boyd,* 54 F.3d 868, 871 (D.C. Cir.1995); *United States v. Foster,* 982 F.2d 551, 555 (D.C.Cir.1993); *United States v. Teffera,* 985 F.2d 1082, 1088, 1089 n. 6 (D.C. Cir.1993). The reasons are obvious. The practice disregards, indeed violates, the rules governing the admission of evidence.  Typically, the attorney's statements amount to blatant hearsay about matters not in the record.  The transgressing attorney makes himself an unsworn witness.  And when it is the prosecutor who goes outside the record, the effect is to deprive the defendant of his right to cross-examine the witnesses against him. *See* Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 24.5 (2d ed.1992).

*United States v. Maddox,* 156 F.3d 1280, 1282 (D.C. Cir. 1998) (reversing conviction and granting a new trial); *see also United States v. Watson*, 171 F.3d 695, 700 (D.C. Cir. 1999) (reversing and

granting new trial based on prosecutors misstatement during closing). Misstatements made by the government during its rebuttal argument, when the defense has no opportunity to correct the error are particularly prejudicial. *See Id.*, 171 F.3d at 700 (one of factors to consider in determining whether a new trial is warranted is "the steps taken to mitigate effects of error").

Moreover, as the Court of Appeals explained in *Maddox,*

> The judge's refusal to sustain the objection, done in open court, only made matters worse. Jurors unschooled in the proprieties of closing argument may have thought the defense was objecting to the accuracy of the prosecutor's representations. If so, the court's overruling of the objection signified that the prosecutor had correctly described what the missing witnesses would attest. Maddox did not mount much of a defense, but he was entitled to present his case to the jury without the extra burden of having to overcome six additional adverse witnesses at a point when the evidence had closed. The right to cross-examine is a "substantial" right of every defendant. The law requires us to disregard errors and irregularities that do "not affect substantial rights," Fed.R.Crim.P. 52(a); 28 U.S.C. § 2111, but the errors of the trial judge and the prosecutor are not of that sort. Can we be sure that the prosecutor's improper rebuttal and the court's erroneous overruling of the defense objection "did not influence the jury" or had only a "very slight effect"? *Kotteakos v. United States,* 328 U.S. 750, 764-65 (1946). No, we cannot be sure of any such thing. It may well be that in a trial uninfected by the sort of overreaching that took place here, Maddox would have been convicted. But that is not the correct harmless-error inquiry. *See United States v. Smart,* 98 F.3d 1379, 1391 (D.C.Cir.1996); *see also* Harry T. Edwards, *To Err is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?,* 70 N. Y. U. L. Rev. 1167, 1199-1206 (1995). The question is "whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error," *Sullivan v. Louisiana,* 508 U.S. 275, 279 (1993), and because that question must be answered in the negative, the defendant's conviction cannot stand. The judgment of conviction is reversed and the case is remanded for a new trial.

*United States v. Maddox*, 156 F.3d at 1283-1284.

Although the government attempts to explain away its misstatements, a careful review of

the record makes clear that it has failed to do so.

       **1.**       **Mejia Did Not Live in Guatemala City at the Time of the Offense and There Was No Evidence to Support the Government's Misstatement During its Rebuttal**

In arguing that the evidence supported the government's rebuttal argument that Mejia lived in Guatemala City, the government fails to consider the entirety of the witness' testimony. Thus, Mr. De Leon, the now-retired Guatemalan police officer who had been Mejia's former supervisor testified on direct:

> Q. And do you know where that picture -- what is the location of that picture?
> A. It was the house of the gentleman -- well, the family, Mr. Augustin.
> Q. You mean the house where he lived?
> A. Exactly.
> Q. And the picture depicts him wearing a uniform; is that correct?
> A. Correct.
> Q. So when you say that's where he lived, you mean that's where he lived when he was a police officer?
> A. Yes.

TR 3/5/08 AM at 29.

On cross-examination of DeLeon, AUSA Laymon attempted to establish that Mejia lived in Guatemala City at the time of the offense but failed to do so:

> Q. You testified that you went to Mr. Mejia's home. Where was this home located?
> A. In zone 8 in Guatemala City.

> Q. So, in other words, he lived in Guatemala City.
>
> A. That's right.
>
> Q. And as far as you know, has he always lived in Guatemala City?
>
> A. He no longer lives there now.
>
> Q. Right. Okay. The photograph that you were shown, do you know when that was taken?
>
> A. Not exactly, but it's about five or six years old.

TR 3/5/08 AM at 35-36.  When read in context, DeLeon responded to questions about his earlier testimony, when he visited Mejia at his home at the time the picture was taken. As DeLeon made clear, that visit had been "five or six years" earlier, while Mejia was still a police officer and lived in Guatemala City.  It is noteworthy that when DeLeon responds that Mejia no longer lives in Guatemala City, AUSA Laymon tried to pin him down on the date.  It is at that point, that DeLeon explains that the photograph and thus the visit was "five or six years" earlier.  In light of that explicit attempt by AUSA Laymon to pin the witness down on a date that would support his theory of the case and the witness' rejection that his reference was to a current date, AUSA Laymon's rebuttal argument on the same day that this examination took place is inexcusable.

From that testimony, which in no way provides for support for stating that at the time of the offense Mejia lived in Guatemala City, AUSA Laymon argues that the jury should infer that during the four to six hour car ride to the July meeting from his home in Guatemala City, Mejia must have discussed details of the June meeting with the codefendants.  AUSA Laymon also argued that the length of the trip supports the inference of how committed to the conspiracy Mejia was.  *See* TR 3/5/08 PM at 8-9, 12.  This was a material misstatment and if there is any ambiguity at all, it was due to the prosecutor's phrasing of the question, which is no excuse for the misstatement.  *See Watson*,

171 F.3d at 701 ("The lack of clarity in Raymond Thomas's testimony stemmed directly from the prosecutor's use of a compound question and his assumption of a key fact not in evidence. The defense, of course, had no obligation to object to the prosecutor's question, much less to perfect the government's case by clarifying the witness' response on reexamination, but could rest satisfied with the response, which did not produce damaging testimony.")

> As the DC Circuit explained in *Watson:*
>
>> A misstatement of evidence is error when it amounts to a statement of fact to the jury not supported by proper evidence introduced during trial, regardless of whether counsel's remarks were deliberate or made in good faith. *See Gartmon,* 146 F.3d at 1025; *United States v. Donato,* 99 F.3d 426, 432-33 (D.C.Cir.1996); *United States v. Small,* 74 F.3d 1276, 1280-81 (D.C.Cir.1996); *United States v. Perholtz,* 842 F.2d 343, 360-61 (D.C.Cir.1988); *Gaither v. United States,* 413 F.2d 1061, 1079-80 (D.C.Cir.1969). The misstatement constituting error is demonstrated here by comparing the witness' testimony with the statements made by the prosecutor in closing arguments. *See Gartmon,* 146 F.3d at 1025; *Perholtz,* 842 F.2d at 360; *Gaither,* 413 F.2d at 1078. The government does not dispute that the prosecutor purported to quote Thomas's testimony. Yet the quote was inaccurate; the error is apparent on the face of the record.

*United States v. Watson*, 171 F.3d at 700.

### 2.    Mr. Mejia Was Not the Only Police Officer Alleged to Have Participated in the Conspiracy

As the government well knows from presiding over the trial and sentencing of the other defendants particularly Del Cid, the government well knew and has argued that Del Cid was a Guatemalan police officer. A DEA-6 provided in discovery refers to Del Cid as a comisario, a higher rank that Mejia's. Moreover, in his closing argument in the Del Cid case, AUSA Laymon clearly argued that both Del Cid and Mejia were former police officers:

> The defendant's [Del Cid} role and Mr. Mejia's role, Ovidio and Edwin, their role in this was to use their police backgrounds to assure that this cocaine was going to safely, once it gets to the country, safely stay in the country, safely transit the country, move its way through the Guatemalan countryside, up to the Guatemalan-Mexican border, and then be sent on to the United States from there. The defendant was going to be security for this load of cocaine.
>
> . . .
>
> Before he was asked by Mr. Constanza Bran a few months before he was asked by Mr. Constanza Bran a few months to act as security. Because although Mr. Mejia and Mr. Del Cid Morales presented false names identifying themselves as Guatemalan officials, in fact both Mr. Mejia and Mr. Del Cid Morales were in fact former police government officials in Guatemala.

Del Cid Trial, TR 10/31/07 at 39, 46-47.

The government's attempt, in its response to Mejia's Motion for New Trial, that the crux of its argument was that Mejia had a particularized experience just doesn't hold water. It's first sentence to that argument was explicit that Mejia was the only conspirator with law enforcement experience. Moreover, the remaining argument that it made about Mejia's particular experience also was unsupported by the testimony at trial and DeLeon explicitly rejected AUSA Laymon's attempt to have him say that Mejia had experience in investigating drug offenses. Indeed, the government's closing argument was rife with misstatements including for example that Mejia was "willing to use his police connections in DIPA" although no evidence was introduced that he indeed had any connections at DIPA. TR 3/5/08 at 70-71.

In summary, the Court should enter a judgment of acquittal or grant a new trial. The misstatements by the government were numerous and went to essential issues in the case. As noted above, there was contradictory evidence of Mr. Mejia's specific intent to join a conspiracy to import cocaine. No evidence that he had connections within DIPA or any of the other agencies and no

evidence that he attempted to use any such connections.

Respectfully submitted,

/s/

Carmen D. Hernandez
PO Box 70
Highland, MD 20777
202-628-0090; 202-628-2881 (fax)

## CERTIFICATION OF SERVICE

    I hereby certify that on this date, I served via ECF a copy of the above Reply to counsel for the government and to the other defendants.

/s/
Carmen D. Hernandez
