UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ALVARO AUGUSTIN MEJIA,<br><br>Defendant. | Criminal Action No. 06-248 (JDB)<br><br>**FILED**<br>JUN 2 0 2008<br>NANCY MAYER WHITTINGTON, CLERK<br>U.S. DISTRICT COURT |

## MEMORANDUM AND ORDER

Following a jury trial that concluded on March 5, 2008, defendant Alvaro Augustin Mejia was convicted of conspiring to import cocaine into the United States, or conspiring to manufacture or distribute cocaine, intending or knowing that such cocaine would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 963, 952, 959, and 960. After the close of the government's evidence at trial, Mejia made a motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, which the Court denied. Mejia now renews that motion pursuant to Fed. R. Crim. P. 29(c) and, alternatively, moves for a new trial pursuant to Fed. R. Crim. P. 33. Upon careful consideration of the motion, the opposition thereto, the applicable law, and the entire record, the Court will deny Mejia's motion.

### BACKGROUND

The evidence at trial established the following. The U.S. Drug Enforcement Administration ("DEA") began investigating a potential drug trafficking organization after Jorge Bardales Bourdet spoke with a DEA informant and told him he could facilitate the transit of cocaine from Colombia through Guatemala into the United States. Bardales Bourdet, Antonio

Chui Serrano, a DEA informant using the name of Augustine Cortez, and two other DEA informants met in Panama City on June 20, 2006. At the meeting, Cortez -- the principal DEA informant -- held himself out as a Colombian cocaine trafficker who needed assistance in moving a large load of cocaine into the United States. The parties discussed fees, storage details for the cocaine, and transportation logistics for a load of at least 1000 kilograms of cocaine. After the meeting, Cortez talked with Chui Serrano's "boss," Erik Donaire Constanza Bran, by telephone on a number of occasions, and a second meeting was arranged.

At the second meeting in San Salvador on July 19, 2006, Mejia made his first appearance. Cortez met with Mejia, Bardales Bourdet, Constanza Bran, an unidentified co-conspirator named "Filipino," and Juan Daniel Del Cid Morales. Both Mejia and Del Cid Morales falsely identified themselves as high ranking Guatemalan officials -- Guatemalan Commisario General Edwin Renee Sapon Ruiz and Guatemalan General Ovidio Fajardo Adana, respectively. When Cortez stated that he wanted to move 1300 kilograms of cocaine from Colombia through Guatemala to the border of Mexico and then on to the United States, all present at the meeting agreed to assist with the venture. Bardales Bourdet and Constanza Bran agreed to provide safe storage for the cocaine in Guatemala, and Del Cid Morales and Mejia agreed to ensure the protection and safe passage of the cocaine through Guatemala to the border of Mexico. In discussing this, Mejia spoke of DIPA (Division of Protection/Security of Ports, Airports, and Borders), the Guatemalan anti-narcotics unit, and his ability to influence the new unit. In the course of reaching the agreement, Del Cid Morales accepted $10,000 in payment from Cortez.

After the presumed death of Bardales Bourdet in a traffic accident, Cortez met with Constanza Bran, Del Cid Morales, and Mejia again in San Salvador on August 23, 2006. In Bardales Bourdet's absence, Constanza Bran assumed leadership of the operation and assured

Cortez that each remaining person would continue to fulfill his own obligations. Constanza Bran showed Cortez a diagram of how the cocaine would be hidden in a shipping container, and he presented paperwork for a transportation company. The parties also discussed setting up a front company to ship the container of cocaine.

Following a number of telephone calls between Constanza Bran and Cortez, a fourth meeting was arranged for September 27, 2006, in San Salvador. At this meeting, officers in El Salvador detained Mejia, Constanza Bran, and Del Cid Morales and turned them over to the DEA. Mejia had with him at this time a list of DEA agents assigned to the Guatemala field office. After each was advised of his <u>Miranda</u> rights, <u>see</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), each individual waived those rights and gave a statement confessing to his involvement with the conspiracy to import cocaine into the United States.[1]

## DISCUSSION

I. **Motion for Judgment of Acquittal**

In considering a Rule 29 motion, a court must view the evidence in the light most favorable to the government and must determine whether the evidence presented at trial is sufficient to sustain a conviction as a matter of law; in other words, the court must decide whether a reasonable jury could conclude that the government met its burden of proving each element of the offense beyond a reasonable doubt. <u>See</u> <u>United States v. Treadwell</u>, 760 F.2d 327, 333 (D.C. Cir. 1985); <u>see also</u> <u>United States v. Gomez</u>, 431 F.3d 818, 819 (D.C. Cir. 2005) ("As always with a defendant's claims of insufficient evidence, we review de novo, viewing the evidence in the light most favorable to the government. We affirm if a rational fact-finder could

---

[1] The three defendants were tried separately and statements of co-conspirators were not admitted at trial. <u>See</u> <u>Bruton v. United States</u>, 391 U.S. 123, 137 (1968).

have found guilt beyond a reasonable doubt.").

Although Mejia argues that the evidence does not demonstrate "a conspiracy to import cocaine but rather a scam by the defendants who were fraudulently representing themselves to be high level Guatemalan officials when they in fact were not," Def.'s Mot. at 14, a review of the evidence establishes otherwise. Based upon the videotaped evidence of the defendants' meetings, the recorded phone conversations between Cortez and Constanza-Bran, the testimony of Cortez, the testimony of several law enforcement witnesses, and Mejia's statement given to Special Agent Steven Fraga, the evidence overwhelmingly supports the jury's finding of a conspiracy to import cocaine.

After Cortez represented his desire to import 1300 kilograms of cocaine, Mejia and the other defendants agreed to assist with the venture and met on several occasions to work out the details of, and to implement, the plan. Each participant had a specific role to play to achieve their shared goal of moving the cocaine through Guatemala to the border of Mexico to be ultimately imported into the United States. See United States v. Tarantino, 846 F.2d 1384, 1392 (D.C. Cir. 1988) ("A single conspiracy is proven if the evidence establishes that each conspirator had the specific intent to further the common unlawful objective."). For his part, Mejia, a former police official, misrepresented his true identity and stature but did so to advance his role in the conspiracy, which was to provide security for the cocaine while in transit. Although Mejia makes much of the fact that no evidence was introduced to demonstrate that he ever contacted any officials at DIPA, this argument does not carry the day for Mejia. He held himself out as someone capable of influencing officials at DIPA, and the list of DEA agents in his wallet at the time of his arrest indicates he took some action related to security measures for the future shipment of cocaine.

Moreover, Mejia confessed to the conspiracy in his post arrest statement to Special Agent Fraga. In Mejia's statement, he explained how he was approached by Constanza Bran to act as a police officer "to facilitate a cocaine transaction that was being conducted with a Colombian male by the name of Augustine." March 3, 2008 PM Tr. at 9. Mejia stated that he was aware that the cocaine was destined for the United States and that he agreed to assist in the venture to make money. Id. at 10, 100. Based upon the evidence presented at trial, therefore, a reasonable jury could conclude that the government met its burden of proving each element of the offense beyond a reasonable doubt. There was sufficient evidence to show a common understanding among those who were involved to commit the crime of importing more than five kilograms of cocaine, or manufacturing or distributing more than five kilograms of cocaine, knowing or intending that it would be imported into the United States. There was also sufficient evidence to demonstrate that Mejia agreed to play a role in the conspiracy, that he understood the unlawful nature of the plan, and that he voluntarily and intentionally joined the conspiracy with the intent to advance or further the unlawful object of the conspiracy.

Although Mejia attempts to place great emphasis on his claim that he had "given thought to stealing the cocaine and reselling the cocaine in Guatemala for $4500 per 1 kilogram," he never voiced this thought to any other co-conspirator. Id. at 100-01. In light of his affirmative actions supporting the conspiracy, which were captured on video and audio tape, his unexpressed thought of a possible scam does not undermine the jury's verdict. Indeed, additional evidence was introduced by the government, which undermines the feasibility of Mejia attempting to scam the other co-conspirators and Cortez. Guatemalan Police Officer Fernando Antonio Carrillo Garcia testified that it would be extremely unlikely that anyone in a group similar to these defendants would attempt to swindle a Colombian drug trafficker, as the penalty would likely be

death. Feb. 29, 2008 PM Tr. at 72. Based upon all of the evidence, the Court concludes that a reasonable jury could easily find that Mejia conspired with the other defendants to import cocaine into the United States. Because the evidence readily permits this conclusion, the Court will deny Mejia's motion for acquittal.[2]

## II.     Motion for a New Trial

In relevant part, Fed. R. Crim. P. 33(a) provides that "the [C]ourt may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "In considering a motion for a new trial, a district judge weighs the evidence and evaluates the witnesses' credibility and decides whether 'a serious miscarriage of justice may have occurred.'" United States v. Rogers, 918 F.2d 207, 213 (D.C. Cir. 1990) (quoting Tibbs v. Florida, 457 U.S. 31, 38 n.11 (1982)). "Unlike a motion for judgment of acquittal, when ruling on a motion for a new trial 'the Court need not accept the evidence in the light most favorable to the government.'" United States v. Howard, 245 F. Supp. 2d 24, 30 (D.D.C. 2003) (quoting United States v. Edmonds, 765 F. Supp. 1112, 1118 (D.D.C. 1991)). Ultimately, "[a] motion for a new trial is committed to the sound discretion of the trial judge, and should be reversed only for abuse or misapplication of the law." United States v. Mangieri, 694 F.2d 1270, 1285 (D.C. Cir. 1982) (quoting United States v. Reese, 561 F.2d 894, 902 (D.C. Cir. 1977)).

Mejia has a heavy burden under Fed. R. Crim. P. 33. As another judge in this District has stated, "the evidence must preponderate heavily against the verdict, such that it would be a

---

[2]Mejia seeks to adopt and incorporate by reference the arguments made by his co-defendant Del Cid Morales in his motion for judgment of acquittal, or in the alternative, for a new trial. Because Mejia fails to cite any additional case law and fails to elaborate with any additional arguments, the Court will deny Mejia's motion for the reasons explained in the April 3, 2008 memorandum and order denying Del Cid Morales's motion.

miscarriage of justice to let the verdict stand." Howard, 245 F. Supp. 2d at 30 (quoting Edmonds, 765 F. Supp. at 1118). Here, Mejia advances three reasons to set aside the jury's verdict and grant a new trial. First, he argues that the prosecutor made "several statements during his rebuttal argument that were unsupported by the evidence or misstated admitted evidence." Def.'s Mot. at 4. Second, he argues that Cortez, the confidential informant, committed perjury when he testified and that the government failed to correct the misrepresentation. And third, Mejia argues that the government's expert witnesses were not sufficiently qualified to render expert testimony. The Court finds none of these arguments to be persuasive.

### A. The Government's Rebuttal Argument

"A misstatement of evidence is error when it amounts to a statement of fact to the jury not supported by proper evidence introduced during trial, regardless of whether counsel's remarks were deliberate or made in good faith." United States v. Watson, 171 F.3d 695, 700 (D.C. Cir. 1999). "[A] prosecutor's statements in closing argument will rarely warrant a new trial," however, unless the defendant has suffered substantial prejudice as a result of the comments. Id. at 699 (citing United States v. Young, 470 U.S. 1, 10-11 (1985), and United States v. Edelin, 996 F.2d 1238, 1243 (D.C. Cir. 1993)). "To judge the prejudicial effect of a closing argument error [the courts] look to the severity of the alleged misconduct, the centrality of the issue affected by the error, the steps taken to mitigate the error, and the closeness of the case." United States v. Rawlings, 522 F.3d 403, 411 (D.C. Cir. 2008) (quoting United States. v. Wilson, 240 F.3d 39, 45 (D.C. Cir. 2001), and citing United States v. Gartmon, 146 F.3d 1015, 1026 (D.C. Cir. 1998)).

In his rebuttal argument, the prosecutor stated that Mejia lived in Guatemala City, a four to six hour drive from San Salvador, El Salvador, where the defendants met several times with the informant in planning the conspiracy. Mar. 5, 2008 PM Tr. at 7-8. Mejia argues that there

was no evidence to support this statement. Upon a review of the testimony of Francisco Pivaral de Leon, however, there is some evidence to support the prosecutor's rebuttal remark. Francisco Pivaral de Leon, former commissioner of the National Civil Police of Guatemala, testified that he went to Mejia's home, which was located in zone 8 in Guatemala City. Mar. 5, 2008 AM Tr. at 36. When the prosecutor asked a follow up question as to whether Mejia had always lived in Guatemala City, the witness responded that Mejia "no longer lives there now." Id. Hence, there was evidence that Mejia lived in Guatemala City at some point in time, although there was ambiguity as to when Mejia stopped living at that location. Additionally, Leonardo Garcia, a former United States Customs officer, testified that it would take four-and-a-half to five hours to drive from Guatemala City to San Salvador using the main road and that travelers would have to present their documentation and vehicle registration when they crossed the border. Feb. 29, 2008 PM Tr. at 14-15.

Relying on the combination of this testimony, the prosecutor suggested that Mejia left his home in Guatemala City and drove four to six hours across an international border to meet with the defendants about the conspiracy to import cocaine. Mar. 5, 2008 PM Tr. at 12. Although the testimony supporting this statement was somewhat ambiguous, the prosecutor could reasonably infer from the evidence that Mejia lived in Guatemala City during the time of the conspiracy. To the extent that the prosecutor misstated or mischaracterized the evidence, moreover, the error was minor, and the distance Mejia traveled to attend the meetings in San Salvador was not a central issue in the case. And when defense counsel objected that the record did not establish that Mejia lived in Guatemala City at the relevant time, the Court noted the objection and instructed the jury to "rely on its memory of the facts." Id. Thus, any potential error in the prosecutor's argument was mitigated by the instruction to the jury.

In his rebuttal, the prosecutor also indicated that Mejia had a list of DEA agents in his wallet "because Guatemalan police are essentially powerless to deal with the overwhelming number of Colombian drug-traffickers that are sending cocaine into Guatemala, and because they're just recovering from -- not just, but several years ago, they're coming out of a bloody civil war." Id. at 13. Mejia argues that there was no evidence to support the prosecutor's referral to the ineffectiveness of the Guatemalan police and the country's civil war. Although there certainly was not an abundance of testimony on this topic, Carrillo Garcia, employed with the counter-narcotics data and analysis administration of the National Civil Police in Guatemala, testified that Guatemalan police have difficulties with drug trafficking at the border of Mexico. Carrillo Garcia testified that people in certain regions at the border "are mostly indigenous, and due to civil war that we had in my country, they don't tend to share information with the police or national forces." Feb. 29, 2008 PM Tr. at 63. The prosecutor relied on this testimony to indicate that Mejia was more concerned about the DEA and its agents' greater ability to collect information. Once again, defense counsel objected to the prosecutor's statement, arguing that there was no supporting evidence in the record. In response, the Court noted that there was minimal evidence to support the prosecutor's basic statements but instructed the prosecutor to move on. Mar. 5, 2008 PM Tr. at 13. Because the prosecutor's statement was supported by some evidence and because the Court curtailed the prosecutor's statement before he could go any further, the Court cannot find that Mejia was prejudiced by this element of the government's rebuttal argument.

At the close of the prosecutor's rebuttal, defense counsel made one last objection, arguing that the government had improperly indicated Mejia was the only law enforcement officer involved in the conspiracy. Specifically, the prosecutor had been addressing the topic of why the

co-conspirators needed Mejia as a member of the conspiracy. To answer this question, he stated as follows: "Well, the reason they need Mr. Mejia is because he brings to it something that they apparently don't have, and that is law enforcement experience. 15 years, not only as a cop on the beat apparently, but as a supervisor, as someone with a sufficiently sophisticated position that he was planning major operations, and that's why they needed Mr. Mejia. That's why they recruited him into this conspiracy." Id. at 15.

The evidence adduced at trial supported the prosecutor's summary of Mejia's credentials. The government introduced into evidence Mejia's law enforcement identification card, which was found in Mejia's wallet, and Pivaral de Leon testified that he worked with Mejia at a police station in Guatemala. Mar. 5, 2008 AM Tr. at 15. Specifically, Pivaral de Leon testified that Mejia was the chief of the operational section of the station, id., and that Mejia was "in charge of carrying out operational plans against common crime, organized crime, all types of crime," id. at 32. The prosecutor clarified that it was the bulk of Mejia's experiences that made him uniquely situated to perform a security role in the conspiracy. Although defense counsel objected to the insinuation that Mejia was the only law enforcement officer involved, the Court noted during trial that "[w]hether Mr. Del Cid Morales also supplied some law enforcement experience is not clear on the record. It is clear that everyone thought he did, and . . . both of them were brought in for security and based on prior relevant law enforcement or related experience, and I think the jury will be able to sort that out with respect to uniquely. Indeed, to some extent, based on the evidence before me, the jury may be able to conclude that Del Cid Morales was also supplying that experience, but that's an inference the jury can make." Mar. 5, 2008 PM Tr. at 22. Because the government did not know the details of Del Cid Morales's police career, it was reasonable for the prosecutor to argue that Mejia could provide a unique service to the group based upon the

totality of his law enforcement experiences, including planning law enforcement operations.

In sum, the Court cannot conclude that Mejia was substantially prejudiced by the prosecutor's comments, individually or in total. At all times the prosecutor's comments were supported by some evidence in the record, such that there was no severe misconduct by the government. Additionally, none of the comments disputed by Mejia involved central issues in this matter, and the jury was instructed to rely on its memory of the evidence. Based upon the government's presentation of numerous audio and video recordings, the case was not close enough that the prosecutor's comments could have engendered any prejudice to Mejia.

**B.     Cortez's Testimony**

Mejia next argues that the confidential informant, Augustine Cortez, committed perjury on the stand when defense counsel attempted to impeach him and that the government knowingly failed to correct Cortez's misrepresentation. As a result, Mejia contends that a new trial is warranted. See Napue v. Illinois, 360 U.S. 264, 269 (1959) (stating that the government "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction"); see also United States v. Agurs, 427 U.S. 97, 111 (1976) (explaining that a conviction must be set aside and a new trial granted "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury").

Defense counsel's line of questioning at trial revolved around a sentencing memorandum issued by a judge in the United States District Court for the Middle District of Florida, in which the judge stated that based upon Cortez's testimony before her, she did not find Cortez to be an entirely truthful witness. When Cortez was asked during the trial of one of Mejia's co-defendants whether he was aware that the Florida judge had made a finding on his credibility, Cortez responded in the negative. Subsequent to the trial of Mejia's co-defendant, the government spoke

with Cortez and asked him if he had any personal knowledge of the judge's finding "or if he had ever heard that the judge had made such a finding, and he said no." Feb. 28, 2008 PM Tr. at 123. According to the government's representation, then, Cortez was never informed of the contents of the judge's sentencing memorandum. Cortez was not present at the sentencing hearing where this topic was discussed, and the government maintains that he "had no personal knowledge that a judge had made an adverse finding as to his credibility." Gov't Opp. at 18.

Thus, when defense counsel asked Cortez about this same topic during Mejia's trial, she was unable to impeach him with the judge's finding. Cortez testified that he had "never read or heard any judge, federal judge for that matter, ever saying that I haven't been truthful in any of the cases I have testified on behalf of the U.S. Government." Feb. 29, 2008 AM Tr. at 63. Cortez further stated that he did not know that the Florida judge had found him to be not entirely truthful. Id. Although Cortez's answers may appear to be disingenuous at first glance based upon the questioning he was subjected to during the earlier trial of Mejia's co-defendant, the information before the Court indicates that Cortez answered defense counsel's questions in a truthful manner since he was never shown the sentencing memorandum and was never informed of its contents. Because Mejia has not demonstrated that Cortez testified untruthfully, Mejia has similarly not established that the government disregarded its obligation to correct any perjury committed by its witnesses. Hence, Mejia is not entitled to a new trial based upon Cortez's testimony.

### C. The Government's Expert Witnesses

Mejia's final argument for a new trial revolves around the government's expert witnesses. Without providing any explanation, Mejia asserts that the government's expert witnesses were not qualified to render expert testimony and that they spoke on "matters that were not the proper

subject of testimony." Def.'s Mot. at 14. Mejia has provided, however, no support for this argument.

During the trial, the government presented two witnesses as experts -- DEA Special Agent Mike Johnson and Guatemalan law enforcement officer Fernando Antonio Carrillo Garcia. Each expert was sufficiently qualified "by knowledge, skill, experience, training, or education" to use his specialized knowledge to assist the trier of fact in understanding the evidence. Fed. R. Evid. 702. At the time of the trial, DEA Special Agent Johnson had worked for the DEA for 17 years, with a six-year period in Guatemala from 2001 to 2007. Based on his experience, knowledge, and training, Johnson was qualified as an expert in the "field of manufacturing of cocaine, and the trafficking and transportation of cocaine from South America through Central America and on to the United States, including the routes that cocaine would take to the United States, the role of Guatemala in facilitating that trafficking and transportation, and the prices for cocaine in Colombia, Guatemala, and the United States." Feb. 29, 2008 AM Tr. at 81-82. At the time of the trial, law enforcement officer Carrillo Garcia had worked for SAIA, the counter-narcotics data and analysis administration of the National Civil Police in Guatemala, for twenty-four years, with fourteen or fifteen years focused on the area of narcotics investigations. Feb. 29, 2008 PM Tr. at 26, 28-29. Based on his knowledge, experience, and training, Carrillo Garcia was qualified as an "expert in the field of drug-trafficking and transportation activities as they relate to Guatemala, including drug transportation groups, trafficking routes, methods of transportation, prices of cocaine in Guatemala, and the consumption of cocaine by Guatemalans in Guatemala." Jury Instructions at 22; Feb. 29, 2008 PM Tr. at 45-46.

As the D.C. Circuit has noted, "there is a well-established practice of law enforcement officers testifying, on the basis of their experience, as experts in the modus operandi of drug

trafficking organizations." United States v. Mejia, 448 F.3d 436, 448 (D.C. Cir. 2006) (citing United States v. Doe, 903 F.2d 16, 19 & 19 n.21 (D.C. Cir. 1990) (citing cases)). In Mejia, the court found no reversible error when a former DEA agent testified regarding the modus operandi of drug trafficking organizations in Central and South America and when an inspector testified about code words and phrases used with respect to the drug trade. Id. at 448-49. Similarly, in United States v. Martinez, 476 F.3d 961, 967 (D.C. Cir. 2007), the court found no abuse of discretion with the expert testimony of a former DEA agent who testified about general drug trafficking routes and the United States as the destination for Colombian cocaine transported through Central America.

Based upon the experience and knowledge of Johnson and Carrillo Garcia and based upon the above cited precedent from this Circuit, the Court concludes that the government's witnesses were properly qualified and testified as experts.

## CONCLUSION

Accordingly, upon consideration of Mejia's motion for judgment of acquittal or, in the alternative, for a new trial, the opposition thereto, and the entire record herein, and for the foregoing reasons, it is hereby **ORDERED** that the motion is **DENIED**.

                                        /s/
                              JOHN D. BATES
                          United States District Judge

Dated:   June 20, 2008